BERNSTEIN LITOWITZ BERGER
    & GROSSMANN LLP
BLAIR A. NICHOLAS
(Bar No. 178428)
blairn@blbglaw.com
12481 High Bluff Drive, Suite 300
San Diego, California 92130
Tel: (858) 793-0070
Fax: (858) 793-0323

KESSLER TOPAZ MELTZER
    & CHECK, LLP
ELI GREENSTEIN
(Bar No. 217945)
egreenstein@ktmc.com
One Sansome Street, Suite 1850
San Francisco, CA 94104
Tel:   (415) 400-3000
Fax:   (415) 400-3001

*Counsel for Lead Plaintiff State
Teachers Retirement System of Ohio
and the Iowa Public Employees
Retirement System and Co-Lead
Counsel for the Class*

[additional counsel on signature page]

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DISTRICT

| | |
|---|---|
| IN RE ALLERGAN, INC. PROXY VIOLATION SECURITIES LITIGATION<br><br>                    Defendants. | Case No. 8:14-cv-2004-DOC (ANx)<br><br>CLASS ACTION<br><br>AMENDED COMPLAINT<br><br><u>JURY TRIAL DEMANDED</u><br><br>Judge:  Hon. David O. Carter |

# TABLE OF CONTENTS

Page

I.   INTRODUCTION ................................................................2

II.  PARTIES AND RELEVANT NON PARTIES ............................7

    A.   Plaintiffs .................................................................7

    B.   Allergan ..................................................................8

    C.   Valeant Defendants .................................................9

    D.   Pershing Defendants................................................11

III. JURISDICTION AND VENUE ..........................................13

IV.  BACKGROUND FACTS ...................................................14

    A.   Valeant Takes Substantial Steps Toward
        The Tender Offer.......................................................14

        1.   Valeant Enlists Pershing to "Front-
            Run" Its Hostile Takeover Efforts ...................14

        2.   Valeant Entices Ackman to Support
            Its Takeover Strategy In Exchange for
            Inside Tender Offer Information................16

        3.   Allergan Publicly Opposes a Valeant
            Deal and Pershing Forms A Funding
            Vehicle To Secretly Acquire Allergan
            Shares .......................................................19

        4.   Valeant Formulates Its Takeover
            Plans and Its Internal Documents
            Confirm that Valeant Contemplated a
            "Hostile" Tender Offer .................................22

    B.   Front-Running Valeant's Tender Offer,
        Ackman Secretly Acquires Billions Of
        Dollars In Allergan Stock..........................................27

    C.   Pershing Discloses Its 9.7% Stake In
        Allergan And Defendants Launch Their
        Hostile Takeover .......................................................32

    D.   Valeant Alone Was the Bidder, While
        Pershing Was Only a Seller And "Other
        Person" Under Rule 14e-3.........................................37

    E.   As Always Anticipated, Valeant Launches
        Its Tender Offer.........................................................42

F.    The S-4 And Schedule TO Confirm That Pershing Was Not An "Offering Person" In The Tender Offer ...........................................45

G.    Defendants Profit from The Illegal Warehousing Scheme When Actavis Acquires Allergan for $7 Billion More Than Valeant Offered .........................................................48

H.    Allergan Sues Defendants and the Court Finds that Defendants' Misconduct Raises "Serious Questions" and Likely Violates the Federal Securities Laws .................................................50

V.    APPLICABILITY OF THE *AFFILIATED UTE* PRESUMPTION OF RELIANCE ...................................51

VI.    CONTEMPORANEOUS TRADING .........................................51

VII.    CLASS ACTION ALLEGATIONS .............................................52

VIII.    CLAIMS FOR RELIEF ................................................................54

FIRST CLAIM FOR RELIEF

For Violations of Section 14(e) Of The Exchange Act And Rule 14e-3 Thereunder Against All Defendants .................................................54

SECOND CLAIM FOR RELIEF

For Violations of Section 20A Of The Exchange Act Against All Defendants ...........................................................................................56

THIRD CLAIM FOR RELIEF

For Violations of Section 20(a) Of The Exchange Act Against Pershing Square, PS Management, Ackman And Pearson ...........................57

PRAYER FOR RELIEF ......................................................................................59

JURY DEMAND ...................................................................................................60

AMENDED COMPLAINT
Case No. 8:14-cv-01214-DOC(ANx)

Lead Plaintiffs the State Teachers Retirement System of Ohio ("Ohio STRS") and the Iowa Public Employees Retirement System ("Iowa PERS"), and plaintiff Patrick T. Johnson (collectively, "Plaintiffs"), through their undersigned counsel, bring this securities class action for violations of Section 14(e) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78n(e), and Rule 14e-3, codified at 17 CFR § 240.14e-3, Section 20A of the Exchange Act, codified at 15 U.S.C. § 78t-1, and Section 20(a), codified at 15 U.S.C. § 78(t)(a), on behalf of investors who sold Allergan, Inc. ("Allergan or the "Company") common stock during the Class Period (defined below) (the "Action"). Plaintiffs bring the Action against Defendants Pershing Square Capital Management, L.P. ("Pershing Square"), PS Management GP, LLC ("PS Management"), William Ackman ("Ackman") and PS Fund 1, LLC ("PS Fund 1") (collectively, "Pershing"), as well as against Michael Pearson ("Pearson"), Valeant Pharmaceuticals International, Inc. ("Valeant"), and Valeant Pharmaceuticals International ("Valeant USA") (collectively, "Valeant" and, together with Pershing, "Defendants").

Plaintiffs allege the following based upon personal knowledge as to themselves and their own acts and upon information and belief as to all other matters. Plaintiffs' information and belief is based on, *inter alia*, the independent investigation of Lead Counsel which included the analysis of: (i) regulatory filings made by Allergan, Valeant and Pershing with the United States Securities and Exchange Commission ("SEC"); (ii) research reports by securities and financial analysts; (iii) transcripts of Allergan's, Valeant's and Pershing Square's earnings and other investor conference calls; (iv) publicly available presentations, press releases, interviews and media reports by Valeant, Allergan, and Pershing Square; (v) economic analyses of the movement and pricing of Allergan publicly traded common stock and options; (vi) consultations with relevant consultants and experts; (vii) publicly available pleadings, evidence and deposition testimony in

AMENDED COMPLAINT
Case No. 8:14-cv-01214-DOC(ANx)

*Allergan, Inc. v. Valeant Pharmaceuticals International, Inc.*, No. 14-cv-1214-DOC (C.D. Cal.); and (vi) other publicly available material and data identified herein.  Lead Counsel's investigation into the factual allegations contained herein is continuing, and many of the relevant facts are known only by Defendants or are exclusively within their custody or control.  Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for further investigation or discovery.

## I.    <u>INTRODUCTION</u>

1.    This case involves an illegal insider trading and front-running scheme that deprived a class of Allergan shareholders of billions of dollars of value in violation of the federal securities laws.  The scheme began in February 2014 when William Ackman, hedge fund billionaire and fearsome "activist" investor, and Michael Pearson, the CEO of cash-strapped but acquisition hungry Valeant, struck a simple but unlawful bargain.  In exchange for inside information regarding Valeant's plans to launch a hostile takeover and tender offer for fellow pharmaceutical company Allergan, Ackman agreed to secretly acquire nearly 10% of Allergan's stock and commit those shares to support Valeant's bid.

2.    This illegal bargain was highly beneficial to both Pershing and Valeant.  Pershing obtained a virtually risk-free trading opportunity to "front run" Valeant's bid and accumulate a multi-billion dollar stake in Allergan before the bid and tender offer became public.  Although Pershing had never before invested in a pharmaceutical company, Ackman was more than willing to spend nearly $4 billion of Pershing's capital to "invest" in Allergan – the largest position in the firm's history – when he had inside information that the rest of the market did not.  Ackman knew that once Valeant publicly disclosed its offer to buy Allergan at a substantial premium, Allergan's stock price would immediately increase and deliver Pershing billions of dollars in short-term profits.

3.    In return, Valeant secured crucial voting support from Pershing's large block of Allergan shares – something Valeant knew it needed to effect its hostile

AMENDED COMPLAINT
Case No. 8:14-cv-01214-DOC(ANx)

takeover and overcome Allergan's defensive measures.  Moreover, given Valeant's debt burden (amassed through its aggressive growth-by-acquisition strategy), Pearson knew that Valeant could not afford the large "toehold" stake necessary to successfully execute a hostile takeover of a $37 billion company like Allergan.  By trading inside information for votes, however, Valeant obtained the support of a near 10% voting block without providing any significant up-front capital of its own.

4.     Defendants' plan not only made Valeant's hostile bid more likely to succeed, but also enabled Valeant to profit even if the bid failed.  Specifically, Pearson convinced Ackman to agree that if Valeant's takeover bid was trumped and defeated by a competing bid, Pershing would kick back 15% of its insider trading profits to Valeant.

5.     Defendants formalized their plan in a contract on February 25, 2014, the first day of the Class Period.  As the ink was drying, Pershing, armed with its inside information concerning Valeant's bid, began buying up Allergan shares from unwitting investors.  By purchasing stock using derivatives and other stealth trading techniques, Pershing was able to circumvent antitrust and federal securities disclosure rules that would have alerted investors to Defendants' scheme.  This strategy also allowed Pershing to conceal its front-running of Valeant's bid long enough to accumulate nearly 10% of Allergan's shares from unsuspecting Allergan shareholders – the members of the Class.

6.     Between February 25 and April 8, 2014, Pershing, through a funding vehicle named "PS Fund 1," bought over 14 million Allergan shares at prices as low as $117.91 for a total cost of approximately $2 billion.  These purchases gave Pershing a 4.9% stake in Allergan – just short of the 5% threshold that would require Pershing to disclose its position in an SEC filing under Section 13(d) within 10 days of crossing that threshold.  Pershing then used that 10-day window (from April 10 through 21) to amass another 13.9 million shares.  By April 21, Pershing held over 28 million Allergan shares, or 9.7% of the company, with an aggregate value of approximately ***$3.2 billion*** – all prior to any disclosure to the

marketplace of the material nonpublic information regarding Valeant's anticipated hostile bid.

7.     After the close of trading on April 21, 2014, Valeant disclosed its intention to acquire Allergan, along with Pershing's 9.7% position in the company. Upon this disclosure, Allergan's stock price increased by approximately $20 per share in one day, jumping 22% from its "unaffected" price and causing Pershing's shares to be worth nearly $1 billion more than it paid for them.

8.     As expected, Valeant's takeover bid put Allergan "in play" for other competing acquisition proposals.   Ultimately, another bidder, Actavis plc ("Actavis"), offered Allergan shareholders $219 per share – more than the $200 per share Valeant offered.   But Defendants' warehousing scheme was a rousing success.  After splitting up the proceeds and paying Valeant its approximately $400 million cut, Ackman walked away with over $2.2 billion in pure profit made off the backs of unwitting Class members who sold their shares during the Class Period.

9.     On November 4, 2014, this Court found, after limited discovery and argument, that Valeant's conduct and communication of material nonpublic information to Pershing concerning Allergan, and Pershing's subsequent trading while in possession of that inside information, raised "serious questions" about violations of Section 14(e) of the Exchange Act and Rule 14e-3 promulgated thereunder.  *Allergan, Inc. v. Valeant Pharmaceuticals International, Inc.*, No. 14-cv-1214, Dkt. No. 234 (the "PI Ruling").   The Court also held that Allergan shareholders who sold during the period of Pershing's insider trading "ha[d] a private right of action under Rule 14e-3" that "c[ould] be remedied through damages."

10.     The above finding from the Court hardly humbled Ackman, much less deterred him from gloating.  During a January 7, 2015 CNBC interview, Ackman was asked pointedly about the obvious unfairness of Pershing's massive profit while so many less privileged Allergan investors sold their shares to Pershing without knowing Valeant's plans.  Ackman's response was telling:   "*Allergan shareholders made a fortune . . . . **90% of people who <u>didn't sell</u> to us when we***

***were buying*** got the benefit of the [Actavis] transaction."[1]  Of course, the Allergan shareholders who ***did sell*** during the period of Ackman's insider trading – *i.e.*, the members of the Class – did not get any "benefit" whatsoever, and suffered substantial damages as a result of Defendants' scheme.

11.    Each of the elements of Plaintiffs' securities claims are satisfied here. ***First***, in violation of Rule 14e-3(d) and Section 20A(c), Valeant unlawfully communicated material nonpublic information relating to its tender offer to Pershing "under circumstances in which it is reasonably foreseeable" – indeed certain – that the communication would be used by Pershing to illegally trade on that inside information.  In fact, Pershing's warehousing of Allergan stock was central to Valeant's hostile takeover strategy.

12.    ***Second***, consistent with the PI Ruling and as further alleged herein, Pershing's trades, which it indisputably knew were based on material nonpublic information acquired from the "offering person" (Valeant), occurred *after* Valeant had taken numerous "substantial steps" towards the tender offer—and therefore violated Section 14(e) and Rule 14e-3(a) of the Williams Act.  Beginning in early 2014, Valeant took numerous substantial steps toward a hostile tender offer, including, *inter alia*:

- hiring three separate law firms to advise it concerning the transaction, including pursuing a hostile tender offer;

- holding no less than ***six formal meetings*** with its Board of Directors and related committees to discuss the transaction, at which internal presentations expressly described the transaction as "hostile";

- seeking out bankers to "line up financing" for and to provide presentations regarding the transaction (including the inevitable hostile bid);

- entering into a formal confidentiality agreement with Pershing concerning the transaction;

---

[1] All emphasis has been added and citations omitted unless otherwise noted.

AMENDED COMPLAINT
Case No. 8:14-cv-01214-DOC(ANx)

- negotiating a separate agreement with Pershing that specifically identified the transaction as potentially proceeding as a "***tender offer***" and the procedures Valeant would follow if and when a tender offer occurred;

- conducting due diligence regarding Allergan;

- pledging $75.9 million of Valeant's own capital to fund the deal (an amount, not coincidentally, just shy of triggering anti-trust disclosure requirements); and

- securing Pershing's agreement to use Valeant's insider information, acquire a friendly toehold stake in the target company and subsequently vote that stake in favor of a Valeant deal.

13.     Valeant's "formal" announcement of its tender offer in June 2014 merely revealed what had been a foregone conclusion since at least February 2014. As Pearson explained when announcing the tender offer:  "On April 22, we announced our offer for Allergan. ***We suspected at the time it would ultimately have to go directly to Allergan shareholders. We were correct***."

