1  Mark Holscher (SBN 139582)
2  mark.holscher@kirkland.com
   Michael Shipley (SBN 233674)
3  michael.shipley@kirkland.com
   Tanya L. Greene (SBN 267975)
4  tanya.greene@kirkland.com
   KIRKLAND & ELLIS LLP
5  333 South Hope Street
6  Los Angeles, California 90071
   Telephone:   (213) 680-8400
7  Facsimile:    (213) 680-8500
8
9  *Attorneys for Pershing Square*
   *Capital Management, L.P., PS*
10 *Management GP, LLC, PS Fund 1,*
   *LLC, and William Ackman*
11
12 [Additional counsel on signature page]
13
14               **UNITED STATES DISTRICT COURT**
                 **CENTRAL DISTRICT OF CALIFORNIA**
15               **SOUTHERN DIVISION—SANTA ANA**
16
17 IN RE ALLERGAN, INC. PROXY        )  Case No.: 8:14-cv-2004-DOC-(ANx)
   VIOLATION SECURITIES             )
18 LITIGATION                       )  Honorable David O. Carter
                                    )
19                                  )  <u>CLASS ACTION</u>
                                    )
20                                  )  **DEFENDANTS' NOTICE OF**
                                    )  **MOTION AND MOTION TO**
21                                  )  **DISMISS PLAINTIFFS' AMENDED**
                                    )  **COMPLAINT; MEMORANDUM OF**
22                                  )  **POINTS AND AUTHORITIES IN**
                                    )  **SUPPORT THEREOF**
23                                  )
                                    )  Orig. Compl. Filed:  Dec. 16, 2014
24                                  )  Operative AC Filed:  Jun. 26, 2015
                                    )  Hearing Date:         Oct. 19, 2015
25                                  )  Time:                 8:30 a.m.
                                    )  Courtroom:            9D
26                                  )
27                                  )
28

---

**DEFS. NOT. & MOT. TO DISMISS AMEND. COMPLT.; MEM. OF P&As THEREOF**

1

## NOTICE OF MOTION AND MOTION

2      TO THIS HONORABLE COURT, THE PARTIES AND THEIR

3  ATTORNEYS OF RECORD, PLEASE TAKE NOTICE THAT on October 19, 2015,

4  at 8:30 a.m., or the soonest date and time available to the Court thereafter, in

5  courtroom 9D of the United States District Court for the Central District of California,

6  located at 411 W. 4th Street, Santa Ana, California 92701, Defendants Pershing

7  Square Capital Management, L.P., PS Management, GP, LLC, PS Fund I, LLC,

8  William A. Ackman, Valeant Pharmaceuticals International, Inc., Valeant

9  Pharmaceuticals International, and Michael Pearson ("Defendants") will and hereby

10  do move for an order dismissing the Amended Complaint ("AC") in its entirety with

11  prejudice pursuant to Federal Rules of Civil Procedure 12(b)(6), 9(b) and 8(a).

12  Plaintiffs' First Claim for Relief must be dismissed because: (i) Plaintiffs Patrick

13  Johnson and Ohio STRS lack standing to bring an insider trading claim; (ii) the AC

14  fails to allege sufficient facts to plead a Section 14(e) claim; and (iii) there is no

15  private right of action to bring a claim based on Rule 14e-3's prohibition on insider

16  trading without a claim of fraud or breach of duty. Plaintiffs' Second Claim for Relief

17  must be dismissed because: (i) Plaintiffs Patrick Johnson and Ohio STRS lack

18  standing to bring an insider trading claim; (ii) there is no right of action to bring a

19  claim under § 20A based on an alleged breach of Rule 14e-3 without any fraud or

20  breach of duty; (iii) the AC fails to allege that Valeant took substantial steps to

21  commence a tender offer, as required to plead a Rule 14e-3 violation; (iv) the AC fails

22  to allege facts that would permit a compelling inference of scienter in support of

23  Plaintiffs' claim that Valeant was, in fact, taking steps to commence a tender offer;

24  and (v) the AC fails to allege sufficient facts in support of the scienter required to

25  plead tipper liability against Valeant. Plaintiffs' Third Claim for Relief must be

26  dismissed because it is wholly derivative and, due to the deficiencies in the First and

27  Second Claims, fails to be predicated on a valid, underlying violation of law or

28  regulation.

**DEFS. NOT. & MOT. TO DISMISS AMEND. COMPLT.; MEM. OF P&As THEREOF**

1        Defendants' Motion is and will be based on this Notice of Motion and Motion

2  to Dismiss Plaintiffs' Amended Complaint, Defendants' Memorandum of Points and

3  Authorities in Support Thereof, Defendants' Request for Judicial Notice, the

4  Declaration of Michael J. Shipley, any Reply, and any oral argument that may be

5  presented at the hearing on this matter.

6        This Motion is made following a conference of counsel pursuant to Local Rule

7  7-3, which took place on July 31, 2015. The parties were unable to reach agreement

8  on the issues raised in the instant motion.

9

10  Dated: August 7, 2015             Respectfully submitted,

11                           KIRKLAND & ELLIS LLP

12                           By: /s/ Mark Holscher

13

14                         Mark Holscher
                             Michael Shipley

15                         Tanya L. Greene
                             Jay Bhimani

16                         Austin Norris

17                         333 South Hope Street
                             Los Angeles, California 90071

18                         Telephone:   (213) 680-8400

19                         Facsimile:    (213) 680-8500

20                         *Attorneys for Pershing Square Capital*

21                         *Management, L.P., PS Management, GP, LLC,*
                           *PS Fund 1, LLC, and William A. Ackman*

22

23

24

25

26

27

28

**DEFS. NOT. & MOT. TO DISMISS AMEND. COMPLT.; MEM. OF P&As THEREOF**

| | |
|---|---|
| 1 | Dated: August 7, 2015 |

SULLIVAN & CROMWELL LLP

By: /s/ Brian T. Frawley

Robert A. Sacks (SBN 150146)
sacksr@sullcrom.com
Edward E. Johnson (SBN 241065)
johnsonee@sullcrom.com
Katherine A. Taylor (SBN 289711)
taylork@sullcrom.com
1888 Century Park East, Suite 2100
Los Angeles, California 90067-1725
Telephone: (310) 712-6600
Facsimile:   (310) 712-8800

Brian T. Frawley (*pro hac vice*)
frawleyb@sullcrom.com
Max S. Heuer (*pro hac vice* to be filed)
heuerm@sullcrom.com
125 Broad Street
New York, New York 10004-2498
Telephone:  (212) 558-4000
Facsimile:   (212) 558-3588

*Attorneys for Defendants Valeant
Pharmaceuticals International, Inc., Valeant
Pharmaceuticals International and Michael
Pearson*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**MEMORANDUM OF POINTS AND AUTHORITIES**

**TABLE OF CONTENTS**

**Page**

INTRODUCTION .................................................................................................. 1

STATEMENT OF FACTS ................................................................................... 4

ARGUMENT ......................................................................................................... 7

I.    Johnson and Ohio STRS Lack Standing to Sue for Insider Trading. ................. 8

    A.    To Have Standing to Sue for Insider Trading, There Must Be a Logical Possibility that a Plaintiff Traded with the Defendants. ............................ 9

    B.    Plaintiffs Ohio STRS and Patrick Johnson Do Not Allege Contemporaneous Trades.......................................................................... 13

    C.    Plaintiffs Cannot Manufacture Standing Through Speculation About Nomura's Hedging and the "Functional Equivalence" Between Options and Common Stock.................................................................................... 15

II.    The First Claim Fails to Plead a Cognizable Claim Arising Under any Recognized Private Right of Action for Money Damages................................. 21

    A.    Plaintiffs Plead No Cognizable Violation of Section 14(e). .................... 21

    B.    Plaintiffs Have No Private Right of Action Under Rule 14e-3 For Conduct Permissible Under § 14(e). .................................................... 22

III.    The Second Claim Is Derivative of the Defective § 14(e) Claim and Must Be Dismissed.......................................................................................................... 24

IV.    The Second Claim Does Not State a Claim for Relief under Rule 14e-3. ......... 25

    A.    Pershing is an Offering Person Outside the Trading Proscription in Rule 14e-3.................................................................................................... 26

    B.    The AC Does Not Adequately Allege Valeant Had Taken Substantial Steps to Commence a Tender Offer During PS Fund 1's Trading. ......... 27

        1.    Rule 14e-3 Requires that an Offering Person Take Substantial Steps Towards the Commencement of a Tender Offer. ................ 27

        2.    The AC Does Not Adequately Allege that Valeant Took any Substantial Step to Commence a Tender Offer Prior to the Completion of PS Fund 1's Trading. ............................................... 29

        3.    The Relationship Agreement Is Not Itself a Substantial Step. ...... 32

    C.    The AC Does Not Adequately Plead Scienter. ....................................... 34

**DEFS. NOT. & MOT. TO DISMISS AMEND. COMPLT.; MEM. OF P&As THEREOF**

1.  Defendants Could Know that Information Came from an "Offering Person" Only if they Knew that Substantial Steps Had Been Taken to Commence a Tender Offer. ........................................34

2.  Because Defendants Are the Offering Persons, Information Cannot Relate to a Tender Offer Unless Defendants Consciously Initiated a Tender Offer. ........................................35

3.  The AC Falls Well Short of the Strong-Inference Standard. .........36

4.  Plaintiffs Fail to Plead Scienter by Any Valeant Defendant. ........37

V.  The Third Claim, Derivative of the Others, Must Be Dismissed. ......................40

CONCLUSION ........................................40

**DEFS. NOT. & MOT. TO DISMISS AMEND. COMPLT.; MEM. OF P&As THEREOF**

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Alexander v. Sandoval*,
    532 U.S. 275 (2001) ........................................................................21, 22, 23

*Ashwander v. TVA*,
    297 U.S. 288 (1936) .................................................................................. 13

*Batwin v. Occam Networks, Inc.*,
    2008 WL 2676364 (C.D. Cal. July 1, 2008) ........................................25

*Beaumont v. Am. Can Co.*,
    621 F. Supp. 484 (S.D.N.Y. 1985) ........................................................28

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) .................................................................................... 7

*Bianco v. Tex. Instruments, Inc.*,
    627 F. Supp. 154 (N.D. Ill. 1985) ..........................................................14

*Biotech. Value Fund, L.P. v. Celera Corp.*,
    12 F. Supp. 3d 1194 (N.D. Cal. 2013) ................................................22

*Brody v. Transitional Hosps. Corp.*,
    280 F.3d 997 (9th Cir. 2002) ..................................................... passim

*Brodzinsky v. FrontPoint Partner LLC, No. 3*,
    2012 WL 1468507 (D. Conn. Apr. 26, 2012) ................................ 12, 13

*Buban v. O'Brien*,
    1994 WL 324093 (N.D. Cal. Jun. 22, 1994) ........................... 10, 12, 14

*Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
    511 U.S. 164 (1994) .................................................................................23

*Chiarella v. United States*,
    445 U.S. 222 (1980) .................................................................................22

*Conn. Nat'l Bank v. Flour Corp.*,
    808 F.2d 957 (2d Cir. 1987) ...................................................................22

*Croker v. Carrier Access Corp.*,
    2006 WL 2038011 (D. Colo. July 18, 2006) ........................................12

*Decker v. Glenfed, Inc.*,
    42 F.3d 1541 (9th Cir. 1994) .................................................................... 8

**DEFS. NOT. & MOT. TO DISMISS AMEND. COMPLT.; MEM. OF P&As THEREOF**

*Destfino v. Reiswig*,
     630 F.3d 952 (9th Cir. 2011) .................................................................... 8

*DSAM Global Value Fund v. Altris Software, Inc.*,
     288 F.3d 385 (9th Cir. 2002) .................................................................. 36

*Feldman v. Motorola, Inc.*,
     1993 WL 497228 (N.D. Ill. Oct. 14, 1993) ............................................ 12

*Fridrich v. Bradford*,
     542 F.2d 307 (6th Cir. 1976) .................................................................. 11

*Gordon v. Sonar Capital Mgmt. LLC*,
     2015 WL 1283636 (S.D.N.Y. Mar. 19, 2015) ........................................ 24

*Holt v. Kormann*,
     2012 WL 123025 (C.D. Cal. Jan. 12, 2012) ........................................... 17

*In re Able Labs. Sec. Litig.*,
     2008 WL 1967509 (D.N.J. Mar. 24, 2008) ............................................ 12

*In re Aldus Sec. Litig.*,
     1993 WL 121478 (W.D. Wash. Mar. 1, 1993) ........................................ 12

*In re AST Research Sec. Litig.*,
     887 F. Supp. 231 (C.D. Cal. 1995) ......................................................... 12

*In re Countrywide Fin. Corp. Sec. Litig.*,
     588 F. Supp. 2d 1132 (C.D. Cal. 2008) .................................................. 12

*In re Digital Island Sec. Litig.*,
     357 F.3d 322 (3rd Cir. 2004) .................................................................. 37

*In re Enron Corp. Sec., Derivative & ERISA Litig.*,
     258 F. Supp. 2d 576 (S.D. Tex. 2003) .................................................... 12

*In re Fed. Nat'l Mortg. Ass'n Sec., Derivative, & "ERISA" Litig.*,
     503 F. Supp. 2d 25 (D.D.C. 2007) ......................................................... 12

*In re Impac Mortg. Holdings Inc. Sec. Litig.*,
     554 F. Supp. 2d 1083 (2008) .................................................................. 39

*In re McDonnell Douglas Corp. Sec. Litig.*,
     567 F. Supp. 126 (E.D. Mo. 1983) ......................................................... 14

*In re MicroStrategy, Inc. Sec. Litig.*,
     115 F. Supp. 2d 620 (E.D. Va. 2000) ..................................................... 12

