1

2

3

4

5

6

7

8

9

10

11

**BERNSTEIN LITOWITZ BERGER
  & GROSSMANN LLP**
BLAIR A. NICHOLAS (Bar # 178428)
blairn@blbglaw.com
12481 High Bluff Drive, Suite 300
San Diego, CA 92130
Telephone: (858) 793-0070
Facsimile: (858) 793-0323

**KESSLER TOPAZ
  MELTZER & CHECK, LLP**
ELI R. GREENSTEIN (Bar # 217945)
egreenstein@ktmc.com
One Sansome Street, Suite 1850
San Francisco, CA 94104
Telephone: (415) 400-3000
Facsimile: (415) 400-3001

*Lead Counsel for Lead Plaintiffs*

[additional counsel on signature page]

12

13

14

**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
SOUTHERN DIVISION**

15

16

17

18

19

20

21

22

23

24

25

26

27

28

| IN RE ALLERGAN, INC. PROXY VIOLATION SECURITIES LITIGATION | Case No. **8:14-cv-02004-DOC-AN** |
|---|---|
| | **LEAD PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS** |
| | Hearing Date: October 19, 2015<br>Time: 8:30 a.m.<br>Courtroom: 9D (Santa Ana)<br>Judge: Hon. David O. Carter |

1

**<u>TABLE OF CONTENTS</u>**

2

**Page**

3

I.   INTRODUCTION ............................................................. 1

4

II.  STATEMENT OF FACTS AND PROCEDURAL HISTORY ...................... 5

5

　　 A.   The Entire Purpose of the Valeant-Pershing Relationship
　　　　　Was to Mutually Benefit from Insider Trading ...................... 5

6

7

　　 B.   Valeant Took Numerous Substantial Steps Toward a
　　　　　Tender Offer ................................................................. 5

8

　　 C.   Pershing Secretly Acquires a Massive Stake in Allergan
　　　　　Based on Nonpublic Information About Valeant's Planned

9

　　　　　Tender Offer ................................................................. 7

10

　　 D.   Valeant Launches Its Hostile Bid .................................... 7

11

III. ARGUMENT ................................................................... 9

12

　　 A.   Legal Standard .............................................................. 9

13

　　 B.   Plaintiffs Traded Contemporaneously With PS Fund 1 ...... 10

14

　　　　　1.   Defendants' Decision to Trade in Options Instead of
　　　　　　　 Common Stock Does Not Shield Them from

15

　　　　　　　 Liability ............................................................. 11

16

　　　　　2.   Defendants' Deliberate Use of Zero Strike Options
　　　　　　　 Is Not a Viable Means to Evade Liability ................. 13

17

　　　　　3.   Defendants' "Control" Arguments Regarding
　　　　　　　 Nomura Are Irrelevant, Incorrect, and Raise

18

　　　　　　　 Disputed Issues of Fact ........................................ 17

19

　　 C.   Plaintiffs Have a Private Right of Action under Rule 14e-3 ....... 20

20

　　　　　1.   Section 14(e) Contains a Private Right of Action ......... 21

21

　　　　　2.   Section 14(e)'s Private Right of Action Extends to
　　　　　　　 Rule 14e-3 ......................................................... 21

22

23

　　 D.   Plaintiffs Adequately Allege Violations of Rule 14e-3 ......... 24

24

　　　　　1.   Pershing Is Not an "Offering Person" under Rule
　　　　　　　 14e-3(a) ............................................................. 25

25

　　　　　2.   Plaintiffs Have Established That Valeant Took

26

　　　　　　　 "Substantial Steps" Related to a Tender Offer Before
　　　　　　　 Pershing's Trades ................................................ 27

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

        (a)    Valeant's Objective Conduct Confirms That Substantial Steps Were Taken Toward a Tender Offer .................................................... 27

        (b)    Pershing's Proxy Contest Does Not Exempt Defendants' Conduct from Rule 14e-3 ........................... 31

    3.    The Complaint Adequately Alleges Requisite Knowledge ....................................................................... 32

    4.    Defendants' Rule 14e-3(d) Arguments Are Baseless ................ 36

  E.    Plaintiffs Adequately Allege Violations of Section 20A ..................... 38

IV.    CONCLUSION ........................................................................................... 40

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Adobe Sys., Inc. Sec. Litig.*,
139 F.R.D. 150 (N.D. Cal. 1991) ............................................................... 15

*Allergan, Inc. v. Valeant Pharms. Int'l, Inc.*,
2014 WL 5604539 (C.D. Cal. Nov. 4, 2014) .................................. *passim*

*Alexander v. Sandoval*,
532 U.S. 275 (2001) ...................................................................... 21, 22

*Backman v. Polaroid Corp.*,
540 F. Supp. 667 (D. Mass. 1982) ................................................... 12

*Beaumont v. Am. Can Co.*,
621 F. Supp. 484 (S.D.N.Y. 1985) ................................................... 29

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ............................................................................ 9

*Bianco v. Tex. Instruments, Inc.*,
627 F. Supp. 154 (N.D. Ill. 1985) .................................................... 16

*Biotech. Value Fund, L.P. v. Celera Corp.*,
12 F. Supp. 3d 1194 (N.D. Cal. 2013) ............................................. 24

*Brody v. Transitional Hosp. Corp.*,
280 F.3d 997 (9th Cir. 2002) ..................................................... *passim*

*Caiola v. Citibank N.A. New York*,
295 F.3d 312 (2d Cir. 2002) ....................................................... 18, 19

*Camelot Indus. Corp. v. Vista Res., Inc.*,
535 F. Supp. 1174 (S.D.N.Y. 1982) ................................................. 30

*Chiarella v. U.S.*,
445 U.S. 222 (1980) .......................................................................... 36

*City of Westland Police & Fire Ret. Sys. v. Sonic Solutions*,
2009 WL 942182 (N.D. Cal. April 6, 2009) ..................................... 11

*Darensburg v. Metropolitan Trans. Com'n*,
2006 WL 167657 (N.D. Cal. Jan. 20, 2006) .................................... 19

*Dau v. Cephalon, Inc.*,
2000 WL 1469347 (E.D. Pa. Sept. 25, 2000) ................... 12, 13, 16, 18

*Deutschman v. Beneficial Corp.*,
841 F.2d 502 (3d Cir. 1988), *cert. denied*, 490 U.S. 1114 (1989) ........ 15

*In re Digital Island Sec. Litig.*,
    357 F.3d 322 (3d Cir. 2004) .................................................................. 33

*DSAM Global Value Fund v. Altris Software, Inc.*,
    288 F.3d 385 (9th Cir. 2002) ................................................................ 33

*Epstein v. MCA, Inc.*,
    50 F.3d 644 (9th Cir. 1995) .................................................................. 21

*In re Equity Funding Corp. of Am. Sec. Litig.*,
    416 F. Supp. 161 (C.D. Cal. 1976) ....................................................... 15

*Fireman's Fund Ins. Co. v. City of Lodi*,
    302 F.3d 928 (9th Cir. 2002) .................................................................. 9

*Fry v. UAL Corp.*,
    84 F.3d 936 (7th Cir. 1996) .................................................................. 16

*Gibbons v. Malone*,
    801 F. Supp. 2d 243 (S.D.N.Y. 2011), *aff'd*, 703 F.3d 595 (2d Cir.
    2013) ................................................................................................. 17

*Hamilton v. State Farm Fire & Cas. Co.*,
    270 F.3d 778 (9th Cir. 2001) ................................................................ 20

*In re Impac Mortg. Holdings, Inc. Sec. Litig.*,
    554 F. Supp. 2d 1083 (C.D. Cal. 2008) ................................................ 33

*Ind. Nat'l Bank v. Mobil Oil Corp.*,
    578 F.2d 180 (7th Cir. 1978) ................................................................ 21

*Johnson v. Aljian*,
    257 F.R.D. 587 (C.D. Cal. 2009) ............................................... 14, 19, 39

*Kern Cnty. Land Co. v. Occidental Petroleum Corp.*,
    411 U.S. 582 (1973) ............................................................................ 16

*Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*,
    501 U.S. 350 (1991) ............................................................................ 39

*Laventhall v. Gen. Dynamics Corp.*,
    704 F.2d 407 (8th Cir.), *cert. denied*, 464 U.S. 846 (1983) .............. 15, 16

*Lee v. City of L.A.*,
    250 F.3d 668 (9th Cir. 2001) .................................................................. 9

*In re McDonnell Douglas Corp. Sec. Litig.*,
    567 F. Supp. 126 (E.D. Mo. 1983) ....................................................... 16

*McGuire v. Dendreon Corp.*,
    2008 WL 1791381 (W.D. Wash. April 18, 2008) ................................... 19

*Middlesex Ret. Sys. v. Quest Software, Inc.*,
    2008 WL 7084629 (C.D. Cal. July 10, 2008) ........................................ 11

*Moskowitz v. Lopp,*
  128 F.R.D. 624 (E.D. Pa. 1989) ............................................................. 12, 16

*O'Connor & Assoc. v. Dean Witter Reynolds, Inc.,*
  529 F. Supp. 1179 (S.D.N.Y. 1981) ................................................ 15, 17, 23

*Piper v. Chris-Craft Indus.,*
  430 U.S. 1 (1977) ...................................................................................... 5, 21

*Plaine v. McCabe,*
  797 F.2d 713 (9th Cir. 1986) ........................................................................ 21

*Polaroid Corp. v. Disney,*
  862 F.2d 987 (3d Cir. 1988) ......................................................................... 21

*Polinsky v. MCA Inc.,*
  680 F.2d 1286 (9th Cir. 1982) ...................................................................... 21

*Provenz v. Miller,*
  102 F.3d 1478 (9th Cir. 1996) ...................................................................... 37

*Reese v. Malone,*
  747 F.3d 557 (9th Cir. 2014) ........................................................................ 33

*Revlon, Inc. v. Pantry Pride, Inc.,*
  621 F. Supp. 804 (D. Del. 1985) .................................................................. 27

*Reyn's Pasta Bella, LLC v. Visa USA, Inc.,*
  442 F.3d 741 (9th Cir. 2006) .......................................................................... 3

*Sargent v. Genesco, Inc.,*
  492 F.2d 750 (5th Cir. 1974) ........................................................................ 21

*SEC v. Drescher,*
  1999 WL 946864 (S.D.N.Y. Oct. 19, 1999) ............................................... 36

*SEC v. Falbo,*
  14 F. Supp. 2d 508 (S.D.N.Y. 1998) ........................................................... 30

*SEC v. Ferrero,*
  1993 WL 625964 (S.D. Ind. Dec. 2, 1993), *aff'd sub nom. Maio,* 51
  F.3d 623 (7th Cir. 1995) ............................................................................... 30

*SEC v. Gaspar,*
  1985 WL 521 (S.D.N.Y. April 16, 1985) ..................................................... 30

*SEC v. Ginsburg,*
  362 F.3d 1292 (11th Cir. 2004) ............................................................ *passim*

*SEC v. Jacobs,*
  No. 1:13-cv-01289-SO, slip op. (N.D. Ohio Aug. 15, 2014), ECF
  No. 112 ................................................................................................... 28, 34

*SEC v. Maio,*
  51 F.3d 623 (7th Cir. 1995) .......................................................................... 30

*SEC v. Mayhew*,
  121 F.3d 44 (2d Cir. 1997) ...................................................28, 29, 34

*SEC v. Musella*,
  748 F. Supp. 1028 (S.D.N.Y. 1989), *aff'd*, 898 F.2d 138 (2d Cir.
  1990) ..............................................................................................28, 30

*SEC v. Sargent*,
  229 F.3d 68 (1st Cir. 2000) .................................................................34

*SEC v. Suman*,
  684 F. Supp. 2d 378 (S.D.N.Y. 2010), *aff'd*, 421 F. App'x 86 (2d
  Cir. 2011) ............................................................................................30

*SEC v. Svoboda*,
  409 F. Supp. 2d 331 (S.D.N.Y. 2006) .................................................30

*SEC v. Warde*,
  151 F.3d 42 (2d Cir. 1998) ..................................................................30

*Shapiro v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
  495 F.2d 228 (2d Cir. 1974) ....................................................14, 15, 17

*Starkman v. Warner Comm'ns, Inc.*,
  671 F. Supp. 297 (S.D.N.Y. 1987) ......................................................16

*Stull v. Bayard*,
  561 F.2d 429 (2d Cir. 1977), *cert. denied*, 434 U.S. 1035 (1978) .......21

*U.S. v. Chestman*,
  947 F.2d 551 (2d Cir. 1991) ....................................................22, 23, 24

*U.S. v. Menasche*,
  348 U.S. 528 (1955) ............................................................................22

*U.S. v. O'Hagan*,
  139 F.3d 641 (8th Cir. 1998) ....................................................4, 22, 30, 34

*Unitrin, Inc. v. Am. Gen. Corp.*,
  651 A.2d 1361 (Del. 1995) ..................................................................31

*In re Wet Seal, Inc. Sec. Litig.*,
  518 F. Supp. 2d 1148 (C.D. Cal. 2007) ...............................................33

*In re Worlds of Wonder Sec. Litig.*,
  1990 WL 260675 (N.D. Cal. Oct. 19, 1990) .......................................15

**Statutes**

15 U.S.C. §78t-1(A).............................................................................16

15 U.S.C. §78n(e) ...............................................................................21

15 U.S.C. §78t-1(a).............................................................................38

**Other Authorities**

17 C.F.R. §240.14e-3 ................................................................. 11

17 C.F.R. §240.14e-3(a) ........................................................ 24, 33

17 C.F.R. §240.14e-3(d) ............................................................. 24

44 Fed. Reg. 70,349 (Dec. 6, 1979) .......................... 23, 28, 34, 36

44 Fed. Reg. 9956 (Feb. 15, 1979) ........................................... 25

45 Fed. Reg. 60,410 (Sept. 12, 1980) ........................ 28, 30, 36, 37

*Federal Regulation of Shareholder Activisism (audio)* AMERICAN
    BAR ASSOCIATION, BUSINESS LAW SECTION (2014 Annual
    Meeting).......................................................................................... 28

