1  Mark Holscher (SBN 139582)
2  mark.holscher@kirkland.com
   Michael Shipley (SBN 233674)
3  michael.shipley@kirkland.com
4  Jay Bhimani (SBN 267689)
   jay.bhimani@kirkland.com
5  Austin Norris (SBN 284603)
   austin.norris@kirkland.com
6  KIRKLAND & ELLIS LLP
7  333 South Hope Street
   Los Angeles, California 90071
8  Telephone:   (213) 680-8400
9  Facsimile:    (213) 680-8500

10
   *Attorneys for Pershing Square*
11 *Capital Management, L.P., PS*
   *Management GP, LLC, PS Fund 1,*
12 *LLC, and William Ackman*
13
14 [Additional Counsel on Signature Page]

15             **UNITED STATES DISTRICT COURT**
               **CENTRAL DISTRICT OF CALIFORNIA**
16             **SOUTHERN DIVISION—SANTA ANA**
17

18 IN RE: ALLERGAN, INC. PROXY      )  Case No.: 8:14-cv-2004-DOC-(ANx)
19 VIOLATION SECURITIES            )
   LITIGATION                      )  Honorable David O. Carter
20                                 )  <u>CLASS ACTION</u>
                                   )
21                                 )  **DEFENDANTS' REPLY BRIEF IN**
22                                 )  **SUPPORT OF MOTION TO**
                                   )  **DISMISS AMENDED COMPLAINT**
23                                 )
                                   )  Orig. Compl. Filed:   Dec. 16, 2014
24                                 )  Operative AC Filed:   Jun. 26, 2015
25                                 )  Hearing Date:          Oct. 26, 2015
                                   )  Time:                  8:30 a.m.
26                                 )  Courtroom:             9D
                                   )
27                                 )
28 ─────────────────────────────── )

───────────────────────────────────────────────────
              **DEFENDANTS' REPLY BRIEF**

# <u>TABLE OF CONTENTS</u>

**Page(s)**

INTRODUCTION ........................................................................................................1

ARGUMENT ..............................................................................................................2

I.    Plaintiffs OHIO STRS and Johnson Lack Standing...........................................2

    A.    That Two Plaintiffs Lack Standing Does Not "Immunize" Defendants or Permit Them to "Escape Liability." .............................................................2

    B.    Plaintiffs Ignore the Purpose of the Contemporaneous Trading Rule. ......3

    C.    Call Options and Stock Are Not of the "Same Class" under § 20A(a). ....8

    D.    Section 20(d) Does Not Give Stock Sellers Standing to Sue Call Option Purchasers. ..............................................................................................9

    E.    Nomura's Trading Does Not Give Plaintiffs Standing. ...........................12

II.    The First Claim Fails Because the Theory Alleged Is Not Subject to an Implied Private Right of Action.........................................................................................16

    A.    The AC Fails to Plead a § 14(e) Claim. .................................................16

    B.    Private Enforcement of Rule 14e-3 Cannot Extend Beyond § 14(e)'s Scope. ...................................................................................................17

    C.    Plaintiffs' Judicial Estoppel Argument Misses the Mark. ......................19

III.    The Second Claim for Relief Must Be Dismissed Because Congress Did Not Intend § 20A to Create Insider Trading Liability in the Absence of Fraud. ......20

IV.    Plaintiffs Fail to State a Claim for Violations of Rule 14e-3............................22

    A.    Plaintiffs Do Not Adequately Allege Substantial Steps. .........................22

    B.    The Definition of "Offering Person" Defeats Plaintiffs' Claim. .............24

    C.    The AC Does Not Adequately Plead Scienter. .......................................27

    D.    Plaintiffs Do Not Plead Tipper Liability as to Valeant............................29

CONCLUSION.........................................................................................................30

**DEFENDANTS' REPLY BRIEF**

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4

*Alexander* v. *Sandoval,*
5
    532 U.S. 275 (2001)................................................................16, 17, 18, 19

6

*Allergan et al. v. Valeant et al.,*
7
    No. 14-cv-1214-DOC, dkt. 234 ....................................7, 23, 24, 27

8

*Blue Chip Stamps v. Manor Drug Stores,*
9
    421 U.S. 723 (1975).........................................................................4

10

*Brody v. Transitional Hosps. Corp.,*
    280 F.3d 997 (9th Cir. 2002) ...............................................*passim*
11

*Caiola v. Citibank, N.A., New York,*
12
    295 F.3d 312 (2d Cir. 2002) ............................................ 14, 15

13

*Central Bank of Denver, N.A.* v. *First Interstate Bank of Denver, N.A.,*
14
    511 U.S. 164 (1994)............................................................ 1, 19

15

*Chiarella v. United States,*
16
    445 U.S. 222 (1980)........................................................... 26, 27

17

*Choe v. I.N.S.,*
18
    11 F.3d 925 (9th Cir. 1993) ....................................................23

19

*Clay v. Riverwood Int'l Corp.,*
20
    157 F.3d 1259 (11th Cir. 1998) ......................................... 8, 11

21

*Dau v. Cephalon, Inc.,*
    2000 WL 1469347 (E.D. Pa. Sept. 25, 2000)...............9, 11, 12
22

*DiLaura v. Power Auth. of State of N.Y.,*
23
    982 F.2d 73 (2d Cir. 1992) ....................................................25

24

*In re Enron Corp. Sec., Derivative & ERISA Litig.,*
25
    258 F. Supp. 2d 576 (S.D. Tex. 2003).......................................8

26

*In re Equity Funding Corp. of Am. Sec. Litig.,*
27
    416 F. Supp. 161 (C.D. Cal. 1976).........................................6

28

-ii-

**DEFENDANTS' REPLY BRIEF**

*Fields v. Legacy Health Sys.*,
    413 F.3d 943 (9th Cir. 2005) ................................................................. 14

*Gilstrap* v. *United Air Lines, Inc.*,
    709 F.3d 995 (9th Cir. 2013) ................................................................. 16

*Hamilton* v. *State Farm Fire & Cas. Co.*,
    270 F.3d 778 (9th Cir. 2001) ...................................................... 19, 20

*Hollywood Casino Corp. v. Simmons*,
    2002 WL 1610598 (N.D. Tex. July 18, 2002) ...................................... 26

*Int'l Molders' & Allied Workers' Local Union No. 164 v. Nelson*,
    799 F.2d 547 (9th Cir. 1986) ................................................................. 24

*Iqbal v. Ashcroft*,
    556 U.S. 662 (2009) ............................................................................... 23

*Johnson v. Aljian*,
    257 F.R.D. 587 (C.D. Cal. 2009) .................................................. 6, 7, 22

*Kessler v. Assocs. Fin. Servs. Co.*,
    573 F.2d 577 (9th Cir. 1977) ................................................................. 25

*Lent v. JP Morgan Chase Bank*,
    2011 WL 5971190 (C.D. Cal. Nov. 29, 2011) ..................................... 14

*Lonberg* v. *City of Riverside*,
    571 F.3d 846 (9th Cir. 2009) ...................................................... 18, 22

*Mark H. v. Lemahieu*,
    513 F.3d 922 (9th Cir. 2008) ................................................................. 18

*In re Musicmaker.com Sec. Litig.*,
    2001 WL 34062431 (C.D. Cal. June 4, 2001) ....................................... 8

*Neubronner v. Milken*,
    6 F.3d 666 (9th Cir. 1993) ........................................................*passim*

*Piper v. Chris-Craft Indus., Inc.*,
    430 U.S. 1 (1977) ........................................................................... 4, 16

*Plaine* v. *McCabe*,
    797 F.2d 713 (9th Cir. 1986) ................................................................. 17

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Rezner v. Bayerische Hypo-Und Vereinsbank AG,*
   630 F.3d 866 (9th Cir. 2010) ............................................................... 11

*Rombach v. Chang,*
   355 F.3d 164 (2d Cir. 2004) ................................................................ 23

*Schneider v. Cal. Dep't of Corr.,*
   151 F.3d 1194 (9th Cir. 1998) ............................................................. 13

*Schreiber v. Burlington N. Inc.,*
   472 U.S. 1 (1985) .................................................................................. 18

*SEC* v. *Clark,*
   915 F.2d 439 (9th Cir. 1990) ............................................................... 21

*SEC v. Ginsburg,*
   362 F.3d 1292 (11th Cir. 2004) ........................................................... 28

*SEC v. Jacobs,*
   No. 1:13-cv-01289-SO (N.D. Ohio Aug. 15, 2014) ............................ 28

*SEC v. Mayhew,*
   121 F.3d 44 (2d Cir. 1997) .................................................................. 28

*SEC v. Morgan Keegan & Co.,*
   678 F.3d 1233 (11th Cir. 2012) ...................................................... 2, 29

*SEC v. Sargent,*
   229 F.3d 68 (1st Cir. 2000) .................................................................. 28

*SEC v. Talbot,*
   530 F.3d 1085 (9th Cir. 2008) ............................................................... 6

*Shapiro v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,*
   495 F.2d 228 (2d Cir. 1974) ......................................................... 3, 4, 7

*Starbuck v. City & Cnty. of S.F.,*
   556 F.2d 450 (9th Cir. 1977) ............................................................... 25

*Stenberg v. Carhart,*
   530 U.S. 914 (2000) ............................................................................. 25

*Sunward Corp. v. Dun & Bradstreet, Inc.,*
   811 F.2d 511 (10th Cir. 1987) ............................................................. 23

-iv-

**DEFENDANTS' REPLY BRIEF**

*United States* v. *Chestman*,
    947 F.2d 551 (2d Cir. 1991) .................................................... 17

*United States v. O'Hagan*,
    139 F.3d 641 (8th Cir. 1998) ................................................. 28

*United States* v. *O'Hagan*,
    521 U.S. 642 (1997)............................................................. *passim*

*Univ. of Tex. v. Camenisch*,
    451 U.S. 390 (1981).............................................................. 25

*Wilson v. Comtech Telecomms. Corp.*,
    648 F.2d 88 (2d Cir. 1981) ............................................ 4, 5, 6, 7

*Winforge, Inc. v. Coachmen Indus., Inc.*,
    2007 WL 854025 (S.D. Ind. Mar. 13, 2007) ......................... 25

*In re Worlds of Wonder Sec. Litig.*,
    1990 WL 260675 (N.D. Cal. 1990) ......................................... 6

*Zucco Partners, LLC* v. *Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009) ................................................. 29

**Statutes and Regulations**

17 C.F.R. § 240.10b-5................................................. 4, 14, 27

17 C.F.R. § 240.14e-3.......................................................... *passim*

17 C.F.R. § 240.15c3-3.................................................... 15

31 C.F.R. § 1010.620......................................................... 15

15 U.S.C. § 78j................................................................ 4, 22

15 U.S.C. § 78m................................................................... 24

15 U.S.C. § 78n................................................................ *passim*

15 U.S.C. § 78t.......................................................... 9, 10, 11, 12

15 U.S.C. § 78t-1 ............................................................ *passim*

15 U.S.C. § 78u-4 ........................................................... 28

Insider Trading Sanctions Act of 1984, Pub.L. No. 98–376, 98 Stat. 1264
  (1984)...........................................................................................................9

