1
2
3
4
5
6
7

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

| | |
|---|---|
| ANTHONY BASILE ET AL., | Case No.: SACV 14-2004-DOC (JCGx) |
| Plaintiffs, | |
| vs. | |
| VALEANT PHARMACEUTICAL INTERNATIONAL, INC. ET AL. | ORDER DENYING MOTION TO DISMISS [71] |
| Defendants. | |

Before the Court is Defendants' Motion to Dismiss Plaintiffs' Amended Complaint ("Motion") (Dkt. 71). Having reviewed the moving papers and considered the parties' arguments, the Court hereby DENIES Defendants' Motion.

## I.  Background

 The Court is generally familiar with the facts of this matter given the related case, *Allergan, Inc., et al. v. Valeant Pharm., Inc., et al.* ("*Allergan I*"), Case No. 14-1214.[1] In February 2014, Canadian-based pharmaceutical company Valeant, and hedge fund management company Pershing Square, teamed up to help Valeant pursue a combination with Irvine-based pharmaceutical company Allergan. Between February and April, Pershing Square acquired 9.7% of Allergan's shares. In June 2014, Valeant publicly announced a tender offer for Allergan shares after Allergan's board of directors had rebuffed an unsolicited merger proposal.

In this action, Plaintiffs State Teachers Retirement System of Ohio ("Ohio STRS"), Iowa Public Employees Retirement System ("Iowa PERS"), and Patrick T. Johnson (collectively, "Plaintiffs") have brought a class action against Defendants Valeant Pharmaceuticals International, Inc. ("Valeant"), AGMS, Inc., Michael Pearson ("Pearson"), Pershing Square Capital Management, L.P. ("Pershing Square"), PS Management GP, LLC, PS Fund 1, LLC, and William Ackman ("Ackman") (collectively, "Defendants").[2] Specifically, Plaintiffs allege that Defendants violated federal securities laws and regulations in connection with Valeant's tender offer for Allergan and in connection with Valeant and Pershing Square's proxy solicitations. In the instant Motion, Defendants seek to dismiss Plaintiffs' First Amended Complaint ("FAC") (Dkt. 60).

### A.  Facts

The following facts are drawn from Plaintiffs' FAC.

Valeant initially approached Allergan regarding a potential merger between their companies in September 2012, but Allergan declined the invitation. *See id.* ¶¶ 48-49.

---

[1] In the related case, the Court addressed several of the same issues discussed below. *See* Order Granting In Part Motion for Preliminary Injunction ("Preliminary Injunction Order"), November 4, 2014, Case No. 14-1214 (Dkt. 234).

[2] For clarity, the Court will refer to Defendants Valeant Pharmaceuticals International, Inc., Valeant Pharmaceuticals International, and AGMS, Inc. as "Valeant," and to Defendants Pershing Square Capital Management, LP, PS Management, GP, LLC, and William A. Ackman as "Pershing Square." Defendant PS Fund 1 will be referred to separately.

On February 4, 2014, Valeant's CEO and Board Chairman J. Michael Pearson had a face-to-face introductory meeting with William Ackman of Pershing Square. *Id.* ¶ 56. They discussed the possibility of partnering in acquisitions, including the potential acquisition of Allergan. *Id.* The meeting was set up by William F. Doyle, a "special advisor" from Pershing Square who personally knew Ackman. *Id.* ¶ 56. Pearson and Ackman followed up on this meeting through a phone call two days later. *Id.* ¶ 62. On the call, they discussed a "potential structure in which Valeant would identify a target and disclose it confidentially to Pershing Square, after which Pershing Square could decide whether it was interested in working with Valeant." *Id.*

Around this time, Pearson scheduled a meeting with Allergan's CEO David Pyott, in hopes that Mr. Pyott would be willing to discuss a potential transaction between Allergan and Valeant. *Id.* ¶ 58. Beginning on February 6, Valeant engaged law firm Sullivan & Cromwell LLP ("Sullivan & Cromwell") to work on a potential Allergan-Valeant transaction. *Id.* ¶ 63. Valeant also hired Skadden, Arps, Slate, Meagher & Flom LLP and Osler, Hoskin & Harcourt LLP for the same purpose. *Id.* On February 7, 2014, the Finance and Transactions Committee of Valeant's board of directors held a telephonic meeting in which it discussed a potential Allergan-Valeant combination. *Id.* ¶ 64.

After a phone call between Ackman and Pearson on February 6, Pershing Square and Valeant signed a confidentiality agreement. *See id.* ¶ 62. Pearson then informed Ackman of Valeant's interest in a potential Allergan transaction. *Id.* ¶ 65. Plaintiffs allege that armed with the "information that Valeant would be proceeding with a takeover of Allergan, Ackman and Pershing formed a limited liability company, 'PS Fund 1,' on February 11, 2014." *Id.* ¶ 67.

On February 10, analysts from Sanford B. Bernstein & Co. published a report on their meeting with Allergan. *Id.* ¶ 70. The report stated that an acquisition of Allergan by Valeant "was [n]ot a good fit" and that "shareholders w[ould] hesitate to take Valeant paper." *Id.* ¶ 70.

Valeant's board of directors met several times between February 7 and February 21 to discuss the potential acquisition. *See id.* ¶ 80. During this time, Valeant and Pershing Square's respective lawyers negotiated and drafted a contractual and financial agreement related to the purchase of equity in Allergan (the "Relationship Agreement"). *Id.* ¶¶ 84-85. The Relationship

Agreement was finalized and executed on February 25, 2014. *Id.* ¶ 85. Under the Relationship Agreement, Valeant agreed to contribute $75.9 million to PS Fund 1 to assist with the Pershing Defendants' acquisition of a significant stake of Allergan's stock. *Id.* ¶ 95. Further, a draft of the agreement identified Pershing Square and Valeant as "co-bidders" in the event that Valeant launched a tender offer. *Id.* ¶ 86.

