# EXHIBIT 10

Report of        Dr. Mukesh Bajaj

Date             October 11, 2016



**EXPERT REPORT OF MUKESH BAJAJ, PH.D.**

**October 11, 2016**

| Report of | Dr. Mukesh Bajaj |  |
|---|---|---|
| Date | October 11, 2016 | |

# Table of Contents

I.   Qualifications ................................................................. 4

II.  Background and scope of assignment ............................................. 5

III. Summary of opinions ........................................................... 7

IV.  What is market efficiency? .................................................... 8

V.   Indicia of market efficiency show that Allergan shares traded in an
     efficient market ............................................................. 9

     A. The *Cammer* factors indicate that the Allergan stock traded in an
        efficient market during the Class Period .................................10

        1. *Cammer* factor 1 – Allergan stock's active trading volume
           indicates market efficiency ........................................... 10

        2. *Cammer* factor 2 – Allergan's extensive analyst coverage
           indicates market efficiency ........................................... 11

        3. *Cammer* factor 3 – Numerous market makers in Allergan's stock
           indicate market efficiency ............................................ 12

        4. *Cammer* factor 4 – Allergan's S-3 registration eligibility indicates
           market efficiency ..................................................... 13

        5. *Cammer* factor 5 – "Cause and effect" between events and price
           movements for Allergan stock .......................................... 14

     B. The *Unger* factors indicate that Allergan stock traded in an efficient
        market during the Class Period ...........................................15

        1. *Unger* factor 1 – Allergan stock's large market capitalization
           indicates market efficiency ........................................... 15

        2. *Unger* factor 2 – Allergan stock's large float indicates market
           efficiency ............................................................ 15

        3. *Unger* factor 3 – Allergan stock's narrow bid-ask spread indicates
           market efficiency ..................................................... 15

VI.  Allergan stock did not provide an ability to exploit price trends and thus
     traded in an efficient market ............................................... 16

        1. Serial correlation analysis confirms that auto-correlation was
           absent in Allergan's stock during the Class Period .................... 16

        2. Y-Filter test results demonstrate that no excess profits could be
           earned in Allergan stock through momentum trading strategies
           during the Class Period .............................................. 18

VII. Stock price analyses show that Allergan stock traded in an efficient
     market during the Class Period .............................................. 20

     A. An event study analysis demonstrates that Allergan's stock price was
        efficient during the Class Period ........................................20

Report of        Dr. Mukesh Bajaj

Date             October 11, 2016



1. Event study methodology ................................................................. 20

2. Allergan's stock price responded to material news during the
   Class Period ................................................................................. 24

   B.  The put-call-parity test, conducted on a second-by-second basis, also
       demonstrates that Allergan stock traded in an efficient market during
       the Class Period.........................................................................26

VIII. There are common class wide methodologies for damages calculation ....... 29

IX.  Conclusion ................................................................................... 30

Report of          Dr. Mukesh Bajaj

Date               October 11, 2016



---

# I.        Qualifications

1.  I am a Managing Director and the Global Head of the Securities and Finance Practice at Navigant Economics LLC, a consulting firm that applies economic and financial analysis to legal, regulatory and business matters. My curriculum vitae is attached as Appendix 1.

2.  In 1988, I graduated from the University of California at Berkeley earning a Ph.D. in Business Administration with a specialty in finance. I was awarded an M.B.A. from the University of Texas at Austin in 1987. I was awarded a Bachelor of Technology degree in 1981 from the Indian Institute of Technology in Delhi, India.

3.  As a financial economist, I specialize in the study of capital markets, including the valuation of stocks, bonds, warrants, restricted stock and other complex contingent securities, intellectual property, intangible assets, corporate hedging practices (through derivatives and other methods), conducting event studies to determine the significance of stock price reactions to particular events, and analyzing market efficiency, materiality and loss causation issues related to securities class action claims.

4.  Since 1996, I have been engaged as an expert on numerous matters involving valuation of firms and their securities, intangible assets and intellectual property.  I have testified as an expert either in court or at deposition in 64 matters, including 27 matters concerning liability and/or damages issues in securities fraud cases.  In such securities fraud cases, I have testified on behalf of the U.S. Securities and Exchange Commission ("SEC") and the U.S. Attorney's Office in a criminal matter, as well as on behalf of both plaintiffs and defendants in civil and criminal matters.

5.  In addition to my work with Navigant, I am also a practicing academic with an active research program. I have taught graduate-level courses in corporate finance, investments and financial engineering as a visiting lecturer with the Haas School of

| Report of | Dr. Mukesh Bajaj |
|---|---|
| Date | October 11, 2016 |



Business ("Haas") at the University of California at Berkeley. At Haas, I served as a Graduate Student Instructor while earning my Ph.D. between 1983 and 1988. From 1988 to 1995, I was an Assistant Professor of Finance and Business Economics at the University of Southern California.

6.  I have authored or co-authored more than 25 publications and working papers in the field of financial economics. My research has been published in *The Journal of Finance, The Journal of Financial Economics, The Journal of Financial Research, The Journal of Applied Finance, International Economic Review, Research in Finance, The Journal of Corporation Law, The Journal of Derivatives* and *Research in Law and Economics.*

7.  I am a member of the American Finance Association, the Western Finance Association and the European Finance Association, and I have lectured widely on a variety of issues in financial economics. Navigant is being compensated for my work on these matters at my regular hourly rate of $1,000 per hour. That compensation is not in any way dependent on the opinions I express on issues in these cases. I am independent of the Plaintiffs and the Defendants in this matter. I have been assisted in my work on this case by my colleagues at Navigant, for whose work Navigant is being paid at their regular hourly rates, which range from $300 an hour to $700 an hour.

8.  The documents I have relied upon in connection with this report are listed in Appendix II. If additional information becomes available, I reserve the right to supplement or modify the opinions set forth in this report.

## II.    Background and scope of assignment

9.  The State Teachers Retirement System of Ohio and the Iowa Public Employees Retirement System, and Patrick T. Johnson (collectively "Plaintiffs") have brought

Report of       Dr. Mukesh Bajaj

Date            October 11, 2016



a securities class action[1] on behalf of investors selling shares of Allergan, Inc., between February 25, 2014 and April 21, 2014, (or the "Class Period"), against a number of defendants including the Pershing Defendants,[2] and the Valeant Defendants,[3] for allegedly violating various sections of the Securities Exchange Act of 1934 (or the "Exchange Act").[4]

10. According to the Complaint, the Defendants participated in an "illegal insider trading and front-running scheme" under which Valeant shared material, nonpublic, inside information with Pershing Square and its CEO Ackman, about Valeant's "plans to launch a hostile takeover and tender offer"[5] for Allergan, an Irvine, California based pharmaceutical company. Notwithstanding the duty to "disclose" or "abstain" from trading,[6] Ackman and Pershing forged an agreement with Valeant, whereby Pershing would acquire a large position in Allergan stock in order to support Valeant's bid.  If Valeant's bid was not successful and a third party ultimately acquired Allergan, Pershing agreed to pay Valeant 15% of Pershing's net profits from its Allergan trades.[7]

---

[1]  Class Action Second Amended Complaint, *IN RE ALLERGAN, INC. PROXY VIOLATION SECURITIES LITIGATION*, dated April 20, 2016 ("Amended Complaint" or the "Complaint")

[2]  The named Pershing Defendants include: Pershing Square Capital Management, L.P. ("Pershing Square"), PS Management GP, LLC ("PS Management"), William Ackman ("Ackman"), PS Fund 1, LLC ("PS Fund 1"), Pershing Square, L.P. ("PSLP"), Pershing Square II, L.P. ("PS II"), Pershing Square GP, LLC ("PSGP"),  Pershing Square International ("PS International"), and Pershing Square Holdings, Ltd. ("PS Holdings") (collectively, "Pershing")

[3]  The Valeant Defendants include Michael Pearson ("Pearson"), Valeant Pharmaceuticals International, Inc., and Valeant Pharmaceuticals International.

[4]  Complaint at 1-2

[5]  Complaint, ¶1

[6]  Complaint, ¶189

[7]  Schedule 13D, Allergan (Issuer), reported by Pershing Square Capital Management, L.P., PS Management GP, LLC, and William A. Ackman, April 21, 2014 for event date April 11, 2014, ("Pershing Square Sch. 13D"), Item 6

| Report of | Dr. Mukesh Bajaj |
| Date | October 11, 2016 |



11. During the Class Period, Pershing acquired about 28.9 million shares of Allergan stock[8] (or about a 9.7% stake in Allergan), for approximately $3.2 billion through a Pershing entity, PS Fund 1. After regular trading closed on April 21, 2014, Pershing filed a Schedule 13D with the SEC disclosing the purchase of Allergan stock.[9]

12. On April 22, Valeant announced its unsolicited offer to acquire Allergan for $48.30 cash and 0.83 of Valeant stock per Allergan share, nominally valued at approximately $152.89/share.[10]

13. I have been asked by counsel for the Plaintiffs to determine whether the common stock for Allergan traded in an efficient market during the Class Period.  I have also been asked to opine on whether damages in this action are subject to a common formula that can be applied class-wide.

## III.    Summary of opinions

14. Based on economic analysis presented in this report, I have concluded that Allergan shares traded in an efficient market during the Class Period. I have also concluded that damages in this case are subject to common proof and can be computed on a class-wide basis utilizing a common methodology.

**Opinion 1:** The *Cammer* and *Unger* factors indicate that Allergan stock traded in an efficient market.

**Opinion 2:** The Serial Correlation and the Y-Filter tests support a finding that Allergan stock traded an in efficient market during the Class Period.

**Opinion 3:** The event study analysis, and the put-call-parity tests also provide strong evidence that Allergan stock traded in an efficient market during the Class Period.

---

[8]   This included 24,831,107 shares of Allergan stock underlying call options and 3,450,000 shares of stock underlying forward purchase contracts [Pershing Square Sch. 13D, Item 1]
[9]   Pershing Square Sch. 13D
[10]   David Benoit, Dana Mattioli and Jonathan D. Rockoff, "Valeant, Ackman Propose Allergan Deal," *Dow Jones Top News & Commentary*, April 22, 2014, 07:40

Report of        Dr. Mukesh Bajaj

Date             October 11, 2016



>    **Opinion 4:** While I have not been asked to provide an opinion quantifying damages
>    in this action, I have been asked to provide an opinion on whether such an
>    analysis can be performed on a class-wide basis. As discussed below, I have
>    determined that a calculation of damages in this matter is subject to a common
>    formula that can be applied for all class members.

## IV.    What is market efficiency?

15.   Professor Eugene Fama is widely credited by financial economists as father of one
      of the cornerstone theories of financial economics, known as Efficient Market
      Hypothesis ("EMH"). In 2013 he was recognized with the Nobel Prize in
      Economics for having "demonstrated that stock price movements are impossible to
      predict in the short-term and that new information affects prices almost
      immediately, which means that the market is efficient."[11]

16.   In Fama's model of market efficiency, "there are large numbers of rational, profit-
      maximizers actively competing, with each trying to predict future market values of
      individual securities."[12]  Markets that are informationally efficient have security
      prices that reflect all material current information.[13] In such informationally
      efficient markets, "prices reflect information to the point where the marginal
      benefits of acting on information (the profits to be made) do not exceed the
      marginal costs"[14] of gathering such information.

17.   In an efficient market, the stock price should incorporate new material information
      quickly[15] and increase following unexpected positive news and decrease following

---

[11]   http://www.nobelprize.org/nobel_prizes/economic-sciences/laureates/2013/fama-facts.html

[12]   Fama, Eugene F. "Random Walks in Stock Market Prices," *Financial Analysts Journal* 21, no. 5 (Sep. - Oct. 1965), ("Fama (1965)"), pages 55-59

[13]   Fama (1965), page 56 notes that "If the discrepancies between actual prices and intrinsic values are systematic rather than random in nature, then knowledge of this should help intelligent market participants to better predict the path by which actual prices will move towards intrinsic values.  When the many intelligent traders attempt to take advantage of this knowledge, however, they will tend to neutralize such systematic behavior in price series.  Although uncertainty concerning intrinsic values will remain, actual prices of securities will wander randomly about their intrinsic values."

[14]   Fama, Eugene F., "Efficient Capital Markets: II," *The Journal of Finance* 46, no. 5 (Dec. 1991), ("Fama (1991)"), pages 1575-617

[15]   "The premise that investors rely on market prices assumes that the market price reflects all publicly, available information quickly and without bias." [Fischel, Daniel R., "Use of Modern Finance Theory in Securities Fraud Cases Involving Actively Traded Securities," *Business Lawyer* 38, no. 1, (Nov. 1982), page 9]



unexpected negative news, and such price changes should fully and correctly reflect the value of the information. Thus, in an efficient market, a stock's price should not be expected to react to stale information, as the value of such information would already have been incorporated into the stock price when it was first released.

