UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| ANTHONY BASILE ET AL., | Case No.: SACV 14-2004-DOC (KES) |
| Plaintiffs, | |
| vs. | ORDER RE MOTION TO CERTIFY CLASS [229]; MOTION TO DISMISS FOR FAILURE TO JOIN PARTIES [264] |
| VALEANT PHARMACEUTICAL INTERNATIONAL, INC. ET AL. | |
| Defendants. | |

Before the Court are Plaintiffs' Motion for Class Certification ("Motion") (Dkt. 229) and Defendants' Motion to Dismiss for Failure to Join Parties ("Motion to Dismiss") ("MTD") (Dkt. 264).

## I.   BACKGROUND

Here, Plaintiffs State Teachers Retirement System of Ohio ("Ohio STRS"), Iowa Public Employees Retirement System ("Iowa PERS"), and Patrick T. Johnson ("Johnson") (collectively, "Plaintiffs") bring a putative class action for violations of securities law against Defendants Pershing Square Capital Management, L.P. ("Pershing Square"), PS Management GP, LLC ("PS Management"), William Ackman ("Ackman"), PS Fund 1, LLC ("PS Fund 1"), Pershing Square, L.P. ("PSLP"), Pershing Square II, L.P. ("PS II"), Pershing Square GP, LLC ("PSGP"), Pershing Square International ("PS International"), Pershing Square Holdings, Ltd. ("PS Holdings"), Michael Pearson ("Pearson"), Valeant Pharmaceuticals International, Inc. ("Valeant"), and Valeant Pharmaceuticals International ("Valeant USA") (collectively, "Defendants").[1] *See generally* Second Amended Complaint ("SAC") (Dkt. 138).

### A.   Facts

Plaintiffs argue that Defendants deprived Plaintiffs and other Allergan shareholders of billions of dollars of value in violation of federal securities laws. *Id.* ¶ 1. Specifically, in 2014 Valeant—a pharmaceutical company who allegedly operates by acquiring smaller, innovative pharmaceutical companies—informed Pershing that Valeant intended to attempt to acquire, non-party Allergan, Inc. ("Allergan"). *Id.* ¶¶ 1, 31–32. Pershing, through William Ackman, its founder and CEO, in turn agreed to acquire an approximately 10% stake in Allergan that Pershing would use to support Valeant's takeover efforts. *Id.* ¶ 1. Plaintiffs allege that at this time, the parties were aware that Valeant would ultimately make a tender offer for Allergan. *See id.*

This arrangement was mutually beneficial to both Pershing and Valeant. When a hostile takeover bid is announced and a tender offer made, stock prices typically increase, and if a

---

[1] For clarity, the Court will refer to Defendants Pershing Square, PS Management, Ackman, PS Fund 1, PSLP, PS II, PSGP, PS International, and PS Holdings, as "Pershing," and to Defendants Pearson, Valeant, and Valeant USA as "Valeant."

substantial tender offer goes through, stock holders can expect a large payout. Pershing's advanced notice of the Valeant bid allowed them to acquire billions of dollars' worth of Allergan stock knowing that the price was likely to sharply increase, while those selling the stock—the putative class members—where unaware of the impending increase in value. *See id.* ¶ 2. In exchange for this information, Valeant secured an ally in its takeover bid who would have a large stake in its target, Allergan. *Id.* ¶ 3.Valeant and Pershing further agreed that if Valeant was ultimately unsuccessful in its bid for Allergan, Pershing would give Valeant 15% of the profits it made from trading the Allergan stock to Valeant. *Id.* ¶ 4.

Defendants signed a contract ("the Relationship Agreement") agreeing to the above stated terms on February 25, 2014. *Id.* ¶ 5; *see also* Declaration of Michael Shipley ("Shipley Decl.") (Dkt. 253) Ex. 2 ("the Relationship Agreement"). That same day, Pershing began to buy up shares of Allergan. *Id.* From February 25 to April 8, 2014, Pershing used a funding vehicle named "PS Fund 1" to buy over 14 million Allergan shares at prices as low as $117.91, for a total cost of roughly $2 billion. *Id.* ¶ 6. This represented a 4.9% stake in Allergan. *Id.* By acquiring only 4.9% of the company, Pershing was able to avoid Securities and Exchange Commission ("SEC") rules that require a party to disclose when it acquires a 5% stake in a company. *Id.* This disclosure must occur within ten days of crossing the 5% threshold. *Id.* During the ten day SEC grace period, from April 10 to April 21, 2014, Pershing amassed another 13.9 million shares of Allergan, giving it control of roughly 9.7% of all of Allergan's shares, with an aggregate value of $3.2 billion. *Id.* Plaintiffs also allege that to avoid detection of many of these trades, Pershing used Nomura International plc ("Nomura") as an intermediary. *Id.* ¶ 52.

On April 21, 2014, Valeant announced its intention to acquire Allergan, and Pershing disclosed its 9.7% stake in Allergan. *Id.* ¶ 7. Immediately Allergan's stock price increased by $20 per share.

On June 18, 2014, Valeant made a tender offer for Allergan. *Id.* ¶ 164. Upon announcing the tender offer, Pearson explained: "On April 22, we announced our offer for Allergan. We suspected at the time it would ultimately have to go directly to Allergan shareholders. We were

correct." *Id.* Third-party bidder Actavis plc's ("Actavis") tender offer to Allergan shareholders of $219 per share won out over Valeant's $200 per share bid. *Id.* ¶ 8. For reference, the putative class member sold their shares at between $115 and $143 a share. Mot. at 5. Pershing is alleged to have made $2.2 billion in profits off the sale of Allergan stock even after it paid a $400 million "kick-back" to Valeant. SAC ¶ 8.

### B.   Procedural History

Plaintiffs brought suit on December 16, 2014. *See* Complaint (Dkt. 1). In the operative complaint, the SAC, Plaintiffs allege three claims. First, Plaintiffs allege all Defendants violated § 14(e) of the Securities Exchange Act ("Exchange Act") and corresponding Rule 14e-3, which prohibits trading while in possession of nonpublic material information in connection with a tender offer. SAC ¶¶ 196–207. Second, Plaintiffs allege all Defendants violated § 20A(a) of the Exchange Act. *Id.* ¶¶ 208–15. Third, Plaintiffs allege Pershing Square, PS Management, Ackman and Pearson violated § 20(a) of the Exchange Act because they acted as "controlling persons of PS Fund 1 within the meaning of Section 20(a) of the Exchange Act." *Id.* ¶¶ 216–26.

