**BERNSTEIN LITOWITZ**
   **BERGER & GROSSMANN LLP**
RICHARD D. GLUCK
(Bar No. 151675)
rich.gluck@blbglaw.com
12481 High Bluff Drive, Suite 300
San Diego, CA 92130
Telephone: (858) 793-0070
Facsimile: (858) 793-0323

-and-

**KESSLER TOPAZ**
   **MELTZER & CHECK, LLP**
ELI R. GREENSTEIN
(Bar No. 217945)
egreenstein@ktmc.com
One Sansome Street, Suite 1850
San Francisco, CA 94104
Telephone: (415) 400-3000
Facsimile: (415) 400-3001

*Counsel for Lead Plaintiffs and the Class*

*[Additional counsel on signature page]*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### SOUTHERN DIVISION

| | |
|---|---|
| IN RE ALLERGAN, INC. PROXY VIOLATION SECURITIES LITIGATION | Case No. **8:14-cv-02004 DOC**<br>**2:17-cv-04776 DOC**<br><br>Hon. David O. Carter<br><br>CLASS ACTION |
| IN RE ALLERGAN, INC. PROXY VIOLATION DERIVATIVES LITIGATION | **LEAD PLAINTIFFS' OPPOSITION TO THE COMPETING PROPOSALS CONCERNING THE ALLOCATION OF DAMAGES**<br><br>Date: November 27, 2017<br>Time: 8:30 a.m.<br>Location: Courtroom 9D |

# TABLE OF CONTENTS

I.      Introduction ................................................................................................ 1

II.     Timber Hill's Profits Cap Theory Is Baseless And Should Not Distract From The Upcoming Trial ................................................................... 4

III.    Timber Hill Cannot Manufacture Damages That It Did Not Suffer .................. 6

IV.     The Court Should Reject Defendants' Opportunistic Request To Revisit The Court's Order Denying Consolidation ......................................... 8

V.      Conclusion ................................................................................................ 12

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Allapattah Servs., Inc. v. Exxon Corp.*,
  333 F.3d 1248 (11th Cir. 2003) ................................................................. 7

*Basile v. Valeant Pharm. Int'l, Inc.*,
  2015 WL 7352005 (C.D. Cal. Nov. 9, 2015) ..................................... 5, 11

*Basile v. Valeant Pharm. Int'l Inc.*,
  2017 WL 3641591 (C.D. Cal. March 15, 2017) ................................. 6, 7

*Dupont v. Southern Pac. Co.*,
  36 6 F.2d 193 (5th Cir. 1966) .................................................................. 11

*Entergy Nuclear Indian Point 2, LLC v. U.S.*,
  62 Fed. Cl. 798 (2004)............................................................................. 11

*Gordon v. Sonar Capital Mgmt. LLC*,
  92 F. Supp. 3d 193, 202 (S.D.N.Y. 2015) ................................................ 6

*Jaffe Pension Plan v. Household Int'l., Inc.*,
  756 F. Supp. 2d. 928 (N.D. Ill. 2010) ...................................................... 9

*Lupton v. American Fidelity Assurance Co.*,
  2014 WL 2201079 (W.D. Okla. May 27, 2014) ..................................... 11

*MAZ Partners LP v. Shear*,
  2017 WL 2986579 (D. Mass. July 13, 2017)............................................ 9

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*,
  2007 WL 4526593 (S.D.N.Y. Dec. 20, 2007)........................................... 7

*Netcurrents Information Systems, Inc. v. Dow Jones & Co. Inc.*,
  2008 WL 11339969 (C.D. Cal. July 17, 2008) ....................................... 11

*In re Puda Coal Sec. Inc. Litig.*,
  2017 WL 65325 (S.D.N.Y. Jan. 6, 2017)................................................... 9

*Taylor v. Sturgell*,
  553 U.S. 880 (2008) .................................................................................. 9

*United States v. Stites,*
   56 F.3d 1020 (9th Cir. 1995).................................................................................2

