**BERNSTEIN LITOWITZ BERGER
  & GROSSMANN LLP**
RICHARD D. GLUCK
(Bar No. 151675)
rich.gluck@blbglaw.com
12481 High Bluff Drive, Suite 300
San Diego, CA 92130
Telephone: (858) 793-0070
Facsimile: (858) 793-0323

-and-

**KESSLER TOPAZ
  MELTZER & CHECK, LLP**
ELI R. GREENSTEIN
(Bar No. 217945)
egreenstein@ktmc.com
One Sansome Street, Suite 1850
San Francisco, CA 94104
Telephone: (415) 400-3000
Facsimile: (415) 400-3001

*Counsel for Plaintiffs and the Class*

*[Additional counsel on signature page]*

**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
SOUTHERN DIVISION**

| | |
|---|---|
| IN RE ALLERGAN, INC. PROXY VIOLATION SECURITIES LITIGATION | Case No. **8:14-cv-02004-DOC-KESx**<br><br><u>CLASS ACTION</u><br><br>**PLAINTIFFS' SUBMISSION CONCERNING SECTION 20A DAMAGES CAP**<br><br>Judge:   Hon. David O. Carter |

State Teachers Retirement System of Ohio, Iowa Public Employees Retirement System, and Patrick T. Johnson (together, "Plaintiffs"), respectfully provide this submission in response to the Court's December 15, 2017 request for additional briefing on the Section 20A damages cap (ECF No. 577).

## I.   INTRODUCTION

There is no Ninth Circuit authority interpreting exactly how to apply Section 20A's profits cap. *See* 15 U.S.C. § 78t-1(b)(1). Plaintiffs have previously advanced the view that Defendants' "profits" are tied to the date that the relevant material, nonpublic information ("MNPI") conveyed by Valeant to Pershing was fully revealed to the market. In its [*Tentative*] Order Denying Defendants' Motions for Summary Judgment [394] [395] and Granting in Part Plaintiff's Motion for Partial Summary Judgment [401] ("Tentative Opinion") at pp. 47-49, the Court expressed the view that the cap encompasses all of Defendants' profits from the trades at issue, regardless of the date that the MNPI was revealed to the market. During the summary judgment hearing, Plaintiffs and Timber Hill stipulated to take the position expressed in the Court's Tentative Opinion. This approach is supported by the plain language of the statute, principles of statutory construction, the statute's legislative history, and general principles of equity and fairness.

## II.   UNDER SECTION 20A, DAMAGES MAY NOT EXCEED DEFENDANTS' TOTAL PROFITS FROM THEIR ALLERGAN STOCK TRADES

In the Tentative Opinion, the Court expressed the straightforward view that "profit gained" means exactly that: how much profit did Defendants make on their challenged trades in Allergan stock? The answer is a matter of simple arithmetic: subtract the price PS Fund 1 paid for each share of common stock during the class period from the price at which it sold those shares, after the Actavis-Allergan merger closed in 2015. Such calculation of profits does not rest on any determination of when the MNPI was fully revealed to the market.

This methodology is supported by a plain reading of the statute. Section 20A states that the "total amount of damages imposed . . . shall not exceed the *profit gained* or loss avoided in the transaction or transactions that are the subject of the violation." 15 U.S.C. § 78t-1(b)(1).[1] If Section 20A intended to cap a defendant's profit at the date at which the MNPI was fully revealed to the market, Congress could easily have capped damages at "the profit gained or loss avoided *as a result of the violation.*" By instead capping damages at "the profit gained or loss avoided *in the transaction or transactions that are the subject of the violation*," it would appear that the framers of Section 20A intended a tippee to be liable for more than just the profits as of the date the MNPI was revealed. Instead, the statute appears to contemplate that a tippee would be liable for the total profits that it may ultimately realize "in the transaction" (i.e., the trading).

