**HUESTON HENNIGAN LLP**
John C. Hueston (164921)
jhueston@hueston.com
Moez M. Kaba (257456)
mkaba@hueston.com
Steven N. Feldman (281405)
sfeldman@hueston.com
523 West 6th Street, Suite 400
Los Angeles, CA 90014
Telephone:  (213) 788-4340
Facsimile:  (888) 775-0898

*Attorneys for Defendants Valeant Pharmaceuticals International, Inc., Valeant Pharmaceuticals International, and J. Michael Pearson*

[Additional Counsel on Signature Page]

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**SOUTHERN DIVISION – SANTA ANA**

| | |
|---|---|
| IN RE: ALLERGAN, INC. PROXY VIOLATION SECURITIES LITIGATION | Case No.: 8:14-cv-2004-DOC (KESx) <br><br> Honorable David O. Carter <br><br> <u>CLASS ACTION</u> <br><br> **DEFENDANT VALEANT'S BRIEF IN SUPPORT OF FAIRNESS, ADEQUACY, AND REASONABLENESS OF SETTLEMENT PURSUANT TO JANUARY 2, 2018 ORDER** <br><br> Hearing Date: January 16, 2018 <br> Time: 9:00 a.m. <br> Courtroom: 9D <br> Judge: Hon. David O. Carter |

# INTRODUCTION

As requested by the Court in its January 2, 2018 Minute Order, Defendant Valeant submits the following brief in support of the fairness, adequacy, and reasonableness of the parties' proposed settlement.

The total settlement of $290,000,000 ($250,000,000 for the Stock Class, and $40,000,000 for the Derivatives Class) is the product of years of hard-fought litigation, lengthy mediation discussions, rigorous discovery, extensive motion practice, and trial preparation.[1] The *Basile* Plaintiffs' own expert values their absolute best-case scenario recovery with a full jury verdict upheld on appeal at $2.3 billion dollars. (Dkt. 473-25 (Bajaj Rep.) ¶¶ 150-52.) Plaintiffs have otherwise conceded that the damages cap is, at most, $2.6 billion. The settlement amount reflects an immediate cash payment – without the uncertainty and years-long delay of trial, claims processing, post-trial briefing, and appeals – of over 11-12% of the highest possible recovery Plaintiffs could obtain. This is in excess of typical settlements in these types of cases, which are as low as 1-3% on average.

Moreover, Valeant believes strongly in the factual and legal merits of its case. Plaintiffs will face substantial hurdles in obtaining any damages, much less full damages. Among other things, a jury verdict in favor of the defense; a legal ruling from this Court on summary judgment, in limine, or post-trial motions; or a reversal of a Plaintiff verdict (or reversal of the denial of any of Defendants' dispositive motions) on appeal may all result in a $0 recovery for the class. And even if Plaintiffs prevail on liability at trial, the outsized damages Plaintiffs seek is vulnerable to many lines of attack (including, for example, attacks on Plaintiffs' failure to establish loss

---

[1] The litigation involving the Derivatives Class is in earlier stages than that of the Stock Class. The Court has not certified a class, no summary judgment briefing has been filed, and Plaintiffs have not yet submitted an expert report regarding damages. Nonetheless, the points regarding the value of an immediate payment to the class rather than protracted litigation and legal uncertainty applies with greater force to this class.

causation), with far more reasonable and meaningful numbers advanced by Defendants' expert, which would limit any damages sought.

Not only is the settlement amount reasonable in light of the uncertainties Plaintiffs face and comparable settlements in securities actions, but the settlement itself does not contain other terms that would undermine the value of the cash settlement. For example, there is no "claims made" reversion of settlement money to Defendants if some class members do not file requests for compensation; rather, all settlement proceeds will go to the class members (after payment of attorneys' fees and costs). Class members are not required to release all conceivable claims against Defendants, but only those relating to the action or its underlying facts. And in the event a Defendant's contribution is reduced or returned because of insolvency, bankruptcy, or the like, lead class counsel can terminate the settlement and its releases – a protection even successful litigation cannot provide to class members.

Under governing standards, the Court should find this settlement is fair, reasonable, and adequate.

