**BERNSTEIN LITOWITZ BERGER
  & GROSSMANN LLP**
RICHARD D. GLUCK
(Bar No. 151675)
rich.gluck@blbglaw.com
12481 High Bluff Drive, Suite 300
San Diego, CA 92130
Telephone: (858) 793-0070
Facsimile:  (858) 793-0323

-and-

**KESSLER TOPAZ
  MELTZER & CHECK, LLP**
ELI R. GREENSTEIN
(Bar No. 217945)
egreenstein@ktmc.com
One Sansome Street, Suite 1850
San Francisco, CA 94104
Telephone: (415) 400-3000
Facsimile:  (415) 400-3001

*Counsel for Class Representatives*

*[Additional counsel on signature page]*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SOUTHERN DIVISION

| | |
|---|---|
| IN RE ALLERGAN, INC. PROXY VIOLATION SECURITIES LITIGATION | **Case No. 8:14-CV-02004-DOC-KESx** |
| | CLASS ACTION |
| | **LEAD COUNSEL'S NOTICE OF MOTION AND MOTION FOR AN AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES; AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT** |
| | Hearing Date: May 30, 2018<br>Time: 7:30 a.m.<br>Courtroom: 9D (Santa Ana)<br>Judge: Hon. David O. Carter |

LEAD COUNSEL'S MOTION FOR AN AWARD OF
ATTORNEYS' FEES AND LITIGATION EXPENSES
CASE NO. 8:14-CV-02004-DOC (KESx)

## <u>NOTICE OF MOTION AND MOTION</u>

**TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on May 30, 2018 at 7:30 a.m., in Courtroom 9D of the United States District Court for the Central District of California, Ronald Reagan Federal Building and United States Courthouse, 411 West Fourth Street, Santa Ana, CA 92701, the Honorable David O. Carter presiding, Lead Counsel Bernstein Litowitz Berger & Grossmann LLP ("BLB&G") and Kessler Topaz Meltzer & Check, LLP ("KTMC") (collectively, "Lead Counsel"), counsel for Court-appointed class representatives the State Teachers Retirement System of Ohio ("Ohio STRS"), Iowa Public Employees Retirement System ("Iowa PERS") and Patrick T. Johnson (collectively, "Plaintiffs") and the Class, will and hereby do move, pursuant to Rule 23(h) of the Federal Rules of Civil Procedure, for an Order granting an award of attorneys' fees and reimbursement of litigation expenses in the above-captioned securities class action.

This motion is made pursuant to the Court's March 19, 2018 Order Preliminarily Approving Proposed Settlement and Providing for Notice (ECF No. 614) ("Preliminary Approval Order") and is based on (i) this Notice of Motion; (ii) the supporting Memorandum of Points and Authorities in Support set forth below; (iii) the accompanying Joint Declaration of Mark Lebovitch and Lee Rudy in Support of (I) Plaintiffs' Motion for Final Approval of the Proposed Settlement and Plan of Allocation and (II) Lead Counsel's Motion for Award of Attorneys' Fees and Reimbursement of Litigation Expenses, and the exhibits attached thereto; (iv) the pleadings and records on file in this action; and (v) other such matters and argument as the Court may consider at the hearing of this motion.

Lead Counsel are not aware of any opposition to the motion. Pursuant to the Preliminary Approval Order, any objection to the request for attorneys' fees and reimbursement of Litigation Expenses must be filed on or before May 9, 2018. To

1   date, no objections have been filed.  A proposed Order will be submitted with Lead

2   Counsel's reply brief, which will be filed on May 23, 2018, after the deadline for

3   objections has passed.

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................ii

MEMORANDUM OF POINTS AND AUTHORITIES ..................................... 1

I.      INTRODUCTION ............................................................................... 1

II.     OVERVIEW OF LEAD COUNSEL'S WORK AND THE RISKS FACED IN THIS ACTION .................................................................... 4

        A.      Lead Counsel Devoted Significant Time And Effort To This Case ................................................................................... 4

        B.      The Case Faced Enormous Risks ......................................... 5

        C.      The $250 Million Settlement Is An Excellent Result ........... 6

III.    THE REQUESTED FEE AWARD IS REASONABLE AND SHOULD BE APPROVED ................................................................. 6

        A.      Lead Counsel Are Entitled To An Award Of Attorneys' Fees From The Common Fund .............................................. 6

        B.      The Requested Attorneys' Fees Are Reasonable Under the Percentage Method ......................................................... 8

        C.      The Requested Attorneys' Fees Are Reasonable Under the Lodestar Method .......................................................... 10

IV.     ALL OTHER FACTORS CONSIDERED BY NINTH CIRCUIT COURTS SUPPORT APPROVAL OF THE REQUESTED FEE .............. 13

        A.      The Results That Lead Counsel Achieved In The Face Of Significant Risks Support The Requested Fee ................................................................................... 13

                i.      The Work Performed And Results Achieved ............... 13

                ii.     The Case Faced Serious Risks ....................................... 14

        B.      The Skill Required And Quality Of Lead Counsel's Work Performed Support The Requested Fee ..................... 17

        C.      The Contingent Nature Of The Fee And The Financial Burden Carried By Lead Counsel Support The Requested Fee ................................................................. 18

        D.      The Requested Fee Is Consistent With Or Less Than Awards Made In Similar Cases On A Percentage or Lodestar Multiplier Basis ................................................. 19

E.      The Reaction Of The Class Supports The Requested Fee.......................................................................................... 19

V.    PLAINTIFFS' COUNSEL'S LITIGATION EXPENSES ARE REASONABLE ...................................................................... 21

VI.   PLAINTIFFS SHOULD BE AWARDED THEIR REASONABLE COSTS AND EXPENSES UNDER 15 U.S.C. §78u-4(a)(4).................................................................................... 24

VII.  CONCLUSION ........................................................................ 25

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*In re American Apparel, Inc. Shareholder Litig.*,
2014 WL 10212865 (C.D. Cal. July 28, 2014) ............................................... 8

*In re Amgen Inc. Sec. Litig.*,
2016 WL 10571773 (C.D. Cal. Oct. 25, 2016) ........................................ 10, 12

*In re Apollo Group Inc. Sec. Litig.*,
2012 WL 1378677 (D. Ariz. Apr. 20, 2012) .................................................. 9

*In re Bank of America Corp. Sec. Litig.*,
772 F.3d 125 (2d Cir. 2014) ........................................................................ 24

*In re Bank of New York Mellon Corp. Forex Transactions Litig.*,
148 F. Supp. 3d 303 (S.D.N.Y. 2015) ........................................................... 9

*Barbosa v. Cargill Meat Solutions Corp.*,
297 F.R.D. 431 (E.D. Cal. 2013) ................................................................. 18

*Board of Trustees of AFTRA Ret. Fund v. JPMorgan Chase Bank, N.A.*,
2012 WL 2064907 (S.D.N.Y. June 7, 2012) .................................................. 9

*Boeing Co. v. Van Gemert*,
444 U.S. 472 (1980) ..................................................................................... 6

*In re Broadcom Corp. Sec. Litig.*,
2005 WL 8153006 (C.D. Cal. Sept. 12, 2005) ............................................... 9

*In re Brocade Sec. Litig.*,
No. 05-2042, slip op. (N.D. Cal. Jan. 26, 2009), ECF No. 496 ..................... 9

*In re Cendant Corp. Sec. Litig.*,
404 F.3d 173 (3d Cir. 2005) ....................................................................... 21

*In re CMS Energy Sec. Litig.*,
2007 WL 9611274 (E.D. Mich. Sept. 6, 2007) .............................................. 9

*In re Comverse Tech., Inc., Sec. Litig.*,
2010 WL 2653354 (E.D.N.Y. June 24, 2010) .......................................... 9, 12

*In re CV Therapeutics, Inc., Sec. Litig.*,
   2007 WL 1033478 (N.D. Cal. Apr. 4, 2007) ...................................................... 24

*In re DaimlerChrysler AG Sec. Litig.*,
   No. 00-0993 (KAJ), slip op. (D. Del. Feb. 5, 2004), ECF No. 971 ................... 10

