# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### SOUTHERN DIVISION

| | |
|---|---|
| IN RE ALLERGAN, INC. PROXY VIOLATION SECURITIES LITIGATION | **Case No. 8:14-cv-02004-DOC-KESx**<br><br>CLASS ACTION<br><br>**JUDGMENT APPROVING CLASS ACTION SETTLEMENT** |

WHEREAS, a class action is pending in this Court entitled *In re Allergan, Inc. Proxy Violation Securities Litigation*, Case No. 8:14-cv-2004-DOC-KESx (C.D. Cal.) (the "Action");

WHEREAS, by Order dated March 15, 2017, this Court certified the Action to proceed as a class action on behalf of all persons who sold Allergan, Inc. ("Allergan") common stock contemporaneously with purchases of Allergan common stock made or caused by Defendants during the period February 25, 2014 through April 21, 2014, inclusive (the "Class Period") and were damaged thereby (the "Class");[1]

---

[1] A person is considered to have sold "contemporaneously" if he, she, or it sold Allergan common stock on a trading day during the Class Period. Excluded from the Class by definition are: Defendants; their Officers and directors during the Class Period; Immediate Family Members of the individual Defendants and of the excluded Officers and directors; any entity in which any of the foregoing has or had a controlling interest; any affiliates, parents or subsidiaries of the Defendants; the

WHEREAS, pursuant to this Court's Order dated June 14, 2017, the Notice of Pendency of Class Action (the "Class Notice") was mailed to potential members of the Class to notify them of, among other things: (i) the Action pending against Defendants; (ii) the Court's certification of the Action to proceed as a class action on behalf of the Class; and (iii) their right to request to be excluded from the Class, the effect of remaining in the Class or requesting exclusion, and the requirements for requesting exclusion;

WHEREAS, (i) State Teachers Retirement System of Ohio, Iowa Public Employees Retirement System, and Patrick T. Johnson (collectively, "Plaintiffs"), on behalf of themselves and the other members of the Class (defined below); and (ii) defendants Valeant Pharmaceuticals International, Inc., Valeant Pharmaceuticals International, and J. Michael Pearson (collectively, the "Valeant Defendants") and Pershing Square Capital Management, L.P., PS Management GP, LLC, PS Fund 1, LLC, Pershing Square, L.P., Pershing Square II, L.P., Pershing Square GP, LLC, Pershing Square Holdings, Ltd., Pershing Square International, Ltd., and William Ackman (collectively, the "Pershing Defendants," together with the Valeant Defendants, "Defendants," and, together with Plaintiffs, the "Parties") have entered

---

legal representatives, agents, affiliates, heirs, successors or assigns of any of the foregoing, in their capacities as such; and Nomura International plc, and any of its affiliates, parents, or subsidiaries. Also excluded from the Class are any persons that submitted a request for exclusion as set forth on Exhibit 1 hereto.

into a Stipulation and Agreement of Settlement dated January 26, 2018 (the "Stipulation"), that provides for a complete dismissal with prejudice of the claims asserted against Defendants in the Action on the terms and conditions set forth in the Stipulation, subject to the approval of this Court (the "Settlement");

WHEREAS, unless otherwise defined in this Judgment, the capitalized terms herein shall have the same meaning as they have in the Stipulation;

WHEREAS, by Order dated March 19, 2018 (the "Preliminary Approval Order"), this Court:  (i) preliminarily approved the Settlement; (ii) ordered that notice of the proposed Settlement be provided to the Class; (iii) provided Class Members with the opportunity to object to the proposed Settlement; and (iv)  scheduled a hearing regarding final approval of the Settlement;

WHEREAS, due and adequate notice has been given to the Class;

WHEREAS, the Court conducted a hearing on June 12, 2018 (the "Settlement Hearing") to consider, among other things, (i) whether the terms and conditions of the Settlement are fair, reasonable, and adequate to the Class, and should therefore be approved; and (ii) whether a judgment should be entered dismissing the Action with prejudice as against the Defendants; and

WHEREAS, the Court having reviewed and considered the Stipulation, all papers filed and proceedings held herein in connection with the Settlement, all oral

and written comments received regarding the Settlement, and the record in the Action, and good cause appearing therefor;

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED:

1. **Jurisdiction** – The Court has jurisdiction over the subject matter of the Action, and all matters relating to the Settlement, as well as personal jurisdiction over all of the Parties and each of the Class Members.

2. **Incorporation of Settlement Documents** – This Judgment incorporates and makes a part hereof: (i) the Stipulation filed with the Court on January 26, 2018; and (ii) the Settlement Notice and the Summary Settlement Notice, both of which were filed with the Court on January 26, 2018.

3. **Settlement Notice** – The Court finds that the dissemination of the Settlement Notice and the publication of the Summary Settlement Notice: (i) were implemented in accordance with the Preliminary Approval Order; (ii) constituted the best notice practicable under the circumstances; (iii) constituted notice that was reasonably calculated, under the circumstances, to apprise Class Members of (a) the effect of the proposed Settlement (including the Releases to be provided thereunder), (b) Lead Counsel's motion for an award of attorneys' fees and reimbursement of Litigation Expenses; (c) their right to object to any aspect of the Settlement, the Plan of Allocation, and/or Lead Counsel's motion for attorneys' fees and reimbursement of Litigation Expenses, and (d) their right to appear at the Settlement Hearing; (iv)

constituted due, adequate, and sufficient notice to all persons and entities entitled to receive notice of the proposed Settlement; and (v) satisfied the requirements of Rule 23 of the Federal Rules of Civil Procedure, the United States Constitution (including the Due Process Clause), the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4, as amended, and all other applicable law and rules.

4. **<u>Final Settlement Approval and Dismissal of Claims</u>** – Pursuant to, and in accordance with, Rule 23 of the Federal Rules of Civil Procedure, this Court hereby fully and finally approves the Settlement set forth in the Stipulation in all respects (including, without limitation: the amount of the Settlement, the Releases provided for therein, and the dismissal with prejudice of the claims asserted against Defendants in the Action), and finds that the Settlement is, in all respects, fair, reasonable, and adequate to the Class. To provide additional context and support for the reasonableness of the Settlement, the Court attaches as Exhibit 2 to this Order a lightly revised version of the tentative summary judgment order the Court issued to the parties ("Summary Judgment Order"), which the Court was finalizing and preparing to issue when the parties settled.[2] While the Summary Judgment Order is overall quite favorable to Plaintiffs, it also evinces several significant obstacles to recovery that Plaintiffs faced and that thus inform the fairness of the Settlement:

---

[2] In their various filings regarding the fairness and approval of the Settlement, the parties also numerous times cited the tentative summary judgment order to support their arguments that the Settlement is fair and reasonable.

1    (a)    First, the actions and non-actions of the SEC may have presented

2    difficulties for Plaintiffs at jury trial. In a Comment Letter, the SEC asked Valeant

3    to amend its Schedule TO to list Pershing as a "co-bidder." Next, although the SEC

4    did also ask Valeant to "provide [its] analysis as to why PS Fund 1, LLC's

5    acquisition of Allergan's shares beginning in February 2014 did not violate Rule

6    14e-3," the SEC never appeared to follow up on the issue of a potential Rule 14e-3

7    violation. Although the Court was prepared to exclude some SEC evidence or

8    provide limiting instructions, the absence of a corresponding government e in the

9    context of such a highly publicized and large transaction would have been a

10   significant hurdle for Plaintiffs to overcome in convincing a jury to find in their favor

11   at trial. According to Plaintiffs, this Settlement represents the sixth largest securities

12   recovery of any kind in the Ninth Circuit (and the largest without a parallel

13   government enforcement action), the largest recovery by private plaintiffs alleging

14   only insider trading claims, and the largest recovery in a private action alleging

15   violations under Rule 14e-3.

16   (b)    Second, throughout the litigation the Court ruled on numerous

17   dispositive issues of first impression or issues on which there was very little caselaw,

18   and the SEC did not step in to provide guidance or a recommended interpretation of

19   its own regulations. As a result, Plaintiffs faced enormous appellate risks,

20   particularly given that appellate review would in many cases be de novo. For

21

example, had Plaintiffs succeeded at trial, Defendants likely would have appealed the following issues, among others: (i) whether Rule 14e-3 affords a private right of action; (ii) whether Rule 14e-3 is constitutional as applied in a "warehousing scenario"; (iii) the standard for determining an "offering person"; (iv) the role of subjective intent in the standard for "substantial steps"; (v) whether Section 20A's "contemporaneity" rule permits Plaintiffs to sue when it was logically impossible that they traded with any defendant; (vi) whether there was a material dispute of fact on any liability element granted at summary judgment; and (vii) the proper standard for loss causation in Rule 14e-3 insider trading cases like this one.

(c) Third, the Summary Judgment Order still required Plaintiffs to convince a unanimous jury that: (i) Pershing traded on material nonpublic information "related to" a tender offer, and (ii) it was "reasonably foreseeable" to Valeant that its tip to Pershing would "result in a violation of this section." While certain evidence might have been subject to exclusion under the Rules of Evidence, Plaintiff was nonetheless concerned that Defendants would rebut these elements with evidence of subjective intent and state of mind.

(d) Fourth, although the Court intended to deny Defendants' Motion for Summary Judgment as to damages, Plaintiffs still faced substantial risk in proving damages at trial, because the damages issue turned on complex facts, would likely have involved a contentious battle of experts, and differed from the usual

damages scenario in that many Plaintiffs actually made money when they sold their stocks—just not as much as they would have if the alleged insider information had been public.

For the foregoing reasons, the Settlement is fair and reasonable. Accordingly, the Parties are directed to implement, perform and consummate the Settlement in accordance with the terms and provisions contained in the Stipulation.

5.     The Action and all of the claims asserted against Defendants in the Action by Plaintiffs and the other Class Members are hereby dismissed with prejudice.  The Parties shall bear their own costs and expenses, except as otherwise expressly provided in the Stipulation.

6.     **Binding Effect** – The terms of the Stipulation and of this Judgment shall be forever binding on Defendants, Plaintiffs, and all other Class Members (regardless of whether or not any individual Class Member submits a Claim Form or seeks or obtains a distribution from the Net Settlement Fund), as well as their respective heirs, executors, administrators, predecessors, successors, and assigns in their capacities as such.  The persons listed on Exhibit 1 hereto are excluded from the Class pursuant to request and are not bound by the terms of the Stipulation or this Judgment.

7.     **Releases** – The Releases set forth in ¶¶ 5 and 6 of the Stipulation, together with the definitions contained in ¶ 1 of the Stipulation relating thereto, are

expressly incorporated herein in all respects. The Releases are effective as of the Effective Date. Accordingly, this Court orders that:

(a)    Without further action by anyone, and subject to ¶ 8 below, upon the Effective Date of the Settlement, Plaintiffs and each of the other Class Members, on behalf of themselves, and their respective heirs, executors, administrators, predecessors, successors, and assigns in their capacities as such, shall be deemed to have, and by operation of law and of this Judgment shall have, fully, finally and forever compromised, settled, released, resolved, relinquished, waived, and discharged each and every Released Plaintiffs' Claim against the Defendants and the other Defendants' Releasees, and shall forever be enjoined from prosecuting any or all of the Released Plaintiffs' Claims against any of the Defendants' Releasees.

(b)    Without further action by anyone, and subject to ¶ 8 below, upon the Effective Date of the Settlement, Defendants, on behalf of themselves, and their respective heirs, executors, administrators, predecessors, successors, and assigns in their capacities as such, shall be deemed to have, and by operation of law and of this Judgment shall have, fully, finally, and forever compromised, settled, released, resolved, relinquished, waived, and discharged each and every Released Defendants' Claim against Plaintiffs and the other Plaintiffs' Releasees, and shall forever be enjoined from prosecuting any or all of the Released Defendants' Claims against any

of the Plaintiffs' Releasees. This Release shall not apply to any person listed on Exhibit 1 hereto.

8. Notwithstanding ¶ 7(a) – (b) above, nothing in this Judgment shall bar any action by any of the Parties to enforce or effectuate the terms of the Stipulation or this Judgment. In addition, nothing in this Judgment shall in any respect affect or impact the U.S. Securities and Exchange Commission, or any other governmental regulatory or law enforcement agency, from taking any action or refraining from taking any action against any of the Parties with respect to the facts or circumstances giving rise to this Action.

9. **Rule 11 Findings** – The Court finds and concludes that the Parties and their respective counsel have complied in all respects with the requirements of Federal Rule of Civil Procedure 11 in connection with the institution, prosecution, defense, and settlement of the Action.

10. **No Admissions** – Neither this Judgment, the Term Sheet, the Stipulation (whether or not consummated), including the exhibits thereto and the Plan of Allocation contained therein (or any other plan of allocation that may be approved by the Court), the negotiations leading to the execution of the Term Sheet and the Stipulation, nor any proceedings taken pursuant to or in connection with the Term Sheet, the Stipulation and/or approval of the Settlement (including any arguments proffered in connection therewith):

(a) shall be offered against any of the Defendants' Releasees as evidence of, or construed as, or deemed to be evidence of any presumption, concession, or admission by any of the Defendants' Releasees with respect to the truth of any fact alleged by Plaintiffs or the validity of any claim that was or could have been asserted or the deficiency of any defense that has been or could have been asserted in this Action or in any other litigation, or of any liability, negligence, fault, or other wrongdoing of any kind of any of the Defendants' Releasees or in any way referred to for any other reason as against any of the Defendants' Releasees, in any civil, criminal, or administrative action or proceeding, other than such proceedings as may be necessary to effectuate the provisions of the Stipulation;

(b) shall be offered against any of the Plaintiffs' Releasees, as evidence of, or construed as, or deemed to be evidence of any presumption, concession, or admission by any of the Plaintiffs' Releasees that any of their claims are without merit, that any of the Defendants' Releasees had meritorious defenses, or that damages recoverable under the Complaint would not have exceeded the Settlement Amount or with respect to any liability, negligence, fault, or wrongdoing of any kind, or in any way referred to for any other reason as against any of the Plaintiffs' Releasees, in any civil, criminal, or administrative action or proceeding, other than such proceedings as may be necessary to effectuate the provisions of the Stipulation; or

(c)     shall be construed against any of the Releasees as an admission, concession, or presumption that the consideration to be given under the Settlement represents the amount which could be or would have been recovered after trial; *provided, however*, that the Parties and the Releasees and their respective counsel may refer to this Judgment and the Stipulation to effectuate the protections from liability granted hereunder and thereunder or otherwise to enforce the terms of the Settlement.

11.     **<u>Retention of Jurisdiction</u>** – Without affecting the finality of this Judgment in any way, this Court retains continuing and exclusive jurisdiction over: (i) the Parties for purposes of the administration, interpretation, implementation, and enforcement of the Settlement; (ii) the disposition of the Settlement Fund; (iii) any motion for an award of attorneys' fees and/or Litigation Expenses by Lead Counsel in the Action that will be paid from the Settlement Fund; (iv) any motion to approve the Plan of Allocation; (v) any motion to approve the Class Distribution Order; and (vi) the Class Members for all matters relating to the Action.

12.     Separate orders shall be entered regarding approval of a plan of allocation and the motion of Lead Counsel for an award of attorneys' fees and reimbursement of Litigation Expenses.  Such orders shall in no way affect or delay the finality of this Judgment and shall not affect or delay the Effective Date of the Settlement.

13.     **Modification of the Stipulation of Settlement** – Without further approval from the Court, Plaintiffs and Defendants are hereby authorized to agree to and adopt such amendments or modifications of the Stipulation or any exhibits attached thereto to effectuate the Settlement that:  (i) are not materially inconsistent with this Judgment; and (ii) do not materially limit the rights of Class Members in connection with the Settlement.  Without further order of the Court, Plaintiffs and Defendants may agree to reasonable extensions of time to carry out any provisions of the Settlement.

14.     **Termination of Settlement** – If the Settlement is terminated as provided in the Stipulation or the Effective Date of the Settlement otherwise fails to occur, this Judgment shall be vacated, rendered null and void and be of no further force and effect, except as otherwise provided by the Stipulation, and this Judgment shall be without prejudice to the rights of Plaintiffs, the other Class Members, and Defendants, and the Parties shall revert to their respective positions in the Action as of December 28, 2017, as provided in the Stipulation.

15.     **Entry of Final Judgment** – There is no just reason to delay the entry of this Judgment as a final judgment in this Action.  Accordingly, the Clerk of the Court is expressly directed to immediately enter this final judgment in this Action.

SO ORDERED this Thirteenth day of August, 2018.

_David O. Carter_

The Honorable David O. Carter
United States District Judge

# Exhibit 1

Arnold Barad
Arlene Barad JT TEN
Boynton Beach, FL

Isobel Nesselson
Chicago, IL

Roger J. Syverson
Olathe, KS

Sandra J. Syverson
Olathe, KS

Joan M. Taylor
Honey Brook, PA

Katherine H. Wahlert
Rutherford, NJ

# Exhibit 2

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SOUTHERN DIVISION

| | |
|---|---|
| **ANTHONY BASILE ET AL.,**<br><br>    **Plaintiffs,**<br><br><br>    **vs.**<br><br><br>**VALEANT PHARMACEUTICAL INTERNATIONAL, INC. ET AL.**<br><br>    **Defendants.** | **Case No.: SA CV 14-2004-DOC (JCGx)**<br><br><br><br>**ORDER[1] DENYING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT [394] [395] AND GRANTING IN PART PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT[401]** |

---

[1] The Court is not actually entering this Order, because the case has already settled. However, because a substantially similar tentative order was provided to the parties at the summary judgment hearing, which led to settlement, and because this Order provides context for the reasonableness of the Settlement and may assist future courts in interpreting the rules at issue in this case, the Court provides this Order as an exhibit to the Settlement Approval Order.

Before the Court are the parties' respective summary judgment motions: (1) Defendants Michael Pearson, Valeant Pharmaceuticals International, and Valeant Pharmaceutical International, Inc.'s (collectively, "the Valeant Defendants") Motion for Summary Judgment ("Val. MSJ") (Dkt. 394); (2) Defendants Willam A. Ackman, PS Fund 1, LLC, PS Management, GP, LLC, Pershing Square Capital Management, L.P., Pershing Square GP, LLC, Pershing Square Holdings, Ltd., Pershing Square II, L.P, Pershing Square International, and Pershing Square, L.P.'s (collectively, "the Pershing Defendants") Motion for Summary Judgment ("Per. MSJ") (Dkt. 395); and Plaintiffs Iowa Public Employees Retirement System, Patrick T. Johnson, and State Teachers Retirement System of Ohio's (collectively, "Plaintiffs") Motion for Partial Summary Judgment ("Pls. MSJ") (Dkt. 401). The Court heard argument on the motions on December 8, December 11, December 12, and December 14, 2017. Having reviewed the moving papers and considered the parties' arguments, the Court DENIES Defendants' Motions and GRANTS IN PART Plaintiffs' Motion.

## I.    FACTS[2]

This case arises out of the decision, in February 2014, by Canadian-based pharmaceutical company Valeant and hedge fund management company Pershing Square to team up to help Valeant pursue a combination with Irvine-based pharmaceutical company Allergan. Between February and April, Pershing Square acquired 9.7% of Allergan's shares. In the end of April, Valeant disclosed its intention to acquire Allergan, after which stock prices increased significantly, and in June 2014, Valeant publicly announced a tender offer for Allergan shares after Allergan's board of directors had rebuffed an unsolicited merger proposal. Ultimately, another bidder named Actavis acquired Allergan after offering shareholders $219 per share—more than the $200 per share Valeant offered. Nonetheless, as a result of the significant rise in stock prices coinciding with Valeant's attempted acquisition and Actavis' successful effort, Pershing Square earned over $2 billion in profits on its stake of Allergan shares. Plaintiffs subsequently brought this class action, alleging that the Valeant Defendants

---

[2] Unless indicated otherwise, to the extent any of these facts are disputed, the Court concludes they are not material to the disposition of the Motion. Further, to the extent the Court relies on evidence to which the parties have objected, the Court has considered and overruled those objections. As to any remaining objections, the Court finds it unnecessary to rule on them because the Court does not rely on the disputed evidence.

and Pershing Defendants (collectively, "Defendants") violated federal securities laws and regulations in connection with Valeant's tender offer for Allergan, specifically by employing an illegal insider trading and front-running scheme that deprived a class of Allergan shareholders of billions of dollars. *See generally* Second Amended Complaint ("SAC") (Dkt. 138).

### A. Parties

Defendant Valeant Pharmaceuticals International, Inc. ("Valeant") is a publicly traded pharmaceutical company based in Quebec, Canada. Valeant's Statement of Uncontroverted Facts ("Val. SUF") (Dkt. 396-1) No. 1. In 2014, Michael Pearson was Chairman and CEO of Valeant. *Id.* Defendant Valeant Pharmaceuticals International is a wholly owned subsidiary of Valeant. *See id.* No. 4.