14.     Defendants knew their *quid pro quo* violated the securities laws, but sought to immunize their misconduct by inserting the term "co-bidder" into certain documents in a superficial and transparent effort to convince regulators that Pershing was like Valeant – an "offering person" permitted to trade under Rule 14e-3.

15.     Calling a pigeon a duck, however, will not make it quack.  Pershing – which had never invested in a pharmaceutical company in its history – never intended to buy or take control of Allergan or its assets; the plan all along was for Pershing to acquire its stake on inside information and then sell it, either to Valeant or another buyer.  Valeant was the sole "offering person" in the tender offer.

16.     Indeed, Pershing did not directly or indirectly offer ***anything*** to any Allergan stockholders in the tender offer.  The "Purchaser" of Allergan stock was a Valeant affiliate, AGMS Inc., in which Pershing held ***zero*** interest.  The Form S-4 filed in connection with the tender offer unambiguously stated that Valeant was the

AMENDED COMPLAINT
Case No. 8:14-cv-01214-DOC(ANx)

"offering person" in the transaction, and Pershing was not: "***none of Pershing Square, PS Fund 1 or any of Pershing Square's affiliates is offering to acquire any shares of Allergan common stock in the [tender o]ffer***."

17.     The question and answer portion of the S-4 was even more unequivocal: "Q:  Who is Offering to Acquire My Shares of Allergan Common Stock? A:  ***The offer is being made by Valeant*** through Purchaser, a wholly owned subsidiary of Valeant."  Indeed, Ackman himself admitted that Pershing was not an "offering person," clarifying on the April 22, 2014 investor call announcing Valeant's bid that "***I am not the one making the offer***."

18.     In short, because the crux of their plan required that Pershing's 9.7% toehold in Allergan would eventually be bought out by Valeant in any tender offer, Ackman was, by definition, never anything but a ***seller*** to Valeant, and could not possibly be a "bidder" for its own Allergan shares.

19.     Defendants' deceptive conduct is not permitted by the federal securities laws and fundamentally violates both the letter and spirit of the Williams Act.  Defendants' scheme, if allowed here, would undoubtedly be used by other takeover specialists, undermine the fairness and transparency of the securities markets and revive the unseemly "warehousing" and "front-running" practices that Rule 14e-3 was specifically designed to prohibit.

20.     Through this action, Lead Plaintiffs seek an award of damages and an order requiring Defendants to return their unjust profits to the innocent Allergan stockholders harmed by their misconduct—a result that would effectuate the core purposes of the those laws while ensuring the integrity of securities markets and providing investors with the crucial protections that Congress intended.

## II.   PARTIES AND RELEVANT NON PARTIES

### A.   Plaintiffs

21.     Lead Plaintiff Ohio STRS is a public pension fund organized under Ohio law for the benefit of current and retired educators in the State of Ohio.  As of June 30, 2014, Ohio STRS managed more than $76.5 billion in assets and served more than 482,000 active, inactive, and retired Ohio public educators.  As reflected

on its certification previously filed in this action (Dkt. No. 18-2), Ohio STRS sold shares of Allergan common stock on the New York Stock Exchange (the "NYSE") during the Class Period and suffered damages as a result of the conduct complained of herein.

22.    Lead Plaintiff Iowa PERS is a public pension fund organized under Iowa law for the benefit of retired public employees in the State of Iowa.  As of June 30, 2014, Iowa PERS managed more than $28 billion in assets and served more than 250,000 active, inactive, and retired Iowa public employees.  As reflected on its certification previously filed in this action (Dkt. No. 18-2), Iowa PERS sold shares of Allergan common stock on the NYSE during the Class Period and suffered damages as a result of the conduct complained of herein.

23.    Additional named plaintiff Patrick T. Johnson is and was at all relevant times an employee of Allergan and resides in Del Mar, California.  As reflected in his certification filed herewith, Mr. Johnson sold Allergan common stock on the NYSE during the Class Period and suffered damages as a result of the conduct complained of herein.

**B.    Allergan**

24.    Nonparty Allergan is a multi-specialty healthcare company established more than 60 years ago.  At all relevant times, and until its acquisition by Actavis in March 2015, Allergan's common stock traded on the NYSE under the ticker symbol "AGN."   Based in Irvine, California and incorporated in Delaware, Allergan had a global presence, with approximately 11,500 employees in 38 countries.   During the Class Period, Allergan had a market capitalization of approximately $39 billion.

25.    Historically, Allergan positioned itself as strongly science-focused and touted its industry-leading research and development ("R&D") operation as a key asset.  In 2013, Allergan spent over $1 billion on research and development – or approximately 16.8% of product net sales – among the highest percentage among comparable pharmaceutical companies.  Allergan credited its R&D efforts for its growth and robust product pipeline.

### C.   <u>Valeant Defendants</u>

26.   Defendant Valeant is a publicly traded company that manufactures and markets pharmaceuticals, over-the-counter products, and medical devices in the eye care, dermatology, and neurology therapeutic classes.   Valeant is based in Laval, Quebec and trades on the NYSE under the stock ticker symbol "VRX."

27.   Defendant Valeant USA is a wholly owned subsidiary of Valeant. Valeant USA is based in New Jersey and incorporated in Delaware.   Valeant USA became a member of PS Fund 1 on April 3, 2014.

28.   Non-party AGMS Inc. ("AGMS") was a Delaware corporation and wholly owned subsidiary of Valeant International.   AGMS was formed solely to acquire Allergan stock in the tender offer in exchange for Valeant International shares and Valeant International cash.

29.   Unless otherwise specified, Valeant, Valeant USA, and AGMS are referred to collectively as "Valeant."

30.   Defendant Pearson was, at all relevant times, the Chairman and CEO of Valeant and President of Valeant USA and, in those capacities and as further alleged herein, was responsible for the day-to-day management and controlled and directed the business and activities of Valeant and Valeant USA.

31.   Valeant has a markedly different business model than Allergan. Valeant eschews R&D investment and instead has achieved extraordinary growth through an aggressive program of acquisitions followed by cost-cutting.   Valeant's philosophy – derived directly from Pearson, an alumnus of consulting firm McKinsey & Company – turns on the idea that "Big Pharma" R&D is nonproductive.   Rather than spend a material percentage of revenue trying to develop new products, Valeant looks for pharmaceutical "start-ups" with established product pipelines, buys them at low prices using highly-leveraged financing structures, implements aggressive cost-cutting measures (which typically includes massive layoffs of legacy employees and slashing of R&D), and tries to leverage those products into profitable brands.   In 2013, Valeant spent just 3% of revenue on R&D.

AMENDED COMPLAINT
Case No. 8:14-cv-01214-DOC(ANx)

32.   From 2010 to 2014, Valeant employed this growth-by-acquisition strategy to increase its market capitalization from $3 billion to over $44 billion by 2014.   In just the past several years, Valeant acquired cold-and-flu remedy manufacturer Afexa Life Sciences, Inc. (December 2011), medical cosmetics company Medicis Pharmaceutical Corp. (December 2012), skin-care and aesthetics products manufacturer Obagi Medical Products, Inc. (April 2013), eye care company Bausch & Lomb Holdings, Inc. (August 2013), and dermatological device maker Solta Holdings Inc. (January 2014), as well as many smaller acquisitions.   Valeant earned a reputation as a "serial acquirer," completing over 100 transactions since 2008.

33.   Valeant's business model of buying up and expanding through acquisitions of more-established companies has also made senior management incredibly rich.   Valeant's acquisitions over the last several years have already made Pearson a billionaire, as his compensation is directly tied to Valeant's growth through acquisitions.   Shortly before the beginning of the Class Period, Valeant announced that it would seek to become one of the five largest pharmaceutical companies in the world by the end of 2016 – an outcome that Pearson told investors during a January 7, 2014 conference call would have "a significant impact" on his annual compensation.   In fact, as set forth in Valeant's 2015 proxy statement, approximately 20% of Pearson's 2014 annual cash bonus award was based solely on his ability to do "at least one significant deal that creates substantial shareholder value" during the year.

34.   While Valeant's growth-by-acquisition strategy has made its CEO and top executives incredibly wealthy, it has its detractors.   Some observers question the debt load the company takes on to fund its acquisitions.   Indeed, while Valeant has set ambitious acquisition and growth targets for itself for years, by early 2014 when it started its assault on Allergan, financing to fund its acquisitions was becoming scarce.

35.   Although Valeant's tender offer and attempted hostile takeover of Allergan was ultimately unsuccessful, it still reaped hundreds of millions of dollars

AMENDED COMPLAINT
Case No. 8:14-cv-01214-DOC(ANx)

in virtually risk-free profits through Defendants' insider-trading scheme.   This represented just under half of Valeant's total profits for all of 2014, and alone was ***more than the company's profits for the prior four years combined***.   In fact, "the effort generated $287 million in net profit" for the company (after deducting $110 million in expenses) and, accordingly, Valeant's Board "gave full credit for this strategic objective" in awarding Pearson $8 million in non-equity incentive compensation for 2014.

### D.   **Pershing Defendants**

36.   Defendant Pershing Square is an investment adviser founded in 2003 and registered with the SEC under the Investment Advisers Act of 1940.   Pershing Square is a Delaware limited partnership with its principal place of business in New York.   Pershing Square manages a group of affiliated hedge funds.   Through its various hedge funds (including those that formed PS Fund 1), Pershing Square currently manages over $17 billion in capital.   Pershing Square is and was at all relevant times the non-member manager of PS Fund 1 and directed the business and affairs of PS Fund 1, including the manner and timing of PS Fund 1's purchases of Allergan securities.

37.   Defendant PS Management is the sole general partner of Pershing Square.   PS Management is a Delaware limited liability company with its principal place of business in New York.

38.   Defendant PS Fund 1 is a Delaware limited liability company with its principal place of business in New York.   PS Fund 1 was formed on February 11, 2014 pursuant to the Limited Liability Company Agreement of PS Fund 1, LLC (the "February 11, 2014 Agreement") for the singular purpose of buying Allergan securities in advance of the contemplated hostile bid for Allergan by and among several Pershing Square-affiliated hedge funds and management entities:   Pershing Square; Pershing Square, L.P., a Delaware limited partnership; Pershing Square II, L.P., a Delaware limited partnership; Pershing Square International, Ltd., a Cayman Islands exempted company; Pershing Square Holdings, Ltd., a Guernsey limited liability company.   Ackman executed the February 11, 2014 Agreement as

the "Managing Member" of the various Pershing entities that were parties to the February 11, 2014 Agreement. Two months later, on April 3, 2014, Valeant USA joined PS Fund 1. Although Valeant USA joined as a "member" of PS Fund 1, it contributed just 2% of the capital PS Fund 1 used to acquire Allergan stock. Pershing Square, as the manager of PS Fund 1, controlled PS Fund 1 at all relevant times.

39.     Unless otherwise specified, Pershing Square, PS Management, and PS Fund 1 are referred to collectively as "Pershing."

40.     Defendant William A. Ackman is the billionaire founder and CEO of Pershing. Ackman resides in New York. At all relevant times, Ackman controlled Pershing and its affiliated entities, including PS Fund 1 and the Pershing entities that were members of PS Fund 1.

41.     Ackman has spent years developing his reputation as a feared "activist" investor. At its most basic, Ackman's strategy involves identifying investment opportunities and aggressively buying up shares, followed by some sort of "active" (and frequently adversarial) strategy using a variety of hostile tactics, such as aggressive "negotiations" with a company's management or contentious proxy contests, to force the company to adopt certain changes Ackman believes will be beneficial. For example, in 2005, Pershing acquired a substantial percentage of Wendy's International's stock and then pressured management to divest certain assets – including selling or closing about 450 Wendy's restaurants and divesting the company's Tim Hortons Canadian doughnut-store business – which drove up the stock price. By 2006, Pershing was able to sell its entire stake in Wendy's International for nearly double what it invested. As described by one investment firm manager, Ackman's "game is to drive up the stock and get out – fast."

42.     While Pershing's investment tactics have made Ackman a billionaire, Ackman suffered a series of bad investments immediately prior to the Class Period that caused many to question his investment acumen. For example, in 2014, Pershing suffered significant losses in a high-profile "short selling" bet that health

supplement distributor Herbalife was in fact a "pyramid scheme" whose stock value would soon plummet. Despite Ackman's highly vocal accusations and media campaign, Herbalife stock increased substantially, resulting in hundreds of millions in losses for Pershing that year. In 2013, Pershing lost nearly $500 million on a wager that it could pressure retailer J.C. Penney Co. to re-vamp its merchandise strategy.

43. Before Allergan, Pershing had never before invested in a pharmaceutical company. As Ackman explained to investors during an April 24, 2014 presentation, Pershing had not historically invested in pharmaceutical companies and in fact had never even "looked at a pharmaceutical company before" because they do not generally have the kind of predictability or "standard of durability of…cash flows" like Pershing's "typical" investments in companies such as Burger King, Procter & Gamble, and Kraft—companies that have brands or other unique assets that "protect the business from new entrants" and are purportedly "shareholder friendly" in the way they allocate capital. Instead, Ackman explained, pharmaceutical companies often invest "huge amounts in speculative R&D," suffer from "price pressure from multiple different players and government," have "bloated overhead structures" and have a poor track record of "value-destroying acquisitions." Of course, these issues became irrelevant to Ackman's preferentially informed "investment" in Allergan.

44. Pershing's "investment" in Allergan was its single largest investment in firm history, and reflected Pershing's attempt to reverse its bad run. From a financial perspective, that has undoubtedly occurred. As alleged herein, Defendants' illegal insider trading scheme enabled Pershing to reap virtually risk-free profits of over $1 billion when Valeant first announced its bid for Allergan, which ultimately grew to more than $2.5 billion on Pershing's $3.2 billion investment.

## III. <u>JURISDICTION AND VENUE</u>

45. This Court has subject matter jurisdiction over this action pursuant to 15 U.S.C. §§ 78aa and 28 U.S.C. § 1331.

46.     This Court has personal jurisdiction over Defendants because each of them has sufficient minimum contacts in California to satisfy California's long-arm statute and constitutional due process requirements through Defendants' participation in a hostile takeover of Allergan, which is located in California, and unlawful trading in Allergan securities while in the possession of material, nonpublic information relating to a tender offer for Allergan.