**DEFS. NOT. & MOT. TO DISMISS AMEND. COMPLT.; MEM. OF P&As THEREOF**

*In re Novatel Wireless Sec. Litig.*,
    830 F. Supp. 2d 996 (S.D. Cal. 2011) ...............................................................12

*In re Silicon Graphics Sec. Litig.*,
    183 F.3d 970 (9th Cir. 1999).............................................................................16

*In re Silicon Graphics, Inc. Sec. Litig.*,
    970 F. Supp. 746 (N.D. Cal. 1997).....................................................................12

*In re SLM Corp. ERISA Litig.*,
    2010 WL 3910566 (S.D.N.Y. Sept. 24, 2010) .....................................................9

*In re Stac Elecs. Sec. Litig.*,
    89 F.3d 1399 (9th Cir. 1996).............................................................................19

*In re VeriFone Sec. Litig.*,
    11 F.3d 865 (9th Cir. 1993)...............................................................................25

*In re Wet Seal, Inc. Sec. Litig.*,
    518 F. Supp. 2d 1148 (C.D. Cal. 2007)..............................................................39

*Indep. Living Ctr. of S. Cal.* v. *City of L.A.*,
    973 F. Supp. 2d 1139 (C.D. Cal. 2013)..............................................................23

*Iqbal v. Ashcroft*,
    556 U.S. 662 (2009) ...................................................................................30, 32

*Jackson v. Fischer*,
    931 F. Supp. 2d 1049 (N.D. Cal. 2013) .............................................................17

*Johnson v. Aljian*,
    490 F.3d 778 (9th Cir. 2007).............................................................................25

*Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*,
    501 U.S. 350 (1991) ........................................................................................25

*Laventhall v. Gen. Dynamics Corp.*,
    704 F.2d 407 (8th Cir. 1983)............................................................................14

*Lent v. JP Morgan Chase Bank*,
    2011 WL 5971190 (C.D. Cal. Nov. 29, 2011) ...............................................17, 20

*Lonberg* v. *City of Riverside*,
    571 F.3d 846 (9th Cir. 2009).............................................................................23

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ........................................................................................13

**DEFS. NOT. & MOT. TO DISMISS AMEND. COMPLT.; MEM. OF P&As THEREOF**

*Mark H. v. Lemahieu,*
  513 F.3d 922 (9th Cir. 2008) .................................................................23, 24

*McGuire v. Dendreon Corp.,*
  2008 WL 5130042 (W.D. Wash. Dec. 5, 2008) ...........................................12

*Miller v. Gammie,*
  335 F.3d 889 (9th Cir. 2003) ......................................................................21

*Neubronner v. Milken,*
  6 F.3d 666 (9th Cir. 1993) ....................................................................passim

*Ore. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.,*
  774 F.3d 598 (9th Cir. 2014) ...................................................................8, 25

*Piper v. Chris-Craft Indus., Inc.,*
  430 U.S. 1 (1977) ........................................................................................21

*Plaine v. McCabe,*
  797 F.2d 713 (9th Cir. 1986) ......................................................................21

*Post v. St. Paul Travelers Ins. Co.,*
  691 F.3d 500 (3d Cir. 2012) ........................................................................28

*Realnetworks, Inc. v. DVD Copy Control Ass'n, Inc.,*
  2010 WL 145098 (N.D. Cal. Jan. 8, 2010) .................................................16

*Reese v. Malone,*
  747 F.3d 557, 569 (9th Cir. 2014) ..............................................................35

*Rombach v. Chang,*
  355 F.3d 164 (2d Cir. 2004) ........................................................................34

*Rubke* v. *Capitol Bancorp Ltd.,*
  2006 WL 1699569 (N.D. Cal. Jun. 16, 2006) .............................................21

*Sanford v. MemberWorks, Inc.,*
  625 F.3d 550 (9th Cir. 2010) ......................................................................21

*SEC v. Ginsburg,*
  362 F.3d 1292 (11th Cir. 2004) .......................................................34, 35, 36

*Shapiro v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,*
  495 F.2d 228 (2d Cir. 1974) ..................................................................10, 11

*Starbuck v. City & Cnty. of S.F.,*
  556 F.2d 450 (9th Cir. 1977) ......................................................................29

**DEFS. NOT. & MOT. TO DISMISS AMEND. COMPLT.; MEM. OF P&As THEREOF**

*Starkman v. Warner Commc'ns, Inc.*,
    671 F. Supp. 297 (S.D.N.Y. 1987) ................................................................... 14

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ........................................................................... 8, 37

*Thomas v. Taco Bell Corp.*,
    879 F. Supp. 2d 1079 (C.D. Cal. 2012) ............................................................. 18

*United States v. Chestman*,
    947 F.2d 551 (2nd Cir. 1991) ...................................................................... 27

*United States v. NASD*,
    422 U.S. 694 (1975) .............................................................................. 16

*United States v. O'Hagan*,
    521 U.S. 642 (1997) .............................................................. 22, 23, 27, 35

*United States v. Rivera-Guerrero*,
    377 F.3d 1064 (9th Cir. 2004) ................................................................... 13

*Unitrin, Inc. v. Am. Gen. Corp.*,
    651 A.2d 1361 (Del. 1995) ........................................................................ 6

*Valley Forge Christian Coll. v. Ams. United for Separation of Church & State*,
    454 U.S. 464 (1982) .............................................................................. 13

*Vess v. Ciba-Geigy Corp. USA*,
    317 F.3d 1097 (9th Cir. 2003) ..................................................................... 8

*Wilson v. Comtech Telecomms. Corp.*,
    648 F.2d 88 (2d Cir. 1981) ....................................................................... 11

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009) ................................................................ 8, 40

**Statutes**

15 U.S.C. § 78c .................................................................................... 19

15 U.S.C. § 78n ............................................................................... passim

15 U.S.C. § 78t-1 ............................................................................ passim

15 U.S.C. § 78u-4 ................................................................................... 8

17 C.F.R. § 240.10b-10 ............................................................................ 22

17 C.F.R. § 240.14e-3 ....................................................................... passim

**DEFS. NOT. & MOT. TO DISMISS AMEND. COMPLT.; MEM. OF P&As THEREOF**

1

**Other Authorities**

2

Aaron Rachelson, *Corporate Acquisitions, Mergers & Divestitures* (2015 online ed.)

3
.................................................................................................................36

4

Bank of Int'l Settlement, *BIS Quarterly Review: International Banking & Financial Market Developments* (June 2015) ....................................................20

5

Frank Partnoy, *The Shifting Contours of Global Derivatives Regulation*, 22 U. Pa. J.

6
Int'l Econ. L. 421 (2001) ..................................................................20

7

H.R. Rep. No. 910, 100th Cong., 2d Sess. 1988, 1988 WL 169923 .....................28, 29

8

Martin Lipton, *Takeovers & Freezeouts* (2015 online ed.) ........................................35

9

Miller & Ruane, *The Dodd-Frank Wall Street Reform and Consumer Protection Act:*

10
*Title VII, Derivatives* (Cong. Research Serv. 2012)...........................................20

11

Richard Heckinger, Fed. Reserve Bank of Chi., Fin. Mkts. Grp., *Understanding*

12
*Derivatives: Markets and Infrastructure* (2015) .................................................21

13

Rossman, *et. al.*, *Commercial Contracts: Strategies for Drafting and Negotiating* ....20

14

SEC Release No. 34-17120, Tender Offers, 45 Fed. Reg. 60,410 (1980) .......33, 38, 41

15

SEC Release No. 6239, 1980 WL 20869 (Sept. 4, 1980) .............................................31

16

Wachtell, Lipton, Rosen & Katz, *Takeover Law & Practice* (2014) ...........................36

17

**Rules**

18

Fed. R. Civ. P. 9(b) ..................................................................................8, 17

19

20

21

22

23

24

25

26

27

28

**DEFS. NOT. & MOT. TO DISMISS AMEND. COMPLT.; MEM. OF P&As THEREOF**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## INTRODUCTION

Plaintiffs allege that Pershing Square Capital Management and its related persons and entities ("Pershing") engaged in insider trading in the stock of Allergan, a pharmaceutical company. Pershing obtained the supposedly inside information from Valeant Pharmaceuticals International, Inc. ("Valeant"), another pharmaceutical company that Pershing partnered with to attempt to acquire Allergan. Pershing's trades created a toehold position in Allergan as leverage for the proposed takeover, a position Pershing would ultimately use to agitate for removal of Allergan's board and the approval of a merger agreement between Valeant and Allergan.

One problem with Plaintiffs' theory is that it does not state an actionable claim of insider trading under existing Rule 10b-5 insider trading rules. Valeant and Pershing voluntarily shared information. No duty was breached. In order to elide this limitation, Plaintiffs rely upon a more limited insider trading rule—SEC Rule 14e-3—which restricts some trading while in possession of non-public information, but only in connection with a tender offer. But no tender offer was commenced until months after Pershing's last trade. Indeed, in their Relationship Agreement, Valeant and Pershing expressly represented to each other that they had *not* taken any steps to commence a tender offer. Yet, the Amended Complaint ("AC") speculates that Defendants took steps towards a tender offer from the very outset of their partnership.

With the Amended Complaint, Plaintiffs are seeking: (i) to turn well-settled insider trading law on its head by ignoring the need to show misappropriation in order to state a fraud claim; (ii) to create a brand-new implied private right of action under Rule 14e-3 in the face of Supreme Court precedent limiting such claims; (iii) to create new Rule 14e-3 law by interpreting a routine corporate action such as hiring counsel as a 'substantial step' toward a tender offer if an offer is ever made thereafter; (iv) to revolutionize the law of § 13(d) and poison pills by transforming a dealer, acting as a principal for its own account, into an agent for all of its investor-counterparties and therefore part of a 'group' for SEC purposes; and (v) to make impossible the drafting

-1-

of any corporate agreements which address or represent compliance with law because, according to Plaintiffs, those provisions alone imply precisely the opposite of what the parties have agreed. These efforts fail for several reasons that were unresolved in the prior strategic litigation between Defendants and Allergan.

*First*, two of the three Plaintiffs lack standing to sue under any insider-trading theory. To plausibly allege standing, Ninth Circuit law is clear that the complaint must plead facts establishing a practical chance that the plaintiff might actually have traded with the defendant. This precept is reflected in the contemporaneous-trader rule, which applies to all of Plaintiffs' claims and, at a minimum, requires Plaintiffs to have sold the same security at the same time Defendants purchased. Here, the AC makes clear that two Plaintiffs did not do so. Both Patrick Johnson and Ohio STRS traded only in Allergan common stock, and first sold Allergan stock on or after March 12, 2014. Yet, Pershing executed only two open market trades in Allergan common stock, on February 25 and February 26, 2014. Every one of the remaining Pershing trades was accomplished through face-to-face trades in options (*not* stock) with a bank, Nomura International plc. No one other than Nomura could possibly have been on the other side of those trades. Because Mr. Johnson and Ohio STRS do not allege they sold Allergan common stock during the brief window when Pershing made open-market purchases of such stock, they cannot satisfy the contemporaneous-trader rule and lack standing to sue.

*Second*, the First Claim should be dismissed because it pleads no cognizable direct claim under § 14(e) of the Exchange Act, 15 U.S.C. § 78n(e), and SEC Rule 14e-3, 17 C.F.R. § 240.14e-3. Although it is doubtful that there is an implied private right of action under § 14(e), that statute prohibits only fraud in connection with tender offers, which is nowhere alleged here. Under well-settled law, Plaintiffs have no cause of action for regulatory violations that create liability *beyond* the prohibitions of the statute, such as Rule 14e-3's prohibition on insider trading without any fraud or breach of duty. Only the government and the SEC can enforce these regulatory

-2-

violations. (Since issuing a comment letter and requesting documents in 2014, the SEC has not taken any further action here.) Thus, the First Claim must fail because Plaintiffs do not allege an actual violation of § 14(e). The Second Claim, alleging a violation of § 20A of the Exchange Act, 15 U.S.C. § 78t-1, is derivative of the First Claim and must fail for the same reason—§ 20A does not create a private right of action in the absence of a direct violation of § 14(e).

*Third*, the Second Claim also fails to allege a Rule 14e-3 violation. By its terms, Rule 14e-3 does not apply to any "offering person," which the Rule defines as a person who "has taken a substantial step or steps to commence . . . a tender offer." Here, Plaintiffs allege affirmatively that Pershing took such steps; by that logic, Pershing could not violate the Rule. In any event, the AC lacks plausible allegations that Valeant had taken substantial steps to commence a tender offer at the time of Pershing's trading. To be clear, the AC does assert that Valeant, along with Pershing, took many steps to achieve a negotiated *merger* agreement, and when that was rejected, took additional steps to commence a hostile *proxy fight* to replace Allergan's board. But steps taken toward a negotiated merger or proxy fight do not implicate Rule 14e-3. Plaintiffs try to obscure this with a sleight-of-hand. They allege numerous facts about "transactions," "deals," and "hostile takeovers" without tying them to a tender offer. Plaintiffs fail to allege any substantial steps towards a tender offer prior to the April 22, 2014 completion of PS Fund 1's trading.

*Finally*, the AC does not allege facts that permit a strong inference of scienter. The innocent explanation of the facts pled in the AC—that Valeant and Pershing were taking steps to plan a merger and pressure Allergan to negotiate a consensual transaction—is much more plausible than Plaintiffs' tender offer conspiracy theory. And, the AC fails entirely to plead the additional scienter requirements that apply to the Valeant Defendants under some tipper theory. The need to plead scienter in this money damages action further distinguishes this action from Allergan's prior injunction action, and makes plain the deficiencies in Plaintiffs' pleading.