Fed. R. Civ. P. 15(a) ................................................................... 40

H.R. Rep. No. 100-910 (1988), *as reprinted in* 1988 U.S.C.C.A.N. 6043 .... 17, 23, 38

*Hearings Before the Subcomm. on Securities of the Senate Comm. on
    Banking and Currency*, 90th Cong., 1st Sess. (1967) ............................ 23

*Hearing Before the Subcomm. on Securities of the Senate Comm. on
    Banking and Currency,* 91st Cong., 2d Sess. (1970) ............................ 22

*Hearings Before the Subcomm. on Telecommunications and Finance of
    the H. Comm. on Energy and Commerce*, 100th Cong., 2d Sess.
    (1988).......................................................................................... 38, 39

*Hearings Before the Subcomm. on Telecommunications and Finance of
    the H. Comm. on Energy and Commerce*, 100th Cong., 1st Sess.
    (1987).......................................................................................... 38

Joseph A. Grundfest, *Just Vote No: A Minimalist Strategy for Dealing
    with Barbarians Inside the Gates*, 45 Stan. L. Rev. 857, 858 n.5
    (1993).......................................................................................... 31

Lucian Arye Bebchuk, *The Powerful Antitakeover Force of Staggered
    Boards: Theory, Evidence, and Policy,* 54 Stan. L. Rev. 887, 920
    (2002).......................................................................................... 31

Tender Offers, Exchange Act Release No. 17,120, 20 SEC Docket 1350
    (Sept. 4, 1980) ............................................................................. 33

# TABLE OF ABBREVIATIONS

| Abbreviation | Definition |
|---|---|
| Ackman | Defendant William Ackman |
| Allergan | Allergan, Inc. |
| Allergan Board | Allergan's Board of Directors |
| *Allergan I* | *Allergan, Inc. v. Valeant Pharms. Int'l, Inc.*, Case No. 8:14-cv-01214-DOC-AN (C.D. Cal.) |
| Class | All persons who sold Allergan publicly traded common stock from February 25, 2014 through April 21, 2014, inclusive |
| Class Period | February 25, 2014 through April 21, 2014, inclusive |
| Complaint | Class Action Amended Complaint, filed June 26, 2015 (Doc. No. 60) |
| Defendants | The Pershing Defendants and the Valeant Defendants, collectively |
| Defs.' Ex. [No.] | Numbered exhibit attached to the Declaration of Michael Shipley in Support of Defendants' Motion to Dismiss Plaintiffs' Amended Complaint (Doc. No. 71-3) |
| Defs' Summ. J. | Defs' Notice of Mot. and Mot. for Summ. J., Mem. of Points and Authorities in Supp. thereof, filed Dec. 26, 2014 (*Allergan I*, Doc. No. 256) |
| Doyle | Non-Party William F. Doyle, special advisor to the Pershing Defendants |
| Ex. [No.] | Numbered exhibit attached to the Declaration of Blair A. Nicholas in Support of Lead Plaintiffs' Opposition to Motion to Dismiss, filed concurrently herewith |
| Exchange Act | Securities Exchange Act of 1934 |
| HSR | Hart-Scott-Rodino Antitrust Improvements Act of 1976 |
| Iowa PERS | Plaintiff Iowa Public Employees Retirement System |
| ITSFEA | Insider Trading and Securities Fraud Enforcement Act of 1988 |

| Abbreviation | Definition |
|---|---|
| Mr. Johnson | Plaintiff Patrick T. Johnson |
| Motion or Mot. | Defendants' Notice of Motion and Motion to Dismiss Plaintiffs' Amended Complaint; Memorandum of Points and Authorities in Support Thereof, filed Aug. 7, 2015 (Doc. No. 71) |
| Nomura | Nomura International plc |
| NYSE | New York Stock Exchange |
| Ohio STRS | Plaintiff State Teachers Retirement System of Ohio |
| Ms. Parschauer | Karah H. Parschauer, Plaintiff in *Allergan I* |
| Pearson | Defendant Michael Pearson |
| Pershing Ans. | Answers and Affirmative Defenses of Defendants: (1) Pershing Square Capital Management, L.P.; (2) PS Management, GP, LLC; (3) PS Fund 1, LLC, and (4) William Ackman, filed Aug. 19, 2014 (*Allergan I*, Doc. No. 39) |
| Pershing | Defendants Pershing Square, PS Management GP, LLC, and PS Fund 1, collectively |
| Pershing Defendants | Defendants Pershing and Ackman, collectively |
| Pershing Square | Defendant Pershing Square Capital Management, L.P. |
| PI Opp. | Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction, filed Oct. 20, 2014 (*Allergan I*, Doc. No. 194) |
| Plaintiffs | Iowa PERS, Ohio STRS, and Mr. Johnson, collectively |
| PS Fund 1 | Defendant PS Fund 1, LLC |
| Relationship Agreement | Relationship Agreement between Pershing Square and Valeant, dated February 25, 2014 and filed with the SEC on April 21, 2014 |
| Schiller | Non-Party Howard B. Schiller, former Valeant Chief Financial Officer |
| SEC | Securities & Exchange Commission |

LP'S OPP. TO MTD                    -ix-

| Abbreviation | Definition |
| --- | --- |
| Valeant | Defendant Valeant Pharmaceuticals International, Inc. and Valeant Pharmaceuticals International, collectively |
| Valeant Board | Valeant's Board of Directors |
| Valeant Defendants | Defendants Valeant and Pearson, collectively |

## I.      INTRODUCTION

Defendants' Motion argues that a corporate bidder can legally conspire with an activist hedge fund to trade on inside information about an anticipated tender offer to profit at the expense of unsuspecting shareholders. Defendants' conduct violates provisions of the securities laws specifically designed to prevent the exact type of insider trading practices employed here. None of Defendants' erroneous interpretations of the law and semantic revisions of the facts changes the inherent illegality of their misconduct, and none suffices to let them escape accountability here.[1]

Defendants do not (and cannot) dispute the particularity of the core allegations in this case.  To the contrary, the Complaint details that, in February 2014, Valeant and Pearson deliberately provided Pershing and Ackman with highly material, nonpublic information regarding Valeant's planned takeover bid for Allergan. As part of Defendants' warehousing agreement, between February 25 and April 21, 2014, Pershing and Ackman used this inside information to accumulate nearly 10% of Allergan's stock from unwitting investors, and gain a "toehold" position that Pershing could use to support Valeant's unsolicited takeover bid.  Multiple internal Valeant and Pershing documents expressly discussed a potential "tender offer" prior to Pershing's trading and, as anticipated, Valeant launched a tender offer for Allergan in June 2014. Defendants' insider trading scheme ultimately generated billions in illicit profits for Pershing and hundreds of millions of dollars for Valeant.

In November 2014, this Court held that Defendants' conduct, at a minimum, raised "serious questions" regarding Defendants' liability under Section 14(e) and Rule 14e-3. *Allergan, Inc. v. Valeant Pharms. Int'l, Inc*., 2014 WL 5604539, at *14 (C.D. Cal. Nov. 4, 2014) ("*Allergan I*"). The Court recognized that Rule 14e-3 was specifically designed to prevent the practice of "warehousing," or the "intentional[]

---

[1]      Unless otherwise noted, all emphasis is added, internal citations and footnotes are omitted, and "¶" and "¶¶" citations are to the Complaint.

leaking [of] information to institutional investors to allow those other entities to make early trades before other investors heard about the tender offer," and held it was "doubtful that Congress and the SEC meant … to exempt an entity like Pershing Square from the 'disclose or abstain' rule of Rule 14e-3." *Id*. at *13. The Court also found that contemporaneous traders have a private right of action to recover damages for Defendants' misconduct. *Id*. at *12.

Defendants' effort to recycle arguments previously rejected by the Court must fail. Similarly, Defendants' newly concocted arguments to escape liability do not survive basic scrutiny. *First*, Defendants contend that they shrewdly circumvented the Williams Act by implementing (and concealing) their insider trading scheme through options contracts with Nomura.[2] This argument ignores the economic realities of Pershing's acquisitions of common stock, as well as Defendants' admissions that Nomura was simply a pass-through entity that purchased Allergan stock on the open market for Pershing's benefit. Indeed, Ackman admitted that Nomura purchased approximately 20% of all Allergan common shares sold on the NYSE during the Class Period on Pershing's behalf—and expressly referred to those trades as "***our*** stock purchases." In any event, Defendants' assertion that their liability is contingent upon how they, *the insider traders*, chose to effect their purchases would eviscerate the insider trading laws by enabling violators to avoid liability by simply purchasing derivatives instead of stock. Such a result is contrary to Congressional policy, and the governing statutes and case law.

*Second*, Defendants argue that there is no private right of action under Rule 14e-3. This position is not only inconsistent with decades of Section 14(e) and Rule 14e-3 jurisprudence allowing private actions to proceed, it also directly contradicts Defendants' express representations to this Court in *Allergan I*. There, Defendants argued that injured shareholders had no right to injunctive relief because the "injury

---

[2]    PS Fund 1 purchased common stock on February 25 and 26, 2014, and thus Defendants concede standing for Iowa PERS stock sales on February 26, 2014.

can be *completely redressed with damages*," and that the plaintiff "*can seek money damages*. That's the *Brody* case and that's the Supreme Court case in *Rondeau*. *Clear as can be*. *Money damages is her relief*." Ex. 1 at 18 n.9 (PI Opp.); Ex. 2 at 9.[3] This Court agreed, denying injunctive relief and holding that an Allergan shareholder has "*a private right of action under Rule 14e-3*" which "can be remedied through damages." *Allergan I*, 2014 WL 5604539, at *7, 17. Setting aside whether Defendants are judicially estopped from blatantly changing their position, the relevant cases and legislative history of Section 14(e) compel the same conclusion that Defendants previously espoused.

*Third*, Defendants claim that Pershing is exempt from Rule 14e-3(a)'s insider trading prohibition because it was an "offering person." The Court already rejected this argument in *Allergan I*, and the facts have not changed. *See* §III.D.1, *infra*. As the Court recognized, Pershing did not actually "make" the offer and "had no control over the price to be offered to Allergan's shareholders, whether the tender offer would involve cash and/or an exchange of stock, or even whether to call off the tender offer at some point." *Allergan I*, 2014 WL 5604539 at *13. In fact, Ackman publicly admitted that "*I am not the one making the offer*" and Pershing's SEC filings likewise verified that "*none* of Pershing Square, PS Fund 1 or any of Pershing Square's affiliates *is offering* to acquire any shares of Allergan common stock in the offer." *Id.* at *14. To the contrary, Defendants' SEC filings conceded that "this offer is being made *by Valeant*" and Pershing was simply a "co-bidder … *for SEC purposes*." *Id*. Thus, the Court held, "even Defendants do not really see Pershing Square and PS Fund 1 as the persons actually making an offer." *Id*.

*Fourth*, Defendants continue to argue that Valeant took no substantial steps toward a tender offer—based solely on their say so. That is, the day before Pershing

---

[3]    The Court can take judicial notice of court proceedings and pleadings in other actions as matters of public record. *See Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006).

began its insider trading spree, Defendants inserted a self-serving disclaimer in their illegal warehousing agreement stating that "the parties acknowledge that no steps have been taken towards a tender or exchange offer." Mot. at 5. The Court already rejected this argument, however, reasoning that "Defendants stating in a contract that they had not taken any steps toward a tender offer does not necessarily make it so." *Allergan I*, 2014 WL 5604539, at \*9. Indeed, Defendants' actual conduct, including repeated discussions and references to a "tender offer" in pre-trading communications, belies Defendants' assertion that no steps were taken. Moreover, Defendants' clumsy attempts to write themselves into the "offering person" exception actually show that they contemplated a tender offer at the time of their trades. *Id.* at \*9. It is inappropriate to accept Defendants' counterfactual disclaimer at the pleading stage, and implausible that a jury would do so at trial.

*Fifth*, despite the admittedly deliberate nature of their scheme, Defendants erroneously attempt to inject a "scienter" requirement into Rule 14e-3 that each Defendant knew "that Valeant had taken substantial steps to commence a tender offer." Mot. at 35. Rule 14e-3 contains no such requirement, as circuit courts across the country have unanimously held. *See, e.g., U.S. v. O'Hagan*, 139 F.3d 641, 650 (8th Cir. 1998) (Rule 14e-3 only requires "'a substantial step or steps' towards the tender offer [but] ***does not require the defendant to have knowledge of these acts***."); *SEC v. Ginsburg*, 362 F.3d 1292, 1304 (11th Cir. 2004) ("Rule 14e-3, by its terms, does ***not*** require that the offender know or have reason to know that the information relates to a tender offer."). In any event, the Complaint more than adequately alleges "scienter" even under Defendants' erroneous standard.

In the end, Defendants engaged in precisely the conduct that Rule 14e-3 was designed to prevent. *See Allergan I*, 2014 WL 5604539, at \*12 (the SEC prohibited "warehousing" as "unfair to investors who are trading at an informational disadvantage"). Accepting Defendants' arguments would create a massive loophole

in the insider trading laws that other corporate takeover specialists and traders like Ackman would undoubtedly seek to exploit to the detriment of ordinary investors. This result cannot be squared with the Williams Act's mandate to "protect[] stockholders" from being "treated as pawns in an elaborate game between the offerors and the management or perhaps other competing interests." *Piper v. Chris-Craft Indus.*, 430 U.S. 1, 35 (1977). Defendants' Motion should be denied.

## II.   STATEMENT OF FACTS AND PROCEDURAL HISTORY

### A.   The Entire Purpose of the Valeant-Pershing Relationship Was to Mutually Benefit from Insider Trading

Plaintiffs' claims arise out of a classic warehousing and front-running scheme. Valeant, a "serial acquirer" pharmaceutical company, could not find financing to continue its growth strategy. ¶34. Pershing, a hedge fund run by billionaire investor Ackman, needed to reverse a bad run of losing investments. ¶¶42-44. By the beginning of 2014, Pearson decided that Allergan was the "most attractive strategic transaction available to Valeant," even though Allergan had rejected Valeant's prior advances and disparaged any combination of the two companies. ¶¶48-51, 70. Since any overture to Allergan would undoubtedly turn hostile, Valeant needed a "toehold" in Allergan stock.  But Valeant "did not have $4 billion sitting at the bank." ¶53.