**Rules**

Fed. Rule Civ. P. 7(a) ...............................................................................13

**Other Authorities**

130 Cong. Rec. 20,108 (1984).................................................................11

Antonin Scalia & Bryan Garner, *Reading Law: The Interpretation of
  Legal Texts* (2012) .............................................................................26

Donald Langevoort, *Insider Trading and the Fiduciary Principle: A Post-
  Chiarella Restatement*, 70 Cal. L. Rev. 1 (1982).................................4

Donald Langevoort, *Insider Trading Regulation, Enforcement and
  Prevention* (2015 online ed.) ........................................................3, 4, 5

Exchange Act Release No. 34-17,120, 1980 WL 20869 (Sept. 4, 1980)...................25

H.R. Rep. 91-1655, 1970 WL 5941 (1970) ..............................................18

H.R. Rep. No. 100-910, 1988 WL 169923 (1988) ....................................21

Harvey Pitt & Karl Groskaufmanis, *A Tale of Two Instruments: Insider
  Trading in Non-Equity Securities*, 49 Bus. Law. 187 (1993)................8

Morrison & Foerster, *2014 Insider Trading Annual Review*........................2

Norman Singer, *Sutherland Statutory Construction* (2014 online ed.)......................26

Note, *Private Causes of Action for Option Investors Under SEC Rule
  10b-5: A Policy, Doctrinal, and Economic Analysis*, 100 Harv. L.
  Rev. 1959 (1987) ...............................................................................10

Peter Henning, *Between Chiarella and Congress: A Guide to the Private
  Cause of Action for Insider Trading Under the Federal Securities
  Laws*, 39 U. Kan. L. Rev. 1 (1990)....................................................10

Restatement (Third) of Agency ...................................................................6

SEC, *Instit. Inv. Study Report*, H.R. Doc. No. 92-64, 92d Cong., 1st Sess.
  (1971)...................................................................................................26

-vi-

**DEFENDANTS' REPLY BRIEF**

SEC Release, 1980 WL 20869 (Sept. 4, 1980) ...........................................................22

SEC, *SEC Enforcement Actions: Insider Trading Cases* ................................................ 2

Steve Thel, *Section 20(d) of the Securities Exchange Act: Congress, the Supreme Court, the SEC, and the Process of Defining Insider Trading*, 69 N.C. L. Rev. 1261 (1991) .....................................................9, 10, 11, 12

Stuart Kaswell, *An Insider's View of the Insider Trading and Securities Fraud Enforcement Act of 1988*, 45 Bus. Law. 145 (1989) ......................................9

Thomas Hazen, *Treatise on the Law of Securities Regulation*.................................4, 10

William Wang, *A Cause of Action for Option Traders Against Insider Option Traders*, 101 Harv. L. Rev. 1056 (1988)..........................................9, 10, 11

William Wang, *ITSFEA's Effect on Either an Implied Cause of Action for Damages by Contemporaneous Traders or an Action for Damages or Rescission by the Party in Privity with the Inside Trader*, 16 J. Corp. L. 445 (1991)............................................................................................9

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**DEFENDANTS' REPLY BRIEF**

# INTRODUCTION

Despite their rhetoric, Plaintiffs fail to address Defendants' substantive arguments. The Opposition dismisses Defendants' standing arguments as an attempt to "escape liability," and repeatedly argues that Defendants are trying to "immunize" themselves. These comments misread the Motion. Defendants concede that the standing of one Lead Plaintiff is adequately pleaded, and that non-plaintiff counterparties to the trades also may have standing. But that does not alter the requirement that all Lead Plaintiffs plead standing properly. In addition, Defendants' principal regulator, the SEC, remains free to commence a civil action against them. Despite Allergan's aggressive efforts to push the SEC to take action—based on the same theories Plaintiffs allege here—the SEC has not done so. While that may well suggest that Defendants' conduct does not warrant legal action, it certainly does not mean they are "immune."

Indeed, as it relates to standing, the Motion detailed the development of the contemporaneous trading rule and explained that only plaintiffs who could possibly have traded with defendants have standing. Instead of engaging on this point, Plaintiffs raise a series of inapposite arguments, including that Defendants should be liable for the trading of a third party, Nomura. But these arguments do not afford Plaintiffs standing to sue. In the absence of an agency relationship between Pershing and Nomura, there is no legitimate legal basis to attribute Nomura's trades to PS Fund 1. Plaintiffs have not pleaded, let alone with particularity, an agency relationship between Nomura and Pershing. As the Ninth Circuit has repeatedly held, Plaintiffs' Opposition cannot add allegations that are lacking in their Amended Complaint.

Nor do Plaintiffs meaningfully address Defendants' other arguments. ***First***, Plaintiffs' Rule 14e-3 claim must be dismissed because they fail to allege fraud. Plaintiffs do not cite a single case recognizing a private right of action under Rule 14e-3 in the absence of fraud. Because there is no such right, Plaintiffs' Rule 14e-3 claim must be dismissed. ***Second***, Plaintiffs ignore the Motion's "offering person"

**DEFENDANTS' REPLY BRIEF**

argument, and instead purport to rebut different arguments that Defendants did not raise in this case. ***Third***, Plaintiffs' response to Defendants' new "substantial steps" and scienter arguments misstates and distorts. Although Plaintiffs' allegations must relate to a tender offer, they do not. Further, far from alleging a "strong inference" of scienter, Plaintiffs' implausible theory is that two sophisticated, well-advised parties conspired to purposefully violate the insider trading laws in one of the largest—and most closely scrutinized—transactions of 2014. For these reasons, described further below, the Court must dismiss the AC.

<u>ARGUMENT</u>

**I.    Plaintiffs OHIO STRS and Johnson Lack Standing.**

**A.    That Two Plaintiffs Lack Standing Does Not "Immunize" Defendants or Permit Them to "Escape Liability."**

The Motion explained that two Plaintiffs lack standing. Dkt. 71 ("Mot.") 8-20. Plaintiffs contend this somehow "shields" or "immunizes" Defendants from any liability. Dkt. 85 ("Opp'n") 11, 15. Not so. These two Plaintiffs' lack of standing means only that they are not the proper parties to enforce the securities laws. Other, more appropriate plaintiffs would, of course, retain any remedies they might have. Indeed, Defendants concede for purposes of this Motion that the standing of one Lead Plaintiff is adequately pleaded. *See* Mot. 9. Moreover, "Congress designated the SEC as the primary enforcer of the securities laws." *SEC v. Morgan Keegan & Co.*, 678 F.3d 1233, 1244 (11th Cir. 2012). The SEC is not constrained by standing limitations, and it remains free to bring civil or administrative enforcement proceedings, as it has aggressively done recently in other cases.[1] To date, even without the standing constraints applicable to Plaintiffs, the SEC has not acted.[2]

---

[1]    *See* Morrison & Foerster, *2014 Insider Trading Annual Review* at 2, *available at http://www.mofo.com/~/media/Files/ClientAlert/2015/02/150211InsiderTradingAnnualReview.pdf*; SEC, *SEC Enforcement Actions: Insider Trading Cases*, *available at http://www.sec.gov/spotlight/insidertrading/cases.shtml.*

[2]    The high profile transaction at issue here—one of 2014's largest—was subjected to close regulatory scrutiny, and Allergan aggressively sought SEC (Continued…)

-2-

<u>DEFENDANTS' REPLY BRIEF</u>

**B.     Plaintiffs Ignore the Purpose of the Contemporaneous Trading Rule.**

As the Motion explained, understanding the "standing test requires some historical background, for it essentially is a codification of the approach . . . developed in the Second Circuit" and adopted in the Ninth. *See* 18 D. Langevoort, *Insider Trading Regulation, Enforcement & Prevention* § 9:3 (2015 online ed.) ("Langevoort"). Courts developed the contemporaneous trading rule as a proxy for trading privity, when privy traders would "as a practical matter" be "impossible" to identify. Mot. 10 (citing *Shapiro v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 495 F.2d 228, 236 (2d Cir. 1974)). But courts, and particularly the Ninth Circuit, have also recognized that the logic of the rule affords a plaintiff standing only when it "could have possibly traded with the insider." *Id.* (quoting *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1005 (9th Cir. 2002)). Indeed, the rule's very purpose is to "filter out plaintiffs who could not possibly have traded with the insider. . . ." *Brody*, 280 F.3d at 1002. Permitting standing for such plaintiffs—like Ohio STRS and Johnson— would ignore the rule's purpose and render it arbitrary.

Plaintiffs ignore the rule's history and rationale, as set out in Ninth Circuit cases such as *Neubronner* and *Brody*. They instead quote snippets from *Brody* while sidestepping its reasoning. Plaintiffs assert that they suffered an "informational disadvantage," which "inheres in trading with an insider with superior access to information." Opp'n 14 (quoting *Brody*). But standing cannot arise from *only* an informational imbalance; there must be such an imbalance between the insider and a party with whom the insider may have traded. *See Brody*, 280 F.3d at 1003 (standing arises from "trading *with an insider*" (emphasis added)). Without a logical possibility that it traded with the defendant, a plaintiff has no standing to sue under *Brody*. OHIO STRS and Johnson cannot satisfy that requirement.

---

intervention based on the same theories Plaintiffs allege.  *See, e.g.*, *Allergan et al. v. Valeant et al.*, No. 14-cv-1214-DOC, dkt. 88 (Sept. 12, 2014) ("*Allergan I*") (letter to Court requesting that it invite the SEC to appear as amicus).

**DEFENDANTS' REPLY BRIEF**

1    In fact, the original source of Plaintiffs' "access to information" quote, *Wilson*

2    *v. Comtech Telecomms. Corp.*, 648 F.2d 88 (2d Cir. 1981), makes this clear. In

3    *Wilson*, a company's CFO sold shares with knowledge of a not-yet-public downgrade

4    of the company's outlook. *Id.* at 91. Before that information was disclosed—but over

5    one month after the CFO's sales—plaintiff Wilson bought company stock. *Id.* at 92.

6    The downgrade was then announced and the stock price dropped. *Id.* Wilson sued for

7    insider trading under Rule 10b-5. *Id.* at 89. The CFO's failure to disclose the

8    downgrade was a but-for cause of Wilson's trading loss, as Wilson would have paid

9    less or not bought had he known of it.[3] But not every such injury may be redressed

10   through a private right of action under the securities laws.[4] Indeed, notwithstanding

11   Wilson's injury, the Second Circuit declined to afford him a private right of action

12   under Rule 10b-5. *Id.* at 94-95.