On February 25, 2014, the Co-Bidder Entity, PS Fund 1, began to purchase Allergan stock. *See id.* ¶ 92. Between February 25 and April 21, 2014, PS Fund 1 acquired 9.7% of Allergan's stock. *Id.* ¶ 6. This occurred through a series of transactions. Specifically, on February 25 and 26, PS Fund 1 acquired approximately 600,000 shares of the outstanding common stock of Allergan. *Id.* ¶ 98. Then, between March 3 and April 8, 2014, PS Fund 1 acquired additional Allergan shares through over-the-counter ("OTC") call options. *Id.* ¶ 99. Each of PS Fund 1's "trades were executed through a single counterparty, Nomura International plc ("Nomura")." *Id.*

These purchases brought PS Fund 1's total holdings up to 4.9%. *Id.* ¶ 6. Finally, between April 11 and April 21, 2014, PS Fund 1 increased its holdings to approximately 14 million shares, or nearly 10% of Allergan's total stock. *Id.* ¶ 6. These additional purchases were made through an equity forward contract entered between PS Fund 1 and Nomura. *Id.* ¶ 107. From the beginning of these purchases until April 22, 2014, Allergan's stock price increased from $125.54 per share, to a closing price of $163.65 per share. *Id.* ¶ 114.

On April 21, 2014, PS Fund 1 publicly disclosed its 9.7% stake in Allergan through a Schedule 13D filing. *See Id.* ¶ 109. On the following day, Valeant publicly announced it wished to negotiate a merger agreement with Allergan's board; Valeant also provided an unsolicited merger offer to Allergan that same day. *Id.* ¶ 110. On May 13, 2014, Valeant and Pershing Square filed a Preliminary Proxy Statement with the SEC calling for a non-binding "shareholder referendum" to pressure Allergan's board to negotiate with Valeant. *Id.* ¶ 140.

Plaintiff alleges that under the façade of a merger agreement, Valeant undertook an aggressive hostile takeover campaign. *Id.* ¶ 117. This campaign included a public relations

component, conference calls with equity analysts, and direct communication with Allergan's customers and employers. *Id.* ¶¶ 118, 120.

On June 17, 2014, Valeant announced a tender offer for Allergan. *Id*. ¶ 133. Upon announcing the tender offer, Pearson explained: "On April 22, we announced our offer for Allergan. We suspected at the time it would ultimately have to go directly to Allergan shareholders. We were correct." *Id.* ¶ 13.

Plaintiffs and the putative class members sold Allergan common stock during between February 25 and April 21, 2014. *Id.* ¶ 173.

### B. Procedural History

Plaintiffs brought suit on December 16, 2014, alleging three claims. First, Plaintiffs allege all Defendants violated § 14(e) of the Securities Exchange Act ("Exchange Act") and corresponding Rule 14e-3, which prohibits trading while in possession of nonpublic material information in connection with a tender offer. *Id*. ¶¶ 180-190. Second, Plaintiffs allege all Defendants violated § 20A(a) of the Exchange Act. *Id.* ¶¶ 191-197. Third, Plaintiffs allege Pershing Square, PS Management, Ackman and Pearson violated § 20(a) of the Exchange Act because they acted as "controlling persons of PS Fund 1 within the meaning of Section 20(a) of the Exchange Act." *Id*. ¶¶ 198-207.

Defendants brought the instant Motion on August 7, 2015 (Dkt. 71). Plaintiffs filed their Opposition on September 18, 2015 (Dkt. 85). Defendants replied on October 5, 2015 (Dkt. 90). The Court heard oral argument on October 26, 2015 (Dkt. 96).

### II.    Legal Standard

Under Federal Rule of Civil Procedure 12(b)(6), a complaint must be dismissed when a plaintiff's allegations fail to set forth a set of facts which, if true, would entitle the complainant to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (holding that a claim must be facially plausible in order to survive a motion to dismiss). The pleadings must raise the right to relief beyond the speculative level; a plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citing *Papasan v. Allain*, 478 U.S. 265,

286 (1986)). On a motion to dismiss, the Court accepts as true a plaintiff's well-pleaded factual allegations and construes all factual inferences in the light most favorable to the plaintiff. *See Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). Courts are not required to accept as true legal conclusions couched as factual allegations. *Iqbal*, 556 U.S. at 678.

In evaluating a Rule 12(b)(6) motion, review is ordinarily limited to the contents of the complaint and material properly submitted with the complaint. *Van Buskirk v. Cable News Network, Inc.*, 284 F.3d 977, 980 (9th Cir. 2002); *Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.*, 896 F.2d 1542, 1555 n.19 (9th Cir. 1990). Under the incorporation by reference doctrine, the court may also consider documents "whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading." *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994), *overruled on other grounds by* 307 F.3d 1119, 1121 (9th Cir. 2002). The court may treat such a document as "part of the complaint, and thus may assume that its contents are true for purposes of a motion to dismiss under Rule 12(b)(6)." *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).

Dismissal with leave to amend should be freely given "when justice so requires." Fed. R. Civ. P. 15(a)(2). This policy is applied with "extreme liberality." *Morongo Band of Mission Indians v. Rose*, 893 F.2d 1074, 1079 (9th Cir. 1990); *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (holding that dismissal with leave to amend should be granted even if no request to amend was made). Dismissal without leave to amend is appropriate only when the court is satisfied that the deficiencies in the complaint could not possibly be cured by amendment. *Jackson v. Carey*, 353 F.3d 750, 758 (9th Cir. 2003).

### III.   Discussion

Defendants move to dismiss Plaintiffs' FAC on several grounds. Specifically, they argue (1) Plaintiffs Ohio STRS and Johnson lack standing to sue for insider trading; (2) there is no implied right of action under Rule 14e-3; (3) Plaintiffs have not pled an underlying violation of the Exchange Act; (4) Plaintiffs have failed to state a claim for relief under Rule 14e-3; and (5)

the third claim is derivative of the other claims and therefore must be dismissed. *See generally* Mot. The Court will address these arguments in turn.

### A. Standing

Defendants argue that Plaintiffs Ohio STRS and Johnson lack standing because they cannot satisfy the contemporaneous trading requirement. They advance two core arguments: first, PS Fund 1's trades with Nomura should not be considered as part of the contemporaneous trading analysis; and second, Plaintiffs did not sell securities of the "same class" that Defendants sold. Mot. at 13.

### 1.    Contemporaneous Trading Requirement

Private plaintiffs may bring an insider trading suit only if they traded "contemporaneously" with the defendant. 15 U.S.C. § 78t-1(a). This requirement limits the private right of action to those who actually traded with someone who had an unfair advantage. *Neubronner v. Milken*, 6 F.3d 666, 670 (9th Cir. 1993) (citing *Wilson v. Comtech Telcomm. Corp.*, 648 F.2d 88 (2d Cir. 1981)); *see also Buban v. O'Brien,* No. C 94-0331 FMS, 1994 WL 324093, at *1 (N.D. Cal. June 22, 1994) ("The purpose of the 'disclose or abstain' rule is to protect only those who might actually have traded with insiders.") (citation omitted).