## V.      Indicia of market efficiency show that Allergan shares traded in an efficient market

18. Intuitively, for a large capitalization stock like Allergan with many market analysts, high trading volume, active flow of information and listing on a well-developed public exchange such as the New York Stock Exchange ("NYSE"), it is reasonable to infer that the observed stock prices are determined in an efficient market. Courts have discussed various indicia of market efficiency. Two cases that are often cited in this connection are the *Cammer v. Bloom*[16] and *Unger v. Amedisys*[17] matters. The *Cammer* Court discussed several indicia of market efficiency and noted that there were "several types of facts which, if alleged, might give rise to an inference" that the stock in question "traded in an efficient market":[18]

> *(1) average weekly trading volume expressed as a percentage of total outstanding shares; (2) number of securities analysts following and reporting on the stock; (3) extent to which market makers and arbitrageurs trade in the stock; (4) whether the company was entitled to file an S-3 Registration Statement, if relevant (as opposed to Form S-1 or S-2); and (5) the existence of empirical facts "showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price."*

19. In addition to the five *Cammer* factors, the Fifth Circuit Court of Appeals in *Unger v. Amedisys*, 401 F.3d 316 (5th Cir. 2005), identified three additional factors that were also considered indicative of market efficiency. These additional factors, the

---

[16] *Cammer v. Bloom*, 711 F. Supp. 1264, (D.N.J. 1989), ("*Cammer*")
[17] *Unger v. Amedisys*, 401 F.3d 316 (5th Cir. 2005)
[18] *Cammer* at 1285-1287

Report of          Dr. Mukesh Bajaj

Date               October 11, 2016



*Unger* factors, are: 1) the company's market capitalization, 2) the stock's float, and 3) the typical bid-ask spread.

## A. The *Cammer* factors indicate that the Allergan stock traded in an efficient market during the Class Period

### 1. *Cammer* factor 1 – Allergan stock's active trading volume indicates market efficiency

20. The *Cammer* Court finds that "the existence of an actively traded market, as evidenced by a large weekly volume of stock trades … implies significant investor interest in the company" which in turn "implies a likelihood that many investors are executing trades on the basis of newly available or disseminated corporate information,"[19] thereby facilitating market efficiency.

21. During the Class Period, Allergan stock was actively traded on the NYSE with an average daily volume[20] of 3.4 million shares. I also computed the average weekly trading volume as a percentage of outstanding Allergan shares (or average weekly stock turnover), since a higher number indicates that a larger proportion of the total outstanding stock is traded every week.  The *Cammer* Court noted that "[t]urnover measured by average weekly trading of two percent or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one; one percent would justify a substantial presumption."[21] For Allergan common stock, I find that the average weekly volume as percentage of shares outstanding[22] was 5.6% during the Class Period.

---

[19]   *Cammer* at 1286
[20]   Calculated as the average of the total daily volumes observed over the class period. Underlying data source: Bloomberg
[21]   *Cammer* at 1286
[22]   Calculated as average daily volume multiplied by 5 trading days per week to obtain average weekly volume, which is then divided by the average shares outstanding over the period. Underlying data source: Bloomberg

Report of        Dr. Mukesh Bajaj

Date              October 11, 2016



22. I also compared the average weekly trading volume for Allergan stock to similar statistics for all NYSE-listed shares for the same periods. I find that the NYSE's average weekly stock turnover was 4.94% for the Class Period.[23] In other words, Allergan stock had more active trading volume relative to shares outstanding than for the NYSE as a whole. Thus, the active trading of Allergan stock is supportive of a finding that Allergan stock traded in an efficient market during the Class Period.

## 2. *Cammer* factor 2 – Allergan's extensive analyst coverage indicates market efficiency

23. The second *Cammer* factor is the extent of security analysts covering and reporting on the stock in question. As the *Cammer* Court notes, "existence of such analysts would imply, for example, the [relevant information] were closely reviewed by investment professionals, who would in turn make buy/sell recommendations to client investors. In this way the market price of the stock would be bid up or down to reflect the financial information …, as interpreted by the securities analysts."[24]

24. I reviewed the Bloomberg database to determine the number of brokerage and other firms whose analysts provided recommendation and target prices for Allergan stock as of April 21, 2014, and found 27 such firms.[25] Of these 27 firms, 18 provided updated estimates, and 8 analysts issued a total of 14 analyst reports during the Class Period.

25. In addition, there are certain other related indications of additional (buy-side) coverage by financial analysts, such as ownership by large institutions that often

---

[23]   The weekly turnover is calculated as the average of the ratios of weekly trading volume to shares outstanding across all common stocks that were trading on the NYSE as of April 21, 2014, and for whom the data was available over the Class Period. The data on volume and shares outstanding are obtained from Bloomberg

[24]   *Cammer* at 1286

[25]   The 27 firms are: Jefferies, BMO Capital Markets, Buckingham Research Group, Stifel, Wells Fargo Securities, Bernstein, Piper Jaffray, Credit Suisse, Sterne Agee CRT, Susquehanna Financial, Morningstar Inc, William Blair & Co, Cowen, EVA Dimensions, Edward Jones, Guggenheim Securities, RBC Capital Markets, Barclays, Leerink Partners LLC, Morgan Stanley, SunTrust Robinson Humphrey, J.P. Morgan, Argus Research Corp, Goldman Sachs, UBS, BTIG LLC, and S&P Capital IQ [Source: Bloomberg]

| Report of | Dr. Mukesh Bajaj |  |
| Date | October 11, 2016 | |

have in-house analysts. The SEC requires large institutions, or firms or individuals that control investment assets in excess of $100 million to report their security holdings in Form 13-F. According to the Thomson Reuters database of 13F filings with the SEC, during the Class Period (in particular as of March 31, 2014), 972 institutions held 91.9% of Allergan's total shares outstanding (or 92.1% of public float outstanding).

26. The *Cammer* Court stated that it would be "persuasive to allege a significant number of securities analysts followed and reported on a company's stock during the class period."[26] Here I find that the number of stock analysts covering Allergan stock, as well as the large number of institutions that owned Allergan stock, are both indicative that Allergan stock traded in an efficient market during the Class Period.

### 3. *Cammer* factor 3 – Numerous market makers in Allergan's stock indicate market efficiency

27. The *Cammer* Court noted that "[t]he existence of market makers and arbitrageurs would ensure completion of the market mechanism; these individuals would react swiftly to company news and reported financial results by buying or selling stock and driving it to a changed price level."[27] Hence the presence of a number of such market makers for Allergan's common stock is indicative that the market for the common stock was efficient.

28. As I note earlier, Allergan traded on NYSE during the Class Period. NYSE uses a designated market maker to "maintain fair and orderly markets for their assigned

---

[26] *Cammer* at 1286
[27] *Cammer* at 1287-88

Report of          Dr. Mukesh Bajaj

Date               October 11, 2016



securities."[28] In addition to the NYSE-designated market maker, other market makers can and do provide liquidity for NYSE-listed stocks. For example, a review of analyst reports about Allergan showed that at least twelve of the brokers issuing analyst reports were also market makers for Allergan's common stock.[29]   For example, during the Class Period, BMO Capital Market noted in its disclosures on its analysts' reports about Allergan that it "makes a market in this security,"[30] and Wells Fargo also similarly said that it "maintains a market in the common stock of Allergan, Inc."[31]   The presence of a number of broker-dealers that were also market makers for Allergan stock through the Class Period, who thus provided liquidity for Allergan stock, further supports a finding of market efficiency.

### 4. *Cammer* factor 4 – Allergan's S-3 registration eligibility indicates market efficiency

29. The fourth *Cammer* factor is the eligibility for filing S-3 forms and as per the SEC's requirements for S-3 registration, a company has to have filed Exchange Act reports for 12 months and has outstanding float above $75 million. Reviewing Allergan's publicly listed stock, I find that it had filed all the required annual and quarterly reports on time over the previous 12 months, and its float[32] ranged from $35 billion to $42 billion during the Class Period (average of $37.7 billion or 99.7% of its average market capitalization of $37.8 billion)[33], and hence, Allergan clearly met

---

28   https://www.nyse.com/market-model
29   Namely, Bank of America, Barclays, BMO Capital Markets, Citibank, Cowen & Co., Credit Suisse, Morgan Stanley, RBC Capital, Susquehanna Financial Group, UBS Securities, Wells Fargo and William Blair. The market maker information was drawn from the end note disclosures of the analyst reports. Since all analysts that were covering Allergan did not issue a new report during the (relatively brief) Class Period, I considered analyst reports issued during the period from February 7, 2014 to April 28, 2014 for this purpose.
30   David Maris, "Five Reasons AGN Shares Have Been Rallying," *BMO Capital Markets*, April 21, 2014
31   Larry Biegelsen, "AGN: Media Reports $45B+ Hostile Bid Coming," *Wells Fargo*, April 21, 2014
32   Float is defined as "number of shares of a corporation that are outstanding and available for trading by the public," and excludes holdings by insiders and affiliated entities [Downes, John, and Jordan Goodman, *Dictionary of Finance and Investment Terms*, 5th ed., Hauppauge: Barron's, 2014]
33   Calculated as the average for Allergan over the 39 trading days during the Class Period

Report of        Dr. Mukesh Bajaj

Date             October 11, 2016



the requirement for S-3 filings. In fact, Allergan filed a form S-3 with the SEC on August 6, 2012.[34] Thus, this fourth *Cammer* factor also supports a finding of market efficiency.

### 5.  *Cammer* factor 5 – "Cause and effect" between events and price movements for Allergan stock

30. The *Cammer* Court stated that it would be "helpful ... to allege empirical facts showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price." Fama also describes the "cause and effect" relationship as part of the analysis of market efficiency when he notes that tests of the efficient markets are concerned with "the speed of price adjustment to other obviously publicly available information."[35] These analyses, more commonly called "event studies," are well accepted in academic as well as business and legal settings for testing market efficiency.[36]

31. I analyze the "cause and effect relationship" between unexpected corporate events or financial releases and immediate responses in stock price for Allergan in section VI below. Based on my analysis described in Section VI, I find that Allergan stock traded in an efficient market where unexpected events and information releases were quickly absorbed into the market price of Allergan common stock. First, I discuss the *Unger* factors mentioned earlier.

---

[34] Automatic Shelf Registration, S-3, REGISTRATION STATEMENT, UNDER THE SECURITIES ACT OF 1933, Allergan Inc., filed with the SEC, August 6, 2012

[35] Fama, Eugene F. "Efficient Capital Markets: A Review of Theory and Empirical Work," *Journal of Finance* 25, no. 2 (May 1970), ("Fama (1970)"), page 388

[36] For example, "Whenever event study methodology shows that a fraudulent event has had a statistically significant effect on the price of a firm's securities, courts are justified in presuming reliance under the fraud-on-the-market theory." [Macey, Jonathan R., Geoffrey P. Miller, Mark L. Mitchell and Jeffry M. Netter, "Lessons from Financial Economics: Materiality, Reliance, and Extending the Reach of Basic v. Levinson," *Virginia Law Review* 77, no. 5 (Nov. 1991), pages 1017-1050]



## B. The *Unger* factors indicate that Allergan stock traded in an efficient market during the Class Period

### 1. *Unger* factor 1 – Allergan stock's large market capitalization indicates market efficiency

32. Allergan's average market capitalization was $37.8 billion during the Class Period. In comparison, the average market capitalization of common stocks that were traded on the New York Stock Exchange ("NYSE") during the Class Period was $11.1 billion.[37] Thus Allergan stock had more than three times the average market capitalization of common stocks that were contemporaneously traded on the NYSE. Based on this indicator, the implication is that Allergan stock traded in an efficient market during the Class Period.

### 2. *Unger* factor 2 – Allergan stock's large float indicates market efficiency

33. I have already discussed that Allergan's stock had significant float (average of $37.7 billion during the Class Period) in the section on S-3 registration above. This factor also supports market efficiency.

### 3. *Unger* factor 3 – Allergan stock's narrow bid-ask spread indicates market efficiency

34. The third *Unger* factor is the bid-ask spread, i.e., the difference between the price quoted for an immediate sale (or bid price) and the price quoted for an immediate purchase (or offer price) of the security in question.[38]  By reducing the cost of trading, lower bid-ask spread facilitates more active trading and timely absorption

---

[37]   Bloomberg. Average market capitalization is based on common stocks that were traded on NYSE as of April 21, 2014 and for whom the data was available over the Class Period.

[38]   Ross, Stephen A., Randolph Westerfield, and Jeffrey F. Jaffe, *Fundamentals of Corporate Finance*, 8th ed., Boston: McGraw-Hill/Irwin, 2008, page 250

| Report of | Dr. Mukesh Bajaj |
|---|---|
| Date | October 11, 2016 |



of material news into stock prices. On average, Allergan stock's bid-ask spread[39] was 0.01% of its stock price during the Class Period. During the Class Period, the average bid-ask spread for common stocks on traded on the NYSE, similarly measured, was 0.12%.[40] Given that the bid-ask spread for Allergan stock was lower compared to the average on NYSE, this factor supports market efficiency.

# VI.   Allergan stock did not provide an ability to exploit price trends and thus traded in an efficient market

35.  Before discussing and interpreting the fifth *Cammer* factor through an event study, I first conduct some foundational empirical tests for efficiency. These tests, based on well-recognized empirical methods in the economics literature, a) confirm that auto-correlation was absent, and b) economically significant excess trading profits could not be earned by trading strategies that seek to exploit predictive trends in stock prices.