Plaintiffs filed the instant Motion on October 11, 2016. Through that Motion, Plaintiffs seek to certify a class ("the Class") consisting of:

> All persons who sold Allergan common stock contemporaneously with purchases of Allergan common stock made or caused by Defendants during the period February 25, 2014 through April 21, 2014, inclusive (the "Class Period") and were damaged thereby (collectively, the "Class").[2]

Defendants opposed the Motion on December 20, 2016 ("Opp'n") (Dkt. 253), and Plaintiffs replied on January 17, 2017 ("Reply") (Dkt. 267).

---

[2] Per the Motion,

> [t]he Class excludes Defendants; their officers and directors during the Class Period; members of the immediate family of the individual Defendants and of the excluded officers and directors; any entity in which any of the foregoing has or had a controlling interest; any affiliates, parents or subsidiaries of the Defendants; the legal representatives, agents, affiliates, heirs, successors or assigns of any of the foregoing, in their capacities as such; and Nomura International plc, and any of its affiliates, parents, or subsidiaries (collectively, "Nomura").

Mot. at 1 n.2.

On January 16, 2017, Defendants moved to dismiss the SAC for failure to join indispensable parties under Federal Rule of Civil Procedure 19. Plaintiffs opposed on January 30, 2017 ("MTD Opp'n") (Dkt. 276), and Defendants replied on February 6, 2017 ("MTD Reply") (Dkt. 284).

The Court held a hearing on the two Motions on February 13, 2017 and February 14, 2017.

## II.    LEGAL STANDARD

### A.    Class Certification

Federal Rule of Civil Procedure 23 governs class actions. Fed. R. Civ. P. 23. A party seeking class certification must demonstrate the following prerequisites: "(1) numerosity of plaintiffs; (2) common questions of law or fact predominate; (3) the named plaintiff's claims and defenses are typical; and (4) the named plaintiff can adequately protect the interests of the class." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (citing Fed. R. Civ. P. 23(a)).

After satisfying the four prerequisites of numerosity, commonality, typicality, and adequacy, a party must also demonstrate either: (1) a risk that separate actions would create incompatible standards of conduct for the defendant or prejudice individual class members not parties to the action; or (2) the defendant has treated the members of the class as a class, making appropriate injunctive or declaratory relief with respect to the class as a whole; or (3) common questions of law or fact predominate over questions affecting individual members and that a class action is a superior method for fairly and efficiently adjudicating the action. Fed. R. Civ. P. 23(b)(1)–(3).

"A party seeking class certification must affirmatively demonstrate compliance with Rule 23—that is, the party must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349 (2011) (emphasis in original). The party may not rest on mere allegations, but must provide facts to satisfy these requirements. *Doninger v. Pac. Northwest Bell, Inc.*, 564 F.2d 1304, 1309 (9th Cir. 1977). A class certification motion requires a district court to conduct

a "rigorous analysis" that frequently "will entail some overlap with the merits of the plaintiff's underlying claim." *Wal-Mart*, 564 U.S. at 351. However, neither "the possibility that a plaintiff will be unable to prove his allegations, nor the possibility that the later course of the suit might unforeseeably prove the original decision to certify the class wrong, is a basis for declining to certify a class which apparently satisfies [Rule 23]." *United Steel Workers v. ConocoPhillips Co.*, 593 F.3d 802, 809 (9th Cir. 2010). "[N]othing in either the language or history of Rule 23 . . . gives a court any authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action." *Id.* (quoting *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177–78 (1974)).

The decision to grant or deny a motion for class certification is committed to the trial court's broad discretion. *Bateman v. American Multi-Cinema, Inc.*, 623 F.3d 708, 712 (9th Cir. 2010).

## III.   DISCUSSION

### A.   The Four Requirements of Rule 23(a)

#### 1.   Numerosity under Rule 23(a)(1)

Numerosity, the first prerequisite of class certification, requires that the class be "so numerous that joinder of all members is impractical." Fed. R. Civ. P. 23(a)(1). A proposed class of at least forty members presumptively satisfies the numerosity requirement. *See Jordan v. Los Angeles County*, 669 F.2d 1311, 1319 (9th Cir. 1982), *vacated on other grounds by County of Los Angeles v. Jordan*, 459 U.S. 810 (1982); *Slaven v. BP America, Inc.*, 190 F.R.D. 649, 654 (C.D. Cal. 2000). Defendants do not argue numerosity is lacking. *See generally* Opp'n. In numerous instances Defendants have conceded that the proposed Class would exceed one hundred members. *See, e.g.*, Declaration of Eli R. Greenstein ("Greenstein Decl.") (Dkt. 229) Ex. A ("Pershing Defendants' Responses and Objections to Plaintiffs' First Set of Request for Admission") Response No. 3. Accordingly, the Court is satisfied Rule 23's numerosity requirement is met here.

### 2.  Typicality under Rule 23(a)(3)

"The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 984 (9th Cir. 2011) (quotation marks omitted). "Typicality refers to the nature of the claim or defense of the class representative, and not to the specific facts from which it arose or the relief sought." *Id.* The typicality requirement demands that a named plaintiff's claims be "reasonably co-extensive with those of absent class members," although "they need not be substantially identical." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998).

"The purpose of the typicality requirement is to assure that the interests of the named representative aligns with the interests of the class." *Hanon*, 976 F.2d at 508. "[A] named plaintiff's motion for class certification should not be granted if 'there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it.'" *Id.*

Plaintiffs argue for typicality by noting that the proposed class representatives, like other class members, "sold Allergan common stock contemporaneously with Defendant's insider trading and suffered damages as a result of Defendants' omissions and misconduct." Mot. at 11. Plaintiffs note that each of the proposed representatives sold Allergan stock on the same day the Pershing Defendants purchased stock. *Id.* Plaintiffs further argue that due to the volume and timing of trades made by the Pershing Defendants, any stocks sold during in the class period are "contemporaneously traded" stocks. Specifically, Plaintiffs point out that the Pershing Defendants purchased, either directly or indirectly through Nomura, Allergan common stock on all but two of the thirty-nine trading days during the Class period. Greenstein Decl. Exs. 11, 12. This Court has found larger gaps sufficient to qualify as contemporaneity. *See Middlesex Ret. Sys. v. Quest Software Inc.*, 527 F. Supp. 2d 1164, 1196 (C.D. Cal. 2007) (finding eight days between plaintiff's and defendant's transactions qualified as contemporaneous trades).

Defendants do not dispute that Plaintiffs are within the Class definition,[3] and the Court is satisfied that the proposed representatives are within the Class definition.