**Statutes**

15 U.S.C. § 78bb(a)(1) ...................................................................................6

15 U.S.C. § 78u-4(e)(1) ..................................................................................9

State Teachers Retirement System of Ohio and Iowa Public Employees Retirement System (together, "Lead Plaintiffs"), respectfully submit this opposition to the motions filed by Timber Hill LLC (*Timber Hill*, ECF No. 66) and Defendants (*Basile*, ECF No. 558) concerning the process for allocating and distributing any damages judgments obtained in the separate actions on behalf of Allergan common stock investors (*Basile*) and derivatives traders (*Timber Hill*) and in further support of Lead Plaintiffs' submission. *See Basile*, ECF No. 560.[1]

## I.    Introduction

After refusing for months to share its damages analysis with Lead Plaintiffs, Timber Hill reverses from its July 25 position and puts forward a baseless and illogical theory concerning two Section 20A profits caps in order to avoid actually substantiating its purported damages.  For their part, Defendants exploit Timber Hill's about-face by asking to reargue this Court's decision on consolidation.  Defendants then endorse Timber Hill's meritless profits cap theory – even though they did not oppose Lead Plaintiffs' summary judgment motion precluding the notion that two profit caps could exist.  Defendants' plan is obvious:  they seek to gut common stock investors' damages, and then belatedly prove Timber Hill's lack of standing and damages at class certification.  In short, Defendants seek to play one class off the other to avoid responsibility for their insider trading entirely.  Nether party's position has any merit.

The Court should follow the path suggested by Lead Plaintiffs, and permit the *Basile* trial to go forward and class certification issues in *Timber Hill* to be developed before addressing any theoretical need for allocation of damages.  If the jury awards damages near or above the profits cap, the Court can order an interim distribution while

---

[1] Defined terms used herein are the same as those set forth in Lead Plaintiffs' opening submission.  *See Basile*, ECF No. 560.  All emphasis is added and citations omitted unless otherwise noted.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

reserving an amount that will cover the maximum possible damage award the putative *Timber Hill* class (assuming it even can be certified) could obtain.  As Lead Plaintiffs have shown, that amount represents approximately 6% of the common stock Class's damages.  *See Basile*, ECF No. 560-2.

Apparently unwilling to accept this reality, Timber Hill contradicts its July 25 representations to the Court that one profit cap exists, which would be decided in *Basile* and would control in *Timber Hill*.  Instead, Timber Hill proposes a new theory that there are two separate profits caps – and, ignoring the Court's request for submissions on October 30, asks that the parties again "brief" this issue **before** trial in the *Basile* common stock case.  *Timber Hill*, ECF No. 66 at 3.  Timber Hill should not be permitted to reverse itself based on current expedience.  *See United States v. Stites*, 56 F.3d 1020, 1025-1026 (9th Cir. 1995) ("nothing in our professional ethics permits an advocate to tell a court one set of facts today and a contradictory set of facts tomorrow").

Holding Timber Hill to its word is particularly appropriate here since its new position is utterly meritless.  Timber Hill contends that traders of over 200 "out-of-the-money" call and put options are entitled to **all** profits flowing from Pershing's unique transactions with Nomura – and that common stock investors cannot recover **any** damages for those trades.  But the Court already held that Lead Plaintiffs and the certified class can recover damages based on Pershing's trades with Nomura because Pershing "caused" Nomura to trade common stock.  Lead Plaintiffs then proved these underlying facts in discovery, and Defendants did not dispute them at summary judgment.  Timber Hill cannot void this reality through additional briefing ahead of Lead Plaintiffs' trial.  Indeed, Section 20A does not relieve Timber Hill of proving damages—it can only **reduce** the amount of damages that Timber Hill must ultimately prove.  But as Lead Plaintiffs have shown, the *Timber Hill* class have damages that are,

at most, about 6% of those suffered by the common stock class. *See Basile*, ECF No. 560-2.

Defendants' proposal similarly ignores the law and attempts to rewrite history. Although Defendants appear to agree with Lead Plaintiffs that the allocation process should be addressed, if necessary, after the *Basile* trial, Defendants seize on Timber Hill's backtracking to ask the Court to revisit its prior decision not to consolidate the *Basile* and *Timber Hill* actions. To start, Timber Hill should not be allowed to retreat from its position at the July 25 conference that one profit cap applies.