An analysis of the broader context of the statute lends further support to this plain reading. Section 20A was enacted in 1988 as the fifth of nine "Sections" of the Insider Trading and Securities Fraud Enforcement Act of 1988 ("ITSFEA"). Pub. L. No. 100-704, 102 Stat. 4677, 1988 H.R. 5133 at Sec. 5 (15 U.S.C. § 78t-1). A separate section of ITSFEA (Section 3) amended existing law regarding "Civil Penalties" for insider traders and persons who controlled them, allowing the SEC to seek "civil penalties" of "three times the amount of the profit gained or loss avoided *as a result of* such controlled person's violation." *Id.* at Sec. 3; 15 U.S.C. § 78u-1(a)(3); *id.* at (a)(2) ("The amount of the penalty which may be imposed on the person who committed such violation . . . shall not exceed three times the profit gained or loss avoided *as a result of* such unlawful purchase, sale, or communication."). In addition to using narrower language to describe the "profit" at issue, Section 3 also specifically defined "profit gained" and "loss avoided" as follows: "*For purposes of this section*, 'profit gained' or 'loss avoided' is the difference between the purchase or sale price of the security

---

[1] Unless stated otherwise emphasis is added and citations are omitted.

and the value of that security as measured by the trading price of the security a reasonable period after public dissemination of the nonpublic information." *Id.* at (e).

Section 20A's damages cap for ***private actions***, on the other hand, contains no such definition requiring that "profit gained" be measured at the time of the public dissemination of the MNPI. 15 U.S.C. § 78t-1(b)(1). Congress's decision not to include the narrower definition is consistent with the broader language that it chose to incorporate in Section 20A, which does not limit "profit gained" to those "as a result of the violation," but rather allows recovery of all of the insider trader's profit gained "in the transaction or transactions" at issue. *Id.*

It is a basic canon of statutory interpretation that "[where] Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Immigration and Naturalization Serv. v. Cardoza-Fonseca*, 480 U.S. 421, 432 (1987).[2] This rule applies with particular force here, where, in enacting ITSFEA, Congress explicitly limited the definition to Section 3 of the Act, specifying that it is solely "[f]or purposes of this section." 15 U.S.C. § 78u-1(e). Had Congress intended that definition to apply to Section 20A, it would have either included the definition in Section 20A itself or specified that Section 3's definition applied to the "Act," not the "section."

Congress's decision to include a broader recovery of profits for injured investors in "private actions" for insider trading is also consistent with the concerns expressed by the Bill's sponsor during hearings on the draft legislation. The initial draft of Section 20A did not contain any damages "cap" at all. *See Hearing on H.R. 4945 Before the Subcommittee on Telecomms. and Fin. of the Committee on Energy and*

---

[2] *See id.* ("[T]he same Congress simultaneously drafted § 208(a) and amended § 243(h). In doing so, Congress chose to maintain the old standard in § 243(h), but to incorporate a different standard in § 208(a).... The contrast between the language used in the two standards, and the fact that Congress used a new standard to define the term 'refugee,' certainly indicate that Congress intended the two standards to differ.").

Case 8:14-cv-02004-DOC-KES   Document 580   Filed 12/21/17   Page 5 of 11   Page ID #:76008

*Commerce,* 100th Cong. 98 (1988) ("Subcommittee Hearing"), at 13-16 (June 16, 1988 Committee Draft did not include cap on damages). During a July 11, 1988 Subcommittee Hearing, David Ruder, then Chairman of the SEC, proposed that Congress add a cap limiting an insider trading defendant's liability in a private action to "the amount of profit gained or loss avoided as a result of the violation." *Id.* at 41.[3] In the discussion that followed, the Bill's sponsor, Representative Edward Markey, expressed concern that the proposed damages cap would protect insider traders at the expense of innocent investors:

> there have been some suggestions for amendments to the committee print which would prevent the plaintiff from receiving any damages greater than the profit gained or loss avoided by the defendant, and would reduce that even further by any amount of disgorgement of penalty paid to the government. Can you reconcile that limitation on damages with the ability of the plaintiffs to recover damages actually suffered?

*Id.* at 97-98.