## I. LEGAL STANDARD

For approval of a settlement, "the universally applied standard is whether the settlement is fundamentally fair, adequate and reasonable." *Officers for Justice v. Civil Serv. Comm'n of City & Cty. of San Francisco*, 688 F.2d 615, 625 (9th Cir. 1982). The district court does not try the merits or reach ultimate conclusions on contested issues or judge hypothetically about what could have been achieved in a negotiation. *See id.* ("Neither the trial court nor this court is to reach any ultimate conclusions on the contested issues of fact and law which underlie the merits of the dispute, for it is the very uncertainty of outcome in litigation and avoidance of wasteful and expensive litigation that induce consensual settlements.").

The Ninth Circuit applies a "strong judicial policy that favors settlements" for complex class actions. *In re Pac. Enterprises Sec. Litig.*, 47 F.3d 373, 378 (9th Cir. 1995). "Parties represented by competent counsel are better positioned than courts to

produce a settlement that fairly reflects each party's expected outcome in litigation." *Id.* On the other hand, a district court should not approve a settlement that is "the product of fraud or overreaching by, or collusion among, the negotiating parties." *Id.*

When evaluating whether a settlement is "fundamentally fair, adequate and reasonable," courts are instructed to consider the following factors: "the strength of plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery completed, and the stage of the proceedings; the experience and views of counsel; the presence of a governmental participant; and the reaction of the class members to the proposed settlement." *Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1375 (9th Cir. 1993). This is a non-exclusive list of factors "and different factors may predominate in different factual contexts." *Id.* at 1376.[2]

## II. THE SETTLEMENT IS FAIR, ADEQUATE, AND REASONABLE

### A. <u>The settlement is a product of informed, extensive, arms-length negotiation involving experienced mediators and informed counsel</u>.

Key to the fairness of a settlement is whether – as here – it is the result of an arms-length negotiation. *See Rodriguez v. West Publishing Corp.*, 563 F.3d 948, 965 (9th Cir. 2009) ("We put a good deal of stock in the product of an arms-length, non-collusive, negotiated resolution . . . ."); *see also Nat'l Rural Telecommunications Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 528 (C.D. Cal. 2004) ("A settlement following sufficient discovery and genuine arms-length negotiation is presumed fair.") (*citing City Partnership Co. v. Atlantic Acquisition Ltd. P'ship,* 100 F.3d 1041, 1043 (1st Cir. 1996) and *New York v. Reebok Int'l Ltd.,* 903 F.Supp. 532, 535 (S.D.N.Y. 1995), *aff'd*, 96 F.3d 44 (2d Cir. 1996)).

---

[2] Because the Court has requested that the parties focus on the amount of the settlement in its January 2, 2018 Minute Order, Defendant focuses on that particular factor in this brief, but in addition, will discuss other factors bearing on the appropriateness of the amount of damages in light of the settlement as a whole.

This settlement is the product of extensive negotiation following years of litigation and discovery. "A court is more likely to approve a settlement if most of the discovery is completed because it suggests that the parties arrived at a compromise based on a full understanding of the legal and factual issues surrounding the case . . . . [quoting 5 W. Moore, Moore's Federal Practice, § 23.85[2][e] (Matthew Bender 3d ed.)] . . . The more discovery that has been completed, the more likely it is that the parties have a clear view of the strengths and weaknesses of their cases." *In re Am. Apparel, Inc. S'holder Litig.*, No. CV 10-06352 MMM (JCGX), 2014 WL 10212865, at *12 (C.D. Cal. July 28, 2014) (some internal citations and quotations omitted).

Not only is most discovery substantially complete, enabling the parties to evaluate the strength of their positions, but extensive negotiations have taken place in mediation over the course of a year and a half. As courts have recognized, "[t]he assistance of an experienced mediator in the settlement process confirms that the settlement is non-collusive." *Satchell v. Fed. Express Corp.*, No. C03-2659, 2007 WL 1114010, at *4 (N.D. Cal. Apr. 13, 2007). The Hon. Layn Phillips and his senior colleague Greg Lindstrom have been involved in resolving the matter since 2016, and full briefing and in-person mediation took place in September 2016. Since that time, Judge Phillips continued to review and analyze case developments over the course of a year, received and reviewed rulings, motion papers, and transcripts from key depositions, and communicated frequently with the parties before making a successful mediator's proposal. *See, e.g., Atlas v. Accredited Home Lenders Holding Co.*, No. 07-CV-00488-H (CAB), 2009 WL 3698393, at *3 (S.D. Cal. Nov. 4, 2009) (approving securities class action settlement mediated by Hon. Layn Phillips); *In re Mannkind Corp. Sec. Litig.*, No. CV 11-0929 GAF (SSX), 2012 WL 13008151, at *5 (C.D. Cal. Dec. 21, 2012) (same); *Hayes v. MagnaChip Semiconductor Corp.*, No. 14-CV-01160-JST, 2016 WL 6902856, at *6 (N.D. Cal. Nov. 21, 2016) (same). It goes without saying that neither party could, would, or did collude in this process. Both sides were