*In re Deutsche Telekom AG Sec. Litig.*,
   No. 00-CV-9475 (NRB), 2005 WL 7984326 (S.D.N.Y. June 9, 2005) ........... 10

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*,
   2007 WL 2416513 (N.D. Cal. Aug. 16, 2007) .................................................... 18

*Ellison v. Steven Madden, Ltd.*,
   2013 WL 12124432 (C.D. Cal. May 7, 2013) ....................................................... 7

*Fischel v. Equitable Life Assurance Societyy*,
   307 F.3d 997 (9th Cir. 2002) ................................................................. 8, 16

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
   2010 WL 4537550 (S.D.N.Y. Nov. 8, 2010) ............................................... 12, 24

*Florin v. Nationsbank of Georgia, N.A.*,
   34 F.3d 560 (7th Cir. 1994) ............................................................................. 16

*In re Genworth Fin. Sec. Litig.*,
   2016 WL 7187290 (E.D. Va. Sept. 26, 2016) ....................................................... 9

*HCL Partners Ltd. Partnership v. Leap Wireless Int'l, Inc.*,
   2010 WL 4156342 (S.D. Cal. Oct. 15, 2010) .............................................. 10, 11

*In re Heritage Bond Litig.*,
   2005 WL 1594389 (C.D. Cal. June 10, 2005) ...................................... 15, 17, 21

*In re Heritage Bond Litig.*,
   2005 WL 1594403 (C.D. Cal. June 10, 2005) ....................................................... 8

*Hopkins v. Stryker Sales Corp.*,
   2013 WL 496358 (N.D. Cal. Feb. 6, 2013) ......................................................... 11

*In re Initial Pub. Offering Sec. Litig.*,
   671 F. Supp. 2d 467 (S.D.N.Y. 2009) .................................................................. 12

*Knight v. Red Door Salons, Inc.*,
   2009 WL 248367 (N.D. Cal. Feb. 2, 2009)............................................ 19, 22, 23

*In re Marsh & McLennan Cos. Sec. Litig.*,
   2009 WL 5178546 (S.D.N.Y. Dec. 23, 2009)...................................................... 24

*In re Merck & Co., Inc. Vytorin/Zetia Sec. Litig.*,
   2013 WL 5505744 (D.N.J. Oct. 1, 2013) ............................................................ 9

*In re Mercury Interactive Corp. Sec. Litig.*,
   2011 WL 826797 (N.D. Cal. Mar. 3, 2011) ......................................................... 9

*Missouri v. Jenkins*,
   491 U.S. 274 (1989) ........................................................................................... 11

*NECA-IBEW Health & Welfare Fund v. Goldman, Sachs & Co.*,
   2016 WL 3369534 (S.D.N.Y. May 2, 2016)......................................................... 9

*In re Nuvelo, Inc. Sec. Litig.*,
   2011 WL 2650592 (N.D. Cal. July 6, 2011) ................................................. 18, 19

*In re Omnivision Techs., Inc.*,
   559 F. Supp. 2d 1036 (N.D. Cal. 2008) ......................................................*passim*

*Paul, Johnson, Alston & Hunt v. Graulty*,
   886 F.2d 268 (9th Cir. 1989) ............................................................................... 8

*Powers v. Eichen*,
   229 F.3d 1249 (9th Cir. 2000) ............................................................................. 7

*Schuh v. HCA Holdings Inc.*,
   No. 3:11-cv-01033, slip op. (M.D. Tenn. Apr. 14, 2016), ECF No.
   563 ...................................................................................................................... 9

*Silverman v. Motorola, Inc.*,
   2012 WL 1597388 (N.D. Ill. May 7, 2012),
   *aff'd*, 739 F.3d 956 (7th Cir. 2013) .................................................................... 9

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) ............................................................................................. 7

*Torrisi v. Tucson Elec. Power Co.*,
   8 F.3d 1370 (9th Cir. 1993).................................................................................. 8

*Vincent v. Reser,*
   2013 WL 621865 (N.D. Cal. Feb. 19, 2013)......................................................22

*Vinh Nguyen v. Radient Pharm. Corp.,*
   2014 WL 1802293 (C.D. Cal. May 6, 2014)...................................................7, 8

*Vizcaino v. Microsoft Corp.,*
   290 F.3d 1043 (9th Cir. 2002)..........................................................7, 8, 11, 13

*In re Washington Mut., Inc. Sec. Litig.,*
   2011 WL 8190466 (W.D. Wash. Nov. 4, 2011) ...............................................8

*In re Washington Pub. Power Supply Sys. Sec. Litig.,*
   19 F.3d 1291 (9th Cir. 1994)........................................................................*passim*

*In re Williams Sec. Litig.,*
   No. 02-cv-72-SPF, slip op. (N.D. Okla. Feb. 12, 2007), ECF No. 1638 ....................................................................................................10

*Woburn Ret. Sys. v. Salix Pharms. Ltd.,*
   2017 WL 3579892 (S.D.N.Y. Aug. 18, 2017) ...................................................9

**STATUTES**

15 U.S.C. §78u-4(A)(4)......................................................................................24

15 U.S.C. §78u-4(A)(6).......................................................................................7

1
2
3
4
5
6
7
8
9
10
11
12

## MEMORANDUM OF POINTS AND AUTHORITIES

Court-appointed Lead Counsel, Bernstein Litowitz Berger & Grossmann LLP ("BLB&G") and Kessler Topaz Meltzer & Check, LLP ("KTMC") (collectively, "Lead Counsel"), having achieved a Settlement providing for a recovery of $250,000,000 in cash for the benefit of the Class, respectfully submit this memorandum in support of their motion for an award of attorneys' fees in the amount of 21% of the Settlement Fund.[1]  Lead Counsel also seek reimbursement of $6,333,235.10 in litigation expenses that were reasonably and necessarily incurred by Plaintiffs' Counsel in prosecuting and resolving the Action, which includes proposed awards pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA") for costs and expenses incurred by Plaintiffs directly related to their representation of the Class in the total amount of $128,126.98.

13

## I.    INTRODUCTION

14
15
16
17
18
19
20

This case epitomized high-stakes litigation.  The legal issues were important and novel, as they arose from one of the most high-profile business transactions of 2014 and they implicated a rarely enforced law that had not been the subject of extensive judicial interpretation.  Lead Counsel represented a class of stock sellers that had to overcome a virtually endless flow of serious risks to prevailing on its claims.  Plus, the deep-pocketed Defendants hired an army of lawyers from no less than four top, nationwide law firms, who litigated this case in the most aggressive

21
22
23
24
25
26
27

---

[1] Unless otherwise noted, capitalized terms have the meanings set forth in the Stipulation and Agreement of Settlement dated January 26, 2018 (ECF No. 606) (the "Stipulation") or the Joint Declaration of Mark Lebovitch and Lee Rudy in Support of (I) Plaintiffs' Motion for Final Approval of the Proposed Settlement and Plan of Allocation and (II) Lead Counsel's Motion for Award of Attorneys' Fees and Reimbursement of Litigation Expenses (the "Joint Declaration" or "Joint Decl."), filed herewith.  Citations to "¶ __" in this memorandum refer to paragraphs in the Joint Declaration.

28

manner possible.  To overcome each of these challenges, Lead Counsel completely committed themselves to prosecuting this Action for more than three years, devoting significant time, effort and money to proving the Class's claims.

Through skill and persistence, Lead Counsel overcame many hurdles.  They defeated three motions to dismiss, obtained certification of a seller class, fought off Defendants' Rule 23(f) petition and amassed a compelling evidentiary record in support of the Class's claims – one that justified a rare affirmative summary judgment motion on Defendants' liability.  But victory at trial – or on a subsequent appeal – remained far from certain.  To the contrary, despite prior successes, the Class and Lead Counsel faced a significant chance of *zero recovery*.