Defendant Pershing Square Capital Management, L.P. ("Pershing") is an investment company based in New York and registered with the U.S. Securities and Exchange Commission ("SEC"). *Id.* No. 2. Defendant William Ackman ("Ackman") is the founder and CEO of Pershing. *Id.* Defendants PS Management GP, LLC ("PS Management"), PS Fund 1, LLC ("PS Fund 1"), Pershing Square, L.P. ("PSLP"), Pershing Square II, L.P. ("PS II"), Pershing Square GP, LLC ("PSGP"), Pershing Square International ("PS International"), and Pershing Square Holdings, Ltd. ("PS Holdings") are various entities associated with Pershing.

In 2014, Allergan was a large California-based pharmaceutical and healthcare company whose common stock was traded on the New York Stock Exchange under the ticker symbol "AGN." *Id.* No. 5.

### B. February 2014 and Earlier: Efforts to Orchestrate a Potential Acquisition

In early 2014, Valeant evaluated a number of potential mergers or transactions with other large pharmaceutical companies, including Allergan. Plaintiff's Corrected Statement of Genuine Disputes and Statement of Additional Facts in Opposition to Pershing's MSJ ("Pls. Reply to Per. SUF") (Dkt. 547-12) Nos. 6, 7; Val. SUF Nos. 6, 7. Even before that, Valeant had taken some steps to discuss or explore a potential combination of Valeant and Allergan. *See* Plaintiff's Corrected Statement of Genuine Disputes and Statement of Additional Facts in Opposition to Valeant's MSJ ("Pls. Reply to Val. SUF") (Dkt. 547-5) No. 8 (listing a number

of earlier meetings and conversations regarding a possible Valeant-Allergan transaction). For example, Valeant's CEO Michael Pearson approached Allergan regarding a potential transaction between their companies in September 2012, but was rebuffed by Allergan's CEO David Pyott and board of directors. *Id.* (citing Valeant's Answer to Amended Complaint ("Val. Answer") (Dkt. 114) ¶ 48). Nevertheless, in January 2014 Pearson still believed that "a merger with Allergan would create tremendous shareholder value and was the most attractive strategic transaction available to Valeant." *Id.* (citing Declaration of Michael Pearson).

Relatedly, in January and early February 2014, representatives of Valeant and Pershing had discussions about opportunities to work together on an acquisition. Pls. Reply to Per. SUF No. 9; Pls. Reply to Val. SUF No. 9. Moreover, the parties discussed generally Pershing's expertise in handling unsolicited or hostile bid situations. *See id.* Over the course of several days following a February 4, 2014 meeting among representatives of Pershing and Valeant, representatives of Pershing developed a potential strategy by which funds associated with Pershing would purchase a "toehold" position in the securities of the target company, and Valeant would potentially pursue an acquisition of the target. Pls. Reply to Val. No. 10; Pls. Reply to Per. No. 10. At the time, Valeant did not have the available cash necessary to purchase a significant "toehold" position in a large company like Allergan. Per. SUF No. 11. A toehold is an initial position in the stock of a target company that potential acquirers often accumulate before attempting an unsolicited acquisition; many toeholds involve between 5% and 10% of the target's shares. *Id.* Nos. 12–13. Plaintiffs assert that Valeant knew that any acquisition of Allergan would be on a hostile basis and believed that a meaningful toehold would facilitate a hostile acquisition of Allergan. Pls. Reply to Per. SUF No. 11. In addition, Plaintiffs contend that Valeant also did not want to purchase a toehold for itself because it was concerned that acquiring a toehold could risk alerting the market to Valeant's plans. *Id.* Thus, Valeant did not have an interest in pursuing an Allergan transaction without obtaining the assistance of a partner like Pershing to fund the purchase of a toehold and commit to support the transaction in terms of voting its toehold stake of shares. *See* Per. SUF. No. 11 (citing Pearson testimony).

Around February 5, 2014, Valeant contacted Goldman Sachs and Bank of America to determine whether either had conflicts that would prevent them from advising on a potential bid for Allergan. Pls. Reply to Per. SUF No. 17. Moreover, notes indicate that Pearson discussed with Goldman Sachs "launch[ing] [a] hostile takeover of" Allergan. Declaration of Eli R. Greenstein ("Greenstein Decl.") (Dkt. 477) Ex. 24.

On February 6, 2014, Michael Pearson contacted Allergan's CEO David Pyott, and they agreed to meet the following weekend. *See* Pls. Reply to Val. SUF No. 18; Val. Answer ¶ 69. On or around that same day, Ackman and Pearson had a telephone call during which they discussed a potential transaction structure in which Valeant would identify a target and disclose it confidentially to Pershing, after which Pershing would decide whether it was interested in working with Valeant. *See* Valeant's Responses to Plaintiff's Statement of Additional Facts ("Val. Reply to Pls. SAF") (Dkt. 522-1). Also on February 6, Valeant contacted law firm Sullivan & Cromwell LLP ("Sullivan & Cromwell") to seek its assistance in a potential Allergan–Valeant transaction. Val. SUF No. 12. Two days later, on February 8, 2014, Sullivan and Cromwell sent Valeant an initial draft of an offer letter to Allergan. *See* Pls. Reply to Per. SUF No. 17; Greenstein Decl. Ex. 44 at VALEANT_00109871. Sometime later in February, Valeant also hired Skadden, Arps, Slate, Meagher & Flom LLP and Osler, Hoskin & Harcourt LLP to work on the transaction. *See* Pls. Reply to Val. SUF No. 18 (citing Val. Answer).

On February 7, 2014, a presentation was given to Valeant's board about possible transactions with several large pharmaceutical companies, including Allergan. Val. SUF No. 13. The slide deck used for the meeting shows, on a slide entitled "Actions to date," that Sullivan & Cromwell was "Pulling together key diligence items" and "Working on structure and key actions to launch offer" and that Bank of America, Merrill Lynch, and Goldman Sachs were "clearing conflict[s]." Greenstein Decl. Ex. 40 at VALEANT_00237951; Pls. Reply to Val. No. 13. The presentation also included detailed valuation analyses of the combined Valeant/Allergan company, modeled synergies from the transaction, and potential stock and cash components of the bid. *See* Greenstein Decl. Ex. 40; Pls. Reply to Val. SUF No. 13.

On February 7 and 8, 2014, Valeant and Pershing exchanged drafts of a confidentiality agreement. Val. SUF No. 14. On February 9, 2014, Defendants signed a confidentiality agreement ("the Confidentiality Agreement"), after which Valeant disclosed to Pershing that it was interested in Allergan as a potential acquisition candidate. Pls. Reply to Per. SUF No. 14; Val. SUF No. 17. The Confidentiality Agreement required Pershing to maintain the confidential and nonpublic nature of Valeant's interest in and its discussions with the target. Plaintiffs' Statement of Uncontroverted Facts ("Pls. SUF") (Dkt. 547-3) No. 231. Defendants claim that at this stage, Valeant's CEO Michael Pearson had not definitively committed to Pershing that Valeant would make a bid for Allergan. *See* Val. SUF No. 18; Per. SUF No. 16; Def. Ex. 5 at 117:10–118:5. However, while Pearson would not make a hard commitment to Pershing that Valeant would make a bid for Allergan, Plaintiffs dispute any contention that "Valeant was not [in fact] committed to making any bid for Allergan." Pls. Reply to Val. SUF No. 18. Citing a variety of evidence, Plaintiffs claim that, by the time Defendants executed the Confidentiality Agreement, "Valeant had already determined that Allergan was the most attractive strategic transaction available to it, reached out to Allergan's CEO, prepared a draft offer letter to Allergan, expended resources, engaged advisors and bankers, prepared detailed projections and analysis, made presentations to its board of directors, and had taken 'key actions to launch' a potential transaction with Allergan—steps that reflected Valeant's commitment to making an offer for Allergan." Pls. Reply to Val. SUF No. 18 (citing various evidence). Thus, Plaintiffs argue that Valeant had already begun taking steps toward launching a potential transaction with Allergan. *See* Pls. Reply to Per. SUF Nos. 16–17.

For its part, Pershing claims that it considered Allergan an interesting activist investment and potential target for combination with Valeant. Per. SUF No. 15. Plaintiff claims that Pershing was interested in Allergan because it knew that Allergan was Valeant's next takeover target and because Pershing knew it would profit by buying up a stake in Allergan before Valeant announced its bid. Pls. Reply to Per. SUF No. 14 (citing Declaration of Michael D. Blatchley ("Blatchley Decl.") (Dkt. 472) Ex. 14 at 283:15–20 ("Q. So as of February 23, 2014, as reflected in this e-mail you believed that Pershing could make 80 percent to 100 percent on

its Allergan investment; is that right? A. Yeah."); Ex. 31 (reflecting that Pershing expected "to make 80 to 100 percent on the investment"); Ex. 13 at 194:15–18 ("Q: Did you expect the stock price to rise after the announcement of an unsolicited transaction? A: Yes.")).

On February 11, 2014, Pershing formed PS Fund 1, LLC, together with four other Pershing entities: PSLP, PS II, PS International, and PS Holdings. Pls. SUF No. 416. Through the LLC Agreement that created PS Fund 1, PSCM became the nonmember manager of PS Fund 1, and PSLP, PS II, PS International, and PS Holdings became the sole members of PS Fund 1. *Id.* No. 417. Ackman signed the LLC Agreement five times—once for each of PSLP, PS II, PS International, PS Holdings, and PSCM. *Id.* No. 418.

On February 13, 2014, representatives from Valeant and Pershing, including Pearson and Ackman and their legal counsel, met to discuss a potential Allergan–Valeant transaction, including potential acquisition strategies. Per. SUF No. 18; Pls. Reply to Per. SUF No. 18. A slide deck marked "Confidential" was emailed to Pearson and other Valeant representatives the following day, and it included an "Update from Pershing Meeting" that indicated that Valeant "met with Bill Ackman and Pershing Square team on 2/13" and that "key discussion items" included "deal assumptions and expectations for A company" and "expectations for deal announcement," as well as "strategic plan and best ways to work together." Blatchley Decl. Ex. 29 at VALEANT_00016146. The following slide, entitled "Plan of Action," noted that Pershing was to "begin acquiring shares with expectations to take a position of 8–10% of [Allergan]," and that Valeant subsequently was "to make [an] unsolicited cash and stock offer with $10–$15B of cash and 20–25% premium." *Id.* at VALEANT_00016147. "Given [the] Pershing stake," Valeant had the "expectation that we would have support to call [a] special meeting." *Id.* Further, the slide deck indicated that if Valeant succeeded in the transaction, Pershing would pay 1% of its earnings (on its stake of Allergan shares) to Valeant, and that Pershing would "pay 10% of earnings [in the event of a] successful [Allergan] transaction to [a] party other than [Valeant]." *Id.* Next steps were listed as: "[Valeant] to receive board approval"; "Pershing to begin buying [Allergan] shares"; "Pershing/[Valeant] Due Diligence meeting on 2/21"; "Prepare offer letter and merger agreement"; "[Valeant] to raise bridge capital"; and

"Launch offer." *Id.* at VALEANT_00016148. The remainder of the slide deck reflects the contents of an earlier version of the same presentation, emailed to Valeant personnel on February 9, 2014; a version of this presentation also appears to have been presented to Pershing at the February 13 meeting. *See id.*; Declaration of Jeremy P. Robinson ("Robinson Decl.") (Dkt. 399) Ex. 63; Pls. SUF No. 235. In particular, the slide deck contains Valeant's financial analysis of a business combination with Allergan, including "key synergy areas" and estimates of the amount of money that might be saved as a result of those synergy areas in the event of a combination of the two companies, as well as Valeant's estimated valuation of Allergan based on certain "key assumptions," and potential offer and stock price impacts scenarios. *See generally* Robinson Decl. Ex. 63; Pls. SUF No. 236. Pershing advisor Bill Doyle testified that Valeant's analysis of the dollar value of the synergies for a combined Valeant/Allergan company was "very important" information, but Pershing also conducted its own due diligence of Allergan and Valeant to derive its own projected synergies. Pls. SUF No. 237; Defendants' Responses to Plaintiffs' SUF ("Defs. Reply to Pls. SUF") (Dkt. 465-2) No. 237.

Valeant claims that, around the time the Confidentiality Agreement was signed, Valeant and Pershing's legal advisors discussed and rejected the idea of using a tender offer for the purposes of the Allergan transaction. Val. SUF No. 20. Valeant further claims that at the February 13, 2014 meeting, Pershing and Valeant management also rejected the idea of using a tender offer for the Allergan transaction. Val. SUF No. 21. Plaintiffs agree that a tender offer was raised at the February 13 meeting as a possible tactic to put pressure on Allergan, but dispute that Valeant "rejected the idea of using a tender offer," and cite various evidence and testimony in support of their position. Pls. Reply Val. SUF No. 20. For example, while a list of "Background Facts for Proposed Acquisition Plan" emailed by Canadian legal counsel later in February notes that "V and PS would advocate for the merger of V and A-Co by way of transaction which would result in shareholders of A-Co receiving choice of cash and shares of V," it also provides that, "If the transaction proceeds by way of tender offer PS will be identified as co-bidder and if by way of merger PS will be identified as soliciting person." Greenstein Decl. Ex. 47. However, Plaintiffs also claim, citing depositional testimony, that

"Defendants were warned that a tender offer would be illegal and otherwise create risks under Rule 14e-3"—which Rule is the basis for the instant lawsuit—"if Pershing acquired a stake in the Allergan securities." Pls. Reply to Val. SUF No. 21.

Between February 13, 2014, and February 20, 2014, representatives of Sullivan & Cromwell and Kirkland & Ellis (legal counsel for Valeant and Pershing) exchanged drafts of, and negotiated, an amended confidentiality agreement. Defs. Reply to Pls. SUF No. 243. Over that time, the parties negotiated to expand the categories of information covered by the confidentiality agreement from including the identity of Allergan, the terms of the confidentiality agreement, and information about the potential transaction only, to also including confidential information about Valeant in connection with Pershing's due diligence investigation on Valeant. *Id.*; *see also* Robinson Decl. Ex. 135. Specifically, the amended agreement noted that Valeant and Pershing were "discussing the possibility of a transaction involving Allergan, Inc.," and required Pershing to

> keep confidential and to not use (except in discussions with us and for the purposes of evaluating a Transaction) (i) the fact that discussions or negotiations may take place, are taking place or have taken place concerning a Transaction . . . or any of the terms or other facts relating thereto or in connection therewith, including the status thereof; (ii) the existence or the term of this letter agreement . . . ; (iii) the fact that [Valeant] may have any interest in a Transaction or has taken any action with respect to [Allergan]; or (iv) any non-public and confidential technical, scientific, trade secret or other proprietary information (including forecasts, financial data or statements and business development plans or strategies) of [Valeant] or any of its affiliates provided to [Pershing by Valeant], whether provided before or after the date of this Agreement and whether oral, written or electronic, together with any reports, analyses, summaries, memoranda, notes, studies, or any other written or electronic materials . . . ."

Robinson Decl. Ex. 135 at PERCAL0082695–96. This agreement was specifically intended to cover "confi info" (confidential information) that Pershing "rcvd at the mtg last Thursday," i.e., received at the February 13 meeting between Pershing and Valeant. *See* Robinson Decl. Ex. 102; *see also* Robinson Decl. Ex. 103.

At a February 21, 2014 meeting, Valeant's Board "authorize[d Valeant] to pursue the [Allergan t]ransaction." Pls. Reply to Per. SUF No. 49; Blatchley Decl. Ex. 64 (Minutes of a Meeting of the Board of Directors of Valeant Pharmaceuticals International, Inc., dated February 21, 2014) at 4.

## C. The February 25th Relationship Agreement

On February 25, 2014, Defendants entered into the Relationship Agreement, the terms of which had been negotiated from February 14 through February 25, and which provided the formal structure that governed Defendants' efforts regarding a potential acquisition attempt for Allergan. Pls. SUF No. 251; Per. SUF No. 20. Valeant and Pershing's express purpose for entering into these arrangements was for PS Fund 1 to secretly acquire a near 10% stake in Allergan in order to support a potential hostile acquisition attempt for Allergan. Per. SUF No. 22; *see id.* No. 23 (citing allegation that "Ackman agreed to secretly acquire nearly 10% of Allergan's stock and commit those shares to support Valeant's bid").

Under the Relationship Agreement, Valeant and Pershing agreed to "become members in a newly formed jointly owned entity" dubbed the "Co-Bidder Entity." Robinson Decl. Ex. 31 at PERCAL-0012976 ("Feb. 25 Relationship Agreement") § 1(a). That Co-Bidder Entity, namely PS Fund 1, would purchase "Allergan Equity, including the purchase of $75.9 million in value of shares of Allergan Common Stock whose gain or loss will be allocated to [Valeant]." *Id.* With regard to financing, Valeant agreed to contribute $75.9 million to the Co-Bidder Entity once the Co-Bidder Entity purchased 4% of Allergan stock. *Id.* § 1(a). Pershing committed to contribute the remaining funds needed to purchase a stake in Allergan not to exceed 10% of Allergan's outstanding shares of equity. Per. SUF No. 25.

Pershing would manage the Co-Bidder Entity, including the manner and timing of purchasing Allergan stock, except that Valeant had to consent before the Co-Bidder Entity's

purchases triggered Hart–Scott–Rodino reporting requirements or the filing of a Statement on Schedule 13D. Feb. 25 Relationship Agreement §§ 1(a), (e). That is, the Relationship Agreement prohibited Pershing or the Co-Bidder Entity from acquiring the Allergan stake in a way that would trigger antitrust or SEC disclosure obligations without Valeant's prior consent Pls. SUF No. 255; Defs. Reply to Pls. SUF No. 255. Pershing would also control the voting rights associated with the Co-Bidder Entity's Allergan stock, except that the Co-Bidder Entity was required to vote all of its shares in favor of Valeant's proposals and against any proposal that would undermine Valeant's proposals. Feb. 25 Relationship Agreement § 1(e). Pershing was not permitted to purchase Allergan stock through any other person or entity but the Co-Bidder Entity. *Id.* § 1(c).

With regard to decision-making authority for the anticipated Allergan–Valeant transaction, the agreement provided:

> Prior to making any material decision relating to a [Valeant] Transaction (including, for the avoidance of doubt, any proxy contest, proxy solicitation, written consent solicitation or other action relating to or potentially affecting the composition of the board of directors of Allergan), [Valeant] will consult with Pershing Square and will consider in good faith Pershing Square's comments on such prospective actions; provided that the parties acknowledge that no steps have been taken towards a tender or exchange offer for securities of Allergan and the parties agree that the consent of both Pershing Square and [Valeant] shall be required for launching such a tender offer or an exchange offer. If a [Valeant] Transaction [with Allergan] is being pursued by [Valeant] through a tender or exchange offer or a merger or any related proxy or other solicitation prior to the Termination Time, each of [Valeant], Pershing Square and the Co-Bidder Entity will be identified as co-bidders or soliciting persons, respectively.

*Id.* § 1(d).

In addition, immediately prior to the consummation of the anticipated Allergan–Valeant transaction, if Valeant wished to do so, it could require Pershing to purchase $400 million of Valeant stock. *Id.* § 2(a). If the transaction was consummated in a way that allowed Allergan shareholders to receive either cash or Valeant shares, then Pershing agreed to have the Co-Bidder Entity, PS Fund 1, elect to receive only Valeant common stock for all shares of Allergan common stock held by PS Fund 1. *Id.* § 2(b); Per. SUF No. 34. Once the transaction was consummated, the Co-Bidder Entity would dissolve, and its assets, including any net profits arising from the Allergan stock, would be divided pro rata between Valeant and Pershing according to their relative contributions to the Co-Bidder Entity, PS Fund 1. Feb. 25 Relationship Agreement § 3. After the transaction was consummated, Pershing agreed to hold $1.5 billion worth of Valeant stock for one year. *Id.* § 2(c); *see also* Per. SUF No. 35. Finally, if, after Valeant made a proposal for Allergan, a third party outbid Valeant, then the parties agreed to allocate 15% of PS Fund 1's net profits to Valeant. Per. SUF No. 37; Feb. 25 Relationship Agreement § 3(a).

### D. February 25–July 2014: Trading, Unsolicited Proposal, Tender Offer

It is undisputed that on February 25, 2014, "Pershing Square removed Allergan from the firm's restricted securities list and began purchasing the securities of Allergan in PS Fund 1." Defs. Reply to Pls. SUF No. 193. Also on February 25, 2014, Valeant contacted PricewaterhouseCoopers LLP to inform it that "Valeant potentially would be working with an investor with respect to making a bid for a publicly traded company." *Id.* No. 195. The parties further agree that between February 25 and April 21, 2014, PS Fund 1 accumulated Allergan equity interests, which could help support an attempt by Valeant to acquire Allergan. Pls. Reply to Per. SUF Nos. 44, 46; Pls. SUF Nos. 269–288. At the time of PS Fund 1's investment in Allergan, both Valeant and Pershing Square knew that Allergan's management would be opposed to a merger with Valeant, and would view such a proposal as hostile. *See* Defs. Reply to Pls. SUF No. 194.