47.     Venue is proper in the United States District Court for the Central District of California pursuant to 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b) and (c).

## IV.     BACKGROUND FACTS

### A.     Valeant Takes Substantial Steps Toward The Tender Offer

#### 1.     Valeant Enlists Pershing to "Front-Run" Its Hostile Takeover Efforts

48.     Long before the Class Period began, Pearson and other Valeant executives identified Allergan as an attractive target to fuel Valeant's highly-leveraged acquisition machine.  In September 2012, Pearson contacted Allergan's CEO, David Pyott, to discuss a potential business combination.  Shortly after telling Pearson that he would discuss Valeant's interest in a merger with Allergan's Board of Directors, Allergan summarily rejected any potential deal, and Pyott informed Pearson personally that the Allergan Board was not interested in a transaction with Valeant.

49.     Despite Allergan's firm rejection of Valeant's overtures, Valeant continued to analyze an Allergan takeover throughout 2013 and early 2014.  In fact, of the many companies that Valeant explored during this period, Pearson believed (as he later admitted) that Allergan was the "most attractive strategic transaction available to Valeant."

50.     Just weeks before Pershing's covert purchasing program began, Pearson told investors at a January 7, 2014 investor conference that two of Valeant's key "strategic initiatives" for 2014 were to "become one of the top five most valuable pharmaceutical companies as measured by market cap by the end of

AMENDED COMPLAINT
Case No. 8:14-cv-01214-DOC(ANx)

2016" and to complete a significant deal that creates "substantial shareholder value."  Pearson acknowledged that Valeant's ability to achieve these strategic initiatives had a "significant impact" on his annual compensation, and therefore Valeant had been "spending a lot of [its] time . . . exploring lots and lots of different deals."  Having put out the bait that Valeant would continue its acquisition binge, Pearson laid the groundwork for selling the incredibly valuable inside information he possessed – the identity of Valeant's target – to Ackman.

51.    Pearson also realized that an acquisition of any real size had become significantly more difficult following Valeant's $8.6 billion Bausch & Lomb acquisition in 2013 (the largest by the company at the time).  Valeant's debt load had increased significantly since then and obtaining financing to acquire a company as large as Allergan – which at the time had a $37 billion market capitalization – was particularly difficult.

52.    Thus, in early 2014, the first step in Valeant's revived Allergan plan was to figure out how to effect a hostile takeover, knowing that Allergan would oppose any deal with Valeant.  Because hostile acquirers must secure stockholder votes to either approve their offer *without* target board support or unseat the board and stack it with directors who will vote for approval, they often buy as many shares as possible to achieve a "toehold" in the target's stock before disclosing their intentions to the target's management and shareholders.

53.    But Valeant could not afford the "toehold" it knew it needed to effect a hostile bid.  As reflected in an internal February 18, 2014 email, Valeant's senior executives knew the company had "neither sufficient available cash nor borrowing capacity to acquire [a] meaningful toe-hold position" in Allergan in the first part of 2014.  Pearson admitted after the Class Period that Valeant "did not have $4 billion sitting at the bank" and confirmed that, given Valeant's debt load, a hostile takeover of Allergan would have been prohibitively expensive in early 2014.

54.    An alliance with Pershing, however, offered a convenient solution to Valeant's dilemma.  Unlike Valeant, Pershing had the financial capacity to acquire a significant stake in Allergan.  Pershing also had a well-known reputation for

waging aggressive proxy contests and challenging incumbent board of directors and management – characteristics that served Valeant's purposes perfectly.

> ### 2. Valeant Entices Ackman to Support Its Takeover Strategy In Exchange for Inside Tender Offer Information

55. Having identified an alliance with Pershing as a way to finance and better position its takeover of Allergan, Valeant took a series of substantial steps toward a tender offer.

56. Valeant and Pershing's discussions concerning Allergan began in earnest in January 2014, when Pershing's "special advisor," William F. Doyle ("Doyle") – who had been Ackman's classmate at Harvard Business School and Pearson's colleague at McKinsey and later Johnson & Johnson – discussed ways that Valeant and Pershing could work together at an industry conference.

57. Two weeks later, on January 31, 2014, Pearson met with Doyle again and the two arranged an introductory meeting between Ackman, Pearson, and Valeant Board member Mason Morfit ("Morfit") on February 4, 2014. Besides serving on Valeant's Board, Morfit was a partner at ValueAct Capital – a hedge fund with a $2.5 billion stake in Valeant and one of its largest shareholders.[2] ValueAct Capital, which is a self-described "activist investor" like Pershing, had likewise been pushing for a Valeant/Allergan combination. Pearson and Morfit were naturally very familiar with Pershing's market reputation and aggressive approach to making money for its investors, including handling unsolicited bids.

---

[2] In addition, Morfit has been elected to the boards of a number of other companies in which ValueAct has invested. For example, Morfit served on the board of directors of Advanced Medical Optics, Inc. ("AMO") from 2007 through 2009, concurrently with James V. Mazzo, who served as AMO's chairman from 2006 until AMO was acquired through a tender offer by Abbott Laboratories, Inc. in 2009. In 2012, Mazzo was charged by the SEC for violations of Section 14(e) and Rule 14e-3 for tipping material, nonpublic information concerning Abbott's plan to launch a tender offer for AMO prior to the announcement of the deal, and later indicted by the U.S. Department of Justice. *See Securities and Exchange Commission v. Mazzo*, Case No. 12-01237-DOC (C.D. Cal.).

58.    During the February 4, 2014 meeting, Pearson and Ackman discussed Valeant's business model and growth plans, and specifically reviewed several potential unsolicited acquisition targets, including Allergan.  According to Ackman, the two specifically discussed how "Pershing Square could be helpful in situations where management of a target corporation was not receptive to an acquisition proposal."   In other words, the whole purpose of Pearson's and Ackman's cooperation presumed the need to resort to hostile takeover tactics, which inevitably include the threat and/or implementation of a tender offer.

59.    It was also clear from the outset that Valeant – not Pershing – would be acquiring Allergan, and that Pershing would have no control over the offer and no role in the combined company if the deal closed.  In fact, Pearson flatly rejected the idea that Pershing or Ackman would have any say in managing the combined company if Valeant's bid was successful, later testifying that "*I don't want [Ackman] on our board and our board doesn't want him on our board*," and that Valeant was firmly opposed to anyone else from Pershing having any role whatsoever in the combined company.

60.    The fact that Pershing was to play no role in the combined company is not surprising given that neither Ackman nor Pershing had any prior experience investing in a pharmaceutical company, let alone running one.  Indeed, Ackman told investors during an April 22, 2014 conference that "*we [had] never looked in pharmaceuticals before*," explaining that "*I [had] not actually looked at a pharmaceutical Company of any consequence*" before meeting with Pearson at the beginning of the year.

61.    Instead, Ackman only became interested in pharmaceutical companies after Pearson offered him the opportunity to trade on inside information concerning one of the largest attempted tender offers in the history of the pharmaceutical industry.  Because the trades were based on inside information – and would be profitable no matter what – and because Pershing would play no role in the combined company if the deal closed, Ackman's lack of expertise or experience with pharmaceutical companies was irrelevant.

AMENDED COMPLAINT
Case No. 8:14-cv-01214-DOC(ANx)

62.     Two days later, on February 6, 2014, Ackman and Pearson had a second telephone call during which they further discussed Valeant's acquisition plans.  As a result of those discussions, Valeant and Pershing agreed to enter into a confidentiality agreement in which Valeant would disclose a specific acquisition target to Pershing, and Pershing could then decide whether it would support the contemplated transaction, *i.e.*, it would assess how serious Valeant was about following through with a bid.

63.     Also on February 6, Valeant engaged Sullivan & Cromwell LLP as counsel in connection with a potential Allergan transaction.  It soon after retained Skadden Arps Slate Meagher & Flom LLP and Osler Hoskins & Harcourt LLP to counsel it in connection with its takeover bid later that month.

64.     On February 7, the Finance and Transactions Committee of Valeant's Board held a conference call to discuss a potential combination with Valeant and Allergan.  The presentation used at that meeting, which summarized Valeant's "actions to date," noted that Sullivan & Cromwell was "[p]ulling together key diligence items" and "[w]orking on structure and *key actions to launch offer*."  Of course, friendly merger proposals are presented, while hostile tender offers are "launched."  The presentation also stated that, at Valeant's request, bankers at Bank of America Merrill Lynch ("BAML") and Goldman Sachs were "clearing conflicts" so that, as Valeant CFO Schiller explained, Valeant could begin to "line up financing" for a deal.  Valeant's Board and its committees subsequently met *five* more times over the next two weeks to discuss Valeant's takeover plans.

65.     Between February 7 and February 9, 2014, Sullivan & Cromwell negotiated with Pershing's counsel, Kirkland & Ellis, the terms of the confidentiality agreement that Pearson and Ackman had discussed.  On February 9, 2014, Valeant and Pershing executed the confidentiality agreement.  Immediately thereafter, Pearson informed Ackman that Allergan was Valeant's acquisition target.  The confidentiality agreement required that the identity of Valeant's takeover target and interest in Allergan be kept strictly confidential, and included a provision acknowledging that the parties had been advised that "the United States

securities laws prohibit any person who has material non-public information about a company from purchasing or selling securities of such company on the basis of such information or from communicating such information to any other person under circumstances in which it is reasonably foreseeable that such person may purchase or sell such securities."

66.   Later that same day, Valeant's Board held a conference call to discuss the confidentiality agreement, Pearson and Ackman's discussions, and Valeant's unsolicited pursuit of Allergan.

   3.   Allergan Publicly Opposes a Valeant Deal
         and Pershing Forms A Funding Vehicle To
         Secretly Acquire Allergan Shares

67.   Armed with the material, nonpublic information that Valeant would be proceeding with a takeover of Allergan, Ackman and Pershing formed a limited liability company, "PS Fund 1," on February 11, 2014.  PS Fund 1 was formed pursuant to a Limited Liability Company Agreement between six Pershing entities, and its express purpose was to secretly acquire a near 10% toehold in Allergan, front-run the disclosure of Valeant's bid, and subsequently support Valeant's hostile takeover plan.

68.   While taking these substantial steps in preparation for a tender offer and hostile takeover, Valeant made a perfunctory overture to Allergan's management, which was immediately (and predictably) snuffed out.   Given Allergan's express and unequivocal rejections of Valeant's prior advances, Valeant knew that Allergan had no interest in a negotiated deal, and that a successful takeover would require coercive tactics facilitated by the voting power of Pershing's near 10% stake in Allergan.

69.   On February 6, 2014, Pearson contacted Allergan and asked to set up a meeting with David Pyott, Allergan's CEO, to discuss a business combination. Although both parties knew that Allergan would likely reject any proposed takeover (as it had in the past), Allergan indulged Valeant, and a meeting between the CEOs was scheduled for February 15, 2014.

AMENDED COMPLAINT
Case No. 8:14-cv-01214-DOC(ANx)

70.     Before the meeting could occur, however, Allergan vocally and publicly expressed its opinion that a combination between the companies was a non-starter.  For example, on February 10, 2014, analysts from Sanford B. Bernstein & Co. published a report on their meetings with Allergan's senior management, which had informed Bernstein that the companies had "very different business models," were "[n]ot a good fit," and that "shareholders w[ould] hesitate to take Valeant paper."  These comments "poisoned the well" for any friendly deal. That same day, Bank of America Merrill Lynch ("BAML") analysts published a similar note indicating Allergan would be opposed to a Valeant transaction.

71.     Expecting Allergan's opposition, Pearson and other senior managers at Valeant received and reviewed both of these reports when published, understood the not-so-subtle message, and cancelled the scheduled meeting with Pyott. Valeant CFO Schiller testified that, although Valeant had discussed the possibility of confidentially approaching Allergan to negotiate a friendly transaction in February 2014, that option was not pursued because, "based on all the data points we had, was that Mr. Pyott was – was, again, unlikely to be receptive."

72.     Indeed, as Ackman later testified, Pearson cancelled the planned meeting with Pyott on February 14, 2014 specifically because "Pyott very assertively made clear [through the Bernstein and BAML analyst reports] that he had no interest in a transaction publicly."  Ackman explained that he was in favor of Pearson canceling the meeting with Pyott because he feared that if the meeting took place, there was a higher risk of a "leak" to the market of Valeant's interest in Allergan.  Ackman's ability to front-run Valeant's takeover bid and purchase Allergan shares from unwitting investors depended on the market remaining ignorant of Valeant's intentions, which only Ackman knew and appreciated. According to Ackman:

> I thought there was a real risk – the biggest risk when you are going to be building a stake in a company is that leaks, and that the stock price goes up and your opportunity to acquire shares becomes much more difficult.

AMENDED COMPLAINT
Case No. 8:14-cv-01214-DOC(ANx)

73.     Allergan's known enmity towards a transaction with Valeant was also clearly set forth in Valeant's own internal documents, which confirm that Defendants always knew hostile tactics – including a tender offer – would be necessary.  For example, an internal Valeant document dated February 16, 2014 reflects that Valeant expected Allergan to adopt a shareholder rights plan or "poison pill" – a mechanism used by boards to defend against hostile takeovers – when Valeant approached Allergan with an offer.[3]  To remove the "pill," Valeant would need to replace a majority of Allergan's directors with new directors beholden to Valeant who could remove the pill to allow a tender or exchange offer to close.   Under Allergan's bylaws, however, a special meeting to replace incumbent directors can only be called by holders of 25% of the outstanding common stock.  Thus, Defendants knew that Pershing's nearly 10% stake would go a long way to capturing enough votes to hold a special meeting.

74.     In fact, Defendants have uniformly admitted that Valeant enlisted Pershing – and provided it with the opportunity to front-run Valeant's bid and make billions in largely risk-free profits based on inside information – so it could use its toehold as a jumping off point to call a special meeting to remove the expected poison pill and thus allow the tender offer to close.  Valeant knew that obtaining the near 10% toehold stake would be critical to calling a special meeting and electing directors that would support Valeant's takeover plan.