-3-

**DEFS. NOT. & MOT. TO DISMISS AMEND. COMPLT.; MEM. OF P&As THEREOF**

## STATEMENT OF FACTS

### Valeant and Pershing Form A Joint Venture to Acquire Allergan.

In January 2014, Valeant contacted Pershing's advisor, William F. Doyle, to discuss "ways [they] . . . could work together." AC ¶ 56. On February 4, 2014, Valeant CEO Michael Pearson and Pershing founder William Ackman met "and specifically reviewed several potential unsolicited acquisition targets, including Allergan." *Id.* ¶ 58. They "further discussed Valeant's acquisition plans" on February 6, and eventually "agreed to enter into a confidentiality agreement in which Valeant would disclose a specific acquisition target to Pershing, and Pershing could then decide whether it would support the contemplated transaction." *Id.* ¶ 62.

On February 6, Valeant also engaged Sullivan & Cromwell and, soon after, two additional law firms, "to counsel it in connection with its takeover bid . . . ." *Id.* ¶ 63. "On February 7, the Finance and Transactions Committee of Valeant's Board held a conference call to discuss a potential combination with Valeant and Allergan." *Id.* ¶ 64. Valeant engaged bankers to "line up financing" for a merger transaction. *Id.* None of these discussions or materials mentioned a tender offer. Valeant and Pershing executed their confidentiality agreement on February 9. *Id.* ¶ 65. Then for the first time, "Pearson informed Ackman that Allergan was Valeant's acquisition target." *Id.*

Defendants initially pursued a negotiated merger with Allergan. *Id.* ¶ 69. Pearson and Allergan CEO David Pyott scheduled a meeting "to discuss a business combination," set for February 15. *Id.* After "Allergan vocally and publicly expressed its opinion that a combination between the companies was a non-starter," however, Valeant cancelled the meeting. *Id.* ¶¶ 70-71. Certain Valeant documents from February 2014 reflect that Valeant thought the deal might close by a "hostile cash and stock merger," but not by a tender offer. *Id.* ¶¶ 73, 80-81.

On February 25, Valeant and Pershing entered into a Relationship Agreement that structured their joint venture. *Id.* ¶ 86. Under its terms, the parties would form a

new entity, PS Fund 1, to acquire Allergan stock. *Id.* ¶ 91; Ex.[1] 1 ¶ 1(a). Valeant would contribute approximately $76 million to PS Fund 1, and Pershing would contribute the rest. AC ¶ 95; Ex. 1 ¶ 1(a). Valeant would consult with Pershing before making any material decision relating to the merger. AC ¶ 126; Ex. 1 ¶ 1(d). In a completed transaction, Pershing would receive only Valeant stock, and hold beneficially at least $1.5 billion of it for at least a year without hedging, while Valeant would be entitled to share in PS Fund 1's profits if Allergan agreed to a competing transaction. Ex. 1 ¶¶ 2(c), 3(a). Finally, in addition to the $3.6 billion it would put forward to acquire an initial stake in Allergan, Pershing committed to provide an additional $400 million in cash to finance Allergan's acquisition, at Valeant's election, in exchange for additional Valeant stock. *Id.* ¶ 2(a), (c).

The Relationship Agreement's express purpose was to pursue jointly a merger between Valeant and Allergan. *Id.* at 1-2. Indeed, it prohibited commencing a tender or exchange offer without both parties' consent: "*[T]he parties acknowledge that no steps have been taken towards a tender or exchange offer* for securities of Allergan and the parties agree that *the consent of both Pershing Square and [Valeant] shall be required for launching such a tender offer or an exchange offer.*" *Id.* ¶ 1(d) (emphasis added). In any potential acquisition, whether "a tender or exchange offer or a merger," Pershing and Valeant agreed to be identified as "co-bidders." AC ¶¶ 86-87; Ex. 1 ¶ 1(d).

**Allergan Rejects Multiple Merger Offers.**

Pershing formed PS Fund 1, LLC ("PS Fund 1") on February 11, 2014, to acquire an initial position in Allergan. AC ¶ 67. On April 21, Pershing timely filed an SEC Schedule 13D, disclosing that its current stake was 9.7%. *Id.* ¶ 109. Valeant announced its intent to propose a merger with Allergan the same day. *Id.*; Ex. 2 at 6. "[O]n April 22, 2014, Valeant delivered to Allergan a formal, unsolicited proposal

---

[1]   Citations to exhibits are attached to the Decl. of Michael Shipley in Supp. of Defs.' Mot. to Dismiss Pls.' Am. Comp., filed concurrently herewith.

**DEFS. NOT. & MOT. TO DISMISS AMEND. COMPLT.; MEM. OF P&As THEREOF**

offering to acquire Allergan for $48.30 in cash and .83 of Valeant stock per Allergan share . . . ." AC ¶ 110. Allergan responded with a typical defense—it "adopted a 'poison pill' with a 10% trigger, effectively blocking Pershing and Valeant from acquiring more shares of Allergan's common stock." *Id.* ¶¶ 76, 115.

By adopting a poison pill, Allergan made it impossible to acquire the company through a tender offer without the board's consent. *See Unitrin, Inc. v. Am. Gen. Corp.*, 651 A.2d 1361, 1381 (Del. 1995). The "danger of activating a poison pill renders it irrational for bidders to pursue stock acquisitions above the triggering level," by tender offer or otherwise. *Id.* The only way to accomplish the transaction would be to convince Allergan's directors to sell, or to elect a new board in a proxy contest. "[B]idders intent on working around a poison pill must launch and win proxy contests to elect new directors who are willing to redeem the target's poison pill." *Id.* (quotation omitted). As Pearson explained, "***in the end, we knew it would come down to, you know, voting the board off or not.***" AC ¶ 75 (emphasis in original).

Allergan "officially rejected Valeant's April 22 proposal" on May 12. In response, Valeant increased its offer twice, on May 28 and 30. *Id.* ¶¶ 139, 141. Pershing then "filed a proxy statement for a nonbinding 'shareholder referendum' to consolidate investor support for Valeant's" merger proposal. *Id.* ¶ 140. "If passed, the referendum would have directed the Allergan Board to 'promptly engage in good faith discussions with Valeant regarding Valeant's offer to merge with the Company.'" *Id.*

Continued efforts to bring Allergan to the negotiating table to discuss a merger did not pay off. "Indeed, Allergan immediately confirmed receipt of [the May 30] Revised Proposal and 'indicated that Allergan would likely not be willing to negotiate with Valeant.'" *Id.* ¶ 142. Allergan rejected the offer on June 10. *Id.* ¶ 146.

**Allergan Shareholders Convince Valeant and Pershing to Change Approaches.**

On May 29, well over a month after Pershing's last trade in Allergan stock, Ackman attended the Sanford C. Bernstein Strategic Decisions Conference in New York City and met with several large, institutional Allergan shareholders. *See id.*

¶ 145; Ex. 3 at 4 (transcript). Those shareholders delivered a "strong message": "Don't waste time with a referendum," in part because it risked triggering Allergan's poison pill, and instead "launch a special meeting" proposal. Ex. 3 at 5, 15. Valeant and Pershing listened to this "strong message"—although a negotiated deal was still Defendants' preferred path, the board's entrenchment demanded alternatives. *Id.* at 5.

On a June 2 conference call, Ackman announced that Pershing was "commencing a proxy solicitation to call for a special meeting to remove six of the nine-member Allergan Board." AC ¶ 145; *see also* Ex. 3 at 5. As Ackman explained, the special meeting proposal was designed to spur negotiations with Allergan's Board:

> Now that [we've] launched the special meeting, I would expect the stock price to increase[,] and so the current board has an opportunity to negotiate a deal on behalf of Allergan shareholders or a new board appointed by . . . the shareholders will negotiate the transaction.

*Id.* ¶ 145; Ex. 3 at 17.

On May 30, the day after Allergan investors told Ackman to abandon the referendum and call for a special meeting, the Valeant Board approved an exchange offer, even though it was only symbolic due to the poison pill. AC ¶ 16; Ex. 4 at 46. On the June 2 call, Valeant stated it was "'taking steps to launch a tender offer,' which [it] 'intend[ed] to commence' 'within the next two to three weeks.'" AC ¶ 143.

Two weeks later, on June 18, Valeant and PS Fund 1 jointly filed a Schedule TO, formally announcing their tender offer. *Id.* ¶¶ 148, 160. PS Fund 1, Pershing, Valeant, and AGMS are listed as "Offerors" on the cover page of the operative Tender Offer Statement. Ex. 5.

## ARGUMENT

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), Plaintiffs must satisfy Rules 8(a) and 9(b), as well as the "exacting" standards of the Private Securities Litigation Reform Act ("PSLRA"). Plaintiffs must satisfy Rule 8(a) by alleging "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). And under Rule 9(b), they "must

state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). Plaintiffs may not "lump multiple defendants together," and "must set forth what is false or misleading about a statement, and why it is false." *Destfino v. Reiswig*, 630 F.3d 952, 958 (9th Cir. 2011); *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003); *Decker v. Glenfed, Inc.*, 42 F.3d 1541, 1548 (9th Cir. 1994). These particularity requirements apply to "all elements" of Plaintiffs' claims. *Ore. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 605 (9th Cir. 2014). Likewise, under the PSLRA, Plaintiffs must allege facts giving rise to a "strong inference" of scienter and "specify each allegedly unlawful act" and the "reasons why." 15 U.S.C. § 78u-4(b). Under this standard, "[a] court must compare the malicious and innocent inferences cognizable from the facts pled in the complaint, and only allow the complaint to survive a motion to dismiss if the malicious inference is at least as compelling as any opposing innocent inference." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009). These requirements serve as a "check against abusive litigation by private parties." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007).

## I.    Johnson and Ohio STRS Lack Standing to Sue for Insider Trading.

To bring a private action alleging insider trading—whether under some implied right or § 20A of the Exchange Act, 15 U.S.C. § 78t-1(a)—a plaintiff must have traded "contemporaneously" with the defendant. *Neubronner v. Milken*, 6 F.3d 666, 669–70 & n.5 (9th Cir. 1993); *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1002 (9th Cir. 2002). The contemporaneity rule "limit[s] the class of potential plaintiffs to only those who could have possibly traded with the insider." *Brody*, 280 F.3d at 1005. Contemporaneity must be pleaded specifically under Rule 9(b) because it is an incident to fraud. *Id.* at 1002. As the Ninth Circuit has explained, if under the pleaded facts a plaintiff "*could not possibly have traded with the insider*, given the manner in which public trades are transacted," that plaintiff fails to state a claim for insider trading. *Id.* (emphasis added). Thus, to allege standing, each Plaintiff must

1  plead specific facts warranting a plausible inference that it could have been the

2  counterparty on at least one of PS Fund 1's trades.

3       The AC alleges that PS Fund 1 executed three sets of trades in Allergan

4  securities. First, on February 25 and 26, 2014, it purchased about 600,000 shares of

5  Allergan common stock on the open market. AC ¶¶ 98, 173. Second, between March

6  3 and April 8, 2014, and then from April 11 to 17, 2014, PS Fund 1 purchased "deep-

7  in-the-money, American-style, over-the-counter ('OTC'), zero-strike call options"

8  from "a single counterparty, Nomura International plc[.]" *Id.* ¶¶ 99, 173. Third, on

9  April 21, 2015, PS Fund 1 purchased over-the-counter equity forward contracts

10  referencing 3.45 million shares of Allergan common stock, [2] also from Nomura. *Id.*

11  ¶¶ 107, 173.

12       Because the AC admits that no Plaintiff sold options or equity forward contracts

13  and that these trades were made "over-the-counter"—*i.e.*, through negotiated

14  transactions, not on an exchange—with a known counterparty, no Plaintiff possibly

15  could have traded options and forward contracts with PS Fund 1. Under *Brody*, the

16  only Plaintiff with standing is one who sold stock contemporaneously with PS Fund

17  1's February 25 and 26 market purchases of Allergan common stock. Because the first

18  of Ohio STRS' and Mr. Johnson's stock sales did not occur until March 26 and March

19  12, 2014, respectively—long after PS Fund 1's purchases—those two Plaintiffs have

20  no standing to sue. *See* Dkt. No. 18–2 at 6 (Ohio STRS' sales); AC at 66 (Johnson's

21  sales).

22      **A.**    **To Have Standing to Sue for Insider Trading, There Must Be a**

23              **Logical Possibility that a Plaintiff Traded with the Defendants.**

24       A private plaintiff may bring an insider trading suit only if he traded

25  "contemporaneously" with the defendant. 15 U.S.C. § 78t-1(a); *Neubronner*, 6 F.3d at

---

26      [2]   "An equity forward contract is a cash contract, similar to a futures contract, by

27  which two parties agree to the exchange of equity shares to be delivered by the seller to the buyer at some future date certain." *In re SLM Corp. ERISA Litig.*, 2010 WL

28  3910566, at *4 n.1 (S.D.N.Y. Sept. 24, 2010).

669. In *Brody*, the Ninth Circuit explained that this rule "limit[s] the class of potential plaintiffs to only those who could have possibly traded with the insider." 280 F.3d at 1005. It "filter[s] out plaintiffs who could not possibly have traded with the insider, given the manner in which public trades are transacted." *Id.* at 1002. Likewise, § 20A creates an express right of action for insider trading, but only for contemporaneous traders. 15 U.S.C. § 78t-1(a). Section 20A further provides that a plaintiff must have traded "securities of the same class," underscoring the *Brody* rule—if the plaintiff traded a different class of securities, then it could not have possibly been a counterparty with the defendant.