By supplying valuable inside information about an expected tender offer, Valeant enlisted Pershing to act as a securities warehouse. Pershing would acquire a substantial position in Allergan and agree to vote its shares in support of Valeant's bid. In exchange, Ackman and Pershing, armed with the advantage of inside information, would rake in billions of dollars in risk-free trading profits.  ¶166.

### B.   Valeant Took Numerous Substantial Steps Toward a Tender Offer

As detailed in the Complaint and §III.D.2, *infra*, between February 4 and February 25, 2014—*i.e.*, before Pershing made a single purchase of Allergan securities—Valeant took numerous substantial steps toward its Allergan tender offer, including retaining lawyers, holding formal meetings, lining up financing,

conducting due diligence, and entering into agreements governing the scheme, many of which expressly discussed a potential "tender offer." *See, e.g.*, ¶¶12, 62-65, 86-91, 95.

Defendants' actions, statements, and internal documents confirm that they always knew hostile tactics—including a potential tender offer—would be necessary. ¶¶12, 64, 68-73, 77, 80-83. For example, Valeant Board meeting materials prepared the week of February 14, 2014, noted that the transaction would likely proceed as a "[h]ostile cash and stock merger." ¶80. Defendants' internal documents also reflect that they expected Allergan to adopt a "poison pill" to defeat Valeant's bid, and that Valeant planned to wage a proxy contest to replace Allergan's Board with directors who would remove the "pill" and allow the tender offer to close. ¶¶73-78. As Pearson explained: "Getting to 10 percent was—or close to 10 percent without triggering any pill was important because in the end, we knew it would come down to, you know, voting the board off or not." ¶75.

Valeant and Pershing's internal documents likewise confirm that a potential tender offer was in the works well before Pershing's trading commenced. ¶¶12, 64, 82, 85-86. For instance, numerous drafts of Defendants' warehouse agreement and emails between Valeant and Pershing on February 17, 18, 20, 23, and 24, 2014, specifically contemplated that the transaction would proceed as a "tender offer" and assigned roles to Defendants if and when a tender offer occurred. ¶¶85-86. On February 25, 2014, Valeant and Pershing formalized their plan in the Relationship Agreement. ¶¶86-91. It was only very late in the drafting process, on February 24, that Defendants inserted a self-serving disclaimer that the parties "acknowledge that no steps have been taken towards a tender or exchange offer for securities of Allergan." ¶¶87-89. Despite this semantic game, the substance of the agreement was clear. Valeant was launching an offer, with Pershing acting as a warehouse. Pershing

profited by buying shares low before Valeant announced its offer, and selling them high after Valeant disclosed its offer and the stock price soared. ¶¶86-91, 123-38.

**C.      Pershing Secretly Acquires a Massive Stake in Allergan Based on Nonpublic Information About Valeant's Planned Tender Offer**

On February 25, 2014, Pershing, through PS Fund 1, launched its covert campaign to acquire a toehold stake in Allergan through a series of moves designed to evade detection and HSR and Williams Act reporting. ¶¶98-107. PS Fund 1 purchased roughly 600,000 Allergan shares on February 25 and 26, 2014 for $75.9 million—just short of HSR reporting thresholds. ¶98.

Pershing next had PS Fund 1 acquire control of another $2 billion in Allergan stock—almost 4.9% of Allergan's shares—through deep-in-the-money, "zero-strike" call options executed through a single counterparty, Nomura. ¶99. Using options allowed Pershing to delay disclosure under HSR until after Valeant publicly announced its takeover plans on April 21, 2014, while using a single counterparty minimized the risk that Pershing's acquisitions would "leak" to the public. ¶¶99-100.

As Ackman admitted, PS Fund 1's options cost the same as and were economically "identical[]" to Allergan stock, and Nomura immediately covered the options by "going into the market" on the NYSE. ¶¶101-03. Ackman also conceded that PS Fund 1 controlled Nomura's trading, stating that Pershing halted Nomura's stock purchasing on April 8—when PS Fund 1's stake reached just short of 5%—to enable Allergan shares to settle down to an "unaffected" share price before triggering the 10-day Williams Act disclosure obligation. ¶¶104-06. Once the deadline was triggered, Pershing embarked on a "rapid accumulation program," ultimately acquiring 24.8 million Allergan shares, almost 10% of Allergan's stock, all before any other public investors knew of Valeant's secret takeover plans. ¶¶106-07.

**D.      Valeant Launches Its Hostile Bid**

After the close of trading on April 21, 2014, Valeant filed a Schedule 13D disclosing its intent to acquire Allergan, and Pershing reported its 9.7% position.

¶109. These disclosures predictably caused Allergan's stock price to jump $20, or 22% from its "unaffected" price, delivering Pershing $1 billion in pure profit. ¶7. The next day, Ackman and Valeant announced Valeant's unsolicited "bear hug" proposal, offering to acquire Allergan for $48.30 in cash and 0.83 shares of Valeant stock per Allergan share. ¶¶110, 117. In doing so, Defendants repeatedly described Ackman as "***Allergan's largest shareholder***" even though PS Fund 1 had not yet converted any of its options into shares. ¶108.[4]   Pearson and Ackman also confirmed that Valeant contemplated a tender offer, and there was no chance of a negotiated deal. When asked whether an "exchange offer" was going to be launched, Ackman told investors that "there are opportunities for investors to ***launch various offers*** [and] [y]ou should ***assume we're familiar with all these various techniques***." ¶111.[5]

Precisely as Defendants predicted, in immediate response to Valeant's "bear hug" proposal, Allergan adopted a "poison pill." ¶115. On May 12, Allergan's Board officially rejected Valeant's April 22 proposal. ¶139. On May 28 and May 30, Valeant upped its bid, ultimately offering approximately $181 per share, but Allergan rejected each offer. ¶¶141, 146. On June 2, 2014, Valeant formally revealed what it had anticipated all along—it would commence a tender offer within two or three weeks. ¶¶143-51. On June 18, Valeant formally filed tender offer documents with the SEC. ¶148. In an investor conference call held to support that filing, Pearson reflected back on the April 22 announcement: "***On April 22, we announced our offer for Allergan. We suspected at the time it would ultimately have to go directly to Allergan shareholders. We were correct.***" *Id.*

---

[4]     After receiving HSR clearance on May 1, PS Fund 1 converted its options and received from Nomura its 24.8 million Allergan shares. On that day, only 3.7 million shares traded hands on the NYSE—or 21 million less than PS Fund 1 received from Nomura—confirming (as Ackman admitted) that Nomura had purchased PS Fund 1's shares concurrent with the derivatives trades weeks before. ¶108.

[5]     Ackman's response echoed talking points prepared by Valeant's investor relations personnel that provided the response that Valeant was "firmly committed to completing the transaction" to the question of whether Valeant was "willing to launch a tender offer to get this deal done." ¶112.

On August 1, 2014, Allergan and Ms. Parschauer sued Defendants, seeking to enjoin their takeover scheme. On November 4, 2014, this Court found there were "serious questions" as to whether Valeant and Pershing had violated Rule 14e-3 and held that contemporaneous traders could assert a claim for damages. *Allergan I*, 2014 WL 5604539, at *14, 17. The Court ordered Defendants to disclose the "risks and exposures" they faced as a result of their scheme, including "private stockholder class actions, which could result in significant damages awards or disgorgement of profits." ¶171.

Although Valeant's tender offer ultimately failed, Defendants' warehousing scheme was a rousing success. Pershing reaped over $2.5 billion, and kicked back $350 million to Valeant—more than Valeant made in the last four years combined. ¶¶164-66.

## III.   ARGUMENT

### A.   Legal Standard

On a motion to dismiss, the allegations in the complaint are taken as true and construed in the light most favorable to the plaintiff. *Fireman's Fund Ins. Co. v. City of Lodi*, 302 F.3d 928, 939 (9th Cir. 2002). In contrast to the demanding standards applicable to a petition seeking the "extraordinary remedy" of a preliminary injunction, *see Allergan I*, 2014 WL 5604539, at *6, a complaint will be sustained over a Rule 12(b)(6) motion unless it fails to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Unlike the evidentiary burden at play with a preliminary injunction, "factual challenges to a plaintiff's complaint have no bearing on the legal sufficiency of the allegations under Rule 12(b)(6)." *Lee v. City of L.A.*, 250 F.3d 668, 688 (9th Cir. 2001).

**B.     Plaintiffs Traded Contemporaneously With PS Fund 1**

Defendants' assertion that Ohio STRS and Mr. Johnson have no standing fails. The Complaint alleges with particularity and specificity that all three Plaintiffs traded contemporaneously with PS Fund 1. ¶¶98-102, 173-174.

To conceal its massive share purchases from regulators and public investors alike, PS Fund 1 purchased $75.9 million in Allergan stock on the NYSE on February 25 and 26, and acquired the rest of its $3.2 billion Allergan stake through options. Specifically, PS Fund 1 purchased deep-in-the-money zero-strike call options and equity forwards through Nomura, which, in turn, bought one out of five Allergan shares sold on the NYSE during all but two of the trading days during the Class Period. During this same trading period, Plaintiffs sold over 110,000 Allergan shares, including on February 26, 2014 (Iowa PERS), March 12, 2014 (Mr. Johnson), and March 20, 2014 (Ohio STRS).  As set forth in the Complaint and chart attached as Ex. 3, **all** of Plaintiffs' sales were made on the **same dates** that Nomura purchased Allergan stock on the NYSE, and on the same day (or within a day) of PS Fund 1's trade confirmations with Nomura. ¶¶102, 173, Ex. 3. These allegations establish Plaintiffs' "contemporaneous trading." In fact, in *Allergan I*, this Court held that Ms. Parschauer traded contemporaneously with Defendants under *Brody v. Transitional Hosp. Corp.*, 280 F.3d 997, 1002-03 (9th Cir. 2002) because she "sold shares on February 26 and March 11, 2014"—*i.e.*, the same day Iowa PERS sold and a day before Mr. Johnson did—which was "during the time period that PS Fund 1 purchased shares." *Allergan I*, 2014 WL 5604539, at *7.

Ignoring that holding, as well as Plaintiffs' particularized allegations, Defendants ask the Court to determine, as a matter of law, that Plaintiffs' sales of Allergan stock were not "contemporaneous" with PS Fund 1's secret purchasing program.  In particular, Defendants contend that they cannot be held liable for their post-March 3, 2014 accumulation of Allergan stock because they executed those trades through pass-through options contracts with Nomura, despite the fact that

Nomura consequently purchased millions of Allergan common stock on the NYSE for Pershing's benefit—trades which Ackman referred to as "***our purchases***." ¶102.

As a preliminary matter, Defendants do not dispute that Iowa PERS's sales were contemporaneous with PS Fund 1's stock purchases. Nor do Defendants explain how Mr. Johnson's sales—which occurred one day after Ms. Parschauer's—fail to meet the Court's ruling in *Allergan I.* 2014 WL 5604539, at * 7; *see also Middlesex Ret. Sys. v. Quest Software, Inc.*, 2008 WL 7084629, at *14-15 (C.D. Cal. July 10, 2008) (Carter, J.) (eight days is contemporaneous); *City of Westland Police & Fire Ret. Sys. v. Sonic Solutions,* 2009 WL 942182, at *12 (N.D. Cal. April 6, 2009) (nine days). In any event, as explained below, Defendants' arguments fail as a matter of law, fact and policy.

### 1. Defendants' Decision to Trade in Options Instead of Common Stock Does Not Shield Them from Liability

Rule 14e-3 prohibits an insider with nonpublic information relating to a tender offer from purchasing "***or caus[ing] to be purchased*** … any of such securities ***or any securities convertible into or exchangeable for any such securities or any option or right to obtain or to dispose of any of the foregoing***" without disclosing that information. 17 C.F.R. §240.14e-3. PS Fund 1's purchases of options through Nomura violate this express prohibition. Thus, Rule 14e-3's plain language suggests that Plaintiffs have standing to assert claims arising out of Pershing's options trades.

But even if there were a question as to which investors are entitled to recover damages under Rule 14e-3, Section 20(d) of the Exchange Act—which Defendants understandably ignore in their brief—provides the answer. Section 20(d) states that when a defendant trades while in possession of inside information (violating ***any*** provision of the Exchange Act), it has "comparable liability" to investors in the company's shares ***regardless of whether the insider trader purchased the shares themselves or options referencing such shares***. Specifically, Section 20(d) provides:

Wherever communicating, or purchasing or selling a security while in possession of, material nonpublic information would violate, or result in liability to any purchaser or seller of the security under any provision of this chapter, or any rule or regulation thereunder, ***such conduct in connection with a purchase or sale of a put, call, straddle, option, privilege or security-based swap agreement with respect to such security*** or with respect to a group or index of securities including such security, ***shall also violate and result in comparable liability to any purchaser or seller of that security under such provision, rule, or regulation***.

In light of this plain language, it is no surprise that courts have rejected Defendants' argument. For example, in *Dau v. Cephalon, Inc.*, 2000 WL 1469347, at *5 (E.D. Pa. Sept. 25, 2000), the court overruled defendants' argument that the insider's options trades "must be excluded" because they did not give rise to liability to common stock investors. The *Dau* court noted that because "both stock and options are within the language of [Section 20(d)]," the stock investors' claims could not be dismissed absent evidence that "[the] securities are ***not part of interdependent markets***." *Id.* at *5.[6] As these courts recognize, given the "interdependency" of stock and options, Defendants cannot avoid liability by trading in derivatives.