13       *Wilson* addressed *Shapiro*, which had previously held that a plaintiff and

14   defendant must trade "during the same period." 495 F.2d at 237. Later district court

15   decisions—including *Shapiro* on remand—had "interpreted this language to refer to

16   the period of time from the defendants' trades to the public disclosure of the insider

17   information . . . ." *See Wilson*, 648 F.2d at 94. Logically, that rule would compensate

18

19       [3]   *See* 18 Langevoort § 9:3 ("[T]he plaintiff in *Wilson* was no less affected or
20   injured by the defendant's conduct than those who might be fortunate enough to meet
     the contemporaneousness standard."); D. Langevoort, *Insider Trading and the*
21   *Fiduciary Principle: A Post-Chiarella Restatement*, 70 Cal. L. Rev. 1, 36 (1982)
     ("[T]he insider's breach [of the disclosure duty] 'injures' any trader who would not
22   have bought or sold had there been adequate disclosure to the marketplace.").

23       [4]   *See Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 726 (1975)
24   (plaintiff who neither bought nor sold had no private right of action under § 10(b)
     even though it was allegedly injured through being convinced not to trade due to false
25   or misleading statements); *Piper v. Chris-Craft Indus., Inc.*, 430 U.S. 1, 25-26 (1977)
     (unsuccessful tender offeror had no private right of action under §14(e), even though
26   false statements in violation of § 14(e) were alleged to have led to the offer's failure);
27   4 T. Hazen, *Treatise on the Law of Securities Regulation* § 12.17 (2015 online ed.)
     (noting that there will not necessarily "be a private remedy simply because the duty to
28   disclose or abstain from trading exists").

**DEFENDANTS' REPLY BRIEF**

1    those, like Wilson, who suffer trading losses from an insider's breach of a duty to

2    disclose. *See* 18 Langevoort § 9:3. But *Wilson* declined to adopt that rule: "To extend

3    the period of liability well beyond the time of the insider's trading simply because

4    disclosure was never made could make the insider liable to all the world." *Wilson*, 648

5    F.2d at 94. "Any duty of disclosure is owed only to those investors trading

6    contemporaneously with the insider; non-contemporaneous traders do not require the

7    protection of the 'disclose or abstain' rule because they do not suffer the disadvantage

8    of trading with someone who has superior access to information." *Id.* at 94-95.

9         Under *Wilson*—later adopted by the Ninth Circuit in *Neubronner v. Milken*, 6

10   F.3d 666, 670 (9th Cir. 1993) and *Brody*, 280 F.3d at 1001, and by Congress in

11   § 20A[5]—Plaintiffs' alleged harm is insufficient to give rise to standing. Only plaintiffs

12   whose injury results from the *trading itself* have standing to bring suit. *See Wilson*,

13   648 F.2d at 94. Johnson and Ohio STRS have not, as *Wilson* put it, "suffer[ed] the

14   disadvantage of *trading with* someone who has superior access to information." *Id.* at

15   94-95 (emphasis added). Thus, they lack standing. *Id.*

16        Plaintiffs do not even cite, much less distinguish, the seminal *Wilson* and

17   *Neubronner* cases. Instead, they argue that "*Brody* decided the narrow question of

18   whether an investor asserting a Rule 14e-3 claim must satisfy a ***temporal***

19   'contemporaneous trading' requirement." Opp'n 13 (emphasis in original). But there

20   is no principled basis to read *Brody*—controlling Ninth Circuit precedent—so

21   narrowly. In fact, Plaintiffs' approach to *Brody* stands in stark contrast to the

22   expansive view they take from sparse analyses contained in nonbinding district court

23   cases. *See id*. Simply put, Plaintiffs' district court cases are irreconcilable with the

24

25

26

27        [5]   *See* 18 Langevoort § 9:3 (noting that "the *Wilson* test has now been adopted in

28   Section 20A.").

**DEFENDANTS' REPLY BRIEF**

1    Ninth Circuit's rule that a plaintiff must have potentially traded with the insider to

2    have standing. *Brody*, 280 F.3d at 1005; *Neubronner*, 6 F.3d at 670.[6]

3        Plaintiffs' decision to ignore *Neubronner* is problematic. Indeed, *Neubronner*

4    declined to follow one of the district court cases Plaintiffs rely upon, *In re Worlds of*

5    *Wonder Sec. Litig.*, 1990 WL 260675, *5 (N.D. Cal. 1990). It instead adopted the

6    *Wilson* rule, which it noted *Worlds of Wonder* had declined to do. *Neubronner*, 6 F.3d

7    at 670. Similarly, Plaintiffs cite *In re Equity Funding Corp. of Am. Sec. Litig.*, 416 F.

8    Supp. 161, 185 (C.D. Cal. 1976), which was decided well before *Wilson* and

9    *Neubronner*. The trial court in *In re Equity Funding* afforded standing to "all persons

10   who during the same period purchased [securities] on the open market without

11   knowledge of the material information which was in the possession of defendants." *Id.*

12   That is precisely the rule that *Wilson*, *Neubronner*, and *Brody* rejected.

13       Plaintiffs' selective quotation from a third case—*Johnson v. Aljian*, 257 F.R.D.

14   587, 593 (C.D. Cal. 2009)—comes from a section of the opinion addressing the

15   impact of the fraud-on-the-market presumption on class certification—a point wholly

16   unrelated to the issues relevant here. *See id.* Moreover, the quoted reasoning—that

17   denying standing to complete strangers to a face-to-face transaction would mean that

18   "all a person would need to do to avoid liability . . . would be to runnel [sic in

19   original] sales of shares through a broker," *id.*—is wrong. A defendant who makes

20   unlawful insider trades through an agent such as a broker is liable to those with whom

21   the broker places the trades.[7] Further, to the extent *Aljian* gave standing to a plaintiff

22

23       [6]    The Motion cites more than a dozen district court cases that—consistently with
24   Ninth Circuit authority—explain that there can be no standing when it is impossible
     for plaintiff to have traded with the insider. *See* Mot. 12 & n.3. The Opposition makes
25   no effort at all to distinguish these cases. It simply ignores them.

26       [7]    *See* 17 C.F.R. § 240.14e-3(a) (creating liability for "caus[ing] securities] to be
27   purchased or sold"); Restatement (Third) of Agency § 7.04; *SEC v. Talbot*, 530 F.3d
     1085, 1095 (9th Cir. 2008) (relying on Restatement as source of agency principles
28   related to insider trading case).

**DEFENDANTS' REPLY BRIEF**

1    who could not possibly have traded with the defendant, it is irreconcilable with

2    *Neubronner* and *Brody*, controlling Ninth Circuit precedent.

3        Plaintiffs also cite to *Shapiro's* refusal to condition standing on traditional

4    common-law privity. 495 F.2d at 236-37. But *Shapiro* was premised on transactions

5    having "occurred on an anonymous national securities exchange where as a practical

6    matter it would be impossible to identify a particular defendant's sale with a particular

7    plaintiff's purchase." *Id.* It says *nothing* about the issue here: whether plaintiffs who

8    could not *possibly* have traded with the defendant because the counterparty is known

9    have standing to bring private rights of action. In any event, as noted, *Shapiro* was

10   limited by *Wilson's* adoption of the contemporaneous trading rule, narrowing standing

11   only to those plaintiffs who possibly could have traded with the insider. *See Wilson*,

12   648 F.2d at 94. The AC admits that for all but two days of PS Fund 1's trading, it

13   traded with a known counterparty in face-to-face transactions. *See* AC ¶¶ 98, 99, 173;

14   Mot. 9. For those trades it is impossible that any plaintiff traded with PS Fund 1.

15   Under Ninth Circuit law, that precludes standing for two plaintiffs.

16       Finally, Plaintiffs intimate that the *Allergan I* preliminary injunction ruling

17   "held" that plaintiff Parschauer's March 11, 2014 sales of Allergan common stock

18   were contemporaneous with PS Fund 1's options purchases. Opp'n 10 (citing

19   *Allergan I*, dkt. 234 at 10 (C.D. Cal. Nov. 4, 2014)). They suggest that means their

20   similarly timed common stock purchases are contemporaneous too. But

21   Ms. Parschauer's standing was never disputed on the preliminary injunction motion,

22   as she *also* sold common stock on February 26, 2014, the same day PS Fund 1

23   purchased Allergan common stock. *See Allergan I*, dkt. 194 at 23. Since only an

24   injunction, not damages, was at issue, there was neither any effort by the parties to

25   parse her sales on a trade-by-trade basis, nor any "holding" from the Court to resolve

26   that uncontested issue. Indeed, when Defendants did later contest Ms. Parschauer's

27   standing to sue for damages on her March 11 trades, see *id.* dkt. 256 at 11 (summary

28   judgment motion), even Allergan did not contend the issue was resolved by the

**DEFENDANTS' REPLY BRIEF**

Court's prior order, *id.* dkt. 258 at 13-19. A stock seller's standing to sue an options purchaser was unresolved in *Allergan I.*

**C.     Call Options and Stock Are Not of the "Same Class" under § 20A(a).**

Plaintiffs' argument that § 20A "supports [their] standing here," Opp'n 17, also misses the mark. Congress enacted § 20A to create a private right of action for "any person who, [1] contemporaneously with the purchase or sale of securities that is the subject of [an insider trading] violation, [2] has purchased (where such violation is based on a sale of securities) or sold (where such violation is based on a purchase of securities) [3] securities of the same class." 15 U.S.C. § 78t-1(a). "Congress did not define the term 'contemporaneous' as used in § 20A, but instead apparently intended to adopt the definition 'which has developed through the case law.'" *Neubronner*, 6 F.3d at 669 n.5. To establish standing under § 20A, Plaintiffs must thus satisfy the contemporaneous trading rule. *See id.*; *In re Musicmaker.com Sec. Litig.*, 2001 WL 34062431, at *27 (C.D. Cal. June 4, 2001) ("The Ninth Circuit has stated that the same standards regarding contemporaneous trading as were applied by the courts before § 20A was enacted should be applied under § 20A."). They have not done so.

In addition, § 20A requires that plaintiffs trade in "securities of the same class" as the insider. 15 U.S.C. § 78t-1(a). Case law defining "securities of the same class" is limited. But derivative "stock appreciation rights" and preferred stock have both been held to be outside the "same class" as common stock.[8] As an article co-authored by a future chairman of the SEC explained, "[a] literal reading of the statutory language [of § 20A(a)] limits the options investor's right of action to other investors who contemporaneously traded options opposite the plaintiff." H. Pitt & K.

---

[8]     *See Clay v. Riverwood Int'l Corp.*, 157 F.3d 1259, 1270 (11th Cir. 1998) (Carnes, J., concurring) *adopted on rehearing as opinion of the court* 176 F.3d 1381 (11th Cir. 1999) (per curiam) (denying standing under § 20A because derivative "stock appreciation rights" were not in the same class as common stock); *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 258 F. Supp. 2d 576, 639 n.66 (S.D. Tex. 2003) (preferred stock not in the same class as common stock).