Contemporaneous trading is a "circumstance constituting fraud" and must be pleaded with particularity under Fed. R. Civ. P. 9(b). *Neubronner*, 6 F.3d 666 at 671-672. Accordingly, the class representative must allege with specificity that it traded contemporaneously with defendants. *Alfus v. Pyramid Tech. Corp.,* 745 F. Supp. 1511, 1523 (N.D. Cal. 1990). It is insufficient that some class members traded contemporaneously as the lead plaintiff may not represent class members on claims it does not share. *See La Mar v. H & B Novelty & Loan Co.*, 489 F.2d 461, 465 (9th Cir. 1973). The contemporaneous requirement was designed to "preserve the notion that only plaintiffs who were harmed by the insider could bring suit, while nonetheless making it possible for such persons to bring suit." *Buban*, 1994 WL 324093, at *3.

The "exact contours" of contemporaneous trading have never been defined. *See Neubronner*, 6 F.3d at 670. Certain courts have confined "contemporaneous" to trades occurring the same day as the insiders' trades. *See In re AST Research Sec. Litig.*, 887 F. Supp. 231, 233

(C.D. Cal. 1995). Other courts, including this one, have found that longer periods of time may satisfy the contemporaneous trading requirement in certain circumstances. *See Middlesex Ret. Sys. v. Quest Software, Inc*., 527 F. Supp. 2d. 1164, 1196 (C.D. Cal. 2007) (finding eight days is contemporaneous); *see also City of Westland Police & Fire Ret. Sys. v. Sonic Solutions*, No. C 07-0511 CW, 2009 WL 942182, at *12 (N.D. Cal. Apr. 6, 2009) (finding purchase of stock nine days after a sale was contemporaneous). While the Ninth Circuit has not defined a specific time period, it has advised that trades must occur at "about the same time" to be considered contemporaneous. *Brody v. Transitional Hosps. Corp*., 280 F.3d 997, 1001 (9th Cir. 2002) (noting that a contemporaneous trading period of two months "would gut the contemporaneous trading rule's premise").

Here, Defendants acknowledge that Iowa PERS's sales were contemporaneous with PS Fund 1's stock purchases. *See* Mot. at 13. However, the parties dispute whether Plaintiffs Ohio STRS and Johnson's sales satisfy the contemporaneous trading requirement.

The parties agree on the dates of the relevant transactions. Ohio STRS sold Allergan stock on March 26, April 14, and April 21, 2014. *See* Certification Pursuant to Federal Securities Law (Dkt. 18-2) Ex. A at 2. Plaintiff Johnson sold Allergan stock on March 12, 2014. FAC Certification to Federal Securities Law (Dkt. 60) at 66. PS Fund 1 purchased 600,000 shares of Allergan stock on the open market on February 25 and 26, 2014; PS Fund 1 purchased OTC call options through Nomura between March 3 and March 8, 2014 and again from April 11 to 17, 2014; and PS Fund 1 entered into an OTC equity forward contract that involved 3.45 million shares of Allergan stock on April 21, 2015. FAC ¶¶ 98, 107, 173.

However, the contemporaneous trading analysis is complicated by two issues in this case. Defendants first contend that only PS Fund 1's open market common stock trades on February 25 and February 26 should be considered in determining whether Plaintiffs' sales were contemporaneous, not PS Fund 1's trades with Nomura between March 3 and April 21. Because Plaintiff Johnson's sale occurred approximately two weeks and Plaintiff Ohio STRS's first sale occurred exactly one month after PS Fund 1's open market purchases on February 25 and 26, 2014, the sales should not satisfy the contemporaneous trading rule. Mot. at 14. Plaintiffs' sales

are also not contemporaneous with PS Fund 1's purchases, Defendants argue, because they were not in the "same class" – that is, Plaintiffs sold common stock while PS Fund 1 purchased options and equity forward contracts. *Id.*

Plaintiffs respond that Defendants cannot escape liability simply because they "executed those trades through pass through option contracts with Nomura," Opp'n at 10, and they argue Defendants' distinction between trading in options and equity contracts instead of common stock is immaterial. *Id.* at 11, 14.

### a.  PS Fund 1's Private Trades with Nomura & Nomura's Open Market Purchases of Allergan Stock

The Court must first determine whether PS Fund 1's trades with Nomura should be included as part of its contemporaneous trading analysis. Defendants cite to several cases that expound upon the rationale for the contemporaneous trading requirement. *See* Mot. at 9-12. However, these cases do not support Defendants' position that PS Fund 1's private trades with Nomura should be excluded from the contemporaneous trading analysis.

Rather, the limited authority on this issue suggests otherwise. Rule 14e-3 prohibits an insider with nonpublic information related to a tender offer from purchasing "*or caus[ing] to be purchased* . . . any of such securities or any securities convertible into or exchanagable for any securities or any option or right to obtain or to dispose of any of the foregoing, unless within a reasonable time prior to any purchase or sale such information and its source are publicly disclosed by press release or otherwise." 17 C.F.R. § 240.14e-3 (emphasis added). Thus, under the plain language of Rule 14e-3 and the accompanying regulations, entities can be held liable for causing others to purchase securities on their behalf. Because Rule 14e-3 explicitly proscribes using material, nonpublic information to cause others to purchase securities, there is little basis for excluding Nomura's open purchases from the contemporaneous trading analysis.[3]

---

[3] At the hearing, Defendants argued the "cause" analysis under Rule 14e-3 was "irrelevant." Because the FAC stated PS Fund 1 traded with Nomura, Defendants contend the Court should disregard Nomura's open market purchases and instead only consider PS Fund 1's trades with Nomura for purposes of the standing analysis. This argument is misguided. Plaintiffs alleged sufficient facts at this stage to establish that PS Fund 1 directed Nomura to purchase Allergan stock on the open market. *See* FAC ¶ 107. Therefore, it is clearly relevant to the analysis. The fact that Plaintiffs separately alleged details related to PS Fund 1's private trades with Nomura should not preclude Plaintiffs from also referencing Nomura's open market purchases.

1    This is what Plaintiffs have alleged here: Defendants, using nonpublic information

2  related to a tender offer, deliberately caused Nomura to purchase Allergan stock on their behalf.