## 1.  Serial correlation analysis confirms that auto-correlation was absent in Allergan's stock during the Class Period

36.  In an efficient market, one should not be able to predict a stock's future price changes from the stock's past prices. As a preliminary test, I examined the statistical relationship between Allergan's daily stock returns and its previous day's stock return ("Lag Return"), also known as serial correlation. I found that Allergan's daily stock return was not statistically significantly related to its previous day's returns over the Class Period, as shown in Table 1-A below.

---

[39]  Calculated as the difference between the ask and bid quotes at market close as determined by Bloomberg, expressed as a percentage of the average of the bid and ask quotes.

[40]  Bloomberg.  I computed the average bid-ask spread for common stocks that were traded on NYSE as of April 21, 2014 and for whom the relevant data was available over the Class Period.

Report of          Dr. Mukesh Bajaj

Date               October 11, 2016



**Table 1: Serial Correlation in Allergan's Stock Price during Class Period[41]**

| Period | Coefficient of Lag Return | t-statistics | Adjusted R² | Observations |
|---|---|---|---|---|
| Class Period | 0.25 | 1.38 | 0.02 | 39 |

37. Table 1 shows that for the Class Period, Allergan's daily stock return's relationship to its own lagged return (or coefficient) was 0.25, implying that every 1% change in Allergan's stock price on a day during the Class Period, a 0.25% change is observed in the stock price on the following trading day. The corresponding t-statistic, which is a measure of the strength of the relationship, was 1.38, which is not statistically significant. The Adjusted $R^2$ of the regression was 0.02 implying that on average, only 2% of the daily variation in Allergan's stock price could be explained by the change in Allergan's stock price on the previous trading day.

38. However, the real question in terms of market efficiency is whether the market for Allergan stock allowed for profits to be made through trading strategies based on the presence of any patterns in stock prices. Fama observed that it is preferable to directly test for profitability of trading rules rather than use the presence of serial correlation alone as an indicator of the lack of efficient trading in the market.[42]

---

[41] Note that the column named t-statistic measures if the co-efficient is different than zero. A t-statistic above 1.96 (or below -1.96) implies that the coefficient was statistically significant and positive (or negative), i.e., "different from zero" at the 95% level of confidence. The column named Adjusted $R^2$ contains a statistical measure of the goodness of fit or how close the data are to the fitted regression line; an Adjusted $R^2$ of 0.02 means that 2% of the total variance in the dependent variable in the regression (i.e. stock price change on a day) is explained by the independent variable, i.e., stock price change on the previous day. The column named "Observations" provides number of data points (stock price returns) used for the analysis.

[42] Fama (1970), page 394

Report of       Dr. Mukesh Bajaj

Date            October 11, 2016

**NAVIGANT**

39. Fama (1970) proposed that the efficient market hypothesis can be tested by calculating the expected profits from "*Y-Filter*" based trading rules to examine if they offer a higher economic profit relative to a buy-and-hold strategy. If the market is efficient, then the expected profits from a Y-Filter trading rule should not exceed the expected profits from a buy-and-hold strategy.[43]

## 2. Y-Filter test results demonstrate that no excess profits could be earned in Allergan stock through momentum trading strategies during the Class Period

40. Fama (1970) describes Y-Filter trading rule as follows:[44]

   *If the price of a security moves up at least y%, buy and hold the security until its price moves down at least y% from a subsequent high, at which time simultaneously sell and go short. The short position is maintained until the price rises at least y% above a subsequent low, at which time one covers the short position and buys. Moves less than y% in either direction are ignored.*

41. I implemented the same Y-Filter trading rule for one share of stock on a second-by-second basis using filters of 1%, 2%, 3%, 4%, and 5% over the Class Period.[45] As Fama (1970) cautioned that Y-Filter trading rule profits may be overstated if real-world transaction costs are ignored,[46] I incorporated transaction costs by assuming that the investor can only buy and sell the stock at the ask and bid quotes, respectively, and also faces small but realistic commission costs.[47]

---

[43] See Fama (1970), page 386. A buy-and-hold strategy is a passive strategy in which the stock is bought and held until the end of the analysis period

[44] See Fama (1970), page 394-395

[45] Appendix III provides the details about the methodology used in this analysis

[46] "[A]ny systems (like the filters) that attempt to turn short-term dependence into trading profits of necessity generate so many transactions that their expected profits would be absorbed by even the minimum commissions (security handling fees) that floor traders on major exchanges must pay." [Fama (1970), page 414]

[47] I assume a commission cost of $10 per trade of 2,000 shares, or $0.005 per share

Report of         Dr. Mukesh Bajaj

Date              October 11, 2016                        

42. I compared the profits from this momentum trading in Allergan stock to the buy-
    and-hold benchmark, as proposed by Fama (1970).   In an efficient market,
    momentum trading should not beat a passive buy-and-hold strategy.

**Chart 1: Y Filter Test for the Class Period**



43. The Chart 1 shows the Y-Filter profits, net of buy-and hold profits, for various
    filters. The buy-and-hold strategy profits exceed those of all the Y-Filters except
    for the 4% filter, which shows essentially no difference in profits. Thus the Y-Filter
    test for Allergan stock appears to be consistent with an efficient market during the
    Class Period.

Report of      Dr. Mukesh Bajaj

Date          October 11, 2016



## VII.    Stock price analyses show that Allergan stock traded in an efficient market during the Class Period

44. The *Cammer* Court considered the fifth factor, *i.e.*, "empirical facts showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price"[48] to be another way of assessing market efficiency. Economists examine the cause and effect relationship between relevant news and stock price movements using a technique called an "event study."[49] An event study identifies unanticipated and economically material news and then examines contemporaneous stock price reaction to determine whether material unexpected events elicit an immediate response in stock price.

45. It is common in event studies to examine the price impact of unanticipated corporate events and material earnings surprises. In the case of Allergan, although there were no earnings releases during the Class Period (which consisted of 39 trading days), there were two material and unanticipated corporate events during the Class Period.

### A. An event study analysis demonstrates that Allergan's stock price was efficient during the Class Period

#### 1.  Event study methodology

46. The first step in my event study was to identify important news over the Class Period that would be expected to impact Allergan's stock price in an efficient market. I reviewed news events during the Class Period through a thorough review of public information pertaining to Allergan from various sources (including

---

[48]   *Cammer* at 1287

[49]   *See generally*, MacKinlay, A. Craig, "Event Studies in Economics and Finance," *Journal of Economic Literature* 35, (Mar. 1997), pages 13-39

Report of        Dr. Mukesh Bajaj

Date            October 11, 2016



newspapers and other publications, websites, newswires and multimedia sources) covered in in the Factiva database[50] as well as analysts' reports from the Thomson database. I reviewed the articles for news events that were related to Allergan's business, including technological, regulatory, financial and competitive information, as well as news about market participant's statements about Allergan.

47. The second step in my event study was to analyze Allergan's stock price reaction for those events. In studying the impact of news on stock price, it is standard practice in event studies to first isolate the effect of market and industry factors on stock returns using a statistical method known as regression analysis. A regression analysis is used to calculate the relationship between changes in a company's stock price (in this case the Allergan stock) and corresponding changes in the value of a market index and an industry index to account for industry-specific factors. Then, the calculated relationship (which is also called the "Market Model"[51]) and the actual performance of the associated indices are used to compute "predicted return" for the stock. Exhibit I provides the results of this analysis.

48. Finally, the security's "abnormal return," or "excess return," or "market-adjusted return" is calculated by subtracting the predicted return from the security's observed return. In other words, I calculate abnormal (or "excess") returns by estimating "a predicted stock price return, or percentage change, from the day before the news reaches the market to the day the stock price assimilates the news,

---

50   As I noted earlier, "Factiva "is the world's leading source of premium news, data and insight … [w]ith access to thousands of premium news and information sources on more than 22 million public and private companies." [Source: http://www.dowjones.com/products/product-factiva/]

51   Note that the particular market model to be used is not the most important determinant of the event study and its results. As Brown and Warner note in their 1985 JFE paper, "a simple methodology based on the market model is both well-specified and relatively powerful under a wide variety of conditions, and in special cases even simpler methods also perform well." [Brown, Stephen J., and Jerold B. Warner. "Using Daily Stock Returns: The Case of Event Studies," *Journal of Financial Economics* 14, no. 1 (1985), pages 3-31, page 3]

Report of          Dr. Mukesh Bajaj

Date               October 11, 2016



using a [regression] model that takes into account market and industry effects on stock price returns … [and subtracting] the predicted return from the actual return to compute the so-called abnormal return."[52]

49.   The abnormal return measures the portion of the security's observed return on a given date that cannot be explained by contemporaneous changes in the market and industry factors. The test of cause and effect relationship is based on whether a stock's abnormal return corresponds to news that would be expected to be value relevant in an efficient market. In other words, we look for evidence whether, after isolating and removing the portion of stock price movement that can be attributed to contemporaneous changes in market and industry wide stock prices, the remaining excess return reflects material news.

50.   Typically for actively traded stocks, financial economists conduct event studies using a one-day event window, i.e., we look at daily stock price returns in response to news events from close of trading on a trading day to the close of trading on the next trading day. For events where there is economic evidence that it takes longer than one day for the market to absorb the implications of an announcement, or where there is evidence of leakage of news, it can be appropriate to use an event window longer than a day.[53]

---

[52]   Tabak, David I. and Frederick C. Dunbar, "Materiality and Magnitude: Event Studies in the Courtroom," in *Litigation Services Handbook: The Role of the Financial Expert*, Third Edition, ed. Roman L. Weil, Michael J. Wagner and Peter B. Frank, John Wiley & Sons, Inc. USA, 2001 ("Tabak and Dunbar (2001)")

[53]   For example, Tabak and Dunbar (2001) at 19-4, note that "when there is a reasonable possibility that the information reached the market before a formal announcement, the event window may be extended back to include the potential leakage."

Report of          Dr. Mukesh Bajaj

Date               October 11, 2016



51. In my analysis of a stock's abnormal return, I use the S&P 500 as the market index. For the industry index, I use an equally weighted index that is made up of Allergan's peers as identified in the Allergan Annual Report for 2013.[54]

52. After calculating the stock's abnormal return, I assess its statistical significance to determine if the observed normal return is statistically significant relative to normal day-to-day variability reflecting vicissitudes of stock prices.[55] As Tabak and Dunbar (2001) note: "Typically, the predicted return does not exactly equal the actual return even when no event has occurred. To decide whether the difference between the actual and the predicted return [the abnormal return] … results merely from chance, one tests… for statistical significance."[56] When the results of an event study are statistically significant, the study supports a conclusion that the identified news, had a "cause and effect" relationship with the observed stock price movements.

---

[54] The peer companies in the index are: Abbot (ABT), Amgen (AMGN), Biogen Idec. (BIIB), Bristol Myers Squibb (BMY), Celgene (CELG), Eli Lilly (LLY), Endo Health Solutions (ENP), Gilead (GILD), Johnson &Johnson (JNJ), St. Jude Medical (STJ), and Stryker (SYK). Valeant was not included in the peer index. Including Valeant in the peer index does not change any of my conclusions.

[55] The abnormal or "excess" return could occur as a result of certain company-specific events or purely as a matter of chance, i.e., due to the normal random fluctuations in the stock's price. The excess return is considered "statistically significant" when the likelihood that it occurred due to random fluctuations – and not because of some company-specific event – is 5% or less (the "5% significance level"). The statistical significance is typically assessed by a "t-statistic." In an event study, the t-statistic is a ratio equal to the estimated excess return divided by its "standard error" (a measure of error in estimating the excess return). A t-statistic of 1.96 or greater (in absolute value) is considered statistically significant at the 5% significance level. On the other hand, if the likelihood that the excess return occurred purely as a matter of chance is more than 5%, the excess return is considered "statistically insignificant."

[56] Tabak and Dunbar (2001), page 19-3

Report of        Dr. Mukesh Bajaj

Date             October 11, 2016



## 2. Allergan's stock price responded to material news during the Class Period

53. I describe below key events and the corresponding movement in Allergan stock price during the Class Period from February 25, 2014 through April 21, 2014.

### a) Positive news related to Allergan's key Botox product had a material effect on Allergan's stock price during the Class Period

54. On April 11, 2014, a key competitor of Allergan's core Botox product, Johnson & Johnson announced that it would no longer develop Purtox, "J&J's version of the Botox botulinum toxin injection sold by Allergan Inc."[57] An analyst from BMO Capital called it a "great news for Allergan, as J&J was the only company with the marketing expertise and capabilities that would have us worried about a protracted marketing battle with Allergan in neurotoxins."[58] Allergan stock responded positively with an abnormal return of 4.83%, which was statistically significant, as would be expected in an efficient market.