However, Defendants do dispute typicality on other grounds, arguing that the proposed Class representatives are subject to unique defenses that render them atypical. Opp'n at 11. First, Defendants argue that Ohio STRS and Johnson's "gains" exceeded their losses. *Id.* at 11–15. Defendants rightly note that insider trading damages stop accruing a reasonable time after the material nonpublic information the insider trader acted on is disclosed to the public. Opp'n at 12 (citing *Short v. Belleville Shoe Mfg. Co.*, 908 F.2d 1385, 1392 (7th Cir. 1990)). The Exchange Act also provides that "[n]o person permitted to maintain a suit for damages under the provisions of this chapter shall recover . . . a total amount in excess of the actual damages to that person on account of the act complained of." 15 U.S.C. § 78bb(a)(1).

Defendants also cite *Gordon v. Sonar Capital Mgmt. LLC*, 92 F. Supp. 3d 193 (S.D.N.Y. 2015). There, the court determined that where a plaintiff net traded in the same direction as an insider trading defendant over the class period, that plaintiff could not establish he had been damaged by the defendants. *Id.* at 205. The *Gordon* court explained that under those circumstances, the plaintiff had unwittingly *gained* from the fact that there was information unknown to the general market. *Id.* Accordingly, that court found that a plaintiff was not typical where he had net traded in the same direction as the defendants and therefore was subject to the potentially meritorious defense that he had not been harmed by the defendants' insider trading.

Defendants point out that Plaintiffs are seeking damages based on Actavis's successful bid for Allergan at $219 per share. Opp'n at 12. Defendants argue that under this logic, both Ohio STRS and Johnson suffered no damages, because their profits exceeded any potential losses due to the fact that they held shares through the announcement of the merger. *Id.* at 13. To elaborate, while Ohio STRS sold 164,100 shares during the Class period, it also held 513,271 shares through the announcement of the Actavis merger. Declaration of Robert M. Daines ("Daines Decl.") (Dkt. 259) ¶ 40, Ex. 9. Johnson exercised 1,250 options and sold those

---

[3] Defendants do dispute that contemporaneity is established as to Plaintiffs, and as to the Class members in general. The Court takes up those arguments below.

shares during the Class period, but at the time of announcement of the merger he still held 700 shares and 7,348 options. *Id.* Defendants contend that because of the increase in the value of the shares and options that Johnson and Ohio STRS held through the announcement of the merger, Johnson and Ohio STRS both profited from Defendants' actions. *See* Opp'n at 13; Daines Decl. ¶ 41, Ex. 10 (estimating that Ohio STRA netted just under $40 million and Johnson just under $800,000 after subtracting the harm from the alleged insider trading from the increase in the value of the shares those Plaintiffs held at the time of the announcement of the merger). Defendant contends that because of Plaintiffs' "legally flawed theory that Defendants' fraud persisted until closing of the Actavis transaction," Plaintiffs should have to offset their gains over that prolonged period. Opp'n at 14–15.

Defendants do not appear to argue that Johnson or Ohio STRS were buying up shares of Allergan during the Class period. Indeed, Defendants have not disputed either Johnson or Ohio STRS's representations that they did not buy any shares of Allergan common stock during the class period. *See* Shipley Decl. Ex. 1 at 8–10, 13. Further, Johnson did not purchase shares even after the close of the Class period. *See id.* at 13. In *Gordon*, the only relevant purchases that resulted in offsetting the plaintiff's losses were purchases by the plaintiff *during the class period* where the plaintiff was *also* benefiting from the fact that there was information unknown to the market. *Gordon*, 92 F. Supp. 3d at 205. Merely holding shares during the class period does not result in an offsetting gain. *See cf. In re Schering-Plough Corp. Sec. Litig.*, No. CIV.A. 01-0829, 2003 WL 25547564, at *9 (D.N.J. Oct. 10, 2003) ("[The plaintiff's] claim is based on losses that resulted from purchases of Schering-Plough stock made during the Class Period. Any capital gains made with respect to the sale of shares purchased before the Class Period are irrelevant.").

Defendants vigorously disputed this issue at oral argument, contending that Ohio STRS and Johnson were net gainers who benefited from the Defendants actions. Defendants are able to make this argument because they draw no distinction between their legal actions and their alleged illegal insider trading actions. The core of Plaintiffs' insider trading allegations is that Defendants withheld information and improperly traded on that information—that is the root of

the harm that Plaintiffs are seeking to remedy through this action. While Plaintiffs may have profited due to Valeant's attempted takeover of Allergan and the Actavis tender offer, Plaintiffs did not profit because Defendants withheld information from the market. Plaintiffs sold tens of thousands of shares during the class period while Defendants were buying up shares, allegedly knowing that a potential tender offer was on the horizon. Plaintiffs were allegedly harmed because they sold their shares for less than the market would have valued the shares at had the market had Defendants' knowledge. That Plaintiffs held other shares that increased in value due to the Defendants' attempts to acquire Allergan is irrelevant to whether Plaintiffs were harmed by Defendants' withholding of information. Defendants' arguments, construed in the most logical light, ultimately go more to the issue of how long after the close of the Class period and the disclosure of the material nonpublic information damages can continue to accrue, rather than the issue of whether Plaintiffs actually profited from the alleged scheme.

Further, other courts have declined to reach the issue of whether plaintiffs should be excluded from the class on the grounds that a plaintiff was a net "winner" at the class certification stage. *See In re Bank of Am. Corp. Sec., Derivative, & Employee Ret. Income Sec. Act (ERISA) Litig.*, 281 F.R.D. 134, 149 (S.D.N.Y. 2012) ("The ultimate issue of whether certain plaintiffs' losses are to be offset by any purported inflation of Merrill share prices need not be resolved at this time."). The Court is satisfied that the fact that Johnson and Ohio STRS may have made money as a result of the merger does not subject them to unique defense in relation to their insider trading claims such that they are rendered atypical.

Defendants' second argument against Ohio STRS's typicality is that Ohio STRS has "spoliated evidence." Opp'n at 15.  Specifically, Defendants argue that Ohio STRS's longstanding policy of requiring employees to save all documents for only ninety days and otherwise allowing employees to delete or discard documents may well amount to culpable spoliation. Shipely Decl. Ex. 13, 61:1–64:9.[4]

---

[4] Of note, under Ohio STRS's policy, employees are encouraged to mark for retention any document they perceive to be a "record" that needs to be saved. *See* Shipely Decl. Ex. 13, 61:1–64:9.