Moreover, Timber Hill's reversal in no way justifies revisiting consolidation. Defendants and Timber Hill themselves appear to agree that the Section 20A profits cap is a statutory limitation that the Court has the authority to apply and interpret separate and apart from any jury finding—meaning there is no risk of inconsistent verdicts.[2] But even if there were, that still would not justify consolidating two actions asserting wildly divergent and incompatible damages theories that are procedurally at opposite ends. Last, Defendants endorse Timber Hill's "separate" profit cap theory (after failing to oppose summary judgment establishing this theory is wrong as a matter of law), and suggest this is a viable path. While Defendants may prefer to allocate their exposure to a class of options traders led by an adversary that lacks standing, there is no reason to entertain this radical notion.

Given Timber Hill's refusal or inability to substantiate its damages theory in time for the briefing deadline on allocation, the Court should adopt the approach offered by Lead Plaintiffs: namely, permit *Basile* to proceed to trial, and provide Timber Hill until then to substantiate its damages. At that time, the Court can distribute any damages award while reserving an amount sufficient to cover the maximum

---

[2] *See* ECF No. 558 at 13 (Defendants noting option of Court to "adopt a single damages cap"); ECF No. 67 at 3-4 (Timber Hill arguing that the damages cap is a "legal issue to be decided by the court").

amount any conceivable Timber Hill options class could hope to obtain – which Lead Plaintiffs calculate to be 6% of the common stock class's damages.

## II.   Timber Hill's Profits Cap Theory Is Baseless And Should Not Distract From The Upcoming Trial

In its submission, Timber Hill reverses course from its representations at the July 25 hearing that there is only one profit cap.  Timber Hill now argues that two caps exists – one for Defendants' profits from purported "derivatives" transactions and a different one for the common stock investors who actually sold common stock while Nomura purchased common stock on behalf of Pershing.  In essence, Timber Hill asserts that simply saying that both Defendants and Timber Hill traded in "derivatives" entitles it to damages.  To the contrary, the opposite is true.

In fact, the rulings by the Court in this case dispose of Timber Hill's argument that the common stock investors are somehow out of luck, and cannot recover damages based on Pershing's trades with Nomura.  As the Court is aware, Pershing acquired its 9.7% Allergan common stock stake by direct common stock acquisitions and by using privately negotiated off-market zero-strike options transactions through which Nomura concealed Pershing's common stock accumulation.  While these trades are nominally "derivative," that term is so general as to be meaningless here.  Pershing's "derivative" contracts with Nomura were simply the mechanism by which Pershing acquired its 9.7% position in *Allergan common stock*.  Indeed, Timber Hill's own complaint makes this very point, and highlights Defendant Ackman's explanation that the private derivative contracts it negotiated with Nomura were designed so that Pershing could acquire a large position in Allergan *common stock* while avoiding triggering the requirements of the Hart-Scott Rodino Act.  *See Timber Hill*, ECF No. 1 at ¶¶119-30.  As Timber Hill alleged and Ackman admitted, "the only reason that PS Fund 1 did not acquire Allergan shares outright was to avoid detection by the marketplace."  *Id.* at 126.

Based on these admissions and other allegations concerning Nomura's role as Pershing's broker in acquiring Allergan common stock, the Court held that Lead Plaintiffs "adequately alleged that PS Fund 1 ***caused*** Nomura to purchase shares of Allergan," as they "could have traded directly with Nomura, who allegedly purchased Allergan stock at Defendants' behest." *Basile v. Valeant Pharm. Int'l, Inc.*, 2015 WL 7352005, at *6 (C.D. Cal. Nov. 9, 2015). The evidence in discovery confirmed these allegations, and demonstrated Pershing caused Nomura to buy Allergan common stock, and ***only*** common stock. *See, e.g.*, ECF No. 393-2 at 25-30 (Lead Plaintiffs' motion); ECF No. 456 at 33-34 n.22 (Defendants' opposition).[3]

In fact, Defendants did not oppose Lead Plaintiffs' summary judgment motion establishing that Pershing caused Nomura to purchase the common stock sold by Lead Plaintiffs and the *Basile* class. ECF No. 401 at 25-30; ECF No. 456 at 33 n.22; ECF No. 517-2 at 2 n.2. Thus, while Timber Hill inexplicably argues that Lead Plaintiffs' class definition somehow precludes a recovery by the common stock class (*Timber Hill*, ECF No. 67 at 4), Lead Plaintiffs' and the common stock class's entitlement to recover damages as a result of Pershing "causing" Nomura to trade has already been established as a matter of law. In sharp contrast to Lead Plaintiffs and the certified class, Timber Hill does not and cannot allege Pershing or Nomura purchased ***any*** of the securities that Timber Hill or any member of its proposed class traded – a potentially insurmountable impediment to establishing Timber Hill's ability to recover