In response, U.S. Attorney Rudy Giuliani replied that it was "a question of which side you are going to protect more . . . From my point of view, it would make more sense to bend over backwards to protect the victim rather than the alleged or ultimately proven wrongdoer." *Id.* at 98. Ironically, the SEC, on the other hand, "came down on the side of the defendant insider traders." *Id.* Rep. Markey disagreed, stating, "I would tell you, Mr. Chairman, that I am honestly a little bit more sympathetic with Mr. Giuliani's perspective on this and how we should tilt it. There is a certain Draconian lack of remedy that many plaintiffs have in these cases, and in striking the balance, I would personally tilt it more towards ensuring that the plaintiff was more able to recover . . ." *Id.* at 99. Rep. Markey noted, however, that he would "work with [SEC

---

[3] Chairman Ruder's proposed amendment was based on the Second Circuit's seminal opinion in *Elkind v. Liggett & Myers, Inc.*, 635 F.2d 156, 172 (2d Cir. 1980), which capped insider trading damages at the profit gained "as a result of his trading on the inside information rather than on an equal basis." *Id.*; Subcommittee Hearing at 41 n.26. As set forth herein, Congress premised Section 20A's damages cap on *Elkind*, but enacted a statute that provided further protection for investors by allowing recovery of all of the insider trader's profits gained "in the transaction or transactions" at issue rather than limiting damages to profits gained "as a result of the violation."

PLAINTIFFS' SUBMISSION CONCERNING SECTION 20A DAMAGES CAP                    -4-

Chairman Ruder] and Mr. Giuliani in drafting some legislation which can strike a balance." *Id.*

Ultimately, Congress struck that balance by allowing recovery of all of the insider trader's profits gained "in the transaction or transactions" at issue. 15 U.S.C. § 78t-1(b)(1). Congress did not, however, limit profits to those gained "as a result of the violation." Nor did Congress choose to tie those profits to the stock price after public dissemination of the nonpublic information, as it had explicitly done in other sections of the same Act. 15 U.S.C. § 78u-1(e). Particularly given the concerns raised at the Subcommittee Hearings that the statute should "tilt . . . more towards ensuring that the plaintiff was more able to recover," the Court should reject Defendants' attempt to read a limitation into 20A's damages cap that Congress chose not to include. Subcommittee Hearing at 99.

The Ninth Circuit has never interpreted how to calculate the Section 20A damages cap, and the out-of-Circuit court cases that have did not conduct the statutory analysis discussed above. For instance, at the hearing, Defendants cited *Short v. Belleville Shoe Mfg. Co.*, 908 F.2d 1385, 1392 (7th Cir. 1990), for the proposition that the Section 20A damages cap is measured by reference to the stock price when the material nonpublic information is disclosed. *Short*, however, discussed the Section 20A damages cap in *dicta* in resolving a dispute over the proper statute of limitations to apply in Section 10(b) actions, and provided no meaningful analysis of the proper interpretation of the cap. Indeed, the cases that *Short* cited for that proposition all predated Section 20A and involved the measure of actual damages, rather than the profits cap.[4] The other out-of-Circuit opinion that Defendants relied on at the summary

---

[4] Likewise, many of Defendants' authorities predate Section 20A and concern the ***measure of actual damages*** in an insider trading action, not the calculation of the damages cap. As the Court correctly noted in its Tentative Opinion, the calculation of actual damages is a different issue than the determination of the statutory damages cap. Plaintiffs can only recover actual damages that were "actually caused by Pershing having traded without disclosing their material nonpublic information . . . ." Tentative Opinion at p. 48. But "[t]he statutory damages cap is not identical to the loss causation requirement—otherwise it would be superfluous . . . ." *Id.*

judgment hearing, meanwhile, based its holding largely on the conclusory statement in *Short*. *See In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 664-65 (E.D. Va. 2000). *Basile v. Valeant Pharm. Int'l, Inc.*, 2016 WL 5922716, at *8 n.7 (C.D. Cal. Aug. 5, 2016) (Carter, J.) ("The court [in *JDS Uniphase*] provided no explanation for that conclusion. Because the *JDS* decision provided no meaningful analysis on this issue, the Court is not persuaded by it.").