fully prepared on both the strengths and weaknesses of their respective cases, which they evaluated before agreeing to the settlement.

In addition, Plaintiffs' counsel are knowledgeable, experienced, seasoned litigators who have litigated many securities class actions. Plaintiffs' counsel participated in the negotiation of the settlement and recommend its approval, leading to additional presumption of reasonability. *See, e.g., In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1043 (N.D. Cal. 2008) ("The recommendations of plaintiffs' counsel should be given a presumption of reasonableness . . . .") (citation omitted).

### B. The settlement amount is reasonable and adequate in light of the case's merits and litigation uncertainties.

Plaintiffs' case is far from guaranteed. Even if they prevailed at summary judgment, Plaintiffs would still need to convince the jury they are entitled to massive damages, and the Court's rulings and the jury's verdict would need to be upheld on appeal. The time and uncertainty justifies the significant, immediate, and certain payout the settlement provides.

#### 1. The settlement amount represents 11-12% of the value of Plaintiffs' unlikely "best case" scenario of a full jury verdict and success on appeal – far above average for this type of case.

The Defendants have agreed to pay the Stock Class $250,000,000 and the Derivatives Class $40,000,000, for $290,000,000 total in cash settlement payments. This amount will not be diminished based on a "claims made" approach where only class members who file requests for compensation will recover. Rather, the entire amount belongs to the class once attorney fees and administrative costs are deducted. Plaintiffs' expert identified a $2.3 billion dollar figure based on the damages cap. (Dkt. 473-25 (Bajaj Rep.) ¶¶ 150-52.) And Plaintiffs' counsel have also proposed a

$2.6 billion dollar damages cap.[3]  In either event, $290,000,000 represents approximately 12.6% or 11.1% of those respective figures.

A settlement of over 10% of the maximum possible award to the class – without the delay and uncertainty of trial and appeal – is more generous than amounts found adequate by numerous courts. *See, e.g., In re Heritage Bond Litig.,* No. 02-ML-1475-DT (RCX), 2005 WL 1594389, at *8–9 (C.D. Cal. June 10, 2005) (showing that the median amount recovered in the average securities class action settlement was 2.7% in 2002, 2.8% in 2003, and 2.3% in 2004); *see also In re Omnivision*, 559 F. Supp. 2d at 1042 ("The Settlement will give Plaintiffs $13.75 million, which is just over 9% of the maximum potential recovery asserted by either party. After accounting for attorneys' fees and costs, the Settlement will give Plaintiffs a certain recovery in excess of 6% of the potential . . . . Plaintiffs here have agreed to accept a smaller certain award rather than seek the full recovery but risk getting nothing. The Court finds the amount agreed upon by the parties reasonable."); *Officers for Justice*, 688 F.2d at 628 ("It is well-settled law that a cash settlement amounting to only a fraction of the potential recovery [does] not per se render the settlement inadequate or unfair").

Indeed, the reasonableness of this number is not only supported by case law, but by the latest research as well. Cornerstone Research maintains a database of settlement information for securities class actions alleging common stock price movements due to violations of Rule 10b-5, Section 11, and/or Section 12(a)(2). Its recent publication, "Securities Class Action Settlements—2016 Review and Analysis," ("CR Settlement Analysis")[4] uses a sample of 1,621 securities class actions filed after the passage of the Reform Act (1995) and settled from 1996 to 2016. *See* Simmons Decl. Ex. 1 (CR Settlement Analysis) at 20. Based on this analysis, the median settlement for all

---

[3] Defendants have presented substantial evidence that the damages cap should be $1 billion, not $2.6 or $2.3 billion as Plaintiffs' counsel and Plaintiffs' expert suggest. This would dramatically lower Plaintiffs' damages. The settlement represents approximately 30% of this amount.