As explained herein, the enormous amount of quality legal work that Lead Counsel dedicated to the prosecution of this Action – and the significant risk that they took on by prosecuting and funding this litigation for three years with no guarantee of recovery – justifies a fee of 21% of the proposed $250 million Settlement Fund.[2]  As discussed below, this request is (a) below the 25% "benchmark" for percentage attorneys' fee awards in the Ninth Circuit; (b) consistent with fee awards in other securities class actions; and (c) a fractional or "negative" multiplier of 0.8 when analyzed under the lodestar methodology.  This means that, despite the substantial contingency risks that counsel faced in the Action (which would justify a substantial *positive* multiplier on their lodestar), Lead Counsel here are requesting a fee equal to only 80% of the value of the time they devoted to the case.

Plaintiffs, which include two sophisticated institutional investors, Ohio STRS and Iowa PERS, and an individual investor with a substantial financial stake in the Action, evaluated Lead Counsel's application for fees and expenses and have

---

[2] This amount reflects 21% of the $250 million Settlement Amount, plus interest thereon at the same rate as earned by the Settlement Fund.

endorsed it as fair and reasonable.  *See* Declaration of William J. Neville for Ohio
STRS (Joint Decl. Ex. 5) ("Neville Decl."), at ¶¶ 10-12; Declaration of Gregg
Schochenmaier for Iowa PERS (Joint Decl. Ex. 6) ("Schochenmaier Decl."), at ¶¶ 10-
12; Declaration of Patrick T. Johnson (Joint Decl. Ex. 7) ("Johnson Decl."), at ¶8.

Pursuant to the Court's Preliminary Approval Order, more than 61,000 copies
of the Settlement Notice have been mailed to potential Class Members and nominees.
*See* Affidavit of Jose C. Fraga Regarding (A) Mailing of the Settlement Notice and
Claim Form and (B) Publication of the Summary Settlement Notice ("Fraga Aff."), at
¶¶3-8.  The Settlement Notice advised Class Members that Lead Counsel would seek
attorneys' fees on behalf of all Plaintiffs' Counsel in an amount not to exceed 25% of
the Settlement Fund, and reimbursement of Litigation Expenses in an amount not to
exceed $8.5 million, *see* Fraga Aff., Ex. A, at ¶¶5, 63.  The Settlement Notice also
advises Class Members that they could object to the request for attorneys' fees and
expenses until May 9, 2018.  *Id*. at p. 2, ¶¶66-69.  While the deadline set by the Court
for Class Members to object has not yet passed, to date, no objections to the amount
of attorneys' fees and expenses set forth in the Settlement Notice have been received.
Joint Decl. ¶189.

Lead Counsel also respectfully submit that the expenses for which they seek
reimbursement were reasonable and necessary for the successful prosecution of the
Action – and that the requests for awards to Plaintiffs pursuant to the PSLRA for the
time that they dedicated to the Action on behalf of the Class are likewise reasonable
and appropriate.

For the reasons set forth herein, Lead Counsel respectfully submit that their fee
and expense motion should be granted in full.

## II.   OVERVIEW OF LEAD COUNSEL'S WORK AND THE RISKS FACED IN THIS ACTION

### A.   Lead Counsel Devoted Significant Time And Effort To This Case

Lead Counsel's efforts began in 2014 with a detailed investigation into the facts surrounding Valeant's attempt to takeover Allergan and the inside trading claims that the Court had previously assessed on a limited evidentiary record. Those efforts continued for more than three years, through two detailed amended complaints as well as vigorously opposed class certification and summary judgment motions. In fact, by the time the Settlement was reached, Lead Counsel had engaged in significant preparation for trial.

As set forth in the Joint Declaration, discovery in this case was fiercely litigated and required significant resources, and virtually every issue was contested. ¶¶11, 58-111. For example, Lead Counsel litigated more than 40 discovery-related motions before the Court-appointed Special Masters. ¶¶85-91. While seeking to be as efficient as possible, Lead Counsel had to ensure that they devoted the necessary resources to meeting their adversaries' litigation strategy and perform at the high level of skill and quality of work that the Class deserved, and the Court expected.

In the end, Lead Counsel took or defended over 70 depositions, obtained and analyzed over 1.5 million pages of productions from Defendants and third parties, issued over 100 document requests and 25 interrogatories and over 500 requests for admission on Defendants and over 30 subpoenas on third parties. ¶¶60, 67, 81, 84. Lead Counsel also reviewed and produced over 800,000 pages of discovery from Plaintiffs and their representatives. ¶47. The parties hired and produced reports from no less than fourteen experts – and then deposed or defended the depositions of each of those experts. ¶¶92-110. Through these considerable efforts, Lead Counsel developed an extensive evidentiary record that allowed them to present a compelling case for summary judgment on liability – and oppose Defendants' cross-motions for

summary judgment.    Lead Counsel and Plaintiffs were also able to use this evidentiary record in settlement negotiations – which spanned more than a year and involved written submissions and extensive negotiations among counsel and the experienced mediators.

Lead Counsel respectfully submit that the Court is well positioned to assess Lead Counsel's efforts here based on its direct experience during the Action.    The Court and its Special Masters saw Lead Counsel perform through the scores of briefs and court appearances made in connection with the forty discovery motions, three rounds of motions to dismiss, class certification and summary judgment.

**B.      The Case Faced Enormous Risks**

Lead Counsel's efforts were undertaken without compensation and in the face of truly substantial risks that they could be left with no recovery at all.    Indeed, the accompanying Joint Declaration and Settlement Memorandum discuss the substantial risks that Plaintiffs faced in establishing liability and damages.    *See* Joint Decl. ¶¶154-172; Settlement Memorandum at 9-12.

Among other things, Plaintiffs faced a significant risk at trial that:    a jury would by unsympathetic to the seller Class at issue here; Plaintiffs would not be able to establish that Pershing's trading "related to" a tender offer; Valeant would succeed in convincing a jury that no decision to launch a tender offer was made until after Pershing's trading or that its conduct was legitimate because it had been approved by sophisticated law firms and the SEC took no action against Defendants.    Even if Plaintiffs convinced a unanimous jury to find Defendants liable for Rule 14e-3 violations, Defendants could still have blocked any recovery by convincing the jury to award far smaller damages, or no damages at all.    *See* Joint Decl. ¶¶164-170; Settlement Memorandum at 10-11.

While these risks were serious when the Settlement was reached, they were even more so at the outset of the case – an important consideration when assessing

the reasonableness of a fee request.  When the case began, Lead Counsel risked a loss on each element of liability, including on "offering person," substantial steps, and contemporaneous trading – especially given the paucity of case law interpreting Rule 14e-3 – as well as the risk that a seller class might not get certified.  Lead Counsel faced the risk that the Court or an appellate court might have found that there was no private cause of action under Rule 14e-3 for Defendants' alleged warehousing scheme.  Lead Counsel assumed these risks in litigating this Action on a fully contingent basis.

### C.   The $250 Million Settlement Is An Excellent Result

In light of the risks to any recovery, Lead Counsel believe that the $250 million cash Settlement is an excellent result for the Class.  Defendants adamantly insisted that Plaintiffs and the Class were entitled to zero recovery and, even assuming liability, the maximum damages that could likely be established were $1 billion.  The Settlement represents 25% of total recoverable damages if they are limited to the disclosure of Valeant's bid and Pershing's Allergan stake on April 21, 2014, and represents 9% of the maximum theoretical damages that could be established.  ¶169.  That such a significant settlement was achieved in a complicated and challenging case involving novel legal issues and unique risks – and in the face of highly skilled and determined opposition by Defendant's Counsel – speaks volumes about Lead Counsel's efforts here.

### III.   THE REQUESTED FEE AWARD IS <u>REASONABLE AND SHOULD BE APPROVED</u>

#### A.   Lead Counsel Are Entitled To An Award Of <u>Attorneys' Fees From The Common Fund</u>

The Supreme Court has recognized that "a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole."  *Boeing Co. v. Van Gemert*, 444

U.S. 472, 478 (1980).   Indeed, the Supreme Court has emphasized that private securities actions, such as the instant Action, are "a most effective weapon" and "an essential supplement to criminal prosecutions and civil enforcement actions" brought by the SEC.  *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313, 318 (2007).   The PSLRA also authorizes courts to award attorneys' fees and expenses to counsel for the plaintiff class provided the award does not exceed a reasonable percentage of the amount of damages paid to the class.  15 U.S.C. § 78u-4(a)(6).