On or around March 15, 2014, Valeant began discussing antitrust issues with Skadden. *See* Defs. Reply to Pls. SUF No. 196. On March 28, 2014, Valeant engaged consultant

McKinsey & Co. in connection with its potential acquisition of Allergan. *See id.* No. 200. In early April 2014, Valeant contacted Barclays Bank PLC ("Barclays") and Royal Bank of Canada ("RBC") about potential financing and working on commitment documentation with respect to a potential unsolicited proposal bid for Allergan. *See id.* No. 199. Barclays began working on providing financing for Valeant's acquisition of Allergan. *Id.* No. 202. On or before April 6, 2014, RBC also started working on financing for Valeant's attempted acquisition of Allergan. *Id.* No. 204.

On April 3, 2014, Pershing notified Valeant that PS Fund 1 had acquired over 4% of Allergan stock. The same day, the PS Fund 1 LLC Agreement was amended to add Valeant as a member. Per. SUF No. 47. As required by the Relationship Agreement, Pershing obtained Valeant's consent before causing PS Fund 1 to acquire more shares and cross the 5% ownership threshold that triggered the 10-day window in which Pershing was required to file a Schedule 13D with the SEC publicly disclosing its stake in Allergan. Pls. SUF No. 257.

On April 7, 2014, Valeant's board resolved to authorize PS Fund 1 to acquire Allergan security interests in excess of 4.9% of Allergan's outstanding shares. Pls. Reply to Per. No. 48; Val. No. 41. The board also resolved to authorize Valeant's officers to "continue to proceed with a proposal to Allergan." *Id.*; Blatchley Decl. Ex. 79. The Valeant Board of Director Meeting Minutes from that day stated:

> RESOLVED, that the Board has determined that it is advisable to authorize the Corporation to continue to proceed with a proposal to Allergan contemplating the Transaction pursuant to which the Corporation would pay cash and common shares, no par value, of the Corporation in exchange for all of the Allergan Common Stock (the "Proposal") at a premium consistent with the discussions at this meeting . . . .

Blatchley Decl. Ex. 79 at 10. In addition, the Valeant Board's April 7, 2014 resolutions stated that Valeant's officers were "not authorized to commence a tender offer or proxy solicitation without the approval of the [Valeant] Board," although Plaintiffs claim that this says nothing

about authorization to take steps to facilitate or support a tender offer. Pls. Reply to Per. SUF No. 49.

On April 10, 2014, Valeant contributed its promised $75.9 million to PS Fund 1. Pls. Resp. to Per. No. 50. On April 11, with Valeant's permission, PS Fund 1 crossed, and began buying Allergan stock in excess of, the 5% Schedule 13D reporting threshold. Pls. Resp. to Per. No. 51. Between April 11 and 21, PS Fund 1 increased its ownership up to 9.7% of Allergan's shares. *See* Pls. SUF Nos. 282–88; Pls. Reply to Per. SUF No. 173. When Pershing purchased its nearly $4 billion stake in Allergan, Ackman and Pershing knew that Valeant's potential takeover plans for Allergan were nonpublic. Pls. SUF No. 248–49; Defs. Reply to Pls. SUF No. 248–49; *see also* Robinson Decl. Ex. 2 (Ackman Tr.) at 869:18–870:18 ("Q. When you traded in Allergan stock, you knew you signed an NDA with Valeant, correct? A. Correct. Q. That's not information that was available to public investors? A. That's true. Q. You also knew when you signed the Relationship Agreement that Valeant had already committed itself to some sort of toehold in the event it then made a bid for Allergan, right? A. Yes. I knew that they had committed to invest $75.9 million into PS Fund 1. That's what I knew. Q. Public investors didn't know that it had made that commitment, correct? A. Yes. Q. You were provided access to confidential information from Valeant, right? A. We had confidential information about Valeant, correct."). Also, notes taken by Pershing's PR consultants memorializing an April 16, 2014 meeting between Valeant, Pershing, and their respective advisors expressly discuss "[t]ender offer" and "[t]ender offer press release" under "[d]etails of bid." Val. Reply to Pls. SAF No. 244.

On April 21, 2014, Valeant and Pershing filed Schedule 13Ds, which publicly disclosed PS Fund 1's approximately 9.7% stake in Allergan as well as the parties' Relationship Agreement. Pls. Reply to Per. SUF Nos. 52, 53; Defs. Reply to Pls. SUF No. 207.

On April 22, 2014, Valeant delivered to Allergan CEO David Pyott and Allergan's board of directors a letter proposing a transaction between Valeant and Allergan in which Allergan shareholders would receive $48.30 in cash plus 0.83 shares of Valeant for each share of Allergan. Pls. Resp. to Per. No 54. Valeant also publicly released the proposal and publicly

announced its unsolicited offer for Allergan at that time. *Id.*; Defs. Reply to Pls. SUF No. 208. The letter to Mr. Pyott attached a draft merger agreement and stated, among other things, that because Allergan "has made it clear both privately and publicly that it is not interested in a deal with us, we chose to present this proposal to Allergan shareholders directly." Val. SUF No. 46. In response to Valeant's proposal, Allergan's Board adopted a "poison pill" with a ten percent trigger. Pls. Resp. to Per. No. 57; Val. SUF No. 48. Also on April 22, Barclays and RBC executed a formal Commitment Letter to Valeant to finance an Allergan transaction. Pls. Resp. to Per. No. 56. The letter made no explicit reference to a tender or exchange offer. *Id.* However, Plaintiffs dispute with various evidence any contention that the financing commitment was solely for a merger, "as all parties knew the transaction was hostile and likely would lead to . . . a tender offer." Pls. Reply to Val. No. 47.

On May 12, 2014, Allergan's Board formally rejected Valeant's April 22 proposal and stated that the proposal "substantially undervalues Allergan." Pls. Reply to Per. SUF Nos. 61, 65; Blatchley Decl. Ex. 99. On May 27, 2014, Allergan issued a press release that was highly critical of Valeant's business model. Pls. Reply to Per. SUF No. 65. On May 28, 2014, Mr. Pearson announced a revised offer for Allergan, increasing the prior per share cash portion of the proposed consideration to $58.30, an increase of $10. *Id.* No. 66.

Pershing claims that at a Sanford Bernstein investor conference on May 29, 2014, "large shareholders of Allergan suggested that if Valeant raised its offer to $180 in value per share of Allergan common stock based on Valeant's then-current trading price, they would be supportive of a transaction." Per. SUF No. 70. Plaintiffs dispute that "other large shareholders of Allergan" suggested this, because neither Valeant or Pershing has been able to identify which shareholders said this. Pls. Reply to Per. SUF No. 70. Pershing further contends that on the morning of May 30, Ackman spoke by telephone with Pearson and conveyed to Pearson both the substance of his conversations with other Allergan shareholders the day before, and an offer that if Valeant raised its bid for Allergan such that its value approximated $180 per share of Allergan stock, then Pershing would accept a fixed exchange ratio of 1.22659 (Valeant shares for Allergan shares) based on the closing stock prices of Valeant and Allergan on May

29, 2014. Per. SUF No. 71. Plaintiffs dispute that Valeant only pursued a $180 per share offer price after hearing from Ackman that large Allergan shareholders purportedly stated at the Sanford Bernstein conference that they would support such an offer. Pls. Reply to Per. SUF No. 71. Plaintiffs claim that, "[a]s Pershing knew, Valeant was willing to pay up to $200 per share for Allergan," and that the events relating to the Sanford Bernstein conference did not represent a change of course from what Valeant already had planned. *Id.*

In any case, the parties do not dispute that on May 30, Pearson recommended to the Valeant board that Valeant raise its offer for Allergan on the terms Pearson had discussed with Ackman, and the Valeant Board approved the new offer at a telephonic meeting later that day. Per. SUF No. 72; *see* Pls. Reply to Per. SUF No. 72. That day, on May 30, Valeant publicly announced a further revised bid under which each Allergan share would be exchanged for $72.00 in cash and 0.83 Valeant common shares. Per. SUF No. 74. In addition, the Board formally authorized an exchange or tender offer. *Id.* No. 77; Pls. Reply to Per. SUF No. 77. Under the terms of the Relationship Agreement, Pershing was required to give its consent for Valeant to make a tender or exchange offer for Allergan, and Pershing gave its consent at some point before the tender offer was publicly announced. Per. SUF No. 78; Pls. Reply to Per. SUF No. 78. On June 2, 2014, Valeant held an investor meeting and webcast and announced the tender offer on the terms described above. Per. SUF No. 79; *see also* Pls. SUF No. 216. That day, Allergan's stock closed at $172.25, up over 38% from when PS Fund 1 first started purchasing Allergan equity. Per. SUF No. 80; *see* Per. MSJ Ex. 96. On June 11, Valeant formed AGMS, Inc. ("AGMS"), a wholly-owned subsidiary, to hold Allergan shares acquired through the tender offer. Pearson Decl. ¶ 30.

On June 18, 2014, Valeant commenced a tender offer for Allergan. Pls. SUF No. 221. Valeant filed a Form S-4 registration statement to register Valeant shares to be issued in the exchange offer for Allergan. Pls. SUF No. 3; Robinson Decl. Ex. 29 ("Form S-4"). The filing describes AGMS, a wholly owned subsidiary of Valeant, as the "Purchaser" and explains that AGMS "herby offers . . . to exchange . . . ." Form S-4 at 3. The Form S-4 also states that "[t]he purpose of the offer is for Valeant to acquire control of and promptly thereafter the entire equity

interest in Allergan." *Id.* at 4. In the "Questions and Answers About the Offer" portion of the Form S-4, the following information was provided:

> Q: WHO IS OFFERING TO ACQUIRE MY SHARES OF ALLERGAN COMMON STOCK? A: This offer is being made by Valeant through Purchaser [(*i.e.*, AGMS Inc.)], a wholly owned subsidiary of Valeant . . .
>
> Q: WHAT DOES IT MEAN THAT PS FUND 1, A PERSHING SQUARE AFFILIATE, IS A CO-BIDDER? Pershing Square has been working with Valeant since February 2014 to facilitate Valeant's efforts to acquire Allergan, and Pershing Square had input in determining the terms of the offer. See the section of this offer to exchange titled "Background of the Offer." Pershing Square formed PS Fund to acquire shares of Allergan common stock and derivative instruments referencing Allergan common stock. As result, although none of Pershing Square PS Fund or any of Pershing Squares affiliates is offering to acquire any shares of Allergan common stock in the offer, PS Fund is considered co-bidder for SEC purposes and thus has joined as filing person in the Schedule TO of which this offer to exchange is a part.

*Id.* at 8, 11.

In addition, also on June 18, 2014, Valeant, AGMS, and PS Fund 1 filed a tender offer statement ("Schedule TO") announcing an exchange offer for Allergan. Per. SUF No. 81; Robinson Decl. Ex. 29; *see also* Pls. SUF No. 222. The Schedule TO listed Valeant and AGMS as "offerors" and PS Fund 1 as an "other person" on the cover page. Robinson Decl. Ex. 32 ("Schedule TO"). The Schedule TO stated that PS Fund 1 was also filing the Schedule TO "as a person that is considered a co-bidder for SEC purposes." *Id.* at 3; Per. SUF No. 81; Per. MSJ Ex. 9.

On July 3, 2014, the SEC sent a comment letter to Valeant, asking it to "revise the cover page to identify Pershing . . . as a co-bidder in the tender offer." Pls. Reply to Per. SUF No.

217; Blatchley Decl. Ex. 84 ("SEC Comment Letter") at 1. At the same time, however, the SEC wrote: "We note that you have now commenced a tender offer for Allergan. Please provide your analysis as to why PS Fund 1, LLC's acquisition of Allergan's shares beginning in February 2014 did not violate Rule 14e-3." *Id.* at 2. Notably, in its July 3 Comment Letter, the SEC did not instruct Defendants to change PS Fund 1's designation on the cover page from "other person" to anything else. Pls. Reply to Per. SUF No. 222; *see generally* SEC Comment Letter. Nevertheless, on July 23, 2014, the Schedule TO was amended by Valeant to list Pershing Square Capital Management, L.P. and PS Fund 1, LLC as "Filing Persons (Offerors)." Per. SUF No. 83. The amended Schedule TO continued to describe the tender offer as a "third-party tender offer by Purchaser" AGMS. Blatchley Decl. Ex. 136 at 4 ("This Amendment No. 1 to Schedule TO amends and supplements the Tender Offer Statement on Schedule TO . . . originally filed on June 18, 2014 by Valeant Pharmaceuticals International, Inc. . . . and AGMS Inc., a Delaware corporation ("Purchaser"), and relates to the third-party tender offer by Purchaser . . . .") The amended Schedule TO described Pershing Square and PS Fund 1 as "co-bidder[s] for SEC purposes," as had been requested by the SEC Comment Letter. *Id.*; Per. SUF No. 84; SEC Comment Letter at 1.

### E. Actavis Outbids Valeant[3]

On August 19, 2014, news outlets reported that Allergan had approached "Salix Pharmaceuticals Ltd and at least one other company" about a takeover deal to "fend off" Valeant's hostile bid. *See* Per. MSJ Ex. 133 (Bajaj Report) ¶ 30. During trading hours on October 7, 2014, *Reuters* reported that Actavis planned to approach Allergan about a potential merger, as Allergan "warm[ed] up to the possibility of a sale" and that Allergan would consider a takeover proposal that valued the company at above $200 per share. *Id.* ¶ 31. After the close of trading, *Dow Jones* reported that Valeant was planning to "boost" its offer by $15 per share, raising its offer to $191 a share. *Id.* On October 8, 2014, Allergan's stock priced closed at

---

[3] The parties did not include in their various Statements of Facts any discussion of events that took place after July 2014, and thus the Court summarizes these events as it understands them, including citations where possible, but the Court does not find that these are undisputed facts and does not rely on them in resolving the parties' motions.

$190.50, up over 50% from when PS Fund 1 first started purchasing Allergan equity on February 25. *Id.*

On October 27, 2014, Valeant published a letter informing Allergan shareholders that it was ready to raise its offer to a value of at least $200 per share if the Allergan board engaged, but it did not revise its outstanding offer. *Id.* ¶ 32. On November 17, 2014, news outlets reported that Valeant had ended its "hostile pursuit" as Allergan announced that it had agreed to be acquired by Actavis as part of a cash and stock offer worth $219 per share. *Id.* ¶ 33. Allergan's stock price closed at $209.20, and as of that date PS Fund 1's 9.7% Allergan stake was worth just over $6 billion, representing approximately a $2.3 billion gain over the $3.7 billion Pershing spent to acquire the stake. *Id.*

On November 19, 2014, Valeant formally withdrew its tender offer, and the next day Valeant filed a Form 13D with the SEC stating that, "on November 19, 2014 and November 20, 2014, PS Fund 1 sold all of the 2,242,560 shares of Common Stock allocated to Valeant USA." *Id.* ¶ 34. Proceeds of almost $400 million in profits were paid to Valeant to satisfy the provision in the Relationship Agreement requiring that if a third party outbid Valeant, then the parties would allocate 15% of PS Fund 1's net profits to Valeant. *Id.*; Pls. Reply to Per. SUF No. 173; Feb. 25 Relationship Agreement § 3(a); *see also* Per. SUF No. 37. Allergan's stock price continued to rise, and on March 16, 2015, the day before Actavis announced that it had completed its merger with Allergan, the stock price for Allergan closed at $240.22, more than $100 above the prices at which the stocked closed in the period when PS Fund 1 was accumulating its stake in Allergan.

## II. PROCEDURAL HISTORY

Many of the facts and issues raised in this case first came before the Court in *Allergan, Inc. v. Valeant Pharms. Int'l, Inc.* ("*Allergan I*"), a case brought by Allergan and one of its shareholders on August 1, 2014, against both Valeant and Pershing entities. Case No. SA CV 14-1214-DOC (ANx). In its Order Granting in Part Plaintiffs' Motion for Preliminary Injunction in *Allergan I*, this Court discussed for the first time some of the issues raised in the

instant motions for summary judgment. *See Allergan, Inc. v. Valeant Pharms. Int'l, Inc.*, No. SACV 14-1214 DOC ANX, 2014 WL 6504539 (C.D. Cal. Nov. 4, 2014) ("PI Order").

The instant suit was filed on December 16, 2014, shortly after this Court issued the PI Order in *Allergan I*. *See* Complaint (Dkt. 1). After the Court appointed Ohio STRS and Iowa PERS as Lead Plaintiffs (Dkt. 57), Plaintiffs filed an Amended Complaint (Dkt. 60). On August 7, 2015, Defendants filed a Motion to Dismiss Plaintiff's Amended Complaint (Dkt. 71). On November 9, 2015, the Court denied Defendants' Motion to Dismiss in full ("MTD I Order") (Dkt. 102). On April 21, 2016, Plaintiffs filed a Second Amended Complaint ("SAC") (Dkt. 138). On May 23, 2016, Pershing Defendants filed a Motion to Dismiss Second Amended Complaint as it relates to the New Pershing Defendants (Dkt. 146).[4] On August 5, 2016, the Court denied Pershing Defendants' Motion to Dismiss in full ("MTD II Order") (Dkt. 200).

In the Second Amended Complaint, Plaintiffs bring three claims. *See generally* SAC. First, Plaintiffs allege that all Defendants violated § 14(e) of the Securities Exchange Act ("Exchange Act") and corresponding Rule 14e-3, which prohibits trading while in possession of nonpublic material information in connection with a tender offer. *Id*. ¶¶ 196–207. Second, Plaintiffs allege that all Defendants violated § 20A(a) of the Exchange Act. *Id*. ¶¶ 208–15. Third, Plaintiffs allege that Pershing Square, PS Management, PSGP, Ackman, and Pearson are liable under § 20(a) of the Exchange Act for the alleged violations of Section 20A and Rule 14e-3, because Pershing Square, PS Management, PSGP, and Ackman acted as "controlling persons of PS Fund 1, PSLP, PS II, PS International, and PS Holdings within the meaning of Section 20(a) of the Exchange Act," and because Pearson was similarly "a controlling person of Valeant." *Id*. ¶¶ 216–26.

On July 10, 2017, the Valeant Defendants and the Pershing Defendants filed their respective Motions for Summary Judgment, and also joined in each other's Motions. *See* Val. Notice of Motion (Dkt. 394) at 2 ("The Valeant Defendants also join fully in the separately filed motion for summary judgment of the Pershing Square Defendants."); Per. Notice of

---

[4] The Second Amended Complaint added several new Pershing entities as defendants, namely Pershing Square, L.P.; Pershing Square II, L.P.; Pershing Square GP, LLC; Pershing Square International; and Pershing Square Holdings, Ltd. *See* SAC at 1. The Amended Complaint had only named Pershing Square Capital Management, L.P.; PS Management GP, LLC; William Ackman; and PS Fund 1, LLC as the Pershing Defendants. *See* Am. Compl. at 1.

Motion (Dkt. 395) at 2 ("The Pershing Square Defendants also join the separately filed summary judgment motion filed by the Valeant Defendants."). On July 11, Plaintiffs filed their Motion for Partial Summary Judgment. On August 14, 2017, the Valeant and Pershing Defendants jointly opposed Plaintiffs' Motion ("Defs. Opp'n to Pls. MSJ") (Dkt. 456). Also on August 14, 2017, Plaintiffs opposed the Valeant Defendants' Motion ("Opp'n to Val. MSJ") (Dkt. 457), and on August 15, 2017, Plaintiffs opposed the Pershing Defendant's Motion ("Opp'n to Per. MSJ") (Dkt. 459). On September 11, 2017, Pershing Defendants replied ("Per. Reply") (Dkt. 513), and Valeant Defendants replied ("Val. Reply") (Dkt. 514). On September 12, 2017, Plaintiffs also replied in support of their Motion ("Pls. Reply") (Dkt. 519). On October 9, 2017, Plaintiffs filed various "Corrected Documents Submitted in Connection with the Parties' Motions for Summary Judgment" (Dkt. 547). The Court heard oral argument on the Motions on December 8, December 11, December 12, and December 14, 2017 (Dkts. 573–76).

### III.   LEGAL STANDARD

Summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is to be granted cautiously, with due respect for a party's right to have its factually grounded claims and defenses tried to a jury. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). A court must view the facts and draw inferences in the manner most favorable to the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1992); *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1161 (9th Cir. 1992). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact for trial, but it need not disprove the other party's case. *Celotex*, 477 U.S. at 323. When the non-moving party bears the burden of proving the claim or defense, the moving party can meet its burden by pointing out that the non-moving party has failed to present any genuine issue of material fact as to an essential element of its case. *See Musick v. Burke*, 913 F.2d 1390, 1394 (9th Cir. 1990).