75.     As Pearson later explained:  "Getting to 10 percent was – or close to 10 percent without triggering any pill was important because *in the end, we knew it would come down to, you know, voting the board off or not*."  Valeant also knew that Ackman had expertise in waging the kind of hostile proxy contest that

---

[3] Specifically, a poison pill is designed to dilute the ownership stake (and thereby its voting power) of a hostile potential acquirer (*i.e.*, Valeant) once the acquirer crosses a certain percentage ownership threshold, often by issuing *pro rata* shares to the other stockholders or giving them the option to buy shares at below market prices.  *See, e.g.*, *Selectica, Inc. v. Versata Enters., Inc.*, 2010 WL 703062, at *12 (Del. Ch. Feb. 26, 2010).

AMENDED COMPLAINT
Case No. 8:14-cv-01214-DOC(ANx)

would be required to replace the Allergan Board – and would willingly support Valeant's bid because doing so would only increase Ackman's insider-trading profits. Similarly, Valeant's CFO Schiller testified that "one factor" Valeant and Pershing discussed in their plans for Allergan in February 2014 was "Ackman's ability to purchase 10% of Allergan stock, which would go a long way toward the 25% needed to call a special meeting."

76.  Ackman also admitted that, in February 2014, the parties expected that they would need to call a special meeting to elect directors who would remove the poison pill that would otherwise block completion of the anticipated tender offer:  "We were going to call a special meeting. The plan was to call a special meeting and replace the Board."

77.  Pershing's "special advisor" Doyle testified that the very fact that Pershing had been recruited by Valeant meant that the parties recognized that the transaction would be hostile, as there would be no need for Pershing's expertise if Valeant did not expect opposition.  As Doyle explained, "The very fact that [Valeant was] contemplating working with us, with Pershing Square, means that the probability – again, *if they were going to negotiate a board to board merger that was solicited or quietly negotiated, they – there wouldn't be any need for Pershing to be in the mix*."

78.  Defendants also knew from the beginning that their proxy contest would go hand-in-hand with a tender offer because taking over a company simply through a proxy contest is virtually impossible without the commitment and credibility of having a firm and financially attractive offer on the table.  As one academic article explains, "proxy contests for control, without an accompanying tender offer, are seldom successful."   Indeed, nearly every contested takeover attempt during the past 10 years has involved a tender offer.

        4.     Valeant Formulates Its Takeover Plans and Its Internal Documents Confirm that Valeant Contemplated a "Hostile" Tender Offer

79.  In addition to the evidence and admissions described above, and the fact that launching a tender offer would be the most logical means of pursuing a

AMENDED COMPLAINT
Case No. 8:14-cv-01214-DOC(ANx)

deal, Valeant's own internal communications confirm that, from the very beginning, Defendants knew that the transaction likely would proceed as a hostile tender offer.

80.     For example, Valeant Board meeting materials prepared the week of February 14, 2014 specifically noted that the transaction would likely proceed as a "*[h]ostile* cash and stock merger."  Likewise, on February 15, 2014, Andrew Davis, Vice President of Business Development at Valeant, emailed Pearson with an attachment of a document stating that the "Allergan Opportunity" would be realized by pursuing a "*[h]ostile cash and stock merger*."

81.     Similarly, a February 16, 2014 Valeant presentation titled "Plan of Action" showed that Valeant expected Allergan to resist Valeant's plan to "make an unsolicited cash and stock offer," but given the "Pershing stake," the "expectation [was] that we would have support to call special meeting."

82.     On February 16, 2014, the Valeant Board held a telephonic meeting to further discuss its plan to describe Pershing Square as a "co-bidder entity," thus clearly contemplating a tender offer, as the term "bidder" logically implies a direct offer to shareholders.  Similarly, on February 18, 2014, Olser, Valeant's Canadian counsel, emailed Pershing's counsel a document providing "Background Facts for Proposed Acquisition Plan" that stated that "*[i]f the transaction proceeds by way of tender offer," Pershing would be identified as a "co-bidder*.'"

83.     Thus, Valeant's own documents clearly demonstrate that it understood that (i) any transaction would have to be hostile; (ii) the steps it had taken that month would likely lead to a tender offer; and (iii) it (and Pershing) were violating insider-trading laws but sought to characterize Pershing as a "co-bidder" in order to later convince regulators, and this Court, of that fiction.

84.     On February 19, 2014, Morfit, members of Valeant's senior management and its audit and risk committee discussed the structure of the contemplated Allergan acquisition with their lawyers from Sullivan & Cromwell and Olser, and formally decided to move forward.  The next day, February 20, Valeant and Pershing amended the February 9, 2014 confidentiality agreement.

AMENDED COMPLAINT
Case No. 8:14-cv-01214-DOC(ANx)

Over the next five days, between February 20, 2014 and February 25, 2014, Valeant, Pershing and their respective counsel negotiated the letter agreement and the terms pursuant to which Ackman would acquire the nearly 10% toehold in Allergan common stock.

85.     As Valeant's and Pershing's lawyers exchanged drafts, Valeant's Board continued to finalize the company's acquisition plans.   On February 21, Valeant's Board met in Toronto to discuss the Allergan transaction, and also met with Ackman and Doyle, who attended a portion of the meeting and discussed Pershing's role in the transaction.

86.     Defendants' discussions and negotiations ultimately resulted in the February 25, 2014 Relationship Agreement (the "February 25 Relationship Agreement"), which provided the formal "structure" that governed and facilitated Valeant's and Pershing's insider-trading scheme.   The very drafting and negotiation of that document was itself a substantial step toward the Tender Offer.   Moreover, drafts of the February 25 Relationship Agreement circulated between Defendants' counsel demonstrate that the parties were clearly anticipating a tender offer. Specifically, numerous drafts of the February 25 Relationship Agreement expressly identified a "tender offer" as the form of the transaction that the parties contemplated, and described the role of the parties in the event the acquisition proceeded as a tender offer.   For example:

> (a)     On February 17, 2014, Defendants' counsel circulated an email attaching a draft of the Relationship Agreement, stating that "If the transaction proceeds by way of *tender offer*, [Pershing] will be identified as a co-bidder and, if by way of merger, [Pershing] will be identified as soliciting person."
>
> (b)     On February 18, 2014, Valeant's counsel emailed Pershing's counsel a draft that similarly stated that if the "transaction proceeds *by way of tender offer*, [Pershing] will be identified as a co-bidder."

(c)     On February 20, 2014, Ackman sent Pearson a draft of the Relationship Agreement that Ackman described as his attempt "to put something together that attempted to contemplate issues that would be important to you." One such "important" issue was that if "a Company Transaction is being pursued by [Valeant] *through a tender offer* . . . [Pershing] and the Co-Bidder Entity will be identified as co-bidders."

(d)     A February 23, 2014 draft of the Relationship Agreement circulated among Ackman and Valeant general counsel Robert Chai-Onn likewise states that if "a Company Transaction is being pursued by [Valeant] *through a tender offer* . . . each of the Company, [Pershing] and the Co-Bidder Entity will be identified as co-bidders."

(e)     A February 24, 2015 draft of the Relationship Agreement noted that the "consent of both [Pershing] and the [Valeant] shall be required for either party to launch *a tender offer or an exchange offer*" and if the "Transaction is being pursued by [Valeant] *through a tender offer*…each of [Valeant], [Pershing] and the Co-Bidder Entity will be identified as co-bidders or soliciting persons, respectively."

87.     Thus, drafts of the very document establishing the mechanism through which Ackman would acquire Allergan shares, on their face, evidence that Valeant was contemplating a hostile tender offer all along. In fact, it was only very late in the drafting process, on February 24, that Defendants inserted a self-serving and misleading disclaimer into the Relationship Agreement stating that the parties "acknowledge that no steps have been taken towards a tender or exchange offer for securities of Allergan."

88.     But stamping the words "no steps have been taken" on a document does not make it so. To the contrary, the act of denying the occurrence of events that create liability only proves the basis for that liability.

89.     The fact that this language was inserted at the last minute – and that prior drafts which explicitly cite to a "tender offer" as the contemplated form of the transaction and the specific roles that each party would play if the transaction proceeded as a tender offer – establish that substantial steps had been taken by the time the parties signed the February 25 agreement.  As reflected in a February 16, 2014 email among Valeant General Counsel Robert Chai-Onn and Valeant's counsel, Defendants' attempt to affix the "co-bidder" label to their relationship appears to have been motivated by their lawyers' concern that regulators might be "offended by a party other than a bidder benefitting from a toehold."

90.     Regardless of the "co-bidder" misnomer, and consistent with the parties' actual roles in the transaction, the February 25 Relationship Agreement made clear that Valeant was the "offering person" and PS Fund 1, at Pershing Square's direction, was an "other person" that was prohibited from trading under Rule 14e-3.  As set forth more fully below, under the Relationship Agreement, Valeant retained unilateral control over the terms, timing and conditions of the offer – including the unilateral discretion to terminate the bid altogether or whether it would even be made in the first place.  Specifically, under the Relationship Agreement, Valeant was able to terminate the contract upon notice to Pershing that "it is not interested in consummating" a transaction with Allergan – a right it later exercised.

91.     Pershing, by contrast, had the sole authority over the management of PS Fund 1, including the manner in which Pershing would acquire PS Fund 1's Allergan stake.  Moreover, Pershing retained the authority to act on behalf of its own self interest, as the Relationship Agreement specifically provided that it would terminate if a "Third Party Transaction Proposal" – a public proposal for Allergan by a bidder other than Valeant – was made and Valeant failed to match or exceed that proposal within 45 days.  In fact, if Valeant was outbid, Pershing's only obligation was to kick back 15% of its insider trading profits to Valeant.

AMENDED COMPLAINT
Case No. 8:14-cv-01214-DOC(ANx)

**B.     Front-Running Valeant's Tender Offer, Ackman
Secretly Acquires Billions Of Dollars In Allergan Stock**

92.    The very same day Valeant and Allergan signed the February 25, 2014 Relationship Agreement, Ackman initiated his covert campaign to acquire nearly 10% of Allergan's stock from unwitting Allergan shareholders (*i.e.*, the Class) while in possession of material non-public information regarding Valeant's anticipated hostile tender offer.  Pershing's secret accumulation of Allergan stock (the vast majority of which was acquired through derivative transactions) through its PS Fund 1 entity was carefully designed to conceal Pershing's identity and avoid triggering regulatory disclosure requirements that would alert investors to Valeant's takeover plans.

93.    Pershing began acquiring Allergan shares at a time when it indisputably had material nonpublic information relating to Valeant's forthcoming tender offer, in violation of Rule 14e-3's insider trading prohibition.  Rule 14e-3 provides that, whenever any person who has taken "a substantial step or steps" (the "offering person") to commence a tender offer of a target company, any "other person" who is in possession of material nonpublic information relating to that tender offer is prohibited from purchasing or selling any securities of the target company, unless the information is publicly disclosed within a reasonable time prior to the purchase or sale.  The rule applies regardless of whether the trader owes or breaches any duty to respect the confidentiality of the nonpublic information.

94.    Here, there is no question – and Defendants have admitted as much – that Ackman and Pershing traded while in possession of material, nonpublic information relating to Valeant's bid and contemplated tender offer.  Indeed, Ackman and Pearson admitted in an April 24, 2014 *Bloomberg* interview that Ackman possessed material, non-public information concerning Valeant's takeover plans that the rest of the market did not:

> Bloomberg: But people who sold you Allergan in the last week could
> say you knew something that we didn't.

AMENDED COMPLAINT
Case No. 8:14-cv-01214-DOC(ANx)

Ackman:        *And we did.  Absolutely*.  We partnered with Valeant for

the purpose of helping catalyze the combination between

the two businesses.

95.    In fact, Defendants went to extraordinary lengths to keep Valeant's takeover plans hidden from investors, as reflected in numerous internal documents. For example, a document titled "Background Facts for Proposed Acquisition Plan" circulated among Pershing and Valeant's counsel the week of February 17, 2014 made clear the acquisition strategy was deliberately designed to avoid triggering regulatory disclosure rules and to enable Pershing to acquire its Allergan stake in secret.  As that document reflects, the parties agreed that Valeant would contribute only $75.9 million to PS Fund 1 once Pershing reached a certain threshold percentage of Allergan shares, precisely because that "would keep [Valeant's] interest below the Hart-Scott Rodino [("HSR")] filing threshold."

96.    Further, PS Fund 1 was intentionally designed so that it could be characterized as the "'ultimate parent entity' for Hart-Scott Rodino purposes, meaning that neither [Valeant] nor any [Pershing] fund with an interest in [PS Fund 1] would be required to obtain HSR clearance for acquisitions of shares by [PS Fund 1]."  Defendants specifically sought to avoid HSR disclosure requirements by requiring that five separate Pershing entities "own" the vehicle through which Pershing acquired its near 10% Allergan stake – another means Defendants used to conceal Pershing's insider trading.

97.    In addition, "[p]rior to the public announcement of the transaction," PS Fund 1's acquisition of Allergan shares was to be conducted "consistent with HSR filing exemptions" so that Pershing would not be required to disclose its position to the market before Valeant announced its hostile bid.  Indeed, to further minimize the risk of a leak that Ackman's growing Allergan position (if discovered) was connected to a Valeant bid, neither Pearson, Valeant, nor any other Valeant entity or employee became a party to the PS Fund 1, LLC agreement on

February 11, 2014 – and did not contribute any actual funds to the entity until April 3, after Ackman had already obtained a nearly $2 billion stake.

98.    Under Pershing's direction and with Valeant's approval, on February 25 and 26, 2014, PS Fund 1 acquired approximately 600,000 shares of Allergan stock, an amount just short of the $75.9 million in stock that would have required disclosure by Valeant – which, unlike Pershing, was an Allergan competitor – under the Hart-Scott Rodino Act.

99.    Next, between March 3, 2014 and April 8, 2014, Pershing directed PS Fund 1 to acquire another $2 billion worth of Allergan shares – or approximately 4.9% of Allergan's outstanding common stock – through deep in-the-money, American-style, over-the-counter ("OTC"), zero-strike call options. Each of PS Fund 1's trades were executed through a single counterparty, Nomura International plc ("Nomura"). Using only Nomura to execute this huge mass of trades minimized the risk that other investors would become aware of Ackman's trading.