Brody's limitation—that there must be some possibility the plaintiff traded with the defendant—follows logically from the rationale behind the contemporaneity rule. "The requirement of contemporaneousness developed as a proxy for the traditional requirement of contractual privity between plaintiffs and defendants." *Buban v. O'Brien*, 1994 WL 324093, at *3 (N.D. Cal. Jun. 22, 1994). "The requirement was intended to preserve the notion that only plaintiffs who were harmed *by the insider* could bring suit, while nonetheless making it possible for such persons to bring suit." *Id.* (emphasis added). "While an actual trade between plaintiff and defendant need not be expressly shown, harm to the plaintiff is a necessary factor." *Id.* "Such harm may be found where it appears the plaintiff might, in fact, have traded with the defendant." *Id.* When it is "manifest that plaintiff could not have traded with defendant," there is no possible harm to the plaintiff and the trades are not contemporaneous as a matter of law. *Id.*

This rule was first addressed in *Shapiro v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 495 F.2d 228, 236 (2d Cir. 1974). The trades in that case "occurred on an anonymous national securities exchange where as a practical matter it would be impossible to identify a particular defendant's sale with a particular plaintiff's purchase." *Id.* To ensure that *someone* had standing, the Second Circuit extended the duty to abstain or disclose to not only "the purchasers of the actual shares sold by

-10-

defendants (in the unlikely event they can be identified) but to all persons who during the same period purchased [the relevant] stock in the open market without knowledge of the material inside information which was in the possession of defendants." *Id.* at 237.

Along those lines, later cases emphasize that only those who "suffer the disadvantage of trading with someone who has superior access to information" have standing. *See Wilson v. Comtech Telecomms. Corp.*, 648 F.2d 88, 95 (2d Cir. 1981). *Wilson* rejected the proposition that an insider trader is liable to any person who trades during the window between the insider's trade and the market disclosure of the information. *Id.* at 94–95. "To extend the period of liability well beyond the time of the insider's trading simply because disclosure was never made could make the insider liable to all the world." *Id.* at 94; *see also Fridrich v. Bradford*, 542 F.2d 307 (6th Cir. 1976) (Celebrezze, J., concurring) ("There is an obvious need to restrict the scope of civil liability of insiders trading in the open market. If an insider trades in a widely-held stock which is actively traded on a national market, the number of potential plaintiffs could be astronomical and the possible award of damages may be grossly disproportionate to the volume of the insider trading.").

In 1993, the Ninth Circuit adopted the contemporaneity rule to limit standing to sue under the implied right of action for insider trading under Rule 10b-5. *Neubronner*, 6 F.3d at 669 (9th Cir. 1993) (relying on *Wilson, Shapiro*, and several Ninth Circuit district courts that had addressed the issue). The Ninth Circuit emphasized that a plaintiff must have at least potentially traded with the defendant: "the contemporaneous trading rule ensures that only private parties who have traded with someone who had an unfair advantage will be able to maintain insider trading claims." *Id.* at 670.

And then in *Brody*, the Ninth Circuit adopted the contemporaneity rule for claims brought under Rule 14e-3. *Id.* at 1002-04. As the court explained, the rule is premised on "a need to filter out plaintiffs who *could not possibly have traded* with

-11-

the insider, given the manner in which public trades are transacted." *Id.* at 1002 (emphasis added). Numerous district courts in the Ninth Circuit and elsewhere have applied the contemporaneity rule, as required by *Brody* and *Neubronner*, to preclude suits by parties who could not have traded with the defendants. *See In re Aldus Sec. Litig.*, 1993 WL 121478, at *7 (W.D. Wash. Mar. 1, 1993) (dismissing claims when it "is clear that plaintiffs did not trade with defendants"); *Buban*, 1994 WL 324093, at *3 (dismissing case because it did not "appear[] the plaintiff might, in fact, have traded with the defendant"); *In re AST Research Sec. Litig.*, 887 F. Supp. 231, 234 (C.D. Cal. 1995) (dismissing claims where plaintiff "could not have purchased any of the shares sold by the defendants").[3] And in 1988, Congress codified the contemporaneity rule in § 20A(a) by limiting the right of action for insider trading to only a trader "who, *contemporaneously with the purchase or sale of securities that is the subject of such violation*, has purchased (where such violation is based on a sale of securities) or sold (where such violation is based on a purchase of securities) *securities of the same class*[.]" 15 U.S.C. § 78t-1(a) (emphasis added). By requiring a putative plaintiff to have traded (a) the same security, (b) at the same time, and (c) on the opposite side of the trader, Congress made clear that, like the contemporaneity rule

---

[3]   *In re Novatel Wireless Sec. Litig.*, 830 F. Supp. 2d 996, 1010 (S.D. Cal. 2011) (noting that the rule "serves as a legitimate proxy for the traditional privity requirement"); *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1204 (C.D. Cal. 2008) ("On this 'privity-substitute' view, the insider must have offered his security for sale before the outsider purchased in order for there to be a possibility that the trade was between them."); *McGuire v. Dendreon Corp.*, 2008 WL 5130042, at *9 (W.D. Wash. Dec. 5, 2008); *In re Silicon Graphics, Inc. Sec. Litig.*, 970 F. Supp. 746, 761 (N.D. Cal. 1997); *Brodzinsky v. FrontPoint Partner LLC, No. 3*, 2012 WL 1468507, at *4 (D. Conn. Apr. 26, 2012); *In re Able Labs. Sec. Litig.*, 2008 WL 1967509, at *27 (D.N.J. Mar. 24, 2008); *In re Fed. Nat'l Mortg. Ass'n Sec., Derivative, & "ERISA" Litig.*, 503 F. Supp. 2d 25, 46 (D.D.C. 2007); *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 258 F. Supp. 2d 576, 600 (S.D. Tex. 2003); *Croker v. Carrier Access Corp.*, 2006 WL 2038011, at *13 (D. Colo. July 18, 2006); *In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 662 (E.D. Va. 2000); *Feldman v. Motorola, Inc.*, 1993 WL 497228, at *13 (N.D. Ill. Oct. 14, 1993).

**DEFS. NOT. & MOT. TO DISMISS AMEND. COMPLT.; MEM. OF P&As THEREOF**

1   adopted in *Brody*, the plaintiff must in fact have been a potential counterparty to the

2   challenged trades.

### B. Plaintiffs Ohio STRS and Patrick Johnson Do Not Allege Contemporaneous Trades.

5       Ohio STRS alleges that its earliest sale of Allergan common stock occurred on

March 26, 2014. Dkt. No. 18-2 at 3. Plaintiff Patrick Johnson alleges that his earliest

7   sale of Allergan common stock occurred on March 12, 2014. AC p. 66. These sales

8   were neither contemporaneous with, nor in the same class with, PS Fund 1's

9   purchases of Allergan options and forward contracts or with PS Fund 1's much earlier

10  purchases of Allergan common stock. Thus, these two Plaintiffs must be dismissed.

11      *First*, if a defendant has entered into a face-to-face trade with a known

12  counterparty, the class of contemporaneous plaintiffs is solely the known

13  counterparty; no other party could "possibly have traded with the insider[.]" *Brody*,

14  280 F.3d at 1002. In such a case, there is no reason to resort to a "proxy" for the real

15  thing. The actual person who has been harmed is known and under the logic that

16  engendered the contemporaneity rule, there is no reason to expand the pool of

17  plaintiffs any further.[4] That rule controls here. For each of its trades (other than its

------

[4]    Indeed, permitting claims by plaintiffs who cannot possibly have been injured
by the defendant's insider trading would be constitutionally suspect. *See Brodzinsky*,
2012 WL 1468507, at *5 (noting that "[a]doption of [a] broad theory of
contemporane[ity] could compromise the fundamental principle that plaintiffs must
have been harmed by defendants' conduct." (citing *Valley Forge Christian Coll. v.
Ams. United for Separation of Church & State*, 454 U.S. 464, 472 (1982))).
Independent of the language of the statute, under Article III of the Constitution, a
plaintiff must have suffered an injury in fact in order to have standing. *Accord Lujan
v. Defenders of Wildlife*, 504 U.S. 555, 576 (1992). "[T]he principle of constitutional
avoidance" cautions against reading a statute in a manner that "would raise serious
Article III concerns." *See United States v. Rivera-Guerrero*, 377 F.3d 1064, 1070 (9th
Cir. 2004); *see generally Ashwander v. TVA*, 297 U.S. 288, 345–348 (1936)
(Brandeis, J., concurring). Thus, a broad reading of "contemporaneous" is both
inconsistent with Ninth Circuit precedent and would raise Article III concerns if
construed to afford a claim to those, like Plaintiffs, who have suffered no injury in
(Continued…)

-13-

1   February 25 and 26, 2014 purchases), PS Fund 1's only counterparty was *Nomura*,

2   AC ¶ 99, so it is *impossible* that PS Fund 1 traded with anyone else.

3       *Second*, and similarly, a plaintiff's trades cannot be contemporaneous when the

4   trades are transacted in a different class of security or in a separate market from the

5   defendant's trades. *See* 15 U.S.C. § 78t-1(a) (limiting standing to parties who traded in

6   the same "class" of securities); *Laventhall v. Gen. Dynamics Corp.*, 704 F.2d 407, 412

7   (8th Cir. 1983) (the "*sine qua non*" of a private insider trading case "is unauthorized

8   trading of securities in the same market as the persons damaged").[5] Here, no Plaintiff

9   traded in any options or forward contracts, so no Plaintiff can establish standing based

10  on PS Fund 1's purchase of those instruments.

11      *Finally*, although PS Fund 1 purchased Allergan common stock, it did so only

12  on February 25 and 26, 2014—roughly two weeks before Patrick Johnson's first

13  alleged sale and a month before Ohio STRS' first alleged sale. *See* AC ¶ 173.

14  Although the exact window of time has not been settled, *see Neubronner*, 6 F.3d at

15  670 (declining to set clear line), it is clear that the window is far less than two

16  weeks—a plaintiff's and defendant's trades need to be "at about the same time" to be

17  contemporaneous. *Brody*, 280 F.3d at 1001. By no means do these trades satisfy that

18  standard. *Buban*, 1994 WL 324093, at *3 (three days not contemporaneous).

19

20

21

22  fact. That itself is a sufficient reason to read the requirement narrowly as a proxy for
    privity.

23      [5]   *See also Starkman v. Warner Commc'ns, Inc.*, 671 F. Supp. 297, 304 (S.D.N.Y.

24  1987) (no standing because "defendants [sellers of common stock] engaged in no
    transaction with plaintiffs [who bought and sold options] and never were about to do

25  so"); *Bianco v. Tex. Instruments, Inc.*, 627 F. Supp. 154, 161 (N.D. Ill. 1985)
    ("Options traders . . . are not investors in the corporation . . . nor do they purchase or

26  sell that corporation's securities."); *In re McDonnell Douglas Corp. Sec. Litig.*, 567 F.

27  Supp. 126, 127 (E.D. Mo. 1983) (option-trading plaintiffs were not contemporaneous

28  with stock-selling defendants).

**DEFS. NOT. & MOT. TO DISMISS AMEND. COMPLT.; MEM. OF P&As THEREOF**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**C.      Plaintiffs Cannot Manufacture Standing Through Speculation About Nomura's Hedging and the "Functional Equivalence" Between Options and Common Stock.**

Plaintiffs offer a number of allegations regarding the nature of the options contracts and Nomura's theoretical hedging activity. It appears that they do so in an effort to suggest that their stock sales that were potentially contemporaneous with hedging by *Nomura* are enough to establish contemporaneous trading with options and forward trades by *PS Fund 1*. *Cf.* AC ¶¶ 99, 102, 107, 173. But these allegations cannot change the fact that it was impossible for any Plaintiff to have been a counterparty on PS Fund 1's purchases of options or equity forwards from Nomura. Nor is there any precedent for Plaintiffs' novel theory that potentially trading contemporaneously with a defendant's counterparty—as opposed to trading contemporaneously with the defendant itself—is sufficient to establish standing for purposes of an insider-trading claim. To the contrary, both the common law rule and § 20A require contemporaneity between the plaintiff and the defendant, not the plaintiff and someone else. 15 U.S.C. § 78t-1(a) (plaintiff's trade must be contemporaneous with the "purchase or sale of securities that is the subject of such violation."); *Brody*, 280 F.3d at 1005.

As support for this theory, the AC suggests that PS Fund 1 and Nomura had a broker relationship, *i.e.*, that Nomura was buying stock on behalf of PS Fund 1. But its allegation is just a conclusory contortion: "As Ackman admitted, Nomura acted just like a broker, and in fact acquired the common shares correlating to its contracts requiring the delivery of those shares to Pershing." AC ¶ 107. That conclusion is not supported by well-pleaded facts.

First, the attribution of an "admission" to Mr. Ackman, without quoting his actual words, is a prime example of Plaintiffs' pleading tactic of snippetization followed by a sleight-of-hand. The "admission" to which Plaintiffs refer was made in

-15-

an April 22, 2014 investor call. *See id.* ¶ 101.[6] Plaintiffs thus have incorporated this document into the AC by reference.[7] In his actual statements, Mr. Ackman consistently referred to Nomura only as PS Fund 1's "dealer," and never as its "broker." Ex. 6 at 100–01, 175. Indeed, the AC uses a snippet of the actual quote with the term "dealer" just five paragraphs earlier. *See* AC ¶ 102 (direct quote referring to Nomura as "our dealer"). It then deftly switches to "broker" (unquoted) to draw its erroneous conclusion that Mr. Ackman "admitted" a "broker" relationship existed between Pershing and Nomura. *Id.* ¶ 107.

The distinction Plaintiffs seek to obscure between "broker" and "dealer" is significant. A "broker" is an *agent* who trades securities for the accounts of its clients. *See* 15 U.S.C. § 78c(a)(4)(A). A "dealer," on the other hand, is engaged in the business of trading as *a principal* for its own account. *See* 15 U.S.C. § 78c(a)(5)(A). *See United States v. NASD*, 422 U.S. 694, 713 (1975) ("[T]he most apparent distinction between a broker and a dealer is that the former effects transactions for the account of others and the latter buys and sells securities for his own account."). A dealer is *not* an agent. Mr. Ackman's actual statements "admit" precisely the opposite of what AC ¶ 107 claims they do—Nomura was a "dealer," and to the extent Nomura was also trading Allergan stock, it did so as a principal for its own account.