Plaintiffs here have pled with particularity that the derivatives that Defendants purchased were not just part of an "interdependent market" with the common stock that Plaintiffs sold, but were ***effectively the same instruments***. Ackman himself told investors that the options PS Fund 1 acquired through Nomura acted "economically identically" to Allergan shares, and provided "the exact same exposure economically as if we owned the stock" where "every dollar the stock goes up we benefit by one dollar." ¶¶101-03. Ackman also admitted that the only reason Defendants purchased options instead of stock was to avoid detection, as doing so enabled PS Fund 1 "to get economic exposure without having to file first with the FTC, which would give

---

[6]     *See also Moskowitz v. Lopp*, 128 F.R.D. 624, 634 (E.D. Pa. 1989) (options holder had standing to pursue insider trading claim against a defendant who sold common stock because the "interdependency of the stock and option markets requires corporate insiders to adhere to the 'disclose or abstain' rule or face liability"); *Backman v. Polaroid Corp.*, 540 F. Supp. 667, 670-71 (D. Mass. 1982) (sustaining option buyer's right to sue insiders who sold shares underlying option).

the company notice that we were interested in the stock." ¶103.[7] These facts preclude dismissal under Rule 12(b)(6).

## 2. Defendants' Deliberate Use of Zero Strike Options Is Not a Viable Means to Evade Liability

Ignoring Section 20(d), *Dau*, and similar cases, Defendants argue that they are immune from liability because they "entered into a face-to-face trade with a known counterparty [Nomura]," and thus "the actual person who was harmed is known [and] there is no reason to expand the pool of plaintiffs any further." Mot. at 13. Defendants' argument turns insider trading law on its head and misreads *Brody*. 280 F.3d at 1005. *Brody* did not address whether a plaintiff who sold stock could assert claims against an insider who traded in options, let alone options created for the sole purpose of acquiring common stock from unsuspecting investors. To the contrary, *Brody* decided the narrow question of whether an investor asserting a Rule 14e-3 claim must satisfy a *temporal* "contemporaneous trading" requirement. *See id.* at 998, 1005 (contemporaneous trading requirement protects plaintiffs who "traded at about the same time" as insiders and "not others who trade later"). Defendants do not contest that Plaintiffs traded "at about the same time" as Pershing's insider trading. Nor could they, as Plaintiffs' sales were made on the same days as Defendants' purchases. *See* Ex. 3. Indeed, Pershing's Answer in *Allergan I* admitted that it "acquired [] Allergan stock" "between March 3, 2014 and April 8, 2014" and again "between April 11[, 2014] and April 21, 2014," despite the fact that it did not officially exercise its options until May 1, 2014. Ex. 4 at ¶¶85-88.

Furthermore, *Brody* did not create the "face-to-face" exception that Defendants seek, and its broader insider trading analysis clearly contemplates imposing liability here. Indeed, *Brody* made clear that the temporal requirement was

---

[7] Pershing admitted in *Allergan I* that the only reason PS Fund 1 purchased options and not stock was to avoid HSR notification, which would have "caused the price of Allergan's stock to rise[,] made PS Fund 1, LLC's acquisition significantly more expensive" and frustrated Defendants' scheme. Ex. 4 at ¶9 (Pershing Ans.).

designed to prevent the "disadvantage that inheres in trading with an insider with superior access to information." 280 F.3d at 1003, 1005. Here, Plaintiffs (and the Class) were harmed by precisely this informational imbalance when Pershing acquired billions of dollars in shares while in possession of material nonpublic information. Defendants assert they are liable to no one because only Nomura— which made money on PS Fund 1's trades—has a claim.[8] This is not the law, and *Brody*, in fact, supports Plaintiffs' standing.[9]

Indeed, courts in the Ninth Circuit post-*Brody* reject Defendants' argument that standing must be denied unless the plaintiffs actually traded face-to-face with the insider. Mot. at 13. In *Johnson v. Aljian*, for instance, Judge Cooper found that plaintiffs had standing to assert insider trading claims against defendants who had sold their stock through **private sales** to third-party banks that acted as purported "principal[s]" in the transactions—and thus could not possibly have directly traded with plaintiffs. *Compare* 257 F.R.D. 587, 593-594 (C.D. Cal. 2009) *with* Mot. at 15-16 (there is no "precedent" for providing standing to plaintiffs who traded with a "principal"). The court reasoned that "if Defendants' argument were adopted as law, then all a person would need to do to avoid liability … would be to funnel sales of shares through a broker." *Johnson*, 257 F.R.D. at 593. The same would be true here.

In fact, courts in the Ninth Circuit and across the country have repeatedly declined to exempt insider traders from liability based on the instrument used to execute their trades. In *Shapiro v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, the Second Circuit refused to limit standing to investors in "face-to-face transactions or to the actual purchasers or sellers," holding that it would make a "mockery" of the

---

[8]    Ackman admitted that PS Fund 1's counterparty—Nomura—was in no way "disadvantaged" by PS Fund 1's insider trading and, in fact, earned a premium on the trades. *See, e.g.*, Defs.' Ex. 9 at 492, 503, 508; Defs.' Ex. 6 at 440.

[9]    Because Plaintiffs were clearly injured, Defendants' Article III standing argument fails. In any event, the Ninth Circuit made clear that the contemporaneous trading requirement "delineate[s] the scope of the implied cause of action," but does not raise Article III standing questions. *Brody*, 285 F.3d at 1001 n.3.

insider trading laws to have liability turn on the "fortuitous matching of buy and sell orders." 495 F.2d 228, 236-37 (2d Cir. 1974).[10] Similarly, the court in *O'Connor & Assoc. v. Dean Witter Reynolds, Inc.*, 529 F. Supp. 1179 (S.D.N.Y. 1981), rejected the argument that trading in options immunized defendants from Rule 14e-3 liability, reasoning that "***it was the defendants' own choice to trade in options rather than stock***, and if [doing so was] fraudulent, there is no good reason to permit them to avoid compensating those directly injured by their conduct*." Id.* at 1188.[11]

Following these decisions, Judge Conti in *In re Worlds of Wonder Sec. Litig.*, 1990 WL 260675, at *3-5 (N.D. Cal. Oct. 19, 1990) held that debenture investors could pursue claims "against Defendants who sold stock," even though there was "***no possibility of the parties trading with each other***." Similarly, in *In re Equity Funding Corp. of Am. Sec. Litig.*, 416 F. Supp. 161, 185-86 (C.D. Cal. 1976), Judge Lucas held that the contemporaneous trading rule set forth in *Shapiro* provided standing "to all persons who during the same period purchased (EFCA securities) on the open market" during defendants' selling of both bonds and stocks.

Defendants' sole authority for their restrictive view of "contemporaneous trading" relies on *Laventhall v. Gen. Dynamics Corp.*, 704 F.2d 407 (8th Cir.), *cert. denied*, 464 U.S. 846 (1983)—a case that has been roundly criticized, including by courts in the Ninth Circuit, and predates the enactment of Section 20(d).[12]  But even

---

[10]    Notably, the *Shapiro* defendant's transactions included short sales which could not "possibly" have been entered into with plaintiffs, as a short seller does not actually acquire the security until she "covers" the short. *See id*. at 232.

[11]    Although both parties in *O'Connor* traded options, the court rejected defendants' argument that recognizing standing would unfairly expand their liability to a "large class of persons with whom they have no relationship." *Id*. at 1187. Rather, the court held that denying standing would "create a broad loophole in the rules against insider trading." *Id*. at 1188.

[12]    *See Deutschman v. Beneficial Corp.*, 841 F.2d 502, 507 (3d Cir. 1988) ("The reasoning of the *Laventhall* case with respect to insider trading liability has been tellingly criticized."), *cert. denied*, 490 U.S. 1114 (1989); *Worlds of Wonder*, 1990 WL 260675, at *3-5 (rejecting the reasoning of *Laventhall* and holding that purchasers of convertible debentures had standing to assert Rule 10b-5 insider trading claims against company insiders who sold stock); *In re Adobe Sys., Inc. Sec. Litig.*, 139 F.R.D. 150, 154 (N.D. Cal. 1991) (citing *Laventhall* and rejecting

*Laventhall* does not help Defendants. *Laventhall* and its progeny denied standing to ***plaintiffs who traded options***—and did not, as Defendants would have here, deprive common stock investors of standing to assert claims against insiders who opt to acquire common stock *via* derivatives.[13]  Indeed, *Laventhall* denied standing because the defendants' "illegal [stock] gain [was] remote and totally speculative in relation to the plaintiff's [options] loss"—a situation clearly inapplicable to PS Fund 1's options, which were admittedly "identical" to, and merely facilitated the purchase of, Class members' stock. *Id.* at 412-13. Thus, far from "mak[ing] the insider liable to all the world," Defendants here are liable to the very persons that their scheme was intended to exploit.  *Id.* at 414.[14]

For similar reasons, Defendants' contention that the Allergan shares Plaintiffs sold were not of the "same class" as PS Fund 1's options fails.[15]   Tellingly, Defendants do not cite a single case supporting their view of Section 20A's "same class" language, and certainly have not shown why zero-strike options that function "identically" to Allergan stock should be considered a different "class" as a matter of law. *Cf. Dau*, 2000 WL 1469347, at *5 (options and stock were "same class").[16]

---

argument that options traders lacked standing to assert Rule 10b-5 insider trading claims); *Moskowitz*, 128 F.R.D. at 634 (rejecting cases following *Laventhall*).

[13]    Defendants' cases following *Laventhall* are distinguishable for these reasons. *Cf. Starkman v. Warner Comm'ns, Inc.*, 671 F. Supp. 297, 301-07 (S.D.N.Y. 1987) (following *Laventhall* and holding that options holders lacked standing under Rule 10b-5, because they were not owed duties by company's insiders); *Bianco v. Tex. Instruments, Inc.*, 627 F. Supp. 154, 161 (N.D. Ill. 1985) (same); *In re McDonnell Douglas Corp. Sec. Litig.*, 567 F. Supp. 126, 127 (E.D. Mo. 1983) (same).

[14]    Moreover, as Judge Posner explained in *Fry v. UAL Corp.*, 84 F.3d 936 (7th Cir. 1996), *Laventhall* "turned on the fact that a corporation has no fiduciary obligation to option traders, as it does to its own shareholders"—a duty of trust and confidence that triggers the abstain or disclose obligation in a Rule 10b-5 insider trading claim, but is inapplicable to a claim under Rule 14e-3. *Id.* at 938.

[15]    Section 20A imposes liability on any person who violates an "disclose or abstain" rule and provides an express cause of action to investors who, contemporaneously with the insider's purchase, sell "securities of the same class" as the insider. 15 U.S.C. §78t-1(A).

[16]    In fact, while Section 20A does not define what is meant by "class," courts have consistently interpreted the term "class" under other provisions of the Exchange Act in a manner that best effectuates Congress' intent to "curb the evils of insider trading." *Kern Cnty. Land Co. v. Occidental Petroleum Corp.*, 411 U.S. 582, 595

Indeed, Ackman admitted the options were "just like common stock," provided the "exact same exposure economically as if we owned the stock," and that Nomura's Allergan purchases on the NYSE were "our stock purchases." ¶¶102-103.

In fact, the legislative history of Section 20A makes clear that Congress intended the insider trading laws be interpreted "expansively" to provide remedies to protect investors and supports Plaintiffs' standing here. Although Section 20A does not define what is meant by "contemporaneous" or "class," the House Committee Report cites *Shapiro* and *O'Connor* with approval, and notes that Congress intended to strengthen remedies for investors to pursue insider trading claims, "giv[ing] the courts leeway to develop such private rights of action in an ***expansive fashion in the future***," and to avoid "unintended effect[s]" that would "in any way ***restrict[] the potential rights of action*** which have been implied by the courts in this area." *See* Ex. 5 at 6064 (H.R. Rep. No. 100-910 (1988), *as reprinted in* 1988 U.S.C.C.A.N. 6043).[17]   Recognizing Plaintiffs' standing here conforms to the statute and fulfills Congress' intent.

### 3.   Defendants' "Control" Arguments Regarding Nomura Are Irrelevant, Incorrect, and Raise Disputed Issues of Fact

Defendants' argument that Plaintiffs lack standing because PS Fund 1 and Pershing did not have "actual control" over Nomura's purchases of Allergan stock likewise fails. *See* Mot. at 15-20. As an initial matter, Defendants point to no case

---

(1973) ("terms are to be given the construction that best serves the congressional purpose"); *see also Allergan I*, 2014 WL 5604539, at *12 (interpreting "offering person" in a manner consistent with Rule 14e-3's purpose of limiting insider trading). For example, in determining what group of securities constitutes a "class" under the "short-swing" insider profit prohibitions contained in Section 16(b) of the Exchange Act, courts have held that—exactly like PS Fund 1's options here—a derivative security with a fixed strike price is part of the same "class" as its underlying stock. *See, e.g., Gibbons v. Malone*, 801 F. Supp. 2d 243, 247-48 (S.D.N.Y. 2011), *aff'd*, 703 F.3d 595 (2d Cir. 2013). Indeed, PS Fund 1's trade confirmations are replete with references to Section 16(b)'s 10% ownership rules, showing Defendants themselves viewed the options as being the same "class" as Allergan's stock. Defs.' Ex. 9, Section 5(b)(iii), (viii).

[17]   Reflecting this "expansive" understanding of insider trading liability, Section 20A(d) provides that nothing in the section should "limit ... the availability of any cause of action implied from a provision of this chapter."

---

suggesting that a control or "agency" relationship is required to satisfy the contemporaneous trading rule.  In fact, Section 20(d) and *Dau* make clear it is not. Moreover, even if it were relevant, Defendants merely raise disputed issues of fact that cannot be resolved on a Rule 12(b)(6) motion.  *See, e.g., Caiola v. Citibank N.A. New York*, 295 F.3d 312, 320, 323 (2d Cir. 2002). Indeed, Defendants' factual dispute that the "timing and type of Nomura's hedge ... was entirely up to Nomura" (Mot. at 18) cannot be reconciled with the Complaint's specific allegations that: (i) Nomura acted as PS Fund 1's "broker" and PS Fund 1's contracts provided Pershing with the right to demand immediate delivery of the Allergan shares underlying its options (¶107); (ii) if Nomura did not immediately purchase Allergan shares, it would be exposed to massive losses (¶¶99-103, 107); (iii) PS Fund 1's "zero-strike" options were virtually certain to be exercised (¶¶99-100); (iv) Pershing admitted it "purchased so-called 'deep in the money' options because it fully intended to exercise those options in a short period of time" (¶103; Ex. 4 at ¶9); and (v) Ackman's own description of Nomura's trading as "our purchases" and Pershing's control over it (¶¶102-08).