-8-
**DEFENDANTS' REPLY BRIEF**

1    Groskaufmanis, *A Tale of Two Instruments: Insider Trading in Non-Equity Securities*,

2    49 Bus. Law. 187, 210 (1993) ("Pitt"). A well-regarded scholar has also deemed

3    Plaintiffs' argument—that options and stock are in the "same class"—"implausible."

4    W. Wang, *ITSFEA's Effect on Either an Implied Cause of Action for Damages by*

5    *Contemporaneous Traders or an Action for Damages or Rescission by the Party in*

6    *Privity with the Inside Trader*, 16 J. Corp. L. 445, 490 n.44 (1991).[9]

7            Finally, in enacting § 20A, Congress specifically declined to extend the private

8    right of action beyond contemporaneous traders. "Earlier versions of the legislation

9    contained a broadly-stated right of action for '[a]ny person . . . injured by [an insider

10   trading] violation.'" *See* Pitt, 49 Bus. Law. at 210. "The potential 'far-reaching civil

11   liability' proved to be such a divisive issue that the provision was dropped . . . ." *Id.*;

12   *see also* S. Kaswell, *An Insider's View of the Insider Trading and Securities Fraud*

13   *Enforcement Act of 1988*, 45 Bus. Law. 145, 152-64 (1989) (article by committee

14   counsel explaining bill history).

15          **D.    Section 20(d) Does Not Give Stock Sellers Standing to Sue Call**
              **Option Purchasers.**

16          Plaintiffs' argument that they have standing based on § 20(d), 15 U.S.C.

17   § 78t(d), fails as well. Contrary to Plaintiffs' characterization, § 20(d)—an entirely

18   separate statute enacted four years before Congress codified the contemporaneous

19   trading rule in § 20A[10]— merely provides that insider trading liability can arise from

20   trades in derivatives, a point Defendants do not contest. Section 20(d) does not change

21

22

23          [9]   Although Plaintiffs cite various district court cases touching on options trading,
     none purport to interpret § 20A(a)'s "securities of the same class" requirement. The

24   only case that even cites the language is *Dau v. Cephalon, Inc.*, 2000 WL 1469347, at

25   *5 (E.D. Pa. Sept. 25, 2000), which rests not on an interpretation of § 20A, but instead
     incorrectly holds that a different statute, § 20(d), 15 U.S.C. § 78t(d), permits holders

26   of different classes of securities to sue for insider trading, notwithstanding § 20A.
     *Dau*'s terse (and incorrect) § 20(d) analysis is addressed in the next section.

27          [10]  Section 20(d) was added to the Exchange Act by the enactment of the Insider

28   Trading Sanctions Act of 1984, Pub. L. No. 98-376, 98 Stat. 1264 (1984).

**DEFENDANTS' REPLY BRIEF**

the contemporaneous trading rule, or afford a seller of common stock a private right of action against the buyer of a call option. Specifically, § 20(d) provides:

> Wherever communicating, or purchasing or selling a security while in possession of, material nonpublic information would violate, or result in liability to any purchaser or seller of the security under any provisions of this chapter, or any rule or regulation thereunder, such conduct in connection with a purchase or sale of a put, call, straddle, option, privilege, or security-based swap agreement with respect to such security or with respect to a group or index of securities including such security, shall also violate and result in comparable liability to any purchaser or seller of *that security* under such provision, rule, or regulation.

15 U.S.C. § 78t(d) (emphasis added).

While there is a question whether § 20(d) "applies only to SEC enforcement suits,"[11] even a broader interpretation affords "comparable liability" only to purchasers or sellers of "*that* security"—the trade in a "put, call, straddle, option, [or] privilege" that violates a prohibition on insider trading. *Id.* By its terms, § 20(d) "gives *option traders* a cause of action against insiders who engage in such illegal *option trading*." S. Thel, *Section 20(d) of the Securities Exchange Act: Congress, the Supreme Court, the SEC, and the Process of Defining Insider Trading*, 69 N.C. L. Rev. 1261, 1266-67 (1991) (emphasis added); W. Wang, *A Cause of Action for Option Traders Against Insider Option Traders*, 101 Harv. L. Rev. 1056, 1059-60 (1988) ("Wang") ("The intent of section 20(d) was to allow analogously situated *option*-trading plaintiffs an equivalent private cause of action against insider traders of *options*." (emphasis original).[12]

---

[11]   Note, *Private Causes of Action for Option Investors Under SEC Rule 10b-5: A Policy, Doctrinal, and Economic Analysis*, 100 Harv. L. Rev. 1959, 1962 (1987).

[12]   Pitt, 49 Bus. Law. at 211 ("[T]he most logical reading of section 20(d) limits an implied right of action to proceedings [by options traders] against other options traders."); P. Henning, *Between Chiarella and Congress: A Guide to the Private Cause of Action for Insider Trading Under the Federal Securities Laws*, 39 U. Kan. L. Rev. 1, 6 (1990) ("[Section 20] granted options traders standing to sue persons trading in options while in possession of material nonpublic information."); 3 T. Hazen, *Treatise on the Law of Securities Regulation* § 12.7 (2015 online ed) ("[S]ection 20(d) (Continued…)

1    But § 20(d) does *not* afford those who trade in *stock* a private right of action

2    against *option* traders—such a rule would not "make[ ] sense." Wang, 101 Harv. L.

3    Rev. at 1057. "The legislative history of the Insider Trading Sanctions Act makes

4    clear that the troublesome phrase 'that security' refers to the derivative security." *Id*.

5    Indeed, the detailed "explanation" in the legislative history explains that, under

6    § 20(d), an options purchaser would subject himself to "comparable liability to *selling*

7    *option holder*s and other similarly situated persons *in the derivative market*." *Id.*

8    (citing 130 Cong. Rec. 20,108, 20,970 (1984)) (emphasis added).

9    Plaintiffs' construction of § 20(d) would also render § 20A(a)'s later-enacted

10    "same class" requirement nugatory. Section 20(d), enacted four years before § 20A,

11    cannot be read to "eviscerate[]" that requirement. *Clay*, 157 F.3d at 1270 n.1. By

12    contrast, the correct interpretation of § 20(d)—that it permits options traders to sue

13    insiders contemporaneously trading in options—harmonizes perfectly with § 20A(a).

14    The only authority Plaintiffs cite to the contrary is a fifteen-year-old

15    unpublished opinion from the Eastern District of Pennsylvania. *Dau*, 2000 WL

16    1469347, at *5. The sum and substance of *Dau's* analysis, which was rejected by the

17    Eleventh Circuit in *Clay*, 157 F.3d at 1270 n.1, is a block quote from § 20(d),

18    followed by a conclusory sentence that a stock seller can sue an options purchaser

19    because "both stock and options are within the language of the statute . . . ." *Id.* But

20    *Dau's* terse conclusion is contrary to: (1) Ninth Circuit law requiring some possibility

21    that plaintiff and defendant were counterparties for the contemporaneous trading rule

22    to apply; (2) the express language of §20(d); (3) the legislative history of, and learned

23    commentary on, § 20(d); and (4) § 20A(a)'s express and later-enacted requirement

24    that contemporaneous traders trade in the "same class" of security. Accordingly, the

25    Court should not conclude that *Dau* is persuasive authority. *Cf. Rezner v. Bayerische*

26    *Hypo-Und Vereinsbank AG*, 630 F.3d 866, 872 (9th Cir. 2010) (one sentence

27

28    does not provide that, when the illegal trading is in connection with an equity security,
the trader will be liable to an option trader.").

-11-

conclusion in unpublished case, without further analysis, was not persuasive authority in interpreting the requirements of the securities laws).[13]

### E.   Nomura's Trading Does Not Give Plaintiffs Standing.

Ironically, in the section of their brief entitled "**Plaintiffs Traded Contemporaneously With PS Fund 1**," Plaintiffs nowhere assert that they could possibly have traded with PS Fund 1 in connection with its options purchases and forward contracts. *See* Opp'n 10-20. Instead, Plaintiffs rely on alleged trading by Nomura, a third party. *Id.*[14] But the law requires a plaintiff's trading to be contemporaneous with that of *the insider*, not some third party. Mot. 9-13. *See Brody*, 280 F.3d at 1001 ("The contemporaneous trading requirement . . . specifi[es] that to bring an insider trading claim, *the plaintiff* must have traded in a company's stock at about the same time *as the alleged insider*." (emphasis added)). Absent a legal relationship, such as an agency relationship, permitting attribution of Nomura's trading to PS Fund 1, any potential that Plaintiffs traded with Nomura is irrelevant.

---

[13]   *Dau* also appears to assume incorrectly that the contemporaneous trading rule in § 20A(a) and the creation of derivatives liability in § 20(d) are parts of the same statute. 2000 WL 1469347, at *5 (discussing § 20A, then referring to "the statute" and quoting § 20(d)). They are not. They are codified in separate provisions of the Exchange Act, and were enacted by different legislation four years apart. Section 20(d), 15 U.S.C. § 78t, was passed as part of the Insider Trading Sanctions Act of 1984, while § 20A, 15 U.S.C. § 78t-1, was enacted in the 1988 Insider Trading and Securities Fraud Enforcement Act. This apparent conflation further undermines *Dau* as the kind of careful analysis that the Court should view as persuasive.

[14]   Plaintiffs also argue that "Pershing's Answer in *Allergan I* admitted that it 'acquired [] Allergan stock' 'between March 3, 2014 and April 8, 2014' and again 'between April 11[, 2014] and April 21, 2014,' despite the fact that it did not officially exercise its options until May 1, 2014." Opp'n 13. Plaintiffs, however, take a single clause out of context to create a misleading impression. Pershing's Answer in *Allergan I* explained that its acquisition of Allergan stock was made through the exercise of call options and forward contracts on May 1, 2014, not through purchases of common stock on any exchange. Dkt. 85-1 ("Nicholas Decl.") Ex. 4 ¶ 88. When relevant, Pershing consistently made this factual distinction in *Allergan I. See id*. There is no inconsistency, and certainly no "admission" that PS Fund 1's purchase of options was the equivalent of a purchase of common stock.

**DEFENDANTS' REPLY BRIEF**

The Opposition offers no authority permitting attribution of Nomura's trades to PS Fund 1 on any theory other than agency. To the extent Plaintiffs intend to rely upon an agency theory, the AC was required to contain particularized factual allegations giving rise to that relationship. *See* Mot. 16-17 (citing cases). But other than a deceptive misquotation about "brokers,"[15] the AC does not contain any factual allegations sufficient to establish that Nomura actually was PS Fund 1's agent. *See id.* Having failed to do so, Plaintiffs cannot cure the facial inadequacy of the AC through factual statements in their Opposition. *See Schneider v. Cal. Dep't of Corr.*, 151 F.3d 1194, 1197 n.1 (9th Cir. 1998) ("The court may not . . . take into account additional facts asserted in a memorandum opposing the motion to dismiss, because such memoranda do not constitute pleadings under Rule 7(a).").