3  For instance, the FAC states that PS Fund 1 deliberately entered into an option contract with

4  Nomura and that Nomura "in fact acquired the common shares correlating to its contracts

5  requiring the delivery of those shares to Pershing." FAC ¶ 107. Taking this allegation as true, as

6  required at this stage in the litigation, Plaintiffs have adequately alleged that PS Fund 1 caused

7  Nomura to purchase shares of Allergan.[4] Thus, while Plaintiffs may not have traded face-to-

8  face[5] with Defendants on the open market, they could have traded directly with Nomura, who

9  allegedly purchased Allergan stock at Defendants' behest. Nomura's open market purchases,

10  therefore, are properly included in evaluating Plaintiffs' standing.

11    It follows that Defendants' private trades with Nomura involving Allergan stock should

12  be considered as part of the contemporaneous trading analysis. In *Johnson*, a case decided after

13  the Ninth Circuit's decision in *Brody*, a court in this Circuit reached a similar conclusion. There,

14  Defendant Tracinda Corporation argued that its sales with banks "must be excluded from class

15  treatment because they are private sales." *Johnson v. Aljian*, 257 F.R.D. 587, 593 (C.D. Cal.

16  2009). The *Johnson* court rejected this argument, finding that plaintiffs need only to allege that

17  "purchase[s] of a security that is actively traded in an efficient market made contemporaneous

18  with a sale by an insider in possession of material, non-publication information." *Id.* The court

19  determined that plaintiffs' private sales should not be exempt from the contemporaneous trading

20  analysis, reasoning "if Defendants' argument were adopted as law, then all a person would need

21  to do to avoid liability under § 20A would be to runnel sales of shares through a broker." *Id.*

22  (citation omitted) (internal quotations omitted). The Court finds the logic of *Johnson* directly

23  applicable here. After all, the *Johnson* court's conclusion is rational:  individuals and entities

24
25
26
27
28

[4] At oral argument, Defendants argued that Plaintiffs did not actually allege that Defendants caused Nomura to purchase Allergan stock. However, the FAC states that "every time Pershing bought an option to acquire Allergan stock, Nomura actually acquired those shares . . . ." FAC ¶ 107; *see also id.* ¶ 102 ("Ackman explained that, even though PS Fund 1 acquired its shares through Nomura, PS Fund 1's trading activity was reflected through actual open market purchases on the NYSE because 'our dealer in order to hedge the options they sell to us had to go into the market.'" Based on a natural reading of these allegations, and drawing all inferences in Plaintiffs' favor, the Court concludes this allegation establishes that Pershing caused Nomura to purchase Allergan stock.
[5] Defendants argue that since they entered into a "face-to-face" trade with Nomura, Plaintiffs could not possibly have traded with them. *See* Mot. at 13. But this narrow view ignores the clear language of Rule 14e-3 that prohibits an insider from causing another purchase to securities.

should not be permitted to use third parties in order to avoid liability under the insider trading laws.

Defendants argue the Court should ignore this portion of *Johnson* because it "comes from a section of the opinion addressing the impact of the fraud-on-the-market presumption on class certification—a point wholly unrelated to the issues relevant here." Reply at 6. However, a close reading of *Johnson* reveals the court was considering the same issue at issue here: whether "class members whose purchases are contemporaneous to the dates of those [private] sales lack standing." *Id.* at 593. Additionally, the reasoning from *Johnson* – that defendants cannot avoid liability by using a third-party broker – applies with equal force in this context. The *Johnson* court ultimately included plaintiffs' purchases were "contemporaneous with Tracinda's March 22, April 8, and June 8 [private] sales" *See id.* at 593-596. This Court is similarly persuaded that PS Fund 1's private dealings with Nomura should be included as part of the contemporaneous trading analysis.

To their credit, Defendants in their Reply acknowledge that a "defendant who makes unlawful insider trades through an agent such as a broker is liable to those with whom the broker places the trades." Reply at 7; *see also* Reply at 7 n.7 (citing 17 C.F.R. § 240.14e-3(a)). But Defendants then interpret this language to mean there must be a formal agency relationship between a defendant and third party in order for the defendant to be held liable. Because Plaintiffs do not allege a formal broker relationship between PS Fund 1 and Nomura, the trades between the two entities should not be considered for the contemporaneous trading analysis. Mot. at 16.

Specifically, Defendants argue that Plaintiffs do not allege facts to meet the three-part agency test discussed in this Court's opinion in *Lent v. JP Morgan Chase Bank*, No. SACV 11-345 DOC, 2011 WL 59711970 (C.D. Cal. Nov. 29, 2011).  But *Lent* concerned agency principles in a breach of contract case and Defendants cite no legal authority to suggest this formal agency test must be satisfied in the context of the contemporaneous trading rule.[6]

---

[6] In their Reply, Defendants also cite to *SEC v. Talbot*, 530 F.3d 1085 (9th Cir. 2008) for the proposition that formal agency principles govern unlawful insider trades made through a broker. *See* Reply at 6 n.7. However, the discussion of agency principles in *Talbot* concerned the fiduciary duties of a corporation's board members – it does not bear on the issue of PS Fund 1's relationship to Nomura. Additionally, at argument, Defendants cited to the recent Ninth Circuit's decision, *In re*

Further, Defendants have not provided the Court with a persuasive rationale for why it should accept this novel argument. Considering that the regulations accompanying Rule 14e-3 proscribe insiders from using material, nonpublic information to cause others to purchase securities, as discussed above, it would be odd to require a formal agency relationship between the insider and the person or entity caused to purchase securities. Thus, the Court is not persuaded by Defendants' attempt to import a formal agency test into the contemporaneous trading analysis.[7]

The allegations in the FAC sufficiently establish PS Fund 1 used Nomura to acquire shares on its behalf. Among these allegations are PS Fund 1 solely traded with Nomura to minimize its risk; Nomura acted "just like a broker" for PS Fund 1; and that Ackman referred to these trades as "our purchases." *Id.* ¶¶ 97, 102, 107. Taking these allegations as true, the Court finds that Plaintiffs have adequately alleged Defendants caused and used Nomura to acquire Allergan stock. As such, the Court finds that Defendants' purchases from Nomura should be included as part of the contemporaneous trading analysis.

Contrary to Defendants' suggestions, this conclusion is consistent with the rationale underlying Rule 14e-3 and insider trading law. As the Ninth Circuit recognized in *Brody*, "the [] requirement of Rule 14e-3 is designed to prevent the disadvantage that inheres in trading with an insider with superior access to information." *Brody*, 280 F.3d at 1003 (citation omitted). Plaintiffs' claims that Defendants used material, nonpublic information to gain an unfair advantage are entirely consistent with the underlying purpose of insider trading law.