### b) Allergan stock reacted significantly to Valeant's initial offer on April 21 and April 22

55. On Monday, April 21, 2014, an after-hours regulatory filing by Pershing[59] revealed that beginning in February, Pershing had "picked up 9.7 per cent of Allergan stock, worth more than $4-billion, through a new entity call [sic] PS Fund 1."[60] Thus, as

---

[57]   Jonathan D. Rockoff, "Johnson & Johnson Ending Plans for Botox Rival; Health-Care Company Acquired Wrinkle Fighter PurTox in $1.1 Billion Purchase of Mentor," *The Wall Street Journal Online*, April 11, 2014, 11:09

[58]   David Maris, "Botox Wannabe Walks – Good News for AGN," *BMO Capital*, April 11, 2014

[59]   Pershing Square Sch. 13D, page 4

[60]   Richard Blackwell And Jacquie McNish, "Valeant, Ackman in $45-billion bid for Botox-maker Allergan; Canadian drug company joins with Pershing Square, which has already acquired $4-billion of Botox maker's shares," *The Globe and Mail*, April 21, 2014

Report of          Dr. Mukesh Bajaj

Date               October 11, 2016



of April 21, 2014, Pershing "beneficially owned an aggregate of 28,878,538 shares of [Allergan] Common Stock (which include 24,831,107 shares of Common Stock underlying American-style call options and 3,450,000 shares of Common Stock underlying forward purchase contracts)."[61] The Schedule 13D filing also discussed Valeant's agreement with Pershing concerning PS Fund 1's acquisition of Allergan common stock, and Valeant's intention to make an offer for Allergan.

56. News reports noted that on Monday there had been unusual option trading activity that had pushed up Allergan's stock price. Such trading could be indicative of leakage of news about a bid for Allergan. According to Dow Jones, "Allergan's options volume on Monday was three times normal, and the heaviest in more than three months, according to Trade Alert."[62]

57. On Tuesday April 22, Allergan "confirmed that it has received an unsolicited proposal from Valeant Pharmaceuticals International, Inc. ("Valeant") to acquire all of the outstanding shares of the Company for a combination of 0.83 of Valeant common shares and $48.30 in cash per share of common stock of the Company."[63]

58. Analysts at Piper Jaffray observed that following Valeant's hostile bid for Allergan, "it will be exceedingly difficult for AGN [Allergan] to stay an independent entity."[64] J.P.Morgan analysts thought the potential merger to be "a compelling transaction from both an expense synergy and tax rate standpoint."[65] Analyst Shibani Malhotra at Sterne Agee commented that while "Allergan will likely do all

---

61   Pershing Square Sch. 13D, Item 1, page 5
62   "Aggressive' Options Activity Ahead of Tie-Up," *Dow Jones Institutional News*, April 22, 2014, 13:10
63   "Allergan Confirms Receipt of Unsolicited Proposal from Valeant," *Business Wire*, April 22, 2014, 11:00
64   David Amsellem and Traver A. Davis, "Allergan Inc. (AGN) Neutral; What Can Allergan Do? Staying Independent Most Likely Not in the Cards," *Piper Jaffray*, April 22, 2014
65   Chris Schott, CFA, Jessica Fye, Dana C Flanders, and Wendy L Lin, "VRX/AGN: Initial Thoughts on a Potential Transaction," *JP Morgan*, April 22, 2014

Report of      Dr. Mukesh Bajaj

Date           October 11, 2016



it can to resist a hostile takeover by Valeant," Allergan's "management would need
to take transformative action in order to keep the company independent."[66]

59. On April 21, Allergan stock closed at $142, reflecting a statistically significant
excess return of 5.31% until the close of regular trading on the NYSE. It then rose
to $171.03 per share (a 20.44% increase from the closing price of $142) in
afterhours trading.[67] On the next trading day, Tuesday, April 22, Allergan stock
closed at $163.65, for a significant abnormal or excess return of 14.70%.

60. Thus the review of cause and effect relationship through an event study provides
evidence that the market for Allergan stock was efficient during the Class Period.

61. While event study evidence can necessarily only pertain to a few economically
material events observed during the Class Period and necessarily involves some
economic judgment on which of these events would be economically material to
shareholders of Allergan, below I discuss another test of market efficiency that can
be conducted on a second-by-second basis throughout the Class Period.

## B. The put-call-parity test, conducted on a second-by-second basis, also demonstrates that Allergan stock traded in an efficient market during the Class Period

62. As I have discussed earlier, in an efficient market, stock prices react promptly to all
publicly available information. If there are multiple markets where the security of
a company could be traded, then the information incorporated in the price of the
security in one market should also be reflected in the price in the other market. In
other words, in an efficient market, price discrepancies on two different markets
should not provide profitable "arbitrage trading" opportunities. Simply put, an
arbitrage opportunity exists, for example, if an investor can profit from the presence
of different prices in different markets for the same security. To illustrate, assume

---

[66]  Shibani Malhotra, "Allergan, Inc.: Hostile Take-Out of Allergan Unlikely Without a Fight," *Sterne Agee*,
April 21, 2014
[67]  "Ackman, Valeant buy stake in Allergan, eye takeover," *Agence France Presse*, April 21, 2014, 17:47

Report of          Dr. Mukesh Bajaj

Date               October 11, 2016



a stock trades on both an American and a French exchange. Suppose an investor learns that at a particular point of time the stock was trading for $100 a share in the U.S., while it traded in France for $105. There then exists an arbitrage opportunity, since an investor can short sell the stock in France for $105, use the proceeds to buy the stock in the U.S. for $100, use the stock to close out the short position in France, and earn a profit of $5 (less any transaction costs). An efficient market is inconsistent with such arbitrage opportunities persisting. In the above example, in an efficient market the public knowledge of such inter-market price differences would become reflected in the market prices, and thus force the prices into convergence and eliminating the arbitrage opportunity.

63. Similarly, if there is derivative (options) market in addition to the stock market in which the company's securities are traded, then the value relevant information should affect both the stock and option markets simultaneously in an efficient market. If not, then there would be arbitrage opportunities to buy a security in one market and sell identical security (in terms of cash flows) in another market to realize risk less profits.

64. A security identical to the common stock can be created by trading a combination of put and call options and a bond.[68] A "synthetic" share can be created in the derivative market by purchasing a call option, selling a put option and lending the present value of the exercise price and expected dividends over the option's contractual term. Thus, in an efficient market, the stock price should equal the price of such a synthetic share. If this relationship, known as "put-call parity," is violated,

---

[68]   Battalio, Robert and Paul Schultz, 2006, "Options and the Bubble," *The Journal of Finance* 61, no. 5 (Oct. 2006), ("Battalio and Schultz (2006)") pages 2071-102

Report of        Dr. Mukesh Bajaj

Date             October 11, 2016



arbitrage opportunities exist, contrary to what would be expected in an efficient
market.

65. I use quote-level data for Allergan stock, and related options in order to test for the
put-call parity equality over the Class Period. Allergan had about 200 distinct
option pairs (with varying strike prices and maturities) traded during the Class
Period.[69] For example, on April 3, 2014, the options traded had seven different
maturities ranging from few weeks to close to two years and 35 different strike
prices ranging from $45 to $195. The combinations for these maturities and strike
prices resulted in about 202 distinct call options and same number of put options
being available to trade on April 3, 2014.

66. I perform the put-call parity analysis at every second on each trading date, resulting
in over 140 million observations over the Class Period. Of these, I find that the
number of arbitrage opportunities, wherein there is a violation in the put-call parity
equality of 1 cent or larger, are minuscule, at only 0.07%.

67. However, such violations have to be large enough for the arbitrage opportunity to
be significant. For example, Battalio and Schultz (2006) consider such arbitrage
opportunities to be economically significant if the observed deviations are larger
than or equal to 1% of stock price or $1.[70]  When I apply these criteria to identify
economically significant violations, I found none. See Table 2 below for the results
of put-call-parity analysis. Hence the put-call-parity tests provide strong evidence
that the Allergan stock traded in an efficient market during the Class Period.
Appendix IV provides the details about the methodology used in this analysis.

---

[69]   An option pair is a call and put option with same strike price and maturity. Note that these are American
       options, i.e. they could be exercised at any time until maturity of the option
[70]   Battalio and Schultz (2006), Table II

Report of        Dr. Mukesh Bajaj

Date            October 11, 2016



---

### Table 2: Put-Call Parity Analysis

| Description | Class Period |
|---|---|
| No. of Put-Call Parity Observation Checks | 140,492,351 |
| No. of Arbitrage Opportunities | 101,812 (0.07%) |
| No. of Arbitrage Opportunities Greater than 1% of Stock Price | 0 (0.00%) |
| No. of Arbitrage Opportunities Greater than $1.00 | 0 (0.00%) |

## VIII.    There are common class wide methodologies for damages calculation

68.  While I have not been asked to provide an opinion quantifying damages in this action, based on my expertise, experience and understanding of the nature of the claims in the case, damages in this matter can be calculated using a common formula that measures the difference between the selling price actually received and the true value of the shares had there been no material omissions and misconduct by Defendants.  Furthermore, to the extent that certain claims of the Class are subject to the limitation that damages "not exceed the profit gained or loss avoided in the transaction or transactions that are the subject of the violation,"[71] that limitation will be common to all members of the Class.

69.  The methodology and evidence for establishing damages is thus common to the class and can be measured class-wide. In particular, the selling price per share received by Class members will be determined during the claims process. Similarly, a determination of the "true value" of the shares sold in the absence of alleged omissions and misconduct by the Defendants, will be subject to common

---

[71]   Securities Exchange Act of 1934, Section 20A

<table>
<tr><td>Report of</td><td>Dr. Mukesh Bajaj</td></tr>
<tr><td>Date</td><td>October 11, 2016</td></tr>
</table>



proof and a common formula that is the same for all Class members. Moreover, the "profits gained" by the Defendants as a result of the alleged misconduct will necessarily be the same for all Class members. Thus, damages can be calculated using a common formula applied to all Class members.

## IX.  Conclusion

70. The *Cammer-Unger* factors and other empirical tests are all consistent with the conclusion that the market for Allergan common stock was efficient during the Class Period.

71. Based on my consideration of damages methodology discussed above, I have reached an opinion that damages in this case are subject to common proof and can be computed on a class wide basis utilizing a common methodology.

Respectfully Submitted,

_____

Mukesh Bajaj Ph.D.

October 11, 2016

**Exhibit 1: Allergan Inc. Market Model Regression Results**

| Time Period | 2/25/2013 to 2/24/2014 |
|---|---|
| **Number of Observations** | 252 |
| **Adjusted R-squared** | 0.23 |
| **Root Mean Square Error (RMSE)** | 0.01 |

| Vairable | Coefficient | T-Stat |
|---|---|---|
| Intercept | 0.00 | (0.67) |
| S&P 500 Total Return Index | 0.78 | 3.83 |
| Industry Index | 0.32 | 2.18 |

**Source**: Bloomberg L.P.

**Note**: [1] The industry index is an equally weighted index.  The index is made up of Allergan's peers according to its 2013 annual report.  Abbot, Amgen, Biogen Idec., Bristol-Myers Squibb, Celgene, Eli Lilly, Endo Health Solutions, Forest laboratories, Gileade, Johnson & Johnson, St. Jude Medical, Stryker, and Valeant are listed in the report.  Valeant was removed from the index.

# Appendix I

NAVIGANT

# Mukesh Bajaj, Ph.D.

**Managing Director and Global Head of the Securities & Finance Practice**
**Navigant Economics, LLC**

685 Third Avenue, 14th Floor, New York, NY 10017
1999 Harrison Street, Suite 2700, Oakland, CA 94612
Office: 212.401.8659 Cell: 510.406.1657 Email: mukesh.bajaj@navigant.com

## Professional Summary

Dr. Mukesh Bajaj is a Managing Director and Global Head of the Securities & Finance Practice at Navigant Economics, LLC.  Prior to joining Navigant Economics, Dr. Bajaj founded AFE Consulting and served as its President.

Dr. Bajaj advises clients in matters involving economic and financial issues, and has managed hundreds of consulting and litigation support assignments. Dr. Bajaj is an expert in matters relating to securities fraud, valuation of complex derivatives and intellectual property, insider trading, financial market microstructure, intangible assets, transfer pricing, interests in closely-held firms, warrants, restricted stock and other complex contingent securities, and purchase price allocation studies. He has also consulted on financial strategy and acquisition analysis.

Dr. Bajaj has testified in various Federal and State Courts, the Superior Court of California, the State Board of Equalization in California, the U.S. Tax Court, arbitrations, mediations and in IRS Appeals proceedings. He has also testified in Canadian and Australian courts, testified in JAMS arbitration and filed an expert report in the International Center for Settlement of Investment Disputes.

As a practicing academic, Dr. Bajaj has an active research program and he has taught corporate finance, investments, and financial engineering courses in the MBA and Masters in Financial Engineering programs at the Haas School of Business at the University of California at Berkeley. Prior to his consulting practice, Dr. Bajaj was an assistant professor of finance and business economics at the University of Southern California where he taught undergraduate and graduate courses in finance. Dr. Bajaj is the recipient of several teaching awards and scholastic honors and has published several articles in leading academic and applied journals, such as *The Journal of Finance*, *The Journal of Financial Economics*, *The Journal of Financial Research*, *The Journal of Applied Finance*, *International Economic Review*, *Research in Finance*, *The Journal of Corporation Law*, *The Journal of Derivatives* and *Research in Law and Economics.*

Dr. Bajaj holds a PhD in Finance from the University of California at Berkeley and an MBA from the University of Texas at Austin. He earned a Bachelor of Technology in Chemical Engineering from the Indian Institute of Technology, Delhi.