1
2
3
4
5
6
7
8

Defendants acknowledge that "[o]rdinarily, the destruction of documents in accord with a facially neutral document retention policy is not culpable spoliation." Opp'n at 16 (citing *Arthur Andersen LLP v. United States*, 544 U.S. 696, 704 (2005)). However, Defendants argue that because Ohio STRS is a frequent participant in securities litigation and because it has such an "aggressive" document destruction policy, its policy is improper. Opp'n at 15. Defendants also contend that Ohio STRS waited too long after deciding to participate in this litigation before saving all relevant documents, pointing out that Ohio STRS did not issue a litigation hold until a month after it moved to be appointed as lead plaintiff in this case. *Id.*

9
10
11
12
13
14
15
16
17

Defendants cite two cases for the proposition that destruction of documents under these circumstances under an otherwise neutral policy amounts to spoliation of evidence: *Hynix Semiconductor Inc. v. Rambus Inc.*, 897 F. Supp. 2d 939 (N.D. Cal. 2012), and *Micron Tech., Inc. v. Rambus Inc.*, 917 F. Supp. 2d 300 (D. Del. 2013). However, both these cases are distinguishable. In *Hynix*, the destruction of documents was part of the litigation plan and aimed at disposing of potentially harmful documents. *Hynix*, 897 F. Supp. 2d at 980–81. Likewise in *Micron*, the defendant considered its document destruction policy to be part of its litigation strategy, and came up with it in response to the threat of litigation. *Micron*, 917 F. Supp. 2d at 307–10. Here, there is no evidence of such willful wrongdoing.

18
19
20
21
22
23
24
25
26
27

Defendants also make the troubling accusation that because Ohio STRS failed to protect documents form destruction, critical documents—including any email or other internal communications regarding Ohio STRS class period sales of Allergan stock— where all destroyed. Opp'n at 16. Defendants suggest that this may be in part because Ohio STRS failed to follow up with its employees to ensure the litigation hold was respected. Opp'n at 16. Plaintiff has offered evidence neither of these accusations are accurate. Reply at 15–16. Specifically, Plaintiffs offered a declaration stating that Ohio STRS preserved all materials that were relevant as soon as the litigation hold went into effect. Declaration of Edward G. Timlin (Timlin Decl.) (Dkt. 266) ¶ 18. Further, Plaintiffs contend Ohio STRS has produced over 4,000 documents from within the class period and that it has produced sixty-two versions of its Large

28

Cap Analyst model, which guided its decisions to sell Allergan stock during the relevant period. *Id.* ¶¶ 6, 9, 11.

After the hearing, the Court asked Special Master Judge James Smith to help establish whether there was actually evidence of spoliation. Judge Smith concluded that there was not. Special Master Order No. 22 (Dkt. 317) at 2–3. Instead, he stated "Pershing's contentions in this regard are based upon its conclusions as to what it hoped for or believed it would receive from Ohio and not on any facts upon which the Court could conclude Ohio engaged in the intentional destruction of or non-production of documents Ohio was under a duty to produce." *Id.*

Accordingly, the Court is satisfied that the proposed class representatives are typical.

### 3. Adequacy of Named Representative under Rule 23(a)(4)

Due process requires that absent class members have an adequate representative. *See Hansberry v. Lee*, 311 U.S. 32, 43 (1940). An adequate representative is one who will "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). A representative is adequate where: (1) there is no conflict of interest between the representative and its counsel and absent class members, and (2) the representative and its counsel will "pursue the action vigorously on behalf of the class." *Hanlon*, 150 F.3d at 120 (internal citations and quotations omitted). Defendants argue that the proposed Class representatives are inadequate due to intra-Class conflicts and that co-Class counsel Bernstein, Litowitz, Berger & Grossmann LLP ("BLB&G") is inadequate because of conflicts arising out of a prior putative class action it prosecuted. Opp'n 3–11.

### a. Plaintiffs' Adequacy

Plaintiffs argue that they are adequate representatives because they, like the rest of the Class members, were damaged when they sold their common stock during the Class period and therefore share the rest of the Class's interest in vigorously prosecuting this action. Mot. at 14. Further, Plaintiffs have submit declarations affirming their willingness to prosecute this action and pursue the interests of absent class members. Greenstein Decl. Exs. 3–5.

Defendants disagree that Plaintiffs are adequate, arguing that as to Plaintiffs' § 20A claims, the Plaintiffs' recovery is capped at the total profit made by Defendants as a result of the alleged insider trading. Opp'n at 4 (citing 15 U.S.C. §§ 78t-1(b)(1)). Defendants argue that this capped pool creates a zero-sum game, in which Plaintiffs are incentivized to sell each other out in order to amass a larger portion of the limited damages for themselves. *Id.* Specifically, Defendants contend  Plaintiffs who traded late in the Class period are incentivized to argue that the Defendants took their first "substantial steps" to commence a tender offer under § 14e later in the class period, because the later the Court finds there were "substantial steps," the fewer plaintiffs there are to share in the capped recovery. Opp'n at 5. At oral argument Plaintiffs did also conceded that both their § 20A and § 14e claims would be capped at the Defendants' profits plus interest.

Defendants' arguments do not merely suggest that these Plaintiffs are not adequate representatives, but rather that this case is not suitable for class treatment at all because the conflict between class members is too deep. However, it has "repeatedly" been recognized that "intra-class conflicts relating to the times at which particular class members purchased their securities, and which could potentially motivate different class members to argue  that the securities were relatively more or less inflated at different time periods, relate to damages and do not warrant denial of class certification." *In re Diamond Foods, Inc., Sec. Litig.*, 295 F.R.D. 240, 254–55 (N.D. Cal. 2013) (quoting *In re Connetics Corp. Sec. Litig.*, 257 F.R.D. 572, 578 (N.D. Cal. 2009)). Additionally, the Ninth Circuit has affirmed certification in the face of arguments by defendants that plaintiffs had countervailing interests regarding the level of price inflation at any given time. *Blackie v. Barrack*, 524 F.2d 891, 908 (9th Cir. 1975). The Circuit noted that any such conflict "is peripheral, and substantially outweighed by the class members' common interests." *Id.* at 909.

At oral argument, Defendants sought to distinguish these cases by arguing that in those cases the class members' interests diverged as to *damages*, whereas here they diverge as to *liability*. To elaborate on Defendants' arguments, in the above-cited cases the plaintiffs were competing over the amount of damages and each had incentive to maximize their recovery at

the expense of the other class members' recovery. However, here, Defendants point out that late-trading Plaintiffs may have an incentive to argue that substantial steps occurred later in order to limit competition for a limited damages pool, and thereby preclude *any* finding of liability for large swaths of early-trading Plaintiffs.

At the outset, the Court notes that the damages pool is calculated based on when a substantial step was taken, meaning that the later the first substantial step is found, the smaller the damages pool is. To illustrate the point, if a substantial step was taken on April 17, 2017 and not before, those class members that traded after April 17, 2017 can only recover the Defendants' gains from April 17 until the end of the class period. Accordingly, this situation does not present a true zero-sum game as the damages pool shrinks the later a substantial step is found. However, this alone does not resolve the issue.