---

[3] Ackman described the difference between Pershing's bespoke zero-strike options contracts with Nomura and the "normal" options purchased by Timber Hill as follows: "[N]ormally people buy an option, the stock is at $125, they might buy an option at $130. This stock was at $125, we bought an option at a dollar. So [there is] very little optionality in the [Nomura] option. It behaves just like the common stock. And because we weren't look[ing] for optionality. We were looking for a way to be exempt from the requirement, be allowed to get economic exposure without having to file first with the FTC, which would give the company notice that we were interested in the stock." *Basile*, ECF No. 472-33 at 3.

anything at all.  Thus, while Timber Hill's motivation for advancing its "two cap" theory is plain, the Court has held (and Defendants effectively conceded) that Defendants' insider trading – and Pershing's secret accumulation of 9.7% of *Allergan's common stock* – harmed investors who **sold Allergan common stock**. Timber Hill's "two cap" theory is meritless, and should be rejected out of hand.

## III.     Timber Hill Cannot Manufacture Damages That It Did Not Suffer

As set forth above, Timber Hill cannot simply point to Defendants' profits on securities that are technically "derivatives" – but are unlike any of the "derivatives" Timber Hill actually traded – and claim profits on those trades as the *Timber Hill* class's damages.  Timber Hill's position mistakenly assumes that Section 20A **creates** damages that Timber Hill can pursue for a class of derivatives traders without any showing of damages to the investors of those securities.  This is wrong.  Timber Hill must still prove actual damages.  Indeed, Section 28(a) of the Exchange Act provides that "[n]o person permitted to maintain a suit for damages under the provisions of this chapter shall recover … a total amount in excess of the actual damages to that person on account of the act complained of."  15. U.S.C. § 78bb(a)(1); *see also Basile v. Valeant Pharm. Int'l, Inc.*, 2017 WL 3641591, at *4 (C.D. Cal. March 15, 2017) (class certification).  Further, Section 20A's plain language and its legislative history make clear that the profit cap does not do away with this requirement.[4]

As set forth in Lead Plaintiffs' opening submission, however, Timber Hill cannot establish its damages—and neither can traders in many of the securities on which Timber Hill sues.  Specifically, under Lead Plaintiffs' *Elkind* damages model, when netting out both the gains and losses that Timber Hill experienced by trading in Allergan put and call options during the Class Period, Timber Hill realized **net gains**

---

[4] *See, e.g.*, *Gordon v. Sonar Capital Mgmt. LLC*, 92 F. Supp. 3d 193, 202 (S.D.N.Y. 2015) (the Section 20A cap "does not necessarily relieve a plaintiff of the burden of proving her actual damages or permit her to recover for her losses without any offset for countervailing gains").

of over $3.5 million.  In other words, Timber Hill suffers from the same exact infirmity that this Court held did ***not*** apply to Lead Plaintiffs when certifying the common stock class.  *See Basile*, 2017 WL 3641591, at *5 (distinguishing *Gordon*, noting that Lead Plaintiffs did not purchase but only sold Allergan stock during the Class Period and were "harmed because they sold their shares for less than the market would have valued the shares at had the market had Defendants' knowledge").  Moreover, even if Timber Hill (or some other Allergan options trader) could establish standing and show it was actually harmed by Defendants' insider trading, the maximum possible classwide damages any derivatives trader class could hope to recover amounts to only about 6% of the common stock investors' classwide damages.  ECF No. 560-2.  Indeed, numerous options in Timber Hill's proposed class traded in such small volumes that even ***classwide*** damages on those securities is nominal.  *See id.*[5]

Timber Hill's inability to show that it was harmed – and the fact that, even if it could, the largest possible classwide damages for derivatives traders are just 6% of common stock investors damages – reveals why Defendants so readily endorse Timber Hill's legally unsupportable "separate" profit caps theory.  ECF No. 558 at 9.  Indeed, Defendants' opportunistic support of Timber Hill's theory underscores why Defendants are not permitted to comment on how classwide damages are allocated.