The courts in those cases were not faced with the situation presented to the Court here—where limiting profits to those made as of the date of disclosure would result in a situation where the insider trader, even if found liable and full damages are awarded at trial, would still pocket half a billion dollars in profits from its challenged trades. Such an outcome could not have been the intent of Congress, which enacted Section 20A to codify a remedy for investors harmed by insider trading but enacted a damages cap in order to protect defendants from exposure to "excessive" liability. Clearly, permitting an insider trading to keep a half billion dollars in profits—even if full damages are awarded at trial—would run contrary to that intent. Simply put, Section 20A should not be construed to invite the very behavior that it was meant to discourage.

Finally, Defendants are wrong to argue that calculating the profits cap based on Defendants' total profits (which include gains realized when Pershing sold its Allergan shares) results in a "windfall" to Plaintiffs. In fact, the opposite is true. As set forth below, even if the cap is set at Defendants' full profits, investors who sold while Pershing was secretly buying will only receive a fraction of their damages. Moreover, the uncontroverted evidence here establishes that Defendants' total profits are in fact ***entirely related*** to the actual damages resulting from Defendants' misconduct. Pershing and Valeant specifically contemplated that a "white knight" bidder such as Actavis might emerge as the highest bidder for Allergan, and specifically contracted

for how profits in such a third-party sale would be allocated between them.[5] Defendants should not be allowed to bar class members from recovering the extra half-billion dollars in "profit" Defendants realized on their transactions between November 17, 2014 and April of 2015 when their own written agreement anticipated that they would in fact realize profits from the sale of these shares to a third party.

### III. PLAINTIFFS AGREE THAT THE 20A TRADING CAP SHOULD BE ALLOCATED BETWEEN THE COMMON STOCK AND DERIVATIVES CLASSES, *PRO RATA*, BASED ON THE DAMAGES IN EACH CASE

Plaintiffs will present argument on the allocation of damages at the Court's request. For the Court's convenience, Plaintiffs respectfully outline the three approaches advocated by each party. For purposes of illustration, Plaintiffs assume that: (1) the damages cap is $2.8 billion; (2) Timber Hill succeeds in certifying a class;[6] (3) damages in the common stock case are $5 billion; and (4) damages in the derivative class are $500 million.[7]

Approach 1 (endorsed by Plaintiffs): Damages would be reduced *pro rata* between the two classes, as follows:

| Class damages = X | Derivatives damages = Y |
|---|---|
| $5 billion / $5.5 billion = X / $2.8 billion | $500 million / $5.5 billion = Y / $2.8 billion |
| X = $2.55 billion | Y = $255 million |

---

[5] *See* Ex. 1 (Relationship Agreement) at §3(a) (Valeant entitled to "an amount equal to 15%" of Pershing's profits from a "Third Party Transaction Proposal" for Allergan).

[6] As Plaintiffs previously noted, Timber Hill only traded 122 of those 253 public options, and realized a net gain on its Class Period trades of $3.55 million. *See* ECF No. 560-2. Timber Hill was also a "market maker," meaning that it bought and sold options to fill orders by other investors, making money regardless of whether the price of those options was inflated or deflated by the alleged fraud. For all of these reasons, Timber Hill faces significant obstacles in establishing that it is an "adequate" or "typical" member of its proposed class under Fed. R. Civ. P. 23.

[7] Plaintiffs have previously submitted evidence that derivative damages could not exceed $651.3 million. *See* ECF No. 560-2. If the class is limited to options that Timber Hill actually traded, aggregate damages of an options class would be no more than $217.4 million. *See id.*

Approach 2 (endorsed by Timber Hill and Defendants): Common stock damages are limited to profits derived from Pershing's direct purchases of common stock on February 25 and 26, 2014, as follows:

| Defendants' profits from direct Class Period purchases of common stock = approximately $75 million | Defendants' profits from Class Period purchases of common stock through Nomura = approximately $2.7 billion |
|---|---|
| Common stock damages cap = $75 million | Derivatives damages cap = $2.7 billion |

Approach 3 (alternative approach endorsed by Timber Hill): "cap-adjusted" damages are reduced *pro rata* between the two classes, as follows:

Step 1: Common stock damages of $5 billion are reduced to $2.8 billion, per the cap.