[4] Available online at http://securities.stanford.edu/research-reports/1996-2016/Settlements-Through-12-2016-Review.pdf

securities class actions represented 2.4% and 2.5% of "estimated damages" for 2006-2015 and 2016, respectively. *See id.* at 8, Figure 7. In fact, the percentage recovery generally *decreases* as "estimated damages" *increase*. For example, the median settlement for securities class actions with "estimated damages" between $1 billion and $5 billion represented 1.3% and 1.5% of "estimated damages" for 2006-2015 and 2016, respectively. *Id.* Thus, the "expected" settlement value for this particular case is between 1.3% and 1.5%, far lower than the more than 11-12% obtained by the class.

The CR Settlement Analysis also provides information regarding the Top 100 Settlements from 1996 to 2016. Simmons Decl. Ex. 2. Notably, only 45 of the 1,621 (2.8%) securities class actions settled from 1996 to 2016 have settled for an amount in excess of the $290 million proposed in this matter. And the median settlement for the Top 100 Settlements from 1996 to 2016 represented 3.5% of "estimated damages." Once again, this settlement at 11-12% of Plaintiffs' best number far exceeds these expected and typical values for a securities class action.

Even when narrowing the sample to more recent securities class actions, the settlement still exceeds the expected value based on settlements from 2012 to 2016. Attachment 2 of the CR Settlement Analysis provides information regarding the Top 100 Settlements from 2012 to 2016. Simmons Decl. Ex. 3. Only 14 of the 350 (4%) securities class actions settled from 2012 to 2016 have settled for an amount in excess of the $290 million proposed in this matter. The median settlement for the Top 100 Settlements from 2012 to 2016 represented 2.0% of "estimated damages." Thus, this settlement amount **exceeds the median settlement by approximately 10%**, and the amount as a function of Plaintiffs' claimed damages is in the **top 4%** of settled cases from 2012-2016. By any standard, this is fair, adequate, and reasonable.

2. <u>Plaintiffs face substantial uncertainties without a settlement.</u>

As noted earlier, "the settlement or fairness hearing is not to be turned into a trial or rehearsal for trial on the merits. Neither the trial court nor [the appellate court] is to reach any ultimate conclusions on the contested issues of fact and law which

underlie the merits of the dispute, *for it is the very uncertainty of outcome in litigation and avoidance of wasteful and expensive litigation that induce consensual settlements.*" *Officers for Justice*, 688 F.2d at 625 (emphasis added).

Plaintiffs here face substantial uncertainties that justify a guaranteed cash payment over the risk of trial and appeal. If the Court fully adopted the tentative ruling on summary judgment, a number of fact issues remain for trial and for which Plaintiffs will need to persuade the jury to render a verdict in their favor with maximum damages – an unlikely prospect. Moreover, even assuming victory at trial, Plaintiffs must then prevail on appeal. As the Court itself has noted, this case involves many legal "close calls." Appeals will not only take years, but also will carry a strong likelihood of rulings of law that result in a decisive no-liability or $0 award to Plaintiffs, or at minimum the lengthy process of undergoing a new trial.

(a) Plaintiffs must still prove key issues at trial, including damages.

Even should the Court fully adopt its tentative summary judgment opinion as final, Plaintiffs must still convince the jury on a number of fact issues at trial, any of which can be a basis for a finding of no liability, no damages, or limited damages.

Plaintiffs must show that the information possessed by Defendants "relate[s] to" a tender offer. Every defense witness has testified that Defendants planned to propose a merger, not tender offer, and that no steps were taken to commence a tender offer until late May. If the jury agrees with Defendants, then Plaintiffs recover nothing.

Plaintiffs also face many hurdles on damages. Plaintiffs' damages expert has already been excluded twice in other cases, a point which the jury will learn at the same time it hears many shortcomings of the expert's analysis. Indeed, based on weaknesses in Plaintiff's expert's testimony, the jury may well conclude that Plaintiffs did not prove loss causation – another no-recovery result. Defendants have identified multiple events that impacted stock prices, which Plaintiffs' expert did not take into account and which will heighten juror skepticism of his damages claims.