The Ninth Circuit has expressly approved the percentage-of-recovery approach, which has become the prevailing method for awarding fees in common fund cases in the Ninth Circuit.  *See, e.g.*, *Powers v. Eichen,* 229 F.3d 1249, 1256 (9th Cir. 2000) (affirming use of percentage-of-the-fund approach); *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1047 (9th Cir. 2002) (affirming use of percentage method and application of lodestar method as a cross-check); *Ellison v. Steven Madden, Ltd.*, 2013 WL 12124432, at *8 (C.D. Cal. May 7, 2013) ("use of the percentage method is the dominant approach in common fund cases"); *In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1046 (N.D. Cal. 2008) (same).

Most courts have found the percentage approach superior in cases with a common-fund recovery because it parallels the use of percentage-based contingency fee contracts, which are the norm in private litigation; aligns the lawyers' interests with that of the class; and reduces the burden on the court by eliminating the detailed and time-consuming lodestar analysis.  *See Vinh Nguyen v. Radient Pharm. Corp.*, 2014 WL 1802293, at *9 (C.D. Cal. May 6, 2014) (Carter, J.) ("There are significant benefits to the percentage approach, including consistency with contingency fee calculations in the private market, aligning the lawyers' interests with achieving the highest award for the class members, and reducing the burden on the courts that a complex lodestar calculation requires").

Rather than engaging in a full-blown lodestar analysis, courts employing the percentage method generally use a less detailed "lodestar cross-check" on the reasonableness of the requested fee.  *See, e.g.*, *Vizcaino*, 290 F.3d at 1047; *Radient Pharm.*, 2014 WL 1802293, at *8-*11 (using percentage method with lodestar cross-check); *In re Am. Apparel, Inc. S'holder Litig.*, 2014 WL 10212865, at *20 (C.D. Cal. July 28, 2014) (same).

In any event, in this case, whether assessed under either the percentage-of-recovery or lodestar approach, the fee request of 21% of the Settlement Fund – which represents a negative lodestar multiplier of 0.8 – is fair and reasonable.

### B.    The Requested Attorneys' Fees Are Reasonable Under the Percentage Method

The requested 21% fee is below the Ninth Circuit's benchmark for percentage fee awards in common fund cases and well within the range typically awarded in comparable cases.

The Ninth Circuit has established 25% as the "benchmark" for percentage fee awards in common-fund cases, such as this one.  *See, e.g.*, *Fischel v. Equitable Life Assurance Soc'y*, 307 F.3d 997, 1006 (9th Cir. 2002); *Vizcaino*, 290 F.3d at 1047-48; *Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1376 (9th Cir. 1993).  The 25% benchmark can "be adjusted upward or downward to account for any unusual circumstances involved in [the] case," *Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268, 272 (9th Cir. 1989), and, indeed, "in most common fund cases, the award exceeds that benchmark."  *Omnivision*, 559 F. Supp. 2d at 1047; *accord In re Heritage Bond Litig.*, 2005 WL 1594403, at *19 & n.14 (C.D. Cal. June 10, 2005).

The 21% fee requested by Lead Counsel is not only below the standard 25% benchmark, it is well within the range of percentage fees that have been awarded in securities class actions and other similar litigation with comparable recoveries in this Circuit.  *See*, *e.g.*, *Vizcaino*, 290 F.3d at 1051 (affirming award of 28% of $97 million

settlement, representing a 3.65 multiplier); *In re Washington Mut., Inc. Sec. Litig.*, 2011 WL 8190466, at *1 (W.D. Wash. Nov. 4, 2011) (awarding 21% of $208.5 total million settlement, representing a 1.1 multiplier); *In re Apollo Grp. Inc. Sec. Litig.*, 2012 WL 1378677, at *7 (D. Ariz. Apr. 20, 2012) (awarding 33.3% of $145 million settlement, representing a 1.74 multiplier); *In re Mercury Interactive Corp. Sec. Litig.*, 2011 WL 826797, at *3 (N.D. Cal. Mar. 3, 2011) (awarding 22% of $117.5 million settlement, representing a 3.08 multiplier); *In re Brocade Sec. Litig.*, No. 05-2042, slip op. at 13 (N.D. Cal. Jan. 26, 2009), ECF No. 496 (Joint Decl. Ex. 10) (awarding 25% of $160 million settlement, representing a 3.5 multiplier); *In re Broadcom Corp. Sec. Litig.*, 2005 WL 8153006, at *4-*5 (C.D. Cal. Sept. 12, 2005) (awarding 25% of $160 million settlement, representing a 1.64 multiplier). The requested fee is also consistent with fee awards in similarly sized settlements of securities class actions and other comparable litigation in other circuits.[3]

---

[3] *See, e.g., Woburn Ret. Sys. v. Salix Pharms. Ltd.*, 2017 WL 3579892, at *5-*7 (S.D.N.Y. Aug. 18, 2017) (awarding 21.2% of $210 million settlement, representing a 3.14 multiplier); *In re Genworth Fin. Sec. Litig.*, 2016 WL 7187290, at *1-*2 (E.D. Va. Sept. 26, 2016) (awarding 28% of $219 million settlement, representing a 1.97 multiplier); *NECA-IBEW Health & Welfare Fund v. Goldman, Sachs & Co.*, 2016 WL 3369534, at *1 (S.D.N.Y. May 2, 2016) (awarding 21% of $272 million settlement, representing a 3.9 multiplier); *Schuh v. HCA Holdings Inc.*, No. 3:11-cv-01033, slip op. at 1 (M.D. Tenn. Apr. 14, 2016), ECF No. 563 (Joint Decl. Ex. 11) (awarding 30% of $215 million settlement); *In re Bank of New York Mellon Corp. Forex Transactions Litig.*, 148 F. Supp. 3d 303, 305 (S.D.N.Y. 2015) (awarding 25% of $180 million settlement, representing a 0.96 multiplier); *In re Merck & Co., Inc. Vytorin/Zetia Sec. Litig.*, 2013 WL 5505744, at *3, *46, *51 (D.N.J. Oct. 1, 2013) (awarding 28% of a $215 million settlement, representing a 1.3 multiplier); *Bd. of Trustees of AFTRA Ret. Fund v. JPMorgan Chase Bank, N.A.*, 2012 WL 2064907, at *1-*3 (S.D.N.Y. June 7, 2012) (awarding 25% of $150 million settlement, representing a 2.86 multiplier); *Silverman v. Motorola, Inc.*, 2012 WL 1597388, at *4 (N.D. Ill. May 7, 2012) (awarding 27.5% of $200 million settlement), *aff'd*, 739 F.3d 956 (7th Cir. 2013); *In re Comverse Tech., Inc., Sec. Litig.*, 2010 WL 2653354, at *6 (E.D.N.Y. June 24, 2010) (awarding 25% of $225 million settlement, representing a

## C.     The Requested Attorneys' Fees Are Reasonable Under the Lodestar Method

To ensure the reasonableness of a fee awarded under the percentage-of-the-fund method, Courts in the Ninth Circuit typically cross-check the proposed award against counsel's lodestar, although such a cross-check is not required.  *See In re Amgen Inc. Sec. Litig.*, 2016 WL 10571773, at *9 (C.D. Cal. Oct. 25, 2016) ("Although an analysis of the lodestar is not required for an award of attorneys' fees in the Ninth Circuit, a cross-check of the fee request with a lodestar amount can demonstrate the fee request's reasonableness."); *HCL Partners Ltd. P'ship v. Leap Wireless Int'l, Inc.*, 2010 WL 4156342, at *2 (S.D. Cal. Oct. 15, 2010) ("Courts have found that a lodestar analysis is not necessary when the requested fee is within the accepted benchmark.").