Once the moving party meets its burden, the burden shifts to the opposing party to set out specific material facts showing a genuine issue for trial. *See Liberty Lobby*, 477 U.S. at

248–49. A "material fact" is one which "might affect the outcome of the suit under the governing law . . . ." *Id.* at 248. A party cannot create a genuine issue of material fact simply by making assertions in its legal papers. *S.A. Empresa de Viacao Aerea Rio Grandense v. Walter Kidde & Co., Inc.*, 690 F.2d 1235, 1238 (9th Cir. 1982). Rather, there must be specific, admissible evidence identifying the basis for the dispute. *Id.* The court need not "comb the record" looking for other evidence; it is only required to consider evidence set forth in the moving and opposing papers and the portions of the record cited therein. Fed. R. Civ. P. 56(c)(3); *Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001). The Supreme Court has held that "[t]he mere existence of a scintilla of evidence . . . will be insufficient; there

## IV. DISCUSSION

Plaintiffs seek summary judgment on all their claims as to Defendants' liability, claiming that the jury need only decide damages. Pls. MSJ at 2. The Valeant Defendants move for summary judgment in their favor as to Plaintiffs' Second Amended Complaint in its entirety, on two grounds: (1) Plaintiffs cannot show Defendants had taken a "substantial step or steps to commence . . . a tender offer" at the time of the challenged trades in Allergan stock, which is a crucial element of the claims against Defendants, and (2) Plaintiffs have failed to prove loss causation, as required by the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4. Val. MSJ at 1–2. In addition, the Valeant Defendants ask the Court to rule as matter of law that the statutory damages cap must be set with reference to a particular date. The Pershing Defendants also move for summary judgment on all of Plaintiffs' claims for relief, arguing that Plaintiffs cannot prove liability because (1) Pershing Square was a co-offeror not subject to Rule 14e-3, and (2) Pershing Square was as an agent obtaining Allergan shares on behalf of Valeant, thus falling within an exception to Rule 14e-3. Per. MSJ at 1. The Court will address each issue in turn.[5]

---

[5] Because the Valeant Defendants joined the Pershing Defendants' Motion for Summary Judgment and vice versa, the Court will refer to "Defendants' arguments" generally, rather than distinguishing in the text of its discussion from which Motion (the Valeant MSJ or the Pershing MSJ) the contention was drawn.

## A. Rule 14e-3 Claims Against All Defendants

Plaintiffs bring a claim for violations of section 14(e) of the Williams Act, and in particular of Rule 14e-3 promulgated thereunder, against both the Valeant and Pershing Defendants. SAC ¶¶ 196–207; *see* 15 U.S.C. § 78n(e); 17 C.F.R. § 240.14e–3. Section 14(e) of the Williams Act prohibits "fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer . . . ." 15 U.S.C. § 78n(e). Under Rule 14e-3(a), once an "offering person" "has taken a substantial step or steps to commence . . . a tender offer, . . . any other person who is in possession of material information relating to such tender offer" that he "knows or has reason to know is nonpublic" and that he "knows or has reason to know has been acquired directly or indirectly" from the offering person must either abstain from trading or disclose the information to the public before trading. 17 C.F.R. § 240.14e-3(a). Failure to comply with this "abstain or disclose" rule constitutes a prohibited "fraudulent, deceptive or manipulative act or practice within the meaning of section 14(e) of the [Williams] Act." *Id.*; *see* 15 U.S.C. § 78n(e). Relatedly, Rule 14e-3(d) makes it unlawful for an "offering person" to communicate "material, nonpublic information relating to a tender offer to any other person under circumstances in which it is reasonably foreseeable that such communication is likely to result in a violation of this section." 17 C.F.R. 240.14e-3(d).

In this case, Plaintiffs allege that Valeant was an "offering person" who communicated to Pershing—an "other person"—material, nonpublic information about its tender offer for Allergan shares, in violation of Rule 14e-3(d). SAC ¶ 202. Plaintiffs allege that Pershing, in turn, violated Rule 14e-3(a) by trading on that information, without making the required disclosures, after Valeant had taken "substantial steps" to commence its tender offer for Allergan shares. *Id.* ¶ 203. In their Motion, Plaintiffs move for summary judgment on the various elements of their Rule 14e-3 claims, arguing that: (1) Pershing was an "other person" prohibited from trading under Section 14(e) of the Securities Exchange Act of 1934 and Rule 14e-3(a) promulgated thereunder; (2) Valeant took a substantial step or steps to commence a tender offer prior to Pershing purchasing or causing the purchase of Allergan securities; (3) Pershing possessed material information relating to such a tender offer that it knew was

nonpublic and acquired directly from Valeant, the "offering person"; (4) Valeant communicated material, nonpublic information relating to a tender offer to Pershing under circumstances in which it was reasonably foreseeable that Pershing would trade; and (5) Pershing "caused" Nomura's Allergan common stock purchases. *See* Pls. MSJ at 1–29.

The Pershing Defendants move for summary judgment in Defendants' favor on these claims on the basis that: (1) Pershing was a "co-offeror" (i.e. an "offering person" together with Valeant rather than an "other person"), and thus is not subject to liability for failing to "abstain or disclose" under Rule 14e-3; and (2) Pershing was an agent obtaining Allergan shares on behalf of Valeant and thus falls within the exception to the "abstain or disclose" rule created in 14e-3(c)(1). *See* Per. MSJ at 7–20. The Valeant Defendants also move for summary judgment in Defendants' favor on Plaintiffs' Rule 14e-3 claims, arguing that "Plaintiffs have adduced insufficient evidence to show that Valeant or Pershing had taken any 'substantial step or steps to commence . . . a tender offer' when PS Fund 1 traded in Allergan stock, as required under SEC Rule 14e-3." Val. MSJ at 1; *see id.* at 5–15. The Court will address each element of Plaintiffs' Rule 14e-3 claims in turn.

### 1. Offering Person

Both Plaintiffs and Defendants seek summary judgment on the issue of whether Pershing is an "other person" prohibited, under Rule 14e-3(a), from trading on material nonpublic information about a tender offer. Pls. MSJ at 2; Per. MSJ at 1. Defendants claim that Pershing is a "co-offering person" rather than an "other person" under Rule 14e-3(a), and is therefore not covered by that provision's proscription against trading. Per. MSJ at 7–16. Plaintiffs, on the other hand, argue that because only Valeant—not Pershing—offered to buy Allergan shares as part of the tender offer, only Valeant—not Pershing—can be an "offering person" under Rule 14e-3, which means that Pershing is an "other person" liable for its trading. Pls. MSJ at 6–13; *see* 17 C.F.R. § 240.14e-3(a) ("If any person has taken a substantial step or steps to commence, or has commenced, a tender offer (the "*offering person*"), it shall [be illegal] for *any other person* . . . ." (emphasis added)).

Because Pershing's status as an "other" or "offering" person has been hotly disputed throughout this case and in *Allergan I*, the Court has discussed the issue in prior orders. In its preliminary injunction order in *Allergan I*, the Court determined that, although Rule 14e-3's "offering person" encompasses the possibility that two or more persons can act together as "co-offering persons" to make a tender offer, Plaintiffs had raised serious questions as to whether Pershing was in fact a co-offering person. PI Order at *10, *13. The Court explained that if the co-offering person exception is not to swallow the rule, "there must be certain characteristics that distinguish a co-offering person from 'any other person' for Rule 14e-3 purposes." *Id.* at *11. The task now before the Court is determining what those characteristics are—in other words, who qualifies as an "offering person" under Rule 14e-3. For the reasons set forth below, including the purpose, history, and text of Rule 14e-3, the Court holds that an "offering person" is the person actually offering to purchase, and seeking to acquire ownership of, shares in a tender offer.

First, effecting the purpose of Rule 14e-3 and the Williams Act requires narrowly defining "offering person" in order to restrict the number of persons allowed to trade on insider information about tender offers. The SEC made the impetus for Rule 14e-3 clear at the time of the rule's adoption: the SEC had "serious concerns" about trading by persons in possession of material nonpublic information relating to a tender offer, because the "practice results in unfair disparities in market information." Tender Offers, 45 Fed. Reg. 60,410, 60,412 (Sept. 12, 1980) ("SEC Adopting Release"). In particular, the SEC sought to address the practice of "warehousing" (the practice of the tender offeror intentionally leaking information to institutional investors to allow those other entities to make early trades before other investors heard about the tender offer), because such a practice is unfair to investors who are trading at an informational disadvantage. *Id.*; Tender Offers, 44 Fed. Reg. 9956, 9976–77 (Feb. 15, 1979) ("Proposed Rule 14e-2"); *see also Chiarella v. United States,* 445 U.S. 222, 234 (1980) (noting that the SEC promulgated Rule 14e-3 to prevent warehousing). The SEC explained that insider trading in this context is unfair to investors because

[s]ecurity holders who purchase from or sell to [persons with material nonpublic information relating to a tender offer] are effectively denied the benefits of disclosure and the substantive protections of the Williams Act. If furnished with the information, these security holders would be able to make an informed investment decision, which could involve deferring the purchase or sale of the securities until the material information had been disseminated or until the tender offer had been commenced or terminated.

SEC Adopting Release at 60,412. Thus, the SEC determined that Rule 14e-3 was "necessary and appropriate in the public interest and for the protection of investors." *Id.* at 60,413.[6]

To effect Rule 14e-3's purpose of protecting investors from being exploited by those with insider information, the SEC sought to ensure that the "abstain or disclose" rule applied broadly so as to restrict insider trading to the greatest extent feasible. For example, the rulemaking history shows that the SEC was so concerned about trading on confidential information in connection with a tender offer that it originally proposed prohibiting trading by the "bidder" itself, and only dropped the proposal because of concerns that it would foreclose certain widely used acquisition techniques, among other problems. Proposed Rule 14e-2 at 9976–78, 9988; Tender Offers, 44 Fed.Reg. 70,326, 78,338 (Dec. 6, 1979) ("Proposed Rule 14e-3"). However, the SEC noted that it remained "concerned by purchases by bidders after the determination to make a tender offer has been made . . . ." Proposed Rule 14e-3 at 70,338.  Next, the SEC's decision to prohibit "any other person" from trading, despite the fact that such broad language required crafting limited exceptions for an offering person's broker or agent, also evinces the SEC's desire that Rule 14e-3 sweep widely. See 17 C.F.R. §§ 240.14e-3(a), 240.14e-3(c). Finally, the SEC explicitly broadened Rule 14e-3 to cover any material information related to a

---

[6] Defendants argue that the Court should essentially ignore Rule 14e-3's underlying purpose in defining "offering person" because the advent of the "poison pill" has made concerns about warehousing "antiquated." *See* Per. MSJ at 20–21; Defs. Opp'n to Pls. MSJ at 3. However, the fact that completing a tender offer is made more difficult by poison pills does not obviate the need to protect against insider trading relating to tender offers. Because tender offers generally involve a price premium, if a target's board approves the offer, the original concerns about unfair information disparities resulting in quick profits for the person who trades on inside information still remain. *See* Pls. Reply at 9; Opp'n to Per. MSJ at 33. Moreover, changes in merger and acquisition practice since the adoption of Rule 14e-3 do not provide a basis for the Court to ignore the intent or purpose of the rule and essentially rewrite the rule to make it more compatible with Defendants' view of current practices in the securities markets. Rather, if the SEC or Congress believe that the rule is antiquated and needs amending, they—not the Court—are the actors who should make such amendments.

-26-

tender offer—rather than only information that the offering person would make a tender offer for the subject securities—"[d]ue in part to its concern that the scope of [the earlier proposed version of the rule] was not sufficiently broad to reach other aspects of the misuse of material, nonpublic information relating to a tender offer . . . ."[7] Proposed Amendments to Tender Offer Rules, 44 Fed Reg. 70,349, 70,353 (Dec. 6, 1979) ("Proposed Amendments"); *see also* SEC Adopting Release at 60,411. Thus, both the text of Rule 14e-3(a) and its rulemaking history and accompanying explanation show that the SEC intended that the rule have a broad sweep—in other words, that essentially all entities and persons be subject to the "abstain or disclose" rule.[8] A narrow interpretation of the term "offering person" bests accords with this intent by limiting the class of persons who can avoid liability by claiming to be an "offering person" who is exempt from the rule rather than an "other person" who is subject to the "abstain or disclose" requirement.

In part for this reason, the Court previously endorsed Plaintiffs' argument that "an offering person should be more than a financier, and should actually make an offer to purchase shares and should have some degree of control over the terms of the tender offer and over the surviving entity." MTD I Order at 19–20; PI Order at *12. The Court noted that these elements are included among the factors used by the SEC to determine whether someone is a "bidder" or "offeror" who is required to file certain disclosures.[9] PI Order at *12. Seizing on this similarity

[7] The SEC explained that it had been hesitant to promulgate a fixed definition for the term "tender offer" because of "the dynamic nature of these transactions and the need for the Williams Act to be interpreted flexibly in a manner consistent with its purposes to protect investors." Proposed Amendments to Tender Offer Rules, 44 Fed Reg. 70,349, 70,349. Nevertheless, despite the fact that parties had been structuring tender offers creatively in an attempt to avoid the Williams Act, in the SEC's judgment, "tender offers, however packaged, are subject to the provision of the Williams Act and are required to be effected in accordance with its provisions." *Id.* In other words, the SEC thought the Williams Act should apply broadly (to various different kinds of "tender offers") so as to afford the maximum protection to investors.
[8] As discussed above, the SEC begrudgingly made a narrow exception for the person making the tender offer because of various concerns about the practicality of imposing liability on such persons.
[9] For example, each bidder in a tender offer subject to Regulation 14D must file a Schedule TO and disseminate the information required by that schedule. For disclosure purposes, the SEC defines a "bidder" as "any person who makes a tender offer or on whose behalf a tender offer is made." SEC Regulation M–A; 17 C.F.R. § 229.1000(d); Rule 14d1 (g)(2); 17 C.F.R. 240.14d1 (g)(2). When the SEC analyzes "bidder" status for Regulation 14D purposes, the staff consider factors such as:

    • Did the person play a significant role in initiating, structuring, and negotiating the tender offer?
    • Is the person acting together with the named bidder?
    • To what extent did or does the person control the terms of the offer?
    • Is the person providing financing for the tender offer, or playing a primary role in obtaining financing?

of factors, Defendants renew their argument that anyone who is a "bidder" under disclosure rules is also an "offering person" under Rule 14e-3. *See* Defs. Opp'n to Pls. MSJ at 5; Per. MSJ at 8–9, 14. However, for the reasons discussed below, the Court rejects such a test.[10]

First, while similar factors may inform whether someone is a "bidder" or an "offering person," the determination that someone should be labeled a "bidder" for disclosure purposes does not mean they should necessarily be considered an "offering person" who is exempt from the "abstain or disclose" rule. Indeed, while the SEC often seeks to interpret "bidder" broadly under the disclosure rules so as to effect those rules' purpose of requiring broad disclosures, effecting Rule 14e-3's purpose of limiting the universe of persons permitted to trade on inside information requires interpreting "offering person" narrowly. *See* PI Order at *12 (noting that the SEC, when determining if someone is a bidder for disclosure purposes, "considers whether adding a person as a named bidder for Regulation 14D purposes would result in more material information being disclosed to shareholders"). Thus, while the words "bidder" and "offering person" may seem analogous as a general matter, when considering the specific context of those terms' use in SEC rules and the legal effects of a determination that an entity is an "offering person" or a "bidder," it is clear that the SEC did not intend for a "bidder" to be equivalent to an "offering person" under SEC rules.[11]

---

• Does the person control the named bidder, directly or indirectly?
• Did the person form the nominal bidder, or cause it to be formed?, and
• Would the person beneficially own the securities purchased by the named bidder in the tender offer or the assets of the target company?

One or two of these factors may control the determination, depending on the circumstances. These factors are not exclusive.

We also consider whether adding the person as a named bidder means shareholders will receive material information that is not otherwise required under the control person instruction . . . .

In addition, we would consider the degree to which the other party acted with the named bidder, and the extent to which the other party benefits from the transaction.

Excerpt from Current Issues and Rulemaking Projects Outline (Nov. 14, 2000), § II.D.2. Mergers & Acquisitions—Identifying the Bidder in a Tender Offer, http://www w.sec.gov/divisions/corpfin/guidance/ci111400ex_tor.htm.
[10] Although the Court in *Allergan I* considered the "bidder" factors, the Court now determines that those factors do not constitute the test for whether someone is an "offering person."
[11] At oral argument, Defendants pointed out that several treatises and other publications sometimes used of the word "bidder" to refer to the "offering person" in the context of Rule 14e-3, and argued that this was evidence that being labeled a bidder for SEC disclosure purposes meant that Pershing was also an "offering person" under Rule 14e-3. However, none of the treatises to which Defendants pointed contained any language explicitly stating such a conclusion. Moreover, those treatises' use of the word "bidder" has a simple explanation: the plain and ordinary meaning of "bidder" in the tender offer context *is* the person who makes the tender offer bid, i.e. the offering person. However, under its disclosure rules, the SEC defines "bidder"

In fact, equating a "bidder" under the disclosure rules with an "offering person" under the "abstain or disclose" rule could in some cases create a strange result. For example, let's say the SEC decided to list a person who was not the person actually offering to buy shares in a tender offer as a co-bidder, in part because that listing would require the person to disclose material information to shareholders.[12] Defendants' assertion that a "bidder" should always be equated with an "offering person" would mean that the very person that the SEC had determined should *disclose to shareholders the material information in their possession* would not be required to abstain from trading without first *disclosing the material information in their possession*. In other words, the people most likely to possess insider information—those involved with the tender offer—would not be covered by the rule against trading on insider information relating to a tender offer. This cannot be correct—such an outcome would undermine the very purpose of Rule 14e-3(a).[13] In addition, it could create a perverse incentive:

---

more broadly to ensure broad disclosures of material information. *See* 17 C.F.R. § 240.14d-1(g)(2). It was only in 2000—after many entities and publications had already been using the word "bidder" in its ordinary sense as referring to the person who makes the tender offer bid, i.e. the offering person—that the SEC issued its co-bidder guidance. *See* Excerpt from Current Issues and Rulemaking Projects Outline (Nov. 14, 2000), § II.D.2. Mergers & Acquisitions—Identifying the Bidder in a Tender Offer, http://www.sec.gov/divisions/corpfin/guidance/ci111400ex_tor.htm. The SEC explained that, in terms of who must file a Schedule TO to make certain disclosures, "[t]he determination of who is the bidder does not necessarily stop at the entity used to make the offer and purchase the securities." *Id.* Further, "it . . . would be possible for other parties involved with the offer to be co-bidders," and to make the co-bidder determination the SEC "would consider the degree to which the other party acted with the named bidder, and the extent to which the other party benefits from the transaction." *Id.* Thus, for the purposes of its own disclosure rules, the SEC expanded the definition of "bidder" beyond the term's ordinary meaning, in essence creating a legal fiction category of entities labeled "co-bidders" who were required to disclose information even though they were not in fact the "real bidder." *See id.* ("Each offer must have at least one real bidder, and there can be co-bidders as well."). However, nowhere does the SEC state that the expansion of the term "bidder" for disclosure purposes is meant to expand the term "offering person" under Rule 14e-3 in a similar fashion. In fact, although PS Fund 1 was listed in the Schedule TO as "as a person that is considered a co-bidder for SEC purposes," in its Comment Letter the SEC asked why PS Fund 1 had not violated Rule 14e-3, suggesting that the SEC does not view status as a "co-bidder" for disclosure purposes as sufficient to avoid liability under Rule 14e-3. *See* Schedule TO at 3; SEC Comment Letter at 2.
[12] Notably, the SEC recognizes that the term "bidder" for disclosure purposes can encompass entities other than the entity that actually makes the tender offer and purchases the securities. *See* Excerpt from Current Issues and Rulemaking Projects Outline (Nov. 14, 2000), § II.D.2. Mergers & Acquisitions—Identifying the Bidder in a Tender Offer, http://www.sec.gov/divisions/corpfin/guidance/ci111400ex_tor.htm (distinguishing between the "real bidder" and other "co-bidders" and noting that it "would be possible for other parties involved with the offer to be co-bidders"). This demonstrates the potentially broad definition of "bidders," and demonstrates why all "bidders" should not be categorized as "offering persons" exempt from liability under Rule 14e-3(a) if that rule is to effectively protect investors from insider trading.
[13] For this reason, the fact that the SEC listed Pershing as a "co-bidder" for disclosure purposes does not mean it is an "offering person" under Rule 14e-3(a). *See* Per. MSJ at 8 ("[T]he SEC directed the parties to identify Pershing Square 'as a co-bidder in the tender offer' on the cover page of the Schedule TO . . . ."). In fact, it makes sense that the SEC sought to require disclosure of Pershing's 9.7% stake in Allergan and its cooperation with Valeant, because shareholders could certainly consider such information to be material. Moreover, given that Defendants identified Pershing as a "co-bidder" in the Relationship Agreement, it is logical that the SEC accepted this voluntary characterization to the extent that it meant Pershing would be subject to particular disclosure requirements. What would not be logical, however, is equating the SEC's decision that Pershing should make certain disclosures with a decision that Pershing should not be liable as an "other person" under the "abstain or disclose" rule. In fact, as discussed above, the SEC asked—in the very same comment letter in which it

-29-

if an entity was exempt from the "abstain or disclose" rule (by way of being deemed an "offering person") as soon as the SEC determined that the entity was a "co-bidder" for disclosure purposes, the entity could, right after being named a co-bidder, trade on any insider information in its possession with impunity.