100.    While Pershing deliberately employed options trades to avoid detection of the huge position it was amassing – as HSR only requires disclosure of ownership of stock with voting rights – the options gave PS Fund 1 effective ownership of Allergan stock. PS Fund 1's options trades had strike prices of less than $1.35 per share, or roughly 100 times less than the actual price of Allergan stock on the day the transactions were executed. Because these options had extraordinarily low strike prices, PS Fund 1 effectively paid the full value of the shares to acquire them – posting billions of dollars in collateral to Nomura – and paid less than $1.35 per share to convert the options into shares of Allergan stock. Moreover, unlike a traditional option – which enables a trader to walk away from the trade without incurring the full out-of-pocket cost of, and the potential full loss that would come from, acquiring the shares directly – Pershing was fully exposed to any decline in Allergan's stock price.

101.    As Ackman admitted during an April 22, 2014 investor call, "what we do here is we are buying a very deep-in-the-money call option. We are buying

options with a strike price of $1.20. On a stock trading for $125 there are 1% strike options. ***They act economically, identically, to shares***."

102.   Ackman explained that, even though PS Fund 1 acquired its shares through Nomura, PS Fund 1's trading activity was reflected through actual open market purchases on the NYSE because "our dealer in order to hedge the options they sell to us has to go into the market."   Illustrating the point using the chart below, Ackman explained that "this is a chart that shows ***our*** stock purchases. ***Our purchases*** began on February 25 and that number in yellow on the bottom was what percentage of the volume ***we were*** on each of those days," making clear that PS Fund 1 purchases were made contemporaneously with the sales of Allergan shares by the members of the Class:



103.   Ackman acknowledged the options PS Fund 1 acquired were no different than purchasing the actual underlying Allergan shares, explaining that the only reason that PS Fund 1 did not acquire Allergan shares outright was to avoid detection by the marketplace.   As Ackman explained during an April 24, 2014 *Bloomberg* interview, PS Fund 1's options were "the exact same exposure economically as if we owned the stock," where "every dollar the stock goes up we benefit by one dollar."   Ackman explained that PS Fund 1 acquired options that behaved "just like the common stock" because "we weren't look[ing] for

optionality.  We were looking for a way to be exempt from the requirement, be allowed to get economic exposure without having to file first with the FTC, which would give the company notice that we were interested in the stock."  Indeed, as later disclosed in Pershing's Schedule 13D filing, the cost basis for PS Fund 1's option contracts were $3.14 billion – meaning that Pershing expended an amount that was just shy of the actual value of the underlying shares PS Fund 1 acquired.

104.   By April 8, 2014, PS Fund 1 had acquired the equivalent of 4.9% of Allergan's outstanding common stock – an amount just below the 5% threshold that would have required PS Fund 1 to disclose its ownership of the shares under Section 13(d) of the Exchange Act.  Under Section 13(d), a "beneficial owner" of more than 5% of a company's voting shares is required to file a Schedule 13D which must disclose, among other things, any plans or proposals that would result in an acquisition or change in the board of directors or management.  That disclosure must be made within 10 days of crossing the 5% threshold – a requirement that was put in place in 1968, a time long before technological advances made a rapid accumulation of shares like PS Fund 1's possible.

105.   As with every other step in the plan, Pershing's decision to stop just short of the 5% threshold provided a strategic benefit to both Ackman (by maximizing his ability to buy shares without detection by the Allergan shareholders he sought to fleece) and Valeant (by allowing Valeant alone to control when and how it could announce its Allergan offer so as to create maximum pressure on Allergan's Board and management).

106.   Once PS Fund 1 had acquired a stake just shy of the 5% threshold, Pershing halted trading for two days (on April 9 and 10) to let Allergan's stock price settle back down after having been driven upward through the high volume of Pershing's trades.  Knowing the 10-day clock to file a Schedule 13D would immediately begin to run upon the next significant trade, on April 11, PS Fund 1 began what Pershing itself termed its "rapid accumulation program," during which PS Fund 1 crossed the 5% threshold and immediately began purchasing another $2

billion in Allergan shares in the ten days before PS Fund 1 was required to file a Schedule 13D.

107.   By April 21, 2014, PS Fund 1 had acquired shares representing nearly 10% of Allergan's outstanding common stock through deep in-the-money OTC call options and OTC equity forwards.  Like the OTC call options, the equity forward contract PS Fund 1 entered into with Nomura enabled PS Fund 1 to purchase 3.45 million Allergan shares, providing the functional equivalent of actual ownership.  As Ackman admitted, Nomura acted just like a broker, and in fact acquired the common shares correlating to its contracts requiring the delivery of those shares to Pershing.   In other words, every time Pershing bought an option to acquire Allergan stock, Nomura actually acquired those shares so as not to expose itself to losses if the stock price at a later date did not track the contract price with Pershing.

108.   In fact, when PS Fund 1's options were actually exercised on May 1, 2014 and PS Fund 1 formally "converted" its options into 24.8 million shares of Allergan, the daily trading volume for Allergan common stock on that day was only 3.7 million total shares.  The fact that the entire NYSE trading volume for Allergan stock on the conversion date was far below the actual amount of stock that PS Fund 1 "converted" on May 1, 2014 further corroborates Defendants' admissions, and demonstrates that Nomura had already covered the options trades during the Class Period, long before Allergan exercised them – confirming that PS Fund 1's options contracts were, in substance, actual ownership of Allergan shares.  Indeed, both Ackman and Pearson repeatedly claimed during the April 22, 2014 investor conference call announcing Valeant's takeover bid for Allergan that Ackman was "***Allergan's largest shareholder***," even though PS Fund 1's options had not been exercised and would not be exercised for another 10 days.

**C.    Pershing Discloses Its 9.7% Stake In Allergan And Defendants Launch Their Hostile Takeover**

109.   After the close of trading on April 21, 2014, the last possible day that PS Fund 1 could file a Schedule 13D and report its interest in Allergan, Pershing

AMENDED COMPLAINT
Case No. 8:14-cv-01214-DOC(ANx)

shocked investors by disclosing that it had secretly acquired a substantial 9.7% toehold in Allergan and Valeant announced it was launching a takeover bid.

110.   The next day, on April 22, 2014, Valeant delivered to Allergan a formal, unsolicited proposal offering to acquire Allergan for $48.30 in cash and .83 of Valeant stock per Allergan share – representing a price per share of approximately $160 per share and a value of over $46 billion based on Valeant's then-stock price.  In the April 22, 2014 "bear hug" proposal, Pearson described the purported benefits of Valeant's offer, specifically touting that Pershing, as "Allergan's largest shareholder," was "strongly in favor of the combination." Pearson likewise explained that the Defendants knew the transaction would be hostile "given that Allergan has not been receptive to our overtures for over eighteen months and has made it clear both privately and publicly that it is not interested in a deal" with Valeant.

111.   In an investor presentation announcing the offer and Pershing's 10% position, Ackman made clear that Valeant and Pershing expected the transaction to be hostile, and that a tender offer was quite possible, if not imminent.  Specifically, when asked about the "commitment to the process of getting the hostile deal effective" and whether there was "an exchange offer to be launched," Ackman did not deny that such an offer had been planned all along given Allergan's prior rejections of Valeant's "friendly" overtures.  To the contrary, Ackman explained:

> So we're committed.  We're contractually committed, again, after we did our due diligence and decided we wanted this deal, we are contractually committed to take it unless and until there's a superior offer that Valeant chooses not to respond to.  So as long as this deal happens, you know, we're in.  You know, the best evidence that we're in is the scale of our commitment as a percentage of our capital and the scale of our commitment on an absolute basis….You know, in terms of what we'll do from here, ***I think that anyone in the room who talks to a good M&A attorney will understand, you read the documents on the company, there are opportunities to call special meetings, there are opportunities for investors to launch various kinds of offers.  You should assume that we're familiar with all these various techniques.***

112.   Ackman's admission that an exchange offer was on the horizon was no accident or off-the-cuff response to an unexpected question.  Indeed, Valeant's own press materials that had been prepared in advance of the April 22, 2014 announcement similarly demonstrate Valeant was contemplating a tender offer, and that Valeant would pursue a hostile deal in whatever form it might take.  Specifically, a draft "Q&A" emailed by Valeant's public relations consultant to Valeant's head of Investor Relations, Laurie Little, on April 17, 2014, asked:

**Question:**   *Are you willing to launch a tender offer to get this deal done?*

Answer:     We would prefer to negotiate with [Allergan] on a friendly basis.  However, we are firmly committed to completing this transaction.

113.   Nobody else from Valeant or Pershing suggested that the transaction would proceed as a "friendly" negotiation during the April 22, 2014 investor presentation.  For example, Valeant CFO Schiller explained that although "we're happy to sit down…and talk to Allergan," he admitted that he "personally" was "not a big fan" of the company, and neither Pearson nor Ackman disagreed with an investors' characterization of Valeant's offer as a "hostile deal."

114.   Following the filing of the Schedule 13D disclosing Pershing's 9.7% stake and Valeant's hostile takeover plans, Allergan shares shot up nearly 20%— delivering nearly $1 billion in illicit insider trading profits to Ackman in a single day.  In fact, from the time Ackman initiated PS Fund 1's hidden buying spree, Allergan's stock price went from $125.54 per share on February 25, 2014, and $116.63 prior to Ackman's "rapid accumulation program," to close at $163.65 per share on April 22, 2014, the day Valeant's acquisition proposal was announced. While the share price increase on April 22 alone delivered a $1 billion paper profit to Ackman, the unlawful gains reaped from Defendants' insider trading only continued to grow as Valeant's announcement predictably put the target, Allergan, into play, ultimately resulting in an historic bidding war benefitting Pershing but

damaging Class members who sold their shares when Ackman acquired his 10% stake.

115. As expected, on April 22, 2014 – the same day Valeant issued its "bear hug" proposal – Allergan's Board adopted a "poison pill" with a 10% trigger, effectively blocking Pershing and Valeant from acquiring more shares of Allergan's common stock.[4]

116. Once Defendants filed their Schedule 13Ds, Valeant announced its hostile proposal, and Allergan adopted the poison pill, Defendants continued to behave as if a tender offer was what Valeant intended all along.

117. Indeed, Valeant knew that its "friendly" offer to "negotiate" its unsolicited proposal was just the first step of building pressure, leading to the inevitable tender offer. M&A professionals recognize, and history makes clear, that unsolicited and public "bear hug" proposals like the one Valeant made on April 22 are merely the opening salvo in a hostile bidder's takeover campaign.

118. To further support the impending tender offer, Defendants conducted an aggressive media blitz, including pre-packaged investor presentations trumpeting the "synergies" of a deal and Allergan's shortcomings as a stand-alone company, as well as direct outreach to Allergan stockholders, employees, and customers. For example, on April 28, 2014, Valeant tried create a sense of urgency in the market by telling analysts that the likelihood of another bidder emerging was low, that "[t]ime [was] of the essence," and that Allergan should not "take more than about 30 days" to evaluate Valeant's proposal.

119. Along similar lines, during Valeant's May 8, 2014 first quarter earnings call, Valeant's CFO Schiller, told investors that he had been traveling across the country to meet with Allergan's top stockholders and claimed that "[s]o

---

[4] Under Allergan's poison pill, or "Rights Agreement," stockholders received one preferred share purchase right for each outstanding share of the Company's stock that they owned, which would be become exercisable once any unapproved person or group – *i.e.*, Pershing and/or Valeant – acquired a beneficial ownership of 10% or more of Allergan's common stock.

far, all of the feedback has been overwhelmingly positive." Irrespective of whether this claim was true, the intent was clearly to garner Allergan stockholders' support for the imminent tender offer. In fact, during that same earnings call, Schiller confirmed that more aggressive measures were forthcoming, explaining that Valeant and Pershing would request a stockholder list from Allergan in order to "commence a shareholder referendum that will determine that the Allergan shareholders are supportive of Allergan's Board engaging in negotiations with us." Schiller also made clear that Valeant and Pershing were willing to bypass the Board entirely, stating that "if necessary, we will also pursue holding a special meeting to remove some or all of the Allergan board members."

120. Throughout April and May 2015, Valeant also communicated directly with Allergan's customers and employees – another tactic employed to facilitate the tender offer. Among other things, Valeant: (i) represented to Allergan's customers that Valeant's takeover was a "*done deal*" and Valeant "*own[ed]*" Allergan; (ii) offered rebates on Allergan products; (iii) contacted Allergan sales representatives to "welcome" them to Valeant; (iv) had Valeant sales representatives contact Allergan customers and announce that they were taking over for Allergan's sales representatives; (v) told Allergan customers that certain product lines would be divested; and (vi) wrote to Valeant customers to outline plans for the joint company going forward.

121. Needless to say, overtly hostile tactics like this are inconsistent with any sincere hope of achieving a negotiated friendly deal. Rather, Valeant's publicity stunts and other public statements were simply part of the hostile acquisition playbook – *i.e.*, putting pressure on a target, turning target stockholders against its board and management, and priming their support for an eventual tender offer.

122. In fact, these were the same tactics Valeant employed just three years earlier in its unsuccessful takeover of Cephalon, Inc. ("Cephalon"), another biopharmaceutical company, in which Valeant threatened to launch a tender offer after Cephalon's board had invoked a poison pill. In Valeant's pursuit of Cephalon,

Valeant used the same hostile playbook and was represented by the same lawyers that served as counsel in its takeover of Allergan. After Valeant's offer was rejected by Cephalon's board, Valeant sought to appeal "directly to shareholders" by electing a new slate of directors who would "remove [the] Poison Pill and other impediments to a possible tender offer" – which, like here, would enable Valeant to "commence [a] Tender Offer" when "negotiations" failed.

### D. Valeant Alone Was the Bidder, While Pershing Was Only a Seller And "Other Person" Under Rule 14e-3

123. The legal effect of Defendants' economic bargain was clear: Valeant was the sole "offering person" seeking to acquire Allergan, and Ackman and Pershing were "other persons" who were prohibited from trading on material non-public knowledge of Valeant's tender offer plans. The parties' arrangement here is virtually identical in substance to the forbidden practice of "warehousing" – *i.e.*, the "practice by which bidders leak advance information of a tender offer to allies and encourage them to purchase the target company's stock before the bid is [publicly] announced" – that was squarely targeted by the SEC in its adoption of Rule 14e-3. *See United States v. O'Hagan*, 521 U.S. 642, 672 n.17 (1997).

124. Here, Valeant was the *only* person publicly offering to buy Allergan shares, the *only* person seeking to acquire or control Allergan, and would be the *only* party that would maintain that control if the offer had been successful.