Nor does the AC adequately allege a broker relationship between PS Fund 1 and Nomura. Brokerage is a type of agency, and in order to allege an agency relationship, a plaintiff must allege facts meriting a plausible inference that "(1) the agent holds power to alter legal relations between the principal and a third person and

[6] The complaint also references an April 24, 2014 interview with *Bloomberg. See* AC ¶ 103. But that interview contains no statements regarding the nature of Pershing's relationship with Nomura. *See* Ex. 7.

[7] *See In re Silicon Graphics Sec. Litig.*, 183 F.3d 970, 986 (9th Cir. 1999); *Realnetworks, Inc. v. DVD Copy Control Ass'n, Inc.*, 2010 WL 145098, at *4 n.7 (N.D. Cal. Jan. 8, 2010) (transcript quoted in complaint is incorporated by reference even if not attached to the pleading).

1    between the principal and himself; (2) the agent is a fiduciary with respect to matters

2    within the scope of the agency; and (3) the principal has the right to control the

3    conduct of the agent with respect to matters entrusted to him." *Lent v. JP Morgan*

4    *Chase Bank*, 2011 WL 5971190, at *3 (C.D. Cal. Nov. 29, 2011). None of this is

5    alleged in the AC, much less with the specificity required under Rule 9(b). *See*

6    *Neubronner*, 6 F.3d at 670; *Jackson v. Fischer*, 931 F. Supp. 2d 1049, 1061 (N.D. Cal.

7    2013) ("[W]here a plaintiff alleges that a defendant is liable for fraud under an agency

8    theory, Rule 9(b) requires that the existence of the agency relationship be pled with

9    particularity."); *Holt v. Kormann*, 2012 WL 123025, at *3 (C.D. Cal. Jan. 12, 2012)

10   (plaintiff failed to plead agency under Rule 9(b) standards when arguing that two

11   entities were essentially one for a particular transaction).

12           Indeed, by admitting that the trades between Nomura and PS Fund 1 were "over

13   the counter," or "OTC," AC ¶¶ 99, 107, the AC essentially concedes that Nomura was

14   a principal/dealer trading for its own account, not PS Fund 1's agent or broker. *See*

15   *generally* Miller & Ruane, *The Dodd-Frank Wall Street Reform and Consumer*

16   *Protection Act: Title VII, Derivatives* 2 (Cong. Research Serv. 2012), *available at*

17   https://www.fas.org/sgp/crs/misc/R41398.pdf ("In the OTC market, contracts are

18   made bilaterally, typically between a dealer and an end user."). That over-the-counter

19   derivatives trading occurs between customers and dealers on a principal-to-principal,

20   buyer-seller basis is a bedrock proposition on which trillions of dollars in trades in

21   derivatives are premised.[8]

22   _____

23           [8]    There were $7.9 trillion in outstanding equity derivative contracts as of
     December 2014. Bank of Int'l Settlement, *BIS Quarterly Review: International*
24   *Banking & Financial Market Developments* (June 2015) at 158 tbl. 22A, *available at*
     http://www.bis.org/publ/qtrpdf/r_qt1506.pdf. Definitions used in the International
25   Swaps & Derivatives Association's industry-standard form contracts that are used in
     derivatives trading include representations that the dealer is not an agent and owes no
26   duties to its counterparty. *See* Ex. 8 §§ 13.1, 13.2. These representations are "virtually
     the same in every derivatives transaction" and subject to "unanimous use[.]" *See*
27   Frank Partnoy, *The Shifting Contours of Global Derivatives Regulation*, 22 U. Pa. J.
28   (Continued…)

**DEFS. NOT. & MOT. TO DISMISS AMEND. COMPLT.; MEM. OF P&As THEREOF**

1   At best, the AC suggests that because the "deep-in-the-money" nature of the

2   option and equity forward contracts made it likely that the options would be exercised,

3   Pershing and Ackman *knew* that Nomura would, in some unalleged transaction at

4   some unspecified time, hedge its risk and ultimately cover its obligations. *See, e.g.*,

5   AC ¶ 102. But the timing and type of Nomura's hedge—which may not have occurred

6   or could have taken the form of trades in stock, options, forwards, swaps or any

7   combination[9]—was entirely up to Nomura. Agency requires actual *control*—

8   knowledge alone is insufficient. *See Thomas v. Taco Bell Corp.*, 879 F. Supp. 2d

9   1079, 1086 (C.D. Cal. 2012) (evidence of company's knowledge and approval of

10   franchisee association's acts were insufficient to establish agency without evidence of

11   control). The AC pleads no facts whatsoever to justify a plausible inference that, if

12   and when Nomura went into the market to hedge, it did so under the control of

13   Pershing. Indeed, Plaintiffs' speculation that Nomura naturally would hedge *its* risk

14   necessarily means that if Nomura did so, it was in Nomura's own interest.

15   The actual options and equity-forward contracts that governed the trades make

16   this clear. These agreements—which are publicly available on the SEC's EDGAR

17   website and the undisputed terms of which are repeatedly alleged in, and are integral

18

19   _____

20   Int'l Econ. L. 421, 479-80 (2001); Rossman, *et. al.*, *Commercial Contracts: Strategies for Drafting and Negotiating* § 25.04[C][24] (noting that "[i]t is uncommon for these

21   representations not to be made").

22   [9]   "Hedging is a technique used to achieve a desired risk level, whereby an organization takes on a negatively correlated position (the hedge) to a currently held

23   asset or liability." Richard Heckinger, Fed. Reserve Bank of Chi., Fin. Mkts. Grp.,

24   *Understanding Derivatives: Markets and Infrastructure* 40 (2015), *available at* https://www.chicagofed.org/~/media/publications/understanding-

25   derivatives/understanding-derivatives-chapter-4-hedging-pdf.pdf?la=en. "Most

26   frequently, hedging is achieved through the use of financial contracts that offset a

27   particular risk or risks. . . . Sometimes it is possible to hedge with highly standardized exchange-traded derivatives contracts. Other times . . . over-the-counter (OTC)

28   contracts are created to ensure an effective hedge." *Id.* at 43–44.

-18-

**DEFS. NOT. & MOT. TO DISMISS AMEND. COMPLT.; MEM. OF P&As THEREOF**

to, the AC, *see* AC ¶¶ 100, 103, 107—can be considered on this motion.[10] Federal securities laws require a broker or dealer to provide its customer with a trade confirmation that discloses certain information. 17 C.F.R. § 240.10b-10(a). Among that information is "[w]hether the broker or dealer is acting as agent for such customer, as agent for some other person, as agent for both such customer and some other person, or as principal for its own account." 17 C.F.R. § 240.10b-10(a)(2).

Here, the Share Call Option Master Confirmation—the contract that governed PS Fund 1's options purchases—specifically explains that Nomura is the "seller" and PS Fund 1 is the "buyer" of call options. Ex. 9 § 1.[11] It further explains that "the Transaction is a derivatives transaction in which [PS Fund 1] has purchased from Dealer an option," *id.* § 5(e)(v), and that "additional representations" for "Non-Reliance" and "Agreements and Acknowledgements Regarding Hedging Activities" are "applicable." *Id.* § 1.[12] In the Non-Reliance representation, each party "represents to the other party that: (a) it is entering into such Transaction as principal (and not as agent or in any other capacity); [and] (b) neither the other party nor any of its Affiliates or agents are acting as a fiduciary for it[.]" Ex. 8 § 13.1.

The Master Confirmation confirms that PS Fund 1 had no control over whether, how, or in what respect Nomura might hedge the options by acquiring Allergan stock or through other derivatives. Indeed, PS Fund 1 specifically acknowledged that "during the term of the Transaction, [Nomura] and its affiliates may buy or sell Shares

---

[10] As noted, courts addressing Rule 12(b)(6) motions in securities fraud cases routinely consider SEC filings and contracts referenced in a complaint. *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1405 n.4 (9th Cir. 1996) ("The district court [properly] considered the full text of the Prospectus, including portions which were not mentioned in the complaints.").

[11] The Share Forward Master Confirmation—which addressed the equity forward contracts—contains substantively the same provisions. Ex. 10 §§ 5(e), (g).

[12] These terms are defined in the 2002 ISDA Equity Derivatives Definitions—industry-standard published terms that are incorporated into the Master Confirmation by reference. Ex. 8.

**DEFS. NOT. & MOT. TO DISMISS AMEND. COMPLT.; MEM. OF P&As THEREOF**

1   or other securities or buy or sell options or futures contracts or enter into swaps or

2   other derivative securities in order to establish, adjust or unwind its hedge position

3   with respect to the Transaction[.]" Ex. 9 § 5(e)(i). The Master Confirmation also

4   confirmed that "[Nomura] shall make its *own determination* as to whether, when or in

5   what manner any hedging or market activities in Counterparty's securities shall be

6   conducted and shall do so in a manner that it deems appropriate to hedge its price and

7   market risk with respect to the Transaction[.]" *Id*. § 5(e)(iii) (emphasis added). In

8   short, "although [Nomura] may hedge its risk under the Transactions in any way

9   [Nomura] determines, [Nomura] has no obligation to hedge with the purchase or

10  maintenance of any Shares[.]" *Id*. § 5(g)(ii).[13] If Nomura did hedge, it did not do so as

11  PS Fund 1's agent. *See Lent*, 2011 WL 5971190, at *3.

12      Further, were Nomura deemed to be PS Fund 1's agent under the facts pleaded

13  in the AC, many collateral effects would ensue. Nomura would become part of a

14  "group" with Defendants for purposes of § 13(d)(3), requiring significant disclosures.

15  Its hedges could have triggered Allergan's poison pill—a contention that even

16  Allergan did not make in its own defense. And there would be many other dire,

17  unprecedented regulatory consequences for Nomura and all other dealers.

18      In any event, Plaintiffs fail even to allege the specific trades by Nomura that

19  they contend might support indirectly their standing here, as required in this Circuit.

20  *Neubronner*, 6 F.3d at 670–71. There is no allegation as to any specific Nomura stock

21  transaction that is alleged to be contemporaneous with any Plaintiff trade.

22

23

24

25

---

26      [13]   These terms are reiterated in the additional representation regarding
    Agreements and Acknowledgements Regarding Hedging Activities, which
27  incorporates an ISDA Definition that similarly disclaims any control over a
    counterparty's hedging activity. Ex. 8 § 13.2.
28

-20-

1

2

## II. The First Claim Fails to Plead a Cognizable Claim Arising Under any Recognized Private Right of Action for Money Damages.

### A. Plaintiffs Plead No Cognizable Violation of Section 14(e).

The First Claim for Relief alleges violations of § 14(e) of the Williams Act, which prohibits fraud (requiring scienter, as under § 10(b)) in connection with tender offers. *See Brody*, 280 F.3d at 1003. Notably, § 14(e) lacks an "express provision for a private cause of action for damages." *Piper v. Chris-Craft Indus., Inc.*, 430 U.S. 1, 26 (1977). Thus, the First Claim is premised on the existence of an implied private right of action. In a footnote in *Plaine v. McCabe*, the Ninth Circuit suggested that a private right to a damages action might extend to a facial violation of § 14(e)'s anti-fraud prohibition. 797 F.2d 713, 717 & n.7 (9th Cir. 1986). But the Ninth Circuit never held that a private right of action for money damages exists for some insider trading theory under Section 14(e), *see Brody*, 280 F.3d at 1002 (assuming, without deciding, the issue because the claim failed for lack of standing anyway), and later Supreme Court cases have virtually prohibited the creation of any new implied rights of action. [14]

Even if Plaintiffs have an implied private right of action under § 14(e), the First Claim does not state a violation of § 14(e). In order to state such a claim, Plaintiffs would have to plead facts establishing that "(1) the defendant made misstatements or omissions of material facts; (2) with scienter; (3) in connection with a tender offer." *Rubke* v. *Capitol Bancorp Ltd.*, 2006 WL 1699569, at *17 (N.D. Cal. Jun. 16, 2006).

---

[14]  In *Alexander v. Sandoval*, 532 U.S. 275, 287 (2001), the Supreme Court narrowed substantially the circumstances under which the courts may recognize an implied private right of action. The sparse analysis in *Plaine*, decided 15 years earlier, likely is no longer good law. *See Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc) (holding that Ninth Circuit *stare decisis* permits a court to decline to apply the rule of a three-judge panel "where intervening Supreme Court authority is clearly irreconcilable with our prior circuit authority"). In any event, because the AC does not allege a facial violation of § 14(e)'s anti-fraud prohibition, the Court does not need to reach the issue of continued viability of *Plaine. See Sanford v. MemberWorks, Inc.*, 625 F.3d 550, 559 n.6 (9th Cir. 2010) (noting that the lack of a private right is not jurisdictional, and thus that the court can avoid resolving issue regarding the post-*Sandoval* viability of a private right when there are other grounds to dismiss).

-21-

1   "'[T]he scienter required under [S]ection 14(e) is the same as that required by

2   [S]ection 10(b),' given that Section 14(e) was modeled upon the antifraud provisions

3   of Section 10(b)." *Biotech. Value Fund, L.P.* v. *Celera Corp.*, 12 F. Supp. 3d 1194,

4   1199 (N.D. Cal. 2013) (quotations omitted); *see Conn. Nat'l Bank* v. *Flour Corp.*, 808

5   F.2d 957, 961 (2d Cir. 1987) ("[S]cienter is a necessary element of a claim for

6   damages under § 14(e) of the Williams Act.").

7       "When an allegation of fraud is based upon nondisclosure, there can be no fraud

8   absent a duty to speak"; no duty arises "from the mere possession of nonpublic market

9   information." *Chiarella* v. *United States*, 445 U.S. 222, 234-35 (1980). Trading on

10   non-public information rises to the level of fraud actionable under §§ 10(b) or 14(e)

11   only when the trader acts "in breach of a duty owed to the source of the information."