As set forth in the Complaint, Ackman admitted Pershing was able to halt Nomura's purchases at will, and did so on April 8 to establish an "unaffected price" for Allergan shares. *See* ¶¶99-107; *see also* Ex. 4 at ¶86 ("Pershing Square admits that PS Fund 1, LLC discontinued trading in Allergan securities on or around April 8, 2014 in accordance with the Pershing Agreement"). Not only is Defendants' post-hoc disclaimer of control patently implausible, it directly contradicts what Ackman actually told investors:

> *We* stopped [purchasing Allergan shares] on the morning of April 8th. And then *we* stopped buying I think around 10:00 or 10:30 on the 8[th]. *We* stepped out of the market on the rest of the day.  *We* stepped out of the market on the 9th.  *We* stayed out of the market on the 10[th].… And what you see is when you step out of the market the last three days, the stock price goes down until it reaches what we call the unaffected price without the impact of our purchases.  Then beginning on the 11[th], *we*

started buying 37% of the volume and *we* bought 35% of the volume on average over the next six days.

Defs.' Ex. 6 at 367.

Defendants' misleading and incomplete citations to PS Fund 1's trade confirmations—and their misplaced contention that simply calling Nomura a "dealer" has legal significance here—raise a factual dispute, at best. *See Aljian*, 257 F.R.D. at 594.[18]  For example, Defendants quote PS Fund 1's trade confirmations to argue that Nomura was able to "make its *own determination* as to whether, when, or in what matter any hedging ... shall be conducted," but the economic reality of their transactions makes clear that Nomura had no choice but to immediately purchase the common shares Pershing sought to acquire. Mot. at 20. As Ackman admitted, Nomura "in order to hedge the options they sell us has to go into the market." ¶102.[19]  Indeed, the fact that Nomura purchased approximately 750,000 Allergan shares on the NYSE on February 27 and 28, 2014—*before* PS Fund 1's first trade confirmation on March 3, 2014—further underscores PS Fund 1's control of Nomura's trading, and the incomplete record before the Court. *Cf.* ¶102 *with* ¶173. Needless to say, Defendants' factual assertions cannot be credited on this Motion.[20]  In fact, discovery will show that: PS Fund 1 tightly controlled Nomura's trading, Nomura purchased

---

[18]     While Plaintiffs do not dispute that certain of PS Fund I's trade confirmations may have been filed with the SEC, the Court cannot "take judicial notice of the complex inferences that Defendant[s] would have it draw from the facts contained in those documents – inferences which Plaintiffs vigorously dispute." *Darensburg v. Metropolitan Trans. Com'n*, 2006 WL 167657, at *2 (N.D. Cal. Jan. 20, 2006); *see also McGuire v. Dendreon Corp.*, 2008 WL 1791381, at *4 (W.D. Wash. April 18, 2008) (same).

[19]     Moreover, the contracts do not say Nomura is a "dealer" under SEC rules, but instead make clear it is ***not*** a "dealer under the 1934 Act." Defs.' Ex. 9, §5(e)(i).

[20]     For example, in *Caiola*, the Second Circuit held the plaintiff adequately pleaded agency based on the nature of the defendant's hedging strategy and allegations that the trades were made "on his behalf," rejecting the argument that the identical ISDA confirmation language that Defendants cling to here was dispositive. *See Caiola*, 295 F.3d at 317, 320, 322-324 (finding agency relationship despite ISDA language stating that parties agreed they were acting "as principal[s] and not as an agent[s]").

Allergan shares in precise correlation to PS Fund 1's options, and these transactions were inseparable from and contemporaneous with Plaintiffs' Class Period sales.[21]

## C.    Plaintiffs Have a Private Right of Action under Rule 14e-3

When seeking to avoid injunctive relief in *Allergan I*, Defendants repeatedly insisted that injured Allergan shareholders had a private remedy for damages under Rule 14e-3. *See* Ex. 1 at 2, 18 n.9 (injured shareholders' remedy "can be completely redressed with damages"), 23 (same). Defendants asserted that the Ninth Circuit's decision in *Brody* was an "unequivocal and binding precedent" that "expressly held" that Allergan shareholders have a right of action for damages under 14e-3. *Id.* at 2, 22. *See also* Ex. 6 at 1 (Defs' Summ. J.); Ex. 7 at 24; Ex. 2 at 9 ("***Ms. Parschauer can seek money damages***. That's the *Brody* case and that's the Supreme Court case in *Rondeau*. ***Clear as can be***. ***Money damages is her relief***."). This Court agreed, holding that an individual Allergan shareholder "has a private right of action under Rule 14e-3" and "[t]he harm that she suffered … can be remedied through damages." *Allergan I*, 2014 WL 5604539, at *17.

Defendants now do a complete about-face, arguing there is no private right of action for injured shareholders, period. Mot. at 22-24. But the doctrine of judicial estoppel "precludes [Defendants] from gaining an advantage by asserting one position, and then later seeking an advantage by taking a clearly inconsistent position." *Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778, 782-83 (9th Cir. 2001) (judicial estoppel is "appropriate to bar litigants from making incompatible statements in two different cases"). Defendants are also wrong as a matter of law.

---

[21]    Finding PS Fund 1's options trading contemporaneous, or that Nomura acted as PS Fund 1's agent, will not bring about the parade of horribles that Defendants claim might follow. Because Nomura is required to report under Section 13(d)(3) as an institutional investor under Section 13(f), an agency relationship between PS Fund 1 and Nomura does not and would not "requir[e] significant disclosures" (beyond Nomura's quarterly 13F Report); "trigger[] Allergan's poison pill"; nor lead to the "dire, unprecedented regulatory consequences" that Defendants fail to explain. Mot. at 20. Rather, adopting Defendants' position would eviscerate Rule 14e-3, immunize well-financed takeover opportunists from insider trading liability, and severely harm the ordinary investor.

1

### 1.     Section 14(e) Contains a Private Right of Action

The Ninth Circuit has repeatedly upheld a private right of action under Section 14(e).[22]  *See Plaine v. McCabe*, 797 F.2d 713, 717 n.7 (9th Cir. 1986) (the Ninth Circuit "has allowed suits for private enforcement of section 14(e)") (citing *Pac. Realty Trust v. APC Inv., Inc.*, 685 F.2d 1083 (9th Cir. 1982)); *Polinsky v. MCA Inc.*, 680 F.2d 1286, 1291 (9th Cir. 1982); *see also Epstein v. MCA, Inc.*, 50 F.3d 644, 650-51 (9th Cir. 1995) ("Congress passed the Williams Act with an understanding that courts would construe the Act as creating private remedies").[23]  Indeed, "[n]o one seriously questions the premise that Congress implicitly created a private right of action when it enacted §14(e) in 1968. Also beyond serious question is the proposition that the members of the class which Congress was especially interested in protecting may invoke that private remedy and, further, that the shareholders of a target corporation are members of that class." *Piper*, 430 U.S. at 55 & n.4 (Stevens, J., dissenting). Accordingly, Defendants' argument fails.

### 2.     Section 14(e)'s Private Right of Action Extends to Rule 14e-3

The SEC promulgated Rule 14e-3 pursuant to an express grant of authority in Section 14(e). 15 U.S.C. §78n(e) (the SEC "***shall*** … by rules and regulations define, and prescribe means reasonably designed to prevent, such acts and practices as are fraudulent, deceptive, or manipulative."). Defendants argue that Section 14(e)'s

---

[22]     Other Circuits are in accord.  *See, e.g., Stull v. Bayard*, 561 F.2d 429, 432 (2d Cir. 1977), *cert. denied*, 434 U.S. 1035 (1978) (private right of action under Section 14(e) has "generally been inferred"); *Polaroid Corp. v. Disney*, 862 F.2d 987, 995-96 (3d Cir. 1988) (same); *Sargent v. Genesco, Inc.*, 492 F.2d 750, 769-70 (5th Cir. 1974) ("courts have uniformly implied" a private right of action under Section 14(e)); *Ind. Nat'l Bank v. Mobil Oil Corp.*, 578 F.2d 180, 183 n.5 (7th Cir. 1978) ("it is generally accepted that there is an implied right of action under §14(e)").

[23]     Defendants contend that these cases are no longer valid because *Alexander v. Sandoval* completely altered the law.  Mot. at 21. In *Sandoval*, however, Justice Scalia confirmed the opposite: "our methodology is not novel, but ***well established in earlier decisions***." 532 U.S. 275, 289 n.7 (2001); *id.* at 287 ("We abandoned [our previous understanding of private causes of action] in [1975] … and have not returned to it since."). Defendants do not cite a single case, post-*Sandoval* or otherwise, holding that no private right of action exists under Section 14(e).

LP'S OPP. TO MTD                                     -21-

1   private right of action does not extend to Rule 14e-3 because the rule prohibits
2   conduct "beyond" what Congress intended to proscribe. Mot. at 22-24.[24]

3         The plain language of Section 14(e) contradicts Defendants' argument. As the
4   Second Circuit, sitting *en banc*, observed, "[i]t is difficult to see how the power to
5   'define' fraud could mean anything less than the power to 'set forth the meaning of'
6   fraud in the tender offer context." *U.S. v. Chestman*, 947 F.2d 551, 558 (2d Cir.
7   1991).[25]   Thus, unlike the regulations in Defendants' cases, Rule 14e-3 does not
8   "forbid conduct that [§14(e)] permits." *Sandoval*, 532 U.S. at 285-86; Mot. at 22-23.
9   To the contrary, Rule 14e-3 explicitly anchors its prohibited conduct (insider trading
10  relating to tender offers) directly to Section 14(e) by stating the forbidden acts
11  "constitute" the fraudulent or deceptive acts (or are designed to prevent such acts)
12  explicitly identified in the statute. "Because Congress has authorized the [SEC], in
13  §14(e), to prescribe legislative rules," courts "owe the [SEC's] judgment 'more than
14  mere deference or weight.'" *O'Hagan*, 521 U.S. at 673.

15        Indeed, the legislative history of Section 14(e) demonstrates that Congress
16  specifically contemplated Rule 14e-3's prohibitions. During hearings on the 1970
17  amendment enacting the current Section 14(e), Senator Williams, the bill's sponsor,
18  asked the SEC for "*examples of the fraudulent, deceptive, or manipulative practices*
19  *used in tender offers which the proposed [SEC] rulemaking powers would prevent.*"
20  Ex. 8 at 11 (*Hearing Before the Subcomm. on Securities of the Senate Comm. on*
21  *Banking and Currency,* 91st Cong., 2d Sess. (1970)). The SEC identified the precise

22  _____
    [24]     According to Defendants, "*O'Hagan* made clear" that Rule 14e-3 prohibits
23  conduct beyond the scope of Section 14(e) "to the extent it 'does not require specific
    proof of a breach of fiduciary duty.'" Mot. at 23. But neither the full text of the
24  sentence Defendants quote, nor any other part of *O'Hagan*, holds anything of the
    sort, as Rule 14e-3 is expressly derived from, and rooted in, the plain text of Section
25  14(e).
    [25]     Defendants' proposed reading of Section 14(e), which would restrict the
26  SEC's ability to "define" fraud as coterminous with fraud under the common law,
    renders Congress' grant of authority to the SEC superfluous, given that Section 14(e)
27  already prohibits "fraudulent … acts or practices." Defendants' construction would
    thus conflict with the settled principle that courts must "give effect, if possible, to
28  every clause and word of a statute." *U.S. v. Menasche,* 348 U.S. 528, 538-39 (1955).

practice at issue here: when a "person who has become aware that a tender bid is to be made … fail[s] to disclose material facts with respect thereto to persons who sell to him securities for which the tender bid is to be made." *Id.* at 12. *See also* Ex. 9 at 70,353 (44 Fed. Reg. 70,349 (Dec. 6, 1979)). "Notably, this hypothetical does not contain any requirement that the trader breach a fiduciary duty." *Chestman*, 947 F.2d at 559. Heeding the SEC's request, Congress enacted the final clause of Section 14(e), granting the SEC explicit power to "define" the regulated practices.[26] Moreover, when Congress passed the 1988 Act, it expressly ratified the SEC's "rules … governing trading while in possession of material, nonpublic information," including Rule 14e-3, as "***necessary and appropriate*** in the public interest and for the protection of investors." *See* Ex. 5 at 6072. In other words, "[n]othing in the legislative history of section 14(e) indicates that the SEC frustrated congressional intent by enacting Rule 14e-3(a)." *Chestman*, 947 F.2d at 558-59; *O'Connor*, 529 F. Supp. at 1190-91 (Rule 14e-3 "appears on its face to be a reasonable administrative fulfillment of the SEC's statutory duty to define the particular fraudulent acts which are banned by §14(e).").

Defendants' incorrectly assert the SEC's authority to define fraud under Section 14(e) can reach no further than its authority under Section 10(b). The textual differences between the statutes demonstrate that the rulemaking authority conferred by Section 14(e), by design, goes beyond that of Section 10(b). While Section 10(b) only authorizes the SEC to proscribe "manipulative or deceptive device[s] or contrivance[s]," Section 14(e) mandates that the SEC "define, and prescribe means reasonably designed to prevent, such acts and practices as are fraudulent, deceptive,

---

[26]     Congress had similar concerns during the hearings leading up to the 1968 enactment of Section 14(e). *See* Ex. 10 at 73 (*Hearings Before the Subcomm. on Securities of the Senate Comm. on Banking and Currency*, 90th Cong., 1st Sess. (1967)) (discussing need to protect "innocent stockholders who sell their shares unaware of the impending offer"); *id.* at 74 (discussing traders who "take advantage of their knowledge that the pending offer is coming and therefore get a quick profit by buying stock").