The Motion cited the three elements required to allege an agency relationship, as well as Ninth Circuit cases holding that they must be pleaded with particularity. Mot. 16-17. The Opposition does not even recognize the test, and the allegations Plaintiffs point to are insufficient to satisfy it. Plaintiffs simply assert that (a) Pershing "knew" Nomura would acquire Allergan stock to hedge its own obligations for its own account; (b) the "economic reality" of the transaction meant "Nomura had no choice" but to purchase Allergan stock; and (c) Pershing "was able" to "halt" Nomura's trading, suggesting that is somehow enough. Opp'n 18-19. But they cite no authority at all establishing that these facts are sufficient to create an agency relationship, or that they otherwise permit the Court to treat Nomura's trading as PS

---

[15] Plaintiffs contend that the Motion turns on a "misplaced contention that simply calling Nomura a 'dealer' has legal significance." Opp'n 19. But the Motion's discussion of broker/dealer labeling was simply explaining that the AC's own conclusory (and misleading) labeling of Nomura as PS Fund 1's "broker" is not sufficient to plead an agency. Mot. 15-17. Plaintiffs continue to mislead when they claim that the Pershing/Nomura contracts "make clear [that Nomura] is ***not*** a "dealer under the 1934 Act." *Id.* 19 n.19. But the full quotation says "Dealer is not registered as a broker or dealer under the 1934 Act," which hardly supports the assertion that "the contracts do not say Nomura is a 'dealer[.]'" *Id.*; *cf.* Shipley Decl. Ex. 8 § 13.1.

1   Fund 1's trading. Absent that, Plaintiffs run afoul of the basic "design[]" of Rule 14e-

2   3—"to prevent the disadvantage that inheres in *trading with an insider*[.]" *Brody*, 280

3   F.3d at 1003 (emphasis added).

4        Indeed, as it relates to agency, neither the AC nor the Opposition says anything

5   at all about whether (a) PS Fund 1 held power to alter Nomura's legal relations with

6   third parties; (b) Nomura acted as a fiduciary; or (c) PS Fund 1 had the "right to

7   control" Nomura's conduct. *See Lent v. JP Morgan Chase Bank*, 2011 WL 5971190,

8   at *3 (C.D. Cal. Nov. 29, 2011) (agency requires these elements). At most, Plaintiffs'

9   Opposition—but not the AC—suggests that PS Fund 1 had the practical ability to

10  affect Nomura. *See* Opp'n 18–19 (arguing that Pershing "was able to halt Nomura's

11  purchases at will," a point not pleaded in the AC). But that is *not* the same thing as a

12  "*right* to control" Nomura's conduct. In fact, as the Motion explained, Nomura's

13  contracts with Pershing provided that Nomura would *not* act as an agent, and could

14  engage in whatever trading it wished, even if it harmed Pershing's interests.[16]

15       The only case Plaintiffs cite on this point—*Caiola v. Citibank, N.A., New York*,

16  295 F.3d 312 (2d Cir. 2002)—supports Defendants. There, a customer sued a bank

17  under Rule 10b-5, alleging misrepresentations about the bank's hedging strategy for

18  certain swap agreements.[17] On a motion to dismiss, the bank argued the customer

19  lacked standing as an "actual purchaser," while the customer alleged the bank's trades

20  were made "on his behalf." *Id.* at 322-23. While Plaintiffs suggest *Caiola* relied upon

21  "the nature of the defendant's hedging strategy," Opp'n 19 n.20, the court found those

22

23       [16]  Plaintiffs assert that these agreements are not judicially noticeable. Opp'n 19
24  n.18. But judicial notice is beside the point. The contracts may be considered on a
    motion to dismiss because the nature of the transactions effected through them is
25  integral to the AC, *see* AC ¶¶ 100, 103, 107, and Plaintiffs do not dispute their
    authenticity. *See Fields v. Legacy Health Sys.*, 413 F.3d 943, 958 n.13 (9th Cir. 2005).
26  In any event, Defendants do not ask the Court to take notice of "complex inferences"
    from the contracts. Defendants address only the agreements' plain undisputed terms.
27       [17]  The "synthetic" hedging at issue was allegedly material to the customer because
28  it could actually affect the purpose of the swap itself. *Caiola*, 295 F.3d at 315-16.

**DEFENDANTS' REPLY BRIEF**

1    allegations weighed *against* standing. *Id.* It ultimately ruled for the customer only

2    because he—unlike Plaintiffs—had actually alleged the bank acted as his *agent*. *Id.*[18]

3        Contrary to Plaintiffs' suggestion that Nomura was PS Fund 1's agent would

4    "not bring about [a] parade of horribles," Opp'n at 20 n.21, such a ruling would have

5    profound implications to the operation of the securities markets. To take just one

6    example, were Nomura deemed PS Fund 1's agent, it would be required, among other

7    things, to establish a customer account for PS Fund 1 in accordance with Rule 15c3-3,

8    17 C.F.R. § 240.15c3-3. That would generally require Nomura, among other things, to

9    (a) gain "control" of the relevant securities, (b) calculate PS Fund 1's fully paid

10   securities amount, (c) calculate excess margin securities amounts, (d) maintain

11   physical possession of securities based on mathematical computations conducted as

12   frequently as daily, and (e) implement and manage special reserve bank accounts for

13   the exclusive benefit of PS Fund 1. *See id.* In addition to these onerous requirements,

14   Nomura would need to comply with due diligence and other related regulations that

15   do not apply to trades in over-the-counter derivatives like those at issue here. *See, e.g.,*

16   31 C.F.R. § 1010.620(a), (b). To unintentionally impose those requirements—

17   notwithstanding clear language in a standard ISDA contract used in connection with

18   *trillions* of dollars of securities transactions, and the lack of any particularized agency

19   allegations in the AC—could inadvertently cause the sophisticated over-the-counter

20   derivatives market to grind to a halt.

21        Finally, even if they could base their standing on Nomura's trades, to do so

22   Plaintiffs must allege, with particularity, sales contemporaneous with Nomura's

23   purchases. *Neubronner*, 6 F.3d at 670. But the AC does not adequately allege this. In

24   fact, while the Opposition declares that "***all*** of Plaintiffs' sales were made on the ***same***

---

25   [18] Plaintiffs argue that *Caiola* "rejec[ed] the argument that the identical ISDA

26   confirmation language that Defendants cling to here was dispositive." Opp'n 19 n.20.
     Not so. *Caiola* credited agency allegations that the defendant had acted as its agent in

27   connection with the transactions at issue. *Caiola*, 295 F.3d at 322. The court's ruling

28   was not premised on the ISDA language that Defendants cite here.

**DEFENDANTS' REPLY BRIEF**

*dates* that Nomura purchased Allergan stock on the NYSE," Opp'n 10:14-16, there are *no such allegations* in the AC. It does not identify any dates at all on which Nomura allegedly purchased Allergan stock. On this point, Plaintiffs cite only AC ¶¶ 102, 173 and Exhibit 3 to Plaintiffs' counsel's declaration in support of the Opposition. Opp'n 10. But *none* of these sources identifies the dates of Nomura's purchases, or says anything substantive about Nomura's purchases more generally.[19]

## II. The First Claim Fails Because the Theory Alleged Is Not Subject to an Implied Private Right of Action.

### A. The AC Fails to Plead a § 14(e) Claim.

Plaintiffs do not dispute that they have not pleaded a claim directly under § 14(e), 15 U.S.C. § 78n(e). They argue only that a private right of action exists, relying largely on a footnote in a thirty-year old dissenting opinion, while ignoring whether, assuming a cause of action exists, the AC pleads it. Opp'n 21. It does not.

Plaintiffs do not demonstrate any Congressional intent to create an implied private right of action under § 14(e). Instead, they cite to a handful of cases predating *Alexander* v. *Sandoval*, 532 U.S. 275 (2001), and argue that *Sandoval* did not change the law. Opp'n 21 & n.23. That contention is inconsistent with Ninth Circuit law. *See, e.g.*, *Gilstrap* v. *United Air Lines, Inc.*, 709 F.3d 995, 1002 (9th Cir. 2013) (recognizing that *Sandoval* "narrowed the framework for evaluating whether a statute implies a private cause of action"). Nor does the dissent in *Piper* assist Plaintiffs. Opp'n 21 (citing 430 U.S. at 55 & n.4 (Stevens, J., dissenting)). Although Justice Stevens asserted in dissent that "no one seriously questions" the existence of a private right of action under § 14(e), the majority in that case concluded that issue "is not before us, and we intimate no view on the matter." *Id.* at 42 n.28. In short, Plaintiffs

---

[19] Plaintiffs apparently suggest that the chart at AC ¶ 102 reflects *Nomura's* purchases of common stock. Opp'n 10. But the AC's reproduction of the chart itself indicates that the information concerns the "Shares, Options, and Forwards Purchased by *Pershing Square*" (emphasis added). Nothing in the chart addresses the specific dates or volumes of any trading by *Nomura*, whether as part of a hedging strategy or otherwise.

**DEFENDANTS' REPLY BRIEF**

1   fail to identify any evidence that Congress intended to create a private right of action

2   under § 14(e). Thus, "a cause of action does not exist and courts may not create one,

3   no matter how desirable that might be as a policy matter, or how compatible with the

4   statute." *Sandoval*, 532 U.S. at 286-87.[20]

5        Further, even if a private right of action exists under § 14(e), Plaintiffs do not

6   even argue that they have pleaded such a claim. It is well-settled that § 14(e) is an

7   antifraud statute. Mot. 21-22. Trading on non-public information constitutes fraud

8   only when there is a "breach of a duty owed to the source of the information." *United*

9   *States. v. O'Hagan*, 521 U.S. 642, 652 (1997). The AC alleges no such breach. To the

10  contrary, Plaintiffs allege that Valeant provided the information to Pershing and

11  consented to its use. AC ¶ 2-7. The Opposition does not contest that a § 14(e) claim

12  requires a breach of duty, or that Plaintiffs failed to plead it. Opp'n 21. As such,

13  Plaintiffs' claim directly under § 14(e) must be dismissed.

14       **B.   Private Enforcement of Rule 14e-3 Cannot Extend Beyond § 14(e)'s**
               **Scope.**
15       Plaintiffs' Rule 14e-3 claim must be dismissed because Plaintiffs have not

16  alleged fraud, and there can be no private right of action for Rule 14e-3 to the extent

17  the Rule proscribes non-fraudulent conduct—*i.e.*, conduct that is permitted under

18  § 14(e). Mot. 22-24; *Sandoval*, 532 U.S. at 285-93. Plaintiffs cite no case recognizing

19  a private right of action under Rule 14e-3 in the absence of fraud. Opp'n 21-24. The

20  cases Plaintiffs do cite, and the legislative history they describe, are inapposite: they

21  address only whether Rule 14e-3 was validly adopted. *See, e.g.*, *United States v.*

22  *Chestman*, 947 F.2d 551, 558 (2d Cir. 1991) (en banc). Likewise, any later

23

24       [20]   Plaintiffs cite *Plaine* v. *McCabe*, 797 F.2d 713, 717 & n.7 (9th Cir. 1986),
     which, as Defendants acknowledged in the Motion, suggested that a private right of
25   action may extend to a facial violation of § 14(e)'s anti-fraud prohibition. But even if
     *Plaine* survives *Sandoval*, "*Plaine* focused only on *non*-insider trading claims brought
26   under Section 14(e)." *Brody*, 280 F.3d 997 at 1003 (emphasis original). The Ninth
     Circuit has never addressed whether any private right of action that may exist under
27   § 14(e) extends to insider trading.
28

**DEFENDANTS' REPLY BRIEF**

"ratification" of Rule 14e-3 may support the rule's validity, but says nothing about private enforcement. Opp'n 23; *Lonberg* v. *City of Riverside*, 571 F.3d 846, 852 (9th Cir. 2009) ("We do not suggest that [the regulation] is invalid or an otherwise improper exercise of agency discretion . . . [but] simply conclude that under *Sandoval*, it is not enforceable through [the statute's] private right of action because the obligations it imposes are nowhere to be found in [the statute's] plain language.").[21]

      With respect to the question that *is* before the Court—whether private parties may enforce Rule 14e-3—Plaintiffs do not dispute that where a statute creates a private right of action, "regulations that go beyond a construction of the statute's prohibitions do not fall within the implied right of action." *Mark H. v. Lemahieu*, 513 F.3d 922, 935 (9th Cir. 2008). But Plaintiffs assert that they may sue under Rule 14e-3, even in the absence of any fiduciary breach, because in promulgating Rule 14e-3 the SEC redefined the meaning of "fraud" in § 14(e). Opp'n 21-24. That is incorrect.