### b. "Same Class" Requirement

The Court must next consider the "same class" requirement outlined in § 20(A) of the Exchange Act. Section 20A(a) provides:

---

*ChinaCast Educ. Corp. Secs. Litig.*, No. 12-57232, 2015 WL 6405680 (9th Cir. Oct. 23, 2015). But that case applied agency principles in the particular context of "when an employee's acts and intent are to be imputed as those of the company . . . ." *Id.* at *3. Thus, this case does not alter the Court's analysis.

[7] To the extent that agency principles apply in this context, Plaintiffs have alleged adequate facts to establish a relationship between Defendants and Nomura at this stage. Drawing all inferences in Plaintiffs' favor, the FAC has raised the possibility that PS Fund 1 had a formal agency relationship with Nomura's "beyond the speculative level," *Twombly*, 550 U.S. at 555. *See, e.g.*, FAC ¶¶ 102-107.

The Second Circuit has applied agency principles in considering a case where a broker purchased securities on a client's behalf without specific authorization. Opp'n at 19 n.20 (citing *Caiola v. Citibank, N.A., New York*, 295 F.3d 312, 317 (2d Cir. 2002). In *Caiola*, the Second Circuit determined that Plaintiff had adequately pleaded agency, relying on "the key fact [that] Caiola has alleged the purchases were made on his behalf . . . ." *Caiola*, 295 F.3d at 324. Here, Plaintiffs have sufficiently pleaded this critical fact: that Nomura's purchases were made on Defendants' behalf. *See* FAC ¶¶ 102-107.

> Any person who violates any provision of this chapter or the rules or regulations thereunder by purchasing or selling a security while in possession of material, nonpublic information shall be liable . . . to any person who, contemporaneously with the purchase or sale of securities that is the subject of such violation, has purchased (where such violation is based on a sale of securities) or sold (where such violation is based on a purchase of securities) securities of the same class.

Defendants interpret "securities of the same class" to mean the exact same type of security. Thus, since Plaintiffs traded only in common stock, they cannot establish standing based on PS Fund 1's purchase of OTC options and equity forward contracts. Mot. at 14.

But Defendants fail to provide any persuasive legal authority for this narrow interpretation of the insider trading laws.[8] In their Reply, Defendants rely heavily on the Eleventh Circuit's decision in *Clay v. Riverwood Int'l Corp.*, 157 F.3d 1259 (11th Cir. 1998) in support of their argument that call options and stocks should not be considered part of the "same class" under § 20A(a). *See* Reply at 8 n.8, 11. It is true that Judge Carnes' concurrence in *Clay*, which was later adopted on rehearing as the opinion of the court,[9] concluded that Stock Appreciation Rights ("SARs") were not the "same class of security" as the common stock that plaintiff had purchased. *Clay*, 157 F.3d at 1270.

However, Defendants leave out the portion of Judge Carnes' opinion that bears directly on the present issue. Judge Carnes specifically distinguished SARs from options for the purpose of evaluating the "same class" requirement. Judge Carnes wrote,

> Clay's attempted analogy ignores key distinctions between SARs and stock options. For example, options to buy give the bearer the right to purchase a given number of shares at a given price, but in order to do that the bearer has to use the market. Such options are traded through the market, and after exercising one, the investor must still sell his shares through the market in order to realize his profit. The *Moskowitz* court concluded that options

---

[8] As Defendants acknowledge, "[c]ase law defining 'securities of the same class' is limited." Reply at 8.
[9] *See Clay v. Riverwood Intern. Corp.*, 176 F.3d 1381, 1381 (11th Cir. 1999).

could be the basis for an insider trading claim not because the option value
is dependent on the stock value, but because trading in options affects the
price of the underlying stock as well. *See Moskowitz,* 128 F.R.D. at
635. Insider trading in options could have a damaging effect on common
stock.

In contrast, the Riverwood SARs cannot be traded through the market, and
the bearer does not need to go through the market to realize his profit.

*Clay*, 157 F.3d at 1270-71 (emphasis added). The obvious implication of Judge Carnes's
analysis is that stock options, unlike SARs, should be considered part of the "same class" as
common stock.

The Court finds the correct reading of §20(A), then, is that plaintiffs who trade in
common stock have standing to pursue insider trading claims against insiders who trade in stock
options.[10] *See Moskowitz v. Lopp*, 128 F.R.D. 624, 635 (E.D. Pa. 1989); *Dau v. Cephalon, Inc.*,
No. 99-CV-2439, 2000 WL 1469347, at *5 (E.D. Pa. 2000) (rejecting the argument that "the
'same class' requirement of § 20(A) means that a contemporaneous purchase of stock lacks
standing to bring a § 20(A) action against an insider purchase of stock options."). This Court
finds that claims should not be dismissed "absent some evidence that the stock and option
markets . . . are not part of interdependent markets." *Dau*, 2000 WL 1469347, at *5.[11]

Even adopting Defendants' distinction between common stocks and options, the Court is
not persuaded that Plaintiffs lack standing. Plaintiffs have alleged that Defendants caused
Nomura to purchase common stocks of Allergan on the open market. FAC ¶¶ 102-103, 107. As

[10] This conclusion is supported by the district court's decision in *Gibbons v. Malone*, 801 F. Supp. 2d 243 (S.D.N.Y. 2011). In *Gibbons*, the court wrote that "[c]ourts have consistently classified a derivative or debenture and its underlying common stock as belonging to the same class because that derivative of debenture security is 'functionally equivalent to holding the underlying equity security . . . since the value of the derivative securities is a function or related to the value of the underlying equity security." *Id.* at 247.

[11] Further, courts in this Circuit have also recognized broad standing for plaintiffs in similar circumstances in the Rule 10b-5 context. The *In re Adobe Sys., Inc. Sec. Litig.* court, for example, found that "[t]he Supreme Court has emphasized the broad coverage of Rule 10b-5: '[A] § 10(b) action can be brought by a purchaser or seller of *any* security against *any* person who has used *any* manipulative or deceptive device or contrivance in connection with the purchase or sale of a security.'" *In re Adobe Sys., Inc. Sec. Litig.*, 139 F.R.D. 150, 154 (N.D. Cal. 1991) (citation omitted) (internal quotations omitted). The court also notes that "Congress amended the definition of 'securities' applicable to Rule 10b-5 to explicitly include options." *Id.*; *see also Hall v. Medicis Pharm. Corp.*, 2009 WL 648626, at *4 (D. Ariz. 2009) (collecting cases where courts have appointed traders as lead plaintiffs to represent the interests of common stockholders).

noted above, this constitutes a violation under Rule 14e-3. Thus, Plaintiffs have alleged that Defendants, through Nomura, bought the exact "same class" of common stocks that Plaintiffs sold.