## NAVIGANT

# Mukesh Bajaj, Ph.D.
**Managing Director and Global Head of the Securities & Finance Practice**
**Navigant Economics, LLC**

| Professional Experience |
| --- |

| | | |
| --- | --- | --- |
| **2012 – Present** | **Navigant Economics** | |
| | Managing Director and Global Head of the Securities & Finance Practice | |

**1997 – 2014**    **Haas School of Business, University of California, Berkeley**
Lecturer

**2011 – 2012**    **AFE Consulting**
Founder and President

**1997 – 2011**    **LECG LLC**
Senior Managing Director and Practice Leader (2007 – 2011)
Member – Executive Management Committee (2007 – 2011)
Member – Management Advisory Committee (2003 – 2007)
Member – Board of Directors (2001 – 2003)
Managing Director (1999 – 2007)
Director (1999)
Affiliate (1998)
Principal (1998)
Senior Economist (1997)

**1995 – 1997**    **BVS Inc.**
Senior Associate

**1988 – 1995**    **University of Southern California**
Assistant Professor – Finance and Business Economics
- Award from Faculty Research and Innovation Fund, University of Southern
California, 1990

**1983 – 1988**    **University of California, Berkeley**
Instructor
Graduate Student Instructor
- Graduate Fellowship, University of California, Berkeley (1988)
- Earl F. Cheit Award for Outstanding Teaching, Graduate School of Business,
University of California, Berkeley (1986–1987)
- Outstanding Graduate Student Instructor Award, University of California,
Berkeley (1986–1987)
- Outstanding Graduate Student Instructor Award, University of California,
Berkeley (1985–1986)
- Award for Best Technical Paper published in Indian Chemical Engineer (1983)

# NAVIGANT

## Mukesh Bajaj, Ph.D.
**Managing Director and Global Head of the Securities & Finance Practice**
**Navigant Economics, LLC**

### Education

**University of California, Berkeley**
PhD in Business Administration (Finance)

**University of Texas at Austin**
MA in Business Administration
  * Sword Scholar (Dean's List), University of Texas at Austin

**Indian Institute of Technology, Delhi, India**
Bachelor of Technology
  * National Science Talent Scholar, National Council of Educational Research and Training, India

### Expert Testimony on Record

*OpenGate Capital, LLC, et al., v. Thermo Fisher Scientific Inc.*, Civil No. 13-475-GMS in the United States District Court for the District of Delaware. Testified in deposition regarding damages allegedly caused by claims of fraudulent misrepresentation in connection with the purchase of a division of Thermo Fisher by OpenGate. Deposition in November 2015.

*Continental Industries Group, Inc. v. FTS International Services, LLC, et al.*, Case Nos. 12-CV-05599 and 12-CV-06966 in the United States District Court, Southern District of New York. Testified in deposition and trial on economic damages resulting from the alleged breaches of two supply agreements between the Plaintiff and Defendants. Deposition in October 2014. Trial in October 2015.

*In re: UBS Financial Services, Inc. of Puerto Rico Securities Litigation*, Civil Case No.: 3:12-cv-01663-CCC, United States District Court for the District of Puerto Rico. Testified in deposition on economic issues related to certain Puerto Rico closed-end funds for class certification purposes. Deposition in September 2015.

*In the Matter of the Arbitration between Offshore Exploration and Production LLC, Claimant/Seller, v. Korea National Oil Corporation and Ecopetrol, S.A., Respondents/Purchasers*, ICDR Case No. 50 198 T 00825 1 in the International Centre for Dispute Resolution. Testified in arbitration proceedings on the calculation of prejudgment interest related to payments Claimant/Seller asserted should have been made pursuant to an escrow agreement between Claimant/Seller and Respondents/Purchasers. Arbitration in February 2014.

*Sekisui America Corporation and Sekisui Medical Co., Ltd. v. Richard and Mary Louise Trudel-Hart*, Case No. 12-CIV-03479 in the United States District Court, Southern District of New York. Testified in deposition on damages in an action alleging breach of contract arising out of the sale of a medical diagnostics company. Deposition in September 2013.

685 Third Avenue, 14th Floor, New York, NY 10017
1999 Harrison Street, Suite 2700, Oakland, CA 94612
Office: 212.401.8659 Cell: 510.406.1657 Email: mukesh.bajaj@navigant.com

Page 3

# NAVIGANT

## Mukesh Bajaj, Ph.D.

**Managing Director and Global Head of the Securities & Finance Practice**
**Navigant Economics, LLC**

### Expert Testimony on Record (Continued)

*Securities and Exchange Commission v. Manouchehr Moshayedi*, Case No. 12CV-01179-JVS-JPR in the United States District Court for the Central District of California.  Testified in deposition regarding allegations by the SEC of insider trading against the founder and former CEO of STEC, a maker of custom memory solutions. Deposition in August 2013.

*In re American International Group, Inc. 2008 Securities Litigation*, Master File No. 08-CV-4772-LTS in the United States District Court, Southern District of New York. Testified in depositions and in an evidentiary hearing on market efficiency at class certification stage in a securities fraud class action alleging that Defendants materially misstated the extent to which AIG had accumulated exposure to the subprime mortgage market through its securities lending program and its credit default swap ("CDS") portfolio. Depositions in November 2011 and March 2012.  Evidentiary Hearing in April 2013.

*Securities and Exchange Commission v. Fabrice Tourre*, Case No. 10-CV-3229 (KBF) in the United States District Court, Southern District of New York.  Testified in deposition on the economic materiality of the nondisclosure of certain hedge fund positions with respect to a particular synthetic ABS CDO. Deposition in February 2013.

*Ohio Public Employees Retirement System, On Behalf of Itself and all Others Similarly Situated, v. Federal Home Loan Mortgage Corporation a/k/a Freddie Mac, Richard F. Syron, Patricia L. Cook, Anthony S. Pizel, and Eugene M. McQuade*, Civil Action No. 4:08-cv-160 in the United States District Court for the Northern District of Ohio, Eastern Division (Youngstown). Testified in deposition concerning the efficiency of the market for Freddie Mac's common stock and the economic evidence as it related to the Plaintiff's allegations that alleged misrepresentations and omissions were material. Deposition in January 2013.

*Cora E. Bennett v. Sprint Nextel Corporation, Gary D. Forsee, Paul N. Saleh and William G. Arendt*, Case No. 09-CV-2122 EFM/KMH in the United States District Court for the District of Kansas. In the class-certification stage of a securities fraud class action, testified in deposition regarding the economic evidence supporting the claim that Sprint bonds traded in efficient markets throughout the Class Period. Deposition in June 2012.

*State of New Jersey, Department of Treasury, Division of Investment, on behalf of Common Pension Fund A. v. Merrill Lynch & Co. and Bank of America Corp.*, Case No. L-3855-09 in the Superior Court of New Jersey. Testified in deposition on the materiality of accounting allegations, loss causation and damages calculations in connection with transactions involving the purchase and subsequent conversion of a convertible preferred security to common stock. Deposition in May 2012.

*In re Richard Kirby v Centro Properties Ltd & Ors* (VID 326 of 2008), *Richard Kirby v Centro Retail Ltd & Ors* (VID 327 of 2008), and *Nicholas Stott v Pricewaterhouse Securities Ltd* (VID 1028 of 2010), in the Federal Court of Australia. In a pair of securities class action disputes in Australia, testified at trial on alleged disclosure deficiencies of two Australian REITs in connection with certain short-term and long-term debts and the effect of those disclosures on the prices of the REITs' two stapled securities, as well as on the condition of the global credit market during the class period. Trial in May 2012.

685 Third Avenue, 14th Floor, New York, NY 10017
1999 Harrison Street, Suite 2700, Oakland, CA 94612
Office: 212.401.8659 Cell: 510.406.1657 Email: mukesh.bajaj@navigant.com

Page 4

# NAVIGANT

## Mukesh Bajaj, Ph.D.

**Managing Director and Global Head of the Securities & Finance Practice
Navigant Economics, LLC**

### Expert Testimony on Record (Continued)

*In re Lehman Brothers Securities and ERISA Litigation*, Case No. 09-MD-2017 (LAK) in United States District Court, Southern District of New York. Testified in deposition on the market for structured products and the market's general awareness of credit risks associated with structured finance products in the class-certification stage of a securities fraud class action alleging materially false and misleading statements and omissions in the offering documents of principal-protected notes. Deposition in April 2012.

*In re International Textile Group Merger Litigation*, C.A. No. 2009-CP-23-3346 in the Court of Common Pleas for the State of South Carolina, County of Greenville. Testified in deposition on damages and loss causation for class action and derivatives suits arising from a merger. Deposition in April 2012.

*Bank of America National Association, and Banc of America Securities LLC v. Bear Stearns Asset Management Inc., Ralph Cioffi, Matthew Tannin, and Raymond McGarrigal*, Case No. 1:08-cv-0265-AJN in the United States District Court, Southern District of New York. Testified in deposition on damages related to a securitization transaction and the Defendants' alleged failure to disclose the financial condition of their hedge funds. Deposition in March 2012.

*Between: Howard Green and Anne Bell, and Canadian Imperial Bank of Commerce, Gerald McCaughey, Tom Woods, Brian G. Shaw, And Ken Kilgour*, No. CV-08-00359335-0000, Ontario Superior Court of Justice. Testified in deposition on loss causation in proceedings under the Class Proceedings Act, 1992 alleging that Defendants made various misrepresentations regarding CIBC's CDO exposure and the extent of impairment of CIBC's CDO positions. Deposition in December 2011.

*In re Tronox Inc. Securities Litigation*, No. 09 Civ. 06220 (SAS), United States District Court, Southern District of New York. Testified in deposition on market efficiency at class certification stage in a securities fraud class action alleging that Defendants materially misstated the extent of legacy environmental liabilities. Deposition in December 2011.

*In re Federal Home Loan Mortgage Corp. (Freddie Mac) Securities Litigation*, Case No. 1:09-MD-2072 in the United States District Court, Southern District of New York. (Appeal denied by United States Court of Appeals for the Second Circuit, May 31, 2012.) Testified in deposition and hearing before the Court on market efficiency at class certification stage in a securities fraud class action alleging misrepresentations concerning Freddie Mac's capitalization and credit risk exposure. Depositions in August 2011 and November 2011. Court hearing in November and December 2011.

*Estate of John F. Koons, III v. Commissioner of Internal Revenue*, Docket Nos. 19771-09 and 19772-09, in the United States Tax Court. Testified at trial regarding the valuation of certain membership interests in a limited corporation. March 2011.

*In Re Altria Group, Inc. v. United States of America*, Case No. 1:06-cv-09430-RJH in the United States District Court, Southern District of New York. Testified in deposition and at trial regarding economic issues affecting tax treatment of certain leveraged lease transactions. Deposition in December 2007. Trial in June-July 2009.

# NAVIGANT

# Mukesh Bajaj, Ph.D.

**Managing Director and Global Head of the Securities & Finance Practice**
**Navigant Economics, LLC**

## Expert Testimony on Record (Continued)

*Madison Tyler Holdings, LLC, et al., Claimants v. Financial Asset Trading & Technology of California, LLC, et al., Respondents; Financial Asset Trading & Technology of California, et al., Cross-Claimants, v. Madison Tyler Holdings, LLC, et al., Cross-Respondents*; and related arbitration *Madison Tyler Holdings, a Delaware Limited Liability Company, et al., Counter-Claimants and Respondents v. Rajashree Karwa, an individual, Counter-Respondent and Claimant*. Arbitration Before JAMS, JAMS Ref. No. 1220038462. Testified in deposition on economic analysis of source of value creation in algorithmic trading strategies. June 2009.

*Lawrence E. Jaffe Pension Plan, On Behalf of Itself and All Others Similarly Situated, v. Household International, Inc., et al.*, Case No. 02-C-5893 in the United States District Court, Northern District of Illinois, Eastern Division. Testified in deposition and at trial on loss causation and damages in a securities class action alleging securities fraud arising from purported accounting irregularities and predatory lending practices to subprime borrowers. Deposition in March 2008. Trial in May 2009.

*Guerrero Family Trust, Carmen De Leon Guerrero, Jose T. Tenorio Trust, Estate of Santiago C. Tenorio, Juan T. Guerrero, Jesus T. Guerrero, and AJT Trust, v. Kinki Nippon Tourist Co. LTD, Saipan Hotel Corporation, Pacific Development Inc., Pedro J.L. Igitol, in his official capacity of Secretary of Saipan Hotel Corporation, Morgan Stanley Japan Limited, Marianas Holdings, LLC, and K.K. ING Karuizawa Training Institute*, Civil Action No. 04-0574D in the Superior Court of the Commonwealth of the Northern Mariana Islands. Testified in deposition on damages arising from alleged abuse of fiduciary duty and dilution of minority shareholders' stock holding. July 2008.