Defendants' expert, Robert M. Daines, found that, due to varied trading rates both on the Defendants' end and on the market side, if substantial steps are found before the class period begins the Class members' receive a per-share recovery of approximately $7.85. Daines Decl. ¶ 26. However, if the first "substantial step" occurred during the Class period, the recovery per recovering Plaintiff could potentially be higher. For example, if the first "substantial step" occurred on April 11, 2014, then the per-share recovery for each share sold from April 11, 2014 through April 21, 2014, inclusive, would be $11.46. *Id.* This fact creates tension between early-trading and late-trading Plaintiffs.

Defendants cited several cases at oral argument for the proposition that the situation described above precludes certification: *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591 (1997); *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 856 (1999); *Hesse v. Sprint Corp.*, 598 F.3d 581, 589 (9th Cir. 2010); *Radcliffe v. Experian Info. Sols. Inc.*, 715 F.3d 1157, 1165 (9th Cir. 2013); and *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 959 (9th Cir. 2009). However, these cases are not analogous to the instant case. In these cases, the named plaintiff either had different claims from some of the class members, or was offered some incentive payment that caused their interests to diverge from that of the class members. Here, the Plaintiffs all have the identical claims and there is no indication that there has been any improper incentive scheme proposed to

the named Plaintiffs. Rather, some Plaintiffs could make out their claims on slightly different factual grounds than other Plaintiffs, and may have some incentive to make arguments that could disadvantage other Plaintiffs.

Ultimately, the Court does not find this tension fatal to class certification. The Class members' interest generally align because they all want to show that Defendants did take substantial steps. Further, the critical alleged substantial step is the Defendants entering into the Relationship Agreement. The Relationship Agreement laid out the Defendants' commitments to each other, purports to define how Allergan would be pursued, and was presumably the result of extensive negotiations and conversations between the Defendants. *See generally* The Relationship Agreement. The Relationship Agreement was entered into on February 25, 2014—the day the Class period began. *See id.* at 1. It is highly likely that the Class claims as to the existence of a substantial step will rise and fall on the jury's interpretation of the Relationship Agreement and its assessment of the negotiations and discussions that led to the Agreement. Therefore, the Class members' claims will likely fail or succeed together as the execution of the Relationship Agreement coincides with the beginning of the Class period.

Additionally, accepting Defendants' argument would result in double-digit numbers of subclasses, theoretically, each arguing for their own substantial step and attempting to undermine the substantial step proposed by the other subclasses. In absence of any indication that any Plaintiff wants to advance this argument, the Court sees no reason to introduce extensive chaos into this case. Accordingly, on this issue the Court finds that any conflict "is peripheral, and substantially outweighed by the class members' common interests." *Blackie*, 524 F.2d at 909.

Next, Defendants contend that there is a conflict between late and early sellers of the Allergan common stock because the material nonpublic information that Defendants had in their possession changed throughout the Class period. Opp'n at 5. Arguments about the shifting character of the material nonpublic information are really arguments to limit the Defendants' liability rather than arguments that truly touch on adequacy, and are more properly argued at

trial or summary judgment, rather than the class certification stage. Accordingly, the Court finds that these arguments do not show that Plaintiffs are inadequate representatives.

Finally, Defendants argue that the "contemporaneous trading" standing rule, applicable in insider trading cases, creates significant intra-Class conflicts. In support of this argument, Defendants cite *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997 (9th Cir. 2002). There, the panel rejected the plaintiffs' proposal that anyone who traded within two months of the illegal trades should be considered a contemporaneous trader. *Id.* at 1002. The panel explicitly found that it was not necessary to "define the exact contours" of a "contemporaneous trading period." *Id.* Instead, that court noted "that a contemporaneous trading period of two months would gut the contemporaneous trading rule's premise—that there is a need to filter out plaintiffs who could not possibly have traded with the insider, given the manner in which public trades are transacted." *Id.* Defendants argue this rule creates an incentive for Plaintiffs who traded simultaneously with the Defendants to narrow the window of contemporaneity down to seconds, while other class members will seek a period of a day. *See* Opp'n at 6–7.

Defendants' arguments on this point suggest that no securities class action would ever be certified unless the plaintiffs could conclusively show that each class member directly sold to the defendants or their agent—essentially imposing a proof of privity requirement. Case law forecloses this outcome. This Court has already determined, in this case, that sales within a day of the Defendants' acquisitions are sufficiently proximate to be considered contemporaneous. Order Denying Motion to Dismiss (Dkt. 102) at 15. This ruling is in line with other courts that have found trades within a week or more of a defendant's trades to satisfy the contemporaneity requirement. *See Middlesex*, 527 F. Supp. 2d. at 1196 (C.D. Cal. 2007) (finding eight days to be contemporaneous); *see also City of Westland Police & Fire Ret. Sys. v. Sonic Solutions*, No. C 07-0511 CW, 2009 WL 942182, at *12 (N.D. Cal. Apr. 6, 2009) (finding purchase of stock nine days after a sale was contemporaneous).

Nor does a close reading of *Brody* support the Defendants' argument. In *Brody*, the circuit said that insider trading rules are meant to protect investors who "traded with an insider or have traded *at about the same time* as an insider." *Brody*, 280 F.3d at 1005 (emphasis

added). Further, "it would make a mockery of the 'disclose or abstain' rule if we were to permit the fortuitous matching of buy and sell orders to determine whether a duty to disclose had been violated." *Shapiro v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 495 F.2d 228, 236 (2d Cir. 1974). The Court rejects as unfounded Defendants' attacks on the proposed Class representatives' adequacy based on any incentive to narrow the window of contemporaneous trading.

Accordingly, the Court finds that the Plaintiffs are adequate representatives.

### a.  Class Counsel's Adequacy

Plaintiffs argue that Class counsel is also adequate because they are experienced in securities litigation and have recovered billions of dollars on behalf of injured investors. Mot. at 15. Further, Plaintiffs cite Class counsel's vigorous prosecution of this case to date as further evidence of Class counsel's adequacy. *Id.*

Defendants do not oppose these arguments, but instead argue that co-lead counsel BLB&G has a conflict because of previous litigation in which BLB&G participated. Opp'n at 9–11. In 2014, BLB&G represented Allergan investors in a putative class action in the Chancery Court of Delaware (the "Delaware Action") seeking declaratory relief regarding Allergan's bylaws. *See* Shipley Decl. Ex. 7. PS Fund 1, as the holder of 9.7% of Allergan stock, was a member of the putative class in the Delaware Action, although not actually represented by BLB&G. Opp'n at 10.