---

[5] For over 80% of the options in Timber Hill's proposed class, classwide damages are less than $1 million—an amount representing a small fraction of Lead Plaintiffs' ***individual*** damages.  *See generally* ECF No. 560-2 at Table 2.  For several others, total ***classwide*** damages ***are less than $50***.  This barely covers the administrative costs for processing a claim, and has been used as the minimum payment threshold in many securities class actions settlements.  *See, e.g.*, *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, No. 02 MDL 1484 (JFK), 2007 WL 4526593, at *12 (S.D.N.Y. Dec. 20, 2007) (approving $50 minimum recovery threshold in securities class action).  The point is that the putative class that Timber Hill seeks to represent has ***miniscule damages as compared to the certified class of common stock sellers in Basile***.  This reality is not going to change – which is why Timber Hill refuses to substantiate its damages and seeks only to delay.

*See, e.g.*, *Allapattah Servs., Inc. v. Exxon Corp.*, 333 F.3d 1248, 1258-59 (11th Cir. 2003) ("[A] defendant has no interest in how the class members apportion and distribute a[n] [aggregate] damage [award] among themselves."). For all of these reasons, Timber Hill's Defendant-endorsed profits-by-security theory should be rejected.

Instead, the Court should follow Lead Plaintiffs' proposal – and the parties' agreement at the July 25 hearing – that the Court proceed with the *Basile* common stock trial, and hold that the finding as to Defendants' profits in *Basile* will control in *Timber Hill*. The Court can then revisit allocation at that time or after class certification in *Timber Hill* is addressed, when any potential allocation dispute may have actually materialized.

## IV.   The Court Should Reject Defendants' Opportunistic Request To Revisit The Court's Order Denying Consolidation

Although Defendants agree with Lead Plaintiffs that the allocation process can be addressed following the trial in *Basile*, Defendants also support Timber Hill's newfound "profits cap" theory and requests that the Court revisit consolidation. ECF No. 558 at 6-7.[6] Neither of these latter two "alternatives" have any merit whatsoever.

---

[6] All parties also appear to agree, in principle, that any awarded damages can be allocated on a *pro rata* basis among the two plaintiff classes, assuming both classes obtain damages awards and one or both awards together exceed the profits cap. *See Timber Hill*, ECF No. 67 at 5-6 (Timber Hill proposing, as an alternative, a *pro rata* allocation of damages to each class based on proportion amount of classwide damages awarded in each case); *Basile*, ECF No. 558 at 6-7 (Defendants proposing *pro rata* allocation of damages whereby classwide damages are added together and divided by the cap, and each class is allocated an amount equal to the classwide damages amount multiplied by the resulting cap-to-damages ratio). While Lead Plaintiffs believe that *pro rata* allocation could be appropriate, it is unclear at this time which of the well over 100 options, if any, the proposed *Timber Hill* class will ultimately be included, as well as the damages for each of those options (which vary drastically, *see Basile*, ECF No. 560-2 at Table 2)—demonstrating any *pro rata* calculation must await further development as to each specific security.

First, pointing to Timber Hill's reversal from its position at the July 25 hearing, Defendants have urged the Court to revisit its decision consolidating the two actions. ECF No. 558 at 12.  The Court should not revisit consolidation based on Timber Hill's reversal of its own position and the untenable theory it has now adopted.  Indeed, Defendants are still withholding consent to certification of a Timber Hill class, which the Court found to be a compelling basis to refuse consolidation in July 2017.

But even if the Court entertains Timber Hill's new theory, it would not provide any basis to reconsider consolidation.  To start, Timber Hill's new profits cap theory does not introduce any undue risk of inconsistent verdicts, because the Court can and should readily reject it as a matter of law.  Indeed, every party agrees that the Court can determine and apply the cap separate and apart from any jury award.  As Timber Hill puts it, the Court could enforce any finding as to the profit cap in *Basile* as binding in *Timber Hill* under the principles of "statutory construction."  *Timber Hill*, ECF No. at 4.[7]  And Defendants state in their submission that the Court can "adopt a single damages cap." ECF No. 558 at 13.  For the reasons set forth above, the Court should hold that Timber Hill's theory is contrary to the law, and should never go to a jury.  In