Step 2: Derivative damages of $500 million are not reduced, because they do not exceed the $2.8 billion profits cap.

Step 3: Pro rata adjustment, as follows:

| Class damages = X | Derivative damages = y |
|---|---|
| $2.8 billion / $3.3 billion = X / $2.8 billion | $500 million / $3.3 billion = Y / $2.8 billion |
| X = $2.38 billion | Y = $424 million |

Plaintiffs reserve argument on why the third approach unfairly shifts class damages from the common stock class to the putative derivative class. However, as long as approach 2 is "off the table," to borrow a phrase,[8] Plaintiffs are willing to commence the trial without further clarity as to whether the Court would ultimately

---

[8] Plaintiffs note that the Court has already observed that this approach "seems to directly contradict or undermine the Court's finding that Pershing 'caused' Nomura to purchase Allergan common stock during the *Basile* class period and that *Basile* Plaintiffs and Defendants traded securities of the 'same class.'" ECF No. 577 at 2.

adopt approach 1 or approach 3, and would present such argument whenever the Court chooses to hear it.

## IV. CONCLUSION

For the foregoing reasons, Plaintiffs endorse a Section 20A profits cap methodology whereby damages are limited to the full amount of profits that Defendants actually made on "the transaction or transactions that are the subject of the violation."

DATED: December 21, 2017        Respectfully submitted,

**KESSLER TOPAZ
  MELTZER & CHECK, LLP**

*/s/ Eli R. Greenstein*
ELI R. GREENSTEIN (Bar No. 217945)
egreenstein@ktmc.com
STACEY M. KAPLAN (Bar No. 241989)
skaplan@ktmc.com
PAUL A. BREUCOP (Bar No. 278807)
pbreucop@ktmc.com
RUPA NATH COOK (Bar No. 296130)
rcook@ktmc.com
One Sansome Street, Suite 1850
San Francisco, CA 94104
Telephone: (415) 400-3000
Facsimile: (415) 400-3001

-and-

LEE RUDY (*Pro Hac Vice*)
lrudy@ktmc.com
JOSH D'ANCONA (*Pro Hac Vice*)
jdancona@ktmc.com
JUSTIN O. RELIFORD (*Pro Hac Vice*)
jreliford@ktmc.com
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

**BERNSTEIN LITOWITZ BERGER
  & GROSSMANN LLP**
RICHARD D. GLUCK (Bar No. 151675)
rich.gluck@blbglaw.com
12481 High Bluff Drive, Suite 300
San Diego, CA 92130
Telephone: (858) 793-0070
Facsimile: (858) 793-0323

|   |   |
|---|---|
| 1 | -and- |
| 2 | MARK LEBOVITCH (*Pro Hac Vice*) |
|   | markl@blbglaw.com |
| 3 | JEREMY P. ROBINSON (*Pro Hac Vice*) |
|   | Jeremy@blbglaw.com |
| 4 | MICHAEL D. BLATCHLEY (*Pro Hac Vice*) |
|   | michaelb@blbglaw.com |
| 5 | EDWARD G. TIMLIN (*Pro Hac Vice*) |
|   | edward.timlin@blbglaw.com |
| 6 | 1251 Avenue of the Americas, 44th Floor |
|   | New York, NY 10020 |
| 7 | Telephone: (212) 554-1400 |
|   | Facsimile: (212) 554-1444 |
| 8 |   |
|   | *Co-Lead Counsel for Plaintiffs and the Class* |
| 9 |   |
|   | **MURRAY MURPHY MOUL** |
| 10 | **  BASIL LLP** |
|   | BRIAN K. MURPHY |
| 11 | murphy@mmmb.com |
|   | JOSEPH F. MURRAY |
| 12 | murray@mmmb.com |
|   | 1114 Dublin Road |
| 13 | Columbus, OH 43215 |
|   | Telephone: (614) 488-0400 |
| 14 | Facsimile: (614) 488-0401 |
| 15 | *Special Counsel for the Ohio Attorney General* |