      (b)  Plaintiffs must prevail on all major, disputed legal issues on appeal.

A victory at trial with substantial damages does not end the matter, nor does it mean imminent recovery for the class. Plaintiffs will have to prevail on the many "close questions" on the law this case presented – issues that will be addressed *de novo*.

Plaintiffs will have to convince an appellate court that "substantial steps" toward a tender offer is a test that disregards the Defendants' actual intent. At best, Plaintiffs have an ambiguous record that shows that Defendants subjectively took steps toward a merger offer and other buy-out efforts short of a tender offer, which, "objectively" overlapped with steps that could later be used to carry out a tender offer. Plaintiffs' argument would make the exception swallow the rule – that is, it would make the sharing of information illegal even in clearly non-prohibited circumstances, because steps taken to consummate a transaction in which information can be legally shared are the same steps that would need to be taken for a tender offer. This Catch-22 situation presents a serious legal issue for appeal.

Plaintiffs must also prevail on fundamental jurisdictional issues with the SEC rules on which they base their action. First, while the Court held that Rule 14e-3 allows a private right of action, there is a significant risk to Plaintiffs that an appellate court, following recent Supreme Court rulings that disfavor private rights of action, decide that there is no private right to enforce a rule that exceeds the scope of the underlying enabling statute. Second, as the Supreme Court has recognized in *United States v. O'Hagan*, 521 US 642, 672, Footnote 17, trading with the consent of the offering person is not fraud, so it remains an open question whether the SEC can validly proscribe it under Rule 14e-3. This is a major policy issue which Defendants would appeal up to the Supreme Court to address in the event that Plaintiffs prevail at trial.

Loss causation also presents an appellate issue as to the proper standard. Plaintiffs have argued – and the Court appears prepared to agree – that loss causation

- 9 -
DEFENDANT VALEANT'S BRIEF IN SUPPORT OF SETTLEMENT

5243859

rules are different in insider trading cases. If an appellate court concludes otherwise, Plaintiffs' damages model falls apart.

The settlement avoids these uncertainties, provides for cash payment, and allows the quick administration and resolution of claims. It is therefore reasonable, adequate, and fair.

### C. Other aspects of settlement enhance its fairness, reasonableness, and adequacy.

The value of an immediate cash payment is not undermined, but enhanced, by other terms of the settlement. Parties in settlements often undermine the face value of the settlement by agreeing to terms that make payment more difficult, or that allow Defendants to claw back some of the settlement value. That is not the case here.

For example, in nearly any class settlement or award, many class members neglect to file claims for recovery. In some cases, unclaimed amounts revert to defendants. But, here, that money is instead distributed to the rest of the class members filing claims.

Another term that Defendants often try to obtain in a class settlement is a full and complete release of more claims than those at issue in the case. Here, the release is limited to the facts and circumstances alleged and described in the complaints.

Defendants also warrant and represent their solvency. In the event that a Defendant's transfer of money to the settlement fund is determined to be fraudulent, voidable, etc., and reverts, then lead counsel for Plaintiffs may elect to terminate the settlement. This provides an additional layer of protection for the class.

## III. CONCLUSION

The Court may be assured that the settlement reached by the parties is fair, adequate, and reasonable, particularly in light of the substantial uncertainties Plaintiffs face at trial and on appeal, as well as the inevitable delays in recovery even if they prevail in whole or part.

| | | |
|---|---|---|
| 1 | Dated: September 11, 2017 | Respectfully submitted, |
| 2 | | HUESTON HENNIGAN LLP |
| 3 | | |
| 4 | | By: */s/ John C. Hueston* |
| | | JOHN HUESTON (SBN 164921) |
| 5 | | jhueston@hueston.com |
| 6 | | Moez Kaba (SBN 257456) |
| | | mkaba@hueston.com |
| 7 | | Steven Feldman (SBN 281405) |
| 8 | | sfeldman@hueston.com |
| | | 523 West 6th St. Suite 400 |
| 9 | | Los Angeles, California 90014 |

- 11 -
DEFENDANT VALEANT'S BRIEF IN SUPPORT OF SETTLEMENT

5243859