As detailed here and in the Joint Declaration, Lead Counsel exerted a tremendous amount of effort in advancing this litigation over the past three years in the face of extremely aggressive and highly skilled defense attorneys.   In total, Plaintiffs' Counsel[4] spent 136,142.60 hours of attorney and other professional support time prosecuting the Action for the benefit of the Class through January 26,

---

2.78 multiplier); *In re CMS Energy Sec. Litig.*, 2007 WL 9611274, at *4 (E.D. Mich. Sept. 6, 2007) (awarding 22.5% of $200 million settlement, representing a 2.6 multiplier); *In re Williams Sec. Litig.*, No. 02-cv-72-SPF, slip op. at 2 (N.D. Okla. Feb. 12, 2007), ECF No. 1638 (Joint Decl. Ex. 12) (awarding 25% of $311 million settlement, representing a 1.7 multiplier); *In re DaimlerChrysler AG Sec. Litig.*, No. 00-0993 (KAJ), slip op. at 1 (D. Del. Feb. 5, 2004), ECF No. 971 (Joint Decl. Ex. 13) (awarding 22.5% of $300 million settlement, representing a 4.21 multiplier); *In re Deutsche Telekom AG Sec. Litig.*, No. 00-CV-9475 (NRB), 2005 WL 7984326, at *4 (S.D.N.Y. June 9, 2005) (awarding 28% of $120 million settlement, representing a 3.97 multiplier).

[4] "Plaintiffs' Counsel" includes Lead Counsel and additional counsel for Lead Plaintiff Ohio STRS, Murray, Murphy, Moul + Basil LLP ("MMM+B").

2018, the date the Stipulation was executed.   ¶194.  Plaintiffs' Counsel's lodestar, derived by multiplying the hours spent on the litigation by each attorney and paraprofessional by their hourly rates in use in 2017, is $65,219,763.25.   *See id.*[5] Accordingly, the requested fee of 21% of the Settlement Fund, which equates to $52,500,000 (before interest), represents a multiplier of 0.8 of the total lodestar.   In other words, the requested fee represents only 80% of the lodestar value of the time that Plaintiffs' Counsel dedicated to the Action.

This "negative" or fractional multiplier is well below the range of multipliers commonly awarded in comparable litigation.   Fee awards in class actions with substantial contingency risks generally represent positive multipliers of counsel's lodestar, often ranging from one to four times the lodestar or even higher.   *See Vizcaino*, 290 F.3d at 1051 n.6 (finding that lodestar multipliers ranging from 1 to 4 are common); *Hopkins v. Stryker Sales Corp.*, 2013 WL 496358, *4 (N.D. Cal. Feb. 6, 2013) ("Multipliers of 1 to 4 are commonly found to be appropriate in complex class action cases.").   Likewise, a review of the lodestar multipliers in the cases cited above, all of which involved percentage awards of 21% or higher in comparably large settlements, reveals that 0.8 is at the very low end of multipliers typically awarded.

Indeed, in cases of this nature, fees representing multiples well above the lodestar are regularly awarded to reflect the contingency fee risk and other relevant factors.   *See Vizcaino*, 290 F.3d at 1051 (noting that "courts have routinely enhanced

---

[5] It is well established that it is appropriate to calculate counsel's lodestar based on current, rather than historical rates, as a method of compensating for the delay in payment and the loss of interest on the funds.  *See Missouri v. Jenkins*, 491 U.S. 274, 284 (1989); *In re Washington Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d 1291, 1305 (9th Cir. 1994) ("*WPPSS*").  However, because the agreement in principal to settle was reached in late 2017 in this Action and Lead Counsel are including less than one month of 2018 time in their lodestar, they have elected to use 2017 rather than 2018 rates in calculating their lodestar.

the lodestar to reflect the risk of non-payment in common fund cases" and affirming a fee representing a 3.65 multiplier) (quoting *WPPSS*, 19 F.3d at 1300); *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 2010 WL 4537550, at *26 (S.D.N.Y. Nov. 8, 2010) ("a positive multiplier is typically applied to the lodestar in recognition of the risk of the litigation, the complexity of the issues, the contingent nature of the engagement, the skill of the attorneys, and other factors"); *Comverse*, 2010 WL 2653354, at *5 ("Where, as here, counsel has litigated a complex case under a contingency fee arrangement, they are entitled to a fee in excess of the lodestar").

Here, despite the existence of numerous substantial litigation risks in the case from the outset, Lead Counsel are seeking a fee that is less than the lodestar value of their time.  Courts have repeatedly recognized that a percentage fee request that is less than counsel's lodestar provides strong confirmation for the reasonableness of the award.  *See, e.g.*, *Amgen*, 2016 WL 10571773, at *9 ("Courts have recognized that a percentage fee that falls below counsel's lodestar strongly supports the reasonableness of the award"); *Flag Telecom*, 2010 WL 4537550, at *26 ("Lead Counsel's request for a percentage fee representing a significant discount from their lodestar provides additional support for the reasonableness of the fee request."); *In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp. 2d 467, 515 (S.D.N.Y. 2009) (finding "no real danger of overcompensation" given that the requested fee represented a discount to counsel's lodestar).

In sum, Lead Counsel's requested fee award is reasonable, justified and well-within the range of what courts in this Circuit regularly award in class actions such as this one, whether calculated as a percentage of the fund or as a cross-check on counsel's lodestar.  Moreover, as discussed below, each of the factors considered by courts in the Ninth Circuit also strongly supports a finding that the requested fee is reasonable.

## IV.   ALL OTHER FACTORS CONSIDERED BY NINTH CIRCUIT COURTS SUPPORT APPROVAL OF THE REQUESTED FEE

Courts in this Circuit consider the following factors when determining whether a fee is fair and reasonable: (1) the results achieved; (2) the risks of litigation; (3) the skill required and quality of work; (4) the contingent nature of the fee and financial burden carried by the plaintiffs; (5) awards made in similar cases; (6) the reaction of the class; and (7) the amount of a lodestar cross-check.  *See Vizcaino*, 290 F.3d at 1048-50; *Omnivision*, 559 F. Supp. 2d at 1046-48.   Application of each of these factors confirms that the requested 21% fee is fair and reasonable.

### A.   The Results That Lead Counsel Achieved In The Face Of Significant Risks Support The Requested Fee

#### i.   *The Work Performed And Results Achieved*

Courts consistently recognize that the settlement achieved is an important factor to consider in determining an appropriate fee award.  *See, e.g., Omnivision*, 559 F. Supp. 2d at 1046.  Here, Lead Counsel succeeded in obtaining a $250 million cash Settlement for the Class.  This achievement was the result of Lead Counsel's vigorous prosecution and settlement negotiations in the face of formidable risks.

Lead Counsel also achieved numerous interim successes throughout the conduct of this case.  As noted above and detailed in the Joint Declaration, Lead Counsel defeated three rounds of motions to dismiss brought by Defendants; successfully obtained certification of a seller class over Defendants' vigorous opposition and then defended that certification win by fending off Defendants' Rule 23(f) petition to the Ninth Circuit.  Based on the enormous effort put into discovery, Lead Counsel were also able to put together a compelling evidentiary record at summary judgment – which not only provided the foundation for Plaintiffs' affirmative summary judgment motion on liability, but also for opposing Defendants' two cross-motions for summary judgment.

None of these achievements would have been possible without Lead Counsel's dedication and skill.  As summarized above and set forth in greater detail in the Joint Declaration, Lead Counsel extensively developed the evidentiary record by, among other things, (i) conducting a detailed investigation into the Class's claims; (ii) engaging in extensive fact and expert discovery, including taking or defending over 70 depositions which took place across the nation and beyond, analyzing over 1.5 million pages of document discovery, and exchanging opening and rebuttal reports for fourteen experts; (iii) briefing and arguing over 40 separate discovery motions before two Court-appointed Special Masters; (iv) consulting extensively with experts and consultants in the areas of market efficiency, damages, loss causation, mergers and acquisitions and corporate governance; (v) briefing and arguing (over the course of four days) cross-summary judgment motions; and (vi) undertaking extensive pre-trial preparations.

Lead Counsel's effort was not exclusively spent on mounting a tremendous offense – as they also were required to protect Plaintiffs from Defendants' vigorous litigation strategy.  In addition, Lead Counsel engaged in a massive discovery effort from Plaintiffs, which involved the review and production of over 800,000 pages of client discovery, the defense of no less than 13 depositions of Plaintiff witnesses and written responses to 23 interrogatories and 266 requests for admission.  ¶¶67, 81, 84.