Moreover, nowhere in the text of Rule 14e-3(a) is there any indication that "offering person" was intended to refer to anyone other than the person actually offering to purchase shares in a tender offer. *See* 17 C.F.R. § 240.14e-3(a). In fact, the provision's imposition of liability on "*any* other person" suggests the opposite, i.e. that "offering person" is not intended to encompass anyone but the person offering to acquire shares. *See id.* (emphasis added). For the foregoing reasons, the Court refuses to rule that any entity named as a co-bidder for disclosure purposes is by definition an "offering person" for the purposes of Rule 14e-3.

Similarly, the Court is unpersuaded by Defendants' argument that Pershing falls within the express definition of "offering person" provided in the text of Rule 14e-3 simply because Pershing took a substantial step or steps toward a tender offer. *See* Defs. Opp'n to Pls. MSJ at 2. Defendants point the Court to the following text in Rule 14e-3(a): "If any person has taken a substantial step or steps to commence, or has commenced, a tender offer (the 'offering person') . . . ." They argue that this language provides an explicit definition for "offering person" that encompasses "any person [who] has taken a substantial step or steps to commence . . . a tender offer." Defs. Opp'n to Pls. MSJ at 2. Defendants claim that Pershing falls within this definition because Pershing acted together with Valeant to take a host of substantial steps, including:

- Pershing Square and Valeant met and discussed working together on a potential acquisition attempt for Allergan
- Pershing Square and Valeant negotiated the terms of a confidentiality agreement and a relationship agreement to govern and facilitate a possible joint acquisition attempt for Allergan

---

directed Pershing to list itself as "a co-bidder in the tender offer"—why PS Fund 1's purchase of a 9.7% stake in Allergan did not violate Rule 14e-3, which indicates that the SEC did not view co-bidder status under disclosure rules as exempting entities from liability under Rule 14e-3. *See* SEC Comment Letter at 1–2.

- Pershing Square and Valeant together entered into the Relationship Agreement . . . and carried out the obligations established thereunder

- Pershing Square and Valeant discussed potential acquisition tactics, strategies, and a timeline for a possible combination attempt

- Pershing Square and Valeant both conducted analyses of a combined Allergan-Valeant company

- Pershing Square and Valeant both engaged and consulted third-party advisors concerning a potential Allergan acquisition attempt

Defs. Opp'n to Pls. MSJ at 5–6 (citations omitted). However, the Court previously rejected the argument that "because Pershing 'took a host of steps' that were similar in nature to the steps taken by Valeant, it should be considered an 'offering person' per the definition provided in Rule 14e-3." MTD Order I at 19. The Court explained that an "offering person should be more than a financier, and should actually make an offer to purchase shares and should have some degree of control over the terms of the tender offer and over the surviving entity." *Id.* In other words, taking steps to facilitate another person's tender offer, as Pershing did here, is insufficient without more to make an entity an "offering person" under Rule 14e-3, because the Court "doubt[s] that Congress and the SEC meant for these factors to be sufficient to exempt an entity like Pershing Square from the "disclose or abstain" rule . . . ."' *Id.* at 20. Defendants do not provide any compelling argument now to reverse course.[14]

Moreover, Defendants read the language of 14e-3(a) too broadly, and in fact, the text of the statute forecloses the very interpretation Defendants say it compels. In claiming that Pershing qualifies as a person who has "taken a substantial step or steps to commence a tender offer," Defendants implicitly argue that such language broadly encompasses anyone, even a

---

[14] Pershing argued at the hearing that the Court would actually narrow the reach of Rule 14e-3(a) by reading offering person narrowly, because doing so limits the class of persons who can trigger the rule by taking substantial steps. That is, under the Court's reading that "offering person" is the person who plans to make the tender offer, the rule would only be triggered by the person who is to make the tender offer taking substantial steps to do so (as opposed to some other person taking substantial steps). However, Defendants do not specify any substantial steps that a person other than the one who will make the tender offer can take toward a tender offer before the would-be commencer takes any steps, and indeed this idea seems somewhat illogical. The Court can think of no substantial step that would be taken by a person toward another person's tender offer before the person planning the tender offer takes any substantial steps. This argument might be clever, but is unavailing.

person who does not ultimately make the tender offer, as long as the person has taken substantial steps to bring about another person's tender offer. However, the grammatical construction of the phrase makes clear that the person taking the substantial steps is the same person that ultimately commences the tender offer—that is, that the person taking substantial steps is the future commencer, the person who will make a tender offer and purchase shares. Specifically, the phrase "if any person has taken a substantial step or steps to commence, or has commenced" has only one subject (the "person"), to which all the verbs refer. "Steps to commence" is used in the sense of "steps in order to commence" (that is, steps toward achieving the specified end of commencing a tender offer). Since no second subject is introduced, the phrase is best read as meaning "any person [who] has taken a substantial step or steps toward their commencing a tender offer."[15] [16] This reading is further supported by the Rule's reference to "*the* offering person," which implies there is one offering person.

This reading, limiting the term "offering person" to the person ultimately commencing the offer, not only accords with the plain meaning of "offering person" (i.e. the one making the offer), but also coheres with Rule 14e-3's broader text and SEC publications describing the rule and its history. First, if the term "offering person" encompassed any person—even a person who is not the one ultimately *offering* to buy shares—who took substantial steps to bring about a tender offer, then the term could include officers or board members of the offering company, as long as they worked on the tender offer and took substantial steps to help the offering person commence it. However, allowing such persons to qualify as "offering persons" exempt from Rule 14e-3's proscription against trading would be to allow a classic form of insider trading.[17]

---

[15] Nor is "commence" written in passive voice (i.e. "steps toward the commencement of a tender offer") such that it could reasonably be read to refer to commencement of a tender offer by someone other than the person taking substantial steps.

[16] Defendants claimed at oral argument that the Court was ignoring the word "any." But as the interpretation that an offering person is *any* person who has taken a substantial step or steps toward their commencing a tender offer shows, the Court is not reading out the word "any." Rather, "any" refers to the notion that the Rule covers substantial steps by any person who will commence a tender offer—it is not limited to some specific subclass of people who will commence a tender offer.

[17] At oral argument, Defendants argued that their reading of the Rule—that an offering person could be "*any* person who takes substantial steps"—would not create a loophole for directors and officers of the offering person who were helping with the tender offer and thus taking substantial steps, because according to Defendants the offering person is limited to those who are a "principal participant" in the tender offer. However, nowhere in the rule is any mention made of a "principal participant," and reading that language into the rule undermines the very argument, made by Defendants, that "any person means any person." With their "principal participant" construction, Defendants would do what they accuse the Court of doing— impermissibly rewrite the Rule.

Moreover, the text of the provision itself distinguishes between such persons and the offering person when listing as potential sources of insider information the offering person and "[a]ny officer, director, partner or employee or any other person acting on behalf of the offering person." 17 C.F.R. § 240.14e-3(a)(3). Similarly, Rule 14e-3(d)(1) imposing "tipper" liability includes an exception for a communication made in good faith to "the officers, directors, partners or employees of the offering person, to its advisors or to other persons, *involved in the planning, financing, preparation or execution of such tender offer* . . . ." 17 C.F.R. § 240.14e-3(d)(1)(i) (emphasis added). Thus, the text of Rule 14e-3 specifically recognizes that there are people who may be acting on behalf of the offering person, or aiding the offering person with the execution of the tender offer (even taking substantial steps toward execution, one might say), but the text nevertheless treats those people as distinct from the offering person and thus sensibly does not exclude them from liability for insider trading.[18] *See id.*

In addition, language in official SEC releases discussing Rule 14e-3 during the rulemaking process suggests that the SEC conceived of the "offering person" as the person who ultimately makes the tender offer. For example, in the Adopting Release the SEC noted that, in contrast to the earlier "proposed rule which would have prohibited the purchase of subject company securities by a *bidder which had determined to make a tender offer* therefor but had not yet publicly announced its intention to do so, Rule 14e-3(a) does not proscribe trading by the offering person." SEC Adopting Release at 60,411 & n.2. This direct comparison reflects the SEC's view that an "offering person" is the one who "make[s] a tender offer." *Id.* This view is further supported by the SEC's explanation of its decision to include the substantial steps standard in the final rule:

> Unlike the November proposal, which was triggered by the determination
> by the bidder *to make* a tender offer, Rule 14e-3(a) is triggered by any
> person taking a substantial step or steps to commence a tender offer. . . .

---

[18] In fact, the SEC viewed even agents purchasing securities on behalf of the offering person as distinct from the offering person and thus at risk of liability under Rule 14e-3(a), which prompted the SEC to adopt a limited exception to the Rule for agents and brokers. *See* 17 C.F.R. § 240.14e-3(c)(1); SEC Adopting Release at 60,416 ("As adopted, Rule 14e-3(a) applies to any person and since the broker or the offering person's agent is a person within the meaning of paragraph (a), the exception is necessary for the offering person to consummate lawful purchases . . . .").

This provision addresses the commentators' concern with the difficulty of identifying when a person has actually determined *to make a tender offer* by replacing that standard with the one in the rule as adopted.

*Id.* at 60,413 n.33 (emphasis added). Thus, the substantial steps standard was adopted to avoid the difficulty of ascertaining when a person had determined to potentially make a tender offer. This reinforces the notion that the term "offering person" in the final rule refers to the person who will make the tender offer, and that "has taken . . . substantial . . . steps" was intended to be used to determine at what point in time Rule 14e-3's mandate to "abstain or disclose" is triggered—not to broaden the definition of "offering person" beyond those who actually make a tender offer.

Furthermore, the examples of "substantial steps" provided by the SEC show that the SEC believed that the steps would be taken by the person making the tender offer, i.e. that the SEC views the offering person as the one who will make the tender offer. Specifically, the SEC explained:

a substantial step or steps to commence a tender offer include, but are not limited to, voting on a resolution *by the offering person's board of directors* relating to the tender offer; the formulation of a plan or proposal to make a tender offer *by the offering person* or the person(s) acting on behalf of the offering person; or activities which substantially facilitate the tender offer such as: arranging financing for a tender offer; preparing or directing or *authorizing* the preparation of tender offer materials; or *authorizing* negotiations, negotiating or entering into agreements with any person to act as a dealer manager, soliciting dealer, forwarding agent or depository in connection with the tender offer.

SEC Adopting Release at n.33 (emphasis added). In this context, only the person who ultimately will make the tender offer can "authorize" actions relating to it, and only the board of directors of the entity that will make the tender offer need vote on a resolution to do so.

Thus, the SEC clearly imagined that the "offering person" who would take substantial steps is the person who will ultimately make the tender offer and offer to purchase shares.

For these reasons, the Court reaffirms its position that an "offering person" within the meaning of Rule 14e-3(a) is the person actually making a tender offer and acquiring shares. As the Court previously mentioned, beyond considering which entity actually directly purchases shares from stockholders, which entity can fairly be said to be the person "making the offer" and seeking to acquire shares may require emphasizing control factors such as control over the surviving entity, control over and identity with the named bidder, and potentially control over the terms of the offer. *See* PI Order at *12, MTD I Order at 20. For example, while AGMS was the acquisition vehicle through which tendered shares were to be purchased, Valeant can fairly be said to have been the "offering person" who was making the tender offer, because AGMS was a wholly-owned Valeant subsidiary—meaning that Valeant itself was effectively seeking to purchase and acquire the shares, albeit through AGMS—and Valeant would have controlled a combined Valeant/Allergan entity.

In contrast, Plaintiffs emphasize that Pershing—unlike Valeant—was not purchasing shares in the tender offer and would not have control over a combined Valeant/Allergan entity:

> The acquisition vehicle, AGMS, was a wholly owned Valeant subsidiary. Thus, Pershing had no financial or ownership interest in, or ability to control, AGMS. Nor would Pershing have had any control over a combined Valeant/Allergan entity, if the offer succeeded. Again, the entire purpose (and intended result) of the tender offer was to combine Valeant and Allergan (not Valeant, Allergan, and Pershing). Moreover, the Relationship Agreement gave Pershing **no managerial or governance role** in any potential combined company.

Pls. MSJ at 8–9 (citations omitted). While Defendants point to other ways in which Pershing contributed toward the tender offer and had some control over aspects of its relationship with Valeant and over Defendants' takeover plan, such evidence does not change the fact that Pershing never offered to buy any shares—in fact, it planned to *sell* its shares to the offeror—

and thus cannot be said to be an "offering person" who made a tender offer and sought to acquire shares. *See* Defs. Opp'n to Pls. MSJ at 11–14; Per. MSJ at 11–16; Form S-4 at 8 (explaining that "none of Pershing Square, PS Fund, or any of Pershing Square's affiliates is offering to acquire any shares of Allergan common stock in the offer"). In other words, even viewing in the light most favorable to Defendants the parties' factual dispute about the extent to which Pershing exercised control over the terms of the tender offer, Pershing does not qualify as an "offering person," because control over the terms, without more, is not enough. Rather, Rule 14e-3's text, purpose, and rulemaking history make clear than an "offering person" is the person who will actually commence the tender offer to purchase and acquire ownership of the shares to be tendered. This Pershing did not do.

For the foregoing reasons, the Court GRANTS Plaintiffs' Motion as to Pershing's status under Rule 14e-3(a). Pershing is an "other person" covered by the broad sweep of Rule 14e-3(a)'s prohibition against insider trading.

### 2. Broker or Agent Exception

Even if Pershing fails to qualify as a co-offeror, Defendants now argue for the first time that Pershing nevertheless is not subject to liability for its trading because Pershing falls within Rule 14e-3's "agent" exception. Per. MSJ at 16. Defendants point to Rule 14e-3(c), which provides that purchases of securities that would otherwise violate 14e-3(a)'s prohibition against insider trading are permissible if made "by a broker or by another agent *on behalf of* an offering person." 17 C.F.R. § 240.14e-3(c)(1) (emphasis added). Defendants claim PS Fund 1 purchased Allergan shares as an agent acting on Valeant's behalf, because Pershing and Valeant were working together as joint venturers and had established an agency relationship. *Id.*

However, Defendants' reading unreasonably seeks to expand the Rule's intended meaning of the term "on behalf of." The SEC's explanation of Rule 14e-3(c) demonstrates that the exception was created to protect agents or brokers through which the offering person purchases shares—not to protect agents or anyone else purchasing shares for themselves (or rather, for anyone but the offering person). Specifically, the SEC Adopting Release states that the broker or agent exception

addresses the concern by some commentators that a broker or other agent

making purchases on behalf of an offering person would violate the

[abstain or disclose] rule if the offering person disclosed material,

nonpublic information to such broker or agent. As adopted, Rule 14e-3(a)

applies to any person and since the broker or the offering person's agent is

a person within the meaning of paragraph (a), the exception is necessary *for*

*the offering person to consummate lawful purchases* . . . .

SEC Adopting Release at 60,416 (emphasis added); *see also id.* (noting that if other

securities rules are applicable, "*the offering person* would be unable to purchase the

securities notwithstanding that" the agent or broker exception applies). This language

evinces the SEC's conception of the exception as applying specifically to agents and

brokers purchasing securities "on behalf of" an offering person in the most direct sense—

essentially acting as an extension of, or proxy for, the offering person itself.

For example, if Valeant had employed a broker or agent to carry out the task of

purchasing shares for Valeant—meaning Valeant was to own them—that broker or agent would

have purchased "on behalf of" Valeant within the meaning of the exception. While Defendants

argue that Pershing, too, purchased shares as an "agent on behalf of Valeant" because the

purchases furthered the parties' joint interests in effecting Valeant's takeover of Allergan,

furthering joint interests is not enough. *See* Per. MSJ at 18–19. If purchasing securities to

further joint interests or to help the offering person successfully carry out their tender offer

were sufficient to satisfy the language "on behalf of an offering person," the agent exception

would explicitly allow warehousing. *See* at 70,354 n.35 (noting that "[a]mong the reasons given

for [bidders tipping institutional investors about proposed tender offers] was that, if the

institution established a position in the subject company's securities, the bidder could expect to

purchase such securities pursuant to the forthcoming tender offer" (citation omitted)). Since

Rule 14e-3 was explicitly designed to prohibit this practice, Defendants' suggested reading of

the agent exception cannot be correct. Further, for the same reasons discussed regarding the

"offering person" exemption from liability, reading the agent exception narrowly accords with

Rule 14e-3's broad prophylactic purpose. For these reasons, the Court interprets "on behalf of" as encompassing the notion of an offering person itself buying securities through a broker or agent.

To make clear that Pershing did not buy Allergan securities "on behalf of" Valeant in the direct sense required by the agent exception, Plaintiffs cite various pieces of evidence indicating that Pershing effected the purchases for its own gain. Plaintiffs explain:

> Defendants' own agreements provide that Pershing bought 98% of the toehold stake *for itself*, and made over $2 billion in profit *for itself*. The Relationship Agreement provided for this expressly, allocating to Valeant the "gain or loss" from only its comparatively minor $75.9 million contribution (*i.e.*, about 2% of PS Fund 1's purchases). Likewise, the Amended LLC Agreement required that PS Fund 1 "track" Valeant's 2% allocation, "along with all direct or indirect proceeds therefrom," "separately" from the 98% that Pershing owned.

Pls. Opp'n to Per. MSJ at 25 (citations omitted). These facts show that Pershing purchased Allergan shares on its own behalf, rather than for Valeant in the direct sense. That is, because Pershing maintained ownership over the shares it purchased, the purchases were not made "on behalf of" Valeant within the meaning of Rule 14e-3(c). Thus, while the parties vigorously dispute whether Pershing and Valeant had in fact established an agency relationship, *see* Pls. SUF No. 238; Pls. Opp'n to Per. MSJ at 26, that dispute is immaterial because irrespective of whether Pershing was Valeant's agent in a legal sense, Pershing does not qualify for the agent or broker exception because it did not purchase shares "on behalf of" Valeant in the direct sense contemplated by Rule 14e-3's broker exception.

For the foregoing reasons, Pershing did not purchase shares "on behalf of" Valeant as that term is used in Rule 14e-3(c). Accordingly, the Court DENIES Pershing's Motion as to its status under Rule 14e-3(c). Pershing does not fall within the broker or agent exception in Rule 14e-3(c) and thus is subject to liability for insider trading under Rule 14e-3(a).

### 3. Substantial Steps

Next, both Plaintiffs and Defendants move for summary judgment in their favor as to the substantial steps element of Rule 14e-3(a). Pls. MSJ at 14–22; Val. MSJ at 7–14. In order to trigger Rule 14e-3(a)'s "disclose or abstain" requirement, Valeant must have "taken a substantial step or steps to commence . . . a tender offer" before PS Fund 1 began purchasing Allergan equity. *See* 17 C.F.R. § 240.14e-3(a). Plaintiffs argue that Valeant's objective conduct, including holding board meetings and entering into the Relationship Agreement with Pershing, easily meets the standard for "substantial steps." Pls. MSJ at 14–16. Defendants, on the other hand, claim that because they had no intention to launch a tender offer until late May 2014, after Pershing had traded, any steps it took prior to Pershing's trading were not toward a tender offer and thus cannot satisfy the substantial steps requirement. Val. MSJ at 6–8.

First, as to the types of activities that may satisfy the standard, the SEC explained that

> a substantial step or steps to commence a tender offer include, but are not
> limited to, voting on a resolution by the offering person's board of directors
> relating to the tender offer; the formulation of a plan or proposal to make a
> tender offer by the offering person or the person(s) acting on behalf of the
> offering person; or activities which substantially facilitate the tender offer
> such as: arranging financing for a tender offer; preparing or directing or
> authorizing the preparation of tender offer materials; or authorizing
> negotiations, negotiating or entering into agreements with any person to act
> as a dealer manager, soliciting dealer, forwarding agent or depository in
> connection with the tender offer.