125. Pershing, by contrast, was expressly denied any sort of control or management over Allergan by Valeant and expressly had no control over how much or what terms Valeant offered to buy Allergan's shares. Rather, Pershing acted in a classic "warehousing" role – a large, friendly institutional investor that is provided a "tip" of an upcoming tender offer and acquires shares of the target company from its unsuspecting shareholders (cheaply and without having to pay a control premium) in exchange for the agreement to support the bid proposed by the "offering person" once the tender offer is announced. Pershing enjoyed inside trading profits at the expense of the selling shareholders, and Valeant enjoyed a

---

AMENDED COMPLAINT
Case No. 8:14-cv-01214-DOC(ANx)

near 10% "head-start" in acquiring Allergan, but without the burden of a significant out-of-pocket cost.

126.   Pershing contractually agreed to provide Valeant voting support, and had no say whatsoever regarding the terms of the tender offer – including the form, timing or amount of consideration, or whether it would even occur at all.  While the February 25, 2014 Relationship Agreement required Valeant to consider "in good faith" Pershing's "comments" on any proposed terms of the offer or the manner in which it was carried out, Valeant, as the sole "offeror," retained final and complete discretion on whether to make a bid and to set its terms.

127.   In fact, Pearson highlighted during the April 24, 2014 *Bloomberg* interview that Ackman had no control over the terms of the offer, but rather acted solely as a "warehouse" and a cheap way for Valeant to obtain a friendly toehold. Specifically, in response to a *Bloomberg* reporter who pointedly asked about Ackman purchasing Allergan shares "at a price much lower than where Allergan stock is today," Pearson explained that Valeant needed Pershing to acquire the toehold because Valeant "did not have $4 billion sitting at the bank."  Moreover, Pearson said, Valeant retained complete control over the bid and whether it would even occur, explaining that even after Ackman had acquired a near 10% stake, Valeant "could have chosen not to" go through with the bid and, in any event, "the price we would have set for – paid for Allergan is the same with or without Bill." Pearson explained that while it could have paid an investment bank like Goldman Sachs to help it run a tender offer and proxy contest for Allergan instead of "partnering" with Ackman, the problem was that "*[w]e would have to pay for it*." Of course, Valeant could not have compensated a bank with a tip regarding its plans and an opportunity to make trading profits based on that inside information, and the economic reality of what Pershing did here is no different, and similarly prohibited.

128.  Consistent with Pershing's role as a separate and distinct "other person" prohibited from trading on its inside knowledge of Valeant's tender offer plans, Pershing retained unilateral control over the PS Fund 1 purchasing entity

and how the nearly 10% toehold in Allergan stock was acquired.   Under the February 25 Relationship Agreement, Pershing was to "direct the management" of PS Fund 1.  In fact, Valeant was not even a party to PS Fund 1 until April 3, 2014, and did not contribute any capital to PS Fund 1 until April 10, 2014.  By that time, PS Fund 1 had already acquired 11 million Allergan shares worth over $1.2 billion.

129.   Further, and as eventually happened, Pershing retained the right to accept a higher bid for its shares by another offeror – with the parties' agreement specifically permitting Pershing to act on behalf of its own independent interests (even if they conflicted with Valeant's).  In fact, the parties' agreement dissolved – with 15% of PS Fund 1's profits distributed to Valeant and the rest to Pershing – if a competing bidder other than Valeant came along with a public proposal to acquire Allergan, and Valeant did not match or exceed the competing proposal within 45 days.   Consistent with Defendants' understanding that trading on nonpublic information concerning Valeant's bid would deliver Ackman virtually risk-free profits, the Relationship Agreement provided for the division of "Net Transaction Profits" – but not losses – if there was a successful competing bid.  Valeant, by contrast, retained virtually unilateral and complete control over the offer, and would retain complete control of Allergan if the tender offer was successful and the merger closed.

130.   Indeed, Defendants' public statements confirm that the parties viewed themselves, in both form and substance, as wholly separate "persons" with distinct roles in Valeant's takeover bid.  For example, Valeant's April 22, 2014 unsolicited proposal described Pershing as "Allergan's largest shareholder" and a "co-proponent of the transaction," but, critically, not a merger counterparty for or acquirer of Allergan.  During an investor conference call discussing the proposal that same day, Ackman similarly described Pershing as "the largest shareholder of Allergan," but not an offering person seeking to acquire anymore Allergan shares.

131.  In fact, during the April 22, 2014 conference call announcing Valeant's bid, Ackman specified that "*I am not the one making the offer*," and confirmed that he had little control over Valeant's proposal, stating that "we bought

a big stake in this Company[, but] had **no assurance** that [Valeant] would come and make an offer for the business." Ackman also confirmed that "**Valeant was giving [Pershing] inside information on Valeant**" before Pershing's secret purchasing program regarding Valeant's plans concerning Allergan.

132. For his part, Pearson confirmed that, in exchange for Valeant's disclosure of inside information to Pershing, all Pershing had to do was acquire its own toehold and pledge to vote those shares in favor of Valeant's tender offer. During the April 22, 2014 analyst call, Pearson explained that Pershing was Allergan's "largest shareholder with 9.7%" and that Pershing was "**going to support the transaction**," never suggesting that Pershing was anything but a shareholder and willing seller.

133. After Valeant publicly announced its bid on April 22, 2014, Valeant and Pershing continued to make repeated public statements confirming that Valeant was the "offering person" that had unilateral control over its own bid, while Pershing was just an ordinary, self-interested Allergan stockholder looking to maximize value. Indeed, during a May 28, 2014 investor conference, Pearson made clear that Pershing had absolutely no influence over Valeant's bid, telling investors unequivocally that "Pershing Square is – **they have no control of what we do**." Likewise, during a June 17, 2014 investor call, Pearson admitted that while Ackman had "committed to vote for [Valeant's] deal," Valeant did not otherwise have any "voting control over his shares or any economic control" over Pershing's stake.

134. Similarly, Pershing did not describe itself as a potential acquirer of Allergan, and corrected others if they inaccurately suggested it was. For example, in a May 5, 2014 letter from Ackman to Michael Gallagher, Allergan's Lead Independent Director, Ackman wrote: (i) "As Allergan's largest shareholder with 9.7% of the common stock, we look forward to working with you and the rest of the board to maximize value for all Allergan shareholders"; and (ii) "As Allergan's largest shareholder, we are supportive of Allergan making the best possible deal with Valeant or identifying a superior transaction with another company." If

Ackman was a true co-bidder, he would want his bid to prevail, not to simply see Allergan sold to the highest bidder, whoever that may be.

135.   Similarly, Ackman's May 12, 2014 letter to Matthew Maletta, Allergan's Associate General Counsel and Secretary, which demanded the inspection of Allergan's books and records under Delaware General Corporation Law Section 220, stated:  "The purpose of this demand is to enable the Requesting Stockholder to communicate with fellow stockholders of the Company on matters relating to their mutual interest as stockholders . . . including, without limitation, the solicitation of views regarding Valeant Pharmaceuticals International Inc.'s proposal to acquire the Company."  A true co-bidder would not share a "mutual interest" with other Allergan stockholders concerning Valeant's bid or solicit their views in the abstract; it would be soliciting affirmative support for the bid.

136.   On May 19, 2014 Ackman wrote Gallagher again and continued to describe Pershing as just another concerned stockholder, with no interest other than maximizing Allergan share value, regardless of who the bidder was.  Ackman wrote that "[b]ased on conversations [Pershing] had with other Allergan shareholders . . . , [Pershing] believe[d] that the majority of Allergan shareholders [we]re interested in a potential business combination with Valeant."  Referring to Pershing, Ackman complained that he "f[ou]nd it inappropriate that Allergan's lead independent director was unwilling to speak to a shareholder without management present," and claimed that "it is rare that a shareholder is willing to candidly share its views with a Chairman/CEO who will likely lose his job as a result of a proposed transaction."  Ackman also took steps to distance Pershing from Valeant, noting that "Mr. Pyott has also apparently criticized Pershing Square, explaining that [its] views should not be considered, as . . . conflicted because of [its] relationship with Valeant.  To set the record straight, Pershing Square is Allergan's largest shareholder with nearly 10% of the common stock of the company.  ***We own no shares of Valeant stock, nor do we have any undisclosed arrangements with Valeant.  We are interested only in maximizing the value of our investment in Allergan***."

AMENDED COMPLAINT
Case No. 8:14-cv-01214-DOC(ANx)

137.   Even after the tender offer was "officially" launched, Pershing continued to position itself publicly as a stockholder looking to maximize its investment in a strategic transaction, not as a transaction counterparty.   For example, on July 16, 2014, Ackman wrote to Allergan's Board that, if the Board's allegations of Valeant "malfeasance" are true, "then as Allergan's largest shareholder with a $5 billion investment we would of course strongly oppose a Valeant transaction."   A true co-bidder, of course, would not "strongly oppose" its own bid; nor could it "bid" for its own shares.

138.   Ackman's own characterizations are significant:   he consistently, correctly identified *Valeant* – not Pershing – as the party proposing a transaction, *i.e.*, the "offering person."   Pershing repeatedly represented that its role was simply an activist stockholder, pressuring Allergan's Board to either pursue in Valeant's hostile takeover bid or find a higher bid.   By trading while in possession of the material nonpublic information regarding the tender offer and then pursuing hostile measures to pressure Allergan, Pershing ensured that its illegal insider trading profits would continue to grow.

### E.   As Always Anticipated, Valeant Launches Its Tender Offer

139.   As expected, on May 12, 2014, Allergan's Board officially rejected Valeant's April 22 proposal, "unanimously determin[ing] that Valeant's unsolicited proposal substantially undervalue[d] Allergan."

140.   In response, and as Defendants had indicated a week before, Pershing filed a proxy statement for a nonbinding "shareholder referendum" to consolidate investor support for Valeant's takeover.   If passed, the referendum would have directed the Allergan Board to "promptly engage in good faith discussions with Valeant regarding Valeant's offer to merge with the Company."   Because the referendum was nonbinding, however, it could not in fact cause the Allergan Board to *do* anything.   Rather, it was simply another means to build support for Valeant's premediated tender offer.   Consistent with Pershing's true role, the referendum

proxy statement defined Pershing as the **Requesting Shareholder**, and not the potential acquirer or an "offering person."

141.   On May 28, 2014, Valeant increased the pressure by announcing a revised offer of $58.30 in cash and 0.83 shares of Valeant stock per Allergan share, a total value of approximately $153.67 per share based on Valeant's then-stock price.  Two days later, on May 30, Valeant made a second revised offer of $72.00 in cash and 0.83 shares of Valeant stock per Allergan share, valued at approximately $181 per Allergan share (the "Second Revised Proposal").

142.   Similar to Valeant's initial offer, however, Defendants already knew that Allergan's Board would summarily reject it.  Indeed, Allergan immediately confirmed receipt of the Second Revised Proposal and "indicated that Allergan would likely not be willing to negotiate with Valeant."  From May 29 through June 2, Allergan's stock price increased approximately 10%, from $156.12 to $172.25.

143.   On June 2, 2014 – six weeks after the conclusion of Pershing's illegal front-running scheme and accumulation of nearly 10% of Allergan's stock – Valeant abandoned the pretense of negotiations with the Allergan Board and publicly announced what it had privately planned all along:  Valeant was "**taking steps to launch a tender offer**," which Valeant "intend[ed] to commence" "within the next two to three weeks."

144.   Valeant and Pershing conducted a joint conference call that morning to describe the purported genesis of the Second Revised Proposal.  According to Ackman, he heard from other Allergan stockholders that they wanted Valeant to increase the aggregate deal consideration to approximately $180 per share.  Ackman then reportedly took this information to Valeant and negotiated with Valeant to obtain that additional consideration to be paid by Valeant to Pershing and the other Allergan stockholders.

145.   During the June 2 conference call, Pershing disclosed it was abandoning its nonbinding stockholder referendum and instead commencing a proxy solicitation to call a special meeting to remove six of the nine-member Allergan Board (the "Special Meeting").  Ackman acknowledged during the June 2

AMENDED COMPLAINT
Case No. 8:14-cv-01214-DOC(ANx)

call that the Special Meeting solicitation was not an ***alternative*** to the tender offer, but rather a hostile means of achieving it.  Specifically, the Special Meeting could result in the removal of Allergan's poison pill – a condition to the tender offer.  But Ackman made sure to note that, even if the Special Meeting were successful, it would result in the ***tender offer*** being consummated, and not some negotiated deal:

> [T]he simplest mechanism here, if you've got a special meeting that is going to be done sometime in November.  [The Pershing-nominated] Board is going to be elected, ***and the board could simply [lift the pill] and allow the exchange offer to close, and that would . . . really be the fastest way this transaction could get done***.  So, I just think it's either negotiate now or close this [exchange offer] transaction, hopefully by year-end.[5]

146.   As Defendants anticipated, on June 10, 2014, Allergan disclosed its Board's unanimous rejection of the Second Revised Proposal, based on its conclusion that Valeant's proposal "substantially undervalue[d] Allergan, create[d] significant risks and uncertainties for Allergan's stockholders and d[id] not reflect the Company's financial strength, future revenue and earnings growth or industry-leading R&D."

147.   Accordingly, and as Valeant had telegraphed a week before, on June 11, Valeant formed AGMS, a wholly-owned subsidiary, to buy and hold Allergan shares acquired through the tender offer.

148.   On June 18, 2014, Valeant formally announced the launch of the tender offer with the filing of a Schedule TO with the SEC.  In connection with that announcement, Pearson confirmed the inaccuracy of Valeant's self-serving claims that it had not previously taken "substantial steps" towards the tender offer. Specifically, Pearson reflected back on the April announcement, and said that:  "On April 22, we announced our offer for Allergan.  ***We suspected at the time it would ultimately have to go directly to Allergan shareholders.  We were correct.***"

---

[5] On July 11, 2014, Pershing filed the definitive proxy statement soliciting proxies to call the special stockholders meeting, and filed amended proxy statements on September 24 and November 14, 2014.  Pershing withdrew the proxy statement and abandoned the proxy contest on November 18, 2014.

149.   The fact that Valeant's own CEO admitted Valeant's intention to launch a tender offer from the beginning undermines Defendants' transparent attempt to dodge securities liability through semantics.  Defendants realized that the core premise of their scheme, *i.e.*, trading a profitable takeover tip in exchange for votes in support of that takeover, violated the securities laws.