12   *United States v. O'Hagan*, 521 U.S. 642, 652 (1997). "Because the deception essential

13   to the misappropriation theory involves feigning fidelity to the source of information,

14   if the fiduciary discloses to the source that he plans to trade on the information there is

15   no 'deceptive device' and thus no § 10(b) violation." *Id.* at 655.

16       The AC expressly alleges that the non-public information belonged to Valeant,

17   AC ¶ 1, and that Valeant purposefully shared that information with Pershing and

18   consented to Pershing's use of the information in its trading decisions, all to benefit

19   Valeant in a potential acquisition. AC ¶¶ 2–7. These allegations make clear that no

20   non-public information was "misappropriated." Thus, the insider trading claims

21   premised upon fraud in violation of § 14(e) are deficient as a matter of law.

22       **B.    Plaintiffs Have No Private Right of Action Under Rule 14e-3 For**

23             **Conduct Permissible Under § 14(e).**

24       Even assuming a private right of action exists under § 14(e), it cannot reach

25   regulatory violations that address conduct beyond the statute's scope, such as the

26   alleged violations of Rule 14e-3 at issue in this case. "[P]rivate rights of action to

27   enforce federal law must be created by Congress." *Sandoval*, 532 at 286. Only the

28   SEC has the authority to enforce Rule 14e-3. "Language in a regulation may invoke a

**DEFS. NOT. & MOT. TO DISMISS AMEND. COMPLT.; MEM. OF P&As THEREOF**

private right of action that Congress through statutory text created, but it may not create a right that Congress has not." *Id.* at 291. While the federal government may enforce validly adopted rules as written,[15] to the extent they stray beyond the confines of the statute, private litigants may not seek to enforce agency rules through money damages. *Id.* at 286–87 ("a 'private plaintiff may not bring a [suit based on a regulation] against a defendant for acts not prohibited by the text of [the statute]'"). "[R]egulations can only be enforced through the private right of action contained in a statute when they 'authoritatively construe' the statute; regulations that go beyond a construction of the statutes' prohibitions do not fall within the implied right of action, even if valid." *Mark H. v. Lemahieu*, 513 F.3d 922, 935 (9th Cir. 2008). "Only those regulations effectuating the statute's clear prohibitions or requirements are enforceable through the statute's private right of action." *Lonberg* v. *City of Riverside*, 571 F.3d 846, 851 (9th Cir. 2009); *see Indep. Living Ctr. of S. Cal.* v. *City of L.A.*, 973 F. Supp. 2d 1139, 1154 (C.D. Cal. 2013).

As *O'Hagan* made clear, Rule 14e-3 prohibits conduct beyond the plain language of § 14(e) to the extent that it "does not require specific proof of a breach of fiduciary duty." 521 U.S. at 676. While the SEC and federal prosecutors may enforce Rule 14e-3 according to its terms, private plaintiffs may not sue for money damages based upon conduct permissible under the express language of § 14(e). *See Cent. Bank of Denver, N.A.* v. *First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 173 (1994) (private plaintiffs may not sue under Rule 10b-5 for acts not prohibited by § 10(b)). Here, Plaintiffs' only insider trading theory impermissibly seeks to impose obligations not found in § 14(e). *Lonberg*, 571 F.3d at 852 (regulation "is not enforceable through [a statute's] private right of action because the obligations it imposes are nowhere to

---

[15]   *O'Hagan* held certain aspects of Rule 14e-3 were validly adopted by the SEC. 521 U.S. at 673. The Court declined, however, to consider whether that Rule was valid insofar is it purports to regulate "trading authorized by a principal [that] breaches no fiduciary duty." *Id.* at 672 n.17.

**DEFS. NOT. & MOT. TO DISMISS AMEND. COMPLT.; MEM. OF P&As THEREOF**

1  be found in [the statute's] plain language"). No such implied private right of action

2  may be pursued under Rule 14e-3. *Mark H.*, 513 F.3d at 939 (even where regulation

3  falls within statutory right of action, scienter requirement of statute remained

4  applicable in private damages case).

## III. The Second Claim Is Derivative of the Defective § 14(e) Claim and Must Be Dismissed.

7  Plaintiffs' Second Claim for Relief, under § 20A of the Exchange Act, must be

8  dismissed as well. AC ¶¶ 191–97. "As Congress explained at the time of its

9  enactment, the purpose of Section 20A is simply to codify the existence of a private

10  right of action for insider trading violations." *Gordon v. Sonar Capital Mgmt. LLC*,

11  2015 WL 1283636, at *8 (S.D.N.Y. Mar. 19, 2015) (citing H.R. Rep. No. 910, 100th

12  Cong., 2d Sess. 1988, 1988 WL 169923, at *26 ("House Rep.")). Section 20A

13  provides a limited cause of action for insider trading that violates "any provision of

14  this chapter or the rules or regulations thereunder." 15 U.S.C. § 78t-1. The legislative

15  history and cases interpreting § 20A make clear that it does not apply in the absence of

16  an underlying violation of the Exchange Act. Because Plaintiffs have not pled a viable

17  § 14(e) claim, their claim under § 20A is likewise deficient as a matter of law.

18  The legislative history of § 20A demonstrates that it was enacted for the express

19  purpose of (a) adopting the misappropriation insider trading theory, and (b)

20  overturning a case that held private parties lacked standing to sue under that theory

21  because the duty breached was not owed to them. At the time § 20A was enacted, few

22  if any cases had recognized a private right of action for insider trading under Section

23  14(e) or Rule 14e-3. Yet, Congress noted that, "[d]espite the breadth of the statutory

24  and regulatory framework for insider trading, several major court cases in recent years

25  have established *clear boundaries* for prosecution of these violations." House Rep.,

26  1988 WL 169923, at *9 (emphasis added). Congress made clear that, "[u]nder current

27  case law, the SEC *must establish that the person misusing the information has*

28  *breached either a fiduciary duty to shareholders or some other duty not to*

-24-

*misappropriate insider information*," and it did "not intend to alter the substantive law with respect to insider trading with this legislation." *Id.* at *10–11 (emphasis added). Instead, Congress adopted the existing misappropriation theory: "[T]he misappropriation theory fulfills appropriate regulatory objectives in determining when communicating or trading while in possession of material nonpublic information is unlawful." *Id.* at *26–27.

Congress also sought in § 20A to ensure standing to sue *under the misappropriation theory* for certain contemporaneous traders. "[T]he codification of a right of action for contemporaneous traders is specifically intended to overturn court cases which have precluded recovery for plaintiffs where the defendant's violation is premised upon the misappropriation theory." *Id.* at *26. In short, § 20A did not create a money damages claim under Rule 14e-3 that did not previously exist. *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 362 (1991) ("The language of § 20A makes clear that the 100th Congress sought to alter the remedies available in insider trading cases[.]").

Consistent with the legislative history, the Ninth Circuit has explained that "claims under Section 20A are derivative and therefore require an independent violation of the Exchange Act." *Johnson v. Aljian*, 490 F.3d 778, 781 (9th Cir. 2007). Thus, to state a claim under § 20A, a plaintiff must plead an "independent underlying violation of the 34 Act[.]"*In re VeriFone Sec. Litig.*, 11 F.3d 865, 872 (9th Cir. 1993). Here, the § 20A claim is "deficient because plaintiff[s] ha[ve] not alleged a predicate violation of the Exchange Act." *Batwin v. Occam Networks, Inc.*, 2008 WL 2676364, at * 27 (C.D. Cal. July 1, 2008).

**IV.    The Second Claim Does Not State a Claim for Relief under Rule 14e-3.**

The Second Claim for Relief, under § 20A, is premised on a violation of Rule 14e-3. *See* AC ¶¶ 191–97. But the AC does not adequately plead the elements of a claim under that regulation. To state a claim under Rule 14e-3, the AC must state with particularity all elements of the claim. *See Ore. Pub. Emps. Ret. Fund*, 774 F.3d at

-25-

605. "[A]ll the elements of a § 14(e)/Rule 14e-3 insider trading violation are supplied by the language of Rule 14e-3." *Brody*, 280 F.3d at 1004.That language states six elements, including, as relevant here: (1) a person (the "offering person") "has taken a substantial step or steps to commence, or has commenced, a tender offer"; (2) an "other person . . . is in possession of material information relating to such tender offer"; and (3) the other person "knows or has reason to know [the information] has been acquired directly or indirectly from . . . [t]he offering person." 17 C.F.R. § 240.14e-3(a). Here, the AC fails to adequately allege these elements with the specificity required under the governing pleading standards.[16]

### A.    Pershing is an Offering Person Outside the Trading Proscription in Rule 14e-3.

Rule 14e-3 restricts trading only of a person other than the "offering person." And, by its plain terms, an "offering person" under Rule 14e-3 is defined to mean "any person who has taken a substantial step or steps to commence, or has commenced, a tender offer." Collectively, this means that "Rule 14e-3(a) does not proscribe purchases or sales of securities to be sought or sought in a tender offer by the person who has taken a substantial step or steps to commence or has commenced the tender offer." SEC Release No. 6239, 1980 WL 20869, at *2 (Sept. 4, 1980) ("SEC Release").

Here, Plaintiffs allege that Pershing took a host of steps that Plaintiffs identify as substantial steps toward the commencement of a tender offer, including executing the Relationship Agreement, conducting due diligence, drafting documents, and, most importantly, acquiring a toehold interest in Allergan.[17] If true, and these acts constitute

---

[16]    To the extent the Court finds that Plaintiffs have a private right to a damages action to enforce Rule 14e-3, the arguments in this section apply to the First Claim, as well as the Second.

[17]    *See, e.g.,* AC ¶ 12 (Pershing was party to an agreement to use Valeant's insider information to acquire a toehold, a substantial step); ¶ 55 (Pershing was to provide financing of the takeover); ¶¶ 67–68 (Pershing formed PS Fund 1 to acquire a toehold (Continued…)

-26-

"substantial steps," then Pershing is, like Valeant, an "offering person" outside of Rule 14e-3's proscription against trading. Thus, by Plaintiffs' own theory, neither Pershing nor Valeant is an "other person" capable of violating Rule 14e-3.

**B.   The AC Does Not Adequately Allege Valeant Had Taken Substantial Steps to Commence a Tender Offer During PS Fund 1's Trading.**

"Rule 14e-3 regulates illegal insider trading that takes place while a tender offer is under consideration." *Brody*, 280 F.3d at 1004. Its first element requires that an "offering person" "has taken a substantial step or steps to commence, or has commenced, a tender offer." 17 C.F.R. § 240.14e-3(a).

**1.   Rule 14e-3 Requires that an Offering Person Take Substantial Steps Towards the Commencement of a Tender Offer.**

It is no accident that the first element of Rule 14e-3 requires a nexus to the commencement of a tender offer. The SEC promulgated Rule 14e-3 under a grant of authority in § 14(e) of the Williams Act. *See O'Hagan*, 521 U.S. at 666. In addition to prohibiting fraud, § 14(e) authorizes the SEC to "by rules and regulations define, and prescribe means reasonably designed to prevent, such acts and practices as are fraudulent, deceptive, or manipulative" when "in connection with any tender offer." *See* 15 U.S.C. § 78n(e). While "the SEC's rulemaking power under" this statute is broad, the "grant of authority is not unlimited" because rules "must still be reasonably related to the purposes of the enabling legislation." *United States v. Chestman*, 947 F.2d 551, 559 (2nd Cir. 1991) (en banc) (quotations omitted). Rules enacted under the auspices of §14(e) thus must "delineate a penumbra around the fuzzy subject of tender offer fraud." *Id.* Notably, § 14(e) did not afford the SEC plenary authority to regulate all merger and acquisition activity, or even all hostile takeover activity, but only "acts and practices" "in connection with any tender offer." 15 U.S.C. § 78n(e).

---

in Allergan, a substantial step) ¶ 86 (Pershing negotiated, drafted, and entered into the Relationship Agreement, a substantial step).

**DEFS. NOT. & MOT. TO DISMISS AMEND. COMPLT.; MEM. OF P&As THEREOF**

Accordingly, the SEC's release upon the enactment of Rule 14e-3 repeatedly explained that to satisfy the substantial steps element, the steps must relate to a transaction structured or to be structured as a tender offer. SEC Release, 1980 WL 20869, at *6. The SEC's examples of a "substantial step or steps to commence a tender offer" include:

> 1.    voting on a resolution by the offering person's board of directors *relating to the tender offer*;
>
> 2.    the formulation of a plan or proposal to make *a tender offer* by the offering person or the persons acting on behalf of the offering person; or,
>
> 3.    activities which substantially facilitate the *tender offer* such as: [a] arranging financing *for a tender offer*; [b] preparing or directing or authorizing the preparation of *tender offer materials*; or [c] authorizing negotiations, negotiating or entering into agreements with any person to act as a dealer manager, soliciting dealer, forwarding agent or depository in connection with *the tender offer*.

*Id.* at *6 n.33 (emphasis added).

Notably, every single example provided by the SEC as a potential step is specifically qualified by an express connection to *a tender offer*. To be sure, the list in the release was not exhaustive. *See id.* (examples "include, but are not limited to . . ."). But under established principles of construction, any other examples must similarly relate directly to tender offers. *See Post v. St. Paul Travelers Ins. Co.*, 691 F.3d 500, 520 (3d Cir. 2012) ("Under the principle of *ejusdem generis*, '[i]t is widely accepted that general expressions such as 'including, but not limited to' that precede a specific list of included items should not be construed in their widest context, but apply only to persons or things of the same general kind or class as those specifically mentioned in the list of examples.'" (citation omitted)). As the SEC suggested in the Release, "substantial steps" satisfy the first element of a claim under Rule 14e-3 *only* when they are directed towards the *commencement of a tender offer*—as opposed to some other type of M&A transaction like a negotiated merger or a hostile proxy contest. *See generally Beaumont v. Am. Can Co.*, 621 F. Supp. 484, 499 (S.D.N.Y. 1985) (because

-28-

§§ 14(d) and (e) are "triggered by the making of a tender offer," rules promulgated under them did not apply to a merger transaction not structured as a tender offer).