1    or manipulative."[27]  "In sum, the language and legislative history of section 14(e), as
2    well as congressional inactivity toward it since the SEC promulgated Rule 14e-3(a),
3    all support the view that Congress empowered the SEC to prescribe a rule that
4    extends beyond the common law." *Chestman*, 947 F.2d at 560.

### D. Plaintiffs Adequately Allege Violations of Rule 14e-3

6          Under Rule 14e-3(a), once an "offering person" has "taken a substantial step
7    or steps to commence a tender offer," it is unlawful for "any other person" in
8    possession of nonpublic information relating to the tender offer—that he knows or
9    has reason to know is nonpublic and comes from the "offering person"—to trade.  17
10   C.F.R. §240.14e-3(a). Rule 14e-3(d) prohibits an offering person from providing
11   "material, nonpublic information relating to a tender offer to any other person under
12   circumstances in which it is reasonably foreseeable that such communication is
13   likely to result in a violation of this section." 17 C.F.R. §240.14e-3(d).

14         In *Allergan I*, this Court analyzed each element of Rule 14e-3 as applied to the
15   facts of this case. Starting with the indisputable premise that "in promulgating Rule
16   14e-3, the SEC was concerned about the practice of 'warehousing'"—the very
17   practice at issue here—the Court held that "Plaintiffs have raised serious questions
18   going to the merits of their Rule 14e-3 claim." *Allergan I*, 2014 WL 5604539, at *14.
19   Defendants ignore the Court's decision and recycle flawed arguments that: (i)
20   Pershing was an "offering person" exempt from Rule 14e-3; (ii) Valeant did not take
21   any "substantial step" toward a tender offer; and (iii) Plaintiffs fail to allege scienter.
22   The Court should not reverse its prior well-reasoned ruling.

---

27        By contrast, *Biotech. Value Fund, L.P. v. Celera Corp.*, 12 F. Supp. 3d 1194,
1199 (N.D. Cal. 2013), involved false statements in violation of the first clause of
Section 14(e)—which *does* contain language similar to Section 10(b).  Mot. at 22.

### 1.    Pershing Is Not an "Offering Person" under Rule 14e-3(a)

In *Allergan I*, the Court examined what it means to be an "offering person" under Rule 14e-3 and ultimately adopted a narrow, fact-intensive "control" test that emphasized factors such as whether the person "***actually ma[d]e*** an offer to purchase shares" and had "control over the terms of the offer, control over the surviving entity, and control over and identity with the named bidder." 2014 WL 5604539, at *12.[28]   The Court explained that this test was guided by an overarching "consideration of whether labeling the person an 'offering person' would be consistent with Rule 14e-3's purpose of limiting the universe of persons permitted to trade on inside information ***only*** to the person ***making*** the tender offer." *Id.*[29]

Applying this standard to Defendants' conduct, the Court highlighted that Pershing "had no control over the price to be offered to Allergan's shareholders, whether the tender offer would involve cash and/or an exchange of stock, or even whether to call off the tender offer at some point." *Id*. at *13. The Court also noted that notwithstanding Pershing's "help" in "financ[ing]" the tender offer, "there is no evidence that it will actually acquire any Allergan stock through the tender offer." *Id*. at *13. In fact, "Defendants' Form S-4 Registration Statement states the opposite," *i.e.*, that "***none*** of Pershing Square, PS Fund 1 or any of Pershing Square's affiliates ***is offering*** to acquire any shares of Allergan common stock in the offer." *Id.* at *13-14 ("Q. WHO IS OFFERING TO ACQUIRE MY SHARES OF ALLERGAN COMMON STOCK? A. "This offer is being made by Valeant"). Indeed, Ackman himself declared that "I am not the one making the offer," (¶131), and Defendants

---

[28]    The Court recognized that an offering person under Rule 14e-3 is both distinct from, and more limited than, the SEC's definition of "bidder" or "offeror" for *disclosure* purposes under Section 14(d). *Id.* at *32.

[29]    Notably, the SEC had initially proposed banning insider trading not only by "other persons" who learn about planned tenders offers, but also by the "bidder" itself. *See* Ex. 11 at 9988 (Tender Offers, 44 Fed. Reg. 9956 (Feb. 15, 1979)). The fact that the SEC seriously considered banning advance trading even by the party *making* the offer demonstrates just how narrowly the SEC intended the term "offering person" to be interpreted.

took pains to explain that Pershing was a "co-bidder[]" "*only for SEC purposes*"—revealing that they did not even view Pershing as "actually making an offer." *Allergan I*, 2014 WL 5604539 at *14. Calling Pershing a co-bidder despite all the facts to the contrary is no more effective than the warehousing agreement disclaiming Defendants' substantial steps toward a tender offer.

Here, Valeant was the only entity offering to purchase Allergan shares (¶¶123-38);[30] only Valeant secured financing for the tender offer and only Valeant was liable to its financiers (¶64); and only Valeant retained final discretion to make the bid, set its terms, and to control the extent of Pershing's "financing" (¶¶90, 125-27). Valeant also had sole control over the resulting entity if its tender offer succeeded, as neither Pearson nor Valeant's Board wanted Ackman or Pershing "on *our* board." ¶¶59, 129, 151, 154. If Valeant's offer succeeded, Pershing would simply tender its Allergan shares to Valeant. Indeed, the cover page of the official June 18, 2014 tender offer filing with the SEC on the "Schedule TO" named Valeant and its AGMS subsidiary as the "offeror" and PS Fund 1 as the "*other person*." ¶¶90, 159. This Court concluded in *Allergan I* that such facts "at minimum, raise[] serious questions regarding whether Pershing Square is an 'offering person' or 'co-offering person' exempt from Rule 14e-3's 'disclose or abstain' rule." 2014 WL 5604539, at *14. They are also sufficient to state a claim under Rule 14e-3 in this case.

Defendants ignore this record and do not even mention (let alone apply) the "offering person" standard adopted by the Court. Instead, they broadly assert that because Pershing purportedly "took a host of steps" to support Valeant's tender offer, it qualifies as an "offering person." Mot. at 26-27. As the Court explained in *Allergan I*, however, the "offering person" determination is a separate inquiry from the substantial steps analysis, and instead turns on the person's control over the

---

[30]   In February 2014, Pershing and Valeant created PS Fund 1, in which Valeant had a minority, non-controlling interest, solely for the purpose of acquiring Allergan stock. Yet, Valeant and its wholly-owned affiliate AGMS, rather than PS Fund 1, made the actual tender offer for Allergan stock later in June. ¶¶38, 147-48.

tender offer, including whether the person "**actually ma[d]e** an offer to purchase shares" and had control over its terms and the surviving entity, among other things. 2014 WL 5604539, at *12.[31]  Here, it was *Valeant* who was actually offering to acquire Allergan shares, *Valeant* who dictated the terms of the offer, and *Valeant* alone who would control Allergan if the offer succeeded.[32]  In sum, the Complaint adequately alleges Pershing was an "other person" under Rule 14e-3.

### 2.   Plaintiffs Have Established That Valeant Took "Substantial Steps" Related to a Tender Offer Before Pershing's Trades

Like their "offering person" argument, Defendants' repackaged "substantial steps" analysis ignores the Complaint and the Court's prior rulings. Defendants contend that: (i) substantial steps cannot occur before a *subjective* decision is made to launch a tender offer; and (ii) hostile tactics and proxy contests can never be part of a plan to commence a tender offer. Mot. at 29-32. Both arguments are meritless.

### (a)   Valeant's Objective Conduct Confirms That Substantial Steps Were Taken Toward a Tender Offer

It is well settled that the offering person's subjective intent to proceed with a tender offer does not control the substantial steps inquiry. To the contrary, "a court looks mainly to the offering person's **objective conduct**." *Allergan I*, 2014 WL 5604539, at *7. As this Court explained, "[t]he SEC chose an objective standard in order to avoid 'the difficulty of identifying when a person has actually determined to

---

[31]      In fact, satisfying the "offering person" test is a necessary first step and precondition to conducting the substantial steps analysis. "To determine whether a 'substantial step or steps' toward a tender offer were taken, a court looks mainly to the *offering person's* objective conduct," not the conduct of the "other person" who possessed the inside information and unlawfully traded on the tip. *Id.* at *7. Defendants' proposed test has the standard precisely backwards.

[32]      This is further supported by Defendants' argument that the "most important[]" step Pershing took was helping Valeant "acquir[e] a toehold interest in Allergan." Mot. at 26. The Court rejected Pershing's claim that its role as "strategist and financier" in Valeant's offering was enough to escape Rule 14e-3. *Allergan I*, 2014 WL 5604539, at *13. A party providing financing for a tender offer is an "other person" for purposes of Rule 14e-3. *See, e.g., Revlon, Inc. v. Pantry Pride, Inc.*, 621 F. Supp. 804, 816-17 (D. Del. 1985) ("Chemical's interest in this matter is solely that of a commercial lender providing funds to finance Pantry Pride's tender offer. Nicole, not Chemical, is the sole purchasing entity of all Revlon stock.").

make a tender offer.'" *Id.*[33] In fact, when adopting Rule 14e-3, the SEC considered—and rejected—earlier proposals that would have confined its scope to situations where there was a "*determination* by the bidder to *make* a tender offer." Ex. 12 at 60,413 n.33 (45 Fed. Reg. 60,410 (Sept. 12, 1980)).

The SEC's substantial steps inquiry focuses on the offering person's objective conduct *before* commencing a tender offer, including steps that "substantially facilitate the tender offer." Ex. 9 at 70,353 n.33.[34] Thus, as this Court and others have held, "substantial steps toward a tender offer [can take] place even though the offeror had ***not yet settled*** on a tender offer as the form of the merger." *Allergan I*, 2014 WL 5604539, at *8 (citing *Ginsburg*, 362 F.3d at 1303; *SEC v. Mayhew*, 121 F.3d 44, 53 (2d Cir. 1997) (substantial steps occurred even though offering person had not decided on a tender offer)).[35]

The Complaint's allegations and objective facts overwhelmingly show that Valeant took substantial steps toward a tender offer before Pershing's trades:

> (i)   In February 2014, Valeant hired three law firms to assist with a potential Allergan transaction ¶63; *Allergan I*, 2014 WL 5604539, at *2;

> (ii)   On February 7, 2014, Valeant's Finance and Transactions Committee met and discussed that Sullivan & Cromwell was "[p]ulling together key diligence items" and "[w]orking on a structure and key actions to ***launch offer***"; and Valeant was "lin[ing] up financing." ¶64; *Allergan I*,

---

[33]   The policy reasons for this interpretation are sound. If substantial steps were deemed to occur only after the subjective determination to initiate a tender offer, "liability could be avoided by taking care to tip only before the formal steps finalizing the acquisition are completed, leaving a substantial gap between the acquisition of inside information and the regulation of its disbursement." *Ginsburg*, 362 F.3d at 1304.

[34]   As the agency explained, "[s]ince the scope of Section 14(e) applies to acts or practices 'in connection with any tender offer,' it was, in the Commission's judgment, intended that conduct *prior to* the date of commencement as well as during a tender offer be covered." Ex. 12 at 60, 414.

[35]   *See also* Ex. 13 at 12 (*SEC v. Jacobs*, No. 1:13-cv-01289-SO, slip op. (N.D. Ohio Aug. 15, 2014), ECF No. 112); *cf. SEC v. Musella*, 748 F. Supp. 1028, 1041 (S.D.N.Y. 1989), *aff'd*, 898 F.2d 138 (2d Cir. 1990) (retaining counsel was a substantial step even though the tender offer never occurred). As Pershing's own in-house counsel explained, "substantial steps" is a "relatively low threshold" that is "quite easy" to meet. *Federal Regulation of Shareholder Activism (audio)*, AMERICAN BAR ASSOCIATION, BUSINESS LAW SECTION (2014 Annual Meeting).

2014 WL 5604539, at *24-25.

      (iii)   On February 20, 2014, Ackman sent Pearson a draft of the Relationship Agreement, which noted that an "important" part of the agreement provided if "a Company Transaction is being pursued by [Valeant] ***through a tender offer*** … [Pershing] and the Co-Bidder Entity will be identified as co-bidders." ¶86(c);

      (iv)   February 23 and 24, 2014 drafts of the Relationship Agreement stated that if "a Company Transaction is being pursued by [Valeant] through a ***tender offer*** … each of [Valeant], [Pershing] and the Co-Bidder Entity will be identified as co-bidders." ¶86(d) and (e);

      (v)   Valeant's Board met at least six times in February 2014 to discuss Valeant's takeover plans. ¶64. Board meeting materials reflect that Valeant knew there was a high likelihood that a transaction with Allergan would involve a "[h]ostile cash and stock merger." *Allergan I*, 2014 WL 5604539, at *24; ¶80;

      (vi)   Between February 19 and 25, 2014, Defendants negotiated and ultimately agreed on a plan pursuant to which Pershing would purchase Allergan stock and would commit to voting in favor of any bid for Allergan stock by Valeant. *Allergan I*, 2014 WL 5604539, at *3-4; ¶¶84-86;

      (vii)   The final Relationship Agreement provided that Valeant and Pershing would form a "Co-Bidder Entity" and be named as "co-bidders" if a ***tender offer*** was launched. ¶¶89-90; *Allergan I*, 2014 WL 5604539, at *3;

      (viii)   On February 15, 2014, a Valeant Vice President, e-mailed Pearson with a document stating that the "Allergan Opportunity" would be a "[h]ostile cash and stock merger." ¶80; and

      (ix)   Defendants' testimony and documents confirm they anticipated that hostile measures—including a tender offer—were inevitable.  ¶¶70-83. Pershing's "advisor" admitted that if Defendants "were going to negotiate a board to board merger that was solicited or quietly negotiated, they—there ***wouldn't be any need for Pershing to be in the mix***." ¶77.