      The SEC promulgated Rule 14e-3 pursuant to a 1970 amendment to § 14(e), which gave the SEC authority to "define, and prescribe means reasonably designed to prevent, such acts and practices as are fraudulent, deceptive, or manipulative." 15 U.S.C. § 78n(e).[22] The Supreme Court has made clear that Rule 14e-3 is a "means reasonably designed to prevent" fraud, but it does not enlarge the scope of fraudulent activities covered by § 14(e). *See Schreiber v. Burlington N. Inc.*, 472 U.S. 1, 11 n. 11 (1985) (describing the 1970 amendment as giving the SEC "latitude to regulate nondeceptive activities as a 'reasonably designed' means of preventing manipulative acts[] without suggesting any change in the meaning of the term 'manipulative' itself"). The Supreme Court also made clear that Rule 14e-3 exceeds the bounds of

---

[21]  To be clear, Defendants are not challenging the SEC's authority to promulgate, or enforce, Rule 14e-3. Thus, Plaintiffs' cases, and most of their argument, entirely miss the point.

[22]  According to the legislative history, the "purpose of [the 1970 amendment was] to allow *the Commission* to deal more effectively with the devices sometimes employed on both sides in contested tender offers," not private plaintiffs. H.R. Rep. 91-1655, 1970 WL 5941 (1970) (emphasis added).

**DEFENDANTS' REPLY BRIEF**

§ 14(e) to the extent the Rule "does not require specific proof of a breach of fiduciary duty." *O'Hagan*, 521 U.S. at 676, 672-73 (Rule 14e-3 "encompasses *more than the core activity prohibited* "by § 14(e) because "its mission is to prevent" violations) (emphasis added)). Thus, Rule 14e-3 is a product of the latitude Congress afforded the SEC—*not* private plaintiffs—to regulate conduct beyond that prohibited by the text of § 14(e) itself. *See Brody*, 280 F.3d at 1005 ("In *O'Hagan*, the Supreme Court ruled that the SEC is permitted to promulgate rules under § 14(e), such as Rule 14e-3, that prohibit *acts not themselves fraudulent* under the common law if the rules are reasonably designed to prevent acts that are." (emphasis added)).

In short, Plaintiffs' Rule 14e-3 claim relates to non-fraudulent conduct that does not violate § 14(e). The Supreme Court has forbidden such a claim. *Sandoval*, 532 U.S. at 285-86 ("a 'private plaintiff may not bring a [suit based on a regulation] against a defendant for acts not prohibited by the text of [the statute]'") (quoting *Central Bank of Denver, N.A.* v. *First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 173 (1994))).

### C.    Plaintiffs' Judicial Estoppel Argument Misses the Mark.

Recognizing that the law affords them no cause of action, Plaintiffs argue instead that Defendants are judicially estopped from asserting that Plaintiffs have no private right of action under § 14(e) and Rule 14e-3, because of arguments Defendants made in *Allergan I*. Opp'n 20. That contention is meritless. In assessing claims of judicial estoppel, courts consider whether the position is "clearly inconsistent" with an earlier position; whether the party to be estopped "succeeded in persuading a court to accept that party's earlier position"; and whether the party to be estopped "would derive an unfair advantage or impose an unfair detriment on the opposing party . . . ." *Hamilton* v. *State Farm Fire & Cas. Co.*, 270 F.3d 778, 782-83 (9th Cir. 2001) (internal quotation marks and citations omitted). None of those factors is present here.

*First*, there is no inconsistency in Defendants' position. The question at issue here—whether Congress intended to create a private right of action to enforce § 14(e)

and Rule 14e-3—was not raised in *Allergan I*. In *Allergan I*, Defendants argued that Allergan lacked standing to seek an injunction because it was not a contemporaneous trader. *See, e.g.,* Nicholas Decl. Ex. 7 at 45. The quotes relied upon by Plaintiffs, which Plaintiffs pull badly out of context,[23] argued only that, to the extent the individual plaintiff in *Allergan I* had a claim under § 14(e) or Rule 14e-3, then under *Brody*, 280 F.3d 997, she had a claim for money damages and thus was not entitled to injunctive relief. *Id.* These statements did not concede that the individual had a viable money damages claim under § 14(e) or Rule 14e-3, and there is nothing "clearly inconsistent" with Defendants' positions. *Hamilton*, 270 F.3d at 782-83.

     *Second*, judicial estoppel may arise only where, unlike here, a party "has succeeded in persuading a court to accept that party's earlier position." *Id.* at 782.

     *Third*, Plaintiffs fail to identify any "unfair advantage." *Id.* at 783. Defendants did not address in *Allergan I* whether a private right of action for money damages exists under § 14(e), much less for Plaintiffs here. Judicial estoppel does not permit Plaintiffs to assert a private right of action that does not exist.

### III. The Second Claim for Relief Must Be Dismissed Because Congress Did Not Intend § 20A to Create Insider Trading Liability in the Absence of Fraud.

     As explained in the Motion, in enacting § 20A, Congress intended to codify the misappropriation theory of insider trading. Mot. 24-25. As the legislative history

---

[23] For example, the Opposition states that "Defendants asserted [in *Allergan I*] that the Ninth Circuit's decision in *Brody* was an 'unequivocal and binding precedent' that 'expressly held' that Allergan shareholders have a right of action for damages under 14e-3." Opp'n 20. The two quotes come from two different places, *twenty pages apart*, in Defendants' preliminary injunction opposition. First, Defendants stated in *Allergan I* that "[i]n [*Brody*], the Ninth Circuit flatly rejected standing under Rule 14e-3 for any plaintiff who did not trade contemporaneously with the defendant. Despite this unequivocal and binding precedent . . . ." Nicholas Decl. Ex. 1 at 5. Second, again discussing the contemporaneous trading rule, Defendants stated that "*Brody* expressly held that the SEC enacted Rule 14e-3 only to protect those who suffer the disadvantage of trading with a counter-party that has an illicit informational advantage, and no one else." *Id.* at 9. Neither of these statements bears any resemblance to the quote that Plaintiffs falsely attribute to Defendants.

**DEFENDANTS' REPLY BRIEF**

1    explains, Congress did not, as Plaintiffs propose, intend to expand insider trading

2    liability by eliminating the fiduciary breach requirement. *Id.* Plaintiffs do not address

3    this legislative history. Opp'n 38-40. Relying on other portions of the legislative

4    history, Plaintiffs inaccurately contend that a reference to § 14(e), not Rule 14e-3,

5    constitutes evidence that "Congress indicated that Rule 14e-3 was expressly

6    contemplated as a predicate insider trading violation." Opp'n 38.

7          Instead, the section of legislative history Plaintiffs rely on makes clear that

8    Congress adopted in § 20A the same sort of "activity [that] is prescribed by . . .

9    Sections 10(b) and 14(e)." Opp'n 38. Given that § 14(e) proscribes only fraud,

10   including it as a predicate violation does not suggest that Congress intended to

11   dispense with the limit on insider trading to cases involving a breach of fiduciary duty.

12   Plaintiffs also cite Congressional "findings" that the SEC rules under the Exchange

13   Act were "necessary and appropriate." H.R. Rep. No. 100-910, 1988 WL 169923

14   (1988). But those findings do not address the breach of fiduciary duty requirement,

15   unlike other portions of the same House Report, which Plaintiffs ignore completely

16   and which make clear that Congress intended to codify the misappropriation theory,

17   not expand liability beyond it. *See, e.g., id.* at *10-11 ("Under current case law, the

18   SEC must establish that the person misusing the information has breached either a

19   fiduciary duty to shareholders or some other duty not to misappropriate insider

20   information"; Congress did "not intend to alter the substantive law with respect to

21   insider trading with this legislation"); *O'Hagan*, 521 U.S. at 665 n.11 ("The United

22   States additionally argues that Congress confirmed the validity of the

23   misappropriation theory" by adopting § 20A). Congress determined in § 20A that

24   "'the misappropriation theory fulfills appropriate regulatory objectives in determining

25   when communicating or trading while in possession of material nonpublic information

26   is unlawful.'" *SEC* v. *Clark*, 915 F.2d 439, 453 (9th Cir. 1990) (quoting H.R. Rep. No.

27   100-910, 1988 WL 169923, at *26-27).

28

-21-

**DEFENDANTS' REPLY BRIEF**

Finally, Plaintiffs rely on *Johnson*, 490 F.3d 778, which held that a § 20A claim is subject to § 20A's own five-year statute of limitations, even if the much shorter statute of limitations for the predicate claim (in that case, under § 10(b)) has run. In so holding, the Ninth Circuit stated that the underlying § 10(b) claim need not be "viable," but the Plaintiff must demonstrate that the challenged actions "satisfied the essential elements of the proscribed act. . . ." *Id.* at 781. Here, Congress made clear that the act proscribed by § 20A is insider trading involving fraud in violation of §§ 10(b) or 14(e). Any private right of action under Rule 14e-3, whether granted in § 20A or implied under § 14(e), exists only to the extent of a claim alleging misappropriation that falls within the proscription of the statute. *Lonberg*, 571 F.3d at 849 ("[R]egulations that do not encapsulate the statutory right and corresponding remedy are not privately enforceable. . . ."). Plaintiffs allege no such claim.