### 2. Contemporaneous Trading Requirement Conclusion

For the reasons set forth above, the Court finds that PS Fund 1's OTC option purchases with Nomura are not exempt from the contemporaneous trading analysis.

All of "Plaintiffs' sales were made on the same dates that Nomura purchased Allergan stock on the NYSE, and on the same day (or within a day) of PS Fund 1's trade confirmations with Nomura." Opp'n at 10. Plaintiff Ohio STRS sold Allergan stock on March 26, 2014, and Plaintiff Johnson sold Allergan sold stock on March 12, 2014; Plaintiffs further allege that Nomura made purchases on those same days and that PS Fund 1 entered into options transactions with Nomura on March 11, 2014 and March 27, 2014. FAC ¶ 173; *see* Opp'n Ex. 3 at 1–2. Given that Plaintiffs' sales were on the same day of Nomura's open market purchases, and within a day of PS Fund 1's private trades with Nomura, the Court finds the contemporaneous trading requirement satisfied.

Accordingly, Plaintiffs Ohio STRS and Johnson have adequately alleged standing to proceed with their claims under insider trading laws.

### B. Private Right of Action

Next, Defendants argue Rule 14e-3 does not provide an implied private right of action.

As an initial matter, the case law indicates that § 14(e) contains a private right of action. *See Plaine v. McCabe*, 797 F.2d 713, 717 n.7 (9th Cir. 1986) ("This circuit, without extensive discussion, has allowed suits for private enforcement of section 14(e)."). The Ninth Circuit has also stated that "[w]e can assume, without deciding, that a private right of action exists under Rule 14e-3, for we see no reason why the same contemporaneous trading rule that applies under Rule 10b-5 would not apply in such an action." *Brody v. Transitional Hosp. Corp.*, 280 F.3d 997, 1002-003 (9th Cir. 2002). Following the Ninth Circuit's guidance on this issue, this Court previously found in *Allergan I* that an individual had a "private right of action under Rule 14e-3." *Allergan I*, Preliminary Injunction Order at 26.

Despite *Brody* and this Court's prior decision, Defendants argue no private right of action exists because Rule 14e-3 "prohibits conduct beyond the plain language of § 14(e) to the extent that 'it does not require specific proof of a breach of fiduciary duty.'" Mot. at 23. This argument, however, rests on a misreading of the applicable precedent. The Supreme Court has previously analyzed the relationship between § 14(e) and Rule 14e-3 in *United States v. O'Hagan*, 521 U.S. 642 (1997).  Nowhere in its opinion did the majority find that Rule 14e-3 exceeds the statutory prohibition of § 14(e). Indeed, the Supreme Court concluded the exact opposite: "Rule [14e-3] is therefore a proper exercise of the SEC's prophylactic power under § 14(e)." *Id.*; *see also United States v. Chestman*, 947 F.2d 551, 560 (2d Cir. 1991) ("Rule [14e-3] retains a close nexus between the prohibited conduct and the statutory aims."). Because Rule 14e-3 has been deemed consistent with the statute, it is enforceable through a private action. *See Longberg. City of Riverside*, 571 F.3d 846, 851 (9th Cir. 2009) ("Only those regulations effectuating the statute's clear prohibitions or requirements are enforceable through the statute's private right of action; regulations that do not encapsulate the statutory right and corresponding remedy are not privately enforceable.").

Alternatively, Defendants argue that Plaintiffs cannot make use of Rule 14e-3's private right of action because they do not plead a misappropriation theory of insider trading. Defendants' theory is that Plaintiffs cannot pursue their claim because it does not constitute a violation of the underlying statute, § 14(e). The Court does not find any support for this creative argument. As detailed above, the Supreme Court's *O'Hagan* decision[12] found that Rule 14e-3 simply gave more specific definition to § 14(e)'s command to the SEC to "define, and prescribe means reasonably designed to prevent, such acts and practices as are fraudulent, deceptive, or manipulative."[13] The Court, therefore, is hard-pressed to conclude Plaintiffs should be prevented from pursuing their claims on the basis of a debatable interpretation of an issue not directly decided by the Supreme Court – especially at this early stage.

---

[12] The Court also notes that the "sole question" at issue in *O'Hagan* was whether the SEC had exceeded its rulemaking authority. *O'Hagan*, 521 U.S. at 666.

[13] Further, the Court notes that Plaintiffs have pointed to legislative history of § 14(e) which suggests that "Congress specifically contemplated Rule 14e-3's prohibitions." *See* Opp'n at 22–23.

### C. Section 20(A) Claim and Predicate § 14(e) and Rule 14e-3 Violations

Claims under § 20A are "derivative, and require proof of separate underlying violation" of the Exchange Act. *Johnson v. Alijian*, 394 F. Supp. 2d 1184, 1194 (C.D. Cal. 2004). Plaintiffs' § 20A claim is based on alleged violations of § 14(e) and Rule 14e-3.[14] FAC ¶ 193. Defendants move to dismiss the § 20A claim because of alleged deficiencies in the underlying § 14/Rule 14e-3 claim. Mot. at 25. Thus, the Court must determine whether Plaintiffs have adequately pleaded the elements of their § 14(e)/Rule 14e-3 claim.

Section 14(e) prohibits "fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer." Under Rule 14e-3(a), once an "offering person" "has taken a substantial step or steps to commence . . . a tender offer, . . . any other person who is in possession of material information relating to such tender offer" that he knows or has reason to know is nonpublic and that he received directly or indirectly from the offering person must either abstain from trading or disclose the information to the public before trading. 17 C.F.R. § 240.14e-3(a). Relatedly, Rule 14e-3(d) makes it unlawful for an "offering person" to communicate "material, nonpublic information relating to a tender offer to any other person under circumstances in which it is reasonably foreseeable that such communication is likely to result in a violation of this section." 17 C.F.R. 240.14e-3(d).