*In the Matter of David A. Finnerty, et al., Administrative Proceeding*, File No. 3-11893, Before the Securities and Exchange Commission. Testified in trial regarding the trading patterns of certain NYSE specialists in connection with alleged violations of priority rules and securities laws. February and March 2008.

*In Re NYSE Specialists Securities Litigation*, Master File No. 03 Civ. 8264 (RWS) in the United States District Court, Southern District of New York. Testified in deposition on class certification issues relating to alleged trading-rule violations by New York Stock Exchange specialist firms. November 2007.

*Theo Bullmore and Phillip S. Stenger, as Joint Official Liquidators of Beacon Hill Master Ltd. (In Official Liquidation), Plaintiffs v. Ernst & Young Cayman Islands, Ernst & Young LLP, Beacon Hill, Asset Management, LLC, John D. Barry, Thomas Daniels, John Irwin, Mark Miszkiewicz, and ATC Fund Services (Cayman) Limited f/k/a ATC Fund Administrators (Cayman) Limited, Defendants*, Index No.: 104314/05 in the Supreme Court of the State of New York, County of New York. Testified in deposition on the causation and alleged damages experienced by the Beacon Hill Master Fund caused by an alleged improper audit by Ernst & Young Cayman Islands. September 2007.

*Sterling Savings Association and Sterling Financial Corporation v. United States of America, Defendant*, Case No. 95-829C in the United States Court of Federal Claims. Testified in deposition and at trial on damages due to alleged breach of contract as a result of Financial Institutions Reform and Recovery Act of 1989. Depositions in June 2002 and May 2004. Trial in July 2007.

NAVIGANT

# Mukesh Bajaj, Ph.D.
**Managing Director and Global Head of the Securities & Finance Practice**
**Navigant Economics, LLC**

## Expert Testimony on Record (Continued)

*Adelphia Communications Corp., Plaintiff v. Deloitte & Touche LLP, (Defendant) v. John Rigas, Timothy Rigas, Michael Rigas and James Rigas (Additional Defendants)*, in the Court of Common Pleas, Philadelphia County. Testified in deposition on loss causation and damages issues related to alleged improper conduct by auditor. May 2007.

*David S. and Malia A. Litman v. United States of America*, Case No. 05-956T; *Robert B. and Michelle S. Diener v. United States of America*, Case No. 05-971T; *Hotels.com Inc. and Subsidiaries (f/k/a Hotel Reservations Network, Inc.) v. United States of America*, Case No. 06-285T. Judge Christine O.C. Miller in the United States Court of Federal Claims. Testified in deposition and at trial on valuation of 9.9 million shares of stock issued to certain former officers of Hotels.com for tax purposes. Deposition in July 2006. Trial in May 2007

*Jane Z. Astleford, Donor, Petitioner v. Commissioner of the Internal Revenue, Respondent*, Docket No 4342-06 in the U.S. Tax Court. Testified at trial on value of certain interests in a limited partnership. March 2007.

*United States of America v. Sanjay Kumar and Stephen Richards*, 04-CR-0846 (ILG), in the United States District Court, Eastern District of New York. Testified at trial on loss causation and damages issues in criminal securities fraud matter in which defendants pleaded guilty to improper revenue recognition related accounting irregularities. October 2006.

*The Procter and Gamble Company and Subsidiaries & Proctor and Gamble FSC (Barbados) vs. The United States of America*, Case number 1:05cv355 in United States District Court for the Southern District of Ohio, Western Division. Testified in deposition on fair market value of certain technologies donated by Proctor and Gamble to various entities in connection with a tax dispute. September 2006.

*United States of America v. Richard Volpe*, Indictment S1 05 Cr. 390 (SHS) in the United States District Court, Southern District of New York. Testified at trial on liability issues in criminal securities fraud matter alleging illegal trading by certain New York Stock Exchange specialists. August 2006.

*United States of America v. Robert Scavone*, Indictment S1 05 Cr. 390 (SHS) in the United States District Court, Southern District of New York. Testified at trial on liability issues in criminal securities fraud matter alleging illegal trading by certain New York Stock Exchange specialists. July 2006.

*United States of America v. Michael Hayward and Michael Stern*, Indictment S1 05 Cr. 390 (SHS) in the United States District Court, Southern District of New York. Testified at trial on liability issues in criminal securities fraud matter alleging illegal trading by certain New York Stock Exchange specialists. July 2006.

*Commonwealth Holdings, Inc., Profit Sharing Plan & Trust, James T. Waddill, IV et al. v. Salomon Smith Barney, Inc. and John Henry Spatz*, in a hearing before NASD. Testified on loss causation and damages aspects of Plaintiffs' claims arising from alleged securities fraud. September 2005.

# NAVIGANT

## Mukesh Bajaj, Ph.D.
**Managing Director and Global Head of the Securities & Finance Practice**
**Navigant Economics, LLC**

### Expert Testimony on Record (Continued)

*Messrs. Robert, Charles and John Switzer et al. v. Deutsche Bank et al.*, in a hearing before NASD. Testified on liability and damages aspects of Plaintiffs' damage claims arising from alleged unsuitable investments in certain leveraged debt obligations. June 2005.

*IDT Corp. v Telfonica S.A. et al.*, Case No. 01 CV 471 in the United States District Court for New Jersey. Testified in deposition on liability and loss causation aspects in a claim of alleged securities fraud. April 2005.

*Sherewin I. Ray et al. v. Citigroup Global Markets, Inc. f/k/a Salomon Smith Barney, Inc., Citigroup, Inc. and John Henry Spatz*, Case No. 03C3157 in the United States District Court for the Northern District of Illinois, Eastern Division. Testified in deposition on liability and loss causation in a claim of alleged securities fraud. March 2005.

*American National Bank and Trust Company of Chicago, as Trustee f/b/o Emerald Investments LP, and Emerald Investments LP, an Illinois Partnership v. Allmerica Financial Life Insurance and Annuity Company.* Testified in deposition on certain liability aspects in a breach of contracts claim involving certain mutual fund trading strategies. January 2005.

*In re WorldCom, Inc. ERISA Litigation*, Master File No. 02 Civ. 4816 (DLC) in the United States District Court, Southern District of New York. Testified in deposition on liability aspects of Plaintiffs' damage claims in an ERISA class action. January 2005.

*Xilinx Inc. and Subsidiaries v. Commissioner of Internal Revenue Service*, Docket Nos. 004142-01 and 00702-03. Testified in U.S. Tax Court on whether grant date value, or certain spread upon exercise, of employee stock options should be considered part of cost sharing pool in a cost sharing arrangement between Xilinx, Inc. and its Irish affiliate. Trial in July 2004. Submitted affidavit in connection with motion to dismiss in June 2002.

*Maxtor Corporation v. Koninklijke Philips Electronics N.V., Philips Semiconductors B.V., Philips Semiconductor International B.V., Philips Electronics North America Corporation, Philips Semiconductors, Inc., Philips Semiconductor Manufacturing, Inc., Philips France, Philips Japan, Ltd., and Does 1 through 25*, Case No. CV 808650 in the Superior Court of the State of California, County of Santa Clara. Testified in deposition on damages analysis in connection with alleged design failure of a chip used in manufacturing computer hard drives. March 2004.

*Mid-Continent Federal Savings Bank v. United States of America, Defendant*, Case No. 95-472C in the United States Court of Federal Claims. Testified in deposition and at trial in Court of Federal Claims on damages due to alleged breach of contract as a result of Financial Institutions Reform and Recovery Act of 1989. Deposition in April 2002. Trial in July 2003.

*Robert F. Flood v. Bessemer Trust Company, N.A.; Robert G. Vanneman; and Does 1-25 and Stephen Gorosh v. same defendants.* Testified in deposition on alleged damages due to failure to diversify. November 2002.

# NAVIGANT

## Mukesh Bajaj, Ph.D.
**Managing Director and Global Head of the Securities & Finance Practice**
**Navigant Economics, LLC**

### Expert Testimony on Record (Continued)

*Christine P. Rales, Plaintiff v. Steven M. Rales, Defendant*, Civil Action No. 02DR166-D in the Superior Court of District of Columbia. Testified in deposition on the fair market value of a block of 19.67 million shares of common stock of Danaher Corporation held by Stephen M. Rales. February 2002.

*American National Bank and Trust Company of Chicago, as Trustee f/b/o Emerald Investments LP, and Emerald Investments LP, an Illinois Partnership v. AXA Client Solutions, LLC, The Equitable Life Assurance Society of the United States, and AXA Financial, Inc.*, Case No. 00 C 6786. Testified in deposition on damages due to alleged breach of contract involving certain mutual fund trading strategies. May 2002.

*Statewide Savings Bank, S.L.A., Plaintiff v. United States of America, Defendant*, Case No. 95-779C in the United States Court of Federal Claims. Testified in deposition on damages due to alleged breach of contract as a result of Financial Institutions Reform and Recovery Act of 1989. February 2002.

*Charles T. McCord and Mary S. McCord, Donors, Petitioners v. Commissioner of Internal Revenue, Respondent*, Docket No 7048-00 in the U.S. Tax Court. Testified at trial on value of several interests in a limited partnership. May 2001.

*Estate of Elma Middleton Dailey, Deceased, K. Robert Dailey, II, Executor, Petitioner v. Commissioner of Internal Revenue, Respondent*, Docket Nos 6251-00 and 6262-00 in the U.S. Tax Court. Testified at trial on value of several interests in a limited partnership. May 2001.

*John G. Balletto v. Xoom.com, Inc.*, Case No. 306798 in the Superior Court of California, San Francisco County. Testified in deposition and at trial relating to damages due to alleged breach of contract. January 2001. Deposition in January 2001. Trial in March 2001.

*Edison International (1585456), Mission First Financial (1431482), Edison Capital (1417993), Edison Funding Company (1417994), Renewable Energy Capital Company (0715920), Mission Funding Epsilon (1426267) v. California Franchise Tax Board*. Testified before the State Board of Equalization on whether Mission First Financial and its parent company SCEcorp formed a unitary business for tax purposes during 1988 to 1990. December 2000.

*Framatome Connectors USA Holdings, Inc. and Subsidiaries, et al. v. Commissioner of Internal Revenue Service*, Docket No. 5030-98, 9160-99, 118 T.C. 32 (2002), aff'd, 108 Fed. Appx. 683, (2004). Testified in trial on whether Burndy Japan was a controlled foreign corporation of the petitioner for the years 1988, 1989 and 1992 under section 957(a) (2) of the Internal Revenue Code. October 2000.

*Barry G. Hittner, Receiver of American Universal Insurance Company v. Sequa Corporation, et al.*, M.D.L. No. 972, C.A. No. 1:92-512. Testified in deposition on the value of a $50 million note backed by certain real estate. June 2000.

*Estate of Richie C. Heck, Deceased, Gary Heck, Special Administrator, Plaintiff v. Commissioner of Internal Revenue Service, Defendant.* Docket No. 11619-99 in the U.S. Tax Court. Testified at trial on the valuation of a minority interest in F. Korbel & Bros., Inc. June 2000.

685 Third Avenue, 14th Floor, New York, NY 10017
1999 Harrison Street, Suite 2700, Oakland, CA 94612
Office: 212.401.8659 Cell: 510.406.1657 Email: mukesh.bajaj@navigant.com

Page 9

# NAVIGANT

## Mukesh Bajaj, Ph.D.
**Managing Director and Global Head of the Securities & Finance Practice**
**Navigant Economics, LLC**

### Expert Testimony on Record (Continued)

*American Heritage Bancorp, Plaintiff v. United States of America, Defendant*; *Federal Deposit Insurance Corporation, as successor to the rights of Home Federal Savings Bank, Plaintiff Intervenor v. United States of America, Defendant*. Case No. 90-3982C. Testified in deposition on damages due to alleged breach of contract as a result of Financial Institutions Reform and Recovery Act of 1989. May 2000.

*Estate of Robert H. Lurie, deceased, Ann Lurie, Executor v. Commissioner of Internal Revenue*, Docket No. 22639-94 in the U.S. Tax Court. Testified at trial on whether certain trusts accumulated assets from investments without transfers for inadequate consideration by the deceased. February 1999.

*Joseph K. Mitchell, et al., v. Central Investment Corporation*, Case No. A9700035, Special Proceedings in the Court of Common Pleas, Hamilton County, Ohio. Testified in deposition regarding fair cash value of a minority position in stock of a Pepsi-Cola bottling company in connection with a freeze-out merger. March 1998.

*Walter L. Gross, Jr. & Barbara H. Gross, Petitioners v. Commissioner of Internal Revenue Service, Respondent*, No. 4460-97; Calvin C. Linnemann & Patricia G. Linnemann, Petitioners v. Commissioner of Internal Revenue Service, Respondent, No. 4469-97. Testified at trial regarding the fair market value of a minority interest in a Pepsi-Cola bottling company, which Petitioners had claimed as a gift-tax liability. November 1997.