The Delaware Action was filed in response to the Allergan Board's public interpretation of the company's bylaws as preventing the removal and replacement of all of the members of the Allergan Board at a single meeting. *See* Shipley Decl. Ex. 7 ¶¶ 2. The Complaint in that action noted the Board had "refused to engage with Pershing and Valeant," and had issued its interpretation of the bylaws "as a mechanism to prevent stockholders from forcing the recalcitrant Board's engagement with the high-premium, value-maximizing takeover proposal in the short-term through removal and replacement." *Id.* ¶ 63. However, the Complaint also said that while "[p]laintiffs take no position as to whether any stockholders should campaign to remove the entire Board, or whether the Pershing/Valeant takeover proposal is good for

stockholders," plaintiffs considered it "critical that the stockholders have unfettered access to all the mechanisms for corporate action afforded to them under the Certificate and the Bylaws." *Id.* ¶ 13.

These facts raise eyebrows as to BLB&G's adequacy—after all, BLB&G appears to have pursued a line of litigation on behalf of its former clients that could have helped the Defendants execute their takeover of Allergan. However, despite Defendants' efforts to suggest otherwise, BLB&G is in no way implicated in the insider trading scheme that Defendants are alleged to have undertaken.

The Court notes that Special Master Robert O'Brien has previously considered Defendants' arguments on this point and found no conflict. Special Master Order No. 5 ("Order No. 5") (Dkt. 222) at 9–14.  In reaching that conclusion, the Special Master found: (1) while PS Fund 1's status as a putative class member in the Delaware Action and a Defendant here is a "factual oddity," it does not create any identifiable conflict; (2) there is no identified conflict of interest between the proposed class in the Delaware Action and the proposed Class here, and BLB&G never represented those classes simultaneously; and (3) BLB&G is not conflicted out simply because they might take different or inconsistent positions on behalf of their clients here than they did on behalf of their clients in the Delaware Action. *Id.* However, as the Special Master noted in his order, his findings on this point—while insightful and appreciated by the Court—were only made for the purposes of ruling on the discovery motion before him, and do not bind the Court in ruling on this class certification Motion. *Id.* at 9 n.4.

Defendants argue that BLB&G's participation in the Delaware Action will be relevant to Defendants' arguments that Defendants formulated the plan to commence a tender offer only in response to Allergan stockholders' demands that the Defendants employ more aggressive tactics to complete the takeover. Opp'n at 10. In particular, Defendants state they will introduce an email from BLB&G attorney Mark Lebovitch stating "[I] have now heard from other influential hedge funds who believe our theory works and may privately contact [P]ershing to urge them to go in for the kill shot." Opp'n at 10 (citing Shipley Decl. Ex 8). However, in context that email appears to be referencing hedge funds encouraging Pershing to attempt to

1   remove and replace all of the Allergan Board members in a single meeting, and does not

2   indicate that BLB&G or hedge funds were urging Defendants to make a tender offer—making

3   it likely the email is irrelevant to Defendants' defense. *See* Shipley Decl. Ex. 8.

4       Even assuming *arguendo* that the email is relevant to the Defendants' defense, if the

5   email were admitted at trial, the Court could redact class counsel's name and merely state that

6   this was an email sent by an attorney who was representing shareholders in a lawsuit seeking

7   declaratory relief regarding the shareholders' right to remove the Allergan Board. Class

8   counsel's personal identity and the identity of his firm is irrelevant to the weight and

9   significance of the email—it would be the singular Orange County juror indeed who would

10  already know anything about either Lebovitch or BLB&G. Therefore, at this time, the Court

11  does not find a conflict between BLB&G or Lebovitch and the Class based on either BLB&G's

12  participation in the Delaware Action or Lebovitch's email.

13      Accordingly, the Court finds that proposed Class counsel is adequate.

14                    **4.   Commonality under Rule 23(a)(2)**

15      The "commonality" prerequisite mandates that there be "questions of law or fact

16  common to the class." Fed. R. Civ. P. 23(a)(2). Commonality requires that the class's claims

17  are based on a "common contention . . . capable of classwide resolution," meaning that

18  determination of the "truth or falsity" of that contention "will resolve an issue that is central to

19  the validity of [the class's] claims." *Wal-Mart*, 564 U.S. at 350.

20      The requirements of Rule 23(a)(2) have "been construed permissively," and just one

21  common question of law or fact will satisfy the rule. *See Ellis v. Costco Wholesale Corp.*, 657

22  F.3d 970, 981 (9th Cir. 2011). "The existence of shared legal issues with divergent factual

23  predicates is sufficient, as is a common core of salient facts coupled with disparate legal

24  remedies within the class." *Hanlon*, 150 F.3d at 1019. "The commonality preconditions of Rule

25  23(a)(2) are less rigorous than the companion [predominance] requirements of Rule 23(b)(3)."

26  *Id.*

27      Plaintiffs offer a host of common questions of law and fact:

28

(i) whether Defendants violated the federal securities laws; (ii) whether Pershing traded Allergan common stock while in possession of material nonpublic information; (iii) whether Valeant had the requisite knowledge regarding how Pershing would use the nonpublic information tipped by Valeant; (v) whether Valeant took "substantial steps" toward a tender offer; (vi) whether Pershing was an "other person" within the meaning of Rule 14e-3; (viii) the proper measure of damages; and (ix) whether Ackman, Pearson, Pershing Square, PS Management GP, LLC, and Pershing Square GP, LLC . . . were "control persons" within the meaning of §20(a).

Mot. at 9–10. The Court is satisfied that Plaintiffs have identified common questions of law and fact. Indeed, Defendants do not appear to dispute this, but instead argue that the common questions do not predominate as required for certification under 23(b)(3). *See* Opp'n at 17. The Court will address those arguments below.

### B.      Rule 23(b)

After satisfying the requirements of Rule 23(a), the proposed class must also satisfy at least one of the three requirements listed in Rule 23(b). Here, Plaintiff seeks certification under Rule 23(b)(3). Mot. at 15. The Court has concluded that the prerequisites of Rule 23(a) are satisfied. Thus, the Court must determine if the requirements of Rule 23(b)(3) are met. Under Rule 23(b)(3), common questions of law or fact must predominate and the class device must offer a superior means of resolving the dispute. The Court must also consider whether Plaintiffs have shown that damages can be feasibly and efficiently measured.