---

[7] By analogy, courts have held that a similar securities law damages limitation under the Private Securities Litigation Reform Act ("PSLRA") – the so-called 90-day lookback period – is a pure "legal issue" to be mechanically applied by courts, not juries. *See* 15 U.S.C. § 78u-4(e)(1). Although that lookback cap serves a different purpose than the Section 20A cap, they serve a similar function that is to be applied by the court. *See, e.g., In re Puda Coal Sec. Inc. Litig.*, 2017 WL 65325, at *14, *15-16 (S.D.N.Y. Jan. 6, 2017) (noting the application of the lookback cap presents a "legal issue"); *Jaffe Pension Plan v. Household Int'l., Inc.*, 756 F. Supp. 2d. 928, 936 (N.D. Ill. 2010) (following jury trial, ruling that "plaintiffs' damages will be limited by the mathematical formula provided in the 90-Day Bounce Back Rule" and applying cap); *see also MAZ Partners LP v. Shear*, 2017 WL 2986579, at *5-8 (D. Mass. July 13, 2017) (awarding disgorgement remedy based on jury findings and evidence presented at trial, noting that court's determination of distribution of disgorged funds "based on the facts as found by the jury does not implicate the Seventh Amendment").

other words, there is no risk of "inconsistent verdicts" on Timber Hill's proposed "profit caps" theory.[8]

On the other hand, the prejudice of consolidation is manifest.  To start, Lead Plaintiffs are rapidly approaching trial, with the summary judgment hearing and pretrial conference just weeks away—while Timber Hill has just begun discovery, there is no certified options class, and no dispositive motions have been filed.  Indeed, at the July 25 hearing, Timber Hill and Defendants made clear that it would take months for them to catch up, which is why the Court set a trial date in *Timber Hill* for next October, or ***eight months*** after a jury renders a verdict in *Basile*.

Moreover, Lead Plaintiffs and the certified common stock class have already obtained summary judgment on the contemporaneous trading element – and introducing Timber Hill into the common stock trial would undoubtedly undo that substantial victory, and prejudice the common stock class.  There can be no question that a jury considering the claims of common stock investors would be confused by the presentation of evidence concerning over 200 options that could be at issue in *Timber Hill*, as well as evidence concerning how each of those options traded relative to Allergan common stock.  *See Basile*, 2015 WL 7352005, at *9.  The presentation of that evidence would be particularly harmful to the common stock class given that

---

[8] Certainly, there is no risk of inconsistent verdicts beyond the ordinary situation in which an investor "opts out" of a certified Rule 23 securities class action and seeks to prove higher damages than found by a jury.  Indeed, if the risk of inconsistent application of a damages limitation were enough to require a consolidated trial, there would never be separate trials in securities class actions—as every securities class action seeking damages requires a court to apply the PSLRA's "lookback" cap.  This is obviously not the law, and any supposed "prejudice" faced by Defendants in litigating two separate actions is simply a function of the application of the collateral estoppel principles set forth in Defendants' authority.  *See Taylor v. Sturgell*, 553 U.S. 880, 903-04 (2008) (noting *stare decisis* and the "human tendency" not to litigate "issues that have already been adversely determined against others" protects defendants).

Nomura did not purchase options during the Class Period at all – but rather purchased common stock, the very security the common stock Class was selling.

But perhaps most troubling, consolidation would work a severe injustice to both investor classes by forcing two sets of plaintiffs to present two competing and irreconcilable damages and profits cap theories before the same jury – and cross examine each other's experts – and then ask the jury to reconcile those theories in rendering a verdict.  That dynamic is simply unworkable, and will necessarily prejudice both sets of investor classes while creating a windfall for Defendants.  *See Dupont v. Southern Pac. Co.*, 36 6 F.2d 193, 196 (5th Cir. 1966) ("Where prejudice to rights of the parties obviously results from the order of consolidation, the action of the trial judge has been held reversible error."); *Entergy Nuclear Indian Point 2, LLC v. U.S.*, 62 Fed. Cl. 798, 802-03 (2004) (denying consolidation where two cases arose out of same contract with defendant but were in different procedural phases and plaintiffs asserted different damages theories); *Lupton v. American Fidelity Assurance Co.*, 2014 WL 2201079, at *2 (W.D. Okla. May 27, 2014) (denying consolidation where presentation of evidence relating to individual plaintiff injuries would lead to confusion and prejudice other plaintiffs).  Of course, Defendants welcome this outcome – but that is a reason to deny consolidation, not to grant it.  *See, e.g.*, *Netcurrents Information Systems, Inc. v. Dow Jones & Co. Inc.*, 2008 WL 11339969, at *2 (C.D. Cal. July 17, 2008) (denying consolidation, noting that the filing of the case sought to be consolidated appeared to be orchestrated by defendants and strategically filed so as to delay trial in the pending case).