Put simply, this case required Lead Counsel to devote an enormous amount of effort to its prosecution and the results achieved, including the $250 million Settlement recovery, is testament to the merit of that effort.

### ii.       The Case Faced Serious Risks

Lead Counsel prosecuted this Action on a fully contingent basis and assumed numerous substantial litigation risks that might have resulted in no recovery at all (and thus no compensation whatsoever to counsel).  Notwithstanding these risks, Lead Counsel dedicated many millions of dollars of their attorneys' and other staff

1    members' time to litigating this Action as forcefully as possible for the Class, and

2    incurred over $6 million in litigation expenses in prosecuting the claims for the Class.

3    These risks are another important factor that strongly support the reasonableness of

4    the requested fee. *See, e.g.*, *Heritage Bond*, 2005 WL 1594389, at *14 ("The risks

5    assumed by Class Counsel, particularly the risk of non-payment or reimbursement of

6    expenses, is a factor in determining counsel's proper fee award."); *Omnivision,* 559

7    F. Supp. 2d at 1047; *WPPSS*, 19 F.3d at 1299-301.

8         As discussed above and detailed in the Joint Declaration, there was a very real

9    risk in this Action that Plaintiffs and the Class might recover ***nothing***.  For example,

10   even with all of their successes, Plaintiffs and Lead Counsel still ultimately faced a

11   significant chance that they could lose on one or more of the serious defenses

12   mounted by Defendants.   For example, Plaintiffs faced the difficult task of

13   convincing a jury at trial that Pershing traded on material non-public information

14   "related to" a tender offer, and that it was "reasonably foreseeable" to Valeant that its

15   tip to Pershing would "result in a violation of" the applicable law.  ¶¶157-163.  As the

16   Court will recall, Defendants were also planning to argue vehemently that their

17   conduct was legal because it was approved by numerous top attorneys and through

18   the SEC's inaction in prosecuting Defendants. ¶119.  Indeed, far from prosecuting

19   Defendants, the SEC fined Allergan, Valeant's target, for its conduct in defending

20   against the takeover.  Defendants' strategies on these fronts could very well have

21   found their mark with the jury.

22        Absent the Settlement, Plaintiffs would also have to confront significant

23   challenges in proving loss causation and damages at trial.  ¶¶163-169.  In that regard,

24   Defendants were adamant that they caused no damages to the Class because Class

25   Members suffered no out-of-pocket damages when they sold Allergan stock

26   contemporaneously with Pershing's trades.  In fact, according to Defendants, many

27   Class Members actually benefitted from Defendants' conduct – profiting from the

28

rise in Allergan's stock price that was occasioned by Pershing's secret buying spree. Indeed, Defendants would have plainly sought to persuade the jury that Plaintiffs were simply upset because they felt they should have made even more money from their sales of Allergan stock.  ¶164.  It might have worked.

Moreover, for purposes of reviewing the reasonableness of a fee award, the Court should consider not just the risks of continued litigation, but all of the risks that the litigation presented from the outset – that is, from the time that counsel undertook the representation.  *See Fischel*, 307 F.3d at 1009 ("there is no dispute that a court should consider risk at the 'outset' of litigation," which the Ninth Circuit has determined to be the point in time "when an attorney determines that there is merit to the client's claim and elects to pursue the claim on the client's behalf"); *accord Florin v. Nationsbank of Georgia, N.A.*, 34 F.3d 560, 565 (7th Cir. 1994) ("A court must assess the riskiness of the litigation by measuring the probability of success of this type of case at the outset of the litigation").

When Lead Counsel first undertook to prosecute the Action on behalf of Plaintiffs and the Class, this case, of course, presented substantially more risks than it does today.  In addition to the risks outlined above, Lead Counsel faced at the outset of the litigation the risks that:  (a) the Court might have found that there was no private cause of action under Rule 14e-3; (b) Valeant and Pershing might be found to be "co-offering persons" and, thus, not subject to Rule 14e-3's restrictions on trading in advance of the tender offer; and (c) a factfinder might find that Valeant had not taken "substantial steps" towards a tender offer during the Class Period.  Related risks included the standard to be applied in determining whether "substantial steps" had occurred (including the role of the offering person's "subjective intent" in determining this issue); and the risk that Plaintiffs' sales of Allergan common stock during the Class Period might not have been considered to be "contemporaneous"

with Pershing's trades, particularly in light of Pershing's use of options rather than purchases of common stock to acquire their position.

That Lead Counsel faced and overcame many of these very significant risks during the course of the litigation, through their extensive efforts and skilled lawyering, strongly supports the requested fee. The Settlement avoids the substantial remaining risks, and obtains a substantial recovery for the Class.

## B. The Skill Required And Quality Of Lead Counsel's Work Performed Support The Requested Fee

Another factor to consider in determining what fee to award is the skill required and quality of work performed. *See Heritage Bond*, 2005 WL 1594389, at *12 ("The experience of counsel is also a factor in determining the appropriate fee award."). "The 'prosecution and management of a complex national class action requires unique legal skills and abilities.'" *Omnivision*, 559 F. Supp. 2d at 1047.

Here, respectfully, Lead Counsel prosecuted the case vigorously, provided high quality legal services, and achieved great results for the Class. Likewise, Lead Counsel exhibited considerable skill and dedication in steering Lead Plaintiffs – and the Class – through a hotly contested class certification process. Indeed, the attorneys at Lead Counsel's firms are among the most experienced and skilled practitioners in the securities litigation field, as discussed in the firm resumes attached to the Joint Declaration as Exhibits 3A-4 and 3B-5. Many of the issues litigated by Lead Counsel were novel or, at least infrequently litigated, and thus required extensive fresh research, argument and thought by Lead Counsel's attorneys. The effort and skill of Lead Counsel in successfully pushing this litigation forward past multiple motions to dismiss and through highly contested discovery was essential to achieving a meaningful settlement against Defendants. In addition, Lead Counsel's reputation as experienced and competent counsel in complex class action cases, who were both

1   willing and able to litigate the case to trial if necessary, greatly facilitated Lead

2   Counsel's ability to deliver the $250 million recovery for the Class.

3       The quality and vigor of opposing counsel are also important in evaluating the

4   services rendered by Lead Counsel.  *See, e.g.*, *Barbosa v. Cargill Meat Solutions*

5   *Corp.*, 297 F.R.D. 431, 449 (E.D. Cal. 2013).  Here, Defendants were represented by

6   an army of very experienced attorneys practicing at the top of their fields from well-

7   respected nationwide firms including Kirkland & Ellis LLP and Kramer Levin

8   Natalis & Frankel LLP, who represented the Pershing Defendants, and Hueston

9   Hennigan LLP and Sullivan & Cromwell LLP, who represented the Valeant

10  Defendants.  ¶202.  The attorneys were not only highly skilled and supported by

11  enormous financial resources, but they also adopted an extremely aggressive

12  litigation strategy that required Lead Counsel to vigorously litigate every conceivable

13  procedural, discovery and substantive dispute in the Action.  ¶¶10-11.  Nevertheless,

14  Lead Counsel were able to persuade Defendants to settle the case on terms highly

15  favorable to the Class.

16      **C.    The Contingent Nature Of The Fee
            And The Financial Burden Carried By
17          Lead Counsel Support The Requested Fee**

18      The Ninth Circuit has confirmed that a determination of a fair and reasonable

19  fee must include consideration of the contingent nature of the fee and the obstacles

20  surmounted in obtaining the settlement.[6]  It is an established practice in the private

21  legal market to reward attorneys for taking on the serious risk of non-payment by

22  permitting a fee award that reflects a premium to normal hourly billing rates.  *See In*

23  *re Nuvelo, Inc. Sec. Litig.*, 2011 WL 2650592, at *2 (N.D. Cal. July 6, 2011) (citing

24

---

25  [6] *WPPSS*, 19 F.3d at 1299; *see In re Dynamic Random Access Memory (DRAM)*

26  *Antitrust Litig.*, 2007 WL 2416513, at *1 (N.D. Cal. Aug. 16, 2007); *see also*

27  *Omnivision*, 559 F. Supp. 2d at 1047.