SEC Adopting Release at 60,413 n.33; *see also* Proposed Amendments at 70353 n.33. Courts have interpreted this list as only a list of examples and have found that other actions are also sufficient to constitute substantial steps. *E.g.*, *SEC v. Ginsburg,* 362 F.3d 1292, 1303 (11th Cir. 2004) (finding that a meeting between executives, followed by due diligence, a confidentiality agreement, and an awareness that "the deal had to go down fast" constituted substantial steps); *SEC v. Mayhew,* 121 F.3d 44, 53 (2d Cir. 1997) (finding that bidder and target

companies' representatives signing a confidentiality agreement and holding a series of confidential discussions regarding a possible merger, and retaining McKinsey to do financial analysis and come up with strategy for the combination constituted substantial steps).

The Court addressed this exact issue both earlier in this case and in *Allergan I*. After establishing that courts mainly look to the offering person's objective conduct to determine whether a "substantial step or steps" toward a tender offer were taken, the Court explained:

> Here, the Court must determine whether a substantial step was taken toward a tender offer before PS Fund 1's purchases of Allergan stock between February 25 and April 21, 2014. Before February 25, Valeant's board of directors met multiple times and discussed a potential combination with Allergan. Board meeting materials reflect that Valeant knew there was a high likelihood that a transaction with Allergan would involve a "[h]ostile cash and stock merger." Valeant hired three law firms and reached out to bankers to begin doing due diligence and lining up financing for the potential Allergan transaction. Valeant representatives met with Mr. Ackman and others from Pershing Square, who were known for their experience in handling unsolicited bids, and signed a confidentiality agreement with Pershing Square in order for Valeant to reveal the name of its proposed target to Pershing Square.
>
> Valeant and Pershing Square also negotiated and ultimately agreed on a plan pursuant to which Pershing Square would purchase Allergan stock, would commit to voting in favor of any bid for Allergan stock by Valeant, and would accept shares and not cash if the Allergan-Valeant transaction was consummated in a way that gave Allergan shareholders the option to choose stock or cash. Feb. 25 Relationship Agreement § 2(b). The February 25 Relationship Agreement specifically provided that Valeant and Pershing Square would form a "Co-Bidder Entity" and would be named as "co-

bidders" if a tender offer was launched for Allergan's shares. *Id.* § 1(a), 1(d).

MTD I Order at 18; PI Order at *8. Plaintiffs comment that, "Now the undisputed evidence proves these steps and many more that led toward and facilitated Valeant's tender offer." Pls. MSJ at 16 (citing Pls. SUF Nos. ¶¶ 85–229).

However, in *Allergan I*, and again now, Defendants argue that, before May, they had taken substantial steps toward a negotiated merger with Allergan, which included a strategy of using Allergan's shareholders to pressure Allergan's board to negotiate, but had taken no steps toward a tender offer. *See* PI Order at *9; Defs. Opp'n to Pls. MSJ at 15–19. Instead, Defendants argue that they took substantial steps toward a tender offer only after the Sanford Bernstein conference on May 29, 2014, where Allergan shareholders urged Valeant and Pershing Square to make a tender offer. *See* Val. MSJ at 10. Defendants point to provisions of Valeant and Pershing Square's February 25 Relationship Agreement, in which both sides acknowledged that no steps have been taken toward a tender offer and which required both sides to consent before launching a tender offer. Of course, as mentioned in *Allergan I*, "Defendants stating in a contract that they had not taken any steps toward a tender offer does not necessarily make it so. Evidence that Defendants took more definite steps toward a tender offer in May does not necessarily mean that a 'substantial step' did not happen in February." PI Order at *9.

In addition, Plaintiffs argue that Defendants' claim that they did not subjectively decide to make a tender offer until May is irrelevant because the substantial steps standard looks to objective conduct. Pls. Opp'n to Val. MSJ at 6, 14. As an initial matter, the Court notes that the SEC adopted the substantial step standard precisely because of the difficulty of determining when a party makes the subjective determination to potentially launch a tender offer. SEC Adopting Release at 60,413 n.33 ("This provision addresses the commentators' concern with the difficulty of identifying when a person has actually determined to make a tender offer by replacing that standard with the one in the rule as adopted."). The SEC explained that "[a]lthough this standard is not totally objective, it provides a reasonable basis to identify"

when the "abstain or disclose" rule applies.[19] *Id.* As a result, this standard seems to have been adopted specifically to allow courts (and other third parties) to determine, in hindsight, at what point in time liability under Rule 14e-3(a) was triggered. *See id.* ("[T]he prohibition of Rule 14e-3(a) will apply to the period from the accomplishment by the offering person of a substantial step or steps to commence a tender offer to the termination of the tender offer.")

Moreover, the courts in *Ginsburg* and *Mayhew* both found that substantial steps toward a tender offer had taken place even though the offeror had not yet settled on a tender offer as the form of the merger. *See Ginsburg,* 362 F.3d at 1303. This course is wisest because it would be difficult for courts to implement a test that attempted to discern at what point, among multiple contemplated acquisition vehicles, an offeror definitively decided to pursue a tender offer as opposed to a different strategy. And it would be odd to create a loophole whereby persons could legally trade on inside information if they did so early enough, when the offeror had not definitively decided to pursue a tender offer.[20] Courts have explained that "[w]ere it otherwise, liability could be avoided by taking care to tip only before the formal steps finalizing the acquisition are completed, leaving a substantial gap between the acquisition of inside information and the regulation of its disbursement." *Ginsburg*, 362 F.3d at 1304; *see also Mayhew*, 121 F.3d at 52–53 (2d Cir. 1997) (finding substantial steps despite a "two month lag between the tip and the tender offer" because "Congress intended §14(e) to be a broad antifraud remedy in the area of tender offers."); *Musella*, 748 F. Supp. at 1041 (S.D.N.Y. 1989) (retaining counsel was a substantial step even though tender offer never occurred). Thus, as indicated in *Mayhew* and *Ginsburg*, under the substantial steps standard courts look to objective

[19] At oral argument, Plaintiffs argued that this language noting that the substantial steps standard is "not totally objective" could be explained as follows: while courts should normally look to objective evidence under the substantial steps standard, if there is also clear evidence of subjective intent to launch a tender offer, that may suffice to trigger Rule 14e-3. In other words, while the standard remains objective rather than subjective, courts may, in certain circumstances, consider strong subjective evidence that a defendant had made the decision to make a tender offer—but not evidence that the defendant had affirmatively decided not to make a tender offer—in informing their view of whether substantial steps had been taken. In any case, the Court does not believe that the "not totally objective" language should be a backdoor for allowing subjective intent to be dispositive for the substantial steps standard, because this is precisely the situation the SEC sought to avoid.

[20] In other words, it would undermine the rule's purpose if an "other person" could trade on inside information that an offering person MIGHT ultimately launch a tender offer—potentially after trying some other strategies first—before the offering person definitively decided to pursue a tender offer. In that case, if the offering person tipped people early enough in the process, when they were still "considering" a potential tender offer, those people could trade before a final decision and avoid liability despite still taking advantage of the unfair informational disparity—the insider information about a potential tender offer.

conduct and keep in mind that some steps in relation to an acquisition, such as lining up financing and retaining lawyers, can ultimately facilitate multiple different forms of acquisition—hostile merger or tender offer.

Nevertheless, Valeant claims that at the time PS Fund 1 acquired its stake in Allergan, Valeant and Pershing had *affirmatively decided against* a tender offer and were pursuing a merger proposal, and Valeant points to this specific intent not to pursue a tender offer, as opposed to mere lack of certainty about whether a tender offer would be used, to distinguish *Mayhew* and *Ginsburg*. Val. MSJ at 9. Plaintiffs both dispute the contention that Defendants had affirmatively ruled out a tender offer, calling it "demonstrably false," and claim that, in any case, it is irrelevant because the substantial steps standard is objective. Pls. Opp'n to Val. MSJ at 6, 14. Thus, Defendants' assertion that these substantial steps should not count for the purposes of triggering Rule 14e-3 because Defendants had allegedly "taken a tender offer off the table" raises the question of whether Defendants' intent is at all relevant to the substantial steps element of Rule 14e-3. Because of the text, intended application, and specific scienter elements of Rule 14e-3(a), the Court agrees with Plaintiffs that Defendants' intent is not relevant to the substantial steps inquiry. That is, it is immaterial that Valeant had allegedly decided, before it took steps toward effecting its acquisition of Allergan, that it would not pursue a tender offer. Rather, as discussed below, Rule 14e-3(a) and its history make clear that the relevant question is whether the steps Valeant took before Pershing traded did in fact facilitate Valeant's later tender offer.

First, the text of the Rule on its face does not contain any element of intent: "[i]f any person has taken a substantial step or steps to commence . . . a tender offer . . . ." *See* 17 C.F.R. § 240.14e-3(a). Next, Rule 14e-3(a) imposes liability on the *tippee* (here, supposedly Pershing), and the scienter requirements of Rule 14e-3(a) also relate to the tippee: the tippee must know or have reason to know that the information he receives is nonpublic and acquired from the offering person. *See id.* Thus, none of the scienter elements of Rule 14e-3(a) relate to the *tipper* (here, supposedly Valeant), which is logical given that the provision imposes liability on the tippee, whereas the tipper is covered by Rule 14e-3(d). *See* 17 C.F.R. § 240.14e-3(d). Indeed, it

would be very strange to include an element of another person's scienter (intent by the *offering person* to pursue a tender offer) when determining liability for the *tippee* (i.e. the "other person"). Moreover, there is no indication that the SEC wished to allow a tippee to avoid liability for trading stock that ultimately is the subject of a tender offer simply because the *tipper* at the time of trading had allegedly decided not to pursue a tender offer, even though the tipper later changed course and did pursue a tender offer.

In addition, the SEC made clear that the tippee itself (here, supposedly Pershing) does not have to know that the information it receives relates to a tender offer (as opposed to a merger or other form of acquisition)—the tippee is liable for trading as long as the tipped information does in fact relate to a tender offer, whether or not the tippee had reason to know the information related to a tender offer. *See* 17 C.F.R. § 240.14e-3(a) (imposing liability on "any other person who is in possession of material information relating to [the] tender offer which information he knows or has reason to know is nonpublic and which he knows or has reason to know has been acquired directly or indirectly from the offering person"; this language notably does not include "relating to [the] tender offer" in the list of scienter elements that the other person must "know or have reason to know"); SEC Adopting Release at 60414 (confirming that the "relate to a tender offer" element is not a scienter requirement); *SEC v. Ginsburg*, 362 F.3d. 1292, 1304 (11th Cir. 2004) ("Rule 14e-3, by its terms, does not require that the offender know or have reason to know that the information relates to a tender offer, so long as the information in fact does relate to a tender offer . . . ."). The lack of a scienter requirement for the "relating to a tender offer" requirement further supports the notion that Pershing's alleged belief, that Valeant was not planning to pursue a tender offer and that the insider information thus did not relate to a tender offer at the time Pershing traded, is irrelevant to the objective substantial steps inquiry under Rule 14e-3.

At the same time, the requirement that the nonpublic information must "relate to a tender offer" addresses the concern, raised by Defendants at oral argument, that the Court's reading of the substantial steps inquiry as being objective would subject anyone pursuing a merger to liability under Rule 14e-3. For example, if an entity took substantial steps to pursue a merger

and never even contemplated the possibility of a tender offer, and then completed the merger and never launched a tender offer, the tipped information could not really be said to "relate" to a tender offer.  Thus, Rule 14e-3 would not apply.

Next, allowing Defendants to raise the defense that they did not intend to pursue a tender offer when they took substantial steps would create a strange loophole under Rule 14e-3. Namely, it would allow tippees to avoid the "abstain or disclose" rule simply by claiming that at the time they traded, the offering person had decided not to pursue a tender offer, even though the offering person later changed their mind and pursued a tender offer. However, looking into the subjective mind of the offering person to determine when liability was triggered is precisely the subjective inquiry the SEC sought to avoid by creating the substantial steps standard. *See* SEC Adopting Release at 60,413 n.33 ("This provision addresses the commentators' concern with the difficulty of identifying when a person has actually determined to make a tender offer by replacing that standard with the one in the rule as adopted."). Second, tender offers may not be the first tactic that an entity contemplating a hostile acquisition chooses to pursue. Rather, like Valeant, a company might first attempt merger negotiations or a proxy contest before resorting to a tender offer. Thus, creating the defense suggested by Defendants would effectively allow a tippee to trade while the tipper was pursuing such other strategies, even though the tipper could later decide to launch a tender offer. Setting such a standard would create both a strange outcome—allowing a tippee to trade on insider information if they do so early enough in the acquisition process—and would force courts to deal with questions about subjective intent, even though substantial steps is intended to be an objective standard. This cannot be correct. Rather, a tippee who purchases stocks based on inside information should *bear the risk* that those stocks will ultimately become the subject of a tender offer by the offering person and thus create liability for the tippee under Rule 14e-3. The choice is simple: other persons can abstain from insider trading, can disclose inside information before trading, or can engage in insider trading and assume the risk that they will face tippee liability under Rule 14e-3 if the material nonpublic information in their possession can objectively be said to relate to a tender offer and the shares which they traded ultimately

become the subject of a tender offer. Such a construction of the rule—one that is more protective against insider trading—best effects Rule 14e-3's purpose of preventing trading on unfair informational disparities in the market.

Given this backdrop, the fact of the matter is that Valeant did ultimately commence a tender offer, and the substantial steps it took, even if (in its view) primarily or exclusively with the intent of pursuing a merger, can fairly be said to have been substantial steps that facilitated their tender offer.[21] For example, Valeant took steps such as holding board meetings to discuss and authorize a potential acquisition attempt for Allergan, lining up financing, hiring lawyers, negotiating and entering into contracts such as the Confidentiality Agreement, conducting analyses of a combined Allergan-Valeant company, and entering the Relationship Agreement.[22]

---

[21] It would create an odd loophole if a defendant could avoid liability by claiming that it affirmatively decided, before it began trading, not to pursue a tender offer—potentially even because of legal advice that doing so would violate Rule 14e-3—and then, after trading changed its mind and decided to make a tender offer after all, but claim in court that the substantial steps taken toward a transaction before trading do not count as substantial steps because at that time a tender offer had been ruled out.

[22] Specifically, as discussed in the Facts section, *supra*, Valeant took the following actions, among others. Around February 5, 2014, Valeant contacted Goldman Sachs and Bank of America to determine whether either had conflicts that would prevent them from advising on a potential bid for Allergan. Pls. Reply to Per. SUF No. 17.

On February 6, 2014, Michael Pearson contacted Allergan's CEO David Pyott, and they agreed to meet the following weekend. *See* Pls. Reply to Val. SUF No. 18; Val. Answer ¶ 69. On or around that same day, Ackman and Pearson had a telephone call during which they discussed a potential transaction structure in which Valeant would identify a target and disclose it confidentially to Pershing, after which Pershing would decide whether it was interested in working with Valeant. *See* Valeant's Responses to Plaintiff's Statement of Additional Facts ("Val. Reply to Pls. SAF") (Dkt. 522-1). Also on February 6, Valeant contacted law firm Sullivan & Cromwell LLP ("Sullivan & Cromwell") to seek its assistance in a potential Allergan–Valeant transaction. Val. SUF No. 12. Two days later, on February 8, 2014, Sullivan and Cromwell sent Valeant an initial draft of an offer letter to Allergan. *See* Pls. Reply to Per. SUF No. 17; Greenstein Decl. Ex. 44 at VALEANT_00109871. Sometime later in February, Valeant also hired Skadden, Arps, Slate, Meagher & Flom LLP and Osler, Hoskin & Harcourt LLP to work on the transaction. *See* Pls. Reply to Val. SUF No. 18 (citing Val. Answer).

On February 13, 2014, representatives from Valeant and Pershing, including Pearson and Ackman and their legal counsel, met to discuss a potential Allergan–Valeant transaction, including potential acquisition strategies. Per. SUF No. 18; Pls. Reply to Per. SUF No. 18. A slide deck marked "Confidential" was emailed to Pearson and other Valeant representatives the following day, and it included an "Update from Pershing Meeting" that indicated that Valeant "met with Bill Ackman and Pershing Square team on 2/13" and that "key discussion items" included "deal assumptions and expectations for A company" and "expectations for deal announcement," as well as "strategic plan and best ways to work together." Blatchley Decl. Ex. 29 at VALEANT_00016146. In particular, the slide deck contains Valeant's financial analysis of a business combination with Allergan, including "key synergy areas" and estimates of the amount of money that might be saved as a result of those synergy areas in the event of a combination of the two companies, as well as Valeant's estimated valuation of Allergan based on certain "key assumptions," and potential offer and stock price impacts scenarios. *See generally* Robinson Decl. Ex. 63; Pls. SUF No. 236.

Between February 13, 2014, and February 20, 2014, representatives of Sullivan & Cromwell and Kirkland & Ellis (legal counsel for Valeant and Pershing) exchanged drafts of, and negotiated, an amended confidentiality agreement. Defs. Reply to Pls. SUF No. 243. Next, at a February 21, 2014 meeting, Valeant's Board "authorize[d Valeant] to pursue the [Allergan t]ransaction." Pls. Reply to Per. SUF No. 49. And on February 25, 2014, Defendants entered into the Relationship Agreement, the terms of which had been negotiated from February 14 through February 25, and which provided the formal structure that governed Defendants' efforts regarding a potential acquisition attempt for Allergan. Pls. SUF No. 251; Per. SUF No. 20. Valeant and Pershing's express purpose for entering into these arrangements was for PS Fund 1 to secretly

These actions meet the objective substantial steps standard for triggering liability under Rule 14e-3(a). *See Mayhew*, 121 F.3d at 48 ("a series of confidential discussions" regarding a "pending business transaction" regarding a "merger candidate or candidates" were substantial steps); *Ginsburg*, 362 F.3d at 1304 ("meeting between executives" regarding a "possible acquisition" met substantial steps element); *SEC v. Jacobs*, 2014 WL 12597830, at *7–8 (N.D. Ohio Aug. 15, 2014) (sustaining jury finding of substantial steps based upon a "due diligence" meeting and communications concerning a "strategic business relationship" and "potential buyout."). Even viewing the facts in the light most favorable to Defendants and accepting that Defendants had ruled out a tender offer until May, after PS Fund 1 acquired its stake in Allergan, it is undisputed that Valeant did not have the available cash necessary to purchase a significant "toehold" position in a large company like Allergan, and that Valeant did not have an interest in pursuing an Allergan transaction without obtaining the assistance of a partner like Pershing to fund the purchase of a toehold and commit to support the transaction. Per. SUF No. 11–12. Thus, there is no genuine dispute that Valeant's ultimate tender offer would not have been possible without all of Valeant's steps to work together with Pershing and enter into the Relationship Agreement, among other things, and thus the undisputed facts establish that Valeant took substantial steps toward a tender offer before PS Fund 1 began acquiring Allergan equity on February 25.

For the foregoing reasons, the Court GRANTS Plaintiff's Motion as to the requirement that Valeant had taken substantial steps to commence a tender offer before Pershing began purchasing Allergan equity.

### 4. Scienter Requirements

Next, Plaintiffs argue that they are entitled to summary judgment on the scienter elements of their Rule 14e-3 claims against Defendants. *See* Pls. MSJ at 22–25. The scienter requirements are set out in the text of the provisions applicable to the respective Defendants— Rule 14e-3(a) for Pershing and Rule 14e-3(d) for Valeant—and are discussed in turn below.

---

acquire a near 10% stake in Allergan in order to support a potential hostile acquisition attempt for Allergan. Per. SUF No. 22; *see id.* No. 23

As an initial matter, while the Court previously quoted *Ginsburg* for the proposition that establishing liability under Rule 14e-3 requires proving that Defendants acted with a mental state embracing intent to deceive, manipulate, or defraud, a closer review of the precedent *Ginsburg* cited has convinced the Court that the mental state requirement does not apply to violations of Rule 14e-3. Rather, the only scienter requirements are those provided in the text of the Rule's provisions, as explained by the accompanying SEC Adopting Release.

### a. Pershing's Scienter Under 14e-3(a)

Rule 14e-3(a) imposes liability on a tippee, or any person "who is in possession of material information relating to [a] tender offer which information he knows or has reason to know is nonpublic and which he knows or has reason to know has been acquired directly or indirectly from the offering person . . . ." 17 C.F.R. § 240.14e-3(a). In its Adopting Release, the SEC explained that, pursuant to this language, "the information which will trigger the operation of the Rule (1) must be material, (2) must relate to a tender offer, (3) must be nonpublic and (4) must have been acquired directly or indirectly from the offering person, from the issuer or from another specified person." SEC Adopting Release at 60414. As for the scienter requirements, the SEC stated that a "knows or has reason to know" standard applies to the latter two requisites (i.e. nonpublic and source of acquisition), but not materiality or relation to a tender offer. *Id.* This explanation accords with the plain text of the rule and has been followed by other courts. *See SEC v. Ginsburg* 362 F.3d. 1292, 1304 (11th Cir. 2004) ("Rule 14e-3, by its terms, does not require that the offender know or have reason to know that the information relates to a tender offer, so long as the information in fact does relate to a tender offer and the offender knows or has reason to know the information is nonpublic and was acquired by a person with the required status."). Thus, to establish that Pershing had the requisite scienter for liability under Rule 14e-3(a), Plaintiffs must show that Pershing knew or had reason to know that the information in its possession was nonpublic and had been acquired from the offering person— here, Valeant—or an officer, director, or other person acting on Valeant's behalf. 17 C.F.R. § 240.14e-3(a)

Plaintiffs claim that Defendants cannot dispute that Pershing knew that the information it received was nonpublic and acquired from Valeant, particularly because these facts were expressly recognized in the contracts between Pershing and Valeant. Pls. MSJ at 23. Specifically, Plaintiffs point to the fact that "the NDA and the Relationship Agreement required Valeant to provide bid-related information to Pershing" and that Ackman acknowledged that Pershing "signed a NDA and . . . got access to inside information." *Id.* (citing Pls. SUF Nos. 230–33, 243, 247–55, 266). Moreover, Plaintiffs cite evidence showing that Defendants even amended the NDA on February 20, 2014 to expressly define the information as including Valeant's "*non-public and confidential* technical, scientific, trade secret or other proprietary information." *Id.* (citing Pls. SUF No. 243).