**F.    The S-4 And Schedule TO Confirm That Pershing Was Not An "Offering Person" In The Tender Offer**

150.   On June 18, 2014, Valeant filed a Registration Statement on S-4 and Valeant and AGMS filed a Schedule TO with the SEC, thus formally commencing the tender offer that it had contemplating for several months.  AGMS was consistently defined as the "Purchaser" throughout the S-4 and other relevant SEC filings.

151.   The S-4 and Schedule TO made clear that it was Valeant – not Pershing – that was making the offer to acquire Allergan shares, and that Pershing had no control or say over the terms of the transaction or the resulting combined company.  Among other things, the S-4 outlined Valeant's "Offer to Exchange Each Outstanding Share of Common Stock of Allergan, Inc. for $72.00 in cash and 0.83 Common Shares *of Valeant*, . . . *by AGMS Inc.*, a wholly owned subsidiary of Valeant."   In other words, the tender offer consideration consisted of cash (provided by Valeant) and Valeant stock, and Valeant, through AGMS, was the "Purchaser" of Allergan shares.

152.   Pursuant to the S-4, "***none of Pershing Square, PS Fund 1 or any of Pershing Square's affiliates [were] offering to acquire any shares of Allergan common stock in the [tender o]ffer.***"  No Pershing entity would acquire a single Allergan share in the tender offer, nor provide Allergan stockholders with a single dollar or unit of Pershing equity.  Indeed, in a crucial section of the S-4 for Allergan investors entitled "Questions and Answers About the Offer," Defendants were unequivocal concerning each party's role in the tender offer – that Valeant was the "offering person" in the transaction, and Pershing was not:

AMENDED COMPLAINT
Case No. 8:14-cv-01214-DOC(ANx)

Q:   Who is Offering to Acquire My Shares of Allergan Common Stock?

A:   *The offer is being made by Valeant* through Purchaser, a wholly owned subsidiary of Valeant.

Q:   What does it mean that Pershing Square and PS Fund 1, a Pershing Square affiliate, are co-bidders?

A:   *[N]one* of Pershing Square, PS Fund 1 or any of Pershing Square's affiliates *is offering* to acquire any shares of Allergan common stock in the offer.

153.   Valeant's answer to the self-imposed question about the purpose of calling Pershing a "co-bidder" is telling.  The label does not mean what it says, as Pershing was not actually a bidder or an acquirer.  The only purpose of attaching the label was to manufacture a falsified defense for Defendants' violation of the federal securities laws.

154.   The S-4 also disclosed that Allergan stockholders would receive a mix of cash (provided by Valeant) and *Valeant* stock in the tender offer and that the purpose of the tender offer was to give *Valeant* control so it could complete a merger of Allergan into *Valeant*.  Specifically, the S-4 explained that the "purpose of the [tender o]ffer [wa]s for *Valeant* to acquire control of, and promptly thereafter, the entire equity interest in, Allergan.  *Valeant* [then] intend[ed] . . . to cause Allergan to merge with Purchaser [*i.e.*, wholly owned AGMS], . . . after which Allergan would be a . . . wholly owned subsidiary of *Valeant*."  In this regard, the S-4 registered the over 240 million Valeant shares that were offered to Allergan stockholders as part of the tender offer consideration.

155.   The S-4 also made clear that the over 28 million shares that Pershing unlawfully purchased after Valeant tipped it off regarding its impending tender offer in exchange for voting support would *not* remain in Pershing's hands following the closing of the transaction.  Instead, Valeant would compensate Pershing in the tender offer for its shares – amounting to the 9.7% stake – in

AMENDED COMPLAINT
Case No. 8:14-cv-01214-DOC(ANx)

Allergan.  To this end, the S-4 registered a pool of Valeant shares that would be used to buy Pershing out of the Allergan stake that it built by front-running the tender offer.

156.  Given that Pershing's Allergan shares were being bought out by Valeant in the proposed tender offer, it is not surprising that the S-4 did not disclose any "purpose" for the tender offer that in any way concerned Pershing.  In fact, according to the S-4, the only role Pershing played in connection with the tender offer was its prior agreement with Valeant pursuant to which Valeant could cause Pershing to buy $400 million of *Valeant's* common stock (at a 15% discount).  This agreement to provide Valeant with an additional source of financing for the tender offer was not a "bid" to provide anything to *Allergan* stockholders in connection with either the tender offer or close-out merger.

157.  Moreover, in the S-4, Valeant imposed a number of conditions on consummating the tender offer, including the tender of, at a minimum, a majority of Allergan's fully diluted shares, certain regulatory approvals, and the approval of Valeant's stockholders.  Not one of these conditions was imposed by Pershing, and in fact none of the conditions had anything to do with Pershing at all – a fact that underscores the lack of any influence whatsoever by Pershing over the transaction or resulting business combination.

158.  In fact, Valeant even amended the S-4 on July 23, 2014 to further clarify *Pershing was not an "offering person."*  Under Article 15 of Allergan's certificate of incorporation, an affirmative vote of at least two-thirds of "disinterested shares" was required for the approval of a transaction between Allergan and any other corporation or its affiliates that individually or in the aggregate directly or indirectly beneficially owned 5% or more of the outstanding voting shares of Allergan.  Because it was critical that Valeant avoid the two-thirds voting requirement, Valeant disclaimed any affiliation with Pershing in the amended S-4.  Specifically, Valeant asserted that, because Valeant itself owned only 100 shares, and because Valeant was not the "owner" of the shares of Allergan common stock held by PS Fund 1, a merger between Valeant and Allergan would

AMENDED COMPLAINT
Case No. 8:14-cv-01214-DOC(ANx)

not be a "Business Combination" with an "Interested Stockholder" subject to Article 15.  Thus, Valeant itself acknowledged that Valeant is and always was the offering person, while PS Fund 1 was a separate, unaffiliated entity.

159.   The Schedule TO was similarly careful to distinguish the Valeant from the Pershing entities.  The Schedule TO listed Valeant and AGMS as "offerors" and PS Fund 1 as an "*other person*" on the cover page.   The Schedule TO also described AGMS – and not any Pershing entity – as the "Purchaser" in "the third-party tender offer."

160.   Despite Valeant's admission that neither Pershing nor PS Fund 1 was acquiring any shares of Allergan in the tender offer, Defendants continued to describe PS Fund 1 "as a person that is considered a co-bidder *for SEC purposes,*" while at the same time stating that "*none* of Pershing Square, PS Fund 1 or any of Pershing Square's affiliates is offering to acquire any shares of Allergan stock in the offer."   Again, the Allergan stockholders (and Pershing as its largest shareholder) were receiving an offer of Valeant cash and Valeant stock from a singular offeror—*Valeant*—through AGMS, a wholly owned Valeant subsidiary.  Pershing was not offering anything to, or purchasing anything from, Allergan's stockholders, and did not provide any consideration in the tender offer.  In fact, as Allergan's largest shareholder, Pershing itself was being "offered" consideration by Valeant in the tender offer.   Accordingly, the amended Schedule TO (and subsequent versions of the Schedule TO) continued to describe the tender offer as a "third-party tender offer by Purchaser," Valeant, through its AGMS subsidiary.

## G.   Defendants Profit from The Illegal Warehousing Scheme When Actavis Acquires Allergan for $7 Billion More Than Valeant Offered

161.   Following Allergan's continued resistance to Valeant's hostile tender offer proposal, on October 27, 2014, Valeant informed investors in a letter to Allergan's Board that it was "prepared to raise its offer to at least $200 per share," over 70% higher than the "unaffected" price of Allergan shares at which unsuspecting class members sold their stock during the Class Period.

162.   On November 17, 2014, Allergan announced that it had entered into a merger agreement with Actavis, subject to certain closing conditions, including a vote by Allergan's stockholders to approve the transaction.  The merger agreement provided Allergan's then-current stockholders with consideration amounting to $219 per share.

163.   On November 18, 2014, following Allergan's announcement of the Actavis agreement, Pershing announced that it had "discontinue[d] its proxy solicitation."   A day later, on November 19, 2014, Valeant filed amendment number 6 to the Schedule TO, withdrawing the tender offer.   All parties then agreed to cancel the Special Meeting.

164.   On November 19 and 20, 2014, consistent with the terms of the February 25 Relationship Agreement and Defendants' warehousing scheme, which required Pershing to pay 15% of its profits to Valeant if an acquirer other than Valeant agreed to acquire Allergan, PS Fund 1 sold 2,242,560 shares of Allergan for $212.80 and $210.36 per share, respectively.   Valeant made almost $400 million in profits on its $75 million investment – approximately $350 million of which was a pure gain resulting from Defendants' unlawful insider trading scheme. Considering that, from 2009 through 2013, Valeant *lost* an average of about $171 million annually, this windfall derived from Pershing's insider trading had a significant impact on Valeant's bottom line.

165.   On November 21, 2014, Pershing made certain amendments to its Schedule 13D to disclose PS Fund 1's November 19 and 20 sales of Allergan stock and the effective termination of the February 25 Relationship Agreement. Defendants attached an amendment to the Relationship Agreement, which provided that Valeant was no longer a member of PS Fund 1 after it received its 15% share of Pershing's trading profits.

166.   The Actavis/Allergan merger was completed on March 17, 2015.  As of that date, Pershing owned nearly 9% of Allergan's common stock – valued at over $6 billion dollars – but quickly cashed in by selling most its shares after the

Actavis transaction closed.  All told, Pershing made well over $2.5 billion in profits from Defendants' modern-day illegal warehousing scheme.

**H.    Allergan Sues Defendants and the Court Finds that Defendants' Misconduct Raises "Serious Questions" and Likely Violates the Federal Securities Laws**

167.    On August 1, 2014, Allergan and Allergan employee Karah H. Parschauer sued Defendants seeking to prevent them from enjoying the fruits of their securities violations in connection with Pershing's proposed scheduled Special Meeting and proxy contest.  Following limited expedited discovery, on October 7, 2014, Allergan and Parschauer filed their motion seeking a preliminary injunction that would enjoin Pershing from (i) exercising beneficial rights of ownership in the shares PS Fund 1 acquired while in possession of nonpublic material information regarding Valeant's anticipated tender offer, and (ii) voting proxies it solicited for the Special Meeting on the basis of misleading disclosures regarding Defendants' securities violations, unless or until those misstatements were corrected.

168.    In its November 4, 2014 order, this Court found that Allergan and Parschauer had raised "at least" and "at minimum" "serious questions" regarding (i) whether Valeant had taken substantial steps towards the tender offer prior to PS Fund 1's purchases and (ii) whether Pershing was an "other person" as described in Rule 14e-3 and, therefore, was required to abstain from trading or disclose the nonpublic information it possessed relating to Valeant's tender offer.  Thus, the Court found that plaintiffs "raised serious questions going to the merits of their Rule 14e-3 claim."

169.    The Court ultimately declined to enjoin Pershing from exercising beneficial ownership rights over the 9.7% of Allergan shares it owned, in part because Parschauer, as a contemporaneous seller of shares to Pershing "ha[d] a private right of action under Rule 14e-3" that "c[ould] be remedied through damages."

170.    The Court also ruled that Defendants' proxy disclosures contained false or misleading statements or omitted to state material facts, including because

they failed to disclose the machinations in the February 25 Relationship Agreement designed to end-run Rule 14e-3 and that Defendants faced meaningful liability for insider trading.   The Court accordingly ordered Defendants to make corrective disclosures that highlighted the appreciable risks of liability Defendants assumed based on their course of conduct.

171.   On November 14, 2014, the Court ordered Defendants to file disclosures with the SEC stating that Defendants faced significant "risks and exposures" "[s]hould Valeant and Pershing Square ultimately be found to have violated Section 14(e) and Rule 14e-3," including "private stockholder class actions, which could result in significant damages awards or disgorgement of profits."

## V.   APPLICABILITY OF THE *AFFILIATED UTE* PRESUMPTION OF RELIANCE

172.   Plaintiffs and the putative Class are entitled to the *Affiliated Ute* presumption of reliance due to Defendants' failure to disclose nonpublic material information relating to a tender offer for Allergan in violation of federal securities laws.   Defendants had a duty to disclose that information and its source within a reasonable time prior to PS Fund 1's transactions in Allergan securities, but made no such disclosure.   Had Plaintiffs known of the material undisclosed information, they could have avoided selling Allergan securities at the unfair prices they did, or at all, during the Class Period.

## VI.   CONTEMPORANEOUS TRADING

173.   During the Class Period, Plaintiffs relied on the integrity of the market for Allergan securities which was presumed to be determined by ordinary supply and demand and free from manipulation, distortion and insider trading on the basis of material, nonpublic information.   The Williams Act required Pershing to disclose all material public information pertaining to Valeant's anticipated tender offer or to abstain from trading.   PS Fund 1 entered into below transactions while in possession of material information relating to a tender offer of Allergan during the Class Period in breach of its obligation to disclose such information or abstain

from trading under the federal securities laws.  Further, as Ackman admitted, these transactions were effectuated by "go[ing] into the market" on the dates indicated in the chart set forth above at paragraph 102:

| Date of 2014 Purchase | Quantity Purchased | Stock Price | Strike Price | Security |
|---|---|---|---|---|
| February 25 | 174,636 | $125.16 | N/A | Common Stock |
| February 26 | 422,795 | $127.83 | N/A | Common Stock |
| March 3 | 1,239,000 | $127.68 | $1.27 | OTC Call Option |
| March 6 | 863,000 | $129.06 | $1.29 | OTC Call Option |
| March 11 | 779,000 | $128.58 | $1.28 | OTC Call Option |
| March 14 | 1,416,000 | $128.90 | $1.28 | OTC Call Option |
| March 19 | 1,353,000 | $131.42 | $1.31 | OTC Call Option |
| March 24 | 2,130,000 | $128.61 | $1.28 | OTC Call Option |
| March 27 | 2,578,000 | $123.60 | $1.23 | OTC Call Option |
| April 1 | 1,733,000 | $123.55 | $1.23 | OTC Call Option |
| April 4 | 1,046,000 | $125.56 | $1.25 | OTC Call Option |
| April 8 | 1,191,107 | $121.94 | $1.21 | OTC Call Option |
| April 11 | 2,523,000 | $120.66 | $1.20 | OTC Call Option |
| April 14 | 2,184,000 | $123.65 | $1.23 | OTC Call Option |
| April 15 | 1,843,000 | $126.02 | $1.26 | OTC Call Option |
| April 16 | 2,233,000 | $130.45 | $1.30 | OTC Call Option |
| April 17 | 1,720,000 | $134.01 | $1.33 | OTC Call Option |
| April 21 | 3,450,000 | $140.37 | N/A | OTC Equity Forward |

174.   As set forth in their sworn certifications previously filed in this action (Dkt. No. 18-2) and herewith, Plaintiffs sold Allergan common stock during the Class Period on the dates and for the prices indicated, and thus traded contemporaneously with PS Fund 1.