### 2. The AC Does Not Adequately Allege that Valeant Took any Substantial Step to Commence a Tender Offer Prior to the Completion of PS Fund 1's Trading.

Part IV.A of the AC, titled "Valeant Takes Substantial Steps Toward The Tender Offer," purports to discuss the "substantial steps" Valeant took to commence a tender offer before PS Fund 1 finished acquiring its stake in Allergan. *See* AC ¶¶ 48–91. The title is misleading. The AC lacks any substantive factual allegations that the actions identified actually relate to a tender offer.[18] For instance, the first subsection—"Valeant Enlists Pershing to 'Front-Run' Its Hostile Takeover Efforts"—does not allege that anything Valeant or Pershing did constituted a step towards commencing a tender offer. The phrase "tender offer" does not appear anywhere in that subsection. *See* Part IV.A.1. Instead, Plaintiffs reference Valeant's contemplated transaction in general terms: "a potential business combination" (¶ 48); "an Allergan takeover" (¶ 49); "how to effect a hostile takeover" (¶ 52); "hostile bid" (¶ 53); and "hostile takeover" (*id.*). But allegations that Valeant took steps to commence a "potential business combination" or a "hostile takeover" miss the mark. There is more than one way to effectuate a "potential combination" or "hostile takeover."[19] Allegations addressed to "hostile takeovers" are insufficient to plead substantial steps towards

---

[18]  The Court previously ruled in a related case that a plaintiff in that case raised "serious questions" as to whether the Defendants took "substantial steps to commence a tender offer," *see Allergan, Inc. et al. v. Valeant Pharms Int'l, Inc., et al.*, Case No. 8:124-cv-01214-DOC, Dkt. No. 234, at 14. That prior ruling—made on an expedited basis, on a limited record, and under an entirely different standard than that applicable to this motion—does not preclude a finding that the AC does not sufficiently plead that Defendants took substantial steps. *See, e.g., Starbuck v. City & Cnty. of S.F.*, 556 F.2d 450, 457 n.13 (9th Cir. 1977) (affirming grant of motion to dismiss despite prior ruling granting a preliminary injunction in a related case).

[19]  *See* Martin Lipton, *Takeovers & Freezeouts* § 1.10 (2015 online ed.) ("*Lipton*") (discussing the various forms a takeover can take).

**DEFS. NOT. & MOT. TO DISMISS AMEND. COMPLT.; MEM. OF P&As THEREOF**

commencing a tender offer because they equally or more plausibly address steps taken to accomplish a transaction with a different structure, such as a merger after a successful proxy contest. *See Iqbal v. Ashcroft*, 556 U.S. 662, 678 (2009) ("Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.") (internal quotations omitted).

The remainder of Part IV.A is rife with similarly general allegations. It describes a meeting with Mason Morfit, a former Valeant Board Member, who had been pushing for "a Valeant/Allergan combination." AC ¶ 57. Plaintiffs similarly allege that, one one occasion, Bill Ackman and Michael Pearson discussed "Valeant's acquisition plans." *Id.* ¶ 62; *see also, e.g., id.* ¶ 64 (a subcommittee of Valeant's board discussed "a potential combination"); ¶ 66 (Pearson and Ackman discussed the "unsolicited pursuit of Allergan"); ¶ 80 (the "Allergan Opportunity" entailed pursuing "a [h]ostile cash and stock merger"). Even allegations regarding Valeant's engagement of professionals do not assert that these professionals were engaged for the purpose of commencing a tender offer. *See id* ¶ 63 (Valeant engaged Sullivan & Cromwell in connection with a "potential Allergan transaction" and retained two more law firms in connection with its "takeover bid" later that month).

To take a specific example, the AC makes several allegations about the retention of bankers to arrange financing for a "deal" or "hostile takeover," ignoring that financing for a potential merger agreement could not have been used for a tender offer. *See id.* ¶¶ 12, 64. Indeed, there is often an enormous difference between the financing used in the different structures. A merger is generally financed such that "the target's assets and/or cash flow" is used as collateral for large, long-term secured loans. *See* Aaron Rachelson, *Corporate Acquisitions, Mergers & Divestitures* § 3:29 (2015 online ed.). On the other hand, "the tender offer structure poses financing-related complications—albeit not insuperable ones—because financing for the tender offer will be needed at the time of its closing, when the acquiror will not yet have

-30-

access to the target's balance sheet, and the Federal Reserve Board's margin rules restrict borrowings secured by public company stock to 50% of its market value." Wachtell, Lipton, Rosen & Katz, *Takeover Law & Practice* § III.C.1.a (2014), *available at* http://www.wlrk.com/files/2014/TakeoverLawAndPractice.pdf. That often results in entirely different financing structures. Despite these differences, the AC ignores the reality that merger and tender offer financings are entirely different; it provides no basis to support a plausible inference that financing was being prepared in support of a tender offer (because it was not), as opposed to a merger.

Moreover, the AC itself reveals the irrelevance of its "hostile takeover" allegations. In many instances, the AC specifically alleges that Valeant was, in fact, taking steps toward a proxy contest as opposed to a tender offer. For example, ¶¶ 52 and 53 allege that Valeant was motivated to team up with Pershing so that it could obtain a toehold that would allow it, as a hostile acquirer, to "*secure stockholder votes to either approve their offer without target board support or unseat the board and stack it with directors who will vote for approval.*" AC ¶ 52 (emphasis added). These allegations describe a proxy contest with the goal of electing a new Allergan board to approve Valeant's merger proposal, rather than a tender offer.

Similarly, ¶ 54 suggests that Valeant was attracted to Pershing due to its "well-known reputation for waging aggressive proxy contests and challenging incumbent boards of directors and management—characteristics that served Valeant's purposes perfectly." And ¶ 75 quotes Valeant CEO Michael Pearson as explaining that PS Fund 1 "[g]etting to 10 percent was – or close to 10 percent without triggering any pill was important because *in the end, we knew it would come down to, you know, voting the board off or not.*" (emphasis original).[20]

---

[20]   *See also* AC ¶¶ 67 (PS Fund 1's "express purpose was to secretly acquire a near 10% toehold in Allergan…and subsequently support Valeant's hostile takeover plan"); 68 ("Valeant knew…that a successful takeover would require coercive tactics facilitated by the voting power of Pershing's near 10% stake in Allergan"); 73 ("Defendants knew that Pershing's nearly 10% stake would go a long way to (Continued…)

**DEFS. NOT. & MOT. TO DISMISS AMEND. COMPLT.; MEM. OF P&As THEREOF**

Consistent with the artifice that pervades the AC, having alleged a series of facts about deals, proxy contests or a generic "hostile" takeover, the AC pivots when it comes to *drawing conclusions*, which attempt to tie these allegations to a tender offer. AC ¶¶ 58 ("[T]he whole purpose of Pearson's and Ackman's cooperation presumed the need to resort to hostile takeover tactics, which inevitably include the threat and/or implementation of a tender offer."); 68 ("While taking these substantial steps in preparation for a tender offer . . ."); 73 ("Defendants always knew hostile tactics—including a tender offer—would be necessary."). But the court need not accept these mere conclusions where the underlying allegations tell a different story. *Iqbal*, 556 U.S. at 678. The AC might well plead that Valeant was indeed gearing up to engage in a "hostile takeover"—in the form of a proxy contest aimed at replacing the membership of Allergan's Board. That, however, is not the kind of "hostile takeover" that could subject Valeant or Pershing to liability under § 14(e) or Rule 14e-3. Otherwise, Plaintiffs could accomplish through artful pleading what Congress has denied to the SEC: plenary regulation of mergers and acquisitions untethered to the commencement of a tender offer.

### 3. The Relationship Agreement Is Not Itself a Substantial Step.

The AC alleges none of the indicia one would expect to see if Defendants were in the process of commencing a tender offer while PS Fund 1 was trading. *See generally* SEC Release, 1980 WL 20869, at *6 n.33; *Lipton* § 1.04 (describing the various participants in a tender offer and their roles). Defendants' Boards had not discussed, much less authorized, a tender offer. Their lawyers had not prepared any tender offer documents, such as a summary advertisement or "tombstone," a depository agreement, or a Schedule 14D. Their bankers had not sought tender offer financing. The various agents responsible for carrying out the mechanics of a tender,

---

capturing enough votes to hold a special meeting."); 74 ("so it could use its toehold as a jumping off point to call a special meeting to remove the expected poison pill").

**DEFS. NOT. & MOT. TO DISMISS AMEND. COMPLT.; MEM. OF P&As THEREOF**

1   such as a dealer manager, had not been hired. Nor does the AC allege that the

2   Defendants hired a dealer manager, or drafted documents ordinarily associated with a

3   tender offer, during the pre-April 22 time period. Nor does the AC allege that

4   Valeant's Board had approved of a tender offer at any time prior to April 22, 2014.

5   Given the telling absence of any allegations that Valeant engaged in planning or

6   any other steps to commence a tender offer prior to June 2015, the AC latches on to

7   the one document created during that period that uses the phrase *tender offer*—the

8   February 25, 2014 Relationship Agreement. That agreement, which sets out Pershing

9   and Valeant's respective obligations in their joint effort to acquire Allergan does use

10  the words "tender offer." But it does so only in recognizing that *no tender offer was*

11  *contemplated at that time.* Indeed, it contains a representation that "no steps have been

12  taken towards a tender or exchange offer for securities of Allergan." AC ¶ 87. It

13  further affirmatively requires the "consent of both Pershing and the Company . . . for

14  launching such a tender offer or an exchange offer." Ex. 1. Indeed, the agreement

15  addressed every permutation any deal might in the future take: "if a Company

16  Transaction is being pursued by the Company through a tender or exchange offer or a

17  merger or any related proxy or other solicitation prior to the Termination Time, each

18  of the Company, Pershing and the Co-Bidder Entity will be identified as co-bidders or

19  soliciting persons, respectively." *Id.*; AC ¶¶ 87–89.

20  It should be obvious that two sophisticated and well-advised parties, *Id.* ¶ 65,

21  were aware of the significance that commencing a tender offer carried and conducted

22  themselves appropriately for each independently to avoid that risk. It is axiomatic that

23  efforts to comply with the law are not evidence of a device to violate the law. But

24  according to various conclusory (and Orwellian) statements in the AC, the true

25  significance of the language representing that no offer was underway is *that it is not*

26  *true. Id.* ¶ 15 ("Calling a pigeon a duck, however, will not make it quack."); *id.* at ¶ 87

27  (the statements in the agreement were "misleading" and "self-serving" because

28  Defendants were "contemplating a hostile tender offer all along"); *id.* at ¶ 88 ("But

-33-

stamping the words 'no steps have been taken' on a document does not make it so."). Indeed, the AC concludes that "[t]he very drafting and negotiation of [the Relationship Agreement] was itself a substantial step toward the Tender Offer." *Id.* at ¶ 86. By the same reasoning, every agreement that represents legal compliance becomes evidence of non-compliance, and every step taken toward a non-consensual corporate transaction becomes a 'substantial step' toward a tender offer.

The relevant pleading standards, however, require more of Plaintiffs than just pointing to evidence that objectively exculpates Defendants and declaring it "False!" As courts have recognized, "'a pleading technique [that] couple[s] a factual statement with a conclusory allegation of fraudulent intent' is insufficient to 'support the inference that the defendants acted recklessly or with fraudulent intent.'" *Rombach v. Chang*, 355 F.3d 164, 176 (2d Cir. 2004). Absent "facts and circumstances that would support an inference that defendants knew of specific facts that are contrary to their public statements," the allegation of falsity is insufficient on its face. *Id.* The AC offers no cogent allegations at all, much less allegations meriting a strong inference, that Defendants entered into the Relationship Agreement as a sham.

### C.   The AC Does Not Adequately Plead Scienter.

Rule 14e-3 was promulgated pursuant to § 14(e), which is a fraud statute—accordingly, there can be no liability under the Rule without scienter. *See SEC v. Ginsburg*, 362 F.3d 1292, 1297 (11th Cir. 2004) ("to establish liability under . . . [Rule 14e-3], [plaintiff] must prove that [defendant] acted with scienter, a mental state embracing intent to deceive, manipulate, or defraud" (quotations omitted)). Plaintiffs' allegations fall far short of giving rise to the requisite "strong inference" that Defendants knowingly or recklessly committed fraud.

#### 1.   Defendants Could Know that Information Came from an "Offering Person" Only if they Knew that Substantial Steps Had Been Taken to Commence a Tender Offer.

"Rule 14e-3 regulates illegal insider trading that takes place while a tender offer is under consideration." *Brody*, 280 F.3d at 1004. Under the text of the rule, Plaintiffs

-34-

must plead facts meriting a strong inference that the "other person"—allegedly PS Fund 1—knew or should have known that the information originated from an "offering person," or someone acting on the offering person's behalf. 17 C.F.R. § 240.14e-3(a); *see also Ginsburg*, 362 F.3d at 1304 (defendant must know or have reason to know that information was acquired from "a person with the required status"); SEC Release, 1980 WL 20869, at *6 ("'knows or has reason to know' standard" applies to the trading person's knowledge of the source of the information). The Rule's express definition of "offering person"— any person who has commenced, or taken a substantial step or steps to commence, a tender offer—is implicated when the source is an "offering person" or someone acting on the offering person's behalf. 17 C.F.R. § 240.14e-3(a)(1), (3). Logically, a defendant may be shown to know that information was acquired from an "offering person" only if the defendant knows that such person has that status and has, in fact, taken steps to commence a tender offer.