*See Allergan I*, 2014 WL 5604539, at *8.[36]  These facts not only "raise[] serious questions as to whether substantial steps to commence a tender offer were taken," they are also sufficient to state a claim. *Id.* at *9. *See, e.g.*, *Ginsburg*, 362 F.3d at 1303–04 (meeting of executives, due diligence, confidentiality agreement, and note that "the deal had to go down fast" were substantial steps); *Mayhew*, 121 F.3d at 48,

---

[36]   *Beaumont v. Am. Can Co.*, 621 F. Supp. 484 (S.D.N.Y. 1985), did not involve a tender offer, Rule 14e-3, or any analysis of substantial steps. Mot. at 28-29.

53 (concluding with "no difficulty" that hiring consulting firm, signing confidentiality agreements, and meetings with top officials were substantial steps).[37]

Ignoring the Court's prior ruling, Defendants continue to assert that no substantial steps occurred because on February 24—the day before Pershing began its insider trading binge—Defendants inserted a single line into their Relationship Agreement: "the parties acknowledge that no steps have been taken towards a tender or exchange offer." Mot. at 33. But the Court already (correctly) rejected these contrived arguments, finding that "Defendants stating in a contract that they had not taken any steps toward a tender offer does not necessarily make it so." *Allergan I*, 2014 WL 5604539, at \*9.

Enforcement of Rule 14e-3 cannot turn on the culprits' own self-serving disclaimer. *See Ginsburg*, 362 F.3d at 1303. The relevant question is not the labels Defendants affix to their conduct but whether, at the time of the trades, objective facts support an inference that Valeant had undertaken "activities which substantially facilitate[d] the tender offer." Ex. 12 at 60,413 n.33. Further, even if the Court could weigh Defendants' evidence at the pleading stage, Defendants still have not explained why they "required Pershing Square and Valeant to identify themselves as 'co-bidders' in the event that Valeant launched a tender offer if there was no plan for a tender offer at that time, or at least a strong possibility at that time that their actions

---

[37] *See also SEC v. Warde*, 151 F.3d 42, 49 (2d Cir. 1998) (meeting with investment bankers and counsel); *O'Hagan*, 139 F.3d at 650 (retaining counsel, deciding financing, and board approval of acquisition and launch date); *SEC v. Maio*, 51 F.3d 623, 636 (7th Cir. 1995) (discussion among principals regarding potential acquisition); *SEC v. Suman*, 684 F. Supp. 2d 378, 391 (S.D.N.Y. 2010) (due diligence and assigning code name to deal), *aff'd*, 421 F. App'x 86 (2d Cir. 2011); *SEC v. Svoboda*, 409 F. Supp. 2d 331, 341–42 (S.D.N.Y. 2006) (contacting bank to arrange financing); *SEC v. Falbo*, 14 F. Supp. 2d 508, 514, 525 (S.D.N.Y. 1998) (meetings with advisors to plan strategy, retaining investment, law, and public relations firms); *SEC v. Ferrero*, 1993 WL 625964, at \*3 (S.D. Ind. Dec. 2, 1993) (meeting between executives and draft confidentiality agreement), *aff'd sub nom. Maio*, 51 F.3d 623 (7th Cir. 1995); *Musella*, 748 F. Supp. at 1041 (having law firm "work[] on the proposed acquisition"); *SEC v. Gaspar*, 1985 WL 521, at \*19 (S.D.N.Y. April 16, 1985) ("acting within an overall plan to make [a tender offer]"); *Camelot Indus. Corp. v. Vista Res., Inc.*, 535 F. Supp. 1174, 1183 (S.D.N.Y. 1982) (meeting between officers of merging firm).

would lead toward and facilitate a tender offer." *Allergan I*, 2014 WL 5604539, at *9. The Complaint alleges substantial steps under Rule 14e-3.[38]

### (b)   Pershing's Proxy Contest Does Not Exempt Defendants' Conduct from Rule 14e-3

Defendants next contend that their repeated use of the term "tender offer" in February 2014 did not actually mean "tender offer," and that Valeant's substantial steps related *only* to a purported "friendly" merger or hostile takeover by proxy contest—even though Valeant indisputably launched a tender offer. Mot. at 29-32, 36-37. These factual arguments ignore the Complaint and the reality of hostile takeovers.

As an initial matter, the Court rejected the same arguments in *Allergan I*, 2014 WL 5604539, at *8, noting that the SEC's examples of substantial steps include "formulation of a plan" to make a tender offer and "activities which substantially *facilitate* the tender offer," even if the offering person had "not yet settled on a tender offer." *Id*.

In any event, proxy contests and tender offers are not mutually exclusive. To the contrary, a critical part of any hostile takeover strategy—including Defendants' here—is to replace the board of the target company *via* proxy contest, remove the poison pill, and thus allow a tender offer to ensue. ¶¶73-76. In fact, "proxy contests for control, without an accompanying tender offer, are seldom successful,"[39] and

---

[38]   Remarkably, Defendants attempt to avoid *Allergan I* and the Court's "serious questions" ruling in a single footnote by citing the "expedited" nature and "limited record" in the prior case. Mot. at 29 n.18. But they do not explain how the record here is limited and are not entitled to dispute the facts alleged in the Complaint or contest the evidence the Court held raised "serious questions" concerning Defendants' Rule 14e-3 violations—in determining whether Plaintiffs have *pleaded* a claim under Rule 12(b)(6). *Cf.* Ex. 1 at 12 (injunctions are an "extraordinary remedy" that must be denied unless "the facts and law clearly favor the moving party").

[39]   Lucian Arye Bebchuk, *The Powerful Antitakeover Force of Staggered Boards: Theory, Evidence, and Policy*, 54 Stan. L. Rev. 887, 920 (2002); Joseph A. Grundfest, *Just Vote No: A Minimalist Strategy for Dealing with Barbarians Inside the Gates*, 45 Stan. L. Rev. 857, 858 n.5 (1993) ("Proxy fights … have become a … means of facilitating a tender offer."). *See also Unitrin, Inc. v. Am. Gen. Corp.*, 651 A.2d 1361, 1379 (Del. 1995) ("the emergence of the 'poison pill'… has resulted in

nearly every hostile acquisition waged since 2006 has involved a tender offer. ¶78. By February 16, 2014, internal Valeant documents reflected that Defendants expected Allergan to adopt a poison pill. ¶73. As a result, Defendants knew that the "simplest mechanism" to remove the pill was to wage a proxy contest, "and [then the Pershing-nominated directors] could simply [lift the pill] and allow the exchange offer to close, and that would ... really be the fastest way this transaction could get done." ¶145. Thus, Plaintiffs' reference to Defendants' "hostile" tactics or "proxy" strategies and Pearson's statements that Valeant "knew it would come down to voting the Board off or not" (Mot. at 31) are entirely consistent with the substantial steps Defendants took toward a tender offer.[40]

At bottom, Defendants ask the Court to ignore the Complaint's actual allegations and draw at least two implausible inferences in their favor: (i) that when Defendants repeatedly discussed and planned for a potential "tender offer" in February 2014 they were not actually contemplating one; and (ii) that Valeant spontaneously planned and executed a $45 billion tender offer in just two weeks after Ackman's purported conversation with "investors" in late May 2014. Mot. at 6-7. While Defendants can try to convince a jury of those irrational inferences, they are not a basis for dismissing Plaintiffs' claims.[41]

### 3.    The Complaint Adequately Alleges Requisite Knowledge

Putting aside that Defendants' effort to import a "scienter" standard into Rule 14e-3 is incorrect, there is no question that when parties design (and conceal from investors) a warehousing scheme to generate billions in profit through inside

---

… hostile bidders … usually 'hav[ing] to couple proxy contests with tender offers.'").

[40]    Defendants' assertion that the SEC Adopting Release requires that substantial steps must relate to a "transaction *structured* or to be structured as a tender offer" is wrong. Mot. at 28. The word "structured" does not even appear in the Release.

[41]    Defendants contend that a finding of substantial steps for pleading purposes here somehow means that "every agreement that represents legal compliance becomes evidence of non-compliance." Mot. at 33-34. But of course, not "every agreement" is drafted in conjunction with a warehousing scheme designed to exploit material nonpublic information to generate billions in illicit profits.

information about an anticipated tender offer, they act with whatever level of "knowledge" the law can possibly require. Specifically, the Complaint alleges that Valeant deliberately provided inside information to Ackman concerning its takeover plans so that Pershing would trade on it. ¶¶58-97. Ackman, in turn, spent nearly $4 billion on Allergan stock precisely because he knew Pershing would profit by trading ahead of Valeant's tender offer, and in fact admitted he "absolutely" knew the nonpublic information about Valeant's bid was hidden from investors who sold to him. ¶94. These facts satisfy any conceivable scienter standard.  Indeed, Defendants conceded scienter in *Allergan I*.[42] In any event, Defendants are wrong about what Rule 14e-3 requires.

By its plain language, Rule 14e-3's "knowledge" requirement is extremely limited. The "abstain or disclose" prohibitions apply where a Defendant simply "knows or has reason to know" that the material information in their possession is: (i) "nonpublic"; and (ii) acquired from the "offering person."  17 C.F.R. §240.14e-3(a). The accompanying SEC release explicitly states a defendant need not "know or ha[ve] reason to know" that the information relates to a tender offer. Ex. 14 at *6. (Tender Offers, Exchange Act Release No. 17,120, 20 SEC Docket 1350 (Sept. 4, 1980)). Ignoring this textual and legislative support, Defendants attempt to read into Rule 14e-3 a "scienter" requirement obligating Plaintiffs to allege each Defendant knew "that Valeant had taken substantial steps to commence a tender offer." Mot. at 35. The only authority they offer, however, holds the opposite: "Rule 14e-3, by its terms, does ***not*** require that the offender know or have reason to know that the information relates to a tender offer." *Ginsburg*, 362 F.3d at 1304.[43]   At least four

---

[42]    2014 WL 5604539, at *7 ("Here, there is no dispute that Pershing Square possessed nonpublic information and did not disclose that information to the public before causing PS Fund 1 to purchase Allergan shares").

[43]    Defendants' other authorities do not mention Rule 14e-3. *Reese v. Malone*, 747 F.3d 557 (9th Cir. 2014); *DSAM Global Value Fund v. Altris Software, Inc.*, 288 F.3d 385 (9th Cir. 2002); *In re Digital Island Sec. Litig.*, 357 F.3d 322 (3d Cir. 2004); *In re Wet Seal, Inc. Sec. Litig.*, 518 F. Supp. 2d 1148 (C.D. Cal. 2007); *In re*

1   other Circuit Courts have held the same.[44]   For example, on remand, the Eighth

2   Circuit in *O'Hagan* explained that Rule 14e-3 only requires that a person "have

3   taken 'a substantial step or steps' towards the tender offer. ***The rule does not require***

4   ***the defendant to have knowledge of these acts.***" 139 F.3d at 650.[45]   Instead, liability

5   attaches where the information relates "to a tender offer and the offender knows or

6   has reason to know the information is nonpublic and was acquired by a person with

7   the required status." *Ginsburg*, 362 F.3d at 1304.

8           Here, the Complaint alleges the "offender" (Pershing) knew that Valeant's tip

9   was both nonpublic and acquired by a person with the required status. ¶¶55-66, 72,

10   97. Defendants also do not seriously dispute that the Complaint alleges that the

11   information in fact "related to" and facilitated Valeant's tender offer, nor can they

12   when their own internal documents were riddled with references to a "tender offer"

13   long before Pershing traded on Valeant's tip. *See* §§II.B, III.D.2.a. *supra*; *Allergan I*,

14   2014 WL 5604539*,* at *8-9. Again, citing no authority, Defendants contend that

15   information cannot, as a matter of law, "relate" to a tender offer unless Plaintiffs

16   show that Defendants "*subjectively* sought to pursue a tender offer"—*i.e.*, when

17   Defendants settled on the offer's precise terms, its price, and the day it would be

18   filed. Mot. at 36. But as explained above, this Court, the SEC, and courts interpreting

19   *Impac Mortg. Holdings, Inc. Sec. Litig.*, 554 F. Supp. 2d 1083 (C.D. Cal. 2008);
Mot. at 35-40.
20   [44]      *See, e.g.*, *SEC v. Sargent*, 229 F.3d 68, 78-79 (1st Cir. 2000) ("Rule 14e-3
21   does ***not*** require that a person charged with violating the rule have knowledge that
the nonpublic information in his possession relates to a tender offer.") (Wallace, J.
22   (Ninth Circuit), sitting by designation); *Mayhew*, 121 F.3d at 49-51 (defendant liable
under Rule 14e-3 where he knew only that company was "in discussions" toward a
merger, not a tender offer); *see also Jacobs*, Ex. 13 at 14-15 ("the First, Second, and
23   Eleventh Circuits [holdings] that Rule 14e-3 does not require a defendant to know or
have reason to know that the information relates to a tender offer [are] persuasive").
24   [45]      As originally drafted, Rule 14e-3 created liability for a person who "received
[information] directly or indirectly" from the offering person, but was later amended
25   because of a concern that legitimate trading could be stifled if investors feared
26   market rumors could later be found to have "indirectly" originated from an offering
person. Ex. 9 at 70,353. The "knowledge" requirement thus serves to protect those
27   trading on market rumors from unintended liability and does not, as Defendants
argue, require that an offender like Pershing—who indisputably knows the
28   information came from an offeror—also know that substantial steps occurred.