## IV. Plaintiffs Fail to State a Claim for Violations of Rule 14e-3.

### A. Plaintiffs Do Not Adequately Allege Substantial Steps.

The Motion explained that Plaintiffs' "substantial steps" allegations fail under § 14(e) and Rule 14e-3 because none of the alleged "steps" "relate[s] to a tender offer." Mot. 27-34. The Opposition only reinforces this. For example, Plaintiffs showcase ten of their "allegations and objective facts" to "show that Valeant took substantial steps toward a tender offer before Pershing's trades." Opp'n 28-29. But these allegations are not tied to a tender offer, and none (other than assertions about the Relationship Agreement, discussed below) even reference the possibility of a tender offer. *See, e.g., id.* ((i) ("potential Allergan transaction"), (ii) (unspecified "offer"), (v) ("[h]ostile cash and stock merger"), (vi) (unspecified "bid"), (viii) ("[h]ostile cash and stock merger"); (ix) (unspecified transaction)). Thus they are not "substantial steps" under Rule 14e-3. *See* SEC Release, 1980 WL 20869, at *6 (listing example substantial steps that each expressly connect to a tender offer). Plaintiffs' argument—that Defendants' election to commence a tender offer months later retroactively relates these acts to a tender offer—is "a wholesale adoption of the

**DEFENDANTS' REPLY BRIEF**

1    familiar logical fallacy, *post hoc ergo procter hoc* (literally, 'after this, therefore

2    because of this')." *Choe v. I.N.S.*, 11 F.3d 925, 938 (9th Cir. 1993) (Alarcon, J.,

3    concurring and dissenting). That rank speculation is not sufficient to state a claim.

4    *Accord Sunward Corp. v. Dun & Bradstreet, Inc.*, 811 F.2d 511, 522 n.8 (10th Cir.

5    1987) ("[A] conclusion based upon such reasoning is not a reasonable inference but is

6    mere speculation and conjecture.").

7         Plaintiffs' reliance on their allegations concerning the Relationship Agreement

8    is similarly misplaced. *See* Mot. 32-34. While the Court noted in *Allergan I* that

9    "Defendants stating in a contract that they had not taken any steps toward a tender

10   offer does not necessarily make it so," *Allergan I,* dkt. 234 at 13, it also does not

11   follow that Defendants' statement of compliance with the law may be construed as a

12   plausible allegation of the precise opposite—that Defendants were taking substantial

13   steps towards a tender offer. Such a bare allegation is insufficient on its face.

14   *Rombach v. Chang*, 355 F.3d 164, 176-77 (2d Cir. 2004). The AC's only other

15   allegations that specifically relate to a tender offer are conclusory and need not be

16   accepted as true on a motion to dismiss. *See, e.g.,* AC ¶¶ 58, 68, 73.

17        Finally, Plaintiffs' argument that proxy contests can precede tender offers

18   (Opp'n 31-32) is beside the point. Section 14(e) and Rule 14e-3 only regulate

19   activities that directly relate to tender offers. Mot. 27-29. Plaintiffs' repeated

20   allegations regarding Valeant's pursuit of a "merger," "business combination," or

21   "hostile takeover" do not relate to a tender offer, and Plaintiffs' speculation cannot

22   supply the necessary relation. *Id.* Indeed, Plaintiffs concede that these allegations are

23   merely "consistent" with steps to commence a tender offer, which is not enough to

24   state a claim. *Iqbal v. Ashcroft*, 556 U.S. 662, 678 (2009).[24]

25

26

27   ────────────────────
     [24] These allegations are also just as consistent, of course, with other forms of

28   unsolicited or contested business combinations.

**DEFENDANTS' REPLY BRIEF**

**B.     The Definition of "Offering Person" Defeats Plaintiffs' Claim.**

Plaintiffs also ignore entirely the Motion's argument that Pershing qualifies as an "Offering Person" under the express language of Rule 14e-3, and instead offer strawman rebuttals to arguments Defendants made in *Allergan I. See Allergan I*, dkt. 234 at 14-22. Yet, those arguments are not at issue here, and the argument raised in *this* motion was neither raised in the prior litigation, nor contested in the Opposition.

As the Court noted in its decision denying a preliminary injunction in *Allergan I*, the parties there did not cite and the Court was not "able to find any legal authority directly addressing how to distinguish between a co-offering person and 'any other person' for Rule 14e-3 purposes." *Id.* at 16. The Court did, however, find certain issues salient to its analysis. First, it recognized that it must be possible for there to be more than one offering person. *Id.* Second, it found that—contrary to the principal argument Defendants made in *Allergan I*—an "offering person" for the purposes of Rule 14e-3 was not the same as a "bidder" for the purposes of § 13(d), 15 U.S.C. § 78m(d), and related rules. *Id.* 18-20. And third, it found that any test to be adopted needed to address "warehousing"—"the practice of the tender offeror intentionally leaking information to institutional investors to allow those other entities to make early trades before other investors heard about the tender offer." *Id.* at 17.

Finding neither party's arguments completely persuasive, and recognizing that neither the SEC nor Congress had "provided clear guidance in this area," the Court recognized that it "must do its best to interpret existing laws and regulations and to apply them to the cases before the Court in a manner faithful to their text and purpose." *Id.* at 20. It ultimately determined that, on the provisional record and arguments before it, Allergan had "raised serious questions as to whether Pershing Square is a co-offering person." *Id.* In that provisional ruling, the Court was "not bound to decide doubtful and difficult questions of law or disputed questions of fact." *Int'l Molders' & Allied Workers' Local Union No. 164 v. Nelson*, 799 F.2d 547, 551 (9th Cir. 1986) (internal quotations omitted). Rulings on a "preliminary injunction are

**DEFENDANTS' REPLY BRIEF**

1    not binding at trial on the merits," *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395

2    (1981), much less in any future case "even before the same judge." *See Kessler v.*

3    *Assocs. Fin. Servs. Co.*, 573 F.2d 577, 579 (9th Cir. 1977). Nothing prevents the court

4    from revisiting its legal rulings on the prior motion, particularly when faced with

5    cogent new arguments not presented in the prior proceedings.[25]

6        The Motion carefully avoided repeating arguments the Court addressed as to the

7    meaning of "offering person" in *Allergan I*. Instead, Defendants advanced a simple

8    premise, which Plaintiffs nowhere address: Rule 14e-3 itself defines "offering person"

9    to mean "any person [that] has taken a substantial step or steps to commence, or has

10   commenced, a tender offer." 17 C.F.R. § 240.14e-3(a). Thus, as the SEC explained,

11   "Rule 14e-3(a) does not proscribe purchases or sales of securities to be sought or

12   sought in a tender offer by the person who has taken a substantial step or steps to

13   commence or has commenced the tender offer." Exchange Act Release No. 34-

14   17,120, 1980 WL 20869, at *2 (Sept. 4, 1980). By any measure, Plaintiffs allege that

15   Pershing meets the definition of an "offering person" in Rule 14e-3.

16       This definition, set forth in the rule itself, also satisfies the concerns the Court

17   raised in its ruling in *Allergan I*. *First* and foremost, it provides clear—and indeed,

18   explicit—guidance from the SEC on who counts as an "offering person." As the

19   Supreme Court has explained, "[w]hen a statute includes an explicit definition, we

20   must follow that definition, even if it varies from that term's ordinary meaning."

21   *Stenberg v. Carhart*, 530 U.S. 914, 942 (2000). "A legislature, best knowing its own

22

23       [25]   *See Starbuck v. City & Cnty. of S.F.*, 556 F.2d 450, 459 & n.13 (9th Cir. 1977)
     (upholding grant of a motion to dismiss following grant of a preliminary injunction
24   in a sister case); *DiLaura v. Power Auth. of State of N.Y.*, 982 F.2d 73, 77 (2d Cir. 1992)
     (dismissing case after grant of a preliminary injunction because a preliminary
25   injunction "does not preclude the parties in any way from litigating the merits of the
     case"); *Winforge, Inc. v. Coachmen Indus., Inc.*, 2007 WL 854025, at *1 n.1 (S.D.
26   Ind. Mar. 13, 2007) ("The standard of review for granting preliminary injunctive relief
     is wholly separate from that governing dismissal of claims, and thus does not
27   foreclose a full analysis" on a later motion to dismiss).

28

-25-

**DEFENDANTS' REPLY BRIEF**

1  intent, which defines the meaning of a word, not only exercises its legislative power,

2  but does so with the explicit goal to provide a correct understanding of its intention,

3  and thus to facilitate the primary judicial inquiry of statutory interpretation." 2A R.

4  Singer, *Sutherland Statutory Construction* § 47:7 (2014 online ed.). "Ordinarily,

5  judges apply text-specific definitions with rigor." A. Scalia & B. Garner, *Reading*

6  *Law: The Interpretation of Legal Texts* 227 (2012).

7          This also accords with the only case to address the issue of multiple offering

8  persons. *See Hollywood Casino Corp. v. Simmons*, 2002 WL 1610598, at *3 (N.D.

9  Tex. July 18, 2002). There, a "well-known corporate 'raider'" allegedly joined forces

10  with a former CEO with significant stockholdings to take over a company. *Id.* at *2.

11  Like here, the alleged "raider" purchased a toehold in the company and agitated for

12  change. *Id.* at *1. Asserting that the raider violated Rule 14e-3, plaintiff alleged that

13  "defendants—working as a group—commenced a 'creeping' tender offer," even

14  though the ex-CEO would ultimately control the company. *Id.* at *3. Under those

15  facts—where all the members of the group participated in commencing the tender

16  offer—the court granted a motion to dismiss, holding that under plaintiff's theory both

17  the raider and the ex-CEO would be "offering persons," such that "information

18  transferred between [them and their affiliated parties] would not be transferred to

19  'another'" under Rule 14e-3. *Id.*

20          *Second*, by following the definition within Rule 14e-3 itself, there is no need to

21  rely on interpretive gloss given to related terms, such as the use of "bidder" in various

22  disclosure regulations, about which the Court expressed concern in *Allergan I*.

23          *Third*, the rule's definition of "offering person" differentiates warehousing—a

24  form of insider trading with which both the SEC and this Court have expressed

25  concern, *see Chiarella v. United States*, 445 U.S. 222, 233-35 (1980); *O'Hagan*, 521

26  U.S. at 673 n.17; SEC, *Instit. Inv. Study Report*, H.R. Doc. No. 92-64, 92d Cong., 1st

27

28

Sess. (1971)[26]—from an offering person's active participation in a corporate acquisition. As is manifest from the definitions of warehousing employed in the case law, the only actions a typical warehouser takes are to purchase based on the information and to tender in support of the offer.[27] In contrast, an offering person who takes "substantial steps" necessarily takes an active role in the tender. [28]

Under this test, Plaintiffs have pleaded themselves out of a claim. Mot. 26-27. Plaintiffs allege that Pershing took a host of steps Plaintiffs identify as substantial steps towards the commencement of a tender offer, such as executing the relationship agreement, conducting due diligence, drafting documents, and acquiring a toehold interest in Allergan. *See, e.g.,* AC ¶¶ 12, 55, 67-68, 86. While Pershing disagrees that these acts are "substantial steps" under Rule 14e-3, if Plaintiffs are correct that they are "substantial steps," then Pershing, like Valeant, is an "offering person" outside of Rule 14e-3's proscription against trading because the AC alleges Pershing took the same steps as Valeant. Mot. 26-27. By Plaintiffs' own allegations, neither Pershing nor Valeant is an "other person" under Rule 14e-3, and the AC should be dismissed.