The Motion raises three independent reasons why Plaintiffs' § 14/Rule 14e-3 claim fails: (1) Valeant did not take any "substantial step" toward a tender offer; (2) Pershing is not an "offering person" within the meaning of Rule 14e-3; and (3) Plaintiffs fail to allege the requisite scienter. The Court will consider these arguments in turn.

#### 1.    Substantial Steps

In order to trigger the Rule 14e-3's "disclose or abstain" requirement, there must have been "a substantial step or steps to commence . . . a tender offer" before PS Fund 1 began purchasing Allergan equity. Preliminary Injunction Order at 11. Defendants argue that Plaintiffs do not adequately allege Valeant took any substantial steps to commence a tender offer prior to

---

[14] Defendants first argue that § 14(e) and Rule 14e-3 cannot serve as a predicate violation because § 20A only applies to insider trading cases involving misappropriation. Mot. at 24-25. This argument lacks merit, as § 20A(a) explicitly provides protections for violations of "*any provision* of this chapter *or the rules or regulations thereunder* . . . ." 15 U.S.C. § 78t-1 (emphasis added).

completion of PS Fund 1's trading. Mot. at 29. In reply, Plaintiffs argue that Valeant's objective conduct confirms that Valeant took substantial steps toward a tender offer. Opp'n at 27.

The Court addressed this exact issue in *Allergan I*. The Court first established that courts mainly look to the offering person's objective conduct to determine whether a "substantial step or steps" toward a tender offer were taken. Preliminary Injunction Order at 11.

The Court then wrote, in relevant part:

> Here, the Court must determine whether a substantial step was taken toward a tender offer before PS Fund 1's purchases of Allergan stock between February 25 and April 21, 2014. Before February 25, Valeant's board of directors met multiple times and discussed a potential combination with Allergan. Board meeting materials reflect that Valeant knew there was a high likelihood that a transaction with Allergan would involve a "[h]ostile cash and stock merger." Valeant hired three law firms and reached out to bankers to begin doing due diligence and lining up financing for the potential Allergan transaction. Valeant representatives met with Mr. Ackman and others from Pershing Square, who were known for their experience in handling unsolicited bids, and signed a confidentiality agreement with Pershing Square in order for Valeant to reveal the name of its proposed target to Pershing Square.
>
> Valeant and Pershing Square also negotiated and ultimately agreed on a plan pursuant to which Pershing Square would purchase Allergan stock, would commit to voting in favor of any bid for Allergan stock by Valeant, and would accept shares and not cash if the Allergan-Valeant transaction was consummated in a way that gave Allergan shareholders the option to choose stock or cash. Feb. 25 Relationship Agreement § 2(b). The February 25 Relationship Agreement specifically provided that Valeant and Pershing Square would form a "Co-Bidder Entity" and would be named as "co-

bidders" if a tender offer was launched for Allergan's shares. Id. § 1(a),
1(d).

*Id.* at 12-13. Under the "sliding scale" test, the Court then concluded there were "serious
questions as to whether substantial steps to commence a tender offer were taken." *Id.* at 13.

In this case, Defendants have not raised any arguments that alter the Court's prior
consideration of this issue. Plaintiffs' core allegations on this issue are virtually identical to
those made in *Allergan I*. For instance, Plaintiffs allege, *inter alia*, Valeant's board of directors
met multiple times, Valeant knew the transaction would likely proceed as a "[h]ostile cash and
stock merger," Valeant hired three law firms, and Valeant representatives met with Mr.
Ackman. FAC ¶¶ 62, 63, 80. The Court previously determined in *Allergan I* that Valeant's
actions "have at least raised serious questions as to whether substantial steps to commence a
tender offer were taken before PS Fund 1 began Allergan shares." Preliminary Injunction Order
at 14.

Thus, under the more permissive 12(b)(6) standard, Plaintiffs have adequately alleged
Valeant took substantial steps within the meaning of Rule 14e-3.

### 2.     Offering Person

Next, Defendant argues that Pershing is an "offering person" and therefore is outside of
Rule 14e-3's proscription against trading. Their position is that Pershing Square and Valeant are
collectively an "offering person" within the meaning of Rule 14e-3. *See* Mot. at 26-27. As a
result, Defendants contend that "neither Pershing nor Valeant is an 'other person' capable of
violating Rule 14e-3." *Id*. at 27. In reply, Plaintiffs argue the Court already addressed this
precise issue in *Allergan I*. Opp'n at 25.

In their moving papers, Defendants purport to offer new arguments for why Pershing
should be considered an "offering person." Reply at 25. Namely, because Pershing "took a host
of steps" that were similar in nature to the steps taken by Valeant, it should be considered an
"offering person" per the definition provided in Rule 14e-3. But as the Court previously
explained, an "offering person should be more than a financier, and should actually make an

offer to purchase shares and should have some degree of control over the terms of the tender offer and over the surviving entity." Preliminary Injunction Order at 19. The Court previously noted that "Pershing Square had no control over the price to be offered to Allergan's shareholders, whether the tender offer would involve cash and/or an exchange of stock, or even whether to call off the tender offer at some point." *Id.* at 21. The Court also expressed doubt "that Congress and the SEC meant for these factors to be sufficient to exempt an entity like Pershing Square from the 'disclose or abstain' rule of Rule 14e-3." *Id.* Defendants' new arguments do not adequately grapple with the distinctions between Valeant and PS Fund 1's behavior or fundamentally alter this analysis, especially because the Court extensively considered and weighed Pershing's actions in connection with the tender offer.

In *Allergan I*, the Court concluded that, at minimum, there were serious questions regarding whether Pershing Square is an "offering person" or "co-offering person" exempt from Rule 14e-3's "disclose or abstain" rule. *Id.* at 22.

Under the 12(b)(6) standard, the Court finds that Plaintiffs have adequately alleged Pershing Square is an "other person" within the meaning of Rule 14e-3. Defendants of course are free to renew this argument at a later stage.

### 3.    Scienter Requirement

The Court must next consider whether the FAC fails to adequately plead the scienter requirements under § 14(e) and Rule 14e-3. Mot. at 34.

### a.  Scienter Under Rule 14e-3

In order to "establish liability under § 10(b) and § 14(e) of the Securities and Exchange Act and accompanying Rules 10b-5 and 14e-3," Plaintiffs must prove that Defendants "acted with scienter, 'a mental state embracing intent to deceive, manipulate, or defraud.'" *Ginsburg*, 362 F.3d at 1304 (citing *SEC v. Adler,* 137 F.3d 1325, 1340 (11th Cir. 1998) (quoting *Aaron v. SEC*, 446 U.S. 680, 695-96)). Scienter also requires the insider to "possess material nonpublic information at the time of the trade." *Id.* at 1297-98.