*R. J. R. Nabisco Inc. and Subsidiaries v. Commissioner*, Docket No. 3796-95 in the U.S. Tax Court. Testified at trial regarding the nature and useful economic life of cigarette package design for federal income taxation purposes. February 1997.

*Clinton, Inc. & Subsidiaries, Petitioner v. Commissioner of Internal Revenue, Respondent*, Docket No. 9885-95 in the U.S. Tax Court. Testified in deposition regarding reasonable executive compensation pursuant to Internal Revenue Code Section 162 (a) (1). August 1996.

*Fullers Jewelry, Inc., Plaintiff v. Dallas Central Appraisal District, Defendant*, Case No. 94-09169-B, District Court, Dallas County, Texas, 44th Judicial District. Testified in deposition regarding the value of merchandise inventory of a retail jewelry chain for purposes of ad valorem taxation. July 1996.

*American Marazzi, Inc., Plaintiff v. Dallas Central Appraisal District, Defendant*, Cause number 95-07028-B, District Court, Dallas County, Texas, 44th Judicial District. Testified in deposition regarding the value of merchandise inventory of a manufacturer and distributor of ceramic tiles for purposes of ad valorem taxation. June 1996.

*Terence Dean, et al. v. Dean Security, Inc. et al*. Testified in binding arbitration regarding damages due to breach of contract for the sale of a security company. March 1996.

*Advertiser's Dynamic Services, Co., Inc., Plaintiff v. United States of America, Defendant*, Case No. 3-94-CV-2079-G, District Court, North Dallas, Texas. Testified at trial regarding the nature of contracts between a publisher and salespersons for payroll tax purposes. February 1996.

# NAVIGANT

## Mukesh Bajaj, Ph.D.
**Managing Director and Global Head of the Securities & Finance Practice**
**Navigant Economics, LLC**

## Publications / Working Papers

### Publications

"Economic Consequences: The Real Cost of U.S. Securities Class Action Litigation," 2014, with Nikolai Caswell, Anand Goel, Sumon C. Mazumdar and Rahul Surana, issued by Institute for Legal Reform, U.S. Chamber of Commerce.

"Assessing Market Efficiency for Reliance on the Fraud-on-the-Market Doctrine after *Wal-Mart* and *Amgen*," with Sumon C. Mazumdar and Daniel A. McLaughlin, 2014, in James Langenfeld Ed., *Research in Law and Economics,* Volume 26, 161-207.

"The NUA Benefit and Optimal Investment in Company Stock in 401(K) Accounts," with Sumon C. Mazumdar, Vikram Nanda and Rahul Surana, 2009, in A. H. Chen Ed., *Research in Finance,* Volume 25, 203–227.

"Competition in IPO Underwriting: Time Series Evidence," with Andrew H. Chen and Sumon C. Mazumdar, 2008, in A. H. Chen Ed., *Research in Finance*, Volume 24, 1–25.

"A Matrix-Based Lattice Model to Value Employee Stock Options," with Sumon C. Mazumdar, Rahul Surana and Sanjay Unni, 2006, *Journal of Derivatives* 14, 9–26.

"Mean Reversion in Earnings and the Use of E/P Multiples in Corporate Valuation," with David Denis and Atulya Sarin, 2004, *Journal of Applied Finance* 14, 4–10.

"Securities Class Action Settlements: An Empirical Analysis," with Sumon C. Mazumdar and Atulya Sarin, 2003, *Santa Clara Law Review* 43, 1001–1033.

"Ownership Structure, Agency Costs and Dividend Policy," with Anand M. Vijh and Randolph W. Westerfield, 2002, in A. H. Chen Ed., *Research in Finance*, Volume 19, 1–28.

"The Cost of Raising Preferred Equity Capital," with Sumon C. Mazumdar and Atulya Sarin, 2002, *Journal of Financial Research* 25, 577–592.

"Firm Value and Marketability Discounts," with David J. Denis, Stephen P. Ferris and Atulya Sarin, 2001, *Journal of Corporation Law* 27, 89–115.

"Transfer Pricing and Foreign Exchange Risk," with Brian Becker and Jonathan Neuberger, *Transfer Pricing Report*, July 1999.

"Dividend Omissions and Forecasts of Future Earnings: Some Positive Evidence on Information Content of Dividends," 1999, in A. H. Chen Ed., *Research in Finance*, Volume 17, 13–39.

"The Relationship Between Ownership, Financing Decisions and Firm Performance: A Signaling Model," with Sudipto Dasgupta and Yuk-She Chan, 1998, *International Economic Review* 39, 723–744.

---

685 Third Avenue, 14th Floor, New York, NY 10017
1999 Harrison Street, Suite 2700, Oakland, CA 94612
Office: 212.401.8659 Cell: 510.406.1657 Email: mukesh.bajaj@navigant.com

Page 11

# NAVIGANT

## Mukesh Bajaj, Ph.D.

**Managing Director and Global Head of the Securities & Finance Practice**
**Navigant Economics, LLC**

### Publications / Working Papers (Continued)

### Publications (Continued)

"Valuation for Smaller Capitalization Companies," with Scott D. Hakala, 1998, in *Financial Valuation: Business and Business Interests* – 1998 update, Warren, Gorham & Lamant.

"Trading Behavior and the Unbiasedness of the Market Reaction to Dividend Announcements," with Anand M. Vijh, 1995, *Journal of Finance* 50. (Abstract reprinted in *Financial Management Collection*, 1996.)

"Beyond Mere Compliance," with Anita S. Agarwal, *Mortgage Banking*, April 1993, 57–61.

"Dividend Clienteles and the Information Content of Dividend Changes," with Anand M. Vijh, 1990, *Journal of Financial Economics* 26, 193–219.

"The Efficient and Inefficient Media for Political Campaign Advertising," with Roland T. Rust and George T. Haley, 1984, *Journal of Advertising* 13, 45–49.

"Modeling of Non-Ideal Residence Time Distribution in a Continuous Flow Stirred Tank Reactor at Zero RPM," with D. Prasanna Rao, 1983, *Indian Chemical Engineer*, 24–27.

"Alternate Criteria for the Comparison of Regression Models," with Roland T. Rust, presented in *Proceedings of the Southwestern Marketing Association*, Spring 1983.

### Working Papers

"ESO Expensing Under the Revised FAS 123: A Practitioner's Guide," with Sumon C. Mazumdar, Sanjay Unni, and Anand Vijh, September 2005.

"Investment in Company Stock in 401(k) Accounts," with Sumon C. Mazumdar, May 2005.

"The New Accounting Rules for ESO Expensing: Not Quite As Easy As 123," with Sumon C. Mazumdar and Sanjay Unni, March 2005.

"Competition in IPO Underwriting: Time Series Evidence," with Andrew H. Chen, Sumon C. Mazumdar and Atulya Sarin, March 2003.

"Auditor Compensation and Audit Failure: An Empirical Analysis," February 2003.

"The Offer Yield of Preferred Stock," with Sumon C. Mazumdar and Atulya Sarin, March 2002.

"Signaling, Agency Costs and Ownership Structure: Theory and Empirical Implications," with Sudipto Dasgupta and Yuk–Shee Chan, mimeo, Hong Kong University of Science and Technology, 1997.

---

685 Third Avenue, 14th Floor, New York, NY 10017
1999 Harrison Street, Suite 2700, Oakland, CA 94612
Office: 212.401.8659 Cell: 510.406.1657 Email: mukesh.bajaj@navigant.com

Page 12

NAVIGANT

# Mukesh Bajaj, Ph.D.
**Managing Director and Global Head of the Securities & Finance Practice**
**Navigant Economics, LLC**

## Publications / Working Papers (Continued)

### Working Papers (Continued)

"Is it Appropriate to Use a Higher Discount Rate to Value Small Firms?" with Martin Hanan, Rick Knoll, and Mark Mitchell.

"Turnover in Equity Ownership, Risk and Return," September 1995.

## Professional Affiliations

Member, American Finance Association
Member, Western Finance Association
Member, Financial Management Association
Member, European Finance Association

# Appendix II

# Appendix II: Documents Relied Upon

## 1. Academic Literature

- Fama, Eugene F. "Random Walks in Stock Market Prices," *Financial Analysts Journal* 21, no. 5 (Sep. - Oct. 1965), pages 55-59
- Fama, Eugene F. "Efficient Capital Markets: A Review of Theory and Empirical Work," *The Journal of Finance* 25, no. 2 (May 1970), pages 383-417
- Fischel, Daniel R., "Use of Modern Finance Theory in Securities Fraud Cases Involving Actively Traded Securities," *Business Lawyer 38,* no. 1, (Nov. 1982), pages 1-20
- Brown, Stephen J., and Jerold B. Warner. "Using Daily Stock Returns: The Case of Event Studies," *Journal of Financial Economics* 14, no. 1 (1985), pages 3-31
- Macey, Jonathan R., Geoffrey P. Miller, Mark L. Mitchell and Jeffry M. Netter, "Lessons from Financial Economics: Materiality, Reliance, and Extending the Reach of Basic v. Levinson," *Virginia Law Review* 77, no. 5 (Nov. 1991), pages 1017-050
- Fama, Eugene F., "Efficient Capital Markets: II," *The Journal of Finance* 46, no. 5 (Dec. 1991), pages 1575-617
- MacKinlay, A. Craig, "Event Studies in Economics and Finance," *Journal of Economic Literature* 35, (Mar. 1997), pages 13-39
- Battalio, Robert and Paul Schultz, 2006, "Options and the Bubble," *The Journal of Finance* 61, no. 5 (Oct. 2006), pages 2071-102

## 2. Analyst Reports

- David Maris, "Botox Wannabe Walks – Good News for AGN," *BMO Capital* , April 11, 2014
- David Maris, "Five Reasons AGN Shares Have Been Rallying," *BMO Capital Markets* , April 21, 2014
- Larry Biegelsen, "AGN: Media Reports $45B+ Hostile Bid Coming," *Wells Fargo* , April 21, 2014
- Shibani Malhotra, "Allergan, Inc.: Hostile Take-Out of Allergan Unlikely Without a Fight," *Sterne Agee* , April 21, 2014
- David Amsellem and Traver A. Davis, "Allergan Inc. (AGN) Neutral; What Can Allergan Do? Staying Independent Most Likely Not in the Cards," *Piper Jaffray* , April 22, 2014
- Chris Schott, CFA, Jessica Fye, Dana C Flanders, and Wendy L Lin, "VRX/AGN: Initial Thoughts on a Potential Transaction," *JP Morgan* , April 22, 2014
- "Rating Action: Moody's revises Allergan's outlook to negative," *Moody's Investors Service* , April 22, 2014

## 3. Books

- Ross, Stephen A., Randolph Westerfield, and Jeffrey F. Jaffe, *Fundamentals of Corporate Finance,* 8th ed., Boston: McGraw-Hill/Irwin, 2008
- Downes, John, and Jordan Goodman, *Dictionary of Finance and Investment Terms* , 5th ed., Hauppauge: Barron's, 2014
- Tabak, David I. and Frederick C. Dunbar, *Materiality and Magnitude  Event Studies in the Courtroom* , in Litigation Services Handbook: The Role of the Financial Expert, Third Edition, ed. Roman L. Weil, Michael J. Wagner and Peter B. Frank, John Wiley & Sons, Inc. USA, 2001

## 4. Legal Documents

- Securities Exchange Act of 1934, Section 20A
- *Cammer v. Bloom* , 711 F. Supp. 1264, (D.N.J. 1989)
- *Unger v. Amedisys* , 401 F.3d 316 (5th Cir. 2005)
- Class Action Second Amended Complaint, *IN RE ALLERGAN, INC. PROXY VIOLATION SECURITIES LITIGATION* , filed on April 21, 2016

## 5. News Articles

- Jonathan D. Rockoff, "Johnson & Johnson Ending Plans for Botox Rival; Health-Care Company Acquired Wrinkle Fighter PurTox in $1.1 Billion Purchase of Mentor," *The Wall Street Journal Online* , April 11, 2014, 11:09
- Richard Blackwell And Jacquie McNish, "Valeant, Ackman in $45-billion bid for Botox-maker Allergan; Canadian drug company joins with Pershing Square, which has already acquired $4-billion of Botox maker's shares," *The Globe and Mail* , April 21, 2014
- "Ackman, Valeant buy stake in Allergan, eye takeover," *Agence France Presse* , April 21, 2014, 17:47
- "Aggressive' Options Activity Ahead of Tie-Up," *Dow Jones Institutional News* , April 22, 2014, 13:10
- "Allergan Confirms Receipt of Unsolicited Proposal from Valeant," *Business Wire* , April 22, 2014, 11:00
- David Benoit, Dana Mattioli and Jonathan D. Rockoff, "Valeant, Ackman Propose Allergan Deal," *Dow Jones Top News & Commentary* , April 22, 2014, 07:40

**6. Publicly Available Documents**

- Automatic Shelf Registration, S-3, REGISTRATION STATEMENT, UNDER THE SECURITIES ACT OF 1933, Allergan Inc., filed on August 6, 2012
- Schedule 13D, Allergan (Issuer), reported by Pershing Square Capital Management, L.P., PS Management GP, LLC, and William A. Ackman, April 21, 2014 for event date April 11, 2014

**7. Miscellaneous**

- http://www.nobelprize.org/nobel_prizes/economic-sciences/laureates/2013/fama-facts.html

- https://www.nyse.com/market-model

- http://www.dowjones.com/products/product-factiva/

# Appendix III

# Appendix III: A Summary of a Y-filter Trading Strategy

1. This appendix provides a detailed description of the manner in which a y-filter rule results in hypothetical purchases and sales of Allergan's stock over the Class Period. In this example, I set the y-filter at 1%, and describe the trades that such a y-filter rule would dictate starting February 25, 2014 on a second by second basis.