### 1.   Predominance

"Rule 23(b)'s predominance criterion is even more demanding than Rule 23(a)." *Comcast Corp. v. Behrend,* 133 S. Ct. 1426, 1432 (2013). Rule 23(b) requires that courts "take a 'close look' at whether common questions predominate over individual ones." *Id.* The predominance inquiry "tests whether proposed class actions are sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623. In determining whether common questions predominate, the Court identifies the substantive issues related to plaintiff's claims

(both the causes of action and affirmative defenses), and then considers the proof necessary to establish each element of the claim or defense; and considers how these issues would be tried. *See* Schwarzer, et al., Cal. Prac. Guide Fed. Civ. Pro. Before Trial Ch. 10–C § 10:412. The predominance inquiry requires that plaintiff demonstrate common questions predominate as to each cause of action for which plaintiff seeks class certification. *Amchem,* 521 U.S. at 620. "Because no precise test can determine whether common issues predominate, the court must pragmatically assess the entire action and the issues involved."  *Romero v. Producers Dairy Foods, Inc.,* 235 F.R.D. 474, 489 (E.D.Cal. 2006).

Section 14(e) prohibits "fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer." Under Rule 14e-3(a), once an "offering person" "has taken a substantial step or steps to commence . . . a tender offer, . . . any other person who is in possession of material information relating to such tender offer" that he knows or has reason to know is nonpublic and that he received directly or indirectly from the offering person must either abstain from trading or disclose the information to the public before trading. 17 C.F.R. § 240.14e-3(a). Relatedly, Rule 14e-3(d) makes it unlawful for an "offering person" to communicate "material nonpublic information relating to a tender offer to any other person under circumstances in which it is reasonably foreseeable that such communication is likely to result in a violation of this section." 17 C.F.R. 240.14e-3(d).

Section 20A makes a person who violates the Exchange Act "by purchasing or selling a security while in possession of material nonpublic information" liable  "to any person who, contemporaneously with the purchase or sale of securities that is the subject of such violation, has purchased . . . securities of the same class." 15 U.S.C. § 78t-1.

Here, the common questions concern whether Defendants violated the Exchange Act and, if so, whether such violations affected the price Class members sold their stock for. Courts have certified 23(b)(3) actions on similar common questions. *See In re Unioil Sec Litig*., 107 F.R.D. 615, 622 (C.D. Cal.1985) ("As plaintiffs' claim is based on a common nucleus of misrepresentations, material omissions and market manipulations, the common questions predominate over any differences between individual class members with respect to damages,

causation or reliance."); *In re Portal Software, Inc. Sec. Litig.*, No. C-03-5138-VRW, 2007 WL 1991529, at *5 (N.D. Cal. June 30, 2007) (certifying a class where "the common questions concern whether defendants violated the Securities Act and, if so, whether such violations affected the price plaintiffs paid for [the] stock.") Showings of the critical elements of Plaintiffs' claims—including issues of substantial steps, material omissions, scienter, Pershing's status as an "other person," and violations of the duty to disclose of abstain—will be common to the whole Class. Defendants dispute this, citing the same arguments regarding individualized issues that the Court rejected above. *See* Opp'n at 17. The Court finds those arguments equally unconvincing in this context.

Defendants also argue that individual issues of reliance predominate, rendering this case unfit for class certification. *Id.* at 18. Where reliance is a required element, if no presumption of reliance applies, then every plaintiff must prove direct reliance and individual issues overwhelm common ones. *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2407–8 (2014). In response, Plaintiffs contend that reliance is not an element of §14(e) or Rule 14e-3 claims. Reply at 17. Further, Plaintiffs contend that the Class's reliance is assumed under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), and under the fraud-on-the-market presumption under *Basic Inc. v. Levinson*, 485 U.S. 224 (1988). Finding that the *Affiliated Ute* presumption applies, the Court does not reach the argument for the fraud-on-the-market presumption.

*Affiliated Ute* holds that in cases "involving primarily a failure to disclose, positive proof of reliance is not a prerequisite to recovery." 406 U.S. at 153. Instead, it is necessary only that "the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision." *Id.* at 153–54. This is a case involving a duty to disclose—accordingly *Affiliated Ute* applies. Further, as to materiality, "[a] failure of proof on the *common* question of materiality ends the litigation and thus will never cause individual questions of reliance or anything else to overwhelm questions common to the class." *Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1196 (2013). Accordingly, Plaintiffs need not show materiality at the class certification stage. *Id.*

Defendants appear to concede that the *Affiliated Ute* presumption applies here, but argue that they can rebut the presumption. Opp'n at 20. It is true that the *Affiliated Ute* presumption is rebuttable rather than conclusive. *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 159 (2008). While the Supreme Court has not addressed whether a party is entitled to rebut the *Affiliated Ute* presumption at the class certification phase, the Supreme Court has found that the fraud-on-the-market presumption is rebuttable, reasoning that "an indirect proxy should not preclude direct evidence when such evidence is available." *Halliburton*, 134 S. Ct. at 2415. The Court agrees with Defendants that this reasoning strongly suggests that a defendant should be entitled to attempt to rebut the *Affiliated Ute* presumption, which is itself a proxy, at the class certification phase.

Defendants attempt to the refute the *Affiliated Ute* presumption by arguing that evidence shows that the alleged material nonpublic information regarding Valeant's intent to make a tender offer had no effect on Allergan's stock price. Opp'n at 19–20. Defendants cite no authority that this showing would rebut the *Affiliated Ute* presumption. Further, this argument is not squarely on point with *Affiliated Ute*, as *Affiliated Ute* did not rely on an assumption that the market in question was efficient. In any event, the Court is unconvinced by Defendants' arguments. Defendants' arguments center on the fact that when Valeant explicitly mentioned a tender offer, and later made a tender offer, the stock price was unaffected. *See* Opp'n at 18–19. However, the material information may be "relating" to a tender offer and need not be literally the fact of a tender offer. *See* 17 C.F.R. § 240.14e-3 (a). Plaintiffs cite evidence that after the April 21, 2014 announcement of Valeant's intent to acquire Allergan the stock price did spike, Greenstein Decl. Ex. 9, and Plaintiffs contend that this disclosure was in connection with an ultimate plan to make a tender offer—and Plaintiffs offer evidence that the market understood it that way too. Daines Decl. ¶ 37 n.47 (noting analyst speculated that "a tender offer may be launched"); Declaration of Eil Greenstein in Support of Reply ("Greenstein Reply Decl.") (Dkt. 268) Ex. 12 at 1 ("VRX/Pershing might have to launch a tender offer for AGN's shares.").