Rather, the best course for the Court and the parties is to proceed along the separate tracks previously ordered by the Court, so that the common stock investors can have the day in court they have so vigorously pursued for the past three years. [9]

---

[9] Defendants also ask that the Court address its request at summary judgment that the profits cap be tied to the price of Allergan common stock as of either the June 2, 2014

## V.   Conclusion

For the foregoing reasons and those set forth in their prior submission, Lead Plaintiffs respectfully request that the Court adopt their proposal concerning the process for addressing allocation of potentially competing damages awards.

DATED:  November 6, 2017          Respectfully submitted,

*Mark Lebovitch*

BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP
RICHARD D. GLUCK (Bar No. 151675)
rich.gluck@blbglaw.com
12481 High Bluff Drive, Suite 300
San Diego, CA 92130
Telephone: (858) 793-0070
Facsimile: (858) 793-0323

-and-

MARK LEBOVITCH (*Pro Hac Vice*)
markl@blbglaw.com
JEREMY P. ROBINSON (*Pro Hac Vice*)
Jeremy@blbglaw.com
MICHAEL D. BLATCHLEY (*Pro Hac Vice*)

---

announcement that Valeant would launch the tender offer or the later June 18, 2014 filing of Valeant's tender offer.  *See* ECF No. 558 at 6 (requesting summary judgment ruling as to profits cap); ECF No. 394 at 24-25 (arguing for June 2 or June 18, 2014 date for measuring profits cap). Of course, Defendants' internal inconsistency and inability to choose which date they contend the full truth was revealed undermines their position. In any event, Lead Plaintiffs established in discovery and through expert testimony that, at minimum, there are disputed issues of material fact that the full truth was not revealed until November 17, 2014, when Valeant withdrew its tender offer. *See* ECF No.  457 at 34-35.

michaelb@blbglaw.com
EDWARD G. TIMLIN (*Pro Hac Vice*)
edward.timlin@blbglaw.com
1251 Avenue of the Americas, 44th
Floor
New York, NY 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444

MURRAY MURPHY MOUL
BASIL LLP
BRIAN K. MURPHY (*Pro Hac Vice*)
murphy@mmmb.com
JOSEPH F. MURRAY (*Pro Hac Vice*)
murray@mmmb.com
1114 Dublin Road
Columbus, OH 43215
Telephone: (614) 488-0400
Facsimile: (614) 488-0401

*Special Counsel for the
Ohio Attorney General*

KESSLER TOPAZ
MELTZER & CHECK, LLP

ELI R. GREENSTEIN (Bar No.
217945)
egreenstein@ktmc.com
STACEY M. KAPLAN (Bar No.
241989)
skaplan@ktmc.com
PAUL A. BREUCOP (Bar No. 278807)
pbreucop@ktmc.com
RUPA NATH COOK (Bar No. 296130)
rcook@ktmc.com
One Sansome Street, Suite 1850
San Francisco, CA 94104
Telephone: (415) 400-3000
Facsimile: (415) 400-3001

1

2                                          -and-

3                                          LEE RUDY (*Pro Hac Vice*)

4                                          lrudy@ktmc.com
                                           JOSH D'ANCONA (*Pro Hac Vice*)
5                                          jdancona@ktmc.com
                                           JUSTIN O. RELIFORD (*Pro Hac Vice*)
6                                          jreliford@ktmc.com
                                           280 King of Prussia Road
7                                          Radnor, PA 19087
8                                          Telephone: (610) 667-7706
                                           Facsimile: (610) 667-7056
9

10
                                           *Co-Lead Counsel for Lead Plaintiffs and*
11                                         *the Class*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28