28

---

*WPPSS*, 19 F.3d at 1299).  "This practice encourages the legal profession to assume such a risk and promotes competent representation for plaintiffs who could not otherwise hire an attorney."  *Id.*

Here, Lead Counsel received no compensation during the three years of litigation.  During that time, Lead Counsel invested over 136,000 hours for a total lodestar of over $65.2 million, and incurred expenses of over $6 million in prosecuting the case.  *See* ¶¶194, 208.  Additional further work in connection with the Settlement and claims administration will still be required.  Any fee award has always been at risk, and completely contingent on the result achieved and on this Court's discretion in awarding fees and expenses.  Unlike defense counsel – who typically receive payment on a timely basis whether they win or lose – Lead Counsel sustained the entire risk that they would have to fund the expenses of this Action and that, unless Lead Counsel succeeded, they would not be entitled to any compensation whatsoever.  Accordingly, the contingent nature of the representation, and the burden carried by Lead Counsel, support the requested fee.

**D.      The Requested Fee Is Consistent With Or Less Than Awards Made In Similar Cases On A Percentage or Lodestar Multiplier Basis**

Lead Counsel's fee request is well within the range of what courts in this Circuit commonly award in complex securities class actions.  To avoid repetition, Lead Counsel will refer to Part II.B, *supra*, which explains that the 21% fee request is below the Ninth Circuit's 25% "benchmark" as well as fee percentages regularly awarded in comparable settlements; and Part II.C, which explains that the 21% fee requested represents a negative multiplier of 0.8 on Plaintiffs' Counsel's lodestar, which is well below the typical lodestar multiplier in cases of this nature.

**E.      The Reaction Of The Class To Date Supports The Requested Fee**

The reaction of the class to a proposed settlement and fee request is also a relevant factor in approving fees.  *See Knight v. Red Door Salons, Inc.*, 2009 WL

248367, at *6 (N.D. Cal. Feb. 2, 2009); *Omnivision*, 559 F. Supp. 2d at 1048.  Here, all of the Plaintiffs, including Ohio STRS and Iowa PERS, which are both sophisticated institutional investor Lead Plaintiffs, have approved the fee request. *See* Neville Decl. ¶11; Schochenmaier Decl. ¶11; Johnson Decl. ¶8.  The Court-approved Summary Settlement Notice was published in *The Wall Street Journal*, *The New York Times*, and the *Financial Times* and released via *PR Newswire* on April 10, 2018.  *See id.* ¶9.  Information regarding the Settlement was also made available through a toll-free telephone number established for the Settlement, *see id.* ¶10, and posted on the case website by the Claims Administrator and on Lead Counsel's websites.  *See id.* ¶11; *see also* Joint Decl. ¶177.  In addition, in accordance with the Court's Preliminary Approval Order, all reasonable steps were taken to ensure that the Court-approved Settlement Notice was mailed to those Class Members who originally received the Class Notice, as well as any new potential Class Members that were identified in a timely fashion by brokers and nominees.  *See* Fraga Aff. ¶¶3-8.

The Settlement Notice informed Class Members that Lead Counsel would seek fees in an amount not to exceed 25% of the Settlement Amount, and reimbursement of Litigation Expenses in an amount not to exceed $8.5 million.  *See* Fraga Aff. Ex. A, at ¶¶5, 63.  The Settlement Notice further advises Class Members of, among other things, their right to object to Lead Counsel's request for attorneys' fees and Litigation Expenses.  While the time to object to the Fee and Expense Application does not expire until May 9, 2018, to date, no objections have been received.  Joint Decl. ¶188.  Should any objections be received, Lead Counsel will address them in their reply brief to be filed by May 23, 2018.[7]

---

[7] Lead Counsel are informed by counsel that filed an initial complaint in this case that they intend to seek substantial attorneys' fees for (a) filing an initial complaint, (b) publishing notice of that filing, (c) seeking to have their clients appointed as lead plaintiff, (d) offering one of their clients as a potential class representative, and

## V.  PLAINTIFFS' COUNSEL'S LITIGATION EXPENSES ARE REASONABLE

Lead Counsel also request reimbursement of Litigation Expenses incurred by Plaintiffs' Counsel in the amount of $6,205,108.12 incurred in prosecuting and resolving the Action on behalf of the Class.  Attorneys who create a common fund for the benefit of a class are entitled to be reimbursed for their out-of-pocket expenses incurred in creating the fund so long as the submitted expenses are reasonable, necessary and directly related to the prosecution of the action.  *See Omnivision*, 559 F. Supp. 2d at 1048 ("Attorneys may recover their reasonable expenses that would typically be billed to paying clients in non-contingency matters.").

From the outset, Lead Counsel were aware that they might not recover any of these expenses or, at the very least, would not recover anything until the Action was successfully resolved.  Thus, Lead Counsel were motivated to, and did, take significant steps to minimize expenses wherever practicable without jeopardizing the vigorous and efficient prosecution of the Action.  *See* Joint Decl. ¶209.

The expenses for which Lead Counsel seek reimbursement are detailed in the accompanying lodestar and expense declarations, attached as Exhibit 3 to the Joint

---

(e) performing one discrete research assignment.  Lead Counsel informed these counsel that they would be offered appropriate compensation for any specifically approved work (*e.g.*, items (d) and (e)), with any such fees deducted from any fee awarded to Lead Counsel.  ¶¶225-227.  However, as for items (a) through (c) above, the law is clear that counsel are not entitled to compensation for filing an initial complaint, publishing notice or seeking appointment as lead.  *See In re Cendant Corp. Sec. Litig.*, 404 F.3d 173, 196-97 (3d Cir. 2005); *In re Heritage Bond Litig.*, 2005 WL 1594389, at *18 (C.D. Cal. June 10, 2005) (following *Cendant* and denying fees to non-lead counsel for filing a complaint and "efforts to have its client appointed lead plaintiff in the action and to have itself be appointed lead counsel").  Lead Plaintiffs deliberately and carefully considered the appropriateness of the 21% fee sought by Lead Counsel, and will oppose any separate request for fees that they have not approved.

Declaration, setting forth the specific categories of expenses incurred and the amount. The types of expenses for which Lead Counsel seek reimbursement were necessarily incurred in litigation and are routinely charged to classes in contingent litigation and clients billed by the hour. These include expenses associated with, among other things, service of process, travel, experts and consultants, and mediation. *See, e.g.*, *Vincent*, 2013 WL 621865, at *5 (granting reimbursement of costs and expenses for "three experts and the mediator, photocopying and mailing expenses, travel expenses, and other reasonable litigation related expenses"); *Red Door Salons*, 2009 WL 248367, at *7 (granting reimbursement because "[a]ttorneys routinely bill clients for all of these expenses").

Notably, Plaintiffs' Counsel applied various "caps" to their litigation expenses, which will benefit the Class. For example, regardless of the actual amounts paid, Lead Counsel capped their airfare at coach rates, capped lodging charges at different rates depending on whether they were located in "high cost" or "low cost" cities (as defined by the IRS), and capped all working meal expenses. Any amounts in excess of these "caps" constitute out of pocket expenses that Lead Counsel did in fact pay – but for which reimbursement will not be sought.

Relatedly, Lead Counsel heeded the Court's comments regarding expenses during the March 5, 2018 preliminary approval hearing, and can each independently confirm without reservation that ***none*** of their expenses for which reimbursement is sought include any "administration" or "standard overhead" costs – or anything remotely similar. Indeed, Lead Counsel are not requesting any reimbursement for internal copying/Xeroxing, telephone or faxing charges – even though such requests are common.