Next, Plaintiffs argue that the lengths to which Pershing went in order to conceal its trades and maintain confidentiality demonstrate that Pershing had the requisite state of mind. *Id.* at 24. For example, as required by the Relationship Agreement, Pershing purchased Allergan securities in a manner that avoided triggering public or other disclosure obligations under antitrust and SEC rules, so that no other party would learn of Valeant's intended bid for Allergan. *See id.* Plaintiffs note that "Pershing even imposed strict confidentiality measures, using code words in contemporaneous discussions concerning Allergan, prohibiting the use of the terms 'Allergan' or 'Valeant' in internal emails and documents, and avoiding discussion of sensitive information about Allergan on phone lines Pershing personnel knew were recorded or could be overheard." *Id.* (citing Pls. SUF Nos. 261–65). Finally, Plaintiffs reference a Bloomberg reporter's interview of Ackman in 2014, during which the reporter commented, "But people who sold you Allergan in the last week could say you knew something that we didn't," to which Ackman replied, "And we did. Absolutely." *Id.* at 25 (citing Pls. SUF No. 267).

In response, Defendants concede that a "subset of the information was 'nonpublic,' and Pershing Square knew it to be nonpublic." Defs. Opp'n to Pls. MSJ at 33; *see also id.* ("Pershing Square and Valeant knew their Relationship Agreement was nonpublic during the trading period.") Nevertheless, Defendants claim that Plaintiffs fail to adequately identify all

the information that is at issue in the case, and that this fact precludes summary judgment on the issue of scienter. *Id.* They broadly argue that there are genuine disputes as to the confidentiality of some of the information at issue in this case. However, Defendants cite only to a single budget presentation shared with the parties in March of 2014, claiming that the extent to which information concerning the supposed value of Valeant's stock was "truly nonpublic" is disputed. *Id.*

Defendants fail to cite to any legal authority in support of their argument, and Plaintiffs point out that Defendants even previously admitted that the single minor piece of evidence Defendants now cite—the Valeant board presentation—was nonpublic. Pls. Reply at 23. That this presentation may have contained some information known to the broader public does not change the fact that it may also have contained nonpublic information. However, Defendants' point is well taken—the Court cannot broadly rule that "the information" in Pershing's possession was nonpublic without specifying what that information was. Nevertheless, Defendants do not and cannot dispute that, "pursuant to the NDA, Valeant confidentially disclosed its interest in Allergan, obligating Pershing to keep this 'very important' information 'confidential and nonpublic.'" Pls. Reply at 19. Thus, the undisputed facts show that Pershing, at a minimum, knew that information about Valeant's intention to launch a bid for Allergan, Valeant's strategies for effecting the transaction, and Valeant's valuation of and return threshold for the Allergan transaction, as well as other information outlined in Plaintiffs' SUF Nos. 232–45, was nonpublic and had been acquired from Valeant.

Accordingly, the Court GRANTS Plaintiffs' Motion as to Pershing's state of mind for a Rule 14e-3 violation, because there is no genuine dispute of fact that Pershing knew the information in its possession relating to Valeant's interest in and return threshold for an Allergan transaction was nonpublic and had been acquired from Valeant.

### b. Valeant's Scienter Under Rule 14e-3(d)(1)

Plaintiffs also move for summary judgment as to Valeant's scienter under Rule 14e-3(d)(1), which imposes "tipper" liability by making it unlawful for an offering person "to communicate material, nonpublic information relating to a tender offer to any other person

under circumstances in which it is reasonably foreseeable that such communication is likely to result in a violation of this section . . . ." 17 C.F.R. § 240.14e-3(d)(1); Pls. MSJ at 25. Thus, to establish liability, Plaintiffs must show that Valeant communicated the relevant information to Pershing under circumstances in which it was reasonably foreseeable that its tip was likely to result in Pershing violating the "abstain or disclose" rule. *See id.*; 17 C.F.R. § 240.14e-3(a). Plaintiffs claim that it was not only reasonably foreseeable that Valeant's tip was likely to result in Pershing trading on the tip, but that in fact the Relationship Agreement "expressly *required* Pershing to trade on the information it had about Valeant's forthcoming takeover effort." Pls. MSJ at 25.

Defendants respond, however, that it is not enough that Valeant knew that Pershing would trade on the information. Defs. Opp'n to Pls. MSJ at 27–28. Rather, they claim it had to be reasonably foreseeable that such trading would likely result in a violation of Rule 14e-3(a). *Id.* Defendants then explain that "no violation of the rule was 'reasonably foreseeable' to Valeant because the evidence shows that the parties agreed at the outset not to pursue a tender offer and took no steps toward one until long after the trading period, by which time circumstances had materially changed." *Id.* at 28. Thus, according to Defendants, Valeant did not have "any reason to believe that any information that it conveyed about a potential merger related to a tender offer or that substantial steps to commence a tender offer had occurred." *Id.* Plaintiffs retort that this is an impermissible attempt to "import a subjective decision to launch a tender offer" into the scienter requirement. Pls. Reply at 24.

The SEC explained in its adopting release that "[t]he standard of reasonably foreseeable is premised on what a reasonable man would view as reasonably foreseeable." SEC Adopting Release at 60,417. This explanation is not particularly helpful, and the parties also do not cite any cases interpreting or applying Rule 14e-3(d)'s foreseeability standard. Without more, the Court is not persuaded that it need only have been reasonably foreseeable that Pershing would trade on Valeant's tip, because the statutory language indicates that the foreseeability standard applies to "a violation". However, the Court also notes that the tipper is not required to know that the constituent acts of a Rule 14e-3(a) violation in fact violate the law. Rather, the most

logical standard on first impression is that it must be reasonably foreseeable that the communication is likely to result in the scenario that is prohibited by Rule 14e-3(a), whether the tipper knows such scenario is illegal or not.

Here, Plaintiffs have not shown that they are entitled to summary judgment as a matter of law with regard to Valeant's liability under Rule 14e-3(d), particularly because there is a genuine dispute of fact as to whether it was reasonably foreseeable that Valeant's tip to Pershing would result in a violation of Rule 14e-3(a). Accordingly, the Court DENIES Plaintiffs' Motion as to this issue.

### 5. Materiality

Plaintiffs argue there can be no genuine dispute that the information Pershing received from Valeant "regarding its impending hostile bid for Allergan" was material, and thus Plaintiffs seek summary judgment on this element of their Rule 14e-3 claim. Pls. MSJ at 23. Defendants disagree, claiming that various evidence creates disputed facts as to the materiality of the information possessed by Pershing during the trading period and precludes summary judgment, particularly because of the allegedly speculative nature of the information that, according to Defendants, related to a potential merger. Defs. Opp'n at 31–32. Further, Defendants again lament that Plaintiffs fail to identify the specific information they claim was material and argue that "[t]he district court should not take the case from the jury unless the court has engaged in meticulous and well-articulated analysis of each item of withheld or misrepresented information. . . ." Defs. Opp'n to Pls. MSJ at 32 (quoting *Caravan Mobile Home Sales, Inc. v. Lehman Bros. Kuhn Loeb,* 769 F.2d 561, 564–65 (9th Cir. 1985)).

Information is material "'if there is a substantial likelihood that a reasonable [investor] would consider it important in deciding how to [invest].'" *Basic Inc. v. Levinson,* 485 U.S. 224, 231 (1988) (quoting *TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 449, (1976)). The Second Circuit has explained the standard for materiality as follows:

> To be material, the information need not be such that a reasonable investor
> would necessarily change his investment decision based on the information,
> as long as a reasonable investor would have viewed it as significantly

altering the "total mix" of information available. *TSC Indus.*, 426 U.S. at 449; *Flynn v. Bass Bros. Enters.*, 744 F.2d 978, 985 (3d Cir.1984). Material facts include those "which affect the probable future of the company and those which may affect the desire of investors to buy, sell, or hold the company's securities." *SEC v. Texas Gulf Sulphur Co.,* 401 F.2d 833, 849 (2d Cir.1968) (*en banc*). They include any fact "which in reasonable and objective contemplation *might* affect the value of the corporation's stock or securities." *Id.* at 849 (quoting *List v. Fashion Park, Inc.,* 340 F.2d 457, 462 (2d Cir.1965)).

In the context of a merger, where information can be speculative and tenuous, the materiality standard may be difficult to apply. *Cf. Basic*, 485 U.S. at 236, 108 S.Ct. at 986. Materiality will, in such cases, depend "upon a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity." *Id.* at 238 (quoting *Texas Gulf Sulphur Co.,* 401 F.2d at 849). . . . Moreover, where information regarding a merger originates from an insider, the information, even if not detailed, "takes on an added charge just because it is inside information." *Id.* at 48; *see also Monarch Fund,* 608 F.2d at 942. And a major factor in determining whether information was material is the importance attached to it by those who knew about it. *See Texas Gulf Sulphur Co.,* 401 F.2d at 851.

*S.E.C. v. Mayhew*, 121 F.3d 44, 51–52 (2d Cir. 1997). Because the determination of materiality "requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him," the determination is usually left to the trier of fact. *TSC Indus., Inc.*, 426 U.S. at 450. However, if the information at issue is "so obviously important to an investor, that reasonable minds cannot differ on the question of materiality," the issue of materiality may appropriately be determined as a matter of law at the

summary judgment stage. *Id.* (quoting *Johns Hopkins University v. Hutton*, 422 F.2d 1124, 1129 (4th Cir. 1970)).

Given this standard, there is no doubt that information such as Valeant's interest in launching a bid for Allergan, and Valeant's valuation of and return threshold for the Allergan transaction, was material. Specifically, every reasonable investor would have viewed this information as significantly altering the "total mix" of information available. *See TSC Indus.*, 426 U.S. at 449. And particularly in light of the magnitude of the potential acquisition, reasonable minds cannot disagree that the nonpublic information "may [have] affect[ed] the desire of investors to buy, sell, or hold the company's securities." *See Mayhew*, 121 F.3d at 51–52. Indeed, no reasonable juror could disagree that the nonpublic information in Pershing's possession "in reasonable and objective contemplation *might* affect the value of the corporation's stock or securities." *Id.* Furthermore, as Plaintiffs point out, after receiving the insider information and doing additional vetting, Pershing ultimately traded in Allergan stock "to the tune of nearly $4 billion—its largest investment ever and first in a healthcare company." Pls. Reply at 21; *see also S.E.C. v. Wyly*, 788 F. Supp. 2d 92, 123 (S.D.N.Y. 2011) ([g]iven the importance that the [Defendants], as investors, attached to this information," by "engaging in a unique, 'massive and bullish' transaction," "it is hard for them now to protest . . . that no reasonable investor could have found it material"); *Veleron Holdings, B.V. v. Stanley*, 117 F. Supp. 3d 404, 432 (S.D.N.Y. 2015) (noting "[r]arely have I heard a sillier argument" than information being material to defendants but not to a "reasonable investor").

Thus, while Defendants dispute materiality, the undisputed facts make clear that the information on which Pershing traded was material. A reasonable investor's decision about holding versus selling Allergan stock would certainly have been impacted by knowledge that Valeant was contemplating launching a hostile takeover bid, particularly if the investor had any indication of potential synergies or how high Valeant was willing to bid.

Accordingly, the Court GRANTS summary judgment to Plaintiffs as to materiality of, at minimum, information such as Valeant's intention to launch a bid for Allergan, and Valeant's valuation of and return threshold for the Allergan transaction.

### 6.    Information "Related to a Tender Offer"

While Plaintiffs claim, and ask the Court to rule, that the information in Pershing's possession "related to a tender offer," this is a vigorously disputed fact. The Court does not believe it appropriate to reason backwards and decide, just because a tender offer was ultimately launched, that in hindsight the information in Pershing's possession was undisputedly related to a tender offer. Rather, to satisfy the requirements of Rule 14e-3(a), the information must have "related to a tender offer" at the time Pershing traded. While this is an objective element—Pershing need not have known that the information related to a tender offer—the Court believes that any of Defendants' evidence about their claimed subjective belief that a tender offer was off the table is best introduced as evidence going to this requirement, as opposed to the substantial steps inquiry. The Court also notes that "relate to" is not a particularly high bar. For example, the SEC made clear that Rule 14e-3 "pertains to trading by persons in securities which *may* be the subject of a tender offer as well as tipping of material, nonpublic information relating to a contemplated tender offer." SEC Adopting Release at 60,410 (emphasis added). Similarly, the SEC explained that "[m]aterial, nonpublic information relating to a tender is not confined to the undisclosed intention to make a tender offer. The amount and class of securities being sought, the price or range of prices being offered therefor, and the date of commencement are among the other items of information which are material to investors in the context of a prospective tender offer." Proposed Amendments at 70,353.

For the foregoing reasons, the Court DENIES Plaintiffs' Motion as to the information's relation to a tender offer. This is a question of disputed fact best decided by the jury.

### 7.    Purchased or Caused to be Purchased

Plaintiffs also ask the Court to hold as a matter of law that Pershing "caused" Nomura to purchase shares of Allergan within the meaning of Rule 14e-3(a). Pls. MSJ at 26–27. Rule 14e-3(a) prohibits an insider with nonpublic information related to a tender offer "from purchas[ing] *or caus[ing] to be purchased*" any securities to which the information relates." 17 C.F.R. § 240.14e-3(a) (emphasis added). Thus, under the plain language of Rule 14e-3 and the

accompanying regulations, entities can be held liable for causing others to purchase securities on their behalf. *See* SEC Adopting Release at 60,413 n.38 ("The meaning of the term 'causes' in the context of this Rule includes a recommendation by one person to another person which results in a purchase or sale by the other person.") The Court previously determined that Plaintiffs' allegations that "PS Fund 1 deliberately entered into an option contract with Nomura and that Nomura 'in fact acquired the common shares correlating to its contracts requiring the delivery of those shares to Pershing," were sufficient, if true, to show that PS Fund 1 caused Nomura to purchase shares of Allergan. *See* MTD I Order at 10.

Plaintiffs now provide support for their allegations by citing extensive evidence about Nomura's contract with PS Fund 1 and the manner in which Pershing directed Nomura's Allergan stock purchases to support its prior allegations, all of which indicates the requisite causal link. *See* Pls. MSJ at 27–28. In addition, Defendants do not make any arguments about this issue in their Opposition, and thus the Court sees no reason to alter its previous analysis. *See generally* Defs. Opp'n to Pls. MSJ.

Accordingly, the Court GRANTS Plaintiffs' Motion as to the "caused" element, and holds that Pershing "caused to be purchased" the Allergan common stock that Nomura purchased during the Class Period.

### B. Section 20A Claims Against All Defendants

Plaintiffs also bring a claim for violations of Section 20A of the Securities Exchange Act of 1934 against all Defendants. SAC ¶¶ 208–215; *see* 15 U.S.C.A. § 78t-1. Plaintiffs claim that Pershing is liable under § 20A(a), which provides:

> Any person who violates any provision of this chapter or the rules or
> regulations thereunder by purchasing or selling a security while in
> possession of material, nonpublic information shall be liable in an action in
> any court of competent jurisdiction to any person who, contemporaneously
> with the purchase or sale of securities that is the subject of such violation,
> has purchased (where such violation is based on a sale of securities) or sold

1 (where such violation is based on a purchase of securities) securities of the

2 same class.

3 15 U.S.C. § 78t-1(a); SAC ¶¶ 209–210. In addition, Plaintiffs allege that Valeant violated

4 § 20A(c), which provides that "[a]n person who violates any provision of [the Exchange Act] or

5 the rules or regulations thereunder by communicating material, nonpublic information shall be

6 jointly and severally liable under subsection (a) with, and to the same extent as, any person or

7 persons liable under subsection (a) to whom the communication was directed." 15 U.S.C. § 78t-

8 1(c); SAC ¶¶ 211–212. As indicated by the text of these provisions, claims under § 20A are

9 "derivative, and require proof of a separate underlying violation" of the Exchange Act. *Johnson*

10 *v. Alijian*, 394 F. Supp. 2d 1184, 1194 (C.D. Cal. 2004). Plaintiffs' § 20A claim is based on

11 Defendants' alleged violations of § 14(e) and Rule 14e-3, discussed above.

12      Plaintiffs seek summary judgment on two elements of their § 20A claim: the

13 contemporaneous trading requirement and the "same class" of securities requirement. Pls. MSJ

14 at 25–26, 29–30. The Court will address each in turn.

15         **1.**      **Contemporaneous Trading**

16      Plaintiffs ask the Court to determine as a matter of law that Plaintiffs traded

17 "contemporaneously" with Pershing's acquisitions of Allergan stock, as is required for Pershing

18 to be liable to Plaintiffs under Section 20A. *See* Pls. MSJ at 25–26; 15 U.S.C. § 78t-1(a)

19 (making a violator liable to "any person who, *contemporaneously* with the purchase or sale of

20 securities that is the subject of [the] violation, has purchased . . . securities of the same class"

21 (emphasis added)). Defendants do not address this issue in their Opposition, except to state that

22 they "incorporate and preserve the arguments regarding these issues set forth in their prior

23 motion to dismiss and class certification briefing." Defs. Opp'n at 34 n.22. While the Court has

24 addressed this issue in prior orders, it does so again briefly here.

25      The contemporaneous trading requirement was designed to "preserve the notion that

26 only plaintiffs who were harmed by the insider could bring suit, while nonetheless making it

27 possible for such persons to bring suit." *Buban v. O'Brien*, No. C 94-0331 FMS, 1994 WL

28 324093, at *3 (N.C. Cal. June 22, 1994). While the Ninth Circuit has not defined the "exact

contours" of contemporaneous trading by requiring trading within a certain time period, it has

advised that trades must occur at "about the same time" to be considered contemporaneous. *See*

*Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1001 (9th Cir. 2002); *Neubronner v. Milken*,

6 F.3d 666, 670 (9th Cir. 1993). Certain courts have confined "contemporaneous" to trades

occurring the same day as the insiders' trades. *See In re AST Research Sec. Litig.*, 887 F. Supp.

231, 233 (C.D. Cal. 1995). Other courts, including this one, have found that longer periods of

time may satisfy the contemporaneous trading requirement in certain circumstances. *See*

*Middlesex Ret. Sys. v. Quest Software, Inc.*, 527 F. Supp. 2d. 1164, 1196 (C.D. Cal. 2007)

(finding eight days is contemporaneous); *see also City of Westland Police & Fire Ret. Sys. v.*

*Sonic Solutions*, No. C 07-0511 CW, 2009 WL 942182, at *12 (N.D. Cal. Apr. 6, 2009)

(finding purchase of stock nine days after a sale was contemporaneous).

Here, Plaintiffs ask the Court to find that trading on the same day, or in some cases

within one day, meets the contemporaneous trading standard. *See* Pls. MSJ at 26. Plaintiffs

provide evidence showing that:

> On February 25 and 26, 2014, PS Fund 1 purchased 597,431 shares of
> Allergan stock. Between March 3 and April 21, 2014, PS Fund 1 acquired
> beneficial ownership of 28,281,107 million Allergan shares by purchasing
> 24,831,107 call options and 3,450,000 equity forward contracts from
> Nomura. . . . PS Fund 1 bought or, through derivative transactions, caused
> Nomura to buy Allergan stock on each trading day between February 27,
> 2014 and April 21, 2014, except April 9-10, and each Plaintiff sold stock on
> at least one of the days within that period.

Pls. MSJ at 26 (citations omitted).