VII.   **CLASS ACTION ALLEGATIONS**

175.   Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who sold Allergan publicly traded common stock from February 25, 2014 through April 21, 2014, inclusive (the "Class Period"), hereinafter referred to as the "Class."  Excluded from the Class are Defendants, their officers and directors, members of the

immediate family of such officers and directors, any entities in which Defendants have or had controlling interests, and all of the legal representatives, heirs, successors or assigns of each of the foregoing.  The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members of the proposed class.  Record owners and other members of the Class may be identified from records maintained by Allergan or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.  As of March 11, 2014, as reported in Allergan, Inc.'s Definitive Proxy Statement on Schedule 14-A filed with the SEC on March 26, 2014, there were 299,108,984 shares of Allergan stock outstanding.

176.   There are numerous questions of law and fact common to all members of the Class that predominate over any questions which may affect individual class members, including but not limited to:

(a)    whether Defendants violated federal securities laws;

(b)    whether the Pershing Defendants unlawfully purchased Allergan securities while in possession of material, nonpublic information relating to a tender offer;

(c)    whether the Valeant Defendants unlawfully communicated material, nonpublic information relating to a tender offer to the Pershing Defendants;

(d)    whether Defendants engaged in fraudulent, deceptive or manipulative practices in violation of Section 14(e) and Rule 14e-3 of the Exchange Act;

(e)    the extent of damages sustained by Class members and the appropriate measure of damages.

177.   Plaintiffs' claims are typical of those of the Class because Plaintiffs and the Class sustained damages from the same wrongful conduct.

178.   Plaintiffs will adequately protect the interests of the Class and have retained counsel who are experienced in class action securities litigation.  Plaintiffs have no interests which conflict with those of the Class.

179.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## VIII.   CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

### For Violations of Section 14(e) Of The Exchange Act And Rule 14e-3 Thereunder Against All Defendants

180.   Plaintiffs incorporate by reference and re-allege each and every allegation contained above, as though fully set forth herein.

181.   Section 14(e) provides: "It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer."

182.   Defendants' conduct violated their respective obligations under Section 14(e) of the Williams Act and the rules promulgated thereunder, including Rule 14e-3(a) (prohibiting the Pershing Defendants from trading while in possession of nonpublic material information relating to a tender offer) and Rule 14e-3(d) (prohibiting the Valeant Defendants from communicating nonpublic material information relating to a tender offer).

183.  Rule 14e-3(a) provides that once an offering person has "taken a substantial step or steps to commence a tender offer," then "it shall constitute a fraudulent, deceptive or manipulative act or practice" for any "other person who is in possession of material nonpublic information relating to the tender offer which information he knows or has reasons to know is nonpublic and which he knows or has reason to know has been acquired directly or indirectly from the offering person" (or any of the offering person's officer, director, partner or employee or any other person acting on behalf of the offering person) to "purchase or sell or cause to be purchased or sold" any securities in the target or "any securities convertible into or exchangeable for any such securities or any option or right to obtain or to dispose" of such securities unless the nonpublic information is disclosed within a reasonable time prior to trading.

184.  Rule 14e-3(d) provides that, under such circumstances, it shall be unlawful for an offering person "to communicate material, nonpublic information relating to a tender offer to any other person under circumstances in which it is reasonably foreseeable that such communication is likely to result in a violation of this section."

185.  The purpose of Rule 14e-3 is to prevent parties with nonpublic information relating to a tender offer as to which substantial steps have been taken from transacting with investors who do not have such information, unless they disclose that information first and within a reasonable time prior to trading the relevant securities.  Rule 14e-3 seeks to curb "warehousing"—the practice of a tender offeror intentionally leaking information to institutional investors to allow those entities to make early trades with other market participants before the latter learns of the tender offer.

186.  After taking substantial steps to commence a tender offer for Allergan shares, the Valeant Defendants unlawfully communicated material, nonpublic information relating to that tender offer to the Pershing Defendants.  Those communications were made under circumstances in which it was reasonably

foreseeable that those communications were likely to result in a violation of Rule 14e-3.

187. Following Valeant's communications, and without disclosing the material, nonpublic information, the Pershing Defendants purchased or caused to be purchased over 28 million shares of Allergan stock while in possession of material, nonpublic information obtained from the Valeant Defendants. The Pershing Defendants knew or had reason to know the information was nonpublic, material and had been acquired directly or indirectly from Valeant, the offering person.

188. Defendants intentionally or recklessly engaged in acts, practices and a course of conduct that was fraudulent, deceptive or manipulative in violation of Section 14(e) and Rule 14e-3 of the Exchange Act.

189. As set forth in Section VI, *supra*, Plaintiffs sold Allergan securities contemporaneously with PS Fund's transactions during the Class Period.

190. Defendants' violations of Section 14(e) of the Williams Act, and the rules adopted thereunder, have caused Plaintiffs and the Class damages. The Class did not have the information required to be disclosed under Section 14(e) and Rule 14e-3 and therefore sold Allergan stock for an unfair and artificially low price. Defendants' misconduct allowed them to unlawfully enrich themselves by purchasing Allergan shares at unfair and artificially low prices.

## SECOND CLAIM FOR RELIEF

### For Violations of Section 20A Of The
### Exchange Act Against All Defendants

191. Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

192. Section 20A(a) of the Exchange Act provides that "[a]ny person who violates any provision of [the Exchange Act] or the rules or regulations thereunder by purchasing or selling a security while in possession of material, nonpublic information shall be liable . . . to any person who, contemporaneously with the

purchase or sale of securities that is the subject of such violation, has purchased . . . securities of the same class."

193.   As set forth herein, the Pershing Defendants violated Section 14(e) and Rule 14e-3 by engaging in fraudulent, deceptive or manipulative practices and trading in Allergan securities while in possession of material, nonpublic information relating to a tender offer.  The Pershing Defendants are therefore liable under Section 20A(a).

194.   Section 20A(c) of the Exchange Act provides that "[a]ny person who violates any provision of [the Exchange Act] or the rules or regulations thereunder by communicating material, nonpublic information shall be jointly and severally liable under subsection (a) with, and to the same extent as, any person or persons liable under subsection (a) to whom the communication was directed."

195.   As set forth herein, the Valeant Defendants violated this provision by communicating material, nonpublic information relating to a tender offer to the Pershing Defendants under circumstances in which it was reasonably foreseeable that those communications were likely to result in a violation of Rule 14e-3.

196.   As detailed in Section VI *supra*, Plaintiffs sold Allergan common stock contemporaneously with the Pershing Defendants.

197.   Under Section 20A of the Exchange Act, Defendants are jointly and severally liable to Plaintiffs and the Class for all profits gained and losses avoided by them as a result of their insider trading.

## THIRD CLAIM FOR RELIEF

### For Violations of Section 20(a)
### Of The Exchange Act Against
### Pershing Square, PS Management, Ackman And Pearson

198.   Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

199.   Section 20A(b)(3) of the Exchange Act provides that the "liability of a controlling person under [Section 20A of the Exchange Act] shall be subject to [Section 20(a) of the Exchange Act]."

AMENDED COMPLAINT
Case No. 8:14-cv-01214-DOC(ANx)

200. Defendants Pershing Square, PS Management and Ackman (collectively, the "Pershing Control Defendants") acted as controlling persons of PS Fund 1 within the meaning of Section 20(a) of the Exchange Act, as alleged herein.

201. Ackman, by reason of his position of control and authority as the CEO of Pershing Square and as the "managing member" of the Pershing entities that were party to the February 11, 2014 Agreement, had the power and authority to influence and control, and did influence and control, the activities of PS Fund 1, including the manner and timing of PS Fund 1's purchases of Allergan securities. In his capacity as the most senior corporate officer of Pershing Square and other Pershing entities, and as more fully described above, Ackman caused PS Fund 1 to enter into the transactions to acquire Allergan securities without disclosing information that was required to be disclosed under Section 14(e) and Rule 14e-3 of the Exchange Act.

202. Pershing Square, as the non-member manager of PS Fund 1, had "full, exclusive and complete discretion in the management and control of the business and affairs" of PS Fund 1 under the February 11, 2014 Agreement, including the manner and timing of PS Fund 1's purchases of Allergan securities. Pershing Square caused PS Fund 1 to enter into transactions to acquire Allergan securities without disclosing information that was required to be disclosed under Section 14(e) and Rule 14e-3 of the Exchange Act as alleged herein.

203. PS Management, as the sole general partner of Pershing Square, had the power and authority to influence and control, and did influence and control, the business activities and decisions of Pershing Square, and thus PS Fund 1, and in that capacity caused PS Fund 1 to enter into transactions to acquire Allergan securities without disclosing information that was required to be disclosed under Section 14(e) and Rule 14e-3 of the Exchange Act.

204. Each of the Pershing Control Defendants culpably participated in some meaningful sense in the violations of federal securities laws as alleged herein.

205.   By virtue of their positions as controlling persons of PS Fund 1 and as a result of their own aforementioned conduct, the Pershing Control Defendants together and individually, are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as PS Fund 1 is liable under Section 14(e) and Rule 14e-3 and Section 20A of the Exchange Act.

206.   Pearson, by reason of his position of control and authority as the CEO of Valeant, had the power and authority to influence and control, and did influence and control, the activities of Valeant, including the substantial steps Valeant took toward a tender offer and Valeant's communication of material, nonpublic information relating to that tender offer to the Pershing Defendants, as alleged herein.  Pearson culpably participated in some meaningful sense in the violations of federal securities laws as alleged herein.

207.   By virtue of his position as a controlling person of Valeant and as a result of his own aforementioned conduct, Pearson is liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as Valeant is liable under Section 14(e) and Rule 14e-3 and Section 20A of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

A.   Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

B.   Awarding Plaintiffs and the members of the Class damages, including interest;

C.   Awarding Plaintiffs reasonable costs and attorneys' fees; and

D.   Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated:  June 26, 2015                  Respectfully submitted,

                                       BERNSTEIN LITOWITZ BERGER
                                         & GROSSMANN LLP


                                       _/s/ Blair A. Nicholas_
                                           BLAIR A. NICHOLAS

                                       BLAIR A. NICHOLAS (Bar No. 178428)
                                       blairn@blbglaw.com
                                       RICHARD D. GLUCK (Bar No. 151675)
                                       rich.gluck@blbglaw.com
                                       BRANDON MARSH (Bar No. 268316)
                                       brandon.marsh@blbglaw.com
                                       12481 High Bluff Drive, Suite 300
                                       San Diego, CA 92130
                                       Tel:   (858) 793-0070
                                       Fax:   (858) 793-0323

                                                   -and-

                                       MARK LEBOVITCH
                                       markl@blbglaw.com
                                       MICHAEL D. BLATCHLEY
                                       michaelb@blbglaw.com
                                       EDWARD G. TIMLIN
                                       (_pro hac vice_ to be filed)
                                       edward.timlin@blbglaw.com
                                       1285 Avenue of the Americas, 38th Floor
                                       New York, NY 10019
                                       Tel:   (212) 554-1400
                                       Fax:   (212) 554-1444

                                       _Counsel for Lead Plaintiff State Teachers_
                                       _Retirement System of Ohio and Plaintiffs_
                                       _and Co-Lead Counsel for the Class_

                                       KESSLER TOPAZ MELTZER
                                          & CHECK, LLP

                                       ELI GREENSTEIN (Bar No. 217945)
                                       egreenstein@ktmc.com
                                       STACEY KAPLAN (Bar No. 241989)

skaplan@ktmc.com
RUPA NATH COOK (Bar No. 296130)
rcook@ktmc.com
One Sansome Street, Suite 1850
San Francisco, CA 94104
Tel:    (415) 400-3000
Fax:   (415) 400-3001

   -and-

LEE RUDY
(*pro hac vice* to be filed)
lrudy@ktmc.com
JUSTIN O. RELIFORD
(*pro hac vice* to be filed)
jreliford@ktmc.com
280 King of Prussia Road
Radnor, PA 19087
Tel:    (610) 667-7706
Fax:   (610) 667-7056

*Counsel for Lead Plaintiff Iowa Public
Employees Retirement System and Plaintiffs
and Co-Lead Counsel for the Class*

MURRAY MURPHY MOUL +
    BASIL LLP

BRIAN K. MURPHY
(*pro hac vice* to be filed)
murphy@mmmb.com
JOSEPH F. MURRAY
(*pro hac vice* to be filed)
murray@mmmb.com
1114 Dublin Rd.
Columbus, OH 43215
Tel:    (614) 488-0400
Fax:   (614) 488-0401

*Special Counsel for Lead Plaintiff State
Teachers Retirement System of Ohio*

AMENDED COMPLAINT
Case No. 8:14-cv-01214-DOC(ANx)

## CERTIFICATION PURSUANT TO
## THE FEDERAL SECURITIES LAWS

I, Patrick T. Johnson, hereby certify, as to the claims asserted under the federal securities laws, that:

1. I have reviewed the Amended Complaint in this matter and authorize its filing by counsel.

2. The securities that are the subject of this action were not purchased at the direction of counsel or in order to participate in any action arising under the federal securities laws.

3. I am willing to serve as a representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary.

4. My transactions in the Allergan securities that are the subject of this action are set forth in the chart attached hereto.

5. I have not sought to serve as a lead plaintiff or representative party on behalf of a class in any action under the federal securities laws filed during the three-year period preceding the date of this Certification.

6. I will not accept any payment for serving as a representative party on behalf of the Class beyond my pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge. Executed this 25 day of June, 2015.

_____
Patrick T. Johnson

**Patrick T. Johnson**
**Transactions in Allergan Common Stock**

| <u>Transaction</u> | <u>Date</u> | <u>Shares</u> | <u>Price</u> |
|---|---|---|---|
| Sale | 3/12/2014 | 250 | $126.662 |
| Sale | 3/12/2014 | 1,000 | $126.461 |