Thus, Plaintiffs must prove that each Defendant knew or was deliberately reckless in not knowing that Valeant had taken substantial steps to commence a tender offer. *See generally Reese v. Malone*, 747 F.3d 557, 569 (9th Cir. 2014). This is consistent with the required nexus to a tender offer that § 14(e) is designed to reach. "'One violates Rule 14e-3(a) if he trades on the basis of material nonpublic information concerning a pending tender offer that he knows or has reason to know has been acquired 'directly or indirectly' from an insider of the offeror or issuer, or someone working on their behalf.'" *O'Hagan*, 521 U.S. at 669.

### 2. Because Defendants Are the Offering Persons, Information Cannot Relate to a Tender Offer Unless Defendants Consciously Initiated a Tender Offer.

Under Rule 14e-3, the information an "offering person" conveys to the "other person" must include "material information relating to such tender offer." This means that Plaintiffs must allege and prove that "the information in fact does relate to a tender offer." *Ginsburg*, 362 F.3d at 1304. In other words, the alleged offering person must have, in fact, planned a tender offer and taken steps in furtherance of the offer.

-35-

As the SEC stated when adopting Rule 14e-3, "[t]he provision implements existing statutory requirements and will be applicable to any tender offer," and "the rule applies only in the context of tender offers." SEC Release,  1980 WL 20869, at *1.

In addressing the liability of third parties, a few out-of-circuit cases have held that Rule 14e-3 "does not require that the offender know or have reason to know that the information relates to a tender offer." *Ginsburg*, 362 F.3d at 1304. That might be correct in a case addressing the Rule 14e-3 liability of someone unaffiliated with the offeror. But it is not plausible to contend that information in the hands of the participants in a tender offer could truthfully "relate to the tender offer" if the supposed offeror had no plan to pursue a tender offer. Thus, in the unique (and unprecedented) circumstances of this case—where Plaintiffs seek to hold the offeror itself liable—the offeror could not have communicated information that truly relates to a tender offer unless Plaintiffs demonstrate that the offeror subjectively sought to pursue a tender offer.

### 3. The AC Falls Well Short of the Strong-Inference Standard.

The AC is replete with conclusory allegations regarding Defendants' supposed state of knowledge, all of which fall far short of the precision and factual particularity required for a securities fraud claim to pass muster under Rule 9(b) and the PSLRA. For example, Plaintiffs allege that "Defendants intentionally or recklessly engaged in acts, practices and a course of conduct that was fraudulent, deceptive or manipulative in violation of § 14(e) and Rule 14e-3 of the Exchange Act." AC ¶ 188; *see also id.* at ¶¶ 186, 187. This is nothing more than a boilerplate recitation of the relevant statutory language and must be disregarded. Likewise, the AC's allegations that Pershing "indisputably knew [its trades] were based on material nonpublic information acquired from the 'offering person' . . ." (*id.* at ¶ 12), that "Defendants knew their *quid pro quo* violated the securities laws," (*id.* at ¶ 14), or that Defendants "realized [that their conduct] . . . violated the securities laws" (*id.* at ¶ 149) are conclusions that fail to provide the factual detail required to plead scienter. *See DSAM Global Value Fund v.*

-36-

*Altris Software, Inc.*, 288 F.3d 385, 388-89 (9th Cir. 2002) (Plaintiffs must "plead, in great detail, facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct." (quotation omitted)).

Shorn of its conclusory allegations, the AC offers no particularized factual allegations demonstrating that either Pershing or Valeant had the requisite knowledge under Rule 14e-3. To the contrary, Plaintiffs' allegations confirm that Valeant in fact had no plan whatsoever to make a tender offer at the time of Pershing's trades. Plaintiffs allege only that Valeant "suspected" that it *might* need to pursue a hostile takeover if its merger efforts failed (AC ¶¶ 13, 148), that a tender offer was "possible" (*id.* at ¶ 111), and that Valeant had expressly disavowed any intention to proceed by way of tender offer by confirming in its agreement with Pershing that in fact "no steps [had] been taken" to commence a tender offer. *Id.* at ¶¶ 87–88. Even accepting as true Plaintiffs' tenuous allegations that Valeant was "contemplating" that a symbolic tender offer might later be deployed (*id.* at ¶¶ 87, 112, 150), or that Valeant's conduct was "inconsistent with any sincere hope of achieving a negotiated friendly deal" (*id.* at ¶ 121), these allegations do not rise to the level necessary to support a strong inference of an "intent to deceive, manipulate, or defraud." *In re Digital Island Sec. Litig.*, 357 F.3d 322, 328 (3rd Cir. 2004). Rather, under the comparative analysis required by *Tellabs*, any malicious inference that could be drawn from these allegations is not nearly so compelling as the competing innocent inference—that at the time Pershing traded, neither Valeant nor Pershing had taken, and neither knew nor was severely reckless in not knowing that substantial steps had been taken to commence a tender offer. *Tellabs*, 551 U.S. at 324. The AC must be dismissed.

### 4. Plaintiffs Fail to Plead Scienter by Any Valeant Defendant.

The claims against the Valeant Defendants fail for the independent reason that the AC does not satisfy the separate scienter requirement for so-called "tipper" liability under Rule 14e-3(d)(1). That section prohibits:

**DEFS. NOT. & MOT. TO DISMISS AMEND. COMPLT.; MEM. OF P&As THEREOF**

communicat[ing] material, nonpublic information relating to a tender offer to any other person under circumstances in which it is reasonably foreseeable that such communication is likely to result in a violation of this section *except* that this paragraph shall not apply to a communication made in good faith . . . to other persons, involved in the planning, financing, preparation or execution of such tender offer.

By its terms, the tipper provision imposes two additional requirements, neither of which is met with respect to the Valeant Defendants, because (1) the Valeant Defendants lacked the requisite knowledge that the information given to the Pershing Defendants related to a tender offer, and (2) all communications with the Pershing Defendants were made in good faith.

*First*, a tipper may be liable only by conveying information "relating to a tender offer" and only if it is "reasonably foreseeable that such communication is likely to result in a violation of this section." *Id.*. Yet, for the reasons set forth above, there is no allegation that any information provided by Valeant to Pershing at that time related to a tender offer. Moreover, no violation of the statute was "reasonably foreseeable" to Valeant because the parties all understood that they were *not* planning a tender offer, and there was no expectation that any trading by Pershing might result in a violation of the securities laws. Plaintiffs' allegation that a tender offer was "possible" or might in the future be pursued does not remotely allege that Valeant knew that its carefully orchestrated takeover plan would result in an unprecedented violation of the Rule even though a tender offer was not being pursued.

*Second*, Rule 14e-3(d)(1) exempts communications made in "good faith" to "other persons, involved in the planning, financing, preparation or execution of such tender offer." Even if the Court finds that, as an objective legal matter, Plaintiffs have alleged that substantial steps had been taken towards the pursuit of a tender offer at the time of Pershing's trades, the Valeant Defendants are exempted from liability for their communications with Pershing under this provision. Plaintiffs allege at length that the Pershing Defendants were "involved in" the planning, financing, preparation

-38-

1   and execution of the tender offer—indeed, the gravamen of the AC is that Valeant and

2   Pershing worked together from the beginning to launch an acquisition proposal and

3   eventually a tender offer.[21] Thus a communication to Pershing cannot violate Rule

4   14e-3 if it was made in "good faith."

5          Valeant concluded after extensive consultation with three separate law firms

6   that providing information to Pershing did not violate Rule 14e-3. *See id.* ¶¶ 12, 63.

7   Valeant's good faith is further evidenced by its inclusion in the February 25

8   Relationship Agreement with Pershing of a clause confirming that "no steps [had]

9   been taken towards a tender or exchange offer for securities of Allergan." *Id.* ¶ 87.

10  Valeant had made no decision to pursue a tender offer and had no intention at any

11  time to run afoul of Rule 14e-3, but instead consciously sought to comply with the

12  Rule. Under these circumstances, Rule 14e-3(d)(1)'s good faith exemption applies to

13  Valeant's communications with Pershing.

14         *Third*, Plaintiffs' claims against Defendant Michael Pearson must be dismissed

15  for the separate reason that Plaintiffs have failed to adequately allege any facts

16  regarding Mr. Pearson's scienter. This Court has repeatedly confirmed that the

17  concept of "group pleading" does not survive the enactment of the PSLRA and that

18  scienter must be pleaded separately and with particularity against each named

19  defendant. *See, e.g., In re Wet Seal, Inc. Sec. Litig.*, 518 F. Supp. 2d 1148, 1156-57

20  (C.D. Cal. 2007) ("the Court must [] analyze scienter separately for . . . each

21  defendant"); *see also In re Impac Mortg. Holdings Inc. Sec. Litig.*, 554 F. Supp. 2d

22  1083, 1093 (2008) (Under the PSLRA, "Plaintiffs in securities actions must

23  distinguish among those they sue and identify with particularity the role each

24  defendant played in the alleged fraud."). Accordingly, none of Plaintiffs' allegations

25  regarding "Valeant" (*see, e.g.*, AC ¶ 11), the "Defendants" (*see, e.g., id.* ¶¶ 14, 78), or

26  the "Valeant Defendants" (*see, e.g., id.* ¶¶ 180–190), which in any event are

27  _____

28      [21]   *See supra* note 17.

1  conclusory and non-specific, go any distance towards alleging sufficiently

2  particularized facts regarding *Mr. Pearson's* scienter, as required by the PSLRA.

3       In fact, in the 207 paragraphs comprising the Amended Complaint, Plaintiffs'

4  sole factual allegation regarding Mr. Pearson's state of mind is the recitation of

5  Mr. Pearson's statement that, as of April 22, 2014, Valeant "suspected" that its offer

6  for Allergan "would ultimately have to go directly to Allergan shareholders," *id.*

7  ¶¶ 13, 148, *e.g.*, a proxy contest to influence or replace Allergan's Board. *See id.* ¶ 75

8  (admitting that the success of the transaction depended on "voting the board off").

9  Comments about a potential proxy contest on April 22 cannot support a conclusion

10 that Mr. Pearson knew or should have known that a violation of Rule 14e-3 was likely

11 more than two months earlier when the information in question was communicated to

12 Pershing. Plaintiffs have failed to allege scienter with respect to Mr. Pearson and the

13 claims against him should be dismissed.

14 **V.    The Third Claim, Derivative of the Others, Must Be Dismissed.**

15      The Third Claim alleges "control person" liability under § 20(a) against several

16 Defendants. In addition to control, § 20(a) requires "a primary violation of federal

17 securities law." *Zucco Partners*, 552 F.3d at 990. Because, as discussed above, the AC

18 does not adequately plead a primary violation, the Third Claim fails as well.

19                                **CONCLUSION**

20      The complaint should be dismissed in its entirety. And because the AC is

21 Plaintiffs' second effort to plead their claims, and drafted with the benefit of the

22 extensive record from the prior *Allergan v. Valeant* preliminary injunction

23 proceedings, there is no basis to believe that further amendment would cure the

24 deficiencies therein. Any dismissal thus should not provide leave to amend.

25

26

27

28

**DEFS. NOT. & MOT. TO DISMISS AMEND. COMPLT.; MEM. OF P&As THEREOF**

1 | Dated: August 7, 2015

Respectfully submitted,
KIRKLAND & ELLIS LLP

By: /s/ Mark Holscher

Mark Holscher
Michael Shipley
Tanya L. Greene
Jay Bhimani
Austin Norris
333 South Hope Street
Los Angeles, California 90071
Telephone:   (213) 680-8400
Facsimile:    (213) 680-8500

*Attorneys for Pershing Square Capital Management, L.P., PS Management, GP, LLC, PS Fund 1, LLC, and William A. Ackman*

**DEFS. NOT. & MOT. TO DISMISS AMEND. COMPLT.; MEM. OF P&As THEREOF**

1   Dated: August 7, 2015                    SULLIVAN & CROMWELL LLP

2                                            By: /s/ Brian T. Frawley

3

4                                            Robert A. Sacks (SBN 150146)
                                             sacksr@sullcrom.com
5                                            Edward E. Johnson (SBN 241065)
                                             johnsonee@sullcrom.com
6                                            Katherine A. Taylor (SBN 289711)
                                             taylork@sullcrom.com
7                                            1888 Century Park East, Suite 2100
8                                            Los Angeles, California 90067-1725
                                             Telephone: (310) 712-6600
9                                            Facsimile:   (310) 712-8800
10

11                                           Brian T. Frawley (*pro hac vice*)
                                             frawleyb@sullcrom.com
12                                           Max S. Heuer (*pro hac vice* to be filed)
                                             heuerm@sullcrom.com
13                                           125 Broad Street
14                                           New York, New York 10004-2498
                                             Telephone:  (212) 558-4000
15                                           Facsimile:   (212) 558-3588
16

17                                           *Attorneys for Defendants Valeant*
18                                           *Pharmaceuticals International, Inc., Valeant*
                                             *Pharmaceuticals International and Michael*
19                                           *Pearson*

20

21

22

23

24

25

26

27

28

-42-

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## SIGNATURE CERTIFICATION

Pursuant to L.R. 5-4.3.4(a)(2)(i), I hereby attest that all other signatories listed, and on whose behalf the filing is submitted, concur in the filing's content and have authorized this filing.

Dated: August 7, 2015                    KIRKLAND & ELLIS LLP

                                         By: /s/ Mark Holscher
                                          Mark Holscher

                                         *Attorneys for Pershing Square Capital Management, L.P., PS Management, GP, LLC, PS Fund 1, LLC, and William A. Ackman*

**DEFS. NOT. & MOT. TO DISMISS AMEND. COMPLT.; MEM. OF P&As THEREOF**