Rule 14e-3 have all rejected a subjective requirement. This "substantial steps argument fails." *Ginsburg*, 362 F.3d at 1304.[46]

In any event, even applying Defendants' faulty standard, the inference that a tender offer was contemplated prior to Pershing's trades is far more compelling than Defendants' competing "innocent explanation" that they were merely "taking steps to plan a merger" or "negotiate a consensual transaction." Mot. at 3, 37. As the Complaint makes clear, Defendants knew that a friendly "merger" with Allergan was a non-starter. ¶¶48-49, 68-91. In fact, before Pershing executed a single trade, Defendants cancelled a meeting with Allergan to discuss a friendly merger because "based on all the data points we had [Allergan] was … unlikely to be receptive" and "very assertively made clear … that [it] had no interest in a transaction publicly." ¶¶71-72. Defendants have also admitted that Valeant enlisted Pershing to use its toehold to call a special meeting, elect new directors, remove the poison pill, and allow a tender offer to close—demonstrating that their "innocent" inference is simply not plausible, let alone more compelling than the allegations in the Complaint.[47]

Finally, Defendants erroneously assert that the Complaint contains mere "conclusory" and "boilerplate" allegations that they engaged in the type of deceptive conduct regulated by Rule 14e-3. Mot. at 36-37. The only thing "boilerplate" here is their argument. The Complaint, developed with the benefit of a voluminous injunction record, details the extraordinary measures Defendants took to keep Valeant's takeover plans hidden from investors. Indeed, to conceal their intentions and circumvent disclosure requirements, Defendants, *inter alia*, deliberately employed options trades through a single broker (¶¶99-100), required that five

---

[46]    Defendants argue the facts here are "unique" and *Ginsburg* is applicable only in cases which the party is "unaffiliated with the offeror." Mot. at 36. But that distinction is false, as the *Ginsburg* defendant was the offering person's head of due diligence, and directly negotiated with the target company. *Ginsberg*, 362 F.3d at 1296-97.

[47]    *See* ¶75 (Pearson: "Getting to 10 percent…without triggering any pill was important because in the end, we knew it would come down to, you know, voting the board off or not"); *id.* (Schiller: same); ¶76 (Ackman: same); ¶77 (Doyle: same).

separate Pershing entities "own" PS Fund 1 (¶96), wrote an agreement requiring that reporting obligations not be triggered (¶95), and cancelled a meeting with Allergan because it increased the risk of a "leak" to the market of Pershing's insider information (¶72). Only by concealing its conduct was Pershing able to acquire a 10% stake from members of the Class at a discount, generating over $2.5 billion in profits after the tender offer was announced. ¶8. This "warehousing" scheme is precisely what Rule 14e-3 was meant to prevent. *See Chiarella v. U.S.*, 445 U.S. 222, 234 (1980); *Allergan I*, 2014 WL 5604539, at *12.

### 4. Defendants' Rule 14e-3(d) Arguments Are Baseless

Defendants' arguments regarding tipper liability under Rule 14e-3(d) fare no better. First, the Valeant Defendants argue that they cannot be liable because it was not "reasonably foreseeable" that their tipping would "result in a violation" of Rule 14e-3. Mot. at 38. But the SEC put the "reasonably foreseeable" requirement in place to balance its concern that "innocent[] social discourse" not be penalized with its desire to prevent the very conduct at issue here: persons who give institutions advance notice in either general or specific terms of proposed tender offers. Ex. 12 at 60,417.[48] Thus, the SEC determined that liability should attach where the "identity, position, reputation or prior actions" of the tippee are such that a reasonable person would suspect that the information could be misused. *Id.* In other words, offering persons cannot communicate information if "another [is] likely to trade on it." *Ginsburg*, 362 F.3d at 1303.[49] Here, Valeant knew Ackman would trade on the tip—indeed, that was precisely the purpose of the warehouse agreement. ¶¶55-67, 127,

---

[48] *See also id.* (requirement "operates to prohibit leaks"); Ex. 9 at 70,354 (purpose is to "prevent the leaks, the source of the problem").

[49] *See also SEC v. Drescher*, 1999 WL 946864, at *5 (S.D.N.Y. Oct. 19, 1999) (liability under 14e-3 where circumstances suggested "it was *reasonably foreseeable that the information would be used to purchase securities*"); Ex. 12 at 60,417 (a person violates "Rule 14e-3 if … it is *reasonably foreseeable that such other person will trade on the basis of the information*").

132. In any event, Defendants recognized their conduct exposed them to liability, which they sought to avoid by labeling themselves "co-bidders." ¶¶14, 83, 89, 153.

The Valeant Defendants next argue that their tipping falls under a limited exception for communications made in "good faith" to "other persons, involved in the planning, financing, preparation or execution of such tender offer." Mot. at 38-39. As an initial matter, the Adopting Release makes clear that "the person claiming the availability of the exception bears the ***burden of proof*** in establishing his good faith." Ex. 12 at 60,417. Thus, at best, Defendants' arguments raise an affirmative defense that cannot be resolved at the pleading stage. *See Provenz v. Miller*, 102 F.3d 1478, 1491 (9th Cir. 1996). Moreover, because it is intended to enable an offering person to carry out activities necessary to execute a tender offer, the "good faith" exception is conditioned upon an affirmative showing that the offering person had a basis to believe the recipients would not use the information to trade for their own benefit. Ex. 12 at 60,417. But where, as here, the offering person communicates nonpublic information with actual knowledge and intent that the information will be used to purchase a target company's securities in order to profit from the market's ignorance of that information, the "good faith" exception cannot apply. To hold otherwise would defeat the very purpose of Rule 14e-3.

Finally, Defendants argue that the claims against Pearson must be dismissed because the Complaint does not "allege *any* facts regarding [his] scienter." Mot. at 39. The Complaint is replete with allegations regarding Pearson's knowledge of and desire to effectuate Defendants' warehousing scheme, including, *inter alia*:

- Pearson actively pursued a deal with Allergan, knew that deal would have to be hostile, knew that Valeant could not afford to pursue a hostile deal alone, and approached Pershing with the warehousing scheme (¶¶3, 13, 48-49, 51, 53, 57-58, 61-62, 72, 75, 127, 148);

- Pearson negotiated the terms of the scheme, convincing Pershing to kick back 15% of its trading proceeds to Valeant if the offer failed (¶¶4, 91); and

- Pearson was financially motivated to execute the scheme. After Valeant took its cut of $350 million in insider trading proceeds from Pershing, Valeant's Board awarded Pearson $8 million in compensation (¶¶33, 35).

This is more than sufficient to state a Rule 14e-3(d) claim against Pearson.

**E.      Plaintiffs Adequately Allege Violations of Section 20A**

Defendants assert that Plaintiffs' 20A claims must be dismissed for failure to plead the requisite underlying violation of the Exchange Act. Mot. at 24. As discussed above, however, Plaintiffs have adequately alleged violations of both Section 14(e) and Rule 14e-3. *See* §III.D, *supra*. Even so, Defendants argue, Rule 14e-3 cannot serve as the predicate violation because Section 20A only applies to insider trading cases involving "misappropriation." Mot. at 24-25. Nothing in the plain language of the statute, however, limits Section 20A to misappropriation claims. To the contrary, Section 20A explicitly protects investors from violations of "***any*** provision of [the Exchange Act] ***or*** the rules or regulations thereunder by purchasing or selling a security while in possession of material, nonpublic information." 15 U.S.C. §78t-1(a). Rule 14e-3 fits squarely within Section 20A.

Nor does the legislative history of Section 20A suggest any intent to limit insider trading claims to instances of "misappropriation." To the contrary, during the hearings leading up to the enactment of 20A, Congress indicated that Rule 14e-3 was expressly contemplated as a predicate insider trading violation: "[a]lthough there is no statutory 'definition' of insider trading, this activity is prescribed by … Sections 10(b) ***and 14(e)***." Ex. 5 at 6045.[50]   Further, in enacting Section 20A, Congress thoroughly reviewed and made express "[f]indings" that the SEC's rules under Sections 10(b) and 14(e) were valid and "in the public interest and for the protection of investors." Ex. 5 at 6072 ("the rules and regulations of the [SEC] under the

---

[50]      *See also* Ex. 15 at 32 (*Hearings Before the Subcomm. on Telecommunications and Finance of the H. Comm. on Energy and Commerce*, 100th Cong., 2d Sess. (1988)); Ex. 16 at 226-227 (*Hearings Before the Subcomm. on Telecommunications and Finance of the H. Comm. on Energy and Commerce*, 100th Cong., 1st Sess. (1987)).

[Exchange Act] governing trading while in possession of material, nonpublic information are ***necessary and appropriate***"); *see also id.* at 35 ("These findings are intended as an expression of congressional support for these regulations.").[51]

Finally, as Defendants admit, the purpose of Section 20A is "to codify the existence of a ***private right of action*** for insider trading violations." Mot. at 24. Thus, regardless of whether Rule 14e-3 separately and independently provides a private right of action (which it does), injured investors can still pursue damages under Section 20A for predicate violations of Rule 14e-3. The Ninth Circuit has made clear that the "violation" underlying a Section 20A claim need not be "timely," "actionable," or "viable." *Johnson*, 490 F.3d at 781 (the term "violates" simply means "breaking or disregarding the law").[52]  As a result, Plaintiffs need only show that Defendants challenged actions "satisfied the essential elements of the proscribed act." *Id.* at 781-82.[53]   Whether or not there is a private right of action for the underlying proscribed act is irrelevant since the purpose of Section 20A is to provide a private right of action for any violation of the Exchange Act that is coupled with insider trading. A private right of action is not an "essential" element of a Rule 14e-3 violation, and a violation can occur regardless of who (the SEC or a private party) can seek to enforce it. *See, e.g.,* Mot. at 26 (reciting the "elements" of a Rule 14e-3 claim). Indeed, Section 20A's codification of an express right of action would have

---

[51]    In fact, Congress declined to define the term "insider trading" in Section 20A for fear it "could potentially be narrowing," and instead expressly sought that it be interpreted "broadly" to protect investors. Ex. 5 at 6048. Indeed, Congress rejected a proposed definition that would have limited insider trading to "the theft of information and the use of information in breach of a duty." Ex. 15 at 51. Had Congress sought to limit Section 20A to "misappropriation," it would have done so. It did not, thus confirming the statute creates liability for insider trading that violates "any" provision of the Exchange Act (Section 14(e)) or its rules (Rule 14e-3).

[52]    The panel explained that when "someone asks if a person 'violated' the speeding law," the question is whether she "disregarded the posted speed limit, not whether a timely action commenced or a successful prosecution resulted." *Id.* at 781-82.

[53]    Defendants' authority does not hold otherwise.  *See* Mot. at 25; *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350 (1991) (holding Section 20A does not extend to ***non-insider trading cases***).

1    little meaning if another, separate and independent private right of action was *also*
2    required to establish the underlying predicate insider trading violation. Because the
3    Complaint adequately alleges the "essential elements" of a Rule 14e-3 violation,
4    Plaintiffs' Section 20A claim should be upheld.[54]

5    **IV.    CONCLUSION**

6          For the foregoing reasons, Plaintiffs respectfully submit that the Defendants'
7    Motion should be denied.[55]

8    DATED: September 18, 2015              Respectfully submitted,

9    **KESSLER TOPAZ**                       **BERNSTEIN LITOWITZ BERGER**
     **    MELTZER & CHECK, LLP**            **    & GROSSMANN LLP**
10
      */s/ Eli Greenstein*                    */s/ Blair A. Nicholas*
11   ELI R. GREENSTEIN (Bar # 217945)      BLAIR A. NICHOLAS (Bar # 178428)
     egreenstein@ktmc.com                  blairn@blbglaw.com
12   STACEY M. KAPLAN (Bar # 241989)       RICHARD D. GLUCK (Bar # 151675)
     skaplan@ktmc.com                      rich.gluck@blbglaw.com
13   RUPA NATH COOK (Bar # 296130)         BRANDON MARSH (Bar # 268316)
     rcook@ktmc.com                        brandon.marsh@blbglaw.com
14   One Sansome Street, Suite 1850        12481 High Bluff Drive, Suite 300
     San Francisco, CA 94104               San Diego, CA 92130
15   Tel:   (415) 400-3000                 Tel:   (858) 793-0070
     Fax:   (415) 400-3001                 Fax:   (858) 793-0323
16
     -and-                                 -and-
17
     DARREN CHECK (*Pro Hac Vice*)         MARK LEBOVITCH (*Pro Hac Vice*)
18   dcheck@ktmc.com                       markl@blbglaw.com
     LEE RUDY (*Pro Hac Vice*)             MICHAEL D. BLATCHLEY (*Pro Hac
19   lrudy@ktmc.com                        Vice*)
     JUSTIN O. RELIFORD (*Pro Hac Vice*)   michaelb@blbglaw.com
20   jreliford@ktmc.com                    EDWARD G. TIMLIN
     280 King of Prussia Road              edward.timlin@blbglaw.com
21   Radnor, PA 19087                      1285 Avenue of the Americas, 38th Floor
     Tel:   (610) 667-7706                 New York, NY 10019
22   Fax:   (610) 667-7056                 Tel:   (212) 554-1400
                                           Fax:   (212) 554-1444
23   *Lead Counsel for Plaintiffs and Counsel*
24   *for the Iowa Public Employees*       *Lead Counsel for Plaintiffs and Counsel*
     *Retirement System, and Patrick T.*   *for the State Teachers Retirement System*
25   *Johnson*                             *of Ohio and Patrick T. Johnson*

26   [54]    Defendants only contest Plaintiffs' Section 20(a) claims for failure to plead a
     primary violation. Because Plaintiffs have adequately pleaded claims under Rule
27   14e-3 and Section 20A, the Section 20(a) claims should be sustained as well.
     [55]    In the event the Court grants, in whole or in part, the Motion, Plaintiffs request
28   leave to amend. *See* Fed. R. Civ. P. 15(a).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

BRIAN K. MURPHY
(pro hac vice to be filed)
murphy@mmmb.com
JOSEPH F. MURRAY
(pro hac vice to be filed)
murray@mmmb.com
1114 Dublin Rd.
Columbus, OH 43215
Tel:   (614) 488-0400
Fax:   (614) 488-0401

*Special Counsel for Lead Plaintiff State
Teachers Retirement System of Ohio*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## SIGNATURE CERTIFICATION

Pursuant to L.R. 5-4.3.4(a)(2)(i), I hereby attest that all other signatories listed, and on whose behalf the filing is submitted, concur in the filing's content and have authorized this filing.

Dated: September 18, 2015

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**

*/s/ Blair A. Nicholas*
BLAIR A. NICHOLAS

*Lead Counsel for Plaintiffs and Counsel for the State Teachers Retirement System of Ohio and Patrick T. Johnson*