### C.  The AC Does Not Adequately Plead Scienter.

Plaintiffs do not dispute that Rule 14e-3 imposes a scienter requirement and that the traditional Exchange Act scienter requirement—willfulness, or, at a minimum, severe recklessness—is the applicable standard. Mot. 34. Plaintiffs argue, however, that Rule 14e-3's scienter requirement is "extremely limited," and that the AC adequately pleads scienter. Opp'n 32-36. Both arguments fail.

---

[26]  *O'Hagan* recognized that Rule 14e-3 was adopted to address warehousing, but declined to decide whether the "proscription of warehousing falls within its § 14(e) authority to define or prevent fraud." 521 U.S. at 673 n.17.

[27]  *See Chiarella*, 445 U.S. at 234 (warehousing is "when a corporation gives advance notice of its intention to launch a tender offer to institutional investors who then are able to purchase stock in the target company before the tender offer is made public and the price of shares rises.").

[28]  At the same time, tender offer participants who trade on the basis of material non-public information that relates to a tender offer, in breach of a duty of confidence, will remain liable under well-settled Rule 10b-5 law. *See O'Hagan*, 521 U.S. at 661.

**DEFENDANTS' REPLY BRIEF**

1    Initially, because Rule 14e-3 defines an "offering person" as one who has taken

2    substantial steps to commence or has commenced a tender offer, Plaintiffs cannot

3    simply plead (as they do) that the information came from Valeant and that Valeant

4    was contemplating a merger. Plaintiffs must plead that Pershing knew Valeant

5    qualified as an *offering person—i.e.,* that Pershing knew Valeant had taken substantial

6    steps towards a *tender offer*. *See* Mot. 34-35. Because Plaintiffs do not make such

7    allegations, Plaintiffs have not pleaded that Pershing knew the information "was

8    acquired by a person with the required status." *SEC v. Ginsburg*, 362 F.3d 1292, 1304

9    (11th Cir. 2004). Moreover, Plaintiffs do not dispute that, to plead a Rule 14e-3

10   violation, they must establish that "the information *in fact* does relate to a tender

11   offer." *Id.* (emphasis added); *see also* Opp'n 34. Here, any information exchanged

12   could not in fact relate to a tender offer unless Plaintiffs establish that Valeant

13   consciously intended a tender offer at that time of the trades. Mot. 36.

14   Plaintiffs fail to rebut these arguments. They instead rely on decisions from

15   other Circuits finding that a third party can violate Rule 14e-3 even if she does not

16   know whether the specific information provided concerns a tender offer or what steps

17   had been taken by the tender offeror. Opp'n 32-34.[29] But in each of those cases, (a)

18   steps were in fact taken by the acquiror to commence a tender offer, and (b) the

19   information in fact related to that planned tender offer. Here, the information did not

20   and could not relate to a tender offer unless Valeant planned such an offer at the time

21   PS Fund 1 traded. And Pershing could not know that Valeant was an "offering

22   person" unless it is alleged to have known substantial steps had been taken.

23   Further, Plaintiffs cannot meet their burden of pleading specific facts

24   demonstrating a "strong inference" of scienter, 15 U.S.C. § 78u-4(b), by arguing that

25   the AC pleads "'whatever' level of knowledge the law can possibly require." Opp'n

---

[29]   *See SEC v. Sargent*, 229 F.3d 68 (1st Cir. 2000); *SEC v. Mayhew*, 121 F.3d 44 (2d Cir. 1997); *SEC v. Jacobs*, No. 1:13-cv-01289-SO (N.D. Ohio Aug. 15, 2014); *United States v. O'Hagan*, 139 F.3d 641 (8th Cir. 1998); *Ginsburg*, 362 F.3d at 1292.

**DEFENDANTS' REPLY BRIEF**

33. Plaintiffs do not plead specific facts demonstrating Defendants' knowledge that a tender offer was planned and substantial steps had been taken in furtherance of it. Plaintiffs point to allegations that Defendants knew that Allergan was unlikely to be receptive to their offer. *Id.* at 35. But that does not give rise to an inference that Defendants knew a tender offer would follow. At most, it suggests that Defendants knew it would be necessary to replace the board. In fact, the allegations Plaintiffs cite do not even mention a tender offer—they discuss Defendants' efforts to call a special meeting of the board. *Id.* at 35 n.47; AC ¶¶ 75-77. Plaintiffs also point to allegations that Defendants undertook efforts to keep their bid proposal confidential. Opp'n 35-36. But those allegations are consistent with the innocent inference of an unsolicited merger proposal (not a tender offer), particularly given that the tender offer occurred months after the initial bid. The AC must be dismissed because Plaintiffs fail to identify factual allegations which, if true, would make "the malicious inference [] at least as compelling as any opposing innocent inference." *Zucco Partners, LLC* v. *Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009).

### D.   Plaintiffs Do Not Plead Tipper Liability as to Valeant.

Plaintiffs do not adequately allege "tipper" liability against the Valeant Defendants under Rule 14e-3(d) either. Mot. 37-40. Plaintiffs argue that the Valeant Defendants knew Pershing would trade on the provided information. Opp'n 36-37. But Rule 14e-3(d) does not apply whenever it is reasonably foreseeable the communication will result in "trading" in general. It applies only when "it is reasonably foreseeable that such communication is likely to result *in a violation* of this section." 17 C.F.R. § 240.14e-3(d)(1) (emphasis added)).[30] It is therefore of no moment that "Valeant knew Ackman would trade on the tip"; that is not the applicable standard under Rule 14e-3(d). Opp'n 36. Plaintiffs have nowhere alleged facts

---

[30]   Plaintiffs quote selectively from *SEC* v. *Drescher*, but there the court required the plaintiff to plead that "it was reasonably foreseeable that the communication[] . . . could result in a violation of the Rule," consistent with the language of the Rule. 1999 WL 946864, at *5 (S.D.N.Y. Oct. 19, 1999); Opp'n 36 n.49.

**DEFENDANTS' REPLY BRIEF**

1   demonstrating that it was "reasonably foreseeable" that communicating information to

2   Pershing would result in a violation of Rule 14e-3; quite the opposite, the Valeant

3   Defendants affirmatively believed, and were advised, that no violation would result.

4   Mot. 38-39.

5         For the same reason, the Valeant Defendants fall within Rule 14e-3(d)'s "good

6   faith" exception. The Opposition asserts that the exception does not apply if the

7   offering person knows the recipient will trade on the information, citing an SEC

8   release. Opp'n 37 (citing Nicholas Decl. Ex. 12 at 60,417). But the citation is

9   misleading: the SEC release states that the exception is unavailable if "the person who

10  communicates the information knows or has reason to know that the person

11  enumerated in Rule 14e-3(d)(1)(i) through (iii) is going to violate Rule 14e-3."

12  Nicholas Decl. Ex. 12 at 60,417. Plaintiffs' allegations only that the Valeant

13  Defendants knew Pershing would trade are not enough.

14        Finally, Plaintiffs fail to plead scienter as to Michael Pearson. The Opposition

15  includes a list of paragraphs in the AC supposedly alleging "Pearson's knowledge of

16  and desire to effectuate Defendants'" plan. Opp'n 37-38. But those paragraphs relate

17  to Mr. Pearson's alleged knowledge that Valeant would make an unsolicited bid for

18  Allergan and that Pershing would purchase Allergan stock. They do not support an

19  inference that Mr. Pearson knew or was reckless in not knowing, when the

20  information in question was communicated to Pershing in February, that the bid

21  would lead to a tender offer months later. Setting aside the rhetoric about

22  "warehousing schemes" and "kick backs," Plaintiffs point to no particularized factual

23  allegations in the AC that give rise to the "strong inference" of scienter necessary to

24  plead a fraud claim against Mr. Pearson under the PSLRA.

25  ## CONCLUSION

26        For the foregoing reasons, and those explained in the Motion, the Court should

27  dismiss the AC with prejudice.

28

**DEFENDANTS' REPLY BRIEF**

1

Dated: October 5, 2015

Respectfully submitted,
KIRKLAND & ELLIS LLP

2

3

By: /s/ Mark Holscher

4

5

Mark Holscher (SBN 139582)
mark.holscher@kirkland.com
Michael Shipley (SBN 233674)
michael.shipley@kirkland.com
Jay Bhimani (SBN 267689)
jay.bhimani@kirkland.com
Austin Norris (SBN 284603)
austin.norris@kirkland.com
KIRKLAND & ELLIS LLP
333 South Hope Street
Los Angeles, California 90071
Telephone:   (213) 680-8400
Facsimile:    (213) 680-8500

6

7

8

9

10

11

12

13

14

*Attorneys for Pershing Square Capital
Management, L.P., PS Management GP, LLC,
PS Fund 1, LLC, and William A. Ackman*

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-31-
**DEFENDANTS' REPLY BRIEF**

1    Dated: October 5, 2015           SULLIVAN & CROMWELL LLP

2

                                  By: /s/ Brian T. Frawley

3

4                               Robert A. Sacks (SBN 150146)
                                 sacksr@sullcrom.com

5                               Edward E. Johnson (SBN 241065)
                                 johnsonee@sullcrom.com

6                               Katherine A. Taylor (SBN 289711)

7                               taylork@sullcrom.com
                                 1888 Century Park East, Suite 2100

8                               Los Angeles, California 90067-1725

9                               Telephone: (310) 712-6600

10                              Facsimile:   (310) 712-8800

11                               Brian T. Frawley (*pro hac vice*)

12                               frawleyb@sullcrom.com
                                 Max S. Heuer (*pro hac vice* to be filed)

13                               heuerm@sullcrom.com

14                               125 Broad Street
                                 New York, New York 10004-2498

15                               Telephone:  (212) 558-4000

16                               Facsimile:   (212) 558-3588

17                               *Attorneys for Defendants Valeant*

18                               *Pharmaceuticals International, Inc., Valeant*
                              *Pharmaceuticals International and Michael*

19                               *Pearson*

20

21

22

23

24

25

26

27

28

**DEFENDANTS' REPLY BRIEF**

1

2

## SIGNATURE CERTIFICATION

3

4

5

        Pursuant to L.R. 5-4.3.4(a)(2)(i), I hereby attest that all other signatories listed, and on whose behalf the filing is submitted, concur in the filing's content and have authorized this filing.

6

7

Dated: October 5, 2015                  KIRKLAND & ELLIS LLP

8

9

                                        By: /s/ Mark Holscher
                                         Mark Holscher

10

11

                                        *Attorneys for Pershing Square Capital Management, L.P., PS Management, GP, LLC, PS Fund 1, LLC, and William A. Ackman*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**DEFENDANTS' REPLY BRIEF**