The parties dispute whether an additional requirement is necessary to prove scienter under Rule 14e-3. Defendants argue that Plaintiffs need to allege "each Defendant knew or was

deliberately reckless in not knowing that Valeant had taken substantial steps to commence a tender offer." Mot. at 35. However, this conclusion is not compelled by the authority on which Defendants rely. Their only citation for this proposition is a case that does not involve Rule 14e-3 or tender offers. *See id.* (quoting *Reese v. Malone*, 747 F.3d 557, 569 (9th Cir. 2014)). Rather, the few courts that have addressed this issue have found otherwise. The Eleventh Circuit in *Ginsburg*, a case Defendants reference in discussing the scienter requirement, wrote, "Rule 14e–3, by its terms, *does not require* that the offender know or have reason to know that the information relates to a tender offer, so long as the information in fact does relate to a tender offer and the offender knows or has reason to know the information is nonpublic and was acquired by a person with the required status." *SEC v. Ginsburg* 362 F.3d. 1292, 1304 (11th Cir. 2004) (emphasis added). The Court therefore concludes there is no basis for finding Plaintiffs need not prove this additional scienter requirement.

Under Federal Rule of Civil Procedure 9(b), parties must plead fraud claims with particularity. The Ninth Circuit "has interpreted Rule 9(b) to require that 'allegations of fraud are specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong.'" *Neubronner*, 6 F.3d at 671 (citation omitted). Courts "must review all the allegations holistically when determining whether scienter has been sufficiently pled." *Reese v. Malone*, 747 F.3d 557, 569 (9th Cir. 2014) (citations omitted) (internal quotation marks omitted). The "relevant inquiry is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* (citations omitted) (internal quotation marks omitted).

Here, Defendants assert that Plaintiffs "offer[] no particularized factual allegations demonstrating that either Pershing or Valeant had the requisite knowledge under Rule 14e-3." Mot. at 37. As noted above, *Ginsburg* establishes that Plaintiffs need not plead Defendants knew or had reason to know the insider information related to a tender offer. Rather, Plaintiffs must plead Defendants knew they were in possession of material nonpublic information at the time of the trade and that they acted with the intent to deceive, manipulate, or defraud. Plaintiffs have

alleged both elements here. In their Amended Complaint, Plaintiffs repeatedly allege that Defendants received material nonpublic information from Valeant concerning Allergan. *See* FAC ¶¶ 58, 59, 67, 69. Plaintiffs have also alleged that Defendants acted with the requisite knowledge to deceive. Specifically, Plaintiffs allege that Defendants, *inter alia*, purposefully used Nomura to avoid detection, intentionally designed PS Fund 1 to avoid disclosure requirements, and "went to extraordinary lengths to keep Valeant's takeover plans hidden from investors." FAC ¶¶ 95, 96, 99-100. Viewed holistically, these detailed allegations are more than sufficient to raise a "strong inference of scienter." *Reese*, 747 F.3d at 567.

Accordingly, the Court finds that Plaintiffs have adequately alleged the scienter requirements under § 14(e) and Rule 14e-3.

### b.  Scienter Under Rule 14e-3(d)(1)

Defendants next argue the claims against the Valeant Defendants must fail for "the independent reason that the AC does not satisfy the separate scienter requirement for so-called 'tipper' liability under Rule 14e-3(d)(1). Mot. at 37. Defendants raise three specific arguments: (1) the Valeant Defendants cannot be liable because it was not "reasonably foreseeable" their tipping would result in a violation of Rule 14e-3; (2) the Valeant Defendants are exempt from liability because they made their communications in "good faith" to Pershing; and (3) Plaintiffs fail to allege any facts regarding Mr. Pearson's scienter. Mot. at 38-39.

These arguments are unavailing. First, Plaintiffs have adequately alleged that Valeant knew that its tip would be traded on. For instance, Plaintiffs allege that Valeant and Pershing, through Pearson and Ackman, entered into a Relationship Agreement that outlined the insider trading scheme. FAC ¶ 86. As alleged, Valeant drafted several versions of the Relationship Agreement that explicitly referenced its forthcoming tender offer. *See id.* Further, Plaintiffs allege that Valeant and Pearson deliberately shared insider information with Ackman related to a forthcoming tender offer. *See* FAC ¶¶ 56-62. Taking these allegations as true, as the Court must at this stage, Plaintiff has sufficiently alleged that Valeant knew the inside information would be traded on. Second, Valeant's "good faith" argument does not concern the question of whether Plaintiffs have adequately pleaded their claims – rather, as Plaintiffs point out, Defendants can

raise this "good faith" argument at the appropriate stage in this litigation. Third, Plaintiffs have included many specific allegations regarding Pearson, including that "Pearson convinced Ackman to agree that if Valeant's takeover bid was trumped and defeated by a competing bid, Pershing would kick back 15% of its insider trading profits to Valeant," "Pearson contacted Allergan's CEO" to discuss a potential business combination, and that Pearson knew that Valeant could not afford to pursue a hostile deal alone. *Id.* ¶¶ 4, 48, 110. Taken together, and taken as true at this stage, these allegations are sufficient to allege that Pearson possessed the requisite scienter.

### D. Section 20(a)

Finally, Defendants argue that Plaintiffs' claim for "control person" liability under § 20(a) fails because Plaintiffs have not adequately pleaded an underlying violation of the Exchange Act. A "plaintiff alleging a § 20(a) claim that individual defendants are 'controlling persons' of a company must plead facts showing a primary violation under the Exchange Act, and must also allege that the defendant exercised actual power or control over the primary violator." *Jackson v. Fisher*, 931 F. Supp. 2d 1049, 1061 (N.D. Cal. Mar. 15, 2013). Thus, the viability of Plaintiffs' § 20(a) claims depend on the underlying §14(e)/Rule 14e-3 claims. Because the Court has already determined that Plaintiffs have adequately alleged a claim under § 14(e)/Rule 14e-3, the Motion is DENIED as to this claim.

### IV.   Disposition

For the foregoing reasons, Defendants' Motion is DENIED in full.

The Clerk shall serve this minute order on the parties.

*David O. Carter*

_____

DAVID O. CARTER
UNITED STATES DISTRICT JUDGE

DATED:  November 9, 2015