2. The trading strategy requires a computation of the midpoint National Best Bid Offer ("NBBO")[1] quote on a second by second frequency starting at 9:30:00 A.M. Eastern (when exchange trading begins) on the first day of the Class Period.[2] On February 25, 2014, the opening NBBO was $124.23[3] which sets the starting high and low NBBOs. NBBO quotes are updated multiple times per second throughout the trading day.[4] To implement the 1% filter trading rule, I compared the NBBO at each second to the most recent high and low NBBO. By 9:30:01 AM, the NBBO had increased by 0.16% to $124.43. As this increase was less than the 1% filter, no trade was undertaken.  However, in the trading algorithm, the new NBBO ($124.43) being higher than the previous value ($124.23) was identified as the "most recent high" as of 9:30:01. Correspondingly, the prior NBBO ($124.23) is still considered the "most recent low" as of 9:30:01. Such most recent highs and lows could change over time.

3. For instance, at 9:30:20 AM, the NBBO had risen to $124.39. This change represented a 0.13% increase relative to the most recent low ($124.23) and a 0.03% decrease relative to the most recent high ($124.43). As such percentage changes in

---

[1]   Harris, Lawrence, <u>Trading and Exchanges: Market Microstructure for Practitioners</u>, *Oxford University Press*, 2002, page 70.

[2]   This example uses the midpoint NBBO quote to illustrate the mechanics of how the timing of buy and sell trades are determined. Since Allergan's stock paid dividends, the results in my report reflect the incorporation of a dividend adjustment to the midpoint NBBO throughout the Class Period.

[3]   The best bid was $123.95 and the best ask was $124.5. The midpoint of NBBO is the average of the best bid and best ask.

[4]   I conduct my filter test analysis on a second-by-second basis by utilizing the last valid best bid and best offer quotes for each second of the trading day.

the NBBO relative to the most recent high and low were less than 1%, no trade was undertaken. Moreover, the most recent low and high remained unchanged at $124.23 and $124.43, respectively, because the NBBO at 9:30:20 AM was within these bounds. Allergan's NBBO changes on a second-by-second basis continued to be small over the subsequent 27 seconds, during which time no trade was triggered given the 1% filter, and the most recent high and low also remained unchanged.  At 9:30:28, the NBBO rose to $124.45, which resulted in the most recent high changing from $124.43 to $124.45. However, no trade was undertaken because the NBBO of $124.45 did not represent a change greater than 1% relative to the most recent high or low.

4.  Based on the 1% filter, the first trade implemented on February 25, 2014 at 10:22:02 AM, when the NBBO had reached $125.48, which was more than a 1% increase relative to the most recent low ($124.23) at the time.[5]  Thus, according to the 1% filter trading rule, 1 share of Allergan was purchased at $125.49, the prevailing best ask price. This long position was maintained until the NBBO decreased by at least 1% relative to the most recent high at some point in the future. At that juncture, according to the trading rule, the single stock that had been bought was then sold at the prevailing best bid price. Further, as this price change represents a 1% or more decrease relative to the most recent high, an additional share of Allergan was also shorted. The short position was then maintained until the NBBO rose by at least 1% relative to the most recent low.

5.  Thus, at the start of the Class Period, no trading occurs but the most recent high and low are continuously updated until the NBBO exceeds the contemporaneous most recent high or low by 1%. Trading then commences. Subsequently, the strategy involves either holding or selling short 1 share of Allergan stock for the remainder of the Class Period, where such position reversals occur (and profits or losses are calculated) only if the 1% y-filter is triggered.[6] At the end of the Class Period, the

---

[5]  The new NBBO at 9:36:11 ($233.24) was also recorded as the new most recent high.

[6]  The open long or short position at the last second of the Class Period is assumed to be closed at the contemporaneous bid or ask price.

profits from such frequent in-and-out trades are aggregated. This cumulative profit (or loss), net of transaction costs imposed by the full bid-ask spread, represents the profit from the y-filter strategy implemented over the Class Period.[7]

6.    As I discuss in the main body of my report, according to market efficiency principles, such profits from a y-filter strategy should not exceed that of a buy and hold benchmark.

---

[7]     As discussed in this report, my y-filter rule excess profit results also incorporate commissions.

# Appendix IV

# Appendix IV:   Identifying Put-Call Parity Violations

1.    Put-call parity is a well-known relationship between a stock price and its "synthetic" that can be created by buying a European call, writing a European put, and lending the present values of the exercise price and expected dividends over the option's remaining maturity.[1] The cash flow from the synthetic is identical to that of the traded stock at maturity, regardless of whether the stock price increases or decreases in the future. Hence, according to put-call parity, the stock's current price must be equal to the current value of the synthetic share position, otherwise arbitrage is feasible, i.e., the market is informationally inefficient.

2.    According to put-call parity:

$$S = C - P + PV(K)$$

where S, C, P denote the current values of the (non-dividend paying) stock, European call and put, respectively, and PV(K) represents the present value (or price) of the zero-coupon risk free bond that has a face value, K, which is equal to the options' strike price. The right hand side of the above equation represents the synthetic share's current value in equilibrium.

3.    The put-call parity relationship can also be stated as an equality using American options which can be exercised at anytime until maturity instead of European options that can be exercised only at maturity.  While using American options, the early exercise premiums ("EEPs") are subtracted from the observed American call and put prices (see equations 1a

---

[1]    Put and call options give the holder the right but not the obligation to sell or purchase the underlying stock at a pre-specified exercise or strike price, respectively. An option buyer (or the holder) can do so (i.e., "exercise the option") on the option's specified maturity date in the case of "European-style" options or on or before the maturity date in the case of "American-style" options. If an option is "out-of-the-money" (which means that in the case of a call option the stock's observed market price is lower than the option's exercise price, and in the put's case means that the stock price is higher than the exercise price) then an option holder would rationally not exercise the option he holds. In addition to buying options, investors can also sell (or short) an option. By doing so, the seller receives the option's price immediately at the time of sale but must pay the option buyer the difference between the stock and strike price (if positive) if the option buyer exercises the option.

and 1b). The EEPs related to the American put option and the American call option on a dividend-paying stock are calculated using an accepted option pricing model.[2]

4.    I test if Allergan's stock price violated the put-call parity relationship for American options. In my analysis I assumed that investors can only buy at the best ask quote and sell at the best bid quote, an "extreme" assumption about transactions costs.[3] That is, following Battalio and Schultz (2006), I assumed that to purchase a share of stock synthetically, an investor buys the call at the ask price and writes (or sells) the put at the bid price. Thus, a synthetic ask price for the stock, $S_{Synthetic}^{Ask}$ must be equal to:

$$S_{Synthetic}^{Ask} = \left(C^{Ask} - EEP^{Call}\right) - \left(P^{Bid} - EEP^{Put}\right) + PV(K) + D \qquad (1a)$$

Where C and P denote the values of American call and put options, and the EEP terms with superscripts "Call" and "Put" denote the early exercise premiums related to the American call and put option, respectively.   PV(K) denotes the present value of the

---

[2]   An American option's early exercise premium (EEP) is the difference between its observed market value and the estimated value of a hypothetical European option counterpart on the same stock with the same contractual terms except for the absence of the early exercise feature available to American option holders.  I used the well-accepted binomial option pricing model to first calculate the implied volatility of the call and put options in my sample, (*i.e.,* the stock return volatility at which the value of the American option calculated using the binomial model matches its observed midpoint quote).  The implied volatility was used in the binomial model, holding all other parameters constant except for the early exercise feature, to derive the value of the hypothetical European option counterpart. Finally, subtracting the estimated value of the European option from the observed American option value (midpoint quote) yields the option's EEP.

*See* Battalio, Robert and Paul Schultz, 2006, "Options and the Bubble," *The Journal of Finance* 61 (henceforth "Battalio and Schultz (2006)"). In estimating the EEP, Battalio and Schultz (2006) estimated a single implied volatility per option per day.  In contrast, I calculate several implied volatilities (and consequently EEPs) per day by re-estimating implied volatilities every time the stock price changed by one percent on an intra-day basis.  I also computed implied volatility several other times during the trading day, namely at the start of the day, at 3.25 hour intervals from the last implied volatility computation (which represents half the trading day on the NYSE), and at the end of the trading day.  The EEP at other times during the trading day was estimated by interpolating calculated EEPs for the same option earlier and later during the trading day.  See Battalio and Schultz (2006) for a discussion of EEP calculations.  Note, however, that these authors ignore the EEP related to American call options as they assume that the dividend paid would be too small for an American call to be exercised early.

[3]   Ofek, Eli et al., "Limited arbitrage and short sales restrictions: evidence from the options markets," *Journal of Financial Economics* 74, page 306.

exercise price and D denotes the present value of future dividends.[4]   Similarly, a synthetic *bid* price for the stock is given by:

$$S_{Synthetic}^{Bid} = \left(C^{Bid} - EEP^{Call}\right) - \left(P^{Ask} - EEP^{Put}\right) + PV(K) + D \qquad (1b)$$

5.   An arbitrage opportunity arises if the stock can be synthetically bought at $S_{Synthetic}^{Ask}$ and sold for a higher price, $S^{Bid}$ on the stock exchange, *i.e.*, if $S^{Bid} - S_{Synthetic}^{Ask} > 0,$ or if the stock can be synthetically sold at $S_{Synthetic}^{Bid}$ and bought for a lower price, $S^{Ask}$ on the stock exchange, *i.e.*, if $S_{Synthetic}^{Bid} - S^{Ask} > 0$.   In short, if the bid-ask range on the stock does not overlap with the synthetic bid-ask range, the put-call parity relationship is violated even after accounting for real-world transaction costs (or bid-ask spreads).

6.   I then tested the number of valid "observations" which represented such arbitrage opportunities, *i.e.*, violated put-call parity.   Each "observation" in my sample is defined as synchronous best bid and ask quotes for Allergan's stock, call, and put options.[5]   I obtained observations on a second-by-second frequency from the Historical Options Trade and Quote Database and the US Equity Trade and Quote DataSet provided by the data vendor Tick Data, LLC.

7.   I then selected a sample of observations that satisfied the following well-accepted filters:

- Any observation for which a matched call and put pair could not be identified was removed;

- Any observation that included either a call or put option with a zero bid or ask quote, or a zero quote size, was removed;

---

[4]   Following Battalio and Schultz (2006) who also use Treasury rates to calculate such present values, I calculate such present values using the Treasury strip yields of relevant maturity. In calculating put-call parity violations, I assumed Allergan's expected dividend was paid.

[5]   Investors can typically buy a security immediately at the prevailing ask quote or sell it at the prevailing bid quote.  The ask quote is typically greater, and the difference between the quotes ("bid-ask spread") represents compensation paid to the market maker for proving immediacy.  My analyses rely on National Best Bid and Offer (NBBO) intraday quotes posted by various exchanges, computed for Allergan's stock and matched option pairs at one second intervals during trading hours following the methodologies outlined in Battalio and Schultz (2006), page 2077.

- Any observation that included either a call or put with crossed or locked quotes was removed;[6]

Option quotes also had to satisfy rational option pricing bounds,[7] *i.e.*,

- Any observation that included a call option whose bid quote was greater than the stock's ask quote was removed;

- Any observation that included a call option whose ask quote was less than the stock's bid quote minus the present value of the exercise price minus the present value of dividends expected over the option's remaining maturity was removed;

- Any observation that included a call option whose ask quote was less than the stock's bid quote minus the exercise price was removed;

- Any observation that included a put option whose bid quote was greater than the exercise price was removed;

- Any observation that included a put option whose ask quote was less than the exercise price minus the stock's ask quote was removed; and

- Any observation that included a put option whose ask quote was less than the present value of the exercise price plus the present value of dividends minus the stock's ask quote was removed.

8.    Furthermore, in calculating the total number of violations, I apply a 1% or $1 filter rule.[8] Thus, if the profit from the arbitrage opportunity is greater than $1 or the amount of arbitrage profit is greater than 1% of Allergan's stock price (at the time the arbitrage opportunity occurs) I consider this a violation of put-call parity.

---

[6]    A crossed quote is one in which the bid quote is higher than the ask quote.  In a locked quote the bid and ask quotes are identical.

[7]    *See* Hull, John C., 2009, *Options, Futures and Other Derivatives*, Seventh Edition, Pearson Prentice Hall, Chapter 9.

[8]    *See* Battalio and Schultz (2006).