Defendant also seeks to rebut the *Affliated Ute* presumption by arguing that the Plaintiffs each admitted that they would have traded as they did even if they had the same information as

Pershing. Opp'n at 20. The Court has reviewed the portions of the deposition testimony that Defendants cite in support of this argument. Defendants use highly creative inferences and assumptions to construct concrete admissions out of vague, abstract statements. The Court does not agree that Ohio STRS or Johnson admitted they would have sold even if they had known about Valeant's plans, especially in light of the fact that both Plaintiffs said the *exact opposite* during depositions. Shipley Decl. Ex. 5 at 129:1–13 (Ohio STRS analyst testifying that "if I had known what Mr. Ackman had known, I would not have sold the stock"); *id.* Ex. 12 (Johnson stating that had he known of Valeant's intentions, "I would absolutely not have exercised these options").

The IPERS investment manager testified that when a cash withdrawal was made, the management company would liquidate the stocks in proportion to IPERS's total holding of the stock, rather than based on any analysis of the market and the stocks IPERS held. *Id.* Ex. 15 at 66:21–70:6. However, the vast majority of IPERS's trades during this period where not made due to these models. Accordingly the Court is satisfied that individual reliance can likely be presumed.

Next, Defendants contend that Plaintiffs have failed to demonstrate a viable methodology for calculation of damages that can produce a class-wide result, as required under *Comcast Behrend*, 133 S. Ct. 1426 (2013). Opp'n at 21 (citing *Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161, 1167 (9th Cir. 2014)). Defendants note that Plaintiffs have stated they intend to calculate damages based a "common formula that measures the difference between the selling price actually received and the true value of the shares had there been no material omissions and misconduct by Defendants." *Id.* at 21–22 (quoting Greenstein Decl. Ex. 10 ("Expert Report of Mukesh Bajaj") ¶¶ 68–69). Defendants contend that this "formula" for calculating damages is at such a high level of generality that it is not a meaningful methodology. Opp'n at 22.

However, the Supreme Court has endorsed similar damages calculations. *See Affiliated Ute*, 406 U.S. at 155 ("In our view, the correct measure of damages . . . is the difference between the fair value of all that the . . . seller received and the fair value of what he would have received had there been no fraudulent conduct."). Further, the Ninth Circuit has dismissed

any concerns about damages calculations in a similar context, stating "the amount of price inflation during the period can be charted and the process of computing individual damages will be virtually a mechanical task." *Blackie*, 524 F.2d at 905.

Therefore, the Court finds that common questions of law and fact predominate.

### 2. Superiority

The second prong of the analysis under Rule 23(b)(3) also requires a finding that "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3). A class action is superior "[w]here classwide litigation of common issues will reduce litigation costs and promote greater efficiency." *Valentino*, 97 F.3d at 1234. "[T]he purpose of the superiority requirement is to assure that the class action is the most efficient and effective means of resolving the controversy. Where recovery on an individual basis would be dwarfed by the cost of litigating on an individual basis, this factor weighs in favor of class certification." *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010).

Defendants argue against superiority by pointing out that 92% of Allergan's shares during the Class period were owned by institutional investors who sold such a large number of stocks that they are sufficiently incentivized to pursue individual recovery. Opp'n at 23–24. However, absent class resolution, the courts could be called on to adjudicate more than 1,000 individual damages claims based on the same underlying conduct. "[E]ach member of the class pursuing a claim individually would burden the judiciary, which is contrary to the goals of efficiency and judicial economy advanced by Rule 23." *Tait v. BSH Home Appliances Corp.*, 289 F.R.D. 466, 486–87 (C.D. Cal. 2012). Further, individualized actions could well leave thousands of retail investors—the other 8% of Allergan's shareholders—without any recovery, which the Court finds weighs in favor of a finding of superiority. Further, the Court does not foresee difficulties in management that would preclude class-wide resolution or undermine other gains in judicial efficiency.

Accordingly, the Court concludes superiority is established.

### C.   Due Process Argument and Rule 19 Motion

Finally, in their Opposition to Class Certification and in a separate Motion to Dismiss, Defendants argue that the proposed Class cannot be certified and the action should be dismissed because the Class includes only those who sold Allergan *common stock* and not those who traded other price-interdependent derivative securities. Opp'n at 24–25; *see generally* MTD. Defendants argue that these other traders are necessary parties under Federal Rule of Civil Procedure 19(a)(1)(B)(i).

Plaintiffs have conceded that recovery by anyone against the Defendants is capped at the Defendants' gains—meaning that if Plaintiffs here succeed in recovering all of Defendants gains, there will be nothing left for other parties who were also harmed by the Defendants' actions. However, Plaintiffs have also shown that other courts have certified § 20A classes that exclude options traders. Reply at 25 (citing *S.A.C Capital*, 311 F.R.D. at 373 (ADR purchasers and sellers); *In re Bridgepoint, Educ., Inc. Sec. Litig.*, 2015 U.S. Dist. LEXIS 5137, at *10–12 (S.D. Cal. Jan. 15, 2015) (common stock purchasers); *Johnson*, 257 F.R.D. at 596 (C.D. Cal. 2009) (same); *In re Pfizer Inc. Sec. Litig.*, 282 F.R.D. 38, 42, 53–54 (S.D.N.Y. 2012) (same)). Defendants contend that be that as it may, there are no reasoned decisions certifying classes under § 14e. However, the §20A cases cited above also dealt with a damages cap and those courts did not require that every conceivable plaintiff be joined in those cases. *See* 15 U.S.C. §§ 78t-1(b)(1).

Further, in the Ninth Circuit "[w]here a party is aware of an action and chooses not to claim an interest, the district court does not err by holding that joinder was 'unnecessary.'" *Altmann v. Republic of Austria*, 317 F.3d 954, 971 (9th Cir. 2002). Defendants state that there is insufficient evidence to show that the derivative sellers of Allergan stock during the class period are aware of this litigation, and that this rule therefore does not apply to these circumstances. MTD Reply at 9. This point is well taken. While there likely are many derivative sellers who are aware of this $2 billion class action, there are surely others who are not. However, Plaintiffs at oral argument made the point that derivative sellers can also be given notice the same time the Class members are given notice of this lawsuit meaning they

will have notice and opportunity to intervene or bring their own claims before the case is resolved. This procedure is proper, because not every party need be joined under Rule 19 before a class action can be properly certified. *See Shimkus v. Gersten Companies*, 816 F.2d 1318, 1321 (9th Cir. 1987) (finding that a "class was properly certified," although parties ultimately did need to be added under Rule 19).

Accordingly, the Court DENIES WITHOUT PREJUDICE Defendants Motion to Dismiss.

**IV.     DISPOSITION**

For the reasons explained above, the Court GRANTS Plaintiffs' Motion for Class Certification and DENIES Defendants' Motion to Dismiss.

David O. Carter
_____
DAVID O. CARTER
UNITED STATES DISTRICT JUDGE

DATED:  March 15, 2017