The largest component of counsel's expenses, $3,477,996.77, over 56% of the expense amount, is for the costs of experts and consultants, including the retention of experts on damages, loss causation, and market efficiency in securities class actions,

in the fields of merger and acquisitions, corporate governance and securities law and practice, and on proxy contests and their use in mergers and acquisitions. ¶¶211-212. Lead Counsel worked extensively with many of these experts throughout the litigation.[8]   Each of Plaintiffs' six testifying experts prepared opening and rebuttal reports and sat for deposition, as well as assisted Lead Counsel in review of discovery and in preparation for Lead Counsel's depositions of Defendants' experts. While the work of these experts did not come cheap, Lead Counsel were required to retain the best possible experts they could in order to maintain a level playing field with the deep-pocketed defendants who had hired seven highly credentialed experts. Lead Counsel have already paid the fees and expenses of all of these expert expenses, whose charges were not contingent on the outcome of this litigation.

Another large component of the expenses, $773,8569.62 or approximately 12.5% of the total expense amount, related to document review and production and litigation support.   ¶218.   Lead Counsel had to retain the services of vendors to, among other things, (i) maintain the electronic database through which the more than 2 million pages of documents produced by the parties and third parties were reviewed; (ii) have documents processed so that they would be in searchable format; (iii) convert and upload hard documents so that they would be electronically searchable; and (iv) produce documents to Defendants in response to their document requests on the Lead Plaintiffs. *Id.*  Lead Counsel also retained a trial consulting firm to conduct the mock trial, analyze the results of the deliberations of mock jurors, and assist in trial preparation and if needed, the presenting of Plaintiffs' case at trial. ¶216.

---

[8] Notably, Lead Counsel had to add one rebuttal expert in the middle of the case – Steven Halperin, a top securities law practitioner in Canada – to address Defendants' designation of an affirmative expert on Canadian law.

The Settlement Notice informed potential Class Members that Lead Counsel would apply for reimbursement of Litigation Expenses in an amount not to exceed $8.5 million, which may include the reasonable costs and expenses of Plaintiffs directly related to their representation of the Settlement Class. *See* Fraga Aff. Exhibit A ¶¶5, 63.   The total amount of expenses requested by Lead Counsel for reimbursement is $6,333,235.10, which includes $128,126.98 in proposed PSLRA awards for reasonable expenses incurred by Plaintiffs as described below.   This amount is significantly less than the $8.5 million maximum amount stated in the Settlement Notice.

## VI.    PLAINTIFFS SHOULD BE AWARDED THEIR REASONABLE COSTS AND EXPENSES UNDER 15 U.S.C. §78u-4(A)(4)

In connection with their request for reimbursement of Litigation Expenses, Lead Counsel also seek reimbursement of $128,126.98 in expenses incurred by Plaintiffs directly related to their representation of the Class.   The PSLRA specifically provides that an "award of reasonable costs and expenses (including lost wages) directly relating to the representation of the class" may be made to "any representative party serving on behalf of a class."  15 U.S.C. § 78u-4(a)(4).

Consistent with that statute, courts regularly reimburse lead plaintiffs and class representatives in PSLRA actions for their reasonable costs and expenses, including the time devoted to the Action. *See, e.g.*, *In re Bank of Am. Corp. Sec. Litig.*, 772 F.3d 125, 133 (2d Cir. 2014) (affirming award of over $450,000 to representative plaintiffs for time spent by their employees on the action); *Flag Telecom*, 2010 WL 4537550, at *31 (approving award of $100,000 to Lead Plaintiff for time spent on the litigation); *In re Marsh & McLennan Cos. Sec. Litig.*, 2009 WL 5178546, at *21 (S.D.N.Y. Dec. 23, 2009) (awarding over $214,000 to lead plaintiffs to compensate them "for their reasonable costs and expenses incurred in managing this litigation and representing the Class").

Here, Plaintiffs request reimbursement of a total of $128,126.98 is consistent with the PSLRA and based on the value of time devoted to the Action by employees of Ohio STRS and Iowa PERS and by Mr. Johnson, including, for example, time spent communicating with Lead Counsel, reviewing pleadings and briefs, assisting in the production of documents and other discovery responses, preparing for depositions and being deposed, and consulting during the course of settlement negotiations. *See* Neville Decl. ¶¶5-7, 15; Schochenmaier Decl. ¶¶5-7, 15; Johnson Decl. ¶¶3-5, 11. The time that Plaintiffs devoted to this Action was extremely substantial and was increased as a result of Defendants' aggressive approach to the litigation. By way of example, nine employees of Ohio STRS alone were deposed by counsel for Defendants. *See* Neville Decl. ¶6. In total, employees of Ohio STRS spent a total of 563 hours participating in the litigation, which represented a cost to Ohio STRS of $70,860.00, and Ohio STRS also incurred out-of-pocket expenses for travel, lodging and meals in the amount of $3,979.78, for a total of $74,839.78. Neville Decl. ¶17. Employees of Iowa PERS devoted a total of 200 hours, which represented a cost to Iowa PERS of $17,887.20 (Schochenmaier Decl. ¶17); and Mr. Johnson dedicated 118 hours, which are valued at $35,400 in total (Johnson Decl. ¶11).

The awards sought by Plaintiffs are reasonable and justified under the PSLRA based on the active involvement of Plaintiffs in the Action, and should be granted.

## VII.  CONCLUSION

Lead Counsel respectfully request that the Court award attorneys' fees in the amount of 21% of the Settlement Fund, reimbursement of Plaintiffs' Counsel's Litigation Expenses in the amount of $6,333,235.10, which includes proposed awards to Plaintiffs under the PSLRA in the total amount of $128,126.98.

1    DATED: April 25, 2018                Respectfully submitted,

2                                         BERNSTEIN LITOWITZ BERGER
3                                            & GROSSMANN LLP

4                                         RICHARD D. GLUCK (Bar No. 151675)
5                                         rich.gluck@blbglaw.com
                                          12481 High Bluff Drive, Suite 300
6                                         San Diego, CA 92130
                                          Telephone: (858) 793-0070
7                                         Facsimile: (858) 793-0323

8
                                          -and-
9

10                                        */s/ Mark Lebovitch*
11                                        MARK LEBOVITCH (*Pro Hac Vice*)
                                          markl@blbglaw.com
12                                        JEREMY P. ROBINSON (*Pro Hac Vice*)
                                          Jeremy@blbglaw.com
13                                        MICHAEL D. BLATCHLEY (*Pro Hac Vice*)
                                          michaelb@blbglaw.com
14
                                          EDWARD G. TIMLIN (*Pro Hac Vice*)
15                                        edward.timlin@blbglaw.com
                                          1251 Avenue of the Americas, 44th Floor
16                                        New York, NY 10020
17                                        Telephone: (212) 554-1400
                                          Facsimile: (212) 554-1444
18

19

20                                        KESSLER TOPAZ
                                          MELTZER & CHECK, LLP
21                                        ELI R. GREENSTEIN (Bar No. 217945)
22                                        egreenstein@ktmc.com
                                          STACEY M. KAPLAN (Bar No. 241989)
23                                        skaplan@ktmc.com
                                          PAUL A. BREUCOP (Bar No. 278807)
24                                        pbreucop@ktmc.com
25                                        RUPA NATH COOK (Bar No. 296130)
                                          rcook@ktmc.com
26                                        One Sansome Street, Suite 1850
27                                        San Francisco, CA 94104

28

1
2

Telephone: (415) 400-3000
Facsimile: (415) 400-3001

3

-and-

4
5
6
7
8
9
10

LEE RUDY (*Pro Hac Vice*)
lrudy@ktmc.com
JOSH D'ANCONA (*Pro Hac Vice*)
jdancona@ktmc.com
JUSTIN O. RELIFORD (*Pro Hac Vice*)
jreliford@ktmc.com
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

11
12
13

*Lead Counsel for Class Representatives and
the Class*

14
15
16
17
18
19
20

MURRAY MURPHY MOUL
          BASIL LLP
BRIAN K. MURPHY (*Pro Hac Vice*)
murphy@mmmb.com
JOSEPH F. MURRAY (*Pro Hac Vice*)
murray@mmmb.com
1114 Dublin Road
Columbus, OH 43215
Telephone: (614) 488-0400
Facsimile: (614) 488-0401

21

*Special Counsel for the Ohio Attorney General*

22
23
24
25
26
27
28