As this Court stated at the class certification stage, "[t]his Court has already determined,

in this case, that sales within a day of the Defendants' acquisitions are sufficiently proximate to

be considered contemporaneous." Order Granting Motion to Certify Class Action ("Class Cert

Order") (Dkt. 318) at 16 (citing MTD I Order at 15); *see also In re Countrywide Fin. Corp. Sec.*

*Litig.*, 588 F. Supp. 2d 1132, 1205 (C.D. Cal. 2008) (finding that trading on the same day or the

day after is "contemporaneous"). Requiring Plaintiffs to show that they actually sold directly to Defendants or their agent would both be difficult practically and impose a proof of privity requirement, which is unsupported by case law. *See, e.g.*, *In re Motel 6 Sec. Litig.*, 161 F. Supp. 2d 227, 244–45 (S.D.N.Y. 2001) (citing *Shapiro v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 495 F.2d 228, 236–37 (2d Cir. 1974)) ("[N]o privity is required as long as the trades occur contemporaneously . . . ."). Moreover, a contemporaneous trading period of a day fits comfortably within the contemporaneity bounds set by other courts—some courts have found that trades within as much as a week or more of a defendant's trades satisfy the contemporaneity requirement. *See Middlesex*, 527 F. Supp. 2d. at 1196 (finding eight days to be contemporaneous); *see also City of Westland Police & Fire Ret. Sys.*, 2009 WL 942182, at *12 (finding purchase of stock nine days after a sale was contemporaneous). Finally, the Court already determined at the motion to dismiss stage that because Defendants "caused and used Nomura to acquire Allergan stock," which is also discussed above, "Defendants' purchases [of options and forward contracts] from Nomura should be included as part of the contemporaneous trading analysis." MTD I Order at 12.

Accordingly, the Court GRANTS Plaintiffs' Motion for Partial Summary Judgment as to the requirement that Plaintiffs traded contemporaneously with Pershing.

### 2. "Same Class" Requirement

Plaintiffs also seek summary judgment on Section 20A's "same class" of securities requirement. Pls. MSJ at 29 –30; *see* 15 U.S.C. § 78t-1(a) (requiring that a defendant's and plaintiff's contemporaneous trades involve "securities of the same class"). Plaintiffs argue that the Allergan common stock sold by Plaintiffs, and the Allergan options and forward contracts PS Fund 1 purchased from Nomura, are securities of the same class, particularly because the derivatives that PS Fund 1 purchased were the "economic equivalent" of buying Allergan common stock. Pls. MSJ at 29. Again, Defendants do not address this issue in their Opposition, except to state that they "incorporate and preserve the arguments regarding these issues set forth in their prior motion to dismiss and class certification briefing." Defs. Opp'n at 34 n.22.

In their prior Motion to Dismiss, however, Defendants argued that "securities of the same class" meant the exact same type of security, and that the common stock sold by Plaintiffs was thus not of the "same class" as the options and forward contracts purchased by PS Fund 1. *See* MTD I Order at 13. The Court noted that Defendants failed to provide any persuasive legal authority for this narrow interpretation of the insider trading laws, and found that the correct reading of § 20(A) was that plaintiffs who trade in common stock could pursue insider trading claims against insiders who trade in stock options. *Id.* at 14 (citing *Moskowitz v. Lopp*, 128 F.R.D. 624, 635 (E.D. Pa. 1989); *Dau v. Cephalon, Inc.*, No. 99-CV-2439, 2000 WL 1469347, at *5 (E.D. Pa. 2000) (rejecting the argument that "the 'same class' requirement of § 20(A) means that a contemporaneous purchase of stock lacks standing to bring a § 20(A) action against an insider purchase of stock options."). The Court declined to dismiss Plaintiffs' claims "absent some evidence that the stock and option markets . . . are not part of interdependent markets." *Id.* (citing *Dau*, 2000 WL 1469347, at *5). The Court's reading of "same class" as encompassing both stocks and options is further supported by language in the SEC's Adopting Release explaining that Rule 14e-3 proscribed trading "in securities whose market value has a relationship to the security sought or to be sought in the tender offer." SEC Adopting Release at 60,413 n. 39.

Now, at the summary judgment stage, Plaintiffs point to evidence showing that:

> Nomura sold PS Fund 1 options and forward contracts that were "the economic equivalent" of buying Allergan common stock. These derivatives were "Delta One" securities, meaning that if they referred to 100 shares, Nomura would have to purchase about 100 shares as a hedge. Moreover, the value of these derivatives was a direct function of the value of Allergan's stock price, as the strike price of the options or price of the forward contracts was based on the price Nomura actually paid to acquire Allergan shares. Last, Dr. Bajaj's unrebutted analysis shows the options, forward contracts, and Allergan common stock transacted in interdependent

markets because the stock market and options market traded synchronously

with each other.

Pls. MSJ at 29–30 (citations omitted). Moreover, as discussed above, Defendants "caused" Nomura to purchase Allergan common stock on the open market. Thus, Plaintiffs have shown that Defendants, in part through Nomura, bought the exact "same class" of common stock that Plaintiffs sold.

Accordingly, the Court GRANTS Plaintiff's Motion as to the "same class" element of Plaintiffs' § 20A claim.

### C. Section 20(a) Control Persons Claim

Plaintiffs bring their third claim for violations of Section 20(a) of the Securities Exchange Act of 1934 against Pershing Square, PS Management, PSGP, Ackman, and Pearson. SAC ¶¶ 216–226. Plaintiffs claim that Pershing Square, PS Management, PSGP, and Ackman acted as "controlling persons of PS Fund 1, PSLP, PS II, PS International, and PS Holdings within the meaning of Section 20(a) of the Exchange Act," and that Pearson similarly acted as "a controlling person of Valeant." *Id.* ¶¶ 218, 225, 226.

Section 20(a) provides "control person" liability when a person or entity "directly or indirectly controlled the person or entity committing the primary violation." *In re New Century*, 588 F. Supp. 2d at 1206, 1233 (C.D. Cal. 2008). A "plaintiff alleging a § 20(a) claim that individual defendants are 'controlling persons' of a company must plead facts showing a primary violation under the Exchange Act, and must also allege that the defendant exercised actual power or control over the primary violator." *Jackson v. Fisher*, 931 F. Supp. 2d 1049, 1061 (N.D. Cal. Mar. 15, 2013). Thus, the viability of Plaintiffs' § 20(a) claims depend on the underlying Rule 14e-3 claims.

Plaintiffs seek summary judgment on the "control" element of their Section 20(a) claim against Ackman, PSCM, PS Management, and Pearson. Pls. MSJ at 30–31. They cite various evidence to support that each of these Defendants were controlling persons, none of which Defendants refute in their Opposition. *Id.*; *see* Defs. Opp'n to Pls. MSJ. Rather, Defendants' only counterargument is that Plaintiffs' control person claim fails "for the same reasons

summary judgment should be granted in favor of Defendants—Defendants did not violate Rule 14e-3." Defs. Opp'n to Pls. MSJ at 35 n.25. Thus, Defendants have not disputed that the Defendants which Plaintiff identifies are in fact controlling persons.

Accordingly, the Court GRANTS summary judgment as to the "control" element of Plaintiffs' Section 20(a) claim.

### D. Primary Violators

Finally, Plaintiffs seek a summary judgment ruling that all of the Pershing Defendants are primary violators of Section 14(e), Rule 14e-3, and Section 20A. Pls. MSJ at 32. Plaintiffs point out that the Court previously found that Plaintiffs had adequately alleged that each of the Pershing Defendants (PS Fund 1, PSLP, PS II, PS Int'l, PS Holdings, PSCM, PS Management, PSGP, and Ackman) were primary violators of Rule 14e-3 because each took independent actions, and had individual roles to play, in causing the challenged trades. *Id.* (citing MTD II Order at *5–8). Plaintiffs claim that its previous allegations are now supported by evidence that shows that "each Pershing Defendant formed, capitalized, controlled, and/or received profits from PS Fund 1," and thus has primary liability for the challenged trades. *Id.* Defendants disagree, arguing that because the funding entities were passive and did not directly participate in the fraud, they cannot be primarily liable. Defs. Opp'n to Pls. MSJ at 34–35. Moreover, Defendants note that they "previously argued that Plaintiffs' claims against the Funding Entities should be dismissed as a matter of law because the Funding Entities did not purchase or sell Allergan securities," and that "[a]lthough the Court disagreed, Defendants continue to believe in the merits of this argument and raise it again here." *Id.* at 35 n.24.

For the same reasons discussed at length in the MTD II Order, the Court holds that the Pershing Defendants are primary violators of Rule 14e-3 and Section 20A. *See* MTD II Order at 7–13. Accordingly, the Court GRANTS Plaintiffs' Motion as to the Pershing Defendants' status as primary violators.

### E. Damages

While Plaintiffs do not move for summary judgment on damages, Defendants raise two issues related to damages: loss causation and the statutory damages cap. *See* Val. MSJ at 15–24.

### 1. Loss Causation

First, Defendants argue that, despite any potential liability on their part, they are entitled to summary judgment on all of Plaintiffs' claims because Plaintiffs have failed to offer sufficient evidence of loss causation. Val. MSJ at 1, 15–23. Under the Private Securities Litigation Reform Act ("PSLRA"), plaintiffs who bring a private action arising under U.S. Code title 15 chapter 2B have the burden of proving "that the act or omission of the defendant . . . *caused the loss* for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u-4(b)(4) (emphasis added). Because both Section 14(e) and Section 20(A) of the Exchange Act, under which Plaintiffs bring their claims, are codified in chapter 2B, Plaintiffs must show loss causation. *See* 15 U.S.C. § 78n(e) (Section 14(e) of the Exchange Act, as amended by the Williams Act); 15 U.S.C. § 78t-1(a) (Section 20A of the Exchange Act); *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 395 (9th Cir. 2010) (applying PSLRA loss causation requirement to § 20A insider trading claim); *Rubke* v. *Capitol Bancorp Ltd.*, 551 F.3d 1156, 1167 (9th Cir. 2009) (applying PSLRA to § 14(e) claim). Because Plaintiffs' claims are premised on a violation of Rule 14e-3, Plaintiffs must show that the "act or omission" constituting a violation of that rule—i.e. Pershing's nondisclosure of nonpublic material information relating to a tender offer before trading in Allergan securities—caused Plaintiffs' loss. *See* 15 U.S.C. § 78u-4(b)(4).

However, Defendants argue that Plaintiffs cannot show loss causation because "Plaintiffs posit a single theory of loss that fails entirely to address how any (a) omission (b) that related to a tender offer (c) undervalued Allergan stock at each point in time in the Class Period, or by how much." Val. MSJ at 2. Defendants explain that at the class certification stage, Plaintiffs suggested they would calculate damages "using a common formula that measures the difference between the selling price actually received and the true value of the shares had there been no material omissions and misconduct by Defendants." Val. MSJ at 17. The Court agreed, quoting *Affiliated Ute*'s holding that "the correct measure of damages . . . is the difference between the fair value of all that the . . . seller received and the fair value of what he would have received had there been no fraudulent conduct." Class Cert Order at 24 (citing *Affiliated*

*Ute Citizens* v. *United States*, 406 U.S. 128, 155 (1972)); Val. MSJ at 17–18. Defendants now complain that Plaintiffs have decided, allegedly without any basis, that a flat $209.20 per share—Allergan's closing price on November 17, 2014—is the "'true value of the Allergan shares after the relevant [material nonpublic information] was fully disclosed." *Id.* at 18.

Defendants particularly take issue with the fact that, in their view, Plaintiffs fail to consider whether all the gain in Allergan stock during that time period "had any causal relationship with the nondisclosure of [nonpublic material information] related to a tender offer." *Id.* at 19. They argue that because Plaintiffs make "no effort to isolate what portion of the gain in Allergan stock was caused by information *actually known* to PS Fund 1 and relating to a tender offer," they fail to account for loss causation. *Id.* Plaintiffs dispute this characterization and explain that "the evidence shows that Pershing possessed detailed [material nonpublic information] regarding Valeant's hostile takeover plans that allowed it to model how much Valeant could offer for Allergan, and unquestionably concealed this information when trading contemporaneously with unsuspecting Class members." Pls. Opp'n to Val. MSJ at 24.

Defendants argue that Plaintiff's proposed methodology is insufficient because it fails to separate out "gains in Allergan stock that are causally unrelated to a tender offer, and thus not recoverable losses." MSJ at 16. However, all the cases that Defendants cite for the proposition that Plaintiffs are required to separate out such gains involve claims of misrepresentations under Rule 10b-5 and Section 10e of the Exchange Act. *Id.* (citing *Dura Pharm., Inc.* v. *Broudo*, 544 U.S. 336, 342 (2005); *Nuveen Mun. High Income Opportunity Fund* v. *City of Alameda, Cal.*, 730 F.3d 1111, 1120 (9th Cir. 2013); *Glickenhaus & Co.* v. *Household Int'l, Inc.*, 787 F.3d 408, 421 (7th Cir. 2015)). Rule 10b-5 addresses misrepresentations such as untrue statements of a material fact "in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b–5. The Court is not persuaded that it is appropriate to take the loss causation requirements from Rule 10b-5 actions and apply them to Rule 14e-3 actions such as this case, because actions brought under Rule 10b-5 differ from actions under Rule 14e-3 in significant ways.

For example, establishing causation and actual loss is more difficult for claims that some misrepresentation artificially inflated the price of stock purchased by a person, *see Dura Pharmaceutical*, because that person could sell the stock again at the same price, or other factors could affect damages. In that kind of case, "Loss causation is established if the market learns of a defendant's fraudulent act or practice, the market reacts to the fraudulent act or practice, and a plaintiff suffers a loss as a result of the market's reaction." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 392 (9th Cir. 2010). However, loss causation in a case like this is categorically different, because the violation is *trading* without disclosing, not simply making a misrepresentation that may affect stock prices. Pershing's failure to disclose may very well have caused Plaintiffs to be willing to sell their Allergan stock, which ultimately meant Plaintiffs lost out on the profits at issue in this case.

Thus, with a claim like this, where Plaintiffs did not reap the benefits of the ultimate deal with Actavis or potentially Valeant precisely *because* they had sold their stock (and Pershing bought it based on their material nonpublic information), causation seems fairly clear. As the Supreme Court made clear, "any particular corrective disclosure is relevant only insofar as it may provide a data point regarding the market's reaction to information about a defendant's alleged misconduct. The fundamental inquiry before the Court remains whether there is 'a causal connection between the material misrepresentation and the loss.'" *Dura Pharm.*, 544 U.S. at 342; *Thomas v. Magnachip Semiconductor Corp.*, 167 F. Supp. 3d 1029, 1046 (N.D. Cal. 2016).

Thus, under the correct standard, a jury could find that Defendants' violation caused the loss, if they find, for example, that Plaintiffs would not have traded had Pershing disclosed fully all its material nonpublic information before trading. While Defendants are free to argue at trial that they did not cause the full losses that Plaintiffs seek, Plaintiffs have provided enough evidence to create a genuine dispute as to loss and thus to survive summary judgment.

Accordingly, the Court DENIES Defendants' Motion for summary judgment as to loss causation.

## 2. Damages Cap

Finally, Defendants ask the Court the rule as a matter of law that Plaintiff's damages cannot take account of any events that took place after Defendants disclosed Valeant's initial exchange offer in June 2014. Val. MSJ at 24–25. Plaintiffs respond that because Pershing possessed valuable material nonpublic information until Valeant withdrew its tender offer, damages are appropriately measured through November 17, 2014. Pls. Opp'n to Val. MSJ at 35.

Defendants' correctly point out, and Plaintiffs do not dispute, that Plaintiffs' claims are subject to a damages cap. *See* Val. MSJ at 24 & n.13. Specifically, under § 20A(b)(1), "[t]he total amount of damages imposed [for a § 20A claim] shall not exceed the profit gained or loss avoided in the transaction or transactions that are the subject of the violation." 15 U.S.C. § 78t-1(b)(1). Thus, the damages in this case must be limited to the profit Defendants gained in the "transactions that are the subject of the violation," which in this case are PS Fund 1's purchases of Allergan securities based on material nonpublic information. *Id.*; *see also* 17 C.F.R. § 240.14e-3. A simple reading of this statute might suggest that Plaintiffs' damages are capped at the total profits Defendants gained as a result of their allegedly illegal purchases of Allergan securities—i.e. over two billion dollars.

Nevertheless, Defendants argue that the cap should instead be set with reference to Allergan's closing price on: (1) April 21, 2014, when Defendants announced PS Fund 1's 9.7% stake in Allergan and Valeant's intention to make an unsolicited offer to acquire Allergan; or, alternatively (2) June 2, 2014, when the parties announced their intention to launch an exchange offer for Allergan; or, at the latest (3) June 18, 2014, when formal exchange offer documents were filed with the SEC. Val. MSJ at 24–25. Defendants' arguments that the damages cap must be set with reference to these dates are premised on the notion that damages should be capped at the profits Defendants had gained at the point in time when they fully disclosed all material nonpublic information relating to the tender offer. *See, e.g.*, *id.* at 25 ("No material information 'relating to a tender offer' could have remained undisclosed following the actual announcement of the exchange offer.").

However, Defendants cite no caselaw to support their claims that the damages cap must exclude any profits Defendants may have gained after they had disclosed all the relevant material nonpublic information in their possession. *See id.* Moreover, the text of the damages cap provision suggests otherwise. The statute limits damages to profits gained in the subject *transaction(s)*—not profits gained as a result of the material nonpublic information defendants possessed or profits gained as a result of the violation. *See* 15 U.S.C. § 78t-1(b)(1). To be sure, Plaintiffs can only recover damages that were actually caused by Pershing having traded without disclosing their material nonpublic information, but that limitation is reflected in the loss causation requirement discussed above. The statutory damages cap is not identical to the loss causation requirement—otherwise it would be superfluous—and in fact the damages cap was intended to protect defendants from unreasonable total damages given that a defendant is liable to all contemporaneous traders rather than only to the person with which the defendant directly transacted. *See* 15 U.S.C. § 78t-1(a).

Thus, Defendants' attempt to read a limitation on "profits gained," based on the date of eventual disclosure of the relevant material nonpublic information, into the damages cap provision is unconvincing. In any case, as discussed above, Plaintiffs argue that Pershing continued to possess valuable material nonpublic information related to Valeant's tender offer—particularly, how high Valeant might be willing to bid—that provided an informational advantage over Class members until Valeant withdrew its tender offer on November 17, 2014. Pls. Opp'n to Val. MSJ at 35. Thus, Defendants would not be entitled to summary judgment even if their reading of the damages cap provision were correct, because they have not shown with undisputed evidence that they had disclosed all material nonpublic information relating to a tender offer by June 2014 at the latest.[23]

---

[23] Directly following the hearings on the parties' summary judgment motions, the Court held a hearing regarding allocation of damages between the instant action and the related derivatives case, *Timber Hill LLC v. Pershing Square Capital Management, L.P. et al*, Case No. CV 17-4776-DOC (KESx). Subsequently, the Court ordered the parties in both cases to submit additional briefing regarding the § 20A damages cap. *See* Order Requiring Additional Briefing On Section 20A Damages Cap (Dkt. 577). The Court explained that it had "determined that it would continue with two separate trials and that it would set one damages cap applicable to both actions jointly (i.e. the total damages from both actions combined cannot exceed the single cap)," but that "the parties dispute the appropriate way to calculate the statutory cap under Section 20A." *Id.* at 1. Thus, the Court requested additional briefing, particularly regarding "legal precedent or statutory construction arguments regarding the Section 20A cap," in order to "ensure the Court has the full benefit of the parties' arguments before it makes a decision." *Id.* at 2. The parties subsequently filed additional briefing (Dkts. 577, 579; Case No. 17-4776 Dkts. 86–

Accordingly, the Court DENIES the Valeant Defendants' Motion for Summary Judgment as to the issue of the damages cap.

## V. Disposition

For the foregoing reasons, the Court DENIES both the Defendants' Motions for Summary Judgment in their entirety. The Court GRANTS IN PART and DENIES IN PART Plaintiffs' Motion for Partial Summary Judgment.

The Court GRANTS summary judgment in Plaintiffs' favor on the following issues:

- Pershing was an "other person" under Rule 14e-3(a)
- Valeant had taken a substantial step or steps to commence a tender offer before Pershing began acquiring Allergan securities
- Pershing knew the information in its possession was nonpublic and had been acquired from Valeant, the offering person
- Certain information in Pershing's possession was material
- Pershing caused Nomura to purchase Allergan equity
- Plaintiffs traded contemporaneously and in the same class of securities
- The "control" element of Plaintiffs' Section 20(a) claim
- Pershing Defendants were primary violators of Rule 14e-3 and Section 20A

The Court DENIES summary judgment as to "reasonable foreseeability" and as to the issue of whether the material nonpublic information in Pershing's possession when it began acquiring Allergan securities in fact "related to a tender offer," as required for liability under Rule 14e-3a.

DATED: August 14, 2018

*David O. Carter*

DAVID O. CARTER
UNITED STATES DISTRICT JUDGE

---

87). While this supplemental briefing was helpful and informative, the Court does not include a discussion of it here because the parties settled before the Court could hear additional argument and make a final decision regarding the proper method of calculating